DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Timothy Graulich
James I. McClammy
Stephen D. Piraino (*pro hac vice* pending)

*Proposed Counsel to the Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **Grupo Aeroméxico, S.A.B. de C.V.**, *et al.*, | **Case No. 20-11563 (___)** |
| | **(Joint Administration Pending)** |
| **Debtors.** [1] | |

**MOTION OF DEBTORS FOR INTERIM AND FINAL ORDERS AUTHORIZING
(i) PAYMENT OF CERTAIN PREPETITION CLAIMS OF CRITICAL
VENDORS AND FOREIGN VENDORS AND (ii) FINANCIAL INSTITUTIONS
TO HONOR AND
PROCESS RELATED CHECKS AND TRANSFERS**

Grupo Aeroméxico, S.A.B. de C.V. ("**Grupo Aeroméxico**") and its affiliates that

are debtors and debtors in possession in these proceedings (collectively, the "**Debtors**";

the Debtors collectively with their direct and indirect non-Debtor subsidiaries, the

"**Company**" or "**Aeroméxico**") hereby move (this "**Motion**") this Court (as defined

---

[1] The Debtors in these cases, along with each Debtor's registration number in the applicable jurisdiction, are as follows: Grupo Aeroméxico, S.A.B. de C.V. 286676; Aerovías de México, S.A. de C.V. 108984; Aerolitoral, S.A. de C.V. 217315; Aerovías Empresa de Cargo, S.A. de C.V. 437094-1.  The Debtors' corporate headquarters is located at Paseo de la Reforma No. 243, piso 25 Colonia Cuauhtémoc, Mexico City, C.P. 06500.

herein) for entry of interim and final orders, substantially in the form attached hereto as

**Exhibit A** and **Exhibit B** (the "**Interim Order**" and the "**Final Order**," respectively),

granting the relief described below.  In support thereof, the Debtors refer to the

contemporaneously-filed *Declaration of Ricardo Javier Sánchez Baker in Support of the*

*Debtors' Chapter 11 Petitions and First Day Pleadings* (the "**Sánchez Declaration**") and

further represent as follows:

**Jurisdiction and Venue**

1.      The United States Bankruptcy Court for the Southern District of New

York (the "**Court**") has jurisdiction to consider this matter pursuant to 28 U.S.C.  §§ 157

and 1334 and the Amended Standing Order of Reference M-431, dated January 31, 2012

(Preska, C.J.).  This is a core proceeding pursuant to 28 U.S.C.  § 157(b) and, pursuant to

Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), the

Debtors consent to entry of a final order by the Court in connection with this Motion to

the extent that it is later determined that the Court, absent consent of the parties, cannot

enter a final order or judgment consistent with Article III of the United States

Constitution.  Venue is proper before the Court pursuant to 28 U.S.C.  §§ 1408 and 1409.

**Background**

2.      On the date hereof (the "**Petition Date**"), the Debtors each commenced

with this Court a voluntary case under chapter 11 of title 11 of the United States Code

(the "**Bankruptcy Code**").  The Debtors are authorized to operate their businesses and

manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of

the Bankruptcy Code.  To date, the United States Trustee for the Southern District of

2

New York (the "**U.S. Trustee**") has not appointed a statutory committee of creditors in these chapter 11 cases, nor has the Court appointed a trustee or examiner therein.

3.     Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of their chapter 11 cases pursuant to Bankruptcy Rule 1015(b).

4.     The Debtors and their direct and indirect subsidiaries constitute the largest airline in Mexico and are collectively known as Mexico's "global airline," providing public air carrier services for passengers and goods (including fleet and cargo services) in and outside of Mexico, and services related to such air operations. The Debtors are one of the four founding members of the SkyTeam airline alliance, and their businesses include Aeroméxico, Aeroméxico Connect, Aeroméxico Cargo and Aeroméxico Servicios. Additional information about the Debtors' businesses and affairs, capital structure and prepetition indebtedness and the events leading up to the Petition Date can be found in the Sánchez Declaration, filed contemporaneously herewith.

## Relief Requested

5.     By this Motion, and pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, the Debtors seek entry of the Interim Order and Final Order, substantially in the forms attached hereto, authorizing Debtors to pay, in their sole discretion and business judgment, some or all of the prepetition obligations of certain Critical Vendors and Foreign Vendors (defined below). If the requested relief is not granted and certain necessary trade and other vendors refuse to continue to supply goods and/or services to the Debtors postpetition, the Debtors may well be unable properly maintain their fleet, fuel their planes, or fly certain routes. This disruption to their business, already decimated by a global pandemic, would be irreversible.

6.      By seeking the authorization requested herein, it should not be presumed that the Debtors have determined, as of this time, which of the Critical Vendors or Foreign Vendors they will pay or honor, nor should any party rely on this Motion as to any specific claim or benefit.

### The Debtors' Critical Vendors and Foreign Vendors

7.      The Debtors operate in a highly specialized, highly regulated and highly competitive industry.  The uniqueness of the airline industry, coupled with the highly regulated arena in which airlines must operate—airports—leave airlines with few options (if any) when selecting vendors.  Even in those circumstances where more than one vendor can be located to provide a service, regulations often inhibit an airline's ability to switch expeditiously from one supplier of goods or services to another.

8.      The Debtors purchase goods and services from certain vendors or independent contractors who are unaffiliated with the Debtors and are, by and large, sole source or limited-source suppliers without whom the Debtors could not operate or who might be able to obtain (or have obtained) mechanics' liens, possessory liens, or similar state law trade liens (the "**Trade Liens**") on property necessary to the Debtors' ongoing operations (collectively, the "**Critical Vendors**").  The Critical Vendors could not be replaced within a reasonable time and on terms as beneficial to the Debtors as those already in place, or have obtained Trade Liens on property necessary to the Debtors' ongoing operations.  Many of these limited-source suppliers are in the unique position of holding a virtual monopoly over the services they provide.  Replacement vendors, even where available, would likely result in higher costs for the Debtors.  The Debtors will benefit from maintaining lower costs of goods and services purchased during the

postpetition period and avoid the severe disruption that would result from a Critical Vendor refusing to do business with the Debtors.  Therefore, it is prudent for the Debtors to pay selected Critical Vendors some or all of their prepetition claims.

9.    Moreover, given the global nature of their services, the Debtors must necessarily purchase a significant portion of their goods and services from certain vendors or independent contractors with little to no connection to the United States and who are unaffiliated with the Debtors.

10.    In the ordinary course of business, and to maintain these foreign operations, the Debtors make payments to various foreign creditors including, among others, vendors, service providers, customers, travel agencies and distributors (collectively, the "**Non-U.S.  Creditors**"). Many of the Non-U.S.  Creditors are vendors and service providers from whom the Debtors purchase goods and services (collectively, the "**Foreign Vendors**") in the ordinary course of business in foreign jurisdictions.  If the Foreign Vendors are not paid, they may withhold vital goods and services, thereby interrupting the Debtors' operations.  Such an interruption could have a drastic impact on the Debtors' business due to the Debtors' dependence on foreign operations, the lack of alternative suppliers, and the time necessary to replace the Foreign Vendors.  Therefore, the Debtors' ability to continue to provide these products and services depends on their ability to preserve key relationships with the Foreign Vendors.  Some of the Debtors' obligations to the Foreign Vendors have accrued but remain unpaid as of the Petition Date.

11.    Despite the global reach of the automatic stay, it is possible that certain Foreign Vendors may seek to enforce claims against the Debtors in foreign jurisdictions

or otherwise interfere with the Debtors' operations outside the United States, threatening the Debtors' ability to operate and to attract new business, imperiling the success of these cases. Furthermore, some of the Foreign Vendors, who are unfamiliar with United States bankruptcy law —and who critically may be beyond the jurisdiction of this Court— may not be willing to do business with a "Chapter 11 Debtor" absent payment of their prepetition claims.

12.     The Debtors are mindful of their fiduciary obligations to seek to preserve and maximize the value of their estates. The preservation of key business relationships is among management's primary goals as the Debtors transition into chapter 11. The Debtors' ability to continue its business operations in the ordinary course is key to meeting those goals.

13.     The Debtors' Critical Vendors and Foreign Vendors fall into nine general categories: (i) safety and security services providers, (ii) aircraft parts suppliers and maintenance services providers, (iii) essential amenity providers, (iv) customer handling and other essential ground support services providers (including fuel), (v) crew and employee related services providers, (vi) information technology suppliers, call centers and service providers, (vii) flight navigation systems providers, (viii) airport use fees, and (ix) warehousing service providers. While the Debtors hope and expect to be able to assure a continuing postpetition supply of goods and services by consensual negotiation with the vendors in the categories above, the Debtors recognize that their fiduciary duties bind them to consider and plan for the many vendors that may refuse to provide future goods or services unless their prepetition claims are paid. The Critical Vendors and Foreign Vendors are so essential to the Debtors' business that the lack of each of their

6

particular services, even for a short duration, would likely disrupt the Debtors' operations and cause irreparable harm to the Debtors' business, goodwill, employees, customer base and market share.  This irreparable harm to the Debtors and to the recovery of its creditors will far outweigh the cost of payment of the prepetition claims of the Critical Vendors and Foreign Vendors.  Therefore, the Debtors seek the authority, but not the direction, to satisfy prepetition obligations to select Critical Vendors and Foreign Vendors as more fully set forth herein.

### Safety and Security Providers

14.    In the airline industry, the need for an uninterrupted supply of safety and security products and services is self-evident.  Regulations require airlines to use certain safety and security products and services to protect airline customers, employees, baggage, freight, aircraft and other airline property.  These products and services relate to the handling of baggage, hazardous materials, facility security systems, access restrictions, fire systems and catering security services.

15.    Safety and security are the preeminent concerns of the Debtors, their passengers, and regulators.  Many of the services the Debtors provide have a security component.  For example, the Debtors have vendors who remove hazardous materials from airfields and maintenance centers.  These specialized services are performed by vendors with authority to access restricted areas of public airfields.  In many of the Debtors' locations, there is only a single authorized provider of such services.  At many locations into which the Debtors fly, the Debtors employ third party service personnel as (a) on-field personnel to monitor the catering deliveries and personnel inside catering kitchens, and to inspect catering carts and (b) private security guards to protect the

7

Debtors' facilities, including maintenance bases and offices. These personnel have received certain security clearances authorizing them to move about the facilities freely. These services are in high demand, and available personnel are limited to those who have received a security clearance following lengthy background checks. Thus, were the Debtors forced suddenly to change such vendors, a qualified replacement would take time to locate and the Debtors might have to suspend or reduce operations at certain airports until the services were restored. In the meantime, the Debtors would lose revenue and likely lose valuable market share.

16.    Safety and security in the air and on the ground is the Debtors' highest priority. Unless the Debtors maintain very high levels of safety and security, regulators will not permit them to operate. Further, the implications of real or perceived breaches of safety and security would permanently damage the Debtors' reputation and, consequently, the likelihood of a successful reorganization. The Debtors cannot—and will not—compromise their safety standards. The Debtors must be afforded the flexibility to pay, as they deem necessary or appropriate, the prepetition claims of safety and security suppliers.

### Aircraft Parts Suppliers and Maintenance Service Providers

17.    In order to maintain safety standards, flight schedules and on-time performance, the Debtors must repair or replace aircraft parts, and make on-the-spot repairs to aircraft on little or no notice. Any disruption in the flow of parts or services causes the Debtors immediate and substantial economic harm and erodes their valuable customer base.

18.    The Debtors' relationship with their parts suppliers and mechanics is subject to many mandatory layers of oversight and control by regulators, the original equipment manufacturers ("**OEMs**"), and the Debtors' engineers.  Passenger aircraft parts suppliers and mechanics are subject to mandatory certification and approval by several entities before an airline can even use the parts or the mechanics' services and, as a result, are difficult to source.  Thus, the Debtors have very limited options with regard to parts suppliers and mechanics.

19.    Unlike other industries, the available pool of experienced and reliable parts suppliers in the aircraft industry is severely limited.  The parts used in aircraft fall into three general categories (a) proprietary parts, (b) alternate source parts and (c) non-proprietary parts.  Proprietary parts (i.e., fundamental flight components, without which an aircraft cannot fly) typically are available from a single supplier, the OEM.  Alternate source parts, which frequently involve safety equipment and other essential systems without which the aircraft is not permitted to fly, typically are available through no more than two or three suppliers.  If the Debtors need to switch suddenly to an alternate source supplier, they may have to wait months for the new supplier to receive regulator, OEM and internal engineering approval.  In the meantime, the affected aircraft could be grounded and the Debtors' business harmed.  Non-proprietary parts, such as aircraft quality nuts, bolts, carpeting, etc., are available through a mere handful of suppliers and, again, only after those suppliers have obtained regulator, OEM and internal engineering approval.  Thus, the parts the Debtors need the most to continue operations and stay competitive are controlled by sole or limited source suppliers.

9

20.     Like aircraft parts suppliers, aircraft mechanics are subject to licensing and certification by regulators.  The work they perform on commercial aircraft must be inspected and approved by qualified and trained inspectors, themselves licensed and highly-trained mechanics, in accordance with the Debtors' approved maintenance programs.  The Debtors rely on these mechanics and inspectors, who must stay current with government regulations and Debtors' manuals, policies and procedures, to provide on-the-spot repairs as necessary.

21.     Without readily available OEM parts and the appropriate mechanics to service, the Debtors simply cannot operate their business.  Government regulators could revoke licenses.  Customary amenities, such as carpeting or the ability to recline seats in-flight, would disappear.  Planes would be stranded.  The Debtors therefore need to protect their hard-earned relationships with their most essential suppliers and mechanics to continue to strengthen their relationship with their most valuable asset—their customers.  The Debtors' aircraft parts and service suppliers are essential because they are frequently less expensive than their competitors, they have been developed to serve the Debtors' particular needs, they have been fully approved, and they have proven their reliability.  At this nascent stage of the Debtors' restructuring efforts, being forced to switch multiple suppliers or mechanics (if even possible) would be extremely detrimental to the uninterrupted operation of the Debtors' business.  Additionally, as already stated, the options for switching suppliers or mechanics is extremely limited (even more so as a result of the COVID-19 pandemic) and, in many instances, nonexistent.  The relief requested herein is essential to the maintenance of the Debtors' safe, uninterrupted and efficient operations, and restructuring efforts.

**Essential Amenity Providers**

22.    In order to meet customer expectations and maintain the Debtors' "brand" integrity, the Debtors provide essential customer amenities on the ground and in flight. These include food, beverages, in-flight audio and video entertainment and other products.  The Debtors have built a solid reputation by offering high quality amenities that their passengers have come to expect.  A drop-off in the supply or quality of these "customer-facing" products would certainly damage business and result in a loss of customer confidence.   Thus, the Debtors realize the importance of protecting and enhancing service amenities.  The Debtors would be unable to replace these Critical Vendors and Foreign Vendors without severely harming their image with the traveling public and, in turn, harming their business.

**Customer Handling and Other Essential Ground Support Service Providers**

23.    Moving customers and their baggage from the point of origin to the ultimate destination requires specialized products and services driven by regulators, airline and airport requirements.  These goods and services include, but are not limited to, check-in equipment (such as airport ticketing kiosks), baggage sorter parts, ground equipment servicing and maintenance, ground support and de-icing.   Any loss of replacement parts or system support would result in less automation and an increase in operating costs.  This equipment is sometimes specifically designed and manufactured for the Debtors.   Therefore, the manufacturers of this equipment are typically the only entities that can, or will, provide parts for maintaining and repairing the equipment. Moreover, the manufacturers are the only source of training on how to repair such equipment.  As a result, were these vendors to refuse to continue to supply the Debtors,

the Debtors would be forced to purchase new equipment from new suppliers, which would result in additional and unnecessary expenses for the redesign and remanufacture of similar equipment.

A.    **Ground Fuel**

24.    To support their extensive national and international operations, the Debtors maintain significant ground operations.  The ground operations of the Debtors requires a large fleet of motor vehicles and specialized ground equipment.  The Debtors use such vehicles and other equipment, among other things, to move personnel to, from, and around the airfield, tow aircraft, de-ice aircraft, move cargo, load passenger bags and run heavy machinery used in aircraft repair.  To assure the uninterrupted provision of these essential services, the Debtors purchase gasoline, diesel fuel, lubricants and other products.  Three external factors limit the Debtors' ability easily and expeditiously to replace their ground fuel vendors.  First, airport fuel storage facilities are often owned by specific ground fuel vendors or by fixed base operators that have entered into exclusive agreements with specific fuel vendors.  Second, heightened security requirements may impose restrictions or require additional background checks on drivers delivering fuel.  As a result, changing vendors may require substantial lead-time to obtain the required clearances.  Third, the supply base for ground fuels is extremely fragmented, increasing the lead-time required to change vendors.

25.    The Debtors could not perform essential airport and maintenance operations without these vendors.  Given the unique constraints, the Debtors could not change to an alternative vendor on short notice.  The loss of one or more suppliers would result in substantial down-time for airport operations, thereby causing serial flight delays

12

and cancellations.    The ultimate impact would be a loss of revenue and customer confidence and an increase in operating costs at a critical time in the Debtors' reorganization.

**B.    Jet Fuel**

26.    The Debtors purchase jet fuel from a variety of fuel suppliers (collectively, the "**Fuel Suppliers**") pursuant to numerous fuel supply contracts and fuel purchase orders (collectively, the "**Fuel Supplier Agreements**").    Prior to the reduction in flights caused by the COVID-19 pandemic, the Debtors consumed approximately 37 million gallons (approximately 900,000 barrels) of jet fuel on a monthly basis.    As a result of the reduction in passenger flights, the Debtors have experienced a greater than 90% reduction in fuel consumption during the COVID-19 pandemic in April and May 2020.    Under current operating conditions, the Debtors are consuming approximately three million gallons (75 thousand barrels) of jet fuel per month in the referred period

27.    Generally, the vast majority of the Debtors' fuel is purchased from fewer than five Fuel Suppliers and such purchases are made on account or paid in arrears. Payments are generally made within a specified time after receipt by the Debtors of invoices from the Fuel Suppliers.    The Debtors do not typically prepay for fuel.    Absent payment of Fuel Suppliers, they may refuse to provide fuel for the Debtors' fleet, causing delays or flight cancellations.

## Crew and Employee Related Providers

28.    As a labor-intensive business, the Debtors require significant infrastructure to support a large workforce.    In addition, the Debtors require airline industry-specific automated and standardized tracking, scheduling and flight-bidding

programs to run their businesses.  Each of these programs is customized to the Debtors'

needs or is required by regulations or other constraints.  The Debtors' work rules,

including those arising under their union contracts, have been painstakingly integrated

into these systems over a matter of years.  Further, the systems are all integral to the

operation of the Debtors' business and produce information that is required by

government regulations (e.g., reports regarding crew rest) and critical to safe operations.

If any of these suppliers refused to supply the necessary parts or refused to maintain and

repair their products or support their software, the Debtors would be required to purchase

and implement entirely new systems or programs at exorbitant cost and with long lead

times, which could, potentially, severely disrupt the Debtors' operations.

### **Information Technology Suppliers, Call Centers and Service Providers**

29.    The Debtors' businesses require a vast and complex constellation of

management and information systems which must be able to communicate effectively

with each other.  The very nature of the airline business is information intensive, and

relies upon a vast complement of interrelated computer software, hardware systems and

other equipment.  The Debtors rely on a number of systems to provide some of their most

critical business functions, most notably these flight operations and reservations-related

activities.  Without steady access to and constant processing of certain information, such

as the amount of fuel or weight on each plane, the Debtors would be unable to fly.

30.    The applications and infrastructure knowledge of these suppliers related to

the Debtors' information technology environment is unique to the airline industry and

critical to maintaining smooth operations.  The Debtors cannot simply replace them

without concerns that the new information systems would be less than completely

accurate; replacement systems would require comprehensive and lengthy evaluation and testing. Even if the Debtors could replace such suppliers, replacement would take substantial time and would come at great cost to the Debtors' business.

### Flight Navigation Systems Providers

31.    In the regular course of the Debtors' businesses, the Debtors use various systems, services and products central to flight operations. In particular, these include radio services and flight charts. Each of the providers of these services or products is, by and large, a monopoly vendor for that service or product.

32.    The Debtors' operations require advanced radio communication capabilities. These communications are the aircraft's lifeline to the outside world. The communication capabilities are essential to providing weather updates, communications between the cockpit and ground services, and form an essential link between pilots and central dispatch. The need for reliable ground-to-plane communications permeates virtually every aspect of the Debtors' operations and must be maintained without interruption. The loss of this communication capability would be crippling to the Debtors' business and the extant restructuring efforts.

33.    The Debtors' flight operations further rely on flight charts that detail airport layouts, radio frequencies, obstructions, approach routes and other essential information regarding airports and air routes. The flight charts are updated regularly. Government regulations require flight manuals, which include updated flight charts, aboard every aircraft. Without updated flight charts, an aircraft cannot safely fly and is not permitted to fly.

34.     As aircraft communications and up-to-date flight charts are indispensable components of flight operations, the Debtors need assurance that the flow of such services and products will be unaffected by the filing of the bankruptcy petitions, especially as the Debtors prepare to resume more normalized operations.  Alternatives to such flight navigation services and products are unavailable.

### Airport Use Fees

35.     In connection with the Debtors' operations as an international airline, the Debtors incur fees arising from the Debtors' and their passengers' utilization of publicly owned airport facilities, including terminals, gates, ticketing counters and other common areas.  These fees include Mexico's Airport Use Fee ("**TUA**"), a fee for passenger use of Mexican airports.   Payment of airport use fees is critical to the Debtors' continued, uninterrupted operations and to avoid immediate and irreparable harm to the Debtors' estates.  Failure to pay these fees, including TUA, would disrupt the Debtors' day-to-day operations and could potentially impose significant costs and burdens on the Debtors' estates, including restricting or prohibiting the company from performing its daily operations by claiming payment prior to the departure of aircrafts from any Mexican airport.

### Shipping and Warehousing Service Providers

36.     The services provided by the shippers and warehousemen are critical to the Debtors' day-to-day operations.  At any given time, there are numerous shipments en route to and from various locations.   Therefore, certain shippers and warehousemen currently possess goods that are vital to the Debtors' operations.

16

37.     To the extent the Debtors have not paid for such services, the shippers and warehousemen may be able, pursuant to state law, to assert liens on the goods in their possession to secure the charges and expenses incurred in connection with the transportation, storage or preservation of the Debtors' goods and merchandise.

38.     It is essential to their reorganization efforts that the Debtors be permitted to pay selected counterparties in order to continue the Debtors' businesses and to honor their contractual commitments to their customers.  Because of the commencement of these chapter 11 cases, certain shippers and warehousemen that hold goods for delivery to or from the Debtors may refuse to release such goods pending receipt of payment for their prepetition services, which would disrupt the Debtors' operations.

### Payment of Critical Vendors and Foreign Vendors is in the Best Interests of the Debtors' Estates and Their Creditors

39.     While the Debtors expect to secure a continuing postpetition supply of goods and services in most cases through consensual negotiation with the Critical Vendors and Foreign Vendors, the Debtors recognize that their fiduciary duties bind them to consider and plan for the vendors that may refuse to provide future goods or services unless their prepetition claims are paid.  The Critical Vendors and Foreign Vendors are so essential to the Debtors' businesses that the lack of each of their particular goods and services, even for a short duration, would disrupt the Debtors' operations and cause irreparable harm to the Debtors' businesses, goodwill and market share.  This irreparable harm to the Debtors and to the recovery of all creditors will far outweigh the cost of payment of the prepetition claims of the Critical Vendors and Foreign Vendors.

40.     The Debtors therefore seek authority to pay, in their sole discretion and business judgment, some or all of the prepetition obligations of certain Critical Vendors

and Foreign Vendors to maintain their operations.  Without this authority, these Critical

Vendors and Foreign Vendors may refuse to continue to supply goods and services to the

Debtors postpetition.  As is illustrated above, the Critical Vendors and Foreign Vendors

are essential to the Debtors' continuing operations.  The Debtors estimate that

approximately $20 million (the "**Interim Vendor Cap**") will need to be paid to Critical

Vendors and Foreign Vendors during the 21 days following the Petition Date.  The

maximum amount needed to pay the Critical Vendor Claims and Foreign Vendor Claims

(the "**Vendor Claims Cap**") will be set forth in a supplement to this Motion to be filed

no later than fourteen (14) days before the hearing on the Final Order.

41.    In determining the amount of the Interim Vendor Cap, the Debtors have

carefully reviewed their suppliers to determine, among other things, (a) which suppliers

were sole source or limited source suppliers, without whom the Debtors could not

continue to operate without disruption, (b) which suppliers would be prohibitively

expensive to replace, (c) which suppliers would present an unacceptable risk to the

Debtors' operations should they cease the provision of truly essential services or supplies,

and (d) the extent to which suppliers may be able to obtain or have obtained trade liens

on assets of the Debtors or an administrative expense claim pursuant to section 503(b)(9)

of the Bankruptcy Code.  The Debtors then considered the financial condition of each

supplier, where that information was known, including the level of dependence each

supplier has on the Debtors' continued businesses.  After compiling this information, the

Debtors estimated the amount they believe they would be required to pay to ensure the

continued supply of critical goods and services.  In addition, some of the Critical Vendors

18

and Foreign Vendors provide goods and services on an ad hoc basis and not pursuant to an executory contract that the Debtors can enforce.

42.    It represents the Debtors' best estimate as to how much must be paid to such creditors to continue the supply of critical goods and services. The Debtors hope to pay far less than the requested amount. The Debtors' proposed Vendor Claims Cap is within the range of amounts awarded by the courts in other cases.

43.    To minimize the amount of payments required, the Debtors request authority to identify Critical Vendors and Foreign Vendors in the ordinary course of their businesses. Identifying the Critical Vendors and Foreign Vendors now would likely cause all such vendors to demand payment in full. The Debtors propose that they may, in their sole discretion, condition payment of the Vendor Claims of each Critical Vendor and Foreign Vendor upon an agreement to continue to supply goods or services to the Debtors on such Critical Vendor's and Foreign Vendor's "**Customary Trade Terms**" for a period of time and on other such terms and conditions as are acceptable to the Debtors. As used herein, "**Customary Trade Terms**" means, with respect to a Critical Vendor and a Foreign Vendor, (a) the normal and customary trade terms, practices and programs (including, but not limited to, credit limits, pricing, cash discounts, timing of payments, allowances, rebates, coupon reconciliation, normal product mix and availability and other applicable terms and programs), that were most favorable to the Debtors and in effect between such Critical Vendor or Foreign Vendor and the Debtors prior to the Petition Date or (b) such other trade terms as agreed by the Debtors and such Critical Vendor or Foreign Vendor. However, as noted above, in determining the Vendor Claims Cap, the Debtors were careful to include only such payments that the Debtors, in their best

19

estimate, determined would be required to continue the supply of critical goods and services as a condition of continued sales. Further, in certain circumstances a Critical Vendor or a Foreign Vendor may refuse to provide services to the Debtors on the Critical Vendor's or Foreign Vendor's Customary Trade Terms even after payment of such vendor's claim. To accommodate these circumstances, the Debtors seek approval to enter into other agreements, at the Debtors' discretion, with each such Critical Vendor or Foreign Vendor on a case-by-case basis.

44.    The Debtors further propose that if a Critical Vendor or a Foreign Vendor later refuses to continue to supply goods or services to the Debtors on the Customary Trade Terms for the applicable period, or on such terms as were individually agreed to between the Debtors and such Critical Vendor or Foreign Vendor, then the Debtors may, in their sole discretion, and without further order of the Court: (a) declare that the payment of the creditor's Vendor Claim is a voidable postpetition transfer pursuant to section 549(a) of the Bankruptcy Code that the Debtors may recover from such Critical Vendor or Foreign Vendor in cash or in goods and (b) demand that the creditor immediately return such payments in respect of the Vendor Claim to the extent that the aggregate amount of such payments exceeds the postpetition obligations then outstanding without giving effect to alleged setoff rights, recoupment rights, adjustments, or setoffs of any type whatsoever, and the creditor's Vendor Claim shall be reinstated in such an amount as to restore the Debtors and the Critical Vendor or the Foreign Vendor to their original positions, as if the agreement had never been entered into and the payment of the Vendor Claim had not been made. In sum, the Debtors will return the parties to their positions immediately prior to the entry of the order approving the relief sought herein.

45.     To ensure that Critical Vendors and Foreign Vendors transact business with the Debtors on Customary Trade Terms, the Debtors propose the following procedures, to be implemented in the Debtors' sole discretion, as a condition to paying any Critical Vendor or any Foreign Vendor: (a) that a letter or contract including provisions substantially in the form of the letter attached hereto as **Exhibit C** (a "**Vendor Agreement**") be delivered to, and executed by, the Critical Vendors and Foreign Vendors along with a copy of the order granting the relief sought herein and (b) that payment of Vendor Claims include a communication of the following statement:

> By accepting this payment, the payee agrees to the terms of the Order of the U.S. Bankruptcy Court for the Southern District of New York, [dated _____, 2020] in the chapter 11 cases of Grupo Aeroméxico, S.A.B. de C.V., et al.  (Case No. 20-11563(_) (Jointly Administered)), entitled "Interim Order Authorizing (i) Payment of Certain Prepetition Claims of Critical Vendors and Foreign Vendors and (ii) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers" and submits to the jurisdiction of that Court for enforcement thereof.

46.     As a further condition of receiving payment on a Vendor Claim, the Debtors propose that a Critical Vendor and a Foreign Vendor must agree to take whatever action is necessary to remove any existing trade liens at such Critical Vendor's or Foreign Vendor's sole cost and expense and waive any right to assert a trade lien on account of the paid Vendor Claim, *provided, however*, that the foregoing shall be determined by the Debtors in their sole discretion.

47.     The Debtors shall maintain a matrix summarizing (a) the name of each Critical Vendor and Foreign Vendor paid on account of Vendor Claims, (b) the amount paid to each Critical Vendor and Foreign Vendor on account of its Vendor Claim and (c) the goods or services provided by such Critical Vendor and Foreign Vendor.  This matrix will be provided (x) biweekly until a final order granting the relief requested

herein is entered and (y) monthly thereafter to the United States Trustee for the Southern

District of New York (the "**U.S. Trustee**") and the professionals to the official

committee of unsecured creditors (the "**Committee**"); *provided, however*, that the

professionals to the Committee shall keep the matrix confidential on a professionals-only

basis and shall not disclose any of the information in the matrix to anyone, including, but

not limited to, any member of the Committee, without prior written consent from the

Debtors.

48.      The Debtors believe that payment of some or all Vendor Claims owed to

Critical Vendors and Foreign Vendors will be necessary to preserve operations and

successfully reorganize.  The need for the flexibility to pay such claims is particularly

acute in the period immediately following the Petition Date.  During this period, the

Debtors, their attorneys and financial advisors, and their other professionals will be

focusing on stabilizing operations and developing a long-term business plan.  At the same

time, while the Debtors are distracted with stabilizing the businesses and long-term

planning, Critical Vendors and Foreign Vendors may attempt to assert their considerable

leverage and deny provision of goods and services going forward, suddenly and without

notice, in an effort to cripple operations and coerce payment.

49.      Furthermore, if the relief sought herein is not granted, Critical Vendors

and Foreign Vendors will have no incentive to continue to finance the Debtors on

customary trade terms.  Indeed, in the recent past certain vendors that became concerned

about Debtors' financial condition have demanded that the Debtors pay for their goods on

accelerated payment terms, cash in advance and cash on delivery basis.  Any further

expansion of these activities by other Critical Vendors and Foreign Vendors would be detrimental to the Debtors, their estates and their creditors.

50.    The continued availability of trade credit, in amounts and on terms consistent with those the Debtors have struggled to obtain over the years, is clearly advantageous to the Debtors.  It allows the Debtors to maintain and enhance necessary liquidity and focus on returning to profitability.  The Debtors believe that preserving working capital through the retention and reinstatement of their normally advantageous trade credit terms will enable the Debtors to stabilize business operations at this critical time, to maintain their competitiveness and to maximize the value of their businesses for the benefit of all interested parties.  Conversely, any deterioration of trade credit, or disruption or cancellation of deliveries of goods or provision of essential services, could spell disaster for the Debtors' restructuring efforts.  Finally, the relief requested herein also may help to avert the institution of numerous reclamation claims, suits and motions. Avoiding the time and expense of evaluating and litigating such claims will provide another incremental benefit for the Debtors, their estates and their creditors.  Any occurrence affecting operations could prolong the Debtors' chapter 11 cases, increase administrative expenses and jeopardize their reorganization.

**Request for Authority to Pay Claims Under Section 503(b)(9)**

51.    Under section 503(b)(9) of the Bankruptcy Code, claims of Critical Vendors and Foreign Vendors for the value of goods received by the Debtors in the ordinary course of their businesses during the 20-day period prior to the Petition Date are entitled to administrative claim status (the "**Twenty-Day Administrative Claims**").  As administrative claims incurred in the ordinary course of the Debtors' businesses, the

23

Debtors believe that they are authorized to pay the Twenty-Day Administrative Claims of

Critical Vendors and Foreign Vendors pursuant to section 363(c)(1) of the Bankruptcy

Code; however, the Debtors also believe that they are not required to reconcile or pay the

Twenty-Day Administrative Claims prior to the conclusion of these cases.  Accordingly,

for the avoidance of doubt, the Debtors request that the Court enter an order clarifying

that the Debtors are authorized in their sole discretion, but not required, to pay the

Twenty-Day Administrative Claims, or any portion thereof, of any Critical Vendor and

any Foreign Vendor in the ordinary course of the Debtors' businesses and on such terms

and conditions as the Debtors deem appropriate.[2]  The Debtors request that all payments

made to Critical Vendors and Foreign Vendors be applied first in satisfaction of such

Critical Vendor's Twenty-Day Administrative Claims, if any.

### Request for Authority for Financial Institutions
### to Honor and Process Related Checks and Transfers

52.    The Debtors also request that all applicable banks and other financial

institutions be authorized to (a) receive, process, honor and pay all checks presented for

payment of, and to honor all fund transfer requests made by the Debtors related to, the

claims that the Debtors request authority to pay in this Motion, regardless of whether the

checks were presented or fund transfer requests were submitted before, on or after the

Petition Date and (b), *provided*, *however*, that: (a) funds are available in the Debtors'

accounts to cover the checks and fund transfers and (b) all the banks and other financial

---

[2] Separately, the Debtors may file a motion requesting authorization to establish procedures for the assertion, resolution, allowance and satisfaction (upon the effective date of a plan of reorganization) of unpaid claims pursuant to section 503(b)(9) of the Bankruptcy Code.

institutions are authorized to rely on the Debtors' designation of any particular check as approved by the attached proposed order of the Court.

## Applicable Authority

53.     Similar relief has repeatedly been granted in other chapter 11 cases in this district.  *See, e.g.*, *In re LATAM Airlines Group S.A.*, Case No.  20-11254 (JLG) (Bankr. S.D.N.Y. May 30, 2020) [Docket No. [64] (authorizing an interim vendor cap to pay critical and foreign vendors in an amount not to exceed $45 million); *In re Windstream Holdings, Inc.*, No.  19-22312 (RDD) (Bankr. S.D.N.Y. Feb. 28, 2019) (authorizing the payment of prepetition claims of critical vendors in an amount not to exceed $80 million) [Docket No.  61]; *In re Sears Holdings Corp.*, No.  18-23538 (RDD) (Bankr. S.D.N.Y. Nov. 16, 2018) (authorizing the payment of up to $90 million in aggregate prepetition claims of critical vendors) [Docket No.  793]; *In re AMR Corp.*, Case No.  11-15463 (SHL) (Bankr. S.D.N.Y. Dec. 23, 2011) (court authorized debtor to pay up to $85 million in critical vendor claims) [Docket No.  451]; *In re The Great Atl.  & Pac. Tea Co.*, Case No.  10-24549 (RDD) (Bankr. S.D.N.Y. Jan. 12, 2010) (court granted debtor authority to pay up to $62 million in critical vendor claims) [Docket No.  504]; *In re Lyondell Chemical Co.*, Case No.  09-10023 (REG) (Bankr. S.D.N.Y. Jan. 23, 2009) (court granted debtor authority to the extent consistent with the Final DIP Order, to pay some or all prepetition critical vendor claims) [Docket No.  360]; *In re Delphi Corp.*, No.  05-44481 (RDD) (Bankr. S.D.N.Y. Oct. 13, 2005) (court granted debtor authority to pay $90 million in the debtors' vendor rescue program) [Docket No.  197]; *In re Delta Air Lines, Inc.*, Case No.  05-17923 (PCB) (Bankr. S.D.N.Y. Sept. 16, 2005) (court granted debtor

authority, subject to the debtor's reasonable exercise of business judgment, to pay all critical vendor claims) [Docket No. 155].

54.    Further, section 363(b)(1) of the Bankruptcy Code empowers the Court to allow the debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate." Debtors' decisions to use, sell or lease assets outside the ordinary course of business must be based upon the sound business judgment of the debtor. *See In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992) (holding that a judge determining a section 363(b) application must find from the evidence presented before him a good business reason to grant such application); *see also Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983) (same); *In re Global Crossing Ltd.*, 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003); *In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 674 (Bankr. S.D.N.Y. 1989) (noting that the standard for determining a section 363(b) motion is "good business reason").

55.    The business judgment rule is satisfied "when the following elements are present: (1) a business decision, (2) disinterestedness, (3) due care, (4) good faith, and (5) according to some courts and commentators, no abuse of discretion or waste of corporate assets." *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993) (internal quotations omitted). In fact, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). Courts in

26

this district have consistently and appropriately been loath to interfere with corporate decisions absent a showing of bad faith, self-interest, or gross negligence and will uphold a board's decisions as long as they are attributable to any "rational business purpose." *In re Integrated Res. Inc.*, 147 B.R. at 656.

56.    The "necessity of payment" doctrine further supports the relief requested herein.  This doctrine "recognizes the existence of the judicial power to authorize a debtor in a reorganization case to pay prepetition claims where such payment is essential to the continued operation of the debtor." *Ionosphere Clubs*, 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989); *see also Michigan Bureau of Workers' Disability Comp. v. Chateaugay Corp.(In re Chateaugay Corp.)*, 80 B.R. 279, 285-86 (S.D.N.Y. 1987).  The rationale for the necessity of payment rule is consistent with the paramount goal of chapter 11— "facilitating the continued operation and rehabilitation of the debtor." *Ionosphere Clubs*, 98 B.R. at 176.

57.    Finally, section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C.  § 105(a).  A bankruptcy court's use of its equitable powers to "authorize the payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept." *In re Ionosphere Clubs, Inc.*, 98 B.R. at 175.  "Under 11 U.S.C. § 105, a court can permit pre-plan payment of prepetition obligations when essential to the continued operation of the debtor." *In re NVR L.P.*, 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) (citing *Ionosphere Clubs*, 98 B.R. at 177).

27

58.    The Debtors submit that the requested relief represents a sound exercise of the Debtors' business judgment and is justified under sections 363(b) and section 105(a) of the Bankruptcy Code, and is also in line with the relief granted in this and other districts.    The Debtors strongly believe that the uninterrupted supply of goods and services, on customary trade terms, and the continuing support of their customers are imperative to the ongoing operations and viability of the Debtors.    Authority to pay the Critical Vendors and Foreign Vendors in the ordinary course of the Debtors' businesses is in the best interest of the Debtors' estates and creditors.    Absent such payment, the operations and value of the Debtors' estates will suffer, possibly precipitously, and the requested relief is necessary to avoid immediate and irreparable harm.    This irreparable harm to the Debtors and to the recovery of all creditors will far outweigh the cost of payment.

### **Necessity for Immediate Relief**

59.    Bankruptcy Rule 6003 provides that "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 21 days after the filing of the petition, issue an order granting . . . (b) a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition . . . ." Fed. R. Bankr. P. 6003.    For all the reasons set forth herein, if the Debtors are not authorized to pay certain Critical Vendors and Foreign Vendors, immediate and irreparable harm might be caused to the Debtors' estates.    Accordingly, the interim relief requested herein is consistent with Bankruptcy Rule 6003.

28

## Debtors Have Satisfied Bankruptcy Rule 6003(b)

60.      Bankruptcy Rule 6003(b) provides that, to the extent relief is necessary to avoid immediate and irreparable harm, a bankruptcy court may issue an order granting "a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition" within twenty-one (21) days of filing a petition.   Irreparable harm "is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation." *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002) (internal quotations omitted).  The "harm must be shown to be actual and imminent, not remote or speculative." *Id*.

61.      As set forth above, the relief requested herein is essential to prevent irreparable damage to the Debtors' operations and going-concern value.  Accordingly, the Debtors submit that the relief requested herein is necessary to avoid immediate and irreparable harm, and that Bankruptcy Rule 6003(b) is satisfied.

## Request for Waiver of Stay

62.      To implement the foregoing successfully, the Debtors request that the Court find that notice of the Motion is adequate under Bankruptcy Rule 6004(a) and waive the fourteen (14) day stay of an order authorizing the use, sale or lease of property under Bankruptcy Rule 6004(h).  As explained above and in the Sánchez Declaration, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors.  Accordingly, ample cause exists to find the notice requirements of Bankruptcy Rule 6004(a) have been satisfied and to grant a waiver of the fourteen (14) day stay

imposed by Bankruptcy Rule 6004(h), to the extent the notice requirement and stay apply.

### Interim Order

63.     The Debtors seek the relief requested in this Motion in the form of an interim order (the "**Interim Order**") attached hereto as **Exhibit A**.  Within three business days of the entry of the Interim Order, the Debtors shall serve a copy of the Interim Order and this Motion on (a)  the United States Trustee for the Southern District of New York, (b) those creditors holding the five largest secured claims against the Debtors' estates on a consolidated basis, (c) those creditors holding the 30 largest unsecured claims against the Debtors' estates on a consolidated basis, (d) the Internal Revenue Service, (e) the Securities and Exchange Commission, (f) the Federal Deposit Insurance Corporation, (g) the Securities Investor Protection Corporation and (h) the United States Attorney's Office for the Southern District of New York.

64.     The Debtors request that the deadline to file an objection ("**Objection**") to the Motion shall be 4:00 p.m. (Prevailing Eastern Time) on a date established by the Court that is at least seven calendar days prior to any hearing scheduled by the Court with respect to the relief sought herein on a final basis (the "**Objection Deadline**").   An Objection shall be considered timely only if, on or prior to the Objection Deadline, it is (a) filed with the Court and (b) served upon and actually received by (i) the U.S.  Trustee, U.S. Federal Office Building, 201 Varick Street, Room 1006, New York, NY 10014 (Attn: Andrea B. Schwartz, Esq.), (ii) proposed counsel to the Debtors, Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, NY 10017 (Attn: Marshall S.

Huebner, Timothy Graulich, James I. McClammy and Stephen D. Piraino), (iii) attorneys for any official committee of unsecured creditors then appointed in these cases.

65.     Unless otherwise ordered by the Court, a reply to an Objection may be filed with the Court and served on or before 12:00 p.m. (Prevailing Eastern Time) on the day that is two days before the date of the applicable hearing.

66.     If no Objections are timely filed and served as set forth herein, the Debtors shall, on or after the Objection Deadline, submit to the Court a final order granting the relief requested herein, which order shall be submitted and may be entered with no hearing and no further notice or opportunity to be heard afforded to any party.  If an Objection is timely filed, a hearing will be held at a date and time to be established by the Court.

67.     The foregoing notice procedures satisfy Bankruptcy Rule 9014 by providing the counterparties with notice and an opportunity to object and be heard at a hearing.  *See, e.g.*, *In re Drexel Burnham Lambert*, 160 B.R. 729, 734 (S.D.N.Y. 1993) (an opportunity to present objections satisfies due process); *In re Colorado Mountain Cellars, Inc.*, 226 B.R. 244, 246 (D. Colo. 1998) (a hearing is not required to satisfy Bankruptcy Rule 9014).  Furthermore, the proposed notice procedures protect the due process rights of the parties in interest without unnecessarily exposing the Debtors' estates to unwarranted administrative expenses.

## Notice

68.     Notice of this Motion will be provided to (a) the U.S. Trustee, (b) each of the Debtors' 30 largest unsecured creditors on a consolidated basis, (c) each of the Debtors' five largest secured creditors on a consolidated basis, (d) the Internal Revenue

Service, (e) the United States Attorney's Office for the Southern District of New York, (f) the Federal Aviation Administration, and (g) any party that has requested notice pursuant to Bankruptcy Rule 2002.  A copy of this Motion and any order approving it will also be made available on the Debtors' Case Information Website located at https://dm.epiq11.com/aeromexico.  In light of the nature of the relief requested in this Motion, the Debtors respectfully submit that no further notice is necessary.

## **Reservation of Rights**

69.     Nothing contained herein or any action taken pursuant to such relief is intended or shall be construed as (a) an admission as to the validity or priority of any claim against the Debtors; (b) a waiver of the Debtors' or any appropriate party in interest's rights to dispute the amount of, basis for or validity of any claim against the Debtors; (c) a waiver of any claims or causes of action which may exist against any creditor or interest holders; or (d) an approval, assumption, adoption or rejection of any agreement, contract, lease, program or policy between the Debtors and any third party under section 365 of the Bankruptcy Code.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission as to the validity or priority of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

## **No Previous Request**

70.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.

[*Remainder of Page Intentionally Left Blank*]

WHEREFORE, the Debtors respectfully request that the Court enter the proposed

forms of order, substantially in the forms attached hereto, granting the relief requested

herein and such other and further relief as the Court deems just and proper.

Dated: New York, New York
      June 30, 2020

DAVIS POLK & WARDWELL LLP

By: */s/ Timothy Graulich*

450 Lexington Avenue
New York, New York 10017
Tel: (212) 450-4000
Fax: (212) 607-7983
Marshall S. Huebner
Timothy Graulich
James I. McClammy
Stephen D. Piraino (*pro hac vice* pending)

*Proposed Counsel to the Debtors and Debtors in
Possession*

**<u>Exhibit A</u>**

**Proposed Interim Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re:

**Grupo Aeroméxico, S.A.B. de C.V.**, *et al.*,

Debtors. [1]

Chapter 11

Case No. 20-11563 (___)

**(Joint Administration Pending)**

## INTERIM ORDER AUTHORIZING (i) PAYMENT OF CERTAIN PREPETITION CLAIMS OF CRITICAL VENDORS AND FOREIGN VENDORS AND (ii) FINANCIAL INSTITUTIONS TO HONOR AND PROCESS RELATED CHECKS AND TRANSFERS

Upon the motion (the "**Motion**") of Grupo Aeroméxico, S.A.B. de C.V. and its affiliates that are debtors and debtors in possession in these cases (collectively, the "**Debtors**") for entry of an interim order (this "**Order**") and a final order authorizing the Debtors to pay in the ordinary course of business prepetition claims of critical vendors[2] (the "**Critical Vendors**") and foreign vendors (the "**Foreign Vendors**"), all as set forth more fully in the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.); and consideration of the Motion and the relief requested therein being a core proceeding under 28 U.S.C. § 157(b); and venue being proper before the Court pursuant to 28

---

[1] The Debtors in these cases, along with each Debtor's registration number in the applicable jurisdiction, are as follows: Grupo Aeroméxico, S.A.B. de C.V. 286676; Aerovías de México, S.A. de C.V. 108984; Aerolitoral, S.A. de C.V. 217315; Aerovías Empresa de Cargo, S.A. de C.V. 437094-1. The Debtors' corporate headquarters is located at Paseo de la Reforma No. 243, piso 25 Colonia Cuauhtémoc, Mexico City, C.P. 06500.

[2] Certain parties may receive payment on account of their prepetition claims pursuant to other motions that have been or may be filed by the Debtors. To the extent that a party receives payment on account of its prepetition claim pursuant to an order approving any such motion, this Order shall not apply to such prepetition claim.

U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided to the Notice Parties, and it appearing that no other or further notice need be provided; and the Court having reviewed the Motion and held a hearing to consider the relief requested in the Motion on an interim basis (the "**Hearing**"); and upon the Sánchez Declaration, filed contemporaneously with the Motion, and the record of the Hearing; and the Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and the Court having determined that immediate relief is necessary to avoid irreparable harm to the Debtors and their estates as contemplated by Bankruptcy Rule 6003(b) and is in the best interests of the Debtors, their estates, their creditors and all parties in interest; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor;

IT IS HEREBY ORDERED THAT:

1.      The relief requested in the Motion is hereby granted on an interim basis as set forth herein.

2.      Pursuant to sections 105(a), 363(b) and 503(b)(9) of the Bankruptcy Code, the Debtors are authorized, but not directed, in the reasonable exercise of their business judgment, to pay some or all of the prepetition claims of the Critical Vendors and Foreign Vendors (the "**Vendor Claims**") in an aggregate amount not to exceed the Vendor Claims Cap; *provided* that, prior to entry of an order granting the relief requested in the Motion on a final basis, the Debtors will not pay any Vendor Claim prior to the applicable due date or in excess of the Interim Vendor Cap.

3.      The Debtors, in their sole discretion, may condition payment of any Vendor Claims upon agreement by the Critical Vendor or Foreign Vendor to continue to supply goods or services to the Debtors on such Critical Vendor's and Foreign Vendor's "**Customary Trade Terms**" for a period following the date of the agreement or on other such terms and conditions as are acceptable to the Debtors.  As used herein, "**Customary Trade Terms**" means, with respect to a Critical Vendor, (i) the normal and customary trade terms, practices and programs (including, but not limited to, credit limits, pricing, cash discounts, timing of payments, allowances, rebates, coupon reconciliation, and availability, and other applicable terms and programs), that were most favorable to the Company and in effect between such Critical Vendor or Foreign Vendor and the Company prior to the Petition Date or (ii) such other trade terms as agreed by the Debtors and such Critical Vendor.

4.      As a further condition of receiving payment on a Vendor Claim, the Debtors are authorized, in their sole discretion, to require that such Critical Vendor or Foreign Vendor agree to take whatever action is necessary to remove any existing trade liens at such Critical Vendor's or Foreign Vendor's sole cost and expense and waive any right to assert a trade lien on account of the paid Vendor Claim.

5.      After the date hereof, the Debtors shall determine, in the ordinary course of business, which entities are Critical Vendors and Foreign Vendors by considering, among other things, (a) which suppliers were sole source or limited source suppliers, without whom the Debtors could not continue to operate without disruption, (b) which suppliers would be prohibitively expensive to replace, (c) which suppliers present an unacceptable risk should they cease the provision of truly essential services or supplies,

3

(d) the extent to which suppliers may be able to obtain or have obtained trade liens on assets of the Debtors and (e) the extent to which suppliers are beyond the jurisdiction of this Court and can thus, notwithstanding the automatic stay, exercise remedies that would disrupt the Debtors' operations and businesses.

6.      The Debtors shall maintain a matrix summarizing (a) the name of each Critical Vendor and Foreign Vendor paid on account of Vendor Claims, (b) the amount paid to each Critical Vendor and Foreign Vendor on account of its Vendor Claim and (c) the goods or services provided by such Critical Vendor.  This matrix will be provided (i) biweekly until a final order granting the relief requested herein is entered and (ii) monthly thereafter to the U.S.  Trustee and the professionals to the official committee of unsecured creditors (the "**Committee**") via their attorneys; *provided*, *however*, that the professionals to the Committee shall keep the matrix confidential on a professionals-only basis and the DIP Agents and their professionals shall keep the matrix confidential and, in each case, shall not disclose any of the information in the matrix to anyone, including, but not limited to, any member of the Committee, without prior written consent from the Debtors.

7.      The Debtors, in their sole discretion, may undertake to require Critical Vendors and Foreign Vendors to enter into an agreement (the "**Vendor Agreement**") including provisions substantially in the form attached to the Motion as **Exhibit C**.

8.      The Debtors are authorized, but not required, to enter into Vendor Agreements when the Debtors determine, in their sole discretion, that it is appropriate to do so in connection with making payments to Critical Vendors and Foreign Vendors.

9.      If the Debtors, in their sole discretion, determine that a Critical Vendor or a Foreign Vendor has not complied with the terms and provisions of the Vendor Agreement or has failed to continue to provide Customary Trade Terms following the date of the agreement, or on such terms as were individually agreed to between the Debtors and such Critical Vendor or Foreign Vendor, the Debtors may terminate a Vendor Agreement, together with the other benefits to the Critical Vendor or Foreign Vendor as contained in this Interim Order, *provided*, *however*, that the Vendor Agreement may be reinstated (a) if such determination is subsequently reversed by the Court for good cause after it is shown that the determination was materially incorrect after notice and a hearing following a motion from the Critical Vendor or Foreign Vendor, (b) the underlying default under the Vendor Agreement is fully cured by the Critical Vendor or Foreign Vendor not later than five business days after the date the initial default occurred or (c) the Debtors, in their sole discretion, reach a subsequent agreement with the Critical Vendor or Foreign Vendor.

10.      If a Vendor Agreement is terminated as set forth above, or if a Critical Vendor or Foreign Vendor that has received payment of a prepetition claim later refuses to continue to supply goods or services for the applicable period in compliance with the Vendor Agreement or this Interim Order, then (a) the Debtors may, in their sole discretion, declare that the payment of the creditor's Vendor Claim is a voidable postpetition transfer pursuant to section 549(a) of the Bankruptcy Code that the Debtors may recover in cash or in goods from such Critical Vendor or Foreign Vendor, (b) the creditor shall immediately return such payments in respect of a Vendor Claim to the extent that the aggregate amount of such payments exceeds the postpetition obligations

5

then outstanding without giving effect to alleged setoff rights, recoupment rights, adjustments, or offsets of any type whatsoever and (c) the creditor's Vendor Claim shall be reinstated in such an amount so as to restore the Debtors and the Critical Vendor or Foreign Vendor to their original positions as if the Vendor Agreement had never been entered into and no payment of Vendor Claim had been made.

11.     All Vendor Agreements shall be deemed to have terminated, together with the other benefits to Critical Vendors and Foreign Vendors as contained in this Interim Order, upon entry of an order converting the Debtors' chapter 11 cases to cases under chapter 7 of the Bankruptcy Code.

12.     All applicable banks and other financial institutions are hereby authorized to receive, process, honor and pay any and all checks, drafts, wires, check transfer requests or automated clearinghouse transfers evidencing amounts paid by the Debtors under this Order whether presented prior to, on or after the Petition Date to the extent the Debtors have good funds standing to their credit with banks or other financial institutions. Such banks and financial institutions are authorized to rely on the representations of the Debtors as to which checks are issued or authorized to be paid pursuant to this Order without any duty of further inquiry and without liability for following the Debtors' instructions.

13.     Nothing in this Order or any action taken by the Debtors in furtherance of the implementation hereof shall be deemed to constitute an assumption or rejection of any executory contract or unexpired lease pursuant to Bankruptcy Code section 365, and all of the Debtors' rights with respect to such matters are expressly reserved.

14.     Notwithstanding the relief granted herein and any actions taken hereunder, nothing contained herein shall (a) create, nor is it intended to create, any rights in favor of, or enhance the status of any claim held by any person or entity or (b) be deemed to convert the priority of any claim from a prepetition claim into an administrative expense claim.

15.     Nothing in this Order or the Motion shall be construed as prejudicing the rights of the Debtors to dispute or contest the amount of or basis for any claims against the Debtors in connection with or relating to the Critical Vendors and Foreign Vendors or the goods and services provided thereby.

16.      Nothing in this Order nor the Debtors' payment of claims pursuant to this Order shall be construed as (a) an agreement or admission by the Debtors as to the validity or priority of any claim on any grounds, (b) a waiver or impairment of any of the Debtors' rights to dispute any claims on any grounds, (c) a promise by the Debtors to pay any claim, or (d) an implication or admission by the Debtors that such claim is payable pursuant to this Order.

17.     The requirements of Bankruptcy Rule 6003 are satisfied by the contents of the Motion.

18.     The contents of the Motion and the notice procedures set forth therein are good and sufficient notice and satisfy the Bankruptcy Rules and the Local Bankruptcy Rules for the Southern District of New York, and no other or further notice of the Motion or the entry of this Order shall be required.

19.     The Debtors are authorized to take all such actions as are necessary or appropriate to implement the terms of this Order.

7

20.     A final hearing to consider the relief requested in the Motion shall be held on ____, ____ at _____ (Prevailing Eastern Time) and any objections or responses to the Motion shall be filed and served on the Notice Parties so as to be actually received on or prior to _____, ____at 4:00 p.m. (Prevailing Eastern Time).  Any objections or responses to the entry of the Final Order shall be: (a) filed with the Court and (b) served upon and actually received by (i) the United States Trustee, U.S.  Federal Office Building, 201 Varick Street, Room 1006, New York, NY 10014 (Attn: Andrea B. Schwartz, Esq.), (ii) proposed counsel to the Debtors, Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, NY 10017 (Attn: Marshall S. Huebner, Timothy Graulich, James I. McClammy and Stephen D. Piraino) and (iii) counsel to any official committee then appointed in these chapter 11 cases, so as to be received by 4:00 p.m. (Prevailing Eastern Time) seven (7) days before the hearing to approve the relief requested in the Motion on a final basis (the "**Objection Deadline**").  A reply to an objection may be filed with the Court and served on or before 12:00 p.m. (Prevailing Eastern Time) on the day that is at least two (2) business days before the date of the applicable hearing.  If no objections or responses are filed and served, this Court may enter the Final Order without further notice or hearing.

21.     If no objections are timely filed and served as set forth herein, the Debtors shall, on or after the Objection Deadline, submit to the Court a final order substantially in the form of this Order, which order shall be submitted and may be entered with no further notice or opportunity to be heard afforded any party, and the Motion shall be approved *nunc pro tunc* to the date of the commencement of these chapter 11 cases.

8

22.     Any Bankruptcy Rule (including, but not limited to, Bankruptcy Rule 6004(h)) or Local Rule that might otherwise delay the effectiveness of this Order is hereby waived, and the terms and conditions of this Order shall be effective immediately and enforceable upon its entry.

23.     This Court shall retain exclusive jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and enforcement of this Order.

Dated: New York, New York
        [____], 2020

_____
UNITED STATES BANKRUPTCY JUDGE

**<u>Exhibit B</u>**

**Proposed Final Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | **Chapter 11** |
| **Grupo Aeroméxico, S.A.B. de C.V.**, *et al.*, | **Case No. 20-11563 (___)** |
| | **(Joint Administration Pending)** |
| Debtors. [1] | |

**FINAL ORDER AUTHORIZING (i) PAYMENT OF**
**CERTAIN PREPETITION CLAIMS OF CRITICAL VENDORS AND FOREIGN**
**VENDORS AND (ii) FINANCIAL INSTITUTIONS TO HONOR AND PROCESS**
**RELATED CHECKS AND TRANSFERS**

Upon the motion (the "**Motion**")[2] of Grupo Aeroméxico, S.A.B. de C.V. and its affiliates that are debtors and debtors in possession in these cases (collectively, the "**Debtors**") for entry of an interim order and a final order (this "**Order**") authorizing the Debtors to pay in the ordinary course of business prepetition claims of critical vendors[3] (the "**Critical Vendors**") and foreign vendors (the "**Foreign Vendors**"), all as set forth more fully in the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended

---

[1] The Debtors in these cases, along with each Debtor's registration number in the applicable jurisdiction, are as follows: Grupo Aeroméxico, S.A.B. de C.V. 286676; Aerovías de México, S.A. de C.V. 108984; Aerolitoral, S.A. de C.V. 217315; Aerovías Empresa de Cargo, S.A. de C.V. 437094-1. The Debtors' corporate headquarters is located at Paseo de la Reforma No. 243, piso 25 Colonia Cuauhtémoc, Mexico City, C.P. 06500.

[2] Each capitalized term used herein but not otherwise defined herein shall have the meaning ascribed to it in the Motion.

[3] Certain parties may receive payment on account of their prepetition claims pursuant to other motions that have been or may be filed by the Debtors. To the extent that a party receives payment on account of its prepetition claim pursuant to an order approving any such motion, this Order shall not apply to such prepetition claim.

Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.); and consideration of the Motion and the relief requested therein being a core proceeding under 28 U.S.C. § 157(b); and venue being proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided to the Notice Parties, and it appearing that no other or further notice need be provided; and the Court having reviewed the Motion and held a hearing to consider the relief requested in the Motion on a final basis (the "**Hearing**"); and upon the Sánchez Declaration, filed contemporaneously with the Motion, and the record of the Hearing; and the Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and the Court having determined that the relief granted herein is in the best interests of the Debtors, their estates, their creditors and all parties in interest; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor;

IT IS HEREBY ORDERED THAT:

1.      The relief requested in the Motion is hereby granted on a final basis as set forth herein.

2.      Pursuant to sections 105(a), 363(b) and 503(b)(9) of the Bankruptcy Code, the Debtors are authorized, but not directed, in the reasonable exercise of their business judgment, to pay some or all of the prepetition claims of the Critical Vendors and Foreign Vendors (the "**Vendor Claims**") in an aggregate amount not to exceed the Vendor Claims Cap; *provided further* that all payments to Critical Vendors and Foreign Vendors on account of Vendor Claims shall be applied first in satisfaction of such Critical Vendors and Foreign Vendors' Twenty-Day Administrative Claims, if any; *provided*

2

*further* that payments on account of Vendor Claims that are not Twenty-Day Administrative Claims shall not, in the aggregate, exceed the Vendor Claims.

3.      The Debtors, in their sole discretion, may condition payment of any Vendor Claims upon agreement by the Critical Vendor and Foreign Vendors to continue to supply goods or services to the Debtors on such Critical Vendor's or Foreign Vendor's "**Customary Trade Terms**" for a period following the date of the agreement or on other such terms and conditions as are acceptable to the Debtors.  As used herein, "**Customary Trade Terms**" means, with respect to a Critical Vendor and a Foreign Vendor, (i) the normal and customary trade terms, practices and programs (including, but not limited to, credit limits, pricing, cash discounts, timing of payments, allowances, rebates, coupon reconciliation, and availability, and other applicable terms and programs), that were most favorable to the Company and in effect between such Critical Vendor or Foreign Vendor and the Company prior to the Petition Date or (ii) such other trade terms as agreed by the Debtors and such Critical Vendor or Foreign Vendor.

4.      As a further condition of receiving payment on a Vendor Claim, the Debtors are authorized, in their sole discretion, to require that such Critical Vendor and such Foreign Vendor agree to take whatever action is necessary to remove any existing trade liens at such Critical Vendor's or Foreign Vendor's sole cost and expense and waive any right to assert a trade lien on account of the paid Vendor Claim.

5.      After the date hereof, the Debtors shall determine, in the ordinary course of business, which entities are Critical Vendors and Foreign Vendors by considering, among other things, (a) which suppliers were sole source or limited source suppliers, without whom the Debtors could not continue to operate without disruption, (b) which

3

suppliers would be prohibitively expensive to replace, (c) which suppliers present an unacceptable risk should they cease the provision of truly essential services or supplies, (d) the extent to which suppliers may be able to obtain or have obtained trade liens on assets of the Debtors and (e) the extent to which suppliers are beyond the jurisdiction of this Court and can thus, notwithstanding the automatic stay, exercise remedies that would disrupt the Debtors' operations and businesses.

6.      The Debtors shall maintain a matrix summarizing (a) the name of each Critical Vendor and Foreign Vendor paid on account of Vendor Claims, (b) the amount paid to each Critical Vendor and Foreign Vendor on account of its Vendor Claim and (c) the goods or services provided by such Critical Vendor and Foreign Vendor.  This matrix will be provided (i) monthly to the U.S.  Trustee and the professionals to the official committee of unsecured creditors (the "**Committee**") via their attorneys; *provided*, *however*, that the professionals to the Committee shall keep the matrix confidential on a professionals-only basis and the DIP Agents and their professionals shall keep the matrix confidential and, in each case, shall not disclose any of the information in the matrix to anyone, including, but not limited to, any member of the Committee, without prior written consent from the Debtors.

7.      The Debtors, in their sole discretion, may undertake to require Critical Vendors and Foreign Vendors to enter into an agreement (the "**Vendor Agreement**") including provisions substantially in the form attached to the Motion as **Exhibit C**.

8.      The Debtors are authorized, but not required, to enter into Vendor Agreements when the Debtors determine, in their sole discretion, that it is appropriate to do so in connection with making payments to Critical Vendors and Foreign Vendors.

9.      If the Debtors, in their sole discretion, determine that a Critical Vendor and a Foreign Vendor has not complied with the terms and provisions of the Vendor Agreement or has failed to continue to provide Customary Trade Terms following the date of the agreement, or on such terms as were individually agreed to between the Debtors and such Critical Vendor or Foreign Vendor, the Debtors may terminate a Vendor Agreement, together with the other benefits to the Critical Vendor or Foreign Vendor as contained in this Final Order, *provided*, *however*, that the Vendor Agreement may be reinstated (a) if such determination is subsequently reversed by the Court for good cause after it is shown that the determination was materially incorrect after notice and a hearing following a motion from the Critical Vendor or the Foreign Vendor, (b) the underlying default under the Vendor Agreement is fully cured by the Critical Vendor or the Foreign Vendor not later than five business days after the date the initial default occurred or (c) the Debtors, in their sole discretion, reach a subsequent agreement with the Critical Vendor or the Foreign Vendor.

10.     If a Vendor Agreement is terminated as set forth above, or if a Critical Vendor or a Foreign Vendor that has received payment of a prepetition claim later refuses to continue to supply goods or services for the applicable period in compliance with the Vendor Agreement or this Final Order, then (a) the Debtors may, in their sole discretion, declare that the payment of the creditor's Vendor Claim is a voidable postpetition transfer pursuant to section 549(a) of the Bankruptcy Code that the Debtors may recover in cash or in goods from such Critical Vendor, (b) the creditor shall immediately return such payments in respect of a Vendor Claim to the extent that the aggregate amount of such payments exceeds the postpetition obligations then outstanding without giving effect to

5

alleged setoff rights, recoupment rights, adjustments, or offsets of any type whatsoever and (c) the creditor's Vendor Claim shall be reinstated in such an amount so as to restore the Debtors and the Critical Vendor or the Foreign Vendor to their original positions as if the Vendor Agreement had never been entered into and no payment of Vendor Claim had been made.

11.    All Vendor Agreements shall be deemed to have terminated, together with the other benefits to Critical Vendors and Foreign Vendors as contained in this Final Order, upon entry of an order converting the Debtors' chapter 11 cases to cases under chapter 7 of the Bankruptcy Code.

12.    All applicable banks and other financial institutions are hereby authorized to receive, process, honor and pay any and all checks, drafts, wires, check transfer requests or automated clearinghouse transfers evidencing amounts paid by the Debtors under this Order whether presented prior to, on or after the Petition Date to the extent the Debtors have good funds standing to their credit with banks or other financial institutions. Such banks and financial institutions are authorized to rely on the representations of the Debtors as to which checks are issued or authorized to be paid pursuant to this Order without any duty of further inquiry and without liability for following the Debtors' instructions.

13.    Nothing in this Order or any action taken by the Debtors in furtherance of the implementation hereof shall be deemed to constitute an assumption or rejection of any executory contract or unexpired lease pursuant to Bankruptcy Code section 365, and all of the Debtors' rights with respect to such matters are expressly reserved.

14.    Notwithstanding the relief granted herein and any actions taken hereunder, nothing contained herein shall (a) create, nor is it intended to create, any rights in favor of, or enhance the status of any claim held by any person or entity or (b) be deemed to convert the priority of any claim from a prepetition claim into an administrative expense claim.

15.    Nothing in this Order or the Motion shall be construed as prejudicing the rights of the Debtors to dispute or contest the amount of or basis for any claims against the Debtors in connection with or relating to the Critical Vendors and Foreign Vendors or the goods and services provided thereby.

16.    Nothing in this Order nor the Debtors' payment of claims pursuant to this Order shall be construed as (a) an agreement or admission by the Debtors as to the validity or priority of any claim on any grounds, (b) a waiver or impairment of any of the Debtors' rights to dispute any claims on any grounds, (c) a promise by the Debtors to pay any claim, or (d) an implication or admission by the Debtors that such claim is payable pursuant to this Order.

17.    Any Bankruptcy Rule (including, but not limited to, Bankruptcy Rule 6004(h)) or Local Rule that might otherwise delay the effectiveness of this Order is hereby waived, and the terms and conditions of this Order shall be effective immediately and enforceable upon its entry.

18.    The contents of the Motion and the notice procedures set forth therein are good and sufficient notice and satisfy the Bankruptcy Rules and the Local Bankruptcy Rules for the Southern District of New York, and no other or further notice of the Motion or the entry of this Order shall be required.

7

19.     The Debtors are authorized to take all such actions as are necessary or appropriate to implement the terms of this Order.

20.     This Court shall retain exclusive jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and enforcement of this Order.


Dated: New York, New York
        [____], 2020

_____
UNITED STATES BANKRUPTCY JUDGE

**<u>Exhibit C</u>**

**Proposed Vendor Agreement**

Grupo Aeroméxico, S.A.B. de C.V.

TO:    [Critical Vendor]
[Name]
[Address]

Dear Valued Supplier:

      As you are aware, Grupo Aeroméxico, S.A.B. de C.V.  ("**Aeroméxico**" or the "**Company**") and certain of its subsidiaries (collectively, the "**Company**") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Cases**" and the "**Bankruptcy Court**," respectively) on [June 30], 2020 (the "**Petition Date**").  On the Petition Date, the Company requested the Bankruptcy Court's authority to pay the prepetition claims of certain suppliers in recognition of the importance of the Company's relationship with such suppliers and its desire that the Bankruptcy Cases have as little effect on the Company's ongoing business operations as possible.  On [●], the Bankruptcy Court entered an order (the "**Order**") authorizing the Company, under certain conditions, to pay the prepetition claims of certain suppliers that agree to the terms set forth below and to be bound by the terms of the Order.  A copy of the Order is enclosed.

      In order to receive payment on account of prepetition claims, you must agree to continue to supply goods and services to the Company based on "**Customary Trade Terms**."  In the Order, Customary Trade Terms are defined as the normal and customary trade terms, practices and programs (including, but not limited to, credit limits, pricing, cash discounts, timing of payments, allowances, rebates, coupon reconciliation, normal product mix and availability and other applicable terms and programs), that were most favorable to the Company and in effect between you and the Company prior to the Petition Date, or such other trade terms as you and the Company agree.

      For purposes of administration of this trade program as authorized by the Bankruptcy Court, you and the Company both agree that:

      1.     The estimated balance of the prepetition claim (net of any setoffs, credits or discounts) (the "**Vendor Claim**") that you will receive from the Company is $_____.

      2.     You will waive any remaining prepetition general unsecured claim against the Company.

      3.     You will provide an open trade balance or credit line to the Company for shipment of postpetition goods in the amount of $_____ (which shall not be less than the greater of the open trade balance outstanding: (a) on _____, or (b) on normal and customary terms on a historical basis before and up to the Petition Date).

4        The terms of such open trade balance or credit line are as follows (if more space is required, attach continuation pages):

_____

_____

_____

_____

_____

_____

5.        During the pendency of the Bankruptcy Cases you will continue to extend to the Company all Customary Trade Terms (as defined in the Order).

6.        You will not demand a lump sum payment upon consummation of a plan of reorganization in the Bankruptcy Cases on account of any administrative expense priority claim that you assert, but instead agree that such claims will be paid in the ordinary course of business after consummation of a plan under applicable Customary Trade Terms, if the plan provides for the ongoing operations of the Company.

7.        The undersigned, a duly authorized representative of [Critical Vendor], has reviewed the terms and provisions of the Order and agrees that [Critical Vendor] is bound by such terms;

8.        You will not separately seek payment for reclamation and similar claims outside of the terms of the Order unless your participation in the Critical Vendor and Foreign Vendor payment program authorized by the Order (the "**Critical Vendor and Foreign Vendor Payment Program**") is terminated;

9.        You will not file or otherwise assert against the Company, the estates or any other person or entity or any of their respective assets or property (real or personal) any lien (regardless of the statute or other legal authority upon which such lien is asserted) related in any way to any remaining prepetition amounts allegedly owed to you by the Company arising from agreements entered into prior to the Petition Date. Furthermore, you agree to take (at your own expense) all necessary steps to remove any such lien as soon as possible; and

10.        If either the Critical Vendor and Foreign Vendor Payment Program or your participation therein terminates as provided in the Order, or you later refuse to continue to supply goods to the Company on Customary Trade Terms during the pendency of the Bankruptcy Case, any payments you receive on account of your Vendor Claim (including claims arising under section 503(b)(9) of the Bankruptcy Code will be deemed voidable postpetition transfers pursuant to section 549(a) of the Bankruptcy Code). You will immediately repay to the Company any payments made to you on account of your Vendor Claim to the extent that the aggregate amount of such payments exceeds the postpetition obligations then outstanding without giving effect to alleged setoff rights, recoupment rights, adjustments, or offsets of any type whatsoever. Your Vendor Claim shall be reinstated in such an amount so as to restore the Company and you

to the same positions as would have existed if payment of the Vendor Claim had not been made.

11.    You agree to submit to the jurisdiction of the Bankruptcy Court with respect to any dispute related to this letter agreement or any purported claims against the company.

If you have any questions about this Agreement or our financial restructuring, please do not hesitate to call.

Sincerely,

Grupo Aeroméxico, S.A.B. de C.V.

By:    _____
       [Name]
       [Title]

Agreed and Accepted by:
[Critical Vendor]

By:    _____
Its:    _____

Dated:    _____, 2020

3