DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Timothy Graulich
James I. McClammy
Stephen D. Piraino (*pro hac vice* pending)
*Proposed Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **GRUPO AEROMÉXICO, S.A.B. de C.V.,** *et al.*, | **Case No. 20-11563 (_)** |
| Debtors.[1] | **(Joint Administration Pending)** |

### DECLARATION OF RICARDO JAVIER SÁNCHEZ BAKER IN SUPPORT OF THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

I, Ricardo Javier Sánchez Baker, hereby declare that the following is true to the best of my knowledge, information and belief:

1.     I am the Chief Financial Officer of Grupo Aeroméxico, S.A.B. de C.V. ("**Grupo Aeroméxico**,") and its affiliates that are debtors and debtors in possession in these proceedings (collectively, the "**Debtors**;" the Debtors collectively with their direct and indirect non-Debtor subsidiaries, the "**Company**" or "**Aeroméxico**"). I have held several other positions at the Company since 2006, including serving as advisor to the Chief Executive Officer and Director of Revenue Management. I have been the chairman of the board of directors of the SABRE

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Grupo Aeroméxico, S.A.B. de C.V. 286676; Aerovías de Mexico, S.A. de C.V 108984; Aerolitoral, S.A. de C.V. 217315; Aerovías Empresa de Cargo, S.A. de C.V. 437094-1.  The Debtors' corporate headquarters is located at Paseo de la Reforma No. 243, piso 25 Colonia Cuauhtémoc, Mexico City, C.P. 06500.

Corporation, a member of the SEAT Technical Committee and a member of the Aeromexpress

CECAM and PLM board of directors.  I have held various positions within the Federal Public

Administration (*Administración Pública Federal*), including deputy director general of public

debt for the Ministry of Finance and Public Credit on 2003 and 2005.  I hold a bachelor's degree

in economics from the Universidad Iberoamericana, a diploma in finance from Instituto

Tecnológico Autónomo de México ("**ITAM**") and a master's and doctorate degree in economics

from the University of California, Los Angeles.  I am familiar with the day-to-day operations,

business and financial affairs of the Debtors.

2.      I submit this declaration (this "**Declaration**") pursuant to Rule 1007-2 of the

Local Bankruptcy Rules for the Southern District of New York (the "**Local Rules**") in support of

the Debtors' petitions and contemporaneously filed requests for relief in the form of motions and

applications (the "**First Day Motions**").  I have reviewed the First Day Motions or have

otherwise had their contents explained to me, and it is my belief that the relief sought therein is

essential to the uninterrupted operation of the Debtors' business and to the success of the Chapter

11 Cases.  I am authorized to submit this Declaration on behalf of the Debtors.

3.      Except as otherwise indicated, all facts set forth in this Declaration are based upon

my personal knowledge, my review of relevant documents, information provided to me by

employees working under my supervision, or my opinion based upon experience, knowledge and

information concerning the operations of the Debtors and the aviation industry as a whole.  If

called upon to testify, I would testify competently to the facts set forth in this Declaration.

Unless otherwise indicated, the financial information contained herein is unaudited and provided

on a consolidated basis.

### Commencement of Bankruptcy Proceedings

4.      On the date hereof (the "**Petition Date**"), the Debtors each commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  The Debtors intend to continue in the possession of their respective properties and the management of their respective businesses as debtors in possession.  Aeroméxico commenced the chapter 11 cases of the Debtors (the "**Chapter 11 Cases**") to preserve and maximize its enterprise value for the benefit of its stakeholders.  Aeroméxico commenced its Chapter 11 Cases in the venue of this Court due to, as further described herein and in the First Day Motions, Debtor property held in a bank account in New York, debt documents for the Debtors' funded indebtedness being governed by New York law, employees in New York and flights to New York City in the ordinary course of business.

5.      Part I of this Declaration describes Aeroméxico's business; Part II describes the circumstances giving rise to the commencement of the Chapter 11 Cases; Part III sets forth the relevant facts in support of the First Day Motions; and Part IV provides additional information about the Debtors.

### I.
### The Debtors' Business

6.      This section provides context for the circumstances surrounding the Chapter 11 Cases and covers three topics: the Debtors' history and corporate structure, operations and capital structure.

#### A.      History and Corporate Structure

7.      Aeroméxico was founded in 1934 as Aeronaves de México, S.A. de C.V. ("**Aeronaves**") and began to operate its first route between Mexico City and Acapulco.  In 1957,

Aeronaves began flying routes to New York City and Los Angeles and subsequently expanded by adding operating routes between Mexico, and Spain and France.

8.      Aeronaves was nationalized in 1959 and began operating under the commercial name "Aeroméxico" in 1971.  In 1988, Aeronaves commenced a bankruptcy case under Mexican bankruptcy law and suspended its operations as a result of a significant decrease in demand for air travel in Mexico during the 1980s and a strike by its employees in April 1988.  As a result, in 1988, the Mexican government incorporated Aerovías de México, S.A. de C.V ("**Aerovías**"), which acquired substantially all fixed assets of Aeronaves in the third quarter of 1988 and began operating a limited number of routes.

9.      In 1994, both Aerovías and Corporación Mexicana de Aviación, S.A. de C.V. ("**CMA**"), a Mexican airline competitor at the time, experienced a severe liquidity crisis as a result of, among other things, reduced revenue resulting from the economic crisis in Mexico, as well as a significant reduction in access to the international capital markets for Mexican companies.  As a result, both companies conducted a financial and operational restructuring in which the creditors of Aerovías and CMA converted the companies' outstanding debt into capital stock of the companies.  In connection with this restructuring, Cintra, S.A. de C.V. ("**Cintra**"), a government-controlled entity, was incorporated to serve as the parent company for both Aerovías and CMA, to create synergies and other savings by combining certain commercial and corporate functions, and to provide a holding vehicle for future strategic and financial transactions.

10.      In 2002, Grupo Aeroméxico was incorporated as a holding company through which Cintra held its interest in Aerovías.  In 2006, Cintra was restructured, changing its corporate name to Consorcio Aeroméxico, S.A.B. de C.V. ("**Consorcio Aeroméxico**").

4

11.     In October 2007, Banco Nacional de México, S.A., Integrante del Grupo Financiero Banamex, solely as trustee under Trust No. 16093-6, or the Trust (in such capacity, "**Banamex**"), acquired 100% of the capital stock of Consorcio Aeroméxico. The primary beneficiaries of the Trust were a subsidiary of Banamex and a group of 14 prominent Mexican investors. In April 2008, Banamex acquired 100% of the 99.99% of the capital stock of Grupo Aeroméxico from Consorcio Aeroméxico.

12.     In September 2010, the Company entered into a joint venture agreement with Aeroplan Holdings UK Limited ("**AIMIA**"), a company specialized in loyalty programs management and development, to operate and improve the "Club Premier" loyalty program. Under the joint venture agreement, AIMIA acquired 28.855% of the capital stock of the non-Debtor subsidiary PLM Premier, S.A.P.I. de C.V. ("**PLM**"), which owns and manages the "Club Premier" program. In December 2012, AIMIA increased its equity participation in PLM.

13.     In February 2011, the Company created Aerovías Empresa de Cargo S.A. de C.V. ("**Aeroméxico Cargo**") to provide cargo services, which commenced operations in January 2012. In April 2011, Grupo Aeroméxico completed its initial public offering on the Mexican Stock Exchange.

14.     In 2012, Delta Air Lines Inc. ("**Delta**") acquired a 4.17% interest in Grupo Aeroméxico. In February 2017, Delta commenced a public tender for the acquisition of additional Grupo Aeroméxico's shares that was consummated on March 2017 and exercised related acquisition options in July 2017, as a result of which Delta increased its interest in Grupo Aeroméxico to 49.0%. As of the Petition Date, Delta's economic interest in Grupo Aeroméxico was 51.27% (calculated excluding Grupo Aeroméxico's repurchased shares); however, Delta

holds only 49.0% of voting rights of Grupo Aeroméxico due to Mexican regulations, as foreign investors cannot hold more than 49.0% of a Mexican airline's voting rights.

15.     In May 2017, the regulatory authorities in Mexico and the United States authorized the Company to begin activities in connection with the operation of trans-border flights between the United States and Mexico under the joint cooperation agreement with Delta (the "**Delta JCA**").  The Delta JCA established the largest cross-border partnership between Mexican and U.S. airlines, and is expected to continue to expand flight offerings and benefits to customers of both airlines.

16.     Grupo Aeroméxico is the majority shareholder of the corporate group that includes companies providing public air carrier services for passengers and goods (including fleet and cargo services) in and outside of Mexico and, to a lesser extent, those providing services related to air operations.  Grupo Aeroméxico holds 100% of the equity interests in Aerovías and Aeroméxico Cargo.

17.     Below is a summary of the main significant subsidiaries of Grupo Aeroméxico as of the Petition Date.

| *Company* | *Ultimate Ownership by Grupo Aeroméxico* | *Commercial Activity* |
|---|---|---|
| *Aerovías* | 100% | Airline focused on long-haul international and mid-range Mexican domestic routes.  It also holds shares of subsidiaries. |
| *Aeroméxico Cargo* | 100% | Mexican domestic and international cargo handling. |
| *PLM Premier* (non-Debtor) | 51.14% | Frequent-flyer loyalty program administrator.  A co-investment with AIMIA. |
| *Aerolitoral, S.A. de C.V. ("**Aeroméxico Connect**")* | 99.74% | Airline focused on low-density Mexican and short-haul international routes. |
| *Centro de Capacitación Aeroméxico ("**CECAM**") (non-Debtor)* | 100% | Company specializing in aeronautics education and training, designed to reduce |

| | | training costs. |
|---|---|---|
| *Sistemas Integrados de Soporte Terrestre en México, S. A. de C. V. (**Aeroméxico Servicios**")* | 99.99% | Aeroméxico Servicios provides ground handling services in Mexico. Holding company of AM Formación Interna, S.A. de C.V., (**Aeroméxico Formación**") which operates one of the largest aeronautical training centers in Latin America. |
| *AM DL MRO JV, S.A.P.I. de C.V., ("**TechOps**")* (non-Debtor) | 50% | Provides airplane maintenance, repair and large-scale inspections. |

18.    The following corporate structure chart sets forth the Debtors' principal subsidiaries as of the Petition Date:



**B.**     **Operations**

i.     *Overview*

19.     Aeroméxico is Mexico's leading airline in terms of market share, fleet size and network, offering passengers a full-service experience to 84 global destinations, connecting Mexico with both domestic and international destinations under a "hub-and-spoke" model. Based on this model, Aeroméxico provides different price points and a broad network, while maintaining a leading market presence in Mexico's key airports, namely Mexico City, Monterrey and Guadalajara. Aeroméxico has delivered robust and improving revenue performance with a compound annual growth rate of 7.9% between 2015-2019. Similarly, EBITDAR has improved with a compound annual growth rate of 5.7% for the same period. In February 2020, Aeroméxico issued $400 million dollars in face amount of unsecured notes in the United States, once again reflecting the confidence of the international investment community in Aeroméxico. Pre-COVID-19, Aeroméxico offered 573 daily passenger flights on average, servicing 42 domestic and 20 destinations in the United States and Canada, 15 in Central and South America and the Caribbean, five in Europe and two in Asia.

20.     Aeroméxico had a 24.3% share of the Mexican domestic market and a 15.8% share of the Mexican international market (measured by passenger traffic) during 2019. During that period, Aeroméxico transported 20.7 million passengers.

21.     Aeroméxico's close strategic partnership with Delta has gradually evolved since the 1990s, starting with basic codeshare agreements and developing into Delta's significant equity stake in Grupo Aeroméxico. In addition to Delta's equity stake, Aeroméxico and Delta established a joint maintenance, repair and major aircraft overhaul facility in the city of Queretaro, Mexico in 2014, in which Delta and Aeroméxico each have a 50% interest.

Aeroméxico and Delta also operate the Delta JCA profit share for flights between the United States and Mexico. The Delta JCA was approved in May 2017 by *Comisión Federal de Competencia Económica* [Federal Commission for Economic Competition]. ("**COFECE**") and U.S. antitrust regulatory authorities. Aeroméxico's unique relationship with Delta is extremely important in strengthening its position in the Mexico-United States travel market, which is the Company's largest and most critical international market. The JCA is the largest cross-border alliance in the airline industry between the two countries. It has increased competitiveness and improved the overall customer experience for travelers flying on both airlines by providing a broader network, improved schedules at more price points, frequent flyer reciprocity and shared VIP lounge access. Collectively, Aeroméxico and Delta have transported more than 20 million passengers on transborder routes between May 2017 and May 2020.

22.     Aeroméxico is a founding member of SkyTeam, an alliance dedicated to providing passengers with a seamless travel experience at every step of their journey. SkyTeam consists of 19 airlines working together across an extensive global network and in 2019, served 676 million customers on more than 15,445 daily flights to 1,036 destinations in 175 countries.

23.     Aeroméxico is the majority shareholder of PLM, the joint venture between Grupo Aeroméxico and AIMIA, which operates Aeroméxico's "Club Premier" loyalty program. As of September 30, 2019, AIMIA's and Grupo Aeroméxico's equity interests in PLM were approximately 48.9% and 51.1%, respectively. As of the Petition Date, "Club Premier" had approximately 6.7 million members who can earn and redeem points across a broad ecosystem of network partners, including some of the world's largest financial institutions and travel companies. "Club Premier" drives incremental passenger traffic to the Aeroméxico platform,

particularly among the profitable business traveler segment. Between 2011 and December 31, 2019, the program grew by 120%.

24.     Aeroméxico reported steady revenue and EBITDAR growth of 10% and 7% in the last five years, and posted healthy EBITDAR margins above 20% in this same period. In February of 2020, Aeroméxico successfully placed $400 million senior unsecured notes, reflecting market confidence in the Company and its business model.

25.     The World Health Organization has declared the coronavirus ("**COVID-19**") a global pandemic. This pandemic has had, and continues to have, a significant and unprecedented impact on the global aviation industry. For example, in response to the effect of COVID-19 on domestic carriers, the United States government agreed in April of 2020 to provide $50 billion in bailout relief funds to domestic airlines. To date, the closure of borders, implementation of prevention measures and health practices, including social distancing and the corresponding decline in passenger demand, has resulted, *inter alia*, in a reduction in demand of 94.4% (measured in RPKs as at May 30, 2020).

26.     The Company reacted quickly and took immediate measures to face the crisis. On a consensual basis, the Company negotiated payment deferrals with aircraft and engine lessors, as well as with its most important suppliers. In addition, the company negotiated voluntary temporary agreements with the different labor groups. On a temporary basis, these measures allowed the company to reduce significantly its cash burn with respect to its regular cost structure. In addition, the company implemented several initiatives to generate additional liquidity to protect its cash position.

27.     The negative effects of COVD-19 on passenger demand have been more profound and persistent than expected, however, and these efforts have been insufficient to guarantee that

10

the Company can continue its operations without undergoing a major restructuring process to the benefit of all its stakeholders.

ii.      *Employees*

28.      As of the Petition Date, Aeroméxico had 14,744 employees, 391 of whom were employed by non-Debtor affiliates.  The majority of employees are located in Mexico.  As of the Petition Date, the Debtors had 290 employees located outside of Mexico, including 87 in the United States (of whom 10 are in New York), representing 0.6% of the total number of employees.

29.      The compensation offered to Aeroméxico's employees provides a variety of additional benefits depending on employee classification, including health insurance, food vouchers, transportation vouchers, dental insurance, holiday bonuses, overtime, productivity bonuses, group life insurance, sick-leave supplement, vacation premium, savings plans, scholarships and automatic pay increases.  Pursuant to Aeroméxico's collective bargaining agreements, three retirement plans have been established for the pilots and flight attendants of Aerovías and the pilots of Aeroméxico Connect.

30.      In response to the global crisis stemming from COVID-19 and the corresponding impacts on the Company and the airline industry, the Debtors' executives agreed to a voluntary 50% cut in their fixed monthly compensation, which has been in place since March 26, 2020. The rest of the Debtors' employees have also agreed to voluntary pay cuts between 20-50% depending on their levels of seniority.  The Debtors' employees are indispensable to the Company's success and the Debtors understand that a permanent substantial pay cut is unsustainable.  The salaries were temporarily reduced as an accommodation by employees, and

the Debtors will suffer extraordinary departures if the reductions last indefinitely.  As such, the Debtors will likely resume more normal prospective compensation during the course of the case.

31.     Approximately 68% of Aeroméxico's employees are unionized.   There are currently four unions covering employees in Mexico: *Asociación Sindical de Pilotos Aviadores de México* [Mexico Ailine Pilots' Union Association] ("**ASPA**"), which represents Aerovías' and Aeroméxico Connect's pilots; National Service Workers' Union for Airlines, Transportation, and Similar and Related Services ("**Independencia**"), which represents the ground personnel of Aerovías, TechOps, Aeroméxico Cargo and Aeroméxico Servicios; *Asociación Sindical de Sobrecargos de Aviación de México* [Mexico Flight Attendants' Union Association] ("**ASSA**"), which represents Aerovías' flight attendants; and Workers' Union for the Aeronautics Industry, Communications and Similar and Related Industries in Mexican Republic ("**STIA**"), which represents Aeroméxico Connect's flight attendants and ground personnel.   Aeroméxico has entered into multi-year collective bargaining agreements with these unions, which are nonetheless required to be renegotiated (i) yearly in respect of wages, and (ii) every two years in respect of benefits and working conditions.  The current agreements with ASPA, Independencia, ASSA and STIA will be renegotiated in 2020, 2022, 2021 and 2022, respectively.

*iii.     Passenger Operations*

32.     Passenger transportation represents the main source of revenue for Aeroméxico.  For the years ended December 31, 2019, 2018, 2017 and 2016, passenger transportation represented 92.2%, 91.8%, 91.5% and 87.8% of total revenue, respectively.

33.     Revenue from transporting passengers is divided into domestic in Mexico and international.  Domestic passengers within Mexico were responsible for revenues of Ps.23,059 million, Ps.23,947 million, Ps.21,929 million and Ps.20,893 million in 2019, 2018, 2017 and 2016, respectively, which is equivalent to 33.5%, 34.1%, 35.7% and 38.7% of total consolidated

revenue for the years ended December 31, 2019, 2018, 2017 and 2016, respectively.  On the other hand, revenue obtained from transporting international passengers represented 51.2%, 50.2%, 49.2% and 49.1% of total consolidated revenue for the years ended December 31, 2019, 2018, 2017 and 2016, respectively.

34.     Aeroméxico's diverse geographic footprint, represented by 37.3% of total revenues for the year ended December 31, 2019 arising from Mexico, 39.7% arising from North, Central and South America's foreign destinations, and 23.0% arising from Europe and Asia, provides flexibility to sustain profitability over time.  Furthermore, no single route represents more than 10.0% of revenues.

35.     For the years ended on December 31, 2019 and 2018, Aeroméxico had a share of the domestic Mexican market (measured by passenger traffic) of 24.3% and 27.7%, respectively. During the same periods, Aeroméxico transported 13,113,112 passengers and 13,811,985, respectively, for flights within Mexico.  For the years ended December 31, 2019 and 2018, Aeroméxico's international market share of passengers traveling to and from Mexico (coming from and going to the U.S., Canada, Central America and the Caribbean, South America, Europe and Asia) reached 15.8% and 17.2%, respectively, based on the number of passengers transported.    During the same periods, Aeroméxico transported 7,576,308 international passengers and 8,066,483 international passengers, respectively.

36.     Ancillary revenue is part of passenger revenue as it is considered a single performance obligation, and it includes revenues from upgrades, sales of preferred seating, unused tickets, and add-on services (excess baggage and other fees charged to passengers).  As of December 31, 2019 and December 31, 2018, these activities represented 7.7% and 7.5%, respectively, of total revenues.

iv.     *Cargo Operations*

37.    Cargo operations are handled by the wholly-owned Debtor subsidiary, Aeroméxico Cargo.  Air cargo revenues represented 6.1% and 6.7% of total revenues for the years ended December 31, 2019 and December 31, 2018, respectively.  In addition to cargo operations, Aeroméxico Cargo commercializes available space for storing cargo at the warehouse that is located inside the Mexico City International Airport ("**AICM**") customs facilities, which contributed to 4.2% of Aeroméxico Cargo's revenues for the year ended December 31, 2019.

v.     *The Debtors' Fleet Structure.*

38.    Aeroméxico's routes range from short-haul domestic trips within Mexico to long-haul transcontinental flights, and, as a result, different aircraft types depending on the characteristics of the markets are operated on different routes.  Aeroméxico's fleet currently consists entirely of Boeing and Embraer aircraft, which reduces costs and makes operations more efficient, as it requires fewer spare parts and simplifies maintenance operations, as well as reduces the number of different aircraft which pilots must be trained to operate.

39.    In 2009 Aeroméxico operated seven different aircraft families.  Following an extensive period of fleet consolidation, the airline now operates three different families of aircraft consisting of the Boeing 787, Boeing 737 and the Embraer E-Jets.  This has delivered material savings in operating costs with reduced training, maintenance and other operating expenses.  The current fleet consists of:

(a)     The Boeing 787 family:

(i)     the BOEING 787-8, designed for 243 passengers and an approximate range of 14,100 kilometers; and

14

(ii)     the BOEING 787-9, designed for 274 passengers and an approximate range of 14,600 kilometers;

(b)     The Boeing 737 family:

(i)     the BOEING 737 700, designed for 124 passengers and an approximate range of 4,700 kilometers;

(ii)     the BOEING 737 800, designed for 160 passengers and an approximate range of 5,000 kilometers; and

(c)     the Embraer 170-190 family:

(i)     the E-170, designed for 76 passengers with an approximate range of 3,706 kilometers; and

(ii)     the E-190, designed for 99 passengers with an approximate range of 4,250 kilometers.

40.     Aeroméxico's fleet also includes the following aircraft type, which are currently non-operational:

(a)     the Boeing 737 MAX 8, which is designed for 166 passengers and a range of approximately 6,750 kilometers.[2]

41.     As of the Petition Date, Aeroméxico operated a fleet of 118 active passenger aircraft, excluding six Boeing 737 MAX that are temporarily grounded since March 2019, of which 91 aircraft are leased.   Prior to payment cessations and deferrals discussed herein, Aeroméxico paid approximately $30.4 million dollars each month in rent for aircraft under operating leases.   As of the Petition Date, the Debtors had $1.3 billion dollars short and long

---

[2] The Boeing 737 Max 8 was grounded on March 11, 2019, following the worldwide grounding of that category of aircraft.

term aircraft-related lease liabilities. Aeroméxico has acquired the 30 owned aircraft under financial leases, other financing options or with its own resources.

42.   Given the current economic climate and projections concerning anticipated passenger demand in the wake of the COVID-19 pandemic, Aeroméxico will likely have a surplus of aircraft in its fleet. The Debtors are considering various alternatives with respect to the restructuring of their lease and the rejection of certain existing leases.

*vi.*   *The Debtors' Prepetition Capital Structure.*

43.   The Debtors' capital structure includes a series of New York law bonds due 2025, Mexican domestic bonds, other long-term loans and borrowings, financings related to the acquisition of the Debtors' fleet and related equipment, and intercompany loans from PLM.[3] As of the Petition Date, the Debtors have an overall cash position of $159.3 million and the Non-Debtor Affiliates have an overall cash position of $600,000.

44.   As of the Petition Date, Aeroméxico has a total of $1,983,440,044 and Ps.7,891,791,534 in financial debt obligations.

45.   Principal long-term loans and borrowings are described[4] below:

---

[3] Pursuant to a January 20, 2016 Intercompany Loan Agreement dated May 13, 2020 between Aerovías de Mexico and PLM, PLM makes dollar denominated revolving term loans to Aeroméxico from time to time prior to the termination date of September 13, 2030, secured by the Irrevocable Security Trust Agreement with Reversion Rights under which Aeroméxico grants PLM a first priority security interest in Aeroméxico's shares of PLM. On May 12, 2020, PLM made a $50 million loan to Aerovías under the terms of an amendment to the existing intercompany loan agreement, dated January 20, 2016, between Aerovías and PLM, with a term of three years at an interest rate of six percent per annum (with interest to be compounded semi-annually). Thereafter, on June 29, 2020, Aerovías (a) entered into an amendment to the existing PLM shareholders agreement between Aerovías and AIMIA which provides Grupo Aeroméxico with a seven-year option to purchase AIMIA's shares of PLM at a specified EBITDA multiple, (b) an amendment to the CPSA that (i) makes certain favorable amendments to the commercial terms related to Aeroméxico 's participation in the Club Premier program and (ii) extended the term of agreement by 20 years and (c) an agreement with PLM whereby PLM will pre-purchase Program Points from Aeroméxico , the first of which occurred on June 29, 2020 in the amount of a $50 million advance to Aerovías.

[4] The Debtors and their professionals are continuing to review the relevant documents pertaining to the Debtors' loans and borrowings. The preliminary descriptions of these financings in this declaration or any of the First Day Motions is provided for informational purposes only and the Debtors reserve all rights relating to the long-term loans and borrowings described herein. Capitalized terms in this section not defined herein shall have the definition used in the underlying debt documents.

46.   <u>Senior Unsecured Notes.</u>  On February 5, 2020, Aerovías issued 7.000% Senior Notes due 2025 in the aggregate principal amount of $400,000,000 (the "Notes"), guaranteed by Grupo Aeroméxico (the "Guarantee").   The Notes and the Guarantee are senior, unsecured obligations of the Aerovías and Grupo Aeroméxico, respectively, ranking equally in right of payment with all of their other present and future unsecured obligations that are not expressly subordinated in right of payment to the Notes and the Guarantee (subject to certain statutory preferences under Mexican law, such as tax, labor and social security obligations).   The Notes bear interest at the rate of 7.0% per annum, payable in cash semi-annually in arrears on February 5 and August 5 of each year, commencing on August 5, 2020.   The indenture, the Notes and the Guarantee are governed by, and construed in accordance with, the laws of the State of New York. As of the Petition Date, the aggregate principal amount outstanding of these Notes is $400,000,000.

47.   <u>Stock Exchange Certificates on the Mexican Market.</u>  In December 2013, the *Comisión Nacional Bancaria y de Valores* [Mexican National Banking and Securities Commission] ("**CNBV**") authorized the registration on the National Registry of Securities (Registro Nacional de Valores) of the CNBV ("**RNV**") of a revolving, medium-term securitized trust certificates (*Certificados Bursátiles Fiduciarios*) program, for a maximum aggregate principal amount of Ps.5,000 million and in June 2017, it authorized the registration on the RNV of a program for a maximum aggregate principal of Ps.7,000 million.   This securitization structure involves the assignment of the Company's rights to receive any amount due from time to time by certain Credit Card Processors (under, and in accordance with, their respective Credit Cards Agreements), derived from sales of air transport and related services made with VISA and MasterCard credit cards in Mexico at travel agencies, Aeroméxico's website and its offices to a

trust, of which the main purpose is to receive and manage such accounts receivable, issue securities backed by the assets of the relevant issuing trust and pay such securities to the holders and any remaining amount to Aeroméxico.  Payment of principal and interest on the securities issued by the trust is made out of the amounts collected from the accounts receivable contributed by the Company.  There have been four issuances listed and sold on the Bolsa Mexicana de Valores, S.A.B. de C.V. (the "**BMV**") under these programs: AERMXCB13 for Ps.3,000 million (Ps.1,500 million initial issuance and a reopening of Ps.1,500 million) with interest rate hedging the issuance; AERMXCB15 for Ps.2,000 million with interest rate hedging the issuance; AERMXCB17 for Ps.3,000 million hedged by a swap-type derivative instrument, which sets the TIIE rate at 6.79% and AERMXCB19 for Ps.2,650 million hedged by a swap-type derivative instrument, which sets the TIIE rate at 7.72%.  All these issuances have a maturity of five years. In September 2017 and June 2019, respectively, AERMXCB17 and AERMXCB19 were issued. The resources obtained from these transactions were used to pre-pay for the AERMXCB series, strengthen liquidity, to amortize debt with less favorable terms and for general corporate purposes.  In September 2017 the program was expanded to a total of Ps.7,000 million.  As of the Petition Date, the aggregate liability in relation to the payment of these certificates (including short and long term certificates) is Ps.5,350 million.

(a)     Pre-delivery Payment Financings.     In connection with Aerovías's agreement to purchase aircraft from The Boeing Company ("**Boeing**"), Aerovías agreed to pay a portion of the purchase price (such payments are referred to as "pre-delivery payments" or "advance payments") for each aircraft in advance of delivery of that aircraft on a schedule agreed between Aerovías and Boeing. The below transactions were entered into in order to finance or provide for payment of a portion of Aerovías's pre-

delivery payment obligations to Boeing.  In each case, Aerovías assigned its right to purchase the aircraft to the borrower entity (or the seller entity in the installment purchase agreements) and guarantees such entities' obligations to the lenders (or to the purchaser in the installment purchase agreements).  If the installment purchase agreements are terminated, the seller is obligated to repay the installment payments.

(b)    Santander PDP Facility.  On March 29, 2017, Trust No. F/1930 (to which Aerovías is a settlor) as borrower, and Aerovías, Grupo Aeroméxico and Aeroméxico Connect, as guarantors, entered into a loan agreement with Banco Santander (México), S.A., and Banco Nacional de Comercio Exterior, S.N.C., Institución de Banca de Desarrollo, as lenders (the "**Santander PDP Facility**"),[5] for a principal amount of $174.3 million to finance pre-delivery payments relating to six aircraft, three of which remain subject to the Santander PDP Facility.  As of the Petition Date, the outstanding principal amount under the Santander PDP Facility is $37,332,050.

(c)    Jackson Square Aviation PDP Facility.  On August 29, 2017, Caballero Aguila Aircraft Holdings Limited as seller ("**Caballero Aguila**"), and Aerovías, as guarantor, entered into an installment purchase agreement with Wells Fargo Trust Company, National Association (formerly known as Wells Fargo Bank Northwest, National Association), not in its individual capacity, except as expressly provided, but solely as owner trustee under each of the MSN 43704 Trust Agreement, the MSN 43756 Trust Agreement, the MSN 43712 Trust Agreement, the MSN 43762 Trust Agreement, and the MSN 43763 Trust Agreement, as purchasers and JSA International U.S. Holdings, LLC as purchaser guarantor (the "**Jackson Square Aviation PDP Facility**"),

---

[5] In August 8, 2017, the first amendment to this agreement was signed adding Sabcapital, S.A. de C.V. SOFOM, E.R as a lender.

to pay a portion of the pre-delivery payments relating to five 737 MAX aircraft, four of which remain subject to the Jackson Square Aviation PDP Facility. The installment payments are secured by a security interest in the purchase agreement with respect to the aircraft and the shares of Caballero Aguila.

(d)     Clover PDP Facility.   On October 27, 2017, Mexican Dragon Aircraft Holdings Limited, as seller ("**Mexican Dragon**"), and Aerovías, as guarantor, entered into an installment purchase agreement with PAAL Cetus Company Limited, as purchaser (the "**Clover PDP Facility**"), to pay a portion of the pre-delivery payments relating to ten 737 MAX aircraft, seven of which remain subject to the Clover PDP Facility.   The purchaser's obligations under the Clover PDP Facility are guaranteed by Clover Aircraft Leasing Company Limited (formerly known as Ping An Aircraft Leasing Company Limited).   The installment payments are secured by a security interest in the purchase agreement with respect to the aircraft and the shares of Mexican Dragon.

(e)     SMBC PDP Facility.   On October 27, 2017, Mayan Aircraft Holdings Limited, as seller ("**Mayan Aircraft**") entered into an installment purchase agreement with Sumidero Limited, as purchaser (the "**SMBC PDP Facility**"), to pay a portion of the pre-delivery payments relating to ten 737 MAX aircraft, six of which remain subject to the SMBC PDP Facility.   Mayan Aircraft's obligations under the SMBC PDP Facility are guaranteed by Aerovías.   The installment payments are secured by a security interest in the purchase agreement with respect to the aircraft and the shares of the seller.

48.     Carlyle PDP Facility.   On May 29, 2020, Runway PDP Borrower Irish Designated Activity Company as borrower ("**Runway PDP Borrower**") entered into a PDP facility agreement with Carlyle Aviation Management Limited as agent, Runway PDP Lender One LLC

as security trustee and Runway PDP Lender One LLC as lender, to finance the pre-delivery payments relating to one Boeing 787-9 aircraft and two Boeing 737 MAX 8 aircraft (the "**Carlyle PDP Facility**").  Runway PDP Borrower's obligations under the Carlyle PDP Facility are guaranteed by Aerovías and Grupo Aeroméxico.  If the loans in respect of the 737 MAX 8 aircraft do not fund by July 30, 2020, the lender's commitment in respect of such loans terminates.  The loans are secured by a security interest in the purchase agreement with respect to the aircraft and the shares of Runway PDP Borrower.

49.     Syndicated Loan Secured with American Express Charge Fees.

(a)     On October 27, 2016, Aerovías, as borrower, and Grupo Aeroméxico as guarantor, entered into a syndicated loan agreement with Deutsche Bank AG, London Branch, Industrial and Commercial Bank of China Limited, New York Branch, Massachusetts Mutual Life Insurance Company, Sabcapital, S.A. de C.V., SOFOM, ER, Phoenix Life Insurance Company and PHL Variable Insurance Company as lenders, for a principal amount of $300 million, which was disbursed.  On June 4, 2018, such loan agreement was amended and restated in order to increase the aggregate principal amount of such loan by $150 million.  This principal amount increase was made under substantially similar conditions as the conditions of the original loan.  The loan is secured by (i) an irrevocable management and source of payment trust agreement to which certain collection rights were assigned to the trustee as source of payment of the obligations arising from such loan agreement, (ii) a Mexican non-possessory pledge agreement over collection rights arising from sales in dollars and pesos made in the United States and Mexico through cards issued by American Express or any of its subsidiaries or affiliates and (iii) a New York Law first-priority floating pledge agreement over collection rights

21

arising from ticket sales in dollars and pesos made in the United States and Mexico through cards issued by American Express or any of its subsidiaries or affiliates.

(b)     The loan has a seven-year term as of the date of first disbursement and accrues interest at a variable rate.  As of the Petition Date, the outstanding principal amount under this loan agreement is $268,750,000.  Pursuant to this loan agreement, Aerovías and Grupo Aeroméxico are required to comply with certain restrictive covenants that, among other things, limit the ability of: (1) Aerovías to incur any indebtedness in excess of certain thresholds, subject to certain exceptions, including indebtedness relating to the financing, maintenance and operation of aircraft; (2) Aerovías or any restricted subsidiary to create or permit the creation of any lien on the collection rights assigned or pledged to guarantee the loan, except for permitted liens thereunder and (3) Aerovías or Grupo Aeroméxico to merge, sell, lease or otherwise transfer all or substantially all assets, except as permitted thereunder.  In case of breach of any such covenants, or other events of default set forth in the loan agreement, including among others, cross-default and bankruptcy of Aerovías, Grupo Aeroméxico or a significant subsidiary, the required lenders may accelerate the loan.

50.     <u>Loan Agreement with IBM Capital Mexico.</u>  On June 25, 2018, Aerovías, as borrower, entered into a loan agreement with IBM Capital Mexico I, S. de R.L. de C.V., as lender, for a principal amount of $9,046,396.31, to be used for the acquisition of IT products and services.  As of the Petition Date, the outstanding principal amount under this loan agreement is approximately $4,347,984.  The loan has a 42-month term as of July 1, 2018 and shall mature on January 1, 2022, and accrues interest at a fixed rate (6.52% including VAT).

51.     <u>Credit Agreements with HSBC and Guaranteed by Ex-Im Bank.</u>  Aeroméxico has entered into a number of facilities with HSBC Bank USA, N.A. or HSBC Mexico, S.A., Institución de Banca Múltiple, and Grupo Financiero HSBC, each to be used to finance certain goods and services and benefitting from a guarantee from the Export-Import Bank of the United States ("**Ex-Im Bank**").  As of the Petition Date, the outstanding principal amount under the HSBC credit agreements are $4,815,057 and Ps.384,384,590.  The HSBC facilities are as follows:

(a)     On June 28, 2017, Aerovías, as borrower, and Grupo Aeroméxico, as guarantor, entered into a credit agreement with HSBC Bank USA, N.A., as lender, for a principal amount of approximately $10.2 million (the "**2017 Facility**").  The 2017 Facility was issued in three tranches and accrues interest at a variable rate.  The 2017 Facility matures on October 27, 2020 and accrues interest at a variable rate.

(b)     On June 26, 2018, Aerovías, as borrower, and Grupo Aeroméxico, as guarantor, entered into a credit agreement with HSBC Bank USA, N.A., as lender, for a principal amount of approximately $10.2 million (the "**2018 Facility**").  The 2018 Facility was issued in three tranches and accrues interest at a variable rate.  The 2018 Facility matures on October 9, 2021 and accrues interest at a variable rate.

(c)     On December 23, 2019, Aerovías, as borrower, and Grupo Aeroméxico, as guarantor, entered into a credit agreement with HSBC Mexico, S.A., Institución de Banca Múltiple, Grupo Financiero HSBC, as lender, for a principal amount of Ps.469,803,388 (the "**2019 Facility**").  The 2019 Facility matures on August 2, 2022 and accrues interest at a variable rate.

52.     <u>Hermes Facility.</u> On December 4, 2018, Aerovías, as borrower, and Grupo Aeroméxico and Aeroméxico Connect, as guarantors, entered into a facility agreement with

Banco Bilbao Vizcaya Argentaria, S.A., as lender, for a principal amount of EUR26 million, to be used to finance contracted engine maintenance services as well as the payment of insurance premiums in connection with the guarantee of a portion of the maintenance contract value by the Federal Republic of Germany (the "**Hermes Facility**").  The Hermes Facility accrues interest at a variable rate and has a maturity date of June 28, 2024.  In case of breach of any event of default set forth in the Hermes Facility, including among others, cross-defaults and bankruptcy of Aerovías, Grupo Aeroméxico or Aeroméxico Connect, the lenders may accelerate the loan.  As of the Petition Date, the outstanding principal amount equivalent under the Hermes Facility is $25,531,767.

53.    EDC Loan. On May 16, 2019, Aerovías, as borrower, and Grupo Aeroméxico, as guarantor, entered into a loan agreement with Export Development Canada, as lender, for a principal amount of approximately $10.4 million, to be used to finance a flight simulator and a flight training device (the "**EDC Loan**").  The EDC Loan is secured by a pledge of certain specific flight simulator and flight training device equipment owned by the Borrower and affiliates of the Borrower, plus all contracts relating thereto and profits therefrom.  The EDC Loan matures on November 12, 2029, with interest rate of 6.88%.  As of the Petition Date, the outstanding principal amount equivalent under the EDC Loan is $9,985,761.

**The Debtors' Fleet Leasing and Financing**

54.    Overview.  The Debtors' fleet comprises owned aircraft as well as aircraft under finance leases and operating leases.  The aircraft subject to finance leases are generally owned by special purpose vehicles.  With respect to the fleet subject to these finance leases, in order to finance the purchase of aircraft, the special purpose vehicles have entered into (i) long-term loan arrangements with commercial lenders, (ii) long-term loan or bond arrangements guaranteed by

U.S. Export-Import Bank ("Ex-Im Bank") or (iii) long-term loan arrangements with Banco Nacional de Desenvolvimento Econômico e Social – BNDES ("BNDES"). Furthermore, five aircraft in the Debtors' fleet are subject to a Japanese operating lease with a call option ("JOLCO") structure, as more particularly explained below.

55.     <u>MUFG Mortgage Loans</u>. MUFG mortgage loans pertain to three B737-700W aircraft registered with the U.S. Federal Aviation Administration (the "**MUFG Mortgaged Aircraft**"). MUFG Bank, Ltd. (formerly DVB Bank SE) ("**MUFG**") made a loan for each MUFG Mortgaged Aircraft to a separate Utah common law trust in which Aerovías owns 100% of the beneficial interest (the "**MUFG Mortgage Loans**"). Each such trust (i) owns title to an individual MUFG Mortgaged Aircraft and (ii) has entered into an operating agreement with Aerovías pursuant to which Aerovías has an exclusive license to possess, use and operate the MUFG Mortgaged Aircraft. Collateral for the MUFG Mortgage Loans includes, *inter alia*, a mortgage lien over the MUFG Mortgaged Aircraft and a pledge of Aerovías' beneficial interest in the relevant trust. Aerovías has also issued a guarantee in favor of MUFG. The MUFG Mortgage Loans mature in 2022 and accrue interest at a fixed rate.

56.     <u>Secured Financings Guaranteed by Ex-Im Bank.</u> Aerovías has eight aircraft registered in Mexico (the "**Ex-Im Guaranteed Aircraft**") financed via loans (the "**Ex-Im Guaranteed Loans**") or bonds (the "**Ex-Im Guaranteed Bonds**"), in each case guaranteed by Ex-Im Bank. As of the Petition Date, the outstanding principal amount of the Ex-Im Guaranteed Loans and Ex-Im Guaranteed Bonds is approximately $196,446,739.

(a)     <u>Ex-Im Guaranteed Loans</u>. The Ex-Im Guaranteed Loans were made to a Delaware LLC special purpose vehicle, which owns certain of the Ex-Im Guaranteed Aircraft and leases them to Aerovías pursuant to a finance lease. The collateral for the

Ex-Im Guaranteed Loans includes, *inter alia*, a mortgage over the relevant Ex-Im Guaranteed Aircraft, a pledge of the equity interests in the borrower and in the parent of the borrower, assignments of insurances and reinsurances, and a collateral assignment of the borrower's rights under the finance lease. Grupo Aeroméxico and Aerovías have issued a guarantee of the Ex-Im Guaranteed Loans in favor of the finance parties and Ex-Im Bank.

(b)    <u>Ex-Im Guaranteed Bonds</u>.  Each Ex-Im Guaranteed Bond is documented pursuant to a secured fixed rate global note issued by a Delaware LLC special purpose vehicle which owns title to the relevant Ex-Im Guaranteed Aircraft and leases them to Aerovías pursuant to a finance lease.  Collateral for the Ex-Im Guaranteed Bonds includes, *inter alia*, a mortgage over the relevant Ex-Im Guaranteed Aircraft, a pledge of the equity interests in the borrower and in the parent of the borrower, assignments of insurances and reinsurances, and a collateral assignment of the issuer's rights under the finance lease.  Grupo Aeroméxico, Aerovías and, in certain cases, Aeroméxico Connect have issued a guarantee in favor of the finance parties and Ex-Im Bank.

57.    <u>BNDES Financing.</u>   On February 11, 2011 (as amended from time to time), Aerovías, as borrower, Grupo Aeroméxico, as guarantor, and BNDES, as lender, entered into a term loan facility (the "**BNDES Facility**") to finance ten Embraer ERJ 190-100 aircraft registered in Mexico (the "**BNDES Aircraft**").  Under the BNDES Facility, a loan was made to Aerovías for each individual BNDES Aircraft (each, a "**BNDES Loan**"), and Aerovías used the proceeds of such BNDES Loan, in part, to prepay the entirety of the rent due under a finance lease between Aerovías, as lessee, and a Delaware LLC special purpose vehicle that owns title to the aircraft, as lessor.  The maturity date of each BNDES Loan is set out in the loan supplement

26

for each BNDES Aircraft, the latest of which is July 2024.  The BNDES Loans accrue interest at a fixed rate (for nine BNDES aircraft) or a LIBOR-based variable rate (in respect of one BNDES Aircraft) and are secured by, *inter alia*, (i) a mortgage over the BNDES Aircraft granted by the Delaware SPV, (ii) a collateral assignment of the Delaware SPV's rights as lessor under the finance lease with Aerovías, (iii) a pledge of the equity interests in the Delaware SPV, (iv) a security interest in certain bank accounts, warranty proceeds and sublease agreements, and (v) assignments of insurances.  Aerovias' obligations are guaranteed by Grupo Aeroméxico and the Delaware SPV.  As of the Petition Date, the outstanding principal amount under the BNDES Facility is $97,314,019.

58.    JOLCOs.    During 2017-2018, Aeroméxico continued to diversify financing sources and secured access to competitive financial terms.  The deliveries of five B787-9 aircraft that took place in these years pursuant to Aeroméxico's order with Boeing were financed through JOLCOs (such aircraft, the "JOLCO Aircraft").  Aerovías is not a borrower under the JOLCO facilities.  However, the JOLCO Aircraft are leased directly to Aerovías, and Grupo Aeroméxico has guaranteed the obligations of Aerovías.

59.    Equity.  Even though the capital stock of Grupo Aeroméxico is represented only by shares of a single class of common stock, such shares confer different rights to its shareholders, depending on whether shareholders are Mexican nationals.  Under the terms of the Foreign Investment Act, foreign investors may not, directly or indirectly, hold more than 49% of capital stock with the right to vote in a Mexican company (such as Aeroméxico or Aeroméxico Connect) that has a concession to provide air transport services for passengers, cargo and mail granted by the Mexican federal government through the SCT under the terms of the Civil Aviation Act.  Grupo Aeroméxico's bylaws also provide that the control of Grupo Aeroméxico

27

shall at all times be in the hands of Mexican individuals or Mexican legal entities with foreigners' exclusion clauses or with a majority of Mexican capital stock.  Any amendment to the foreign investment restriction mechanisms included in its bylaws requires prior approval from the Mexican General Directorate of Foreign Investment.

60.    In February 2017, Delta consummated a public tender for the acquisition of Grupo Aeroméxico's common stock and exercised related acquisition options in March and July 2017, as a result of which Delta became the holder of 349,757,660 of the sole series of shares, which represented 49.0% of Grupo Aeroméxico's then-outstanding share capital.  As of the Petition Date, Delta owns the rights to 51.27% of the economic rights arising from the shares of Grupo Aeroméxico and 49.0% of the voting rights arising from the shares of Grupo Aeroméxico. Delta appoints only two out of fifteen directors on Grupo Aeroméxico's board of directors and does not have the right to veto any decisions of the board.

## II.
## Events Leading to the Chapter 11 Cases

61.    Entering 2020, Aeroméxico was the leading airline in Mexico and sufficiently capitalized to continue its operational initiatives and take advantage of its strategic partnerships. However, due to worldwide travel restrictions and a collapse in consumer demand, the COVID-19 pandemic has resulted in unprecedented harm to the global aviation industry.  Many commentators have characterized the pandemic as the worst crisis to ever affect the industry, including United Airlines' characterization of the pandemic as "the most disruptive global crisis in the history of aviation."[6]  Numerous airlines have already filed for bankruptcy due to pandemic-related losses, including the largest carrier in Latin America LATAM Airlines, Virgin

---

[6] United Airlines, "United Expects To Have Approximately $17 Billion In Available Liquidity By September 2020," June 15, 2020, https://hub.united.com/2020-06-15-united-expects-to-have-approximately-17-billion-in-available-liquidity-by-september-2020-2646173793.html.

Australia, Colombia's Avianca, and the United States regional carriers Compass Airlines and Trans States Airlines.

62.     The unprecedented effects of the COVID-19 pandemic on the global economy, and on the aviation industry in particular, have significantly affected Aeroméxico's operations and its business plan.  Since the World Health Organization declared the widespread outbreak of the novel COVID-19 a global pandemic, countries around the world, including each of those in which Aeroméxico primarily operates, announced severe travel restrictions and/or outright closure of their borders.  The impact of such restrictions and COVID-19 generally on the demand for services in the aviation industry was almost instantaneous.  Mexican domestic capacity was reduced by as much as 75% and international capacity was reduced as much as 90%.  As of the Petition Date, Aeroméxico's passenger flights are limited to 2,098, which reflects only roughly 12.2% of Aeroméxico's routes prior to the COVID-19 crisis.

63.     In addition, Aeroméxico's operations have been affected by travel restrictions imposed by the countries to which it operates.  Countries such as Argentina, Brazil, Colombia, Chile, and Canada have all closed their borders to international travel.  There are also restrictions on travel for non-nationals to Schengen countries and Japan among others.  Aeroméxico has been directly impacted by travel restrictions to 18 international markets usually served by direct Aeroméxico flights.  In the months leading up to the Petition Date, 93% of the world's population have been impacted by travel restrictions as countries have taken preventive measures to limit the spread of the virus and protect their citizens.

64.     As the shutdowns continued, borders remained closed and passenger demand decreased, Aeroméxico's passenger business continued to dwindle.  In addition, there is no

certainty regarding the health policies and social distancing protocols, the duration thereof and the associated expenses, under which Aeroméxico will need to operate going forward.

65.     The COVID-19 pandemic arrived at a time when Aeroméxico's balance sheet was strong thanks to the efforts of its employees and its stakeholders.  All of Aeroméxico's profits in recent years have been reinvested in the Company, which has allowed the Company to acquire its own aircraft and be current with all obligations.  Furthermore, Aeroméxico has responded quickly to address the impact of the pandemic, as described above.

66.     Immediately following the outbreak of COVID-19, Aeroméxico began taking the necessary steps to protect the company while continuing its operations and meeting its commitments to its employees, customers and other stakeholders.  This has included significant cost reduction and liquidity preservation in advance of the filing of these Chapter 11 Cases.  For example, Aeroméxico immediately entered into negotiations with its main suppliers, including its fleet's lessors and airport groups.  Aeroméxico engaged directly with its various creditors and counterparties to request accommodations based on the extraordinary circumstances surrounding the COIVD-19 pandemic, including deferrals of upcoming payment obligations, and also postponed all non-critical expenses for its operation or capital goods.

67.     As discussed above, Aeroméxico has also implemented consensual salary reductions of up to 50% for employees, as well voluntary unpaid leave programs for 30, 60 or 90 days.  Aeroméxico has also reached various agreements with its various trade unions, which allowed on average of over 50% of its fixed labor costs, with the precise extent of savings dependent on the extent and duration of capacity adjustments.

68.     In the weeks leading up to this filing, Aeroméxico successfully negotiated payment deferrals with creditors and counterparties, resulting in payment deferrals of

approximately $83.3 million worth of payments.   Although these deferrals have allowed Aeroméxico to reduce its near-term cash expenditures and preserve existing liquidity, it has necessarily resulted in an increase in the Debtors' prepetition accounts payable, including to taxing authorities, critical United States vendors, lienholders, vendors in Mexico and other non-U.S. countries, and fuel suppliers.

69.     The company also implemented several initiatives to generate additional liquidity to protect its cash position.  The negative effects of COVID-19 on passenger demand have been more profound and persistent than expected, however, and these efforts have been insufficient to guarantee that the Company can continue its operations without undergoing a major restructuring process in the benefit of all its stakeholders.

70.     In connection with its efforts to respond to unprecedented recent events, Aeroméxico retained Davis Polk & Wardwell LLP as legal counsel, AlixPartners, LLP to provide management support and strategic advice, Rothschild & Co and SkyWorks Capital, LLC to provide financial advice, and Cervantes Sainz, S.C., as local Mexican counsel (the professionals in this paragraph together, the "**Restructuring Advisors**").  Retainer amounts paid in connection with certain of these retentions are held in bank accounts in New York.

71.     Unfortunately, despite the Company's previously-strong balance sheet and recent cost-savings and liquidity-preserving measures, Aeroméxico's liquidity position has deteriorated significantly, culminating in the filing of these Chapter 11 Cases in order to, among other things, prevent the exercise of remedies against the Debtors' assets, including with regards to their leased fleet assets.[7]  Ultimately, these Chapter 11 Cases represent the Debtors' best opportunity

---

[7] Aeroméxico is among several airlines to file for chapter 11 in the wake of the COVID-19 disruption.  See *In re LATAM Airlines Group S.A.,* No. 20-11254 (JLG) (Bankr. S.D.N.Y. May 26, 2020); *In re Avianca Holdings S.A.*, No. 20-11133 (MG), (Bankr. S.D.N.Y. May 10, 2020); *In re Ravn Air Group*, No. 20-10755 (BLS), (Bankr. D. Del. Apr. 5, 2020).

to ensure their stability, meet their obligations to their stakeholders and continue as a going concern on the other side of the COVID-19 pandemic.  Aeroméxico's intention is to continue serving those passengers still flying while preparing to welcome additional customers back as travel prohibitions are lifted, demand for flights increases and the industry begins to recover. Specifically, the Company plans to operate twice as many Mexican domestic flights in July as it did in June and expects to increase its international operations four-fold over the same time. With these adjustments, Aeroméxico expects to operate 6,000 flights in July.  As countries start to lift their border restrictions, the Company will continue resuming flights to more destinations. Aeroméxico will also continue to apply the protocols it created through its new Health and Sanitization Management System to protect the health of its clients and internal teams.

72.     Through these proceedings, the Debtors intend to streamline ongoing operations and reorganize prepetition obligations.  Given the current economic climate, the Debtors currently have a surplus of aircraft in its fleet.  Because fleet obligations comprise a significant portion of the Debtors' obligations, the Debtors may seek to reject, renegotiate and/or assume and assign certain aircraft leases in order to revitalize the size and makeup of their fleet. Similarly, the Debtors intend to use the substantive and procedural tools available in bankruptcy to maximize the efficiency of their ongoing operations, including with respect to prepetition debt and lease obligations, and to take advantage of current market conditions in order to renegotiate certain key contractual relationships.

73.     Ultimately, the Debtors expect to emerge from bankruptcy a strengthened airline in a more favorable economic climate.  In the meantime, the Debtors will make every effort to continue to serve their customers that have come to depend on Aeroméxico's service.  The Debtors have sufficient liquidity to continue operations in the ordinary course and intend to file a

motion seeking approval of a secured debtor-in-possession ("**DIP**") financing within thirty days of the Petition Date. The Debtors are negotiating a delayed-draw DIP loan facility with various parties as a comprehensive single tranche facility or a two tranche facility to augment liquidity.

## III.
## First Day Motions

74. The Debtors filed the First Day Motions contemporaneously with the filing of their chapter 11 petitions. In my opinion, the granting of each First Day Motion constitutes a critical element in achieving a successful and smooth transition to chapter 11.

75. For a more detailed description of the First Day Motions than set forth below, I respectfully refer the Court to the respective First Day Motions. To the extent that this Declaration and the provisions of any of the First Day Motions are inconsistent, the terms of the First Day Motions shall control. Capitalized terms that are used in this Part III but not otherwise defined herein shall have the meanings ascribed to them in the relevant First Day Motions (including the term "Motion"), and all terms of reference such as "herein" or "hereto" shall refer to the applicable First Day Motion.

### A. Administrative Motions

    i. *Debtors' Motion for an Order Directing Joint Administration of Chapter 11 Cases (the "**Joint Administration Motion**").*

76. The Debtors seek entry of an order directing joint administration of these Chapter 11 Cases for procedural purposes only pursuant to Bankruptcy Rule 1015(b). Specifically, the Debtors request that the Court maintain one file and one docket for all of the Chapter 11 Cases under the lead case—that of Grupo Aeroméxico, S.A.B. de C.V.—and further, that an entry be made on the docket of each of the Chapter 11 Cases of the Debtors to indicate the joint administration of the estates.

77.     Given the provisions of the Bankruptcy Code and the Debtors' affiliation, joint administration of these cases is warranted.   Joint administration will avoid the preparation, replication, service and filing, as applicable, of duplicative notices, applications and orders, thereby saving the Debtors considerable expense and resources.   The Debtors' financial affairs and business operations are closely related.   Many of the motions, hearings and orders in these Chapter 11 Cases will affect each Debtor and their respective estates.   The rights of creditors will not be adversely affected, as this Motion requests only administrative, and not substantive, consolidation of the estates.   Moreover, each creditor can still file its claim against a particular estate.   In fact, all creditors will benefit by the reduced costs that will result from the joint administration of these Chapter 11 Cases.   The Court also will be relieved of the burden of entering duplicative orders and maintaining duplicative files.   Finally, supervision of the administrative aspects of these Chapter 11 Cases by the U.S.  Trustee will be simplified.

78.     In my opinion, the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical step toward achieving a successful and smooth transition to chapter 11. Accordingly, on behalf of the Debtors, I respectfully submit that the Joint Administration Motion should be granted.

      ii.     *Debtors' Motion for an Order (i) Extending the Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases and Statements of Financial Affairs and (ii) Waiving the Requirements to File Equity Lists and Provide Notice to Equity Security Holders (the "***Motion for Extension of Time***").*

79.     The Debtors seek entry of an order (a) pursuant to Bankruptcy Rule 1007(c), extending the 14-day period to file the Schedules for an additional 20 days, without prejudice to the Debtors' ability to request additional time should it become necessary, and (b) pursuant to

Bankruptcy Rule 1007(a)(3), waiving the requirement to file the Equity Lists and, pursuant to Bankruptcy Rule 2002(d), the requirement to give notice of the order for relief to all equity security holders of the Debtors.

80.     Due to the complexity of their operations, the overwhelming number of contracts to which the Debtors are party and the numerous other matters that the Debtors must attend to in connection with filing these cases, the Debtors anticipate that they will be unable to complete the Schedules for the four Debtor entities in the 14 days provided under Bankruptcy Rule 1007(c).

81.     To prepare their Schedules, the Debtors must compile information from books, records and documents relating to potentially tens of thousands of claims, assets and contracts. This information is voluminous and is located in numerous places throughout the Debtors' organization.  Collection of the necessary information requires an enormous expenditure of time and effort on the part of the Debtors and their employees.  Additionally, because all invoices related to prepetition goods and services have not yet been received and/or entered into the Debtors' accounting system, it may be some time before the Debtors have access to all of the required information to prepare the Schedules.

82.     Unavoidably, the Debtors' primary focus has been on preparing these complex cases for filing and reacting to the events surrounding the filing.  While the Debtors, with the help of their professional advisors, are mobilizing their employees to work diligently and expeditiously on the preparation of the Schedules, resources are strained.  Not only have the same employees with the expertise to complete the Schedules been diligently preparing for the chapter 11 filing, they have also been occupied by numerous other restructuring-related work streams.

83.     Given the numerous critical operational matters that the Debtors' accounting and legal personnel must address in the early days of these Chapter 11 Cases, I believe that with the 20-day extension requested, the Debtors will be able to focus their attention on business operations to maximize the value of the Debtors' estates during the first critical postpetition months.  I believe this will help the Debtors make a smooth transition into chapter 11 and, therefore, maximize the value of the Debtors' estates to the benefit of creditors and all parties in interest.

84.     In my opinion, the relief requested in the Schedules Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the Schedules Motion should be granted.

> iii.    *Motion of Debtors for an Order (i) Waiving the Requirement to File a List of Creditors and Authorizing Preparation of a Consolidated List of Creditors in Lieu of Submitting a Formatted Mailing Matrix, (ii) Authorizing the Debtors to File a Consolidated List of the Debtors' Thirty Largest Unsecured Creditors and (iii) Establishing Procedures for Notifying Creditors of the Commencement of the Debtors' Chapter 11 Cases (the "Creditors List Motion").*

85.     The Debtors seek entry of an order: (a) waiving the requirement to file a list of creditors, co-debtors and parties to executory contracts on the Petition Date as required by section 521(a)(1) of the Bankruptcy Code, Bankruptcy Rule 1007(a)(1), Local Bankruptcy Rule 1007-1 and General Orders M-133, M-137, M-138 and M-409 (the "**Standing Orders**") of the United States Bankruptcy Court for the Southern District of New York (collectively, the "**Notice Rules**") and authorizing the Debtors to prepare a consolidated, electronic list of creditors in lieu of submitting a formatted mailing matrix; (b) authorizing the Debtors to file a single consolidated list of the Debtors' thirty largest unsecured creditors; and (c) authorizing the implementation of

certain procedures (the "**Procedures**") for notifying creditors of the commencement of the Chapter 11 Cases and of the meeting of creditors to be held pursuant to section 341 of the Bankruptcy Code using a notice to creditors and other parties in interest announcing the commencement of these Chapter 11 Cases (the "**Notice of Commencement**").

86.    Under Bankruptcy Rule 1007(d), a debtor is required to file "a list containing the name, address and claim of the creditors that hold the 20 largest unsecured claims, excluding insiders . . . ."  Fed. R. Bankr. P. 1007(d).  Requiring each Debtor to file a list of its top twenty creditors would place an undue burden on the Debtors.  Therefore, the Debtors request authorization to file a consolidated list of the Debtors' thirty largest unsecured creditors ("**Consolidated Top 30 List**").

87.    Authorizing the Debtors to file a single, consolidated list of the Debtors' thirty largest unsecured creditors will allow the Debtors to devote more time and resources to continuing operations and filing these Chapter 11 Cases.  Additionally, the Debtors believe that a Consolidated Top 30 List will be advantageous to the Office of the United States Trustee for the Southern District of New York by making a greater number of creditors potentially available for service on an official committee of unsecured creditors and will aid in any potential efforts to communicate with these creditors regarding potential service.

88.    Bankruptcy Rule 2002(a) provides, in relevant part, that "the clerk, or some other person as the court may direct, shall give the debtor, the trustee, all creditors and indenture trustees at least 21 days' notice by mail of: the meeting of creditors under § 341 or § 1104(b) of the Code."  Furthermore, Bankruptcy Rule 2002(f) provides that notice of the order for relief shall be sent by mail to all creditors.

89.     In light of the requirement to notify parties in interest of the commencement of these Chapter 11 Cases and the meeting of creditors, the Debtors seek authority to have the Notice and Claims Agent undertake the mailing of the Notice of Commencement to creditors at least 21 days before the meeting of creditors to be held pursuant to section 341 of the Bankruptcy Code (the "**Section 341 Meeting**").

90.     In addition to mailing the Notice of Commencement to the Debtors' creditors, the Debtors propose to publish, at least 21 days before the date on which the Section 341 Meeting is to be held, the Notice of Commencement in English and in Spanish (a) once in the national and international editions of the *Wall Street Journal*, *New York Times*, and/or a comparable newspaper with national/international circulation, and in *El Economista*, a Mexican newspaper of national circulation, and (b) on the website to be established by the Notice and Claims Agent and the Debtors' website.  The Debtors are confident that these publications will be most likely to reach those creditors who may not have received notice by mail.

91.     The proposed Procedures are beneficial to the Debtors' estates and to the Debtors' creditors because they provide actual notice to all of the Debtors' creditors in an efficient and cost-effective manner.

92.     In my opinion, the relief requested in the Creditors List Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical step toward achieving a successful and smooth transition to chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the Creditors List Motion should be granted.

      iv.     *Motion of Debtors for Entry of an Order Implementing Certain Notice and Case Management Procedures (the "**Case Management Motion**").*

93.     The Debtors seek entry of an order implementing certain notice and case management procedures.

94.      The Case Management Motion, if granted, will ensure that these Chapter 11 Cases are administered efficiently and economically, by, among other things, limiting service of Court Filings to those parties that have an interest in the subject matter thereof, authorizing electronic service and fixing monthly Omnibus Hearings.  Given the size and scope of these Chapter 11 Cases, the Case Management Motion will, among other things, reduce the administrative and financial burden that would otherwise be placed on the Debtors and other parties in interest who file documents in these Chapter 11 Cases, provide ample opportunity to parties in interest to prepare for and respond to matters before the Court, and ensure prompt and appropriate notice of matters affecting parties' interests.

95.      I believe that the relief requested in the Case Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11.   Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Case Management Motion should be granted.

> v.      *Application of Debtors for Authorization to Retain and Employ Epiq Corporate Restructuring, LLC as Claims and Noticing Agent Nunc Pro Tunc to the Commencement Date (the "**Claims and Noticing Agent Motion**").*

96.      The Debtors seek entry of an order appointing Epiq as Claims and Noticing Agent in order to assume full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim filed in the Debtors' Chapter 11 Cases, effective nunc pro tunc to the Commencement Date.  The Debtors' selection of Epiq to act as Claims and Noticing Agent has satisfied the Court's Protocol for the Employment of Claims and Noticing Agents under 28 U.S.C.  § 156(c), in that the Debtors have obtained and reviewed engagement proposals from at least two (2) other court-approved claims and noticing agents to ensure selection through a competitive process.  Moreover, I submit, based on all engagement proposals

39

obtained and reviewed, that Epiq's rates are competitive and reasonable given Epiq's quality of services and expertise.

97.      The Debtors anticipate that there will be in excess of 1,000 entities to be noticed. In view of the number of anticipated notice parties and claimants, and the complexity of the Debtors' business, the appointment of a claims and noticing agent is both necessary and in the best interests of both the Debtors' estates and their creditors.  By appointing Epiq as the Claims and Noticing Agent in these Chapter 11 Cases, the distribution of notices and the processing of claims will be expedited, and the Office of the Clerk of the Bankruptcy Court will be relieved of the administrative burden of processing what may be an overwhelming number of claims.

98.      Epiq is one of the country's leading chapter 11 administrators, with experience in noticing, claims administration, solicitation, balloting, and facilitating other administrative aspects of Chapter 11 Cases.  Epiq has substantial experience in matters of this size and complexity and has acted as the official notice and claims agent in many large bankruptcy cases pending in this District and other districts nationwide.

99.      In view of the number of anticipated claimants and the complexity of the Debtors' businesses, on behalf of the Debtors, I respectfully submit that the Epiq's Application should be granted.

### B.  Operational Motions Requesting Immediate Relief

> i.    *Motion of Debtors for an Order Authorizing (i) Debtors to Continue to Use Existing Cash Management System and Maintain Existing Bank Accounts and Business Forms and (ii) Financial Institutions to Honor and Process Related Checks and Transfers (the "**Cash Management Motion**").*

100.    The Debtors seek entry of interim and final orders authorizing the Debtors to (a) continue to operate their prepetition Cash Management System (as defined in the Cash Management Motion), (b) fund the operations of affiliates and subsidiaries, (c) maintain the

Debtors' existing bank accounts including, but not limiting to, those opened within any Mexican trust and under the name of any Mexican trustee acting as trustee of said trusts where the Debtors act as settlors and first or second beneficiaries, and (d) maintain the Debtors' existing business forms, in each case in the ordinary course of business and consistent with prepetition practice.

101.    The Debtors further request interim and final orders to (a) authorize all Banks to receive, process, honor and pay any and all checks, drafts and other forms of payment, including fund transfers, on account of the Cash Management System, whether such checks or other requests were submitted before, on or after the Petition Date, (b) authorize the Banks (as defined in the Cash Management Motion) to rely on the representations of the Debtors as to which checks and fund transfers are subject to the Cash Management Motion, provided that no Bank shall have any liability to any party for relying on such representations, (c) prohibit the Banks from placing any holds on, or attempting to reverse, any automatic transfers to any account of the Cash Management System, and (d) authorize the Debtors to issue new postpetition checks or effect new postpetition fund transfers to replace any checks, drafts and other forms of payment which may be dishonored or rejected and to reimburse any expenses that may be incurred as a result of any Bank's failure to honor a prepetition check or other form of payment.

102.    Given the Debtors' operations, as well as the goal of preserving and enhancing their respective going concern values, a successful reorganization of the Debtors' businesses simply cannot be accomplished if there is substantial disruption to the Cash Management System, including the intercompany transfers made thereunder.  It is essential that the Debtors be permitted to continue to consolidate the management of their cash and transfer monies from entity to entity as necessary and appropriate to continue the operation of their businesses.  If the Debtors were required to dismantle the Cash Management System, it would wreak havoc on their

day-to-day operations and their accounting practices and impair the Debtors' ability to generate timely reports of transactions and balances.

103.     In addition, it would be very time consuming, difficult and costly for the Debtors to establish an entirely new system of accounts and new cash management system, and doing so would disrupt the Debtors' relationships with their key customers and suppliers/vendors.  The attendant delays from opening new accounts, revising cash management procedures and instructing customers to redirect payments would harm the Debtors' ability to operate their businesses while pursuing these arrangements.  Under the circumstances, maintenance of the Cash Management System is essential and in the best interests of the Debtors' estates.  Furthermore, preserving the "business as usual" atmosphere and avoiding the unnecessary and costly distractions that would inevitably be associated with any substantial disruption in the Cash Management System will facilitate the Debtors' reorganization efforts.

104.     The Debtors also seek authorization to implement changes to the Cash Management System in the ordinary course of business, including opening any additional bank accounts, or closing any existing Bank Account as they may deem necessary and appropriate. The Debtors request that the Court authorize the Banks to honor the Debtors' requests to open or close, as the case may be, such bank accounts or additional bank accounts, provided, however, that, unless otherwise ordered by this Court, any new bank account shall be with (i) a bank insured by the FDIC and that is organized under the laws of the United States or any State therein, (ii) a bank designated as an Authorized Depository under the U.S.  Trustee Guidelines or (iii) any other bank, as the Debtors may determine upon consultation with the U.S.  Trustee.

105.     I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors and all other parties in interest and constitutes a

critical element in achieving a successful and smooth transition to chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Cash Management Motion should be granted.

> ii.   *Motion of Debtors for Entry of Interim and Final Orders Authorizing the Debtors to Continue and Renew their Letter of Credit and Surety Bond Programs (the "**Letter of Credit and Surety Bond Motion**").*

106.    The Debtors request authorization to maintain, continue and renew, in their sole discretion, their Letter of Credit and Surety Bond Programs (as defined below) on an uninterrupted basis and in accordance with the same practices and procedures, including, but not limited to, the maintenance of cash collateral, as were in effect before the Petition Date.  This authority would include permitting the Debtors (i) to pay all amounts arising under the Letter of Credit and Surety Bond Programs due and payable after the Petition Date, (ii) to renew or obtain new letters of credit and surety bonds as needed in the ordinary course of business, including, but not limited to, as may be required by law or judicial authority, (iii) directing any non-Debtor subsidiaries who have obtained letters of credit or letters of credit and surety bonds on the Debtors' behalf to do the foregoing, as applicable.  If the requested relief is not granted and the Letter of Credit and Surety Bond Programs are interrupted, lapses or terminates, the Debtors' operations could be immediately and irreparably harmed, thereby endangering the Debtors' successful reorganization and substantially harming all creditors.   The Debtors also seek authority, but not direction, under section 365 of the Bankruptcy Code to, in their sole discretion, assume the Indemnity Agreements (defined below) and continue all obligations thereunder.

107.    In the ordinary course of their businesses, the Debtors and certain non-Debtor wholly-owned subsidiaries are required to provide to third parties letters of credit and surety bonds to secure the Debtors' payment or performance of certain obligations required by law, including, without limitation: (a) obligations owed to municipalities, (b) obligations associated

with operations, (c) contractual or permit obligations, (d) airport obligations and (e) customs requirements. Failure to provide, maintain or to timely replace these letters of credit and surety bonds could jeopardize the Debtors' ability to conduct their operations.

108.    Unlike an insurance policy, if an Issuer incurs a loss on a surety bond, it is entitled to recover the full amount of that loss from the principal. This right to indemnity is typically memorialized in an indemnity agreement between the Issuer and the principal, the execution of which is generally required by the Issuer as a precondition to the issuance of a bond. The Debtors are a party to a number of such indemnity agreements (together, the "**Indemnity Agreements**"). Pursuant to the Indemnity Agreements, the Debtors have agreed to indemnify certain parties from any loss, cost, damage or expense they may incur by reason of their execution of any bonds on behalf of Debtors. By this Motion, the Debtors seek the authority, but not the obligation, to honor those Indemnity Agreements under section 365 of the Bankruptcy Code.

109.    Based on the current financial status of the Debtors, it is unlikely that the Debtors will be able to renew or obtain replacement letters of credit or surety bonds on an unsecured basis and in some cases capacity may not be available even on a secured basis. In order to be able to give the financial assurances the Debtors will be required to provide in order to continue their business operations during the reorganization process, the Debtors must maintain the existing Letter of Credit and Surety Bond Programs and may need additional letter of credit and bonding capacity not currently provided by the Letter of Credit and Surety Bond Programs.

110.    Accordingly, to operate their businesses, which require the Letter of Credit and Surety Bond Programs, the Debtors will have to either renew or replace their existing letters of

credit and surety bonds, and will most likely have to maintain collateral arrangements similar to those currently in place.

111.    I believe that if the Debtors are not permitted to continue to maintain their Letter of Credit and Surety Bond Program in its current form, it would cause immediate and irreparable harm by endangering the Debtors' ability to maintain sufficient surety bonds, which are necessary for their operations.

112.    In my opinion, the relief requested in the Surety Bonds Motion is in the best interests of the Debtors' estates, their creditors and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the Surety Bonds Motion should be granted.

   iii. *Motion of Debtors for Authorization, but not Direction, to (i) Enter into Derivative Contracts and (ii) Pledge Collateral under Derivative Contracts (the "**Derivative Contracts Motion**").*

113.    The Debtors seek authority, but not direction, to (a) continue entering into, "rolling over," adjusting, modifying, and settling Derivative Contracts to hedge the Debtors' risk of fluctuations in jet fuel prices, changes in interest rates and exchange rates (if deemed necessary)[8], and to (b) perform all such actions necessary or appropriate to implement, execute, and perform these transactions, including paying premiums, posting letters of credit, entering into escrow agreements, opening and funding escrow accounts, posting collateral or margin, prepayment, taking physical delivery of commodities, and effecting settlement of Derivative Contracts.

114.    The Debtors' businesses are sensitive to fluctuations in jet fuel prices and interest rates, exchange rates and other prices and rates.  Accordingly, the Debtors' global risk

---

[8] As discussed in the Derivatives Motion, the Debtors do not currently have any exchange rate Derivative Contracts.

management policy focuses on mitigating risks of jet fuel prices, interest rates, exchange rates and fleet flexibility maintenance. For fuel costs in particular, the Debtors have a policy to procure financial derivatives to hedge between 40% to up to 60% of their jet fuel consumption requirements for the upcoming 12 months, on a continuous basis. To effectuate this risk management policy, the Debtors are currently party to and will continue to enter into derivatives contracts that reduce the risks associated with some of these fluctuations and from time to time the Debtors may enter into derivative contracts, including forward contracts, swap contracts, option contracts, or combinations of the foregoing (collectively, "**Derivative Contracts**").

115.     To effectively manage the risks inherent in the Debtors' business, the Debtors must be able to continue to enter into Derivative Contracts and must be able to maintain the confidentiality of the basic terms of the Derivative Contracts. Given the confidential and immediate nature of entering into Derivative Contracts, it is impractical and counterproductive to require the Debtors to seek separate approval of each Derivative Contract.

116.     Furthermore, Derivative Contracts typically include provisions for credit support and obligations to post margin. Posting of margin requires participants to periodically deposit money with their counterparties based on the mark-to-market values of the Derivative Contracts and potential future changes in value. A re-evaluation of the credit support requirement generally occurs periodically throughout the term of each Derivative Contract. Re-evaluation often results in one party having either to provide additional collateral or return some of the existing collateral.

117.     Thus, under certain prepetition Derivative Contracts, as well as Derivative Contracts the Debtors may enter into postpetition, they may be required to pledge certain of the

Debtors' assets to the counterparty in circumstances where the Debtors' obligations to the counterparty exceed a predetermined threshold.

118.    The Debtors are concerned that without the express authority to pledge collateral under certain Derivative Contracts, counterparties may refuse to enter into the Derivative Contracts.   Therefore, to preserve the value of the Debtors' estates, the Debtors request the express authority to pledge collateral under Derivative Contracts.   Inability to enter into Derivative Contracts could (a) cause disruption to the Debtors' operations and (b) expose the Debtors' ability to successfully reorganize to fluctuations in jet fuel prices, interest rates, or exchange rates.

119.    Furthermore, the posting of collateral may not result in any net loss to the Debtors. The counterparties will realize on their collateral only if the Debtors owe the counterparties money.   The Debtors will owe money to counterparties for the Derivative Contracts, and the collateral that has been posted will be at risk, only when the prices of jet fuel, interest rates or exchange rates, as the case may be, become favorable to a counterparty.   In these situations, although the Debtors may owe money on account of the Derivative Contracts, the Debtors' businesses may have benefited from the favorable prices of the jet fuel, interest rates and exchange rates.   Consequently, the losses from the Derivative Contracts, if any, may be offset by gains in the Debtors' operations.   Thus, the significant positive benefits of the Debtors' derivative strategy can be realized only by the Debtors continuing their prepetition practices.

120.    I believe that the relief requested in the Derivative Contracts Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11.   Accordingly, on

behalf of the Debtors, I respectfully submit that the relief requested in the Derivative Contracts

Motion should be granted.

### C.  Employee, Customer and Operational Matters

> i.  *Motion of Debtors for an Order Authorizing (i) Debtors to (a) Pay Prepetition*
> *Wages, Salaries, Employee Benefits and Other Compensation and (b)*
> *Maintain Employee Benefits Programs and Pay Related Administrative*
> *Obligations, (ii) Employees and Retirees to Proceed With Outstanding*
> *Workers' Compensation Claims and (iii) Financial Institutions to Honor and*
> *Process Related Checks and Transfers (the "**Wages Motion**").*

121.    The Debtors seek entry of an order (a) authorizing, but not directing, the Debtors

to pay, in their sole discretion, all or a portion of the amounts owing (and associated costs) under

or related to Wages, Executive VP Compensation, Withholding Obligations, Reimbursement

Obligations, Relocation Obligations, Health and Welfare Plan Obligations, Vacation Obligations,

S&A Obligations, Retirement Plans, Supplemental Savings Plans, Savings Plans, Severance

Obligations, Workers' Compensation Obligations, Financing Agreement Payments, Non-Insider

STIP Obligations and Other Employee Programs, (b) unless otherwise set forth in the Wages

Motion, authorizing, but not directing, the Debtors to continue, in their sole discretion, their

plans, practices, programs and policies for their Employees and Retirees, as those plans,

practices, programs and policies were in effect as of the Petition Date and as may be modified,

terminated, amended or supplemented in the ordinary course of business from time to time, in

their sole discretion, and to make payments pursuant to such plans, practices, programs and

policies in the ordinary course of business, as well as to pay related administrative obligations,

(c) permitting Employees and Retirees holding claims under the Workers' Compensation

Programs to proceed with such claims in the appropriate judicial or administrative fora and to

permit insurers to continue to access collateral and security provided by the Debtors pursuant to

the Workers' Compensation Programs and (d) authorizing applicable banks and other financial

institutions to receive, process and pay any and all checks drawn on the Debtors' payroll and general disbursement accounts and automatic payroll and other transfers to the extent that those checks or transfers relate to any of the foregoing.

122.    Absent the relief requested, the Debtors' employees will suffer undue hardship and, in many instances, serious financial difficulties, as the amounts in question are necessary to enable the employees to meet their personal financial obligations.  Moreover, based on the centrality of employee issues in past airline bankruptcies, the Debtors believe that, absent the requested relief, the stability of the business operations and the success of these Chapter 11 Cases will be undermined.

123.    I believe that the relief requested in the Wages Motion is in the best interests of the Debtors' estates, their creditors and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Wages Motion should be granted.

> ii.    *Motion of Debtors for Entry of Interim and Final Orders Authorizing (i) Debtors to Honor Prepetition Obligations to Customers and Related Third Parties and to Otherwise Continue Customer Programs, (ii) Relief from Stay to Permit Setoff in Connection with the Customer Programs and (iii) Financial Institutions to Honor and Process Checks and Transfers (the "Customer Programs Motion").*

124.    By the Customer Programs Motion, the Debtors request entry of an Interim Order and Final Order authorizing but not directing them in their business judgment to (a) perform and honor such of their prepetition obligations related to the Club Premier loyalty program, advance ticket sales, promotional programs, ticket refunds, ticket vouchers, frequent flyer credit card programs, travel agency and tour operator programs, airport lounge programs, corporate incentive programs, charter and cargo programs as they deem appropriate and (b) continue,

renew, replace, implement new, and/or terminate such agreements as they deem appropriate, in each case in the ordinary course of business and without further application to the Court.

125.    The Debtors have obligations to their customers for airline travel tickets that were purchased prepetition but have not yet been used.  The Debtors also have obligations from various sales tools and promotional programs, including, but not limited to, credits for airline travel, vouchers, passes to airport lounges, coupons, travel certificates, upgrade award certificates, and they also issue non-cash travel authorizations.  Further, in response to the COVID-19 pandemic, for any ticket booked between March 1, 2020 and June 30, 2020, Aeroméxico has offered customers with qualifying tickets the option to receive a voucher valid until April 30, 2021.  The Debtors also provide travel vouchers to passengers that experienced delays or losses from irregular operations, such as canceled or delayed flights and lost, damaged, or delayed delivery of baggage.  Additionally, the Debtors make payments for hotel stays, meals, and other services to passengers for certain travel disruptions, including, but not limited to, overbooking, cancelations, flight delays and claims for lost, damaged or delayed delivery of baggage.

126.    The Debtors most significant Customer Program is the Club Premier Loyalty Program, which has approximately 6.7 million members.  In 2010, the Debtors transferred Club Premier to PLM.  Through Club Premier, members earn points and kilometers each time they fly with the Debtors and by using the services of participating bank credit cards or through purchases with the more than 100 Club Premier participants, including hotel chains and car rental companies, which members can use to redeem various awards.

127.    Frequent flyer programs like Club Premier have been adopted by most major air carriers and are considered an important marketing tool for developing brand loyalty among

travelers and accumulating demographic data pertaining to business flyers.  Even though Club Premier is maintained by PLM (itself majority owned by the Debtors) and not by the Debtors, the program is essential to building and maintaining a loyal customer base, among both business and leisure travelers.  Honoring the Club Premier obligations will not involve any cash expense above those costs normally incurred in providing travel to passengers.  However, the benefits of the Club Premier Program cannot be overstated, and maintaining the Club Premier Program is a critical element of the Debtors' reorganization efforts.

128.   Failure to maintain the customer programs consistent with the Debtors' past business practices, customers will likely lose confidence in the Debtors' ability to reorganize. There is no reason to think that the Debtors' loyal customers would stay loyal when they resume flying if the Debtors did not honor the customer program obligations.  Ultimately, the damage from refusing to honor these obligations far exceeds the cost associated with honoring prepetition obligations and continuing these practices.  The relief requested in the Customer Programs Motion will protect the Debtors' goodwill during this critical time and enhance the Debtors' ability to generate revenue.

129.   I believe that the relief requested in the Customer Programs Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and facilitates achieving a successful and smooth transition to chapter 11.  Accordingly, on behalf of each the Debtors, I respectfully submit that the relief requested in the Customer Programs Motion should be granted.

      iii.   *Debtors' Motion for an Order Authorizing (i) Debtors to Pay Certain Prepetition Taxes, Governmental Assessments and Fees and (ii) Financial Institutions to Honor and Process Related Checks and Transfers (the "**Taxes Motion**").*

130.   The Debtors request entry of an Interim Order and a Final Order, authorizing,

but not directing, the Debtors to pay certain taxes and business license, compliance and regulatory fees to various foreign, federal, state, county and city taxing, licensing and regulatory authorities, whether asserted before, on or after the Petition Date, and without prejudice to the Debtors' rights to contest the amounts of any Taxes and Fees on any grounds available under applicable law.  The Debtors also respectfully request that the Interim Order and the Final Order (a) authorize and direct all applicable banks and other financial institutions to receive, process, honor and pay any and all checks, drafts and other forms of payment, including fund transfers, on account of the Taxes and Fees, whether such checks or other requests were submitted before, on or after the Petition Date; (b) authorize the Banks to rely on the representations of the Debtors as to which checks and fund transfers are subject to this Motion, provided that no Bank shall have any liability to any party for relying on such representations; (c) prohibit the Banks from placing any holds on, or attempting to reverse, any automatic transfers on account of the Taxes and Fees; and (d) authorize the Debtors to issue new postpetition checks or effect new postpetition fund transfers to replace any checks, drafts and other forms of payment, which may be dishonored or rejected and to reimburse any expenses that may be incurred as a result of any Bank's failure to honor a prepetition check or other form of payment.

131.     In the ordinary course of business, the Debtors collect and incur various Taxes and Fees, including income taxes, VAT and sales taxes, and Airline Taxes and Fees (as defined below), among other taxes.  The Debtors remit the Taxes and Fees to Governmental Authorities. In addition to the more generally applicable Taxes and Fees, the Debtors collect, incur and remit several taxes and fees attributable to their operations as an international airline (the "**Airline Taxes and Fees**").  The Airline Taxes and Fees include: (i) customs, immigration and security fees (including the Mexican Tourism Tax (DNI)); (ii) taxes and fees assessed for flying over, or

landing in, a particular jurisdiction (including Servicios a la Navegacion en el Espacio Aereo Mexicano (SENEAM) fees which are incurred when operating within Mexican airspace) and (iii) national tourism taxes related to education and social welfare initiatives.

132.     Moreover, the Debtors also seek to pay prepetition Taxes and Fees in order to forestall Governmental Authorities from taking actions that might interfere with the Debtors' successful reorganization, including restricting the Debtors´ principal activities (such as requesting advance payments for any Airlines Taxes and Fees, as defined below) or blocking the receipt or renewal of permits required for the Debtors' continued operations or possibly bringing personal liability actions against directors, officers and other employees in connection with non-payment of Taxes and Fees, among other possible Governmental Authority actions.  Actions against the Debtors' directors, officers and other employees would likely distract key personnel, whose full-time attention to the Debtors' reorganization efforts is required, and would likely cause potential business disruptions.  Any such business disruptions would likely erode the Debtors' customer base and negatively impact these Chapter 11 Cases.  Accordingly, the Debtors submit that the proposed relief is in the best interest of the Debtors' estates.

133.     I believe that the relief requested in the Taxes and Fees Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Taxes and Fees Motion should be granted.

> iv.     *Motion of Debtors for Entry of Interim and Final Orders Authorizing (i) The Debtors to Continue and Renew their Liability, Property, Casualty and Other Insurance Policies and Honor All Obligations in Respect Thereof and (ii) Financial Institutions to Honor and Process Related Checks and Transfers (the "**Insurance Motion**").*

134.     The Debtors seek entry of interim and final orders (a) authorizing, but not directing, them to maintain, continue, renew or purchase, in their sole discretion, Insurance Policies (defined below) on an uninterrupted basis and in accordance with the practices and procedures in effect before the Petition Date and (b) allowing the Debtor's financial institutions to receive, process, honor and pay checks or wire transfers used by the Debtors to pay the foregoing.  This would include (a) paying all amounts arising under the Insurance Policies, including, but not limited to, any Brokers Fees (defined below), whether due and payable before, on or after the Petition Date and (b) renewing or obtaining new insurance policies as needed in the ordinary course of business (including creating, capitalizing, and obtaining insurance from a captive insurance company or a segregated account within a licensed insurer as described herein).

135.     The Debtors require various liability, casualty, property and other insurance, reinsurance and risk control programs in the ordinary course of their businesses (the "**Insurance Policies**"), which they maintain through several private insurance carriers (the "**Insurance Carriers**").  A summary of the Debtors' principal Insurance Policies is set forth on **Exhibit C** attached to the Insurance Motion.

136.     The Insurance Policies include coverage for, among other things, war, terrorism, operation of aircraft, property damage, ground handling operators liability, operation of automobiles, officers' or directors' liability, civil liability, transport/cargo and various other property-related and general liabilities.  All of the Insurance Policies are essential to the ongoing operation of the Debtors' businesses.

137.     The Insurance Policies renew on various dates throughout the year.  The premiums for most of the Insurance Policies (collectively, the "**Insurance Premiums**") are

determined annually and are due either in their entirety at policy inception or via installments through the policy term.  In Mexico, the Debtors make such payments directly to the Insurance Carriers.  Outside of Mexico, Brokers' Fees and Insurance Premiums are typically paid together through the applicable Broker.

138.     The nature of the Debtors' businesses and the extent of their operations makes it essential for the Debtors to maintain their Insurance Policies on an ongoing and uninterrupted basis.  The nonpayment or delayed payment of any premiums, deductibles or related fees under the Insurance Policies could result in one or more of the Insurance Carriers terminating or declining to renew their insurance policies or refusing to enter into new insurance policies with the Debtors in the future.  If any of the Insurance Policies lapse without renewal, the Debtors could be in violation of applicable law, resulting in a loss of licenses and therefore loss of the ability to operate their business, which would result in immediate and irreparable harm to the Debtors and their estates.  Allowing the Insurance Policies to lapse without renewal could also result in exposure to substantial liability for personal, contractual and/or property damages, to the detriment of all parties-in-interest.

139.     The Debtors are compelled by sound business practice to maintain essential insurance coverage.  Any interruption in such coverage would expose the Debtors to a variety of risks, including the possible (a) incurrence of direct liability for the payment of claims that otherwise would have been covered by the Insurance Policies, (b) incurrence of material costs and other losses that otherwise would have been reimbursed, such as attorneys' fees for certain covered claims, (c) inability to obtain similar types and levels of insurance coverage, (d) incurrence of higher costs for reestablishing lapsed policies or obtaining new insurance coverage and (e) incurrence of direct liability for failing to maintain required insurance coverage.

140.     I believe that the relief requested in the Insurance Motion is in the best interests of the Debtors' estates, their creditors and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Insurance Motion should be granted.

> i.     *Motion of Debtors for Interim and Final Orders (i) Authorizing Debtors to Honor Interline Agreements, Clearinghouse Agreements, Industry Agreements, Protection Agreements, Alliance Agreements, Delta Airlines Agreements, Club Premier Loyalty Program Agreements and Prepetition Obligations Related Thereto, (ii) Modifying the Automatic Stay Solely to the Extent Necessary to Effectuate the Intended Relief and (iii) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers (the "***Airline Contracts Motion***").*

141.     The Debtors seek entry of interim and final orders authorizing, but not directing, the Debtors to (a) assume various agreements including multilateral agreements, clearinghouse agreements, industry agreements, protection agreements, alliance agreements, strategic partnership agreements, and Club Premier Agreements that the Debtors are party to, along with certain other contractual agreements integral to the Debtors' airline business with third parties (the "**Critical Airline Agreements**") pursuant to specified assumption procedures, to the extent the Debtors deem, in their sole direction and discretion, that the assumption of such agreements is in the best interest of the estates, (b) continue to perform, as deemed necessary, all obligations arising under the Critical Airline Agreements, including making all payments owing under the agreements in the ordinary course of business and (c) honor all obligations (whether prepetition or postpetition) owed under such Critical Airline Agreements pending assumption.

142.     The airline business is an interdependent industry that relies upon a network of complex agreements governing virtually all aspects of air travel and airline operations.  Without agreements for coordination between airlines and airline services, efficient service by the airline

industry to the traveling public would be virtually impossible. Among other things, these agreements facilitate cooperation among airlines for such critical activities as making reservations and transferring passengers, baggage, freight and mail between airlines. Without these agreements, the Debtors would not be able to provide the efficient service that its customers—particularly international travelers—have come to expect.

143.  Certain services under the Critical Airline Agreements, such as the clearinghouse functions and global reservation services, are the equivalent of industry-wide cooperative services in that there is no readily available alternative. The clearinghouse functions provide for the settlement of obligations that are owed among airlines and other travel-related entities that participate in the clearinghouses. Any failure in the continuity of these relationships may well result in irreparable harm to the Debtors' ability to maintain their essential relationships with their business partners, various clearinghouses, other airlines and certain other business entities essential to the preservation of the going concern value of the Debtors' businesses.

144.  The Debtors are party to multilateral and other agreements with, or administered by, International Air Transport Association, including the IATA Membership Agreement, the Interline Traffic Participation Agreement – Passenger, the Multilateral Interline Traffic Agreement – Passenger, Multilateral Agreements for Passenger and Cargo Interline Charges – United States, the Air Traffic Conference Interline Traffic Agreement – Passenger and the Air Traffic Conference Interline Air Cargo Procedures Agreement. The Debtors are also parties to the Air Transport Association of America membership application/agreement, the ATA Interline Traffic Agreement – Passenger, the 1995 Amendatory Agreement for the Exchange of Dishonored Check Data, the ATA Airline Freight Traffic Agreement, the Spec 2000

Participation Agreement and to numerous bilateral interline agreements with other airlines relating to ticketing, baggage-handling and other services.

145.    The Critical Airline Agreements are essential to the Debtors' ongoing operations and the Debtors do not have competing suppliers, providers or relationships to replace many of the vital functions served or benefits provided by the foregoing agreements.

146.    I believe that the relief requested in the Airline Contracts Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and facilitates achieving a successful and smooth transition to chapter 11.  Accordingly, on behalf of each the Debtors, I respectfully submit that the relief requested in the Airline Contracts Motion should be granted.

### D.  Critical Vendors and Suppliers

> ii.    *Motion of Debtors for Interim and Final Orders Authorizing (i) Payment of Certain Prepetition Claims of Critical Vendors and Foreign Vendors and (ii) Financial Institutions to Honor and Process Related Checks and Transfers (the "**Critical Vendors and Foreign Vendors Motion**").*

147.    The Debtors seek entry of an Interim Order and a Final Order, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, the Debtors seek authority to pay, in their sole discretion and business judgment, some or all of the prepetition obligations of certain Critical Vendors and Foreign Vendors (defined below).  If the requested relief is not granted and certain necessary trade and other vendors refuse to continue to supply goods and/or services to the Debtors postpetition, the Debtors may well be unable to properly maintain their fleet, fuel their planes, or fly certain routes.  This disruption to their business, already decimated by a global pandemic, would be irreversible.

148.    I believe that if the requested relief is not granted and essential Critical Vendors and Foreign Vendors (as defined below) refuse to continue to supply goods and services to the

Debtors postpetition, the Debtors may be unable to continue portions of their operations, thereby preventing the Debtors from maximizing the value of their estates and substantially harming all creditors.

149.    The Debtors operate in a highly specialized, highly regulated and highly competitive industry.  The uniqueness of the airline industry, coupled with the highly regulated arena in which airlines must operate—airports—leave airlines with few options (if any) when selecting vendors.  Even in those circumstances where more than one vendor can be located to provide a service, regulations often inhibit an airline's ability to switch expeditiously from one supplier of goods or services to another.

150.    The Debtors purchase goods and services from certain vendors or independent contractors who are unaffiliated with the Debtors and are, by and large, sole source or limited-source suppliers without whom the Debtors could not operate or who might be able to obtain (or have obtained) mechanics' liens, possessory liens, or similar state law trade liens (the "**Trade Liens**") on property necessary to the Debtors' ongoing operations (collectively, the "**Critical Vendors**").  The Critical Vendors could not be replaced within a reasonable time and on terms as beneficial to the Debtors as those already in place, or have obtained Trade Liens on property necessary to the Debtors' ongoing operations.  Many of these limited-source suppliers are in the unique position of holding a virtual monopoly over the services they provide.  Replacement vendors, even where available, would likely result in higher costs for the Debtors.  The Debtors will benefit from maintaining lower costs of goods and services purchased during the postpetition period and avoid the severe disruption that would result from a Critical Vendor refusing to do business with the Debtors.  Therefore, it is prudent for the Debtors to pay selected Critical Vendors some or all of their prepetition claims.

151.    Moreover, given the global nature of their services, the Debtors must necessarily purchase a significant portion of their goods and services from certain vendors or independent contractors with little to no connection to the United States and who are unaffiliated with the Debtors.  The Debtors estimate that approximately $20 million will need to be paid to Critical Vendors and Foreign Vendors during the 30 days following the Petition Date.  The maximum amount needed to pay the Vendor Claims and Foreign Vendor Claims will be set forth in a supplement to this Motion to be filed no later than fourteen (14) days before the hearing on the Final Order.

152.    In determining the amount of the Interim Vendor Cap, the Debtors have carefully reviewed their suppliers to determine, among other things, (a) which suppliers were sole source or limited source suppliers, without whom the Debtors could not continue to operate without disruption, (b) which suppliers would be prohibitively expensive to replace, (c) which suppliers would present an unacceptable risk to the Debtors' operations should they cease the provision of truly essential services or supplies, and (d) the extent to which suppliers may be able to obtain or have obtained trade liens on assets of the Debtors or an administrative expense claim pursuant to section 503(b)(9) of the Bankruptcy Code.  The Debtors then considered the financial condition of each supplier, where that information was known, including the level of dependence each supplier has on the Debtors' continued businesses.  After compiling this information, the Debtors estimated the amount they believe they would be required to pay to ensure the continued supply of critical goods and services.

153.    I believe that the relief requested in the Critical Vendors and Foreign Vendors Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to

chapter 11.  The need for the flexibility to pay such claims is particularly acute in the period immediately following the Petition Date to afford the Debtors, their attorneys and financial advisors, and other professionals the opportunity to stabilize the businesses in chapter 11.  In light of the foregoing, I believe that payment of Critical Vendor and Foreign Vendor Claims owed to Critical Vendors and Foreign Vendors will be necessary to preserve operations, dramatically reduce the financial burden on the Debtors' estates, maintain goodwill and positive relationships with all Critical Vendors and Foreign Vendors, and maximize the value of the Debtors' assets for the benefit of all stakeholders.  Accordingly, on behalf of each the Debtors, I respectfully submit that the relief requested in the Critical Vendors and Foreign Vendors Motion should be granted.

> iii.  *Debtors' Motion for an Order (i) Granting Administrative Expense Status to Debtors' Undisputed Obligations to Vendors Arising from the Postpetition Delivery of Goods Ordered Prepetition, (ii) Authorizing Debtors to Pay Those Obligations in the Ordinary Course of Business and (iii) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers (the "**Prepetition Purchase Order Motion**").*

154.   By this Prepetition Purchase Order Motion, Debtors seek entry of an order authorizing the vendors and suppliers (the "**Vendors**") administrative priority status for undisputed obligations arising from outstanding prepetition purchase orders (the "**Prepetition Purchase Orders**") for parts, inventory, supplies, equipment and other goods (the "**Goods**") delivered after the Petition Date, to pay such obligations in the ordinary course of business, and to permit all applicable banks and financial institutions to pay all checks presented for the payment of such obligations.

155.   In connection with the normal operation of their businesses, the Debtors rely on numerous Vendors to provide the Debtors with goods for use in the regular operation of the

Debtors' airline businesses.  Goods are generally shipped by Vendors to the Debtors' primary maintenance and engineering facilities and then distributed as needed to satellite locations.

156.   As a consequence of the commencement of these Chapter 11 Cases, the Vendors may be concerned that Goods purchased before the Petition Date pursuant to the Prepetition Purchase Orders that are delivered to the Debtors postpetition will render the Vendors general unsecured creditors of the Debtors' estates for those shipments.  Accordingly, I understand that the Vendors may refuse to provide Goods to the Debtors (or may recall shipments thereof) unless the Debtors issue substitute purchase orders postpetition or obtain an order of the Court (i) providing that all undisputed obligations of the Debtors arising from the postpetition delivery of Goods subject to Prepetition Purchase Orders are afforded administrative expense priority under section 503(b) of the Bankruptcy Code and (ii) authorizing the Debtors to satisfy those obligations in the ordinary course of their businesses.

157.   I believe that the relief requested herein is necessary for the successful reorganization of the Debtors' businesses and will help ensure a continuous supply of materials indispensable to the Debtors' operations.  If the relief requested is not granted, I am concerned that the Debtors may be required to expend substantial time and effort to reissue the Prepetition Purchase Orders or even obtain further relief from the Court to provide the Vendors with the assurance of such administrative priority, causing disruption to the Debtors' businesses.  This, in turn, would hamper the prospects of a successful reorganization plan by significantly decreasing the value of the Debtors' estates.  Accordingly, on behalf of each the Debtors, I respectfully submit that the relief requested in the Prepetition Purchase Orders Motion should be granted.

     iv.    *Debtors' Motion Pursuant to Sections 105(A) and 546(C) of the Bankruptcy Code for Approval of Procedures for the Treatment of Reclamation Claims (the "**Reclamation Motion**").*

158.    Consistent with the normal operation of their businesses, prior to the Petition Date, the Debtors ordered merchandise from various vendors on varying credit terms.  For example, the Debtors regularly purchase, among other things, equipment, aircraft and engine parts, parts for ground equipment and other materials that are necessary for their operations.  These goods are typically delivered directly to the Debtors, to their storage facilities or to facilities owned by third parties.  Given the extension of credit by various vendors, the Debtors are perpetually in possession of goods for which payment had not been made at the time of delivery.

159.    Upon commencement of a chapter 11 case, reclamation rights are governed by section 546(c) of the Bankruptcy Code, which provides that sellers who sold goods to debtors in the ordinary course of the seller's business may reclaim the goods if: (a) the debtor received the goods while insolvent within forty-five days before the date of the commencement of the case, (b) the seller makes a reclamation demand in writing (i) before forty-five days after receipt of the goods by the debtor or (ii) if the forty-five day period expires after the Petition Date, before twenty days after the date of commencement of the case[9] and (c) the seller is otherwise entitled to reclamation under applicable state law.

160.    The Debtors seek authority, pursuant to sections 105(a) and 546(c) of the Bankruptcy Code, to establish certain procedures for the resolution of reclamation claims against the Debtors (the "**Reclamation Procedures**").  I submit that implementation of the Reclamation Procedures are in the best interests of the Debtors, their estates, creditors and all parties in interest.   Accordingly, on behalf of each the Debtors, I respectfully submit that the relief requested in the Reclamation Motion should be granted.

---

[9] Notwithstanding the foregoing, a seller of goods that fails to provide notice in the manner described in section 546(c) "still may assert" an administrative priority claim pursuant to section 503(b)(9) of the Bankruptcy Code for goods sold to the debtor in the ordinary course of the debtor's business within 20 days before the date of the commencement of the case.

### E.  Cross-Border Matters

i.   *Motion of Debtors for Entry of an Order (i) Authorizing Aerovías de Mexico, S.A. de C.V. to Act as Foreign Representative and (ii) Granting Related Relief (the "**Foreign Representative Motion**").*

161.    The Debtors seek entry of an order authorizing Aerovías De Mexico, S.A. de C.V. to seek recognition of these Chapter 11 Cases in any judicial or other proceedings in any foreign country, and upon recognition any foreign jurisdiction, seek any other appropriate relief that is just and proper in furtherance of the protection of the Debtors' estates.

162.    The Debtors are headquartered in Mexico, and have substantial business operations and relationships in Mexico and abroad.  In my opinion, authorizing Aerovías De Mexico, S.A. de C.V. to act as the Foreign Representative in any foreign proceedings pursuant to section 1505 of the Bankruptcy Code will allow for coordination between these Chapter 11 Cases and any future foreign proceeding, and will provide an effective mechanism to protect and maximize the value of the Debtors' assets and estates, which would further the purpose of the relevant provisions of the Bankruptcy Code.  I believe that the relief requested in the Foreign Representative Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the Foreign Representative Motion should be granted.

ii.   *Motion of Debtors for Entry of an Order Confirming the Statutory Protections of the Bankruptcy Code (the "**Automatic Stay Motion**").*

163.    The Debtors seek entry of an order confirming the application of (i) the automatic stay provisions of section 362 of the Bankruptcy Code, (ii) the anti-termination and anti-modification provisions of section 365 of the Bankruptcy Code, (iii) the anti-discrimination provisions of section 525 of the Bankruptcy Code, and (iv) the anti-transfer provisions of section 541 of the Bankruptcy Code (collectively, the "**Statutory Protections**"), to facilitate their

commercial dealings during the course of the Chapter 11 Cases with parties who may be unfamiliar with, are mistaken regarding, or simply ignore the Statutory Protections.

164.    The Debtors' business and relationships have resulted in the Debtors having material creditors both in this country and abroad.  The Automatic Stay Motion, by restating the provisions and protections of the Bankruptcy Code would help protect the Debtors from such unwitting violations of these crucial Statutory Protections.  The granting of the relief requested will help ensure that (a) the non-debtor parties to unexpired leases and executory contracts with the Debtors will continue to perform and will not unilaterally terminate their contracts, (b) creditors do not seize the Debtors' assets, impose liens or take any other action in violation of the automatic stay and (c) foreign governmental authorities do not deny, revoke or suspend any licenses or permits solely because the Debtors are in chapter 11.  It also would spare the Debtors from the burden of commencing adversary proceedings to enforce the protections automatically provided by the Bankruptcy Code.  Consequently, such order will assist the Debtors in effecting a prompt and orderly reorganization.  I believe that the relief requested in the Automatic Stay Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Automatic Stay Motion should be granted.

**IV.**
**Information Required by Local Rule 1007-2**

165.    In accordance with Local Rule 1007-2, the schedules attached hereto provide certain information related to the Debtors.[10]

---

[10] The information contained this Part IV and the associated schedules attached to this declaration does not constitute an admission of liability by, nor is it binding on, the Debtors, and the Debtors reserve all rights to assert

166.     Pursuant to Local Rule 1007-2(a)(3), **Schedule 1** hereto lists the names and addresses of the members of, and attorneys for, any committee organized prior to the Petition Date and a brief description of the circumstances surrounding the formation of the committee and the date of its formation.

167.     Pursuant to Local Rule 1007-2(a)(4), **Schedule 2** hereto lists the holders of the Debtors' thirty (30) largest unsecured claims on a consolidated basis, excluding claims of insiders.

168.     Pursuant to Local Rule 1007-2(a)(5), **Schedule 3** hereto lists the holders of the five (5) largest secured claims against the Debtors on a consolidated basis.

169.     Pursuant to Local Rule 1007-2(a)(6), **Schedule 4** hereto provides a summary of the (unaudited) consolidated assets and liabilities for the Debtors.

170.     Pursuant to Local Rule 1007-2(a)(7), **Schedule 5** hereto provides the following information: the number and classes of shares of stock, debentures and other securities of the Debtors that are publicly held and the number of record holders thereof; and the number and classes of shares of stock, debentures and other securities of the Debtors that are held by the Debtors' directors and officers, and the amounts so held.

171.     Pursuant to Local Rule 1007-2(a)(8), **Schedule 6** hereto describes the Debtors' property in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, secured creditor, or agent for any such entity, giving the name, address and telephone number of each such entity and the location of the court in which any proceeding relating thereto is pending.

-------

(continued…)

that any debt or claim listed herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt.

172.     Pursuant to Local Rule 1007-2(a)(9), **Schedule 7** hereto provides a list of the premises owned, leased, or held under other arrangement from which the Debtors operate their businesses.

173.     Pursuant to Local Rule 1007-2(a)(10), **Schedule 8** hereto provides the location of the Debtors' substantial assets, the location of their books and records, and the nature, location and value of any assets held by the Debtors outside the territorial limits of the United States.

174.     Pursuant to Local Rule 1007-2(a)(11), **Schedule 9** hereto provides a list of the nature and present status of each action or proceeding, pending or threatened, against the Debtors or their property where a judgment against the Debtors or a seizure of their property may be imminent.

175.     Pursuant to Local Rule 1007-2(a)(12), **Schedule 10** hereto provides a list of the names of the individuals who comprise the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

176.     Pursuant to Local Rule 1007-2(b)(1)-(2)(A), **Schedule 11** hereto provides the estimated amount of weekly payroll to the Debtors' employees (not including officers, directors, stockholders and partners) and the estimated amount to be paid to officers, stockholders, directors, members of any partnerships and financial and business consultants retained by the Debtors for the thirty (30) day period following the filing of the Debtors' Chapter 11 Cases as the Debtors intend to continue to operate their businesses.

177.     Pursuant to Local Rule 1007-2(b)(3), **Schedule 12** hereto provides, for the thirty (30) day period following the filing of the Chapter 11 Cases, a list of estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue that remain unpaid, other than professional fees.

## **Conclusion**

178.    This Declaration illustrates the factors that warrant the relief requested in the First Day Motions. I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Executed:    June 30, 2020

By:    _____

Ricardo Rafael Sanchez Baker
Chief Financial Officer

## **Schedule 1**

### **Committees**

Pursuant to Local Bankruptcy Rule 1007-2(a)(3), to the best of the Debtors' knowledge and belief there were, prior to the Petition Date, no committees formed to participate in the Debtors' ongoing restructuring efforts other than the Ad Hoc Restructuring Committee approved on June 4, 2020 by Unanimous Resolutions approved by the totality of the members Board of Directors of Grupo Aeroméxico, S.A.B. de C.V.

## **Schedule 2**

**Consolidated List of 30 Largest Unsecured Claims (Excluding Insiders)**

Pursuant to Local Rule 1007-2(a)(4), the following is a list of creditors holding, as of the Petition Date, the thirty (30) largest, unsecured claims against the Debtors, on a consolidated basis, excluding claims of insiders as defined in 11 U.S.C. § 101.

| Fill in this information to Identify the case: |
|---|

Debtor Name:   Grupo Aeroméxico, S.A.B. de C.V. et al.

United States Bankruptcy Court for the:      Southern District of New York

Case Number (If known):

☐ Check if this is an amended filing

## Official Form 204

### Chapter 11 or Chapter 9 Cases: Consolidated List of Creditors Who Have the 30 Largest Unsecured Claims and Are Not Insiders

12/15

A consolidated list of creditors holding the 30 largest unsecured claims must be filed in a Chapter 11 or Chapter 9 case. Include claims which the debtor disputes. Do not include claims by any person or entity who is an insider, as defined in 11 U.S.C. § 101(31). Also, do not include claims by secured creditors, unless the unsecured claim resulting from inadequate collateral value places the creditor among the holders of the 30 largest unsecured claims.

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 1  THE BANK OF NEW YORK MELLON ATTN: CORPORATE TR ADMIN 240 GREENWICH STREET FLOOR 7 EAST NEW YORK, NY 10286 | CONTACT: CORPORATE TR ADMIN PHONE: 212-815-8273 FAX: 212-815-5875 MIGUEL.BARRIOS@BNYMELLON.COM.JULIE.HOFFMAN-RAMOS@BNYMELLON.COM PETER.BAUMGAERTNER@HKLAW.COM | INTERNATIONAL ISSUANCE 2020 | | | | $411,355,556.00 |
| 2  AEROPUERTO INTERNACIONAL DE LA CIUDAD DE MEXICO SA DE CV AV CAPITAN CARLOS LEON SN PENON DE LOS BANOS, VENUSTIANO CARRANZA CDMX 15620 MEXICO | CONTACT: FRANCISCO PARDO PHONE: 52 (55) 2482-2424 FPARDO@AICM.COM.MX | TRADE PAYABLE | | | | $61,950,676.00 |
| 3  BANCO BILBAO VIZCAYA ARGENTARIA, S.A. AV PASEO DE LA REFORMA 243 COLONIA CUAUHTEMOC, DELEGACION CUAUHTEMOC DISTRITO FEDERAL 06500 MEXICO | CONTACT: GENERAL COUNSEL PHONE: 34 91 537 79 54 MARIA.ZOTES@BBVA.COM ; ECA.STRUCTURING@BBVA.COM | GUARANTEE HERMES | | | | $25,719,330.00 |
| 4  HSBC MEXICO SA PASEO DE LA REFORMA 347, 18TH FL COL. CUAUHTEMOC MEXICO CITY 06500 MEXICO | CONTACT: GENERAL COUNSEL PHONE: 52 (55) 5721-5978 CECILIA.STETA@HSBC.COM.MX | GUARANTEE EXIM BANK | | | | $17,035,285.00 |

Debtor:  Grupo Aeroméxico, S.A.B. de C.V. et al.    Case Number  (if known):

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 5  AEROPUERTOS Y SERVICIOS AUXILIARES AV 602 NO 161 SAN JUAN DE ARAGON VENUSTIANO CARRANZA CDMX  15620  MEXICO | CONTACT: ROSA MARIA DAVILA MORALES PHONE: 52 (55) 5133 1000 MAM.COMERCIAL@ASA.GOB.MX | TRADE PAYABLE | | | | $16,184,197.00 |
| 6  TESORERIA DE LA FEDERACION DOMICILIO CONOCIDO DISTRITO FEDERAL CDMX MEXICO  MEXICO | CONTACT: JORGE ARMENDARIZ JIMENEZ PHONE: 618 118 7017 JARMEND@IMT.MX | TAXES | | | | $14,882,399.00 |
| 7  WORLD FUEL SERVICES AVENIDA LIBERTAD 1405 OF 1302 VINA DEL MAR  1111111 BRASIL | CONTACT: JUAN PINTO PHONE: 569 322689200 JPINTO@WFSCORP.COM | TRADE PAYABLE | | | | $10,344,391.00 |
| 8  GENERAL ELECTRIC 3135 EASTON TURNPIKE FAIRFIELD, CT  06828 | CONTACT: ALAN FRETWELL PHONE: 513-479-9428 ALAN.FRETWELL@GE.COM | TRADE PAYABLE | | | | $9,189,203.00 |
| 9  PANASONIC AVIONICS CORPORATION 3303 MONTE VILLA PARKWAY BOTHELL, WA  98021 | CONTACT: JOSE MARTINEZ PHONE: 949-462-1943 JOSER.MARTINEZ@PANASONIC.AERO | TRADE PAYABLE | | | | $8,324,902.00 |
| 10  BANCO BILBAO VIZCAYA ARGENTARIA, S.A. NIEDERLASSUNG DEUTSCHLAND NEUE MAINZER STRASSE 28 60311 FRANKFURT AM MAIN GERMANY | CONTACT: GENERAL COUNSEL MARIA.ZOTES@BBVA.COM ; ECA.STRUCTURING@BBVA.COM | SHORT TERM LOAN | | | | $7,943,114.00 |
| 11  CREDIT AGRICOLE CORPORATE AND INVESTMENT BANK TOKYO BRANCH 1 9 2 HIGASHI SHIMBASHI TOKYO MINATO KU  1050021  JAPAN | CONTACT: THOMAS JEAN PHONE: 12 122617067 THOMAS.JEAN@CA-CIB.COM | TRADE PAYABLE | | | | $6,404,527.00 |
| 12  BOEING 100 N RIVERSIDE PLAZA MC 5003-4549 CHICAGO, IL  60606 | CONTACT: ERIKA ZAVALA PHONE: 52 8125595386 SALES.MEXICO@BOEINGDISTRIBUTION.COM | TRADE PAYABLE | | | | $5,684,079.00 |
| 13  AEROPUERTO DE GUADALAJARA SA DE CV AV SOLIDARIDAD IBEROAMERICANA KM 17 12 TLAJOMULCO DE ZUNIGA JALISCO TLAJOMULCO DE ZUNIGA  45659 MEXICO | CONTACT: DANIEL OSVALDO ARELLANO PHONE: 3336714582 DARELLANOS@AEROPUERTOSGAP.COM.MX | TRADE PAYABLE | | | | $5,211,109.00 |
| 14  NORDIC AVIATION CAPITAL ATTN: CHIEF CONTRACT OFFICER STRATUSVEJ 12 BILLUND  7190 DENMARK | CONTACT: MIKE FITZGERALD PHONE: 45 7651 1200 NAC@NAC.DK | TRADE PAYABLE | | | | $5,160,868.00 |

Debtor:  Grupo Aeroméxico, S.A.B. de C.V. et al.      Case Number  (if known):

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 15 | AEROPUERTO DE MONTERREY SA DE CV DOM CONOCIDO CARR MIGUEL ALEMAN SN CENTRO DE APODACA NUEVO LEON MEXICO NUEVO LEON MONTERREY  66600  MEXICO | CONTACT: ABIGAIL CAMPOS MEDINA PHONE: 52 81 8625.4300 ACAMPOS@OMA.AERO | TRADE PAYABLE | | | | $5,058,384.00 |
| 16 | HSBC BANK USA, N.A. ATTN: DANIELA ALVARADO AILEEN CHUA 452 FIFTH AVENUE NEW YORK, NY  20018 | CONTACT: DANIELA ALVARADO PHONE: 212-252-2482 DANIELA.ALVARADO@US.HSBC.COM ; AILEEN.L.CHUA@US.HSBC.COM ; CARLA.G.CAMPO@US.HSBC.COM | GUARANTEE EXIM BANK | | | | $5,045,129.00 |
| 17 | CITIBANK, NA ATTN: PAUL JOSEPH 3800 CITIGROUP CENTER DRIVE TAMPA, FL  33610 | CONTACT: PAUL JOSEPH PHONE: 813-604-4724 PAUL.O.JOSEPH@CITI.COM | GUARANTEE EXIM BANK | | | | $4,829,251.00 |
| 18 | SMBC AVIATION CAPITAL LIMITED IFSC HOUSE IFSC DIBLIN 1 IRELAND DUBLIN DUBLIN IRLANDA  IRELAND | CONTACT: FEDERICO PASCUAL PHONE: 353 1 859 9000 FEDERICO.PASCUAL@SMBC.AERO | TRADE PAYABLE | | | | $4,468,777.00 |
| 19 | IBM CAPITAL MEXICO 1 S DE RL DE CV ATTN: JOSE RAMON GARCIA ALFONSO NAPOLES GANDARA 3111 PENA BLANCA SANTA FE CIUDAD DE MEXICO  01210  MEXICO | CONTACT: JOSE RAMON GARCIA PHONE: 5270 3095 RASTUDIL@MX1.IBM.COM | LONG TERM LOAN | | | | $4,367,664.00 |
| 20 | CELESTIAL AVIATION TRADING AVIATION HOUSE SHANON SHANNON IRELAND  IRELAND | CONTACT: FIONA CONNOLLY PHONE: 353 61706684 FIONA.CONNOLLY@GECAS.COM | TRADE PAYABLE | | | | $4,334,100.00 |
| 21 | ASOCIACION SINDICAL DE PILOTOS AVIADORES PALOMAS 110 1ER PISO REFORMA SOCIAL CDMX, MIGUEL HIDALGO, 11650 11650 MEXICO | CONTACT: ARTURO MALIACHI ARTURO.MALIACHI@ASPA.ORG.MX | UNION | | | | $3,375,738.00 |
| 22 | AIR LEASE CORPORATION 2000 AVENUE OF THE STARS 1000N CALIFORNIA LOS ANGELES, CA  90067 | CONTACT: CHIEF FINANCIAL OFFICER PHONE: 310-553-0555 INFO@AIRLEASECORP.COM | TRADE PAYABLE | | | | $3,228,871.00 |
| 23 | GRUPO TELVISTA SA DE CV BLV AGUA CALENTE 11606 AVIACION TIJUANA BAJA CALIFORNIA TIJUANA  22420  MEXICO | CONTACT: KAREN ARRIAGA PHONE: 5130 0600 KAREN_ARRIAGA@TELVISTA.COM | TRADE PAYABLE | | | | $2,409,986.00 |

Debtor:  Grupo Aeroméxico, S.A.B. de C.V. et al.                                    Case Number  (if known):

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 24 SABRE GROUP INC 3150 SABRE DRIVE MAIL DROP 8510 SOUTHL CHICAGO, IL  60693 | CONTACT: CHRIS POWERS PHONE: 817-584-0887 CHRIS.POWERS@SABRE.CO M | TRADE PAYABLE | | | | $2,400,000.00 |
| 25 MTU MAINTENANCE STRAWINWINSHYLAAN 1639, 1077XX AMSTERDAM NETHERLANDS | CONTACT: MAREK FRIEDRICH PHONE: 31 (0) 207052592 MAREK.FRIEDRICH@MTU-LEASE-SERVICES.COM | TRADE PAYABLE | | | | $2,309,021.00 |
| 26 WILMINGTON TRUST COMPANY 345 MAIN ST ONE M&T PLAZA 7TH FLOOR BUFFALO, NY  14203 | CONTACT: CHIEF FINANCIAL OFFICER PHONE: 302-651-1000 RRITROVATO@WILMINGTON TRUST.COM | TRADE PAYABLE | | | | $2,161,899.00 |
| 27 AEROPUERTO DE CANCUN SA DE CV KM 22 CARR CANCUNCHETUMAL MUNICIPIO BENITO JUAREZ QUINTANA ROO CANCUN  77500  MEXICO | CONTACT: ALICIA ISABEL GUZMAN CORTES PHONE: 52-99-8848-7200 AGUZMAN@ASUR.COM.MX | TRADE PAYABLE | | | | $2,076,290.00 |
| 28 ORACLE DE MEXICO SA DE CV MONTES URALES 470 PB LOMAS DE CHAPULTEPEC MIGUEL HIDALGO CDMX  11710  MEXICO | CONTACT: YUGLAL KUMAR PHONE: 553 300 6913 YUGLAL.KUMAR@ORACLE.C OM | TRADE PAYABLE | | | | $1,813,758.00 |
| 29 ENTSERV ENTERPRISE SERVICES MEXICO S DE RL DE CV AV PROLONGACION PASEO DE LA REFORMA 700 LOMAS DE SANTA FE, ALVARO OBREGON CDMX  1210  MEXICO | CONTACT: ELIZABETH MORENO PHONE: 703-245-9700 ELIZABETH.MORENO@DXC.C OM | TRADE PAYABLE | | | | $1,680,744.00 |
| 30 US DEPARTMENT OF TRANSPORTATION FAA 6500 S MACARTHUR BOULEVARD 6500 S MACARTHUR BOULEVARD OKLAHOMA, OK  73169 | CONTACT: MICHELLE LEISSNER PHONE: 405-954-9559 FAX: 202-267-3227 9-AMC-AMZ-OVERFLIGHT-FEES@FAA.GOV | TRADE PAYABLE | | | | $1,616,478.00 |

## Schedule 3

### Consolidated List of Holders of Five largest Secured Claims

Pursuant to Local Rule 1007-2(a)(5), to the best of the Debtors' knowledge, belief, and understanding, the following chart lists the creditors holding, as of the Commencement Date, the five (5) largest secured, non-contingent claims against the Debtors, on a consolidated basis, excluding claims of insiders as defined in 11 U.S.C. § 101.

| No. | Name of Creditor | Name, telephone number and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted | Amount of Claim | Type of Collateral |
|---|---|---|---|---|
| 1 | Deutsche Bank Trust Company Americas | Deutsche Bank Trust Company Americas<br>Trust & Agency Services<br>60 Wall St, MS NYC60-1630<br>New York, NY 10286<br>deisilania.gomes@db.com<br>Phone: 212-250-9170 | $268,775,558.00 | Amex Receivables |
| 2 | Deutsche Bank México, SA F/1748 | Deutsche Bank México, SA F/1748<br>PEDREGAL 24 20<br>Address Number 24<br>Bdg Unit 20, Molino del Rey<br>Miguel Hidalgo<br>Ciudad de México 11040<br>Mexico<br>alonso.rojas@db.com<br>Phone: 52-81-5000-0200 | $235,251,130 | VMC Receivables |
| 3 | Crédit Agricole Corporate & Investment Bank, Tokyo Branch | Crédit Agricole Corporate & Investment Bank, Tokyo Branch<br>ATTN Agency & Middle Office<br>1-9-2, Higashi-Shimbashi, Minato-ku<br>Tokyo 105-0021<br>Japan<br>Fax: 8134-580-5331 | $132,213,208 | Fleet |
| 4 | Natixis, New York Branch | Natixis, New York Branch<br>Attn Urs Fishcer/Hanna Beckles/ Yazmin Vasconez/Connie Moy<br>1251 Ave Of The Americas, 5th Fl<br>New York, Ny 10020<br>adminagency@us.natixis.com | $126,089,077 | Fleet |
| 5 | Sumitomo Mitsui Banking Corporation | Sumitomo Mitsui Banking Corporation, New York Branch<br>Attention: Shawn Powers<br>277 Park Avenue<br>New York, NY 10172<br>Fax: 212-918-1633 | $119,037,001 | Fleet |

**Schedule 4**

**Condensed Consolidated Balance Sheet (Unaudited)
as of March 31, 2020**

Pursuant to Local Rule 1007-2(a)(6), the following are estimates of the Debtors' total assets and liabilities on a consolidated basis.  The following financial data is the latest available information and reflects the Debtors' financial condition, as consolidated among affiliated Debtors and non-Debtors as of March 31, 2020.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors.  The Debtors reserve all rights to assert that any debt or claim included herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt.

On a consolidated basis, the total value of the Debtors' assets is approximately Ps121,669,120,000 (approximately $5,180,782,000) and the total amount of the Debtors' liabilities is approximately Ps.116,636,525,000 (approximately $4,966,490,000), in each case as consolidated among affiliated Debtors and non-Debtors.

## Schedule 5

### The Debtors' Securities

Pursuant to Local Rule 1007-2(a)(7), the following describes Debtors' publicly held classes of shares of stock, debentures and other securities.

### *Common Stock of Grupo Aeroméxico*

Grupo Aeroméxico has a sole series of common stock.  As of April 29, 2020, the date of Grupo Aeroméxico's last Shareholders Meeting, the share capital was comprised of 682,119,793 registered ordinary shares, with no nominal value, corresponding 5,000 shares to the fixed part. The Company is listed on the Mexican Stock Exchange.

### *Senior Notes issued by Aerovias*

In January 2020, Aerovias issued Senior Notes in the United States of America under Rule 144 A of the Securities Act of 1933 of the United States of America and outside that country under Regulation S of the Securities Act, at a fixed rate of 7%, for an amount of $400 million and with maturity in February 2025.  The Notes are guaranteed by Grupo Aeroméxico and they are listed on the Republic of Singapore Stock Exchange.

## **Schedule 6**

**Debtors' Property Not in the Debtor's Possession**

Local Rule 1007-2(a)(8) requires the Debtors to list property that is in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, secured creditor or agent for any such entity.

Certain property of the Debtors is likely to be in the possession of various other persons, including maintenance providers, shippers, common carriers, materialmen, custodians, public officers, mortgagees, pledges, assignees of rents, joint venturers, secured creditors, or agents. Through these arrangements, the Debtors' ownership interest is not affected. In light of the movement of this property, providing a comprehensive list of the persons or entities in possession of the property, their addresses and telephone numbers, and the location of any court proceeding affecting such property would be impractical.

## Schedule 7

Pursuant to Local Rule 1007-2(a)(9), the following lists the property or premises owned, leased or held under other arrangement from which the Debtors operate their business.

### Owned Property

| Debtor | Street Address | City | State | Zip Code | Country |
|---|---|---|---|---|---|
| | N/A | | | | |

### Leased Property

| Debtor | Street Address | City | State | Zip Code | Country |
|---|---|---|---|---|---|
| Aerolitoral, S.A. | Boulevard a la fuerza Aerea, La Lima, CORTES AEROPUERTO RAMON VILLEDA MORALES, OFICINA DE AEROMÉXICO AIRLINES | Cortes de Honduras | San Pedro Sula | 21101 | Honduras |
| Aerolitoral, S.A. | Antigua Carretera a San Pedro KM 9 NUM 188 | Torreon | Coahuila | 27016 | México |
| Aerolitoral, S.A. | Avenida Avición 31 S/N | Ciudad del Carmen | Campeche | 24190 | México |
| Aerolitoral, S.A. | Avenida López Portillo S/N ,Aviación | Campeche | Campeche | 24070 | México |
| Aerolitoral, S.A. | Boulevard Adolfo López Mateos 1001 | Tampico | Tamaulipas | 89339 | México |
| Aerolitoral, S.A. | Boulevard de las naciones, Plan de los amates S/N | Acapulco | Guerrero | 39931 | México |
| Aerolitoral, S.A. | Boulevard Juan Pablo II Num 14 | Chihuahua | Chihuahua | 31390 | México |
| Aerolitoral, S.A. | Carretera a Matehuala KM 9.5 | San Luis Potosí | San Luis Potosí | 78341 | México |
| Aerolitoral, S.A. | Carretera a Navolato y KM 5 Bachihualato | Culiacan Rosales | Sinaloa | 80130 | México |
| Aerolitoral, S.A. | Carretera Antigua Minatitlán - Coatzacoalcos KM 22.5 | Cosolecaque | Veracruz | 96340 | México |
| Aerolitoral, S.A. | Carretera Ciudad Victoria KM 9 S/N | Matamoros | Tamaulipas | 87560 | México |
| Aerolitoral, S.A. | Carretera Costera Pinotera Salina Cruz KM237 | Santa María Huatulco | Oaxaca | 70980 | México |

| Debtor | Street Address | City | State | Zip Code | Country |
|---|---|---|---|---|---|
| Aerolitoral, S.A. | Carretera estatal 200 | Tequisquiapan | Queretaro | 76270 | México |
| Aerolitoral, S.A. | Carretera Federal Dos Montes | Villahermosa | Tabasco | 86280 | México |
| Aerolitoral, S.A. | Carretera Federal México-Puebla KM 91.5 | Huejotzingo | Puebla | 74160 | México |
| Aerolitoral, S.A. | Carretera Internacional al sur S/N | Mazatlán | Sinaloa | 82269 | México |
| Aerolitoral, S.A. | Carretera Internacional KM1840 | Ciudad Obregon | Sonora | 85000 | México |
| Aerolitoral, S.A. | Carretera Los Mochis-Topolobampo KM 12.5 | Los Mochis | Sinaloa | 81360 | México |
| Aerolitoral, S.A. | Carretera Manzanill--Barra de Navidad KM 42 | Manzanillo | Colima | 281219 | México |
| Aerolitoral, S.A. | Carretera Mérida-Uman S/N | Mérida | Yucatán | 97295 | México |
| Aerolitoral, S.A. | Carretera Mesa de Andrade KM 23.5 | Mexicali | Baja california | 21600 | México |
| Aerolitoral, S.A. | Carretera Nacional a Acapulco Desviación S/N | Zihuatanejo | Guerrero | 40880 | México |
| Aerolitoral, S.A. | Carretera Panamericana KM18.5 | Ciudad Juarez | Chihuahua | 32690 | México |
| Aerolitoral, S.A. | Carretera Panamericana KM22. Ejido Buena Vista de Peñuelas | Aguascalientes | Aguascalientes | 20340 | México |
| Aerolitoral, S.A. | Carretera Panorámica Zacatecas Fresnillo KM 24 | Zacatecas | Zacatecas | 98500 | México |
| Aerolitoral, S.A. | Carretera Piedra Negra KM 5 | Nuevo Laredo | Tamaulipas | 88020 | México |
| Aerolitoral, S.A. | Carretera Reynosa- Matamoros KM 83 S/N | Reynosa | Tamaulipas | 88780 | México |
| Aerolitoral, S.A. | Carretera Tapachula- Puerto Madero KM 18.5 | Tapachula de Cordova y Ordoñez | Chiapas | 30830 | México |
| Aerolitoral, S.A. | Carretera Transpeninsular KM 13 | La Paz | Baja california Sur | 23201 | México |
| Aerolitoral, S.A. | Carretera Transpeninsular KM 43.5 | San Jose del Cabo | Baja california Sur | 23420 | México |
| Aerolitoral, S.A. | Carretera Veracruz- Xalapa KM 13.5 | Veracruz | Veracruz | 91698 | México |
| Aerolitoral, S.A. | KM 25 Carretera Durango- Gomez Palacio Colonia General Lázaro Cárdenas | Durango | Durango | 34305 | México |

| Debtor | Street Address | City | State | Zip Code | Country |
|---|---|---|---|---|---|
| Aerolitoral, S.A. | KM 55 Carretera Silao-Leon | Silao | Guanajuato | 36270 | México |
| Aerolitoral, S.A. | KM 7.5 Carretera a Tepic | Puerto Vallarta | Jalisco | 48311 | México |
| Aerolitoral, S.A. | KM 7.5 Carretera Puerto Angel-Salina Cruz S/N | Santa Cruz Xoxocotlan | Oaxaca | 71230 | México |
| Aerolitoral, S.A. | KM12.48 Tramo carretero Vergel Aeropuerto | Chiapa de Corzo | Chiapas | 29176 | México |
| Aerolitoral, S.A. | KM27 Carretera Morelía - Zinapécuaro | Alvaro Obregón | Michoacán | 58920 | México |
| Aerolitoral, S.A. | Km 11 carretera norte, Aeropuerto Internacional Augusto Cesar Sandino, Managua, Nicaragua | Managua | Managua | 11072 | Nicaragua |
| Aerolitoral, S.A. | Terminal de Pasajeros, local 1-49B. AIESMOARG. Carretera a Compalapa KM42.  San Luis Talpa, Departamento de La Paz, El Salvador. | San Luis Talpa | De la Paz | 813 | El Salvador |
| Aerolitoral, S.A. | 2538 World Gateway Place | Detroit | MI | 48242 | USA |
| Aerolitoral, S.A. | 3624 West 510 North | Salt Lake City | UT | 84116 | USA |
| Aerolitoral, S.A. | 9800 AIRPORT BLVD TERMINAL A | SAN ANTONIO | TEXAS | 78216 | USA |
| Aerolitoral, S.A. | Austin Bergstrom Interanational Airport.  3600 Presidential Blvd | AUSTIN | TEXAS | 78719 | USA |
| Aerolitoral, S.A. | DFW Int Airport Terminal D room D17L375 | Dallas | TX | 75261 | USA |
| Aerovías de México, S.A. de C.V. | Edificio AA2000 - 3rd floor suite 304 "A" - (B1802EZE) Aeropuerto Ezeiza - Pcia. de Buenos Aires - República Argentina | Ezeiza | Buenos Aires | 1802 | Argentina |
| Aerovías de México, S.A. de C.V. | AEROMÉXICO  - ROD.  HELIO SMITH S/N - TERMINAL 1 - SALA111 - ASA C - CUMBICA - GUARULHOS - SP-SÃO PAULO - 07190-972 | Guarulhos | Sao Paulo | 3051 | Brasil |
| Aerovías de México, S.A. de C.V. | 975 Romeo Vachon N. Suite 241 A | Dorval | QC | H4Y 1H1 | Canada |
| Aerovías de México, S.A. de C.V. | Lester B. Pearson Int'l Airport Terminal 3, AT level, unit K334 | Mississauga | ON | L5P 1B2 | Canada |
| Aerovías de México, S.A. de C.V. | Room C.3113.05 International Terminal Building, Vancouver International Airport, 3211 Grant McConachie Way, | RICHMOND | British Columbia | V7B 0A4 | Canada |
| Aerovías de México, S.A. de C.V. | AEROMÉXICO , ROTONDA PONIENTE, CUARTO NIVEL S/N, AEROPUERTO INTERNACIONAL A.M.B, SANTIAGO DE CHILE. | Pudahuel | Region Metropolitana | 9020000 | Chile |

| Debtor | Street Address | City | State | Zip Code | Country |
|---|---|---|---|---|---|
| Aerovías de México, S.A. de C.V. | EL GOLF 40 PISO 12 COMUNA DE LAS CONDES | SANTIAGO | SANTIAGO | 7550000 | CHILE |
| Aerovías de México, S.A. de C.V. | Aeropuerto El Dorado Entrada 6 Segundo piso Entrada Aerolíneas Oficina BO14 | Fontibon | Bogota | 110911 | Colombia |
| Aerovías de México, S.A. de C.V. | AEROPUERTO INTERNACIONAL JOSE MARIA CORDOVA PRIMER PISO OFICINA BO3A (RIONEGRO - Antioquia) Colombia. | Rio Negro | Antioquia | 54047 | Colombia |
| Aerovías de México, S.A. de C.V. | AEROPUERTO INTERNACIONAL JUAN SANTAMARIA . OFICINA DE AEROMÉXICO . SAN JOSE, COSTA RICA | Provincia de Alajuela | Alajuela | 10107 | Costa Rica |
| Aerovías de México, S.A. de C.V. | Av Rancho Boyeros S/N ala derecha oficinas de aerolíneas Aeropueto Internacional Jose Martí terminal 3 sección 2 sala b | Habana | Habana | 10800 | Cuba |
| Aerovías de México, S.A. de C.V. | CALLE 23 N°.64 ESQ P PLAZA DE LA REVOLUCION | HABANA | HABANA | 10400 | CUBA |
| Aerovías de México, S.A. de C.V. | Oficina PO Box 11336, Terminal Sur tercer piso Aeropuerto International Las Americas, Santo Domingo, República Dominicana | Santo Domingo | Santo Domingo | 11336 | Dominican Republic |
| Aerovías de México, S.A. de C.V. | Aeropuerto Mariscal Sucere Tababela S/N Via Yaruqui 3er piso Oficinas Companias de Aviacion | Tababela | Quito | 170907 | Ecuador |
| Aerovías de México, S.A. de C.V. | CALLE Y COLONIA LA MASCOTA EDIF.  13G LOCAL NUM 3 | SAN SALVADOR | SAN SALVADOR | 1101 | EL SALVADOR |
| Aerovías de México, S.A. de C.V. | Aeroport Charlles De Gaulle, Terminal 2E | Roissy | France | 95700 | France |
| Aerovías de México, S.A. de C.V. | Aeropuerto Internacional La Aurora, oficina ET-4-28, 9 avenida 14-75 zona 13 Guatemala, Guatemala 01013 | Guatemala | Guatemala | 1013 | Guatemala |
| Aerovías de México, S.A. de C.V. | Aeroméxico Office, N433, Passenger terminal 1, Nairta international airport, | Narita City | Chiba | 282-0011 | Japan |
| Aerovías de México, S.A. de C.V. | Cancún-Chetumal KM 22 | Cancún | Quintana Roo | 77565 | México |
| Aerovías de México, S.A. de C.V. | Carretera Aeropuerto Meza de Otay S/N | Tijuana | Baja California | 22435 | México |
| Aerovías de México, S.A. de C.V. | Carretera Bahia de Kino KM 9.5 | Hermosillo | Sonora | 83220 | México |
| Aerovías de México, S.A. de C.V. | Carretera Guadalajara.Chapala KM17.5 | Gaudalajara | Jalisco | 45659 | México |
| Aerovías de México, S.A. de C.V. | Carretera Miguel Alemán KM 24 | Apodaca | Nuevo León | 66600 | México |
| Aerovías de México, S.A. de C.V. | Terminal 3, Amsterdam Airport Schiphol, Vertrekpassage 1, 240 | Schiphol | Holland | 1118 | Netherlands |

| Debtor | Street Address | City | State | Zip Code | Country |
|--------|----------------|------|-------|----------|---------|
| Aerovías de México, S.A. de C.V. | AVENIDA ELMER FAUCETT S/N AEROPUERTO INTERNACIONAL JORGE CHAVEZ CALLAO PERU OFICINA 255 MEZANINE NORTE | Callao | Perú | 7031 | Perú |
| Aerovías de México, S.A. de C.V. | Aeroméxico office, 4th floor, 2805-3, Terminal 2, 446, Je2terminal-daero, Jung-gu | Incheon | | 22382 | South Korea |
| Aerovías de México, S.A. de C.V. | Aeropuerto Adolfo Suárez Madrid-Barajas Terminal 1.  Oficina 42138 | Barajas | Spain | 28042 | Spain |
| Aerovías de México, S.A. de C.V. | Aeropuerto Josep Tarradellas Barcelona – El Prat Terminal T1, Dique Sur, Planta 2, Oficina 00311S20125 | El pratt de Llobregat | Catalonia | 8820 | Spain |
| Aerovías de México, S.A. de C.V. | Terminal 4, Room 2499M, Heathrow Airport, Hounslow | Hounslow | England | TW6 3XZ | UK |
| Aerovías de México, S.A. de C.V. | 17801 International Blvd TICKETING LEVEL DOOR 5669 | SEATTLE | WASHINGTON | 98158 | USA |
| Aerovías de México, S.A. de C.V. | 3100 North TERMINAL RD Suite 146.7 | HOUSTON | TEXAS | 77032 | USA |
| Aerovías de México, S.A. de C.V. | 5175 E. Clinton Way Ste 125 | FRESNO | CALIFORNIA | 93727 | USA |
| Aerovías de México, S.A. de C.V. | 6900 Airport Blvd West Suite B # 107 | SACRAMENTO | CALIFORNIA | 95837 | USA |
| Aerovías de México, S.A. de C.V. | 8400 Peña Blvd, unit 492102 | Denver | CO | 80249 | USA |
| Aerovías de México, S.A. de C.V. | 9300 Jeff Fuqua Blvd. Suite 1783 | Orlando | FL | 32827 | USA |
| Aerovías de México, S.A. de C.V. | JFK IAT Terminal 4 room 262.080 | Jamaica | NY | 11430 | USA |
| Aerovías de México, S.A. de C.V. | Los Angeles International Airport - 200 World Way - Terminal 2 | LOS ANGELES | CALIFORNIA | 90045 | USA |
| Aerovías de México, S.A. de C.V. | Mcarran International Airport T-3 , 5757 Wayne Newton blvd | LAS VEGAS | NEVADA | 89111 | USA |
| Aerovías de México, S.A. de C.V. | Miami International Airport Concourse H 2nd floor | Miami | Fl | 33299 | USA |
| Aerovías de México, S.A. de C.V. | O'hare Int'l Airport Terminal 5, room UL-132A | Chicago | IL | 60666 | USA |
| Aerovías de México, S.A. de C.V. | San Francisco International Airpot room 1-2-14D | SAN FRANCISCO | CALIFORNIA | 94128 | USA |
| Aerovias Empresa de Cargo, S.A. de C.V. | AEROPUERTO ABELARDO L. RODRIGUEZ TIJUANA | Tijuana | Baja Calif. Norte | 22300 | México |
| Aerovias Empresa de Cargo, S.A. de C.V. | AEROPUERTO DE SAN LUIS POTOSÍ CARRETERA A MATEHUALA KM 9.5 COL. | San Luis Potosi | San Luis Potosi | 78430 | México |

| Debtor | Street Address | City | State | Zip Code | Country |
|---|---|---|---|---|---|
| | SOLEDAD DE GRACIANO SANCHEZ | | | | |
| Aerovias Empresa de Cargo, S.A. de C.V. | AEROPUERTO INTERNACIONAL ABRAHAM GONZALEZ CALLE CARRETERA PANAMERICANA KM 18.5.  COLONIA FEDERAL | Cd. Juarez | Chihuahua | 32690 | México |
| Aerovias Empresa de Cargo, S.A. de C.V. | AEROPUERTO INTERNACIONAL CD. DEL CARMEN ANTIGUA TERMINAL AEREA COLONIA AVIACION | Cd. Del Carmen | Campeche | 24190 | México |
| Aerovias Empresa de Cargo, S.A. de C.V. | AEROPUERTO INTERNACIONAL DE ACAPULCO "JUAN N. ALVAREZ" ENTRE AVIACIÓN GENERAL Y COMISIÓN DEL AGUA COL.  PLAN DE LOS AMATES | Acapulco | Guerrero | 39931 | México |
| Aerovias Empresa de Cargo, S.A. de C.V. | AEROPUERTO INTERNACIONAL DE CANCÚN KM. 22 CARRETERA CANCÚN-CHETUMAL | Cancún | Quintana Roo | 77565 | México |
| Aerovias Empresa de Cargo, S.A. de C.V. | AEROPUERTO INTERNACIONAL DE CHIHUAHUA GRAL.  ROBERTO FIERRO VILLALOBOS BOULEVARD JUAN PABLO II S/N KM 14.5 AEROPUERTO INTERNACIONAL GRAL. ROBERTO FIERRO V. | Chihuahua | Chihuahua | 31390 | México |
| Aerovias Empresa de Cargo, S.A. de C.V. | AEROPUERTO INTERNACIONAL DE COZUMEL S/N COLONIA ZONA FEDERAL | Cozumel | Quintana Roo | 77600 | México |
| Aerovias Empresa de Cargo, S.A. de C.V. | AEROPUERTO INTERNACIONAL DE GUADALAJARA CARRETERA GUADALAJARA - CHAPALA KM 17.5 S/N COLONIA TLAJOMULCO DE ZUÑIGA | Guadalajara | Jalisco | 45659 | México |
| Aerovias Empresa de Cargo, S.A. de C.V. | AEROPUERTO INTERNACIONAL DE TAPACHULA.  CARRETERA A PUERTO MADERO KM18.5 COL. AEROPUERTO INTERNACIONAL DE TAPACHULA | Tapachula | Chiapas | 30830 | México |
| Aerovias Empresa de Cargo, S.A. de C.V. | AEROPUERTO INTERNACIONAL DE XOXOCOTLAN CARRETERA OAXACA –PUERTO ANGEL KM 6.5 COL.  XOXOCOTLAN | Oaxaca | Oaxaca | 68130 | México |
| Aerovias Empresa de Cargo, S.A. de C.V. | AEROPUERTO INTERNACIONAL DE ZIHUATANEJO | Zihuatanejo | Guerrero | 40880 | México |
| Aerovias Empresa de Cargo, S.A. de C.V. | AEROPUERTO INTERNACIONAL FRANCISCO SARAVIA ANTIGUA CARRETERA A SAN PEDRO KM 9 | Torreon | Coahuila | 27050 | México |

| Debtor | Street Address | City | State | Zip Code | Country |
|---|---|---|---|---|---|
| Aerovias Empresa de Cargo, S.A. de C.V. | AEROPUERTO INTERNACIONAL GENERAL RAFAEL BUELNA CARR. INTERNACIONAL KM 17 AL SUR MAZATLÁN, SINALOA CP 82080 | Mazatlan | Sinaloa | 82080 | México |
| Aerovias Empresa de Cargo, S.A. de C.V. | AEROPUERTO INTERNACIONAL GENERAL GUADALUPE VICTORIA KM 15.5 AUTOPISTA DURANGO-GOMEZ PALACIOS | Durango | Durango | 34304 | México |
| Aerovias Empresa de Cargo, S.A. de C.V. | AEROPUERTO INTERNACIONAL GENERAL IGNACIO PESQUEIRA BOULEVARD GARCIA MORALES S/N COLONIA LA MANGA CARRETERA BAHIA KINO KM 9.5 | Hermosillo | Sonora | 83220 | México |
| Aerovias Empresa de Cargo, S.A. de C.V. | AEROPUERTO INTERNACIONAL GENERAL MARIANO ESCOBEDO CARRE. MIGUEL ALEMAN KM 24 ZONA DE CARGA AEROMÉXICO CARGO APODACA | Apodaca | Nuevo Leon | 66600 | México |
| Aerovias Empresa de Cargo, S.A. de C.V. | AEROPUERTO INTERNACIONAL GRAL. MANUEL MARQUEZ DE LEON KM 13 CARRETERA TRANSPENINSULAR COL. CHAMETLA | La Paz | Baja Calif. Sur | 23089 | México |
| Aerovias Empresa de Cargo, S.A. de C.V. | AEROPUERTO INTERNACIONAL GUSTAVO DIAZ ORDAZ COLONIA: VILLA LAS FLORES CP 48354 PUERTO VALLARTA, JALISCO | Puerto Vallarta | Jalisco | 48354 | México |
| Aerovias Empresa de Cargo, S.A. de C.V. | AEROPUERTO INTERNACIONAL HERIBERTO JARA CORONA S/N COL.  LAS BAJADAS | Veracruz | Veracruz | 91698 | México |
| Aerovias Empresa de Cargo, S.A. de C.V. | AEROPUERTO INTERNACIONAL LIC. JESÚS TERAN PEREDO DOMICILIO CONOCIDO COL.  EL CEDAZO EJIDO DE PEÑUELAS C.P. 20340 AGUASCALIENTES, AGS. | Aguascalientes | Aguascalientes | 20340 | México |
| Aerovias Empresa de Cargo, S.A. de C.V. | AEROPUERTO INTERNACIONAL LUCIO BLANCO, CARRETERA MATAMOROS MAZATLAN KM 86 COL.  NUEVO AMANECER | Reynosa | Tamaulipas | 88788 | México |
| Aerovias Empresa de Cargo, S.A. de C.V. | AEROPUERTO INTERNACIONAL MANUEL CRECENCIO REJON MÉRIDA | Merida | Yucatan | 97288 | México |
| Aerovias Empresa de Cargo, S.A. de C.V. | AEROPUERTO INTERNACIONAL QUETZALCOATL CARRETERA AL AEROPUERTO KM 12.5 COL. ENRIQUE CARDENAS GONZALEZ | Nuevo Laredo | Tamaulipas | 88295 | México |
| Aerovias Empresa de Cargo, S.A. de C.V. | AEROPUERTO INTERNACIONAL RODOLFO SANCHEZ TABOADA CARR. MESA DE ANDRADE KM. 23.5 S/NCOL. MARIANO ABASOLO. | Mexicali | Baja Calif | 21600 | México |

| Debtor | Street Address | City | State | Zip Code | Country |
|---|---|---|---|---|---|
| Aerovias Empresa de Cargo, S.A. de C.V. | AEROPUERTO INTERNACIONAL SERVANDO CANALES CARRETERA VICTORIA KM 9 COL. EJIDO TIJERITA | Matamoros | Tamaulipas | 87300 | México |
| Aerovias Empresa de Cargo, S.A. de C.V. | AEROPUERTO INTERNACIONAL, CAPITAN. CARLOS ROVIROSA PEREZ COL. POBLADO DOS MONTES | Villahermosa | Tabasco | 86280 | México |
| Aerovias Empresa de Cargo, S.A. de C.V. | AEROPUERTO NACIONAL DE CANTICAS MTT Y QTZ. CARRETERA ANTIGUA A MINATITLÁN KM 21.5 COLONIA CANTICAS | Minatitlan | Veracruz | 96340 | México |
| Aerovias Empresa de Cargo, S.A. de C.V. | ALMACEN FISCAL No. 16, AV 602 S/N, COL PEÑON DE LOS BAÑOS | CDMX | CDMX | 15620 | México |
| Aerovias Empresa de Cargo, S.A. de C.V. | AUTOPISTA MEX-QRO KM 200+700 LOC.4 FRACC. SAN ISISDRO MIRANDA, MUNICIPIO EL MARQUÉS QRO C.P. 76240 | Queretaro | Queretaro | 76240 | México |
| Aerovias Empresa de Cargo, S.A. de C.V. | AV. GUSTAVO BAZ No. 142 COL. BELLAVISTA, TLALNEPANTLA DE BAZ ESTADO DE MEXICO | Tlalnepantla | EDO MEX | 54080 | México |
| Aerovias Empresa de Cargo, S.A. de C.V. | AV. LÓPEZ MATEOS 240 LOCAL E, COL. SAN ROMAN CP 24040 CAMPECHE | Campeche | Campeche | 24040 | México |
| Aerovias Empresa de Cargo, S.A. de C.V. | BOULEVARD ADOLFO LOPEZ MATEOS # 1001 COL. AEROPUERTO | Tampico | Tamaulipas | 89339 | México |
| Aerovias Empresa de Cargo, S.A. de C.V. | BOULEVARD HERMANOS SERDAN 337 COL. AQUILES SERDAN | Puebla | Puebla | 72140 | México |
| Aerovias Empresa de Cargo, S.A. de C.V. | CARRETERA NAVOLATO KM 4.5 INTERIOR DE AEROPUERTO COL. BACHIGUALATO | Culiacan | Sinaloa | 80130 | México |
| Aerovias Empresa de Cargo, S.A. de C.V. | CARRETERA SILAO-LEON KM 5.5 COLONIA NUEVO MEXICO | Silao | Guanajuato | 36270 | México |
| Aerovias Empresa de Cargo, S.A. de C.V. | DIRECCION OFICINA CENTRO: CALLE MUZQUIZ 477 - C PONIENTE (entre Xicotencatl y Acuña) ZONA CENTRO CP. 25000 SALTILLO COAHUILA | Saltillo | Coahuila | 25000 | México |
| Aerovias Empresa de Cargo, S.A. de C.V. | Dirección:BLVD. MIGUEL ALEMAN VALDES NUM. 210 LOCAL C | Toluca | Edo de Mex | 50209 | México |
| Aerovias Empresa de Cargo, S.A. de C.V. | OFICINA EN APTO EN OPERACIÓN AEROPUERTO INTERNACIONAL DE LOS CABOS CARRETERA TRANSPENINSULAR KM 43.5 SAN JOSÉ DEL CABO | San Jose del Cabo | Baja Calif. Sur | 23400 | México |
| Aerovias Empresa de Cargo, S.A. de C.V. | PROLONGACIÓN 5ª NTE. PTE. No.3088 ESQ. CHANCALA. COL. CALICHAL. | Tuxtla Gutierrez | Chiapas | 29023 | México |

| Debtor | Street Address | City | State | Zip Code | Country |
|---|---|---|---|---|---|
| Aerovias Empresa de Cargo, S.A. de C.V. | SUCURSAL T1, AV TEXCOCO S/N ESQ.  FRANCISCO SARABIA, COL PEÑON DE LOS BAÑOS.  DEL VENUSTIANO CARRANZA | CDMX | CDMX | 15520 | México |
| Aerovias Empresa de Cargo, S.A. de C.V. | TAMAULIPAS No. 466 NORTE ENTRE MORELOS Y YAQUI COL.  NORTE CENTRO DE LA CIUDAD | Ciudad Obregon | Sonora | 85059 | México |
| Aerovias Empresa de Cargo, S.A. de C.V. | TERMINAL DE CARGA T2, HANGAR D, ZONA DE HANGARES DE LA TERMINAL 2 DEL AICM | CDMX | CDMX | 15620 | México |
| Aerovias Empresa de Cargo, S.A. de C.V. | 152 Harborside dr BLDG # 56 E. | Boston | Massachusetts | 02128 | USA |

## Schedule 8

### Location of Debtors' Assets, Books, and Records

Pursuant to Local Rule 1007-2(a)(10), the following lists the location of the Debtors' substantial assets, and the location of their books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States.

### Location of Debtors' Substantial Assets

Within the United States, the Debtors have fixed assets valued at approximately $58,000.

### Books and Records

The Debtors' books and records are located at Mexico City, Mexico.

### Debtors' Assets Outside the United States

The Debtors, together with their non-Debtor affiliates, have significant fixed assets worldwide of approximately $3.269 billion, chiefly in the form of aircraft and equipment, including significant fixed assets held outside the United States through their direct and indirect subsidiaries, with significant fixed assets in Mexico.

**<u>Schedule 9</u>**

**Litigation**

Pursuant to Local Rule 1007-2(a)(11), the Debtors do not believe that there are actions or proceedings, pending or threatened, in which a judgment against the Debtors or a seizure of their property is imminent.

## Schedule 10

### Senior Management

Pursuant to Local Rule 1007-2(a)(12), the following provides the names of the individuals who comprise the Debtors' existing senior management, a description of their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

| | Name | Title | Tenure (Years) | Overview of Experience and Responsibilities |
|---|---|---|---|---|
| 1. | Andrés Conesa Labastida | Chief Executive Officer | 16 | Mr. Conesa has been a member of the board of directors and the chief executive officer since 2005.  Mr. Conesa is also a member of Aeroméxico's board of directors.  Currently, Mr. Conesa is member of the board of directors of Sempra Energy.  Prior to joining us, he was the chairman and member of Cintra's board of directors.  He has also been a member of the Board of Governors of IATA and a member of the board of directors of ALTA, SkyTeam, Aeromexpress, CECAM and SEAT.  He has also held various government positions in Mexico, including general director of financial planning for the Ministry of Finance and Public Credit and head of the Public Credit Unit (Unidad de Crédito Público) of the same Ministry from 2003 to 2004, general director of international financial affairs for the Ministry of Finance and Public Credit from 1998 to 2000 and chief of staff of the assistant secretary for finance and public credit from 1997 to 1998.  Mr. Conesa holds a bachelor's degree in economics from the Instituto Tecnológico Autónomo de México, or ITAM, and a PhD in economics from the Massachusetts Institute of Technology.  Mr. Conesa has received a Fulbright Scholarship and a MacArthur Fellowship.  In 1997, he was awarded the Banamex Prize for Economics in the Doctorate Level Category. |

| 2. | Ricardo Javier Sánchez Baker | Chief Financial Officer | 14 | Mr. Sánchez Baker is the Chief Financial Officer of Grupo Aeroméxico S.A.B. de C.V. and has held several positions within the company since 2006. Mr. Sánchez Baker has also served as advisor of the chief executive officer and director of revenue management. He has been the chairman of the board of directors of the SABRE Corporation, member of the SEAT Technical Committee and member of the Aeromexpress CECAM and PLM board of directors. He has also held various positions within the Federal Public Administration (Administración Pública Federal), including deputy director general of public debt for the Ministry of Finance and Public Credit on 2003 and 2005. Mr. Sánchez Baker holds a bachelor's degree in economics from the Universidad Iberoamericana, a diploma in finance from the ITAM and a masters and PhD in economics from the University of California, Los Angeles. |
| --- | --- | --- | --- | --- |
| 3. | Sergio Alfonso Allard Barroso | Chief of Legal Affairs and Institutional Relations Officer | 10 | Mr. Allard is the chief of legal affairs and institutional relations officer, a member of the board of directors of Aeroméxico and has held several positions at the company since 2010, including executive commercial director. Mr. Allard has more than 31 years of experience in the airline industry. Before joining us, he was the director of commercial affairs, or CCO, at Spanair and corporate director of commercial affairs at Grupo Mexicana for over 19 years. Mr. Allard holds a bachelor's degree in actuarial science from the Universidad Nacional Autónoma de México and a master's degree in finance engineering and economics from the Universidad La Salle. |
| 4. | Andres Castañeda Ochoa | Chief Digital and Customer Experience Officer | 6 | Mr. Castañeda has been the chief digital and customer experience officer since 2014. Mr. Castañeda has over 8 years of experience in the airline industry. Prior to this role, he worked as chief operations officer at Clarus Digital and communications manager at Unilever México. He holds a bachelor's degree in finance from ITESM. |

| 5. | Rosa Angélica Garza Sánchez | Executive Vice President of Human Resources | 3 | Ms. Garza is the Executive Vice President of Human Resources, responsible for the acquisition, management and development of talent.  Throughout her career she has held key roles in companies such as PepsiCo where she was senior director of Human Resources Mexico and, more recently, Organizational Development for Latin America.  Prior to this she served as Director of Human Resources of Microsoft Mexico.    Ms. Garza holds a degree in Organizational Psychology from ITESM and has an MBA. |
| 6. | Claudia Angélica Cervantes Muñoz | Senior Vice President of Legal and Compliance | 13 | Ms. Cervantes is the senior vice president of legal and compliance.   She has over 24 years of experience as a litigating attorney and in the aviation industry at Aeroméxico.  Ms. Cervantes holds a bachelor's degree from the Universidad La Salle; a Major in Civil Law from the Universidad Panamericana and a Management Development Program (D-1) from IPADE Business School. |

### Schedule 11

**Payroll**

Pursuant to Local Rule 1007-2(b)(1)-(2)(A) and (C), the following provides the estimated amount of weekly payroll to the Debtors' employees (not including officers, directors, and stockholders) and the estimated amount to be paid to officers, stockholders, directors and financial and business consultants retained by the Debtors for the 30-day period following the Petition Date.

| | |
|---|---|
| **Payments to Employees (Not Including Officers, Directors and Stockholders)** | $16,260,780 |
| **Payments to Officers, Stockholders, and Directors** | $999,066 |
| **Payments to Financial and Business Consultants** | $0 |

**<u>Schedule 12</u>**

**Cash Receipts and Disbursements, Net Cash Gain or Loss, Unpaid Obligations and Receivables**

Pursuant to Local Rule 1007-2(b)(3), the following provides, for the 30-day period following the Petition Date, the estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue that remain unpaid, other than professional fees.

| | |
|---|---|
| **Cash Receipts** | $105 million |
| **Cash Disbursements** | $125 million |
| **Net Cash Loss** | $20 million |
| **Unpaid Obligations** | $308 million |
| **Uncollected Receivables** | $87.5 million |