## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| GRUPO AEROMÉXICO, S.A.B. de C.V., *et al.*, | Case No. 20-11563 (SCC) |
| Debtors.[1] | (Jointly Administered) |

### DISCLOSURE STATEMENT FOR THE JOINT CHAPTER 11 PLAN OF REORGANIZATION OF GRUPO AEROMÉXICO, S.A.B. de C.V. <u>AND ITS AFFILIATED DEBTORS</u>

THIS IS NOT A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT A SOLICITATION OF AN OFFER TO BUY ANY SECURITIES.

---

[1] The Debtors in these cases, along with each Debtor's registration number in the applicable jurisdiction, are as follows: Grupo Aeroméxico, S.A.B. de C.V. 286676; Aerovías de México, S.A. de C.V. 108984; Aerolitoral, S.A. de C.V. 217315; and Aerovías Empresa de Cargo, S.A. de C.V. 437094-1. The Debtors' corporate headquarters is located at Paseo de la Reforma No. 243, piso 25 Colonia Cuauhtémoc, Mexico City, C.P. 06500.

**DAVIS POLK & WARDWELL LLP**

Marshall S. Huebner
Timothy Graulich
James I. McClammy
Stephen D. Piraino
Erik Jerrard (admitted *pro hac vice*)
450 Lexington Avenue
New York, New York 10017
Tel.:  (212) 450-4000
Fax:  (212) 701-5800
marshall.huebner@davispolk.com
timothy.graulich@davispolk.com
james.mcclammy@davispolk.com
stephen.piraino@davispolk.com
erik.jerrard@davispolk.com

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

Derek C. Abbott (admitted *pro hac vice*)
Andrew R. Remming (admitted *pro hac vice*)
Joseph C. Barsalona II
Taylor M. Haga (admitted *pro hac vice*)
1201 North Market Street, 16th Floor
Wilmington, Delaware 19899
Tel.:  (302) 658-9200
Fax:  (302) 658-3989
dabbott@morrisnichols.com
aremming@morrisnichols.com
jbarsalona@morrisnichols.com
thaga@morrisnichols.com

*Counsel to the Debtors and Debtors in Possession*


Dated:  October 1, 2021
       New York, New York

## PRELIMINARY STATEMENT[2]

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE DEBTORS' PLAN AND CERTAIN OTHER DOCUMENTS AND INFORMATION. THE FINANCIAL INFORMATION INCLUDED HEREIN IS FOR PURPOSES OF SOLICITING ACCEPTANCES OR REJECTIONS OF THE PLAN AND SHOULD NOT BE RELIED UPON FOR ANY PURPOSE (INCLUDING, WITHOUT LIMITATION, TRADING OF THE DEBTORS' CLAIMS, SECURITIES OR SHARES) OTHER THAN TO DETERMINE HOW AND WHETHER TO VOTE ON THE PLAN. THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE. THE SUMMARIES OF THE FINANCIAL INFORMATION AND THE DOCUMENTS THAT ARE ATTACHED HERETO ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO SUCH INFORMATION AND DOCUMENTS.

THE STATEMENTS AND INFORMATION CONTAINED HEREIN HAVE BEEN MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED. HOLDERS OF CLAIMS OR INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER AT THE TIME OF SUCH REVIEW THAT THERE HAVE BEEN NO CHANGES IN THE FACTS SET FORTH HEREIN SINCE THE DATE HEREOF. EACH HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN SHOULD CAREFULLY REVIEW THE PLAN AND THIS DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE CASTING A BALLOT. THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE U.S. OR MEXICAN LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. ANY PERSONS DESIRING ANY SUCH ADVICE OR OTHER ADVICE SHOULD CONSULT WITH THEIR OWN ADVISORS.

ALTHOUGH THE DEBTORS HAVE ATTEMPTED TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT, EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED.

THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT HAS BEEN PREPARED BY THE MANAGEMENT OF THE DEBTORS AND THEIR FINANCIAL ADVISORS. THE FINANCIAL INFORMATION, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, IS NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS THAT, ALTHOUGH CONSIDERED REASONABLE BY MANAGEMENT, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY,

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Plan (as defined below); *provided*, that capitalized terms used but not otherwise defined herein or in the Plan, but are defined in title 11 of the United States Code (the "**Bankruptcy Code**") or the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), shall have the meanings ascribed to such terms in the Bankruptcy Code or the Bankruptcy Rules, as applicable. To the extent that a definition of a term in the text of this Disclosure Statement and the definition of such term in the Plan are inconsistent, the definition included in the Plan shall control and govern. To the extent that a summary of a motion, order, agreement or other operative document contained in this Disclosure Statement is inconsistent with any such motion, order, agreement or other operative document, the actual motion, order, agreement or other operative document shall control and govern in all instances.

MARKET AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE DEBTORS' CONTROL. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION OR THEIR ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE. FURTHER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE FINANCIAL INFORMATION WAS PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED AND/OR MAY HAVE BEEN UNANTICIPATED AND, THUS, THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. THE FINANCIAL INFORMATION, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

NO PARTY IS AUTHORIZED TO GIVE ANY INFORMATION WITH RESPECT TO THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. NO REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY HAVE BEEN AUTHORIZED BY THE DEBTORS OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY INFORMATION, REPRESENTATIONS OR INDUCEMENTS MADE TO OBTAIN AN ACCEPTANCE OR REJECTION OF THE PLAN OTHER THAN, OR INCONSISTENT WITH, THE INFORMATION CONTAINED HEREIN AND IN THE PLAN SHOULD NOT BE RELIED UPON BY ANY HOLDER OF A CLAIM.

WITH RESPECT TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER PENDING, THREATENED, OR POTENTIAL LITIGATION OR ACTIONS, THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED BY ANY PARTY AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT WILL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR WILL IT BE CONSTRUED TO CONSTITUTE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE PLAN AS IT RELATES TO THE HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTORS.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND NOT IN ACCORDANCE WITH U.S. OR MEXICAN FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-APPLICABLE BANKRUPTCY LAWS. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "**SEC**") OR THE COMISIÓN NACIONAL BANCARIA Y DE VALORES [NATIONAL BANKING AND STOCK COMMISSION] (THE "**CNBV**"), NOR HAS THE SEC OR THE CNBV PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

SEE ARTICLE X OF THIS DISCLOSURE STATEMENT, ENTITLED "CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING," FOR A DISCUSSION OF CERTAIN CONSIDERATIONS IN CONNECTION WITH A DECISION TO ACCEPT THE PLAN BY A HOLDER OF AN IMPAIRED CLAIM ENTITLED TO VOTE.

# TABLE OF CONTENTS

PAGE

ARTICLE I

INTRODUCTION ............................................................................................................1

A.    Purpose of the Disclosure Statement ...............................................................1

B.    Overview of Proposed Restructuring................................................................2

C.    Confirmation of the Plan..................................................................................3

D.    Releases, Exculpations, and Injunctions..........................................................7

E.    Voting Procedures and Voting Deadline ..........................................................8

F.    Confirmation Hearing ......................................................................................9

ARTICLE II

GENERAL INFORMATION REGARDING THE DEBTORS .......................................................9

A.    The Debtors' Businesses, Structure, Management, and Employees...................9

B.    The Company's Prepetition Corporate Structure............................................24

C.    The Company's Prepetition and Postpetition Capital Structures.....................24

D.    Additional Information and Historical Financials ...........................................33

E.    Summary of Events Leading to the Chapter 11 Filings...................................34

ARTICLE III............................................................................................................36

CERTAIN MEXICAN LAW CONSIDERATIONS...................................................................36

ARTICLE IV

THE CHAPTER 11 CASES ............................................................................................40

A.    First and Second Day Motions.......................................................................40

B.    Professional Advisors ....................................................................................48

C.    Other Key Filings and Developments in the Chapter 11 Cases.......................51

D.    Disclosure Statement Hearing and Confirmation Hearing ..............................82

ARTICLE V

SUMMARY OF THE PLAN ............................................................................................82

A.    Administrative Expense Claims and Priority Tax Claims ...............................83

B.    Classification and Treatment of Claims and Interests ....................................................88

C.    Implementation of the Plan ..........................................................................................98

D.    Provisions Governing Distributions ...........................................................................106

E.    Disputed Claims or Interests ......................................................................................113

F.    Executory Contracts and Unexpired Leases ...............................................................116

G.    Effect of Confirmation ...............................................................................................121

H.    Conditions Precedent to Effectiveness of the Plan .....................................................129

I.    Retention of Jurisdiction by the Bankruptcy Court ....................................................131

J.    Miscellaneous .............................................................................................................133

ARTICLE VI

VOTING REQUIREMENTS; ACCEPTANCE AND CONFIRMATION OF THE PLAN .................................141

A.    General ........................................................................................................................141

B.    Parties in Interest Entitled to Vote .............................................................................142

C.    Classes Impaired and Entitled to Vote Under the Plan ...............................................142

D.    Voting Procedures and Requirements .........................................................................143

E.    Acceptance of Plan .....................................................................................................145

F.    Confirmation Without Necessary Acceptances; Cramdown ........................................146

G.    Classification...............................................................................................................147

ARTICLE VII

BEST INTERESTS OF CREDITORS AND FEASIBILITY.................................................................147

A.    Best Interests Test .......................................................................................................147

B.    Liquidation Analysis ...................................................................................................148

C.    Application of the Best Interests Test .........................................................................149

D.    Feasibility....................................................................................................................149

E.    Valuation of the Debtors .............................................................................................150

ARTICLE VIII

EFFECT OF CONFIRMATION ...................................................................................................150

A.    Binding Effect of Confirmation ..................................................................................150

B.    Good Faith ..................................................................................................................150

ARTICLE IX

SECURITIES LAW MATTERS ...............................................................................................150

A.      Bankruptcy Code Exemptions from Registration Requirements for the New Stock.......150

ARTICLE X

CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING...................................................153

A.      Certain Bankruptcy, Tax, Corporate and Securities Law Considerations ......................154
B.      Risks Related to Exit Financing, New Notes and New Stock .........................................159
C.      Certain Risks Associated with the Debtors' and the Reorganized Debtors' Business
        Operations and Financial Condition ...............................................................................163
D.      Other Risks.....................................................................................................................170

ARTICLE XI

CERTAIN MEXICAN AND U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ..................171

A.      Certain Mexican Federal Income Tax Consequences of the Plan ...................................171
B.      Certain U.S. Federal Income Tax Consequences of the Plan .......... **Error! Bookmark not
        defined.**

ARTICLE XII

RECOMMENDATION...............................................................................................................191

## **Appendices**

Appendix A     Plan of Reorganization
Appendix B     Liquidation Analysis
Appendix C     Financial Projections
Appendix D     Valuation Analysis
Appendix E     Organizational Chart

# ARTICLE I

# INTRODUCTION

## A.    Purpose of the Disclosure Statement

On June 30, 2020 (the "**Petition Date**"), Grupo Aeroméxico, S.A.B. de C.V. ("**Grupo Aeroméxico**"), Aerovías de México, S.A. de C.V., Aerolitoral, S.A. de C.V. and Aerovías Empresa de Cargo, S.A. de C.V. (collectively, the "**Debtors**"), each of which is a debtor and debtor in possession, filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**").   The Debtors' chapter 11 cases are being jointly administered under the caption *In re Grupo Aeroméxico, S.A.B. de C.V.*, Case No. 20-11563 (the "**Chapter 11 Cases**").   The Debtors have continued in possession of their property and have continued to operate and manage their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.   No request has been made for the appointment of a trustee or examiner in the Chapter 11 Cases.  On July 13, 2020, the United States Trustee (the "**U.S. Trustee**") appointed an Official Committee of Unsecured Creditors (the "**Creditors' Committee**").   *See Notice of Appointment of Official Committee of Unsecured Creditors* [Docket No. 92].  The Debtors submit this disclosure statement (as may be amended, altered, modified, revised, or supplemented from time to time, the "**Disclosure Statement**") in connection with the solicitation of votes on the *Debtors' Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* (including all exhibits and schedules attached thereto, and as may be amended, altered, modified, or supplemented from time to time, the "**Plan**") attached hereto as Appendix A.

The Debtors submit this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code to Holders of Claims against the Debtors in connection with (a) the solicitation of votes on the Plan and (b) a hearing to consider confirmation of the Plan.

The purpose of this Disclosure Statement is to describe the Plan and its provisions and to provide adequate information, as required under section 1125 of the Bankruptcy Code, to Holders of Claims against the Debtors who will have the right to vote on the Plan so they can make informed decisions in doing so.  Holders of Claims entitled to vote to accept or reject the Plan will receive, among other things, a Ballot together with this Disclosure Statement to enable them to vote on the Plan in accordance with the Voting Instructions and make any other elections or representations required pursuant to the Plan and/or the Voting Instructions.

This Disclosure Statement includes, among other things, (a) information pertaining to the Debtors' prepetition business operations and financial history and (b) the events leading up to the Chapter 11 Cases.  In addition, this Disclosure Statement includes a summary of the Plan (which summary sets forth certain terms and provisions of the Plan), the effects of confirmation of the Plan, certain risk factors associated with the Plan, and the manner in which distributions will be made under the Plan ("**Distributions**").  This Disclosure Statement also discusses the confirmation process and the procedures for voting, which procedures must be followed by the Holders of Claims entitled to vote under the Plan in order for their votes to be counted.

### B.      Overview of Proposed Restructuring

As described in greater detail below, Aeroméxico is the leading carrier in Mexico (Latin America's second largest economy) and prior to the COVID-19 pandemic was sufficiently capitalized to continue its operational initiatives and take advantage of its strategic partnerships. However, due to the economic distress and travel restrictions that resulted from the COVID-19 pandemic, the Debtors were forced to commence these Chapter 11 Cases.  The Debtors believe that the post-emergence enterprise will have the ability to withstand the challenges and volatility facing the airline industry as it begins to recover from the COVID-19 pandemic and to succeed as the flagship carrier in Mexico and a leading carrier in Latin America.

The Plan is the result of extensive good faith negotiations, overseen by Grupo Aeroméxico's board of directors (the "**Board of Directors**") and the Restructuring Committee (as defined below), among the Debtors and their key economic stakeholders.  The Plan is supported by, among others, [●]].  The transactions contemplated in the Plan will strengthen the Company by substantially reducing its debt and increasing its cash flow and, importantly, will preserve almost 13,000 jobs in Mexico, the United States and around the world.

As part of the restructuring:

- As discussed in more detail below, the Debtors  performed a robust market-check to determine the value of the Reorganized Debtors.  As a result, the Debtors received three exit financing proposals.  The Board of Directors proceeded with a valuation based on the Joint Proposal that, if consummated, would (a) pay off the portion of the DIP Facility that remains after certain DIP Lenders exercise their Voluntary Equity Conversion, (b) provide the greatest recovery to the Debtors' creditors and (c) best position the Company for continued growth and profitability.

- As discussed in greater detail below, the Plan authorizes (but does not require the Debtors to consummate) the PLM Stock Participation Transaction, pursuant to which PLM shall become a wholly-owned subsidiary of Grupo Aeroméxico.  In addition, the Plan provides for the Debtors' assumption of the Club Premier Agreements.

- Holders of General Unsecured Claims will receive [·], if the Plan is confirmed and consummated;

- Aeroméxico has been able to leverage the chapter 11 process to effectively transform its businesses and simplify its balance sheet.  As contemplated by the Plan, the Company will eliminate approximately $[1] billion of debt from the Debtors' consolidated balance sheet.  At the same time, Aeroméxico has improved the customer experience.  As a result of its reorganization, Aeroméxico expects to emerge from bankruptcy as a strong, competitive and global airline that continues to connect Mexico with the world.  In particular, Aeroméxico expects to be the airline of choice for business and leisure customers by offering a best-in-class customer experience on the ground and in the air.  Aeroméxico expects to remain

focused on maintaining the competitive cost structure it has obtained from its reorganization in order to improve its financial position and pursue long-term stability and growth.

## C.   Confirmation of the Plan

### 1.   *Requirements*

The requirements for confirmation of the Plan are set forth in section 1129 of the Bankruptcy Code.  The requirements for approval of the Disclosure Statement are set forth in section 1125 of the Bankruptcy Code.

### 2.   *Confirmation of the Plan*

To confirm the Plan, the Bankruptcy Court must hold a hearing to determine whether the Plan meets the requirements of section 1129 of the Bankruptcy Code.

### 3.   *Treatment and Classification of Claims and Interests*

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation and Distributions under the Plan.  A Claim or Interest is classified in a particular Class only to the extent such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim is also classified in a particular Class for the purpose of receiving Distributions under the Plan only to the extent such Claim is an Allowed Claim in that Class and such Claim has not been satisfied, released or otherwise settled prior to the Effective Date.  In no event shall any Holder of an Allowed Claim be entitled to receive payments under the Plan that, in the aggregate, exceed the Allowed amount of such Holder's Claim.

### 4.   *Only Impaired Classes Vote*

Pursuant to the provisions of the Bankruptcy Code, only classes of claims or interests that are "impaired" (as defined in section 1124 of the Bankruptcy Code) under a plan may vote to accept or reject such plan; whereas classes of claims or interests that are unimpaired are deemed to accept such plan and their votes are not solicited.  Generally, a Claim or Interest is impaired under a plan if the applicable holder's legal, equitable or contractual rights are modified under such plan.  In addition, if the holders of claims or interests in an impaired class do not receive or retain any property under a plan on account of such claims or interests, such impaired class is deemed to have rejected such plan under section 1126(g) of the Bankruptcy Code and, therefore, such holders are not entitled to vote on such plan.

Under the Plan, Holders of Claims in Classes [3(a), 3(b), 3(c), 3(d) and 3(e)] are Impaired and are entitled to vote on the Plan.

Under the Plan, Holders of Claims in Classes [1 and 2] are Unimpaired and, therefore, deemed to accept the Plan.

Under the Plan, Holders of interests in Class [7] are Impaired and will not receive or retain any property under the Plan on account of their Claims or interests in such Classes and, therefore, are (a) not entitled to vote on the Plan and (b) deemed to reject the Plan.

ACCORDINGLY, A BALLOT FOR ACCEPTANCE OR REJECTION OF THE PLAN IS BEING PROVIDED ONLY TO HOLDERS OF CLAIMS IN CLASSES [3(a), 3(b), 3(c), 3(d) and 3(e)].

**Summary of Classification and Treatment of Claims against and Interests in the Debtors**

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND ARE SUBJECT TO CHANGE.**

The information in the table below is provided in summary form for illustrative purposes only and is subject to material change based on certain contingencies, including those related to the claims reconciliation process. Actual recoveries may widely vary within these ranges, and any changes to any of the assumptions underlying these amounts could result in material adjustments to recovery estimates provided herein and/or the actual Distribution received by Holders of Allowed Claims. The projected recoveries are based on information available to the Debtors as of the date hereof and reflect the Debtors' estimates as of the date hereof only. In addition to the cautionary notes contained elsewhere in the Disclosure Statement, it is underscored that the Debtors make no representation as to the accuracy of these recovery estimates. The Debtors expressly disclaim any obligation to update any estimates or assumptions after the date hereof on any basis (including new or different information received and/or errors discovered).

The categories of Claims and interests listed below classify Claims and interests for all purposes, including voting, confirmation, and Distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. For a summary of the treatment of each Class of Claims and interests, see Article V, "Summary of the Plan," below.

| Class | Claims or Interest | Status | Voting Rights | Projected Recovery Under the Plan | Estimated Allowed Claims ('000) |
|---|---|---|---|---|---|
| 1 | Secured Claims against the Debtors | Unimpaired | Presumed to Accept | [·] | $636,000 – $656,000 |
| 2 | Other Priority Claims against the Debtors | Unimpaired | Presumed to Accept | [·] | $400 – $1,000 |
| 3(a) | Aerovías and Grupo Aeroméxico Recourse Claims against Grupo Aeroméxico and Aerovías | Impaired | Entitled to Vote | [·] | $736,000 – $842,000 |
| 3(b) | General Unsecured Claims against Grupo Aeroméxico | Impaired | Entitled to Vote | [·] | $47,500 – $48,000 |
| 3(c) | General Unsecured Claims against Aerovías | Impaired | Entitled to Vote | [·] | $2,023,000 – $2,272,000 |
| 3(d) | General Unsecured Claims against Aeroméxico Connect | Impaired | Entitled to Vote | [·] | $455,000 – $546,000 |

| 3(e) | General Unsecured Claims against Aeroméxico Cargo | Impaired | Entitled to Vote | [·] | $4,900 – $6,000 |
|------|------|------|------|------|------|
| 4(a) | Unsecured Convenience Class Claims against Grupo Aeroméxico | [·] | [·] | [·] | [·] |
| 4(b) | Unsecured Convenience Class Claims against Aerovías | [·] | [·] | [·] | [·] |
| 4(c) | Unsecured Convenience Class Claims against Aeroméxico Connect | [·] | [·] | [·] | [·] |

| 4(d) | Unsecured Convenience Class Claims against Aeroméxico Cargo | [·] | [·] | [·] | [·] |
|---|---|---|---|---|---|
| 5(a) | Intercompany Claims against Grupo Aeroméxico | [·] | [·] | [·] | $15 |
| 5(b) | Intercompany Claims against Aerovías | [·] | [·] | [·] | $299,000 |
| 5(c) | Intercompany Claims against Aeroméxico Connect | [·] | [·] | [·] | $646,000 |
| 5(d) | Intercompany Claims against Aeroméxico Cargo | [·] | [·] | [·] | $10,000 |
| 6 | Intercompany Interests | [·] | [·] | [·] | [·] |
| 7 | Interests in Grupo Aeroméxico | Impaired | Deemed to Reject | [·] | [·] |

If a controversy arises regarding whether any Claim is properly classified under the Plan, the Bankruptcy Court shall, upon proper motion and notice, determine such controversy at the Confirmation Hearing.  If the Bankruptcy Court finds that the classification of any Claim is improper, then such Claim shall be reclassified and the Ballot previously cast by the Holder of such Claim shall be counted in, and the Claim shall receive the treatment prescribed in, the Class in which the Bankruptcy Court determines such Claim should have been classified, without the necessity of resoliciting any votes on the Plan.

## D.    Releases, Exculpations, and Injunctions

The Plan contains releases, exculpations, and injunctions (as described more fully in Article VIII of the Plan), including releases between the Debtors, on the one hand, and certain Released Parties on the other hand.  The Releasing Parties under the Plan include the following:

(a) the Creditors' Committee and each of its members in their capacity as such; (b) the DIP Lenders (as defined in the DIP Credit Agreement); (c) the DIP Agent; (d) the Senior Notes Indenture Trustee; (e) the Equity Financing Commitment Parties; (f) the Debt Financing Commitment Parties; (g) the Debtors' current and former officers and directors; (h) each of the Unions; (i) the Ad Hoc Group of Senior Noteholders and its members; (j) the Ad Hoc Group of Unsecured Claimholders and its members; (k) each Holder of a Claim that votes to accept the Plan; and (l) with respect to each of the Persons referred to in clauses (a) through (k), such Person's Related Parties, in each case only in their capacity as such.  The release, exculpation, and injunction provisions in Article VIII of the Plan are integral to the Plan.

**E.    Voting Procedures and Voting Deadline**

If you are entitled to vote to accept or reject the Plan, a Ballot will be enclosed in the Solicitation Packages sent out for the purpose of voting on the Plan and making any other elections or representations required pursuant to the Plan and/or Ballot, including for the Individual Ballots whether or not to make a voluntary, irrevocable election (the "**Individual Ballot Cash Opt-In Election**") to receive Cash (in an amount equal to such Holders' Pro Rata share of the Aerovías/Grupo Claimholder Cash Pool) in lieu of New Stock.  Further, the Beneficial Holder Ballot will include a notice about a cash opt-in election; however, the process through which the Beneficial Holders elect to make the cash opt-in election (the "**Beneficial Holder Cash Opt-In Election**" and with the Individual Ballot Cash Opt-In Election, the "**Cash Opt-In Election**") will occur after confirmation of the Plan and will be separately communicated via separate notice to such Beneficial Holders and their Nominees, as applicable.  If a Cash Opt-In Eligible Claimholder does not duly make an election when required, then such Holder will receive the New Stock.  To ensure your vote is counted and your elections made, if applicable, you must complete, date, sign, and promptly mail the Ballot enclosed with the Solicitation Package or complete your Ballot using the online portal (https://dm.epiq11.com/case/aeromexico) (the "**Online Voting Portal**") maintained by the claims and solicitation agent (the "**Claims and Solicitation Agent**"), in each case indicating your decision to accept or reject the Plan in the boxes provided and in accordance with the instructions set forth in your Ballot and the Approval Order.

TO BE COUNTED, YOUR BALLOT INDICATING YOUR ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED BY THE CLAIMS AND SOLICITATION AGENT NO LATER THAN [4:00 P.M.] (PREVAILING EASTERN TIME) ON **[NOVEMBER 19], 2021** (THE "**VOTING DEADLINE**").

In order for the Plan to be accepted by an Impaired Class of Claims, a majority in number and two-thirds in dollar amount of the Claims voting in such Class that actually voted on the Plan must vote to accept the Plan.  At least one voting Class, excluding the votes of insiders, must actually vote to accept the Plan.

YOU ARE URGED TO COMPLETE, DATE, SIGN AND PROMPTLY MAIL THE BALLOT ENCLOSED WITH THE SOLICITATION PACKAGES (AS DEFINED IN THE APPROVAL ORDER) OR COMPLETE YOUR BALLOT USING THE ONLINE VOTING PORTAL MAINTAINED BY THE CLAIMS AND SOLICITATION AGENT IN ACCORDANCE WITH THE INSTRUCTIONS SET FORTH IN YOUR BALLOT AND THE APPROVAL ORDER.  PLEASE BE SURE TO COMPLETE THE BALLOT PROPERLY AND

LEGIBLY AND TO IDENTIFY THE EXACT AMOUNT OF YOUR CLAIM AND THE NAME OF THE HOLDER, IF SUCH INFORMATION IS ALREADY NOT PREFILLED IN YOUR BALLOT.  IF YOU ARE A HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN AND YOU DID NOT RECEIVE A BALLOT, YOU RECEIVED A DAMAGED BALLOT OR YOU LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THE DISCLOSURE STATEMENT, THE PLAN OR PROCEDURES FOR VOTING ON THE PLAN, PLEASE CONTACT THE CLAIMS AND SOLICITATION AGENT AT (855) 917-3578 (TOLL-FREE U.S.) OR +1 (503) 520-4473 (IF CALLING FROM OUTSIDE THE U.S.).  THE CLAIMS AND SOLICITATION AGENT IS NOT AUTHORIZED TO PROVIDE LEGAL ADVICE AND WILL NOT PROVIDE ANY SUCH ADVICE.

BALLOTS CAST BY HOLDERS AND BENEFICIAL HOLDERS AND MASTER BALLOTS CAST ON BEHALF OF BENEFICIAL HOLDERS IN CLASSES ENTITLED TO VOTE MUST BE RECEIVED BY THE CLAIMS AND SOLICITATION AGENT IN ACCORDANCE WITH THE INSTRUCTIONS SET FORTH IN THE BALLOT OR MASTER BALLOT.

## F.    Confirmation Hearing

The Bankruptcy Court has scheduled a hearing to consider confirmation of the Plan (the "**Confirmation Hearing**").  The Confirmation Hearing will take place on  [November 29], 2021 at [4:00 p.m.] (prevailing Eastern Time).  Parties in interest will have the opportunity to object to the confirmation of the Plan at the Confirmation Hearing.

## ARTICLE II

## GENERAL INFORMATION REGARDING THE DEBTORS

## A.    The Debtors' Businesses, Structure, Management, and Employees

### 1.    Overview

Grupo Aeroméxico (with their direct and indirect non-Debtor subsidiaries, the "**Company**" or "**Aeroméxico**") is Mexico's flagship carrier and is committed to sustainability and adhering to a strict framework of ethical principles and corporate integrity.  It is the leading Mexican airline in terms of fleet size and network.  Aeroméxico offers passengers a full-service, premium experience to 85 global destinations, including every major city in Mexico.  In fact, Aeroméxico is the only full-service carrier in Mexico.  As a founding member of SkyTeam (the "**SkyTeam Alliance**"), an alliance of 19 international airlines dedicated to providing passengers with a seamless travel experience, Aeroméxico connects Mexico with the world.  In addition, Aeroméxico has a strategic partnership with Delta that provides unique passenger flows in the Mexico-USA market, one of the most dynamic markets in the world.

The following table shows the Company's consolidated statement of comprehensive income for the three months ended June 30, 2021.

| | Revenue (in millions of pesos) | % of Total |
|---|---|---|

| Domestic Passenger Ticket Revenue | 4,303 | 43.0% |
|---|---|---|
| International Passenger Ticket Revenue | 3,728 | 37.2% |
| Ancillary Passenger Revenue | 564 | 5.6% |
| **Total Passenger Ticket Revenue** | **8,595** | **85.8%** |
| Air Cargo | 1,238 | 12.4% |
| Charter Flights | 2 | 0.0% |
| Over Revenue | 178 | 1.8% |
| **Total Revenue** | **10,013** | **100.0%** |

### i.    Operations and Management Overview

Aeroméxico's network, like most international air carriers, is a "hub and spoke" system. Domestic hubs include, among others, Mexico City (the principal international gateway), Monterrey and Guadalajara, where traffic from markets in the geographic region surrounding the hub is distributed to domestic and international cities and to other Aeroméxico hubs.

Aeroméxico provides its customers the largest offering of domestic (42) and international (43) destinations in Mexico, with leading positions in many primary cities. Various key performance indices undergird the Company's leading market position. In full-year 2019, Aeroméxico served over 20 million customers, operated approximately 567 daily flights and transported nearly 169,000 tons of cargo. These indices are the result of hard work and a strong management team with a track record of successfully navigating crises. As of June 30, 2021, Aeroméxico has returned to 63% of its pre-pandemic volume (ASKs).

Over the past decade and in the face of previously unprecedented terrorist attacks, financial crises and various public health emergencies, Aeroméxico's management has charted a successful path for the Company. Prior to the start of the pandemic, the Company's cost structure had decreased by approximately 17% between year-end 2008 and 2019. The Company's overall leverage has decreased by approximately 14-times during the same period, and its liquidity has markedly improved by over 1,100 basis-points.

The Company's streamlined fleet is one reason for the dramatically improved performance over the last decade. Moreover, since the Petition Date, the Company has simplified its fleet from six aircraft sub-fleets to four—the Embraer 190 regional jet, the Boeing 737-700/800 narrow-body, 737MAX-8 and 737MAX-9 narrow-bodies and the Boeing 787-8/9 wide-body. Importantly, each sub-fleet type is uniquely suited for a particular mission within the Company's route structure, which allows the Company to minimize training and maintenance costs and operational complexity and maximize on-time performance.

The following table shows the Company's operating fleet as of the three months ended June 30, 2021.

| Aircraft Type | Number of Aircraft |
|---|---|
| **B-787** | 18 |
| **B-737-700** | 5 |
| **B-737-800** | 34 |
| **B-737 MAX 8** | 10 |
| **B-737 MAX 9** | 4 |
| **Aerovías Total** | **71** |
| **E-190** | 47 |
| **Aeroméxico Connect Total** | **47** |
| **Grupo Aeroméxico Total** | **118** |

a. Aerovías

Aerovías de México, S.A. de C.V. ("**Aerovías**") is the Company's main airline, primarily operating Aeroméxico's high-density routes, such as the business triangle through Mexico City, Guadalajara and Monterrey and international destinations such as Madrid, Los Angeles and New York. Most of Aerovías' flights depart from one of the Company's hubs, most frequently Mexico City. Aerovías relies on Aeroméxico Connect (as defined below) to aggregate passengers to the Company's busiest hubs.

b. Aeroméxico Connect

Aerolitoral, S.A. de C.V. ("**Aeroméxico Connect**") is focused on flying low-density Mexican and short-haul international routes, which allows Aeroméxico to connect its passengers with lesser traveled destinations and those destinations with Aeroméxico hubs.

c. Aeroméxico Cargo

In February 2011, the Company formed *Aerovías Empresa de Cargo S.A. de C.V.* ("**Aeroméxico Cargo**") to provide domestic and international cargo services. These services include shipping goods both domestically and internationally and storing goods in the Company's airport warehouses. Since the beginning of the COVID-19 pandemic, Aeroméxico Cargo has operated 300 exclusive cargo flights that have transported, among other things, 250 tons of essential medical supplies, drugs and technology between Mexico and 15 other countries.

d. Aeroméxico Servicios

In order to support its flights operations at the largest commercial airports in Mexico, Aeroméxico's subsidiaries Estrategias Especializadas de Negocios, S.A. de C.V. and Administradora Especializada en Negocios, S.A. de C.V. (d/b/a Aeroméxico Servicios) (collectively, "**Aeroméxico Servicios**") provide Aerovías, Aeroméxico Connect and certain airline partners with the ground services needed to operate. Aeroméxico Servicios provides baggage handling and other aircraft services such as weighing and balancing the aircraft, cleaning, water supplies, push back and aircraft towing and restroom maintenance.

e. Ancillary Services and Other Operations

The Company also provides certain ancillary services including, among other things, "upgrades" or sales of preferred seating, add-on passenger services and frequent flyer mileage accrual via Club Premier (defined below). Additionally, prepetition, the Company offered its customers vacation packages ("**Vacation Packages**") through AM BD GP JV, S.A.P.I. de C.V. ("**Gran Plan**" or "**Aeroméxico Vacations**" in the United States), a majority-owned subsidiary of Grupo Aeroméxico. As discussed in Article IV herein, the Debtors obtained authority to dissolve Gran Plan in the Chapter 11 Cases, which provided the Debtors the flexibility to transition to a new business model through which Aeroméxico anticipates offering customers the opportunity to purchase flight, hotel and/or car rental Vacation Packages at a discounted price compared to the cost of purchasing standalone products through a strategic alliance with a major travel agency.

f.  Aeroméxico Formación

An important part of maintaining its status as Mexico's leading airline is ensuring that the Company's employees are the best trained in the marketplace. Throughout its history and to today, Aeroméxico invests in services and products to help continually educate its employees. In particular, Aeroméxico's subsidiary AM Formación Interna, S.A. de C.V. ("**Aeroméxico Formación**") operates training facilities and programs for its flight attendants, ground crew, maintenance technicians and pilots. And in addition to robust training programs for each of those employee groups, Aeroméxico Formación also operates one of the largest aeronautical training centers in Latin America with state of art flight simulators for each of its aircraft types. Likewise, employees are trained on, among other things, issues related to ethics, corporate integrity, protection of personal data, antitrust practices, prevention of harassment and discrimination, each in accordance with Aeroméxico's compliance program.

g.  Club Premier

The Company's loyalty program, Club Premier ("**Club Premier**"), is designed to engender customer loyalty, ensure customer satisfaction and address competitive pressures so that Aeroméxico can retain current and attract new customers. Club Premier was the first frequent flyer program established in Latin America and is Mexico's leading loyalty program. As of the Petition Date, Club Premier had approximately 6.7 million members who can earn and redeem points ("**Premier Points**") across a broad ecosystem, including to, among other things, (a) fly with Aeroméxico, Aeroméxico Connect, SkyTeam Alliance airlines, and other airlines; (b) use as part of certain co-branded credit cards; (c) convert other loyalty currency into Premier Points; or (d) purchase goods or services from participating loyalty partners.

As more fully set forth in Article IV, the Plan contemplates the PLM Stock Participation Transaction, pursuant to which PLM (a joint venture that owns and operates the Club Premier loyalty program) will become a wholly-owned subsidiary of Grupo Aeroméxico, and the Debtors' assumption of the Club Premier Agreements.

h.  Delta Partnership

Aeroméxico and Delta Air Lines Inc. ("**Delta**") have a close strategic partnership that bolsters the Company's competitiveness and supports its mission to serve its passengers in the best manner possible.  In May 2017, upon obtaining the necessary approvals from Mexican (COFECE) and U.S. antitrust regulatory authorities, Aeroméxico and Delta began activities in connection with the operation of transborder flights between the United States and Mexico pursuant to that certain joint cooperation agreement, dated May 27, 2015 (the "**Delta JCA**").  The Delta JCA is the largest cross-border alliance in the airline industry between a Mexican and an American airline.  It has increased Aeroméxico's competitiveness and improved the overall customer experience for travelers flying on Aeroméxico by providing a broader network, improved schedules at diverse price points, frequent flyer reciprocity and shared VIP lounge access.  Aeroméxico and Delta have collectively transported more than 22 million passengers on transborder routes between April 2017 and April 2021.  Delta has been instrumental in strengthening Aeroméxico's position in the Mexico-United States travel market, which is the Company's largest and most critical international market.

The Company's relationship with Delta has gradually evolved since the 1990s, starting with basic codeshare agreements and developing into Delta ultimately becoming a significant equity owner in Aeroméxico.  As of the Petition Date, Delta held 51.3% of the economic interests and 49% of the voting rights in Grupo Aeroméxico, which variance was needed to comply with the Mexican Foreign Investment Law (as defined and described below).

In December 2011, Aeroméxico entered into a joint venture agreement with Delta, AM DL MRO JV, S. A. P. I de C. V. ("**TechOps**"), to jointly build and operate an aircraft maintenance, repair and overhaul ("**MRO**") facility in Querétaro, Mexico.  TechOps is the largest MRO facility in Mexico, and the second largest in Latin America.  Aeroméxico and Delta each have a 50% interest in TechOps.  The base at Querétaro, opened in January 2014, provides major maintenance services for Aeroméxico, Delta and other airlines.

### ii.    Competitive Landscape

As a leading domestic and international airline, Aeroméxico faces significant passenger and cargo air transportation competition on its routes from other full service airlines, charter airlines and potential new entrants into its markets, as well as in the loyalty points market with regard to its Club Premier loyalty program.  Too, Aeroméxico has already faced, and may in the future face, increased competition from existing and new participants in the market in which it operates, including full-service and low-cost carriers.  In particular, low-cost carrier business models have been gaining increasing momentum in the Latin American aviation market in recent years.

Notwithstanding the ever-changing competitive landscape it finds itself in, Aeroméxico has and will continue to leverage its strengths.  In particular, the Company has worked to differentiate itself from domestic competitors by enlarging the value proposition it provides to customers, including by providing the following set of services, which none of their domestic competitors collectively offer: on-board Wi-Fi, live TV, free beverages and snacks, on-board sales, cabin segmentation, airport lounges and designated seats.  And this has worked—Aeromexico's brand equity outranks its primary domestic competitors by significant margins.  Too, the Company

has similarly taken the low-cost providers head-on by right-sizing its cost structure, so as to narrow the cost gap to domestic carriers all the while offering a superior product. Moreover, Interjet, formerly the #2 at Mexico City International Airport, has not operated since December 2020.

### iii.    Mexico's Favorable Trends Driving Growth

Mexico is a major economy within Latin America and the world. According to the World Bank, based on aggregate 2020 gross domestic product, Mexico was the second largest economy in Latin America and the 15th largest economy in the world. And Mexico's economy is only expected to expand as its population grows and as its middle class grows as a proportion of Mexico's overall population. Both of these trends are positive for Aeroméxico because they will in turn strengthen the demand to fly and significantly increase air travel's penetration within Mexico over the long term. This is important, generally, since Mexico's air travel industry is presently underpenetrated when compared to developed markets as well as emerging markets and, specifically, since Aeroméxico is the leading and largest carrier in Mexico and therefore is well positioned to capture and profit from much of this growth over the long-term.

### iv.    Reorganized Aeroméxico's Business Strategy

Aeroméxico expects to emerge from bankruptcy confident in its position as Mexico's flagship carrier. Aeroméxico expects to be the airline of choice for customers traveling to or through Mexico by continuing to improve the customer experience for both leisure and corporate travelers on the ground and in the air. Aeroméxico's emergence business strategy, as described in more detail below, touches all facets of its operations—the destinations Aeroméxico will serve, the way Aeroméxico will serve its customers and the fleet Aeroméxico will operate—all in order to earn customer preference and continue to improve revenue performance. At the same time, Aeroméxico expects to remain focused on maintaining the competitive cost structure it has achieved through reorganization in order to improve its financial position and ensure long-term stability.

#### a.    Strengthen and Leverage its Mexico City Position

Today, Aeroméxico occupies the top position at the Mexico City International Airport, "**AICM**", offering more daily flights out of AICM than any other airline. AICM is the Company's central hub, the busiest airport in Mexico and the primary airport for international flights to and from Mexico. The Company seeks to strengthen and leverage its strategic position in Mexico City by improving network and schedule positions at AICM, which will help Aeroméxico further enhance its connectivity.

By leveraging its position at AICM, Aeroméxico will be best positioned to take advantage of a rebound in international and corporate demand by offering the most robust and optimized flight schedule out of Mexico's busiest airport. In turn, this will allow the Company to offer more flights at the highest demand hours of the day, which will help generate the highest revenue premiums that come from, among other things, successfully fulfilling corporate and international demand—something Aeroméxico has effectively done in the past and seeks to continue to do in the future. It will also allow for enhanced schedule banking, which provides more connecting

opportunities for Aeroméxico's customers.  Aeroméxico's growing presence at AICM will put the airline in line with other flagship carriers' banking structure at its respective main hubs.

### b.  Maximizing a Streamlined and Upgraded Fleet

During the Chapter 11 Cases, Aeroméxico significantly simplified and upgraded its fleet to make it more efficient, with a focus on higher density and more fuel efficient aircraft.  To date, the Company has reduced its aircraft sub-fleets from six (6) to four (4), retiring certain outdated and inefficient E170 and 737-700 aircraft.  In addition, the Company has been able to leverage the chapter 11 bankruptcy process to modify the terms of its existing leases and financings, so as to bring them more in line with current market realities and to secure new aircraft deliveries on prevailing market terms.  Moreover, as demand continues to rebound toward pre-pandemic levels, the Company intends to increase its use of modern and highly efficient 737MAX aircraft, which will help close the price gap between Aeroméxico and certain low-cost Mexican carriers.  The Company also intends to limit its use of regional aircraft and move towards more cost efficient aircraft.  Similarly, the Company intends to upgauge its long-haul fleet over time to include a greater proportion of larger capacity 787-9 widebody aircraft as demand for longer distance business and leisure travel rebounds to pre-pandemic levels.  In all, a simplified, modernized and more fuel efficient fleet with additional capacity will yield significant cost savings and improved profitability to the Company.

In addition, many of the restructured lease agreements contain "power-by-the-hour"[1] arrangements that extend until the end of 2022.  These provisions give the Company enhanced flexibility to adjust the utilization of its fleet as demand recovers, while ensuring that its aircraft finance costs remain more directly aligned with demand as the market recovers.  Additionally, through leveraging the chapter 11 bankruptcy process, the Company has been able to decrease the average age of the aircraft in its fleet from 9.3 years, as of December 31, 2020, to an estimated 8 years by December 31, 2021, with expected improvements to the average age of its fleet continuing into 2022. This will represent an important milestone for the Company since having a more modern fleet allows the Company to minimize maintenance costs, maximize fuel efficiency and provide a better product to its customers.

### c.  Rebuild and Restore Commercial Partnerships

Aeroméxico and Delta have an important and significant commercial partnership that Aeroméxico is committed to maintaining over the long term.  The Company anticipates continuing to leverage certain synergies through its relationship with Delta, such as joint cargo and network services, revenue management and sales best practices that increase revenue efficiency, fleet and engine negotiations, airport operations, supply chain and procurement, and maintenance, among others.  Access to these best practices allows the Company to optimize its unit costs.  As international travel continues to rebound, Aeroméxico hopes to restore its capacity to Delta hubs and focus cities, which will help give its passengers more access to more destinations around the globe at more competitive price points.  Similarly, as travel restrictions fade away and demand

---

[1] Broadly speaking, "power-by-the-hour" provisions provide for the payment of rent calculated based on actual usage of the leased equipment, rather than a fixed monthly rental payment.

resurfaces,[2] Aeroméxico will reestablish its routes to major cities in Europe, South America, and Asia to pre-crisis levels by, among other things, leveraging and expanding partnerships with other SkyTeam Alliance members (*e.g.*, Air France/KLM and Korean Air) for transcontinental flights and with Latin American carriers like LATAM for flights throughout Latin America.

### d.   Expanding Loyalty Programs

Aeroméxico's loyalty program, Club Premier was the first frequent flyer program established in Latin America and is Mexico's leading airline loyalty program.   The Company seeks to expand its loyalty program so as to increase its appeal to high-value customers, which started with transforming Club Premier from a distance- to revenue-based accrual program and initiating strategies and programs (*e.g.*, creating new tiers and implementing campaigns to boost website and airport activations) designed to increase Club Premier membership among Aeroméxico customers.   Moreover, part of the Company's strategy to expand its loyalty program will include enhancing Club Premier's co-branding opportunities, so as to increase co-branded revenue streams and enhance acquisition efforts through the use of a Club Premier credit card. The Company anticipates that consummation of the PLM Stock Participation Transaction will enhance its ability to achieve the foregoing goals.   Further, the Company plans to relaunch offering Vacation Packages through Aeroméxico Vacations around the world, instead of just in the United States, which will enable Aeroméxico to offer another high-end product to customers, and again differentiating it from its domestic competitors.

### e.   Other Revenue Management Initiatives

Aeroméxico has been and will continue to implement accretive revenue initiatives that present significant upside opportunity.   In particular, the Company plans to focus on improving its passenger and yield mix, driving premium revenue growth through better upselling and merchandising, introducing new products such as gift cards and seat blocking, unbundling products and services to better compete with low-cost carriers on base fare, growing revenue through add-ons and continuing the trend towards direct online sales through www.aeromexico.com, which will maximize the profit of each ticket sold.

### 2.   *Management*

Aeroméxico's management team ("**Senior Management**") is comprised of highly capable professionals with substantial airline and other applicable industry experience.   Information regarding the executive officers of Aeroméxico is as follows:

| Name | Position |
| --- | --- |
| Andrés Conesa Labastida | Chief Executive Officer |

---

[2] Additionally, the Debtors are hopeful that the U.S. Federal Aviation Administration (the "**FAA**") upgrades Mexico's category 2 safety rating in the near future.   On July 25, 2021, it was announced that Mexico's Communications and Transport Ministry signed a memorandum of understanding with the FAA as part of its effort to recover Mexico's category 1 air safety rating.   Once, and if, Mexico's category 2 air safety rating is upgraded, the Company will be permitted to once again establish new and increase its existing routes between Mexico and the United States.   *See also* Article X of this Disclosure Statement.

| Name | Position |
|------|----------|
| Ricardo Javier Sánchez Baker | Chief Financial Officer and Executive Vice President |
| Nicolas Enrique Ferri | Chief Commercial Officer and Executive Vice President |
| Andrés Castañeda Ochoa | Chief Digital and Customer Experience Officer and Executive Vice President |
| Sergio Alfonso Allard Barroso | Chief Legal and Institutional Affairs Officer and Executive Vice President |
| Rosa Angélica Garza Sánchez | Chief Human Resources Officer and Executive Vice President |
| Santiago Diago | Chief Operations Officer and Executive Vice President |

*Andrés Conesa Labastida*.  Mr. Conesa is the Company's Chief Executive Officer since 2005 and member of the Board of Directors.  Since 2017 he has been a member of Sempra Energy's board of directors and was previously chairman and a member of the board of directors of Cintra. He has also been chairman of the board of directors of IATA, and has served as chairman of the executive committee of ALTA.  He has also been a member of the board of directions of SkyTeam Alliance, Aeromexpress, CECAM and Servicios de Apoyo en Tierra ("**SEAT**") (which has been transformed to Aeroméxico's current subsidiary Estrategia Especializada en Negocios, S.A. de C.V.).  He has occupied several government positions, including general director of tax planning of the Mexican Ministry of Finance and head of the public credit unit of the same Ministry from 2003 to 2004, general director of international tax affairs of the Mexican Ministry of Finance and Public Credit from 1998 to 2000, and coordinator of advisors to the Undersecretary of Finance and Public Credit from 1997 to 1998. Mr. Conesa holds a B.A. degree in economics from Instituto Tecnológico Autónomo de Mexico ("**ITAM**") and a Ph.D. degree in economics from the Massachusetts Institute of Technology. He received Fulbright and Ford MacArthur scholarships for his postgraduate studies.  In 1997, he received the National Economics Award from Banamex at the doctoral level.

*Ricardo Javier Sánchez Baker*.  Mr. Sánchez Baker is the Chief Financial Officer and Executive Vice President of Aeroméxico, a position he assumed in December 2006.  Mr. Sánchez Baker first joined the Company in early 2006 and has held several positions including advisor to the Chief Executive Officer and Director of Revenue Management.  He has been chairman of the Board of directors of PLM since 2019.  Prior to joining Aeroméxico, Mr. Sánchez Baker held various government positions in Mexico, including deputy director general of public debt for the Ministry of Finance and Public Credit from 2003 to 2005.  Mr. Sánchez Baker holds a bachelor's degree in economics from the Universidad Iberoamericana ("**Ibero-American University**"), a diploma in finance from ITAM and a masters and PhD in economics from the University of California, Los Angeles (UCLA).  Mr. Sánchez Baker has 15 years of experience in the aviation industry.

*Nicolas Enrique Ferri*.  Mr. Ferri is the Chief Commercial Officer and Executive Vice President of Aeroméxico, a position he assumed in 2019, and is a Delta secondee.  Prior to joining the Company, Mr. Ferri served as vice president, Latin America & Alliances – Americas at Delta where he was responsible for, among other things, the commercial integration of Delta's partnership with Aeroméxico.  Mr. Ferri has also served in a variety of other senior leadership positions at United Airlines and the Oneworld Alliance.  Mr. Ferri has a degree from Universidad

de la Republica [The University of the Republic] in Uruguay and has 30 years of experience in the aviation industry.

*Andrés Castañeda Ochoa*.  Mr. Castañeda is the Chief Digital and Customer Experience Officer and Executive Vice President of Aeroméxico, a position he assumed in 2014.  Before joining Aeroméxico, he served as chief operating officer at Clarus Digital and as communications manager for Unilever Mexico.  Mr. Castañeda holds a bachelor's degree in finance from Instituto Tecnológico y de Estudios Superiores de Moneterrey ("**ITESM**").  Mr. Castañeda has 8 years of experience in the aviation industry.

*Sergio Alfonso Allard Barroso*.  Mr. Allard is the Chief Legal and Institutional Affairs Officer and Executive Vice President of Aeroméxico, a position he assumed 2014.  Mr. Allard joined the Company in 2010 as Chief Commercial Officer.  Prior to joining Aeroméxico, Mr. Allard served as chief commercial officer for Spanair, and before that worked for Mexicana de Aviación for over 19 years.  Mr. Allard holds a bachelor's degree from Universidad Nacional Autónoma de México [National Autonomous University of Mexico] and a master's degree from Universidad La Salle.  Mr. Allard has 31 years of experience in the aviation industry.

*Rosa Angélica Garza Sánchez*.  Ms. Garza is the Chief Human Resources Officer and Executive Vice President of Aeroméxico, a position she assumed in 2017.  Before that, Ms. Garza served as the director of human resources for Mexico and as the director of organizational development for Latin America at PepsiCo.  And prior to PepsiCo, Ms. Garza was the director of human resources for Microsoft Mexico.  Ms. Garza holds a bachelor's degree in organizational psychology and a master of business administration (MBA) from ITESM.  Ms. Garza has 4 years of experience in the aviation industry.

*Santiago Diago*.  Mr. Diago is the Chief Operations Officer and Executive Vice President of Aeroméxico, a position he assumed in 2021. A lawyer by profession and commercial pilot, he began his career at Caribbean Airlines (LAC) and has more than 25 years of experience in the industry.  He has held different leadership positions at LATAM Airlines (Chile) and Avianca S.A ("**Avianca**").  At Avianca, Mr. Diago was the international director of affairs and legal and later traveled to Mexico to assume the position of general manager of the Colombian airline in the country.  Years later, Mr. Diago was Avianca's vice president of flight operations before being appointed executive president of OceanAir, where he led the airline's restructuring plan and initiated a new growth strategy under the name Avianca Brasil.

### 3.    *Board of Directors*

The Board of Directors is composed of highly capable and experienced individuals. Information regarding the Board members is as follows:

*Javier Arrigunaga Gómez del Campo*.  Mr. Arrigunaga is the Chairman of the Board of Directors, a position he has held since 2015.  Mr. Arrigunaga is also chief executive officer of Xokan Advisors, a financial advisory firm.  Mr. Arrigunaga is an advisor to the Canada Pension plan investment fund and Lazard Mexico.  Mr. Arrigunaga is a founding partner and director of Prestanomico, a fintech company specialized in lending as a service. Mr. Arrigunaga is also a Director of El Puerto de Liverpool, Gentera/Compartamos Banco, Dine y Kuo (DESC) y Paralelo

19 and a member of the UIAC, the governing body of Ibero-American University.  Until October 2014, Mr. Arrigunaga was the CEO of Citi Banamex and a member the  Citigroup Operating Committee.  Between 2002 and 2014, Mr. Arrigunaga held a number of senior positions at Citi Banamex and was instrumental in putting together the group of investors that acquired Aeroméxico in 2007, and  Mr. Arrigunaga has been a director and member of Aeroméxico's executive committee ever since.  Mr. Arrigunaga was also the Chairman of the Mexican Bankers Association between 2013 and 2014.  Mr. Arrigunaga was the Mexican ambassador to the OECD between 2000 and 2002.  Before that, Mr. Arrigunaga worked at the Mexican Central Bank for 15 years. In 1997, he was appointed CEO of the deposit insurance agency, where in that capacity and while a member of the Mexican Central Bank's senior team, Mr. Arrigunaga played an important role in the management and solution of Mexico's macroeconomic issues of 1994.

*Edward H. Bastian*.  Mr. Bastian is chief executive officer of Delta, a position he has held since 2016.  Mr. Bastian has served on the Board of Directors since 2012.  Mr. Bastian joined Delta in 1998 as vice president – finance and controller and was promoted to senior vice president in 2000.  After a brief stint at Acuity Brands, Mr. Bastian rejoined Delta in 2005 as chief financial officer.  In 2007, Mr. Bastian was appointed to serve as Delta's president.  Prior to joining Delta, Mr. Bastian held senior finance positions at Frito-Lay International and Pepsi-Cola International, and started his career with Price Waterhouse where he became an audit partner in its New York Practice.  Mr. Bastian holds a bachelor's degree from St. Bonaventure University.

*William Carroll*.  Mr. Carroll is senior vice president – controller of Delta.  Mr. William Carroll has served on the Board of Directors since 2012.  Prior to joining Delta, Mr. Carroll worked for Homedics, a global consumer products company, PepsiCo and Arthur Anderson & Co.  During his more than thirty year career in finance, Mr. Carroll has served in a variety of positions both in the United States and abroad, including as chief financial officer and controller.  Mr. Carroll holds a bachelor's degree in accounting from Rider University in New Jersey and is a certified public accountant and CFA charterholder.  Mr. Carroll is fluent in Spanish and Portuguese.

*Andrés Conesa Labastida*.  See Mr. Conesa's biography above.

*Antonio Cosío Pando*.  Mr. Cosío is the vice president of the board of directors of Grupo Hotelero Las Brisas, S.A. de C.V., general manager of Compañía Industrial de Tepeji del Río, S.A. de C.V. and a member of the board of directors for, among others, Bodegas Santo Tomás, S.A. de C.V., Grupo Financiero Inbursa, S.A.B. de C.V., Grupo Carso, S.A.B. de C.V. and Teléfonos de México, S.A.B. de C.V.  Mr. Cosío has served on the Board of Directors since 2007.  Mr. Cosío holds a bachelor's degree in engineering from ITESM.

*Luis De La Calle Pardo*.  Mr. de la Calle is the chief executive officer and founding partner of De la Calle, Madrazo, Mancera, S.C., a consulting firm specializing in economics, regulatory proceedings and international trade related matters. Mr. De La Calle was president of Hill & Knowlton Strategies for Latin America, non-executive director of the Mexican Institute for Competitiveness, vice chairman of the US-Mexico Bilateral Committee of the Mexican Council on Foreign Trade, vice chairman of the International Trade and Investment Committee of the International Chamber of Commerce, non-executive director of Grupo Modelo and member of the independent North American working group of the Council on Foreign Relations, the Canadian Council of Chief Executives and the Mexican Council on Foreign Relations. Prior to his private

sector career, Mr. de la Calle was appointed Undersecretary for International Trade Negotiations at the Mexican Ministry of Economy; Minister for Commercial Affairs at the Mexican Embassy in Washington, D.C., and also worked at the World Bank. Mr. de la Calle holds a B.A. in Economics from ITAM, and received his M.A. and Ph.D. degrees from the University of Virginia.

*Valetín Diez Morodo.*  Mr. Diez Morodo is the president of the board of directors of Grupo Financiero Citibanamex, S.A. de C.V., president of the advisory council of Grupo Modelo, S.A.B. de C.V. and vice president of the board of directors of Kimberly Clark de México, S.A.B. de C.V.  Mr. Diez Morodo has served on the Board of Directors since 2007.  Mr. Diez Morodo is also a member of the board of directors of prominent companies such as Grupo Kuo, S.A.B. de C.V., Grupo Dine, S.A.B. de C.V., Zara México, S.A. de C.V., Telefónica México, S.A. de C.V., Bodegas Vega Sicilia, S.A., and Instituto de Empresa, Madrid.  He is president of the Consejo Empresarial Mexicano de Comercio Exterior, Inversión y Tecnología [Mexican Business Council of Foreign Trade, Investment and Technology] and president of the Mexico-Spain Bilateral Committee for the same.  Mr. Diez Morodo is also president of the Instituto Mexicano para la Competitividad, A.C. [Mexican Institute for Competitiveness] and President of the Assembly of Associates of the Ibero-American University, A.C. He is a member of the Consejo Mexicano de Negocios [Mexican Business Council, A.C.].  He is a founding member and first president of the Consejo Empresarial Hispano Mexicano [Hispanic Mexican Business Council] and president of the Foundation of the House of Mexico in Spain, based in Madrid.  Mr. Diez Morodo holds a bachelor's degree in business administration from the Ibero-American University and has taken postgraduate courses in Marketing, Sales and Personnel Management at the University of Michigan, Ann Arbor.

*William H. Easter III.*  Mr. Easter was president and chief executive officer of DCP Midstream LLC (formerly Duke Energy Field Services, LLC) from 2004 until his retirement in 2008. He previously worked at ConocoPhillips for 32 years, Mr. Easter served as vice president of State Government Affairs from 2002 to 2004 and as general manager of the Gulf Coast Refining, marketing and transportation business unit from 1998 to 2002. In addition, Mr. Easter has experience as a member of the boards of directors of other public companies where he serves and/or served as an auditor on the audit (chairman), compensation (chairman), finance and corporate governance committees. Since his retirement from DCP Midstream, LLC, Mr. Easter has been involved in private investments. He previously held management level positions with the following companies: BakerHughes, Inc; Concho Resources Inc. (resigned January 2021); Delta Air Lines, Inc; and Sunoco, Inc. (2011-2012). He is also director of Emerson Electric, Inc. and currently serves as Chairman of the board of directors of Memorial Hermann Hospital System.

*Jorge Esteve Recolóns.*  Mr. Esteve Recolóns is a shareholder and member of the executive committee of ECOM Agroindustrial, the main global trader of agro-industrial commodities and sustainable supply chain management operating in 40 countries.  Mr. Esteve Recolóns has served on the Board of Directors since 2007.  Mr. Esteve Recolóns is also President of Grupo COPRI, a Mexican company that develops real estate and infrastructure.  Mr. Esteve Recolóns also has extensive experience as a board member including as a director of, among others, Mexican Business Council, Telmex, Grupo Real Turismo and the Latin American Conservation Council. Mr. Esteve Recolóns holds a bachelor's degree from Anahuac University in Mexico City and a

masters of business administration (MBA) from the Kellogg Graduate School of Management at Northwestern University.

*Arturo Martínez del Campo Saucedo.*  Mr. Martínez is chief financial officer of Grupo Posadas, a hospitality company based in Mexico City, a position he assumed in 2015.  Mr. Martínez has served on the Board of Directors since 2013. Prior to that, Mr. Martínez worked for Grupo Financiero Banamex/Citigroup for over 25 years, holding various positions including, among others, Mexico cost management head, chief financial officer of Crédito Familiar [CitiFinancial], chief financial officer and senior vice president Global Banking of Avantel/Banamex Citigroup. Mr. Martínez holds a degree in industrial engineering from Ibero-American University, and an MBA from the University of California, Los Angeles (UCLA). Since February 2015 to date, he has been Vice President of Finance for Grupo Posadas. Previously, and for more than 25 years, he worked at Grupo Financiero Banamex/Citigroup, holding several positions, including director of costs management Mexico, financial planning corporate banking and treasury (Mexico/Latam), director of administration and finance of Crédito Familiar and director of Finance of Avantel.

*María Tricio Gómez.*  Ms. Tricio is a fashion coordinator of Harper's Bazzar Mexico & Latin America, a position she assumed in 2005, and the owner and buyer of a clothing boutique in Mexico City.  Ms. Tricio has served on the Board of Directors since 2015.  Prior to joining Harper's Bazaar, Ms. Tricio worked as Beauty Coordinator and Junior Fashion Coordinator for ELLE magazine.  Ms. Tricio holds a bachelor's degree in communication sciences from Ibero-American University.

*Eduardo Tricio Haro.*  Mr. Tricio is the chairman of the board of directors of Grupo Industrial Lala S.A. de C.V. and Nuplen Alimentos and a member of the board of directors of, among others, Grupo Televisa, Orbia, Grupo Financiero Banamex, Aura Solar and the Mexican Business Council.  Mr. Tricio has served on the Board of Directors since 2007.  Mr. Tricio holds a bachelor's degree in agricultural engineering from ITESM.

*José Antonio Tricio Haro.*  Mr. Tricio is owner and chief executive officer of the José Antonio Tricio Haro company, a dairy producer, and the chief executive officer r and shareholder of Puerto Chico, S.A. de C.V.  Mr. Tricio has served on the Board of Directors since 2007.  Mr. Tricio is also a member of, among others, the board of directors of Grupo Industrial Lala S.A. de C.V.  Mr. Tricio holds a bachelor's degree in agricultural engineering from ITESM.

*Rafael Tricio Haro.*  Mr. Tricio is the chief executive officer of Fresnedo, S.P.R. de R.L. de C.V., a company dedicated to milk production and he is the Chief Executive Officer of Desarrollos Inmobiliarios GTH, S.A. de C.V., a company dedicated to the construction and sale of residential properties.  Mr. Tricio has served on the Board of Directors since 2013.  Mr. Tricio is also a member of, among others, the board of directors of Grupo Industrial Lala S.A. de C.V. and Grupo Financiero BBVA Bancomer ("**BBVA**").  Mr. Tricio holds a bachelor's degree in accounting from ITESM and has completed the AD-2 program and three Continuing Education and Update Programs at IPADE.

*Carlos Villarreal Tricio.*  Mr. Villarreal is the owner and chief executive officer of Carlos Villarreal Tricio Company, a diary producer, Crianza Suprema, S.P.R. de R.L. de C.V., a company dedicated to raising and fattening cattle and Agricola Vitri, S.P.R de R.L. de C.V., a company dedicated to the production and marketing of fodder.  Mr. Villarreal has served on the Board of Directors since 2013.  Mr. Villarreal also serves as a member of the board of directors of, among others, Genetica Mexicana, S.A. de C.V. and Integradora de Ganaderos de Engorda de la Laguna, S.A. de C.V.  Mr. Villarreal holds a bachelor's degree in civil engineering from ITESM.

Each of Eduardo Tricio Haro, José Antonio Tricio Haro, Rafael Tricio Haro, Carlos Villarreal Tricio and Maria Tricio Gomez are relatives, either of the first or second degree.

The Board of Directors has five separate committees:

i.   The audit and corporate practices committee (the "**Audit Committee**") is responsible for supervising the external auditors as well as analyzing the rulings, opinions, reports and briefs that are prepared and signed by the external auditors and accountants.  The Audit Committee reports directly to the Board of Directors on existing internal controls, officer activities, related party transactions and any other irregularity that may arise in the ordinary course.  The Audit Committee is comprised of six members from the Board of Directors, including Luis De la Calle Pardo (President of the Audit Committee), Jorge Esteve Recolóns, William H. Easter III, Antonio Cosío Pando, Arturo Martínez del Campo Saucedo and María Tricio Gómez..

ii.  The executive committee (the "**Executive Committee**") is responsible for, among other things, managing and overseeing the Company's business objectives and strategies.  The Executive Committee is comprised of three members from the Board of Directors, including Eduardo Tricio Haro (President of the Executive Committee), Javier Arrigunaga Gómez del Campo and Andrés Conesa Labastida.

iii. The nominations and compensation committee (the "**Nomination & Compensation Committee**") is responsible for, among other things, appointing candidates to the Board of Directors and committees thereto.  The Nomination & Compensation Committee is comprised of four members from the Board of Directors, including Valentín Diez Morodo (President of the Nomination & Compensation Committee), Javier Arrigunaga Gómez del Campo, Eduardo Tricio Haro and Edward H. Bastian.

iv.  The finance committee (the "**Finance Committee**") is responsible for, among other things, reviewing the Company's revenue, cost and investment budgets, presenting the same to the Board of Directors and reviewing matters related to the granting of financial guarantees and other material financial projects.  The Finance Committee is comprised of seven members from the Board of Directors, including Javier Arrigunaga Gómez del Campo (President of the Finance Committee), Antonio Cosío Pando, Jorge Esteve Recolóns, Arturo Martinez del Campo Saucedo, Eduardo Tricio Haro, Carlos Villarreal Tricio and William C. Carroll.

v.   In light of the impact that the COVID-19 pandemic had on the Company's business, on June 4, 2020, pursuant to the Company's by-laws, the Board of Directors established a restructuring committee (the "**Restructuring Committee**") to, together with the Company's advisors, perform an analysis of the Company's financial situation and identify necessary measures to be taken by the Company, including a potential restructuring of its liabilities.  Presently, the Restructuring Committee is comprised of four members from the Board of Directors, including, Javier Arrigunaga Gómez del Campo (President of the Restructuring Committee), Andrés Conesa Labastida, Arturo Martínez del Campo Saucedo and Luis de la Calle Pardo.

### 4.    *The Company's Employees*

As of June 30, 2021, Aeroméxico had 12,868 employees, 3,837 of whom were employed by non-Debtor affiliates.  This figure represents a decrease of 1,924 employees since the Petition Date.  The majority of these employees are located in Mexico, with the remainder spread around across the various destinations in which the Company operates.  As of June 30, 2021, Aeroméxico had 209 employees employed outside of Mexico, including 55 in the United States.  This streamlined employee base is the result of the various workforce rationalization efforts the Company has undertaken during these Chapter 11 Cases and as more fully described in Article IV of this Disclosure Statement.

As of June, 2021, the majority, or approximately 71%, of the Company's employees are unionized.  The company's Mexico-based union employees are members of one of four unions: (a) Asociación Sindical de Pilotos Aviadores de México ("**ASPA**"), which represents the Company's pilots, (b) Asociación Sindical de Sobrecargos de Aviación de México ("**ASSA**"), which represents the Aerovías' flight attendants, (c) Sindicato de Trabajadores de la Industria Aeronáutica, Comunicaciones Similares y Conexos de la República Mexicana ("**STIA**"), which represents Aeroméxico Connect's flight attendants and ground personnel and (d)  Sindicato Nacional de Trabajadores al Servicio de las Lineas Aéreas, Transportes, Servicios, Similares y Conexos ("**Independencia**" and together with ASPA, ASSA and STIA, collectively the "**Unions**"), which represents the ground personnel working for the Aerovías, Aeroméxico Cargo, Aeroméxico Servicios and TechOps.  The Company is party to seven collective bargaining agreements with its Unions, which were substantively amended during these Chapter 11 Cases, as explained in greater detail in Article IV below.  The following table presents certain information concerning the Unions' representation of the Company's Mexico-based employees as of June 2021.

| Union | Approximate Number of Employees Represented | Date on which Collective Bargaining Agreement Becomes Amendable |
|-------|---------------------------------------------|----------------------------------------------------------------|
| ASPA  | 1,687                                       | Aeroméxico Connect: November 30, 2024                          |

| | | Aerovías: September 30, 2024 |
|---|---|---|
| ASSA | 1,989 | May 31, 2024 |
| STIA | 792 | Aeroméxico Connect: September 30, 2024 |
| Independencia | 4,640 | Aerovías: October 13, 2024 |
| | | Aeroméxico Cargo: October 26, 2024 |

Labor unions periodically engage in organizing efforts, seeking to represent various groups of employees of the Company that are or are not represented for collective bargaining purposes. All of the Company's frontline workers (e.g., pilots, flight attendants, and ground and maintenance workers) based in Mexico are unionized. The timing and outcome of these organizing efforts cannot presently be determined.

## B.    The Company's Prepetition Corporate Structure

Grupo Aeroméxico is the majority shareholder of a corporate group that collectively provides the services described herein, which are primarily public air carrier services for passengers and goods in and outside of Mexico. Grupo Aeroméxico is the ultimate parent company of Debtors, wholly-owning or owning a 99% share of (a) Aerovías de México, S.A. de C.V. or Aerovías, (b) Aerolitoral, S.A. de C.V. or Aeroméxico Connect (indirectly, through Aerovías) and (c) Aerovías Empresa de Cargo S.A. de C.V. or Aeroméxico Cargo. Further, Grupo Aeroméxico directly or indirectly owns, in whole or in part, significant non-Debtor subsidiaries, including (a) Sistemas Integrados de Soporte Terrestre en México, S.A. de C.V. or Aeroméxico Servicios, (b) PLM Premier, S.A.P.I. de C.V. or PLM, (d) Centro de Capacitación Aeroméxico ("**CECAM**") and (e) AM DL MRO JV, S.A.P.I. de C.V. or TechOps. A chart showing the organizational structure of the Company is attached hereto as Appendix E.

## C.    The Company's Prepetition and Postpetition Capital Structures

### 1.    *Prepetition Capital Structure*

An overview of the Debtors' funded indebtedness as of the Petition Date is as follows. The descriptions of the Debtors' prepetition indebtedness are for informational purposes only and are qualified in their entirety by reference to the specific agreements evidencing such indebtedness.

| Facility Name | Principal Amount (approximate) (as of the Petition Date) | Collateral |
|---|---|---|
| **Secured Debt** | | |
| *DB/AMEX Facility due 2023* | $268,750,000 | Amex credit card receivables |
| *CEBURES due 2022-2025* | $231,709,060 | Visa/Mastercard credit card receivables |
| *BNDES Facility* | $97,314,019 | Certain aircraft |
| *PLM Intercompany Loan Agreement* | $50,000,000 | Company's equity interests in PLM |
| *MUFG Mortgage Loans* | $18,375,000 | Certain aircraft |
| *EDC Loan* | $9,985,761 | Flight simulator |

-24-

| | | |
|---|---|---|
| *Santander PDP Facility (partially secured)* | $4,342,553 | Cash collateral |
| *320 CEBURES (partially secured)* | $3,248,250 | Cash collateral |
| **Unsecured Debt** | | |
| *JOLCOs* | $604,693,582 | N/A[3] |
| *Senior Notes due 2025* | $400,000,000 | N/A |
| *Commercial Ex-Im Guaranteed Loans & Bonds* | $196,446,739 | N/A[4] |
| *Carlyle PDP Facility* | $61,881,550 | N/A |
| *Short-Term CEBURES* | $39,498,815 | N/A |
| *Santander PDP Facility (partially unsecured)* | $32,989,497 | N/A |
| *Hermes Facility* | $25,531,767 | N/A |
| *HSBC Facilities* | $21,462,794 | N/A[5] |
| *BBVA Credit Line* | $7,795,819 | N/A |
| *320 CEBURES (partially unsecured)* | $7,579,276 | N/A |
| *MTG Citi Loan* | $4,892,348 | N/A[6] |
| *IBM Loan* | $4,347,984 | N/A |
| *East West Bank Loan* | $83,710 | N/A |
| **Totals** | | |
| **Total Secured Funded Indebtedness** | **$683,724,643** | |
| **Total Unsecured Funded Indebtedness** | **$1,407,203,881** | |
| **Total** | **$2,090,928,524** | |

### i.    Secured Funded Indebtedness Facility Descriptions

*DB/AMEX Facility due 2023.* On October 27, 2016, Aerovías, as borrower, and Grupo Aeroméxico as guarantor, entered into a syndicated loan agreement with Deutsche Bank AG, London Branch, Industrial and Commercial Bank of China Limited, New York Branch,

---

[3] The Debtors' obligations under the JOLCO facilities are unsecured because the Debtors' owned aircraft do not serve as collateral. Instead, the Debtors lease aircraft from the JOLCO entities, which entities themselves own the aircraft that serve as collateral under the JOLCO facilities.

[4] The Debtors' obligations under the Ex-Im guaranteed facilities are unsecured because the Debtors' owned aircraft do not serve as collateral. Instead, the Debtors lease aircraft from certain entities, which entities themselves own the aircraft that serve as collateral under the Ex-Im guaranteed facilities.

[5] The Debtors' obligations under the HSBC Facilities are unsecured because the Debtors' owned aircraft do not serve as collateral. The Debtors, however, have a beneficiary interest in the aircraft that serves as collateral securing obligations under the HSBC Facilities.

[6] The Debtors' obligations under the MTG Citi Loans are unsecured because the Debtors' owned aircraft do not serve as collateral. The Debtors, however, have a beneficiary interest in the aircraft that serves as collateral securing obligations under the MTF Citi Loans.

Massachusetts Mutual Life Insurance Company, Sabcapital, S.A. de C.V., SOFOM, ER, Phoenix Life Insurance Company and PHL Variable Insurance Company as lenders, for a principal amount of $300 million (the "**DB/AMEX Facility**").  The DB/AMEX Facility was amended and restated on June 4, 2018 in order to increase the aggregate principal amount by $150 million.  As of the June 4, 2018 amendment, $256.25 million was outstanding under the DB/AMEX Facility.  The $256.25 million balance, together with the $150 million increase provided by the June 4, 2018 amendment, brought the total principal loan balance at that time to $406.25 million.  As of the Petition Date, a principal amount of $268.75 million remained outstanding. The DB/AMEX Facility is secured by (a) a trust agreement pursuant to which Aerovías purported to transfer in favor of the trustee Aerovías' collection rights under those certain Terms and Conditions for Worldwide Acceptance of the American Express Card by Airlines, dated as of July 28, 1997 (the "**AMEX Receivables**"), as the source of payment of Aerovías' obligations arising under the DB/AMEX Facility, (b) a Mexican non-possessory pledge agreement, dated as of October 27, 2016, over the AMEX Receivables, and (c) a New York law first-priority floating pledge agreement over the AMEX Receivables.  The DB/AMEX Facility accrues interest at a variable rate of LIBOR +3.25% and, as of the Petition Date, was scheduled to mature on October 29, 2023.  However, as described in Article IV herein, the DB/AMEX Facility was amended and restated pursuant to a Court-approved settlement agreement entered into during the pendency of these Chapter 11 Cases that, among other things, provided for an 11-month extension of the maturity date.

*CEBURES due 2022-2025*.  In December 2013, Aerovías, as settlor, second place beneficiary and administrator, and Deutsche Bank Mexico, S.A., Institución de Banca Múltiple, División Fiduciaria, as trustee, and Banco Invex, S.A., Institución de Banca Múltiple, Invex Grupo Financiero, as common representative of the holders, executed a Trust Agreement (the "**Trust Agreement**") to establish Fideicomiso F/1748 (the "**Trust**"), a trust governed by Mexican law.  Pursuant to the Trust Agreement, Aeroméxico transferred to the Trust certain credit card receivables (the "**Receivables**") arising from Visa and Mastercard transactions with, among others, travel agencies and sales offices in Mexico.  The trust then issued certain series of Certificados Bursátiles Fiduciarios, or trust certificates ("**CEBURES**"), backed by the Receivables, including the Series AERMXCB 17 Trust Certificates (the "**Series AERMXCB 17 Trust Certificates**"), which were issued in September 2017 and the Series AERMXCB 19 Trust Certificates (the "**Series AERMXCB 19 Trust Certificates**", and collectively with the Series AERMXCB 17 Trust Certificates, the "**Trust Certificates**"), which were issued in June 2019.  The Trust Certificates have a maturity of five years from when they were issued.[7]  The net proceeds of the issuance of the Trust Certificates issuances were transferred to Aeroméxico as consideration for such Receivables.  As of the Petition Date, the aggregate liability with respect to the Trust Certificates is approximately MEX$5.35 billion.  Furthermore, on May 28, 2020, additional short-term CEBURES were issued under the ticker symbol AEROMEX 00320 (the "**320 CEBURES**") in an aggregate principal amount of MEX$250 million, of which only MEX$75 million is secured by cash collateral.  The remaining MEX$175 million of the 320 CEBURES are unsecured.  As described in Article IV herein, shortly after the Petition Date, the Debtors began negotiating possible restructurings of the Trust Certificates and the 320 CEBURES, which culminated in

---

[7]  As discussed in Article IV of this Disclosure Statement, as part of a Bankruptcy Court-approved settlement agreement, such maturity date of the Trust Certificates was initially extended an additional 18 months.

certain Bankruptcy Court-approved settlement agreements. The 320 CEBURES settlement agreement was subsequently amended in July 2021. As of the Petition Date, the principal amount outstanding under the Trust Certificates and the 320 CEBURES was approximately $231.7 million and $10.8 million, respectively.

*BNDES Facility.* On February 11, 2021, Aerovías, as borrower, Grupo Aeroméxico, as guarantor, and Banco Nacional de Desenvolvimento Economico e Social ("**BDNES**"), as lender, entered into a term loan facility (the "**BNDES Facility**") to finance ten Embraer ERJ 190-100 aircraft registered in Mexico. As of the Petition Date, the outstanding principal amount under the BNDES Facility was approximately $97.3 million.

*PLM Intercompany Loan Agreement.* On January 20, 2016, Aerovías and PLM entered into that certain Intercompany Revolving Loan Agreement (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**PLM Intercompany Loan Agreement**"). As of the Petition Date, the outstanding principal amount under the PLM Intercompany Loan Agreement was $50 million.

*MUFG Mortgage Loans.* Aerovías owns 100% of the beneficial interests in a Utah common law trust that MUFG Bank, Ltd. ("**MUFG**") loaned funds ("**MUFG Mortgage Loans**") to for the purchase of three B737-700W aircraft. The MUFG Mortgage Loans mature in 2022 and accrue interest at a fixed rate. As of the Petition Date, the outstanding principal amount under the MUFG Mortgage Loans was approximately $18.4 million.

*EDC Loan.* On May 16, 2019, Aerovías, as borrower, and Grupo Aeroméxico, as guarantor, entered into a loan agreement with Export Development Canada, as lender, for a principal amount of approximately $10.4 million, to be used to finance a flight simulator and a flight training device (the "**EDC Loan**"). The EDC Loan is secured by a pledge of certain flight simulators and flight training device equipment owned by the Company, plus all contracts relating thereto and profits therefrom. The EDC Loan matures on November 12, 2029 and carries an interest of 6.88%. As of the Petition Date, the principal amount outstanding under the EDC Loan was approximately $10 million.

### ii. Unsecured Funded Indebtedness Facility Descriptions

*JOLCOs.* During 2017 and 2018, the Company continued to diversify its financing sources and secured access to competitive financial terms for its aircraft financing. The deliveries of five B787-9 aircraft were financed through the use of Japanese operating leases with a call option structure ("**JOLCOs**"). The aircraft financed through JOLCOs are leased directly to Aerovías and Grupo Aeroméxico guarantees the obligations of Aerovías. As of Petition Date, Aerovías and Grupo Aeroméxico were party to five JOLCO agreements and the principal amount outstanding was approximately $604.7 million.

*Senior Notes due 2025.* On February 5, 2020, Aerovías issued 7.000% Senior Notes due 2025 in the aggregate principal amount of $400 million (the "**2025 Notes**"), guaranteed by Grupo Aeroméxico (the "**Guarantee**"). The 2025 Notes and the Guarantee are senior, unsecured obligations of Aerovías and Grupo Aeroméxico, respectively, ranking equally in right of payment with all other present and future unsecured obligations that are not expressly subordinated in right

of payment to the 2025 Notes and Guarantee (subject to certain statutory preferences under Mexican law, such as tax, labor, and social security obligations). The 2025 Notes bear interest at the rate of 7.000% per annum, payable in cash semi-annually in arrears on February 5 and August 5 of each year, commencing on August 5, 2020. The indenture, the 2025 Notes and the Guarantee are governed by, and construed in accordance with, the laws of the State of New York. As of the Petition Date, the principal amount outstanding of the 2025 Notes was $400 million, plus $11,355,555.56 in accrued and unpaid interest.

*Commercial Ex-Im Guaranteed Loans & Bonds*. Aerovías has eight aircraft registered in Mexico financed via loans or bonds (the "**Commercial Guaranteed Loans & Bonds**") with certain commercial counterparts, which are in each case guaranteed by the Export-Import Bank of the United States ("**Ex-Im Bank**"). As of the Petition Date, the outstanding principal amount under the Commercial Guaranteed Loans & Bonds was approximately $196.5 million.

*Carlyle PDP Facility*. On May 29, 2020, Runway PDP Borrower Irish Designated Activity Company as borrower ("**Runway PDP Borrower**") entered into a pre-delivery payment (PDP) facility agreement with Carlyle Aviation Management Limited as agent, Runway PDP Lender One LLC as security trustee and Runway PDP Lender One LLC as lender, to finance the pre-delivery payments relating to one Boeing 787-9 aircraft and two Boeing Max 737 8 aircraft (the "**Carlyle PDP Facility**"). Runway PDP Borrower's obligations under the Carlyle PDP Facility are guaranteed by Aerovías and Grupo Aeroméxico. The loans are secured by a security interest in the purchase agreement with respect to the aircraft and the shares of Runway PDP Borrower. As of the Petition Date, the principal amount outstanding under the Carlyle PDP Facility was approximately $61.9 million.

*Short-Term CEBURES*. Grupo Aeroméxico issued (a) on October 24, 2019, MEX$200 million of short-term CEBURES with the ticker symbol AEROMEX 00119, (b) on December 5, 2019, MEX$262 million of short-term CEBURES with the ticker symbol AEROMEX 01219, (c) on January 30, 2020, MEX$350 million of short-term CEBURES with the ticker symbol AEROMEX 00120, and (d) on April 2, 2020, MEX$100 million of short-term CEBURES with the ticker symbol AEROMEX 00220 (collectively, the "**Short-Term CEBURES**"), each of which are unsecured. As of the Petition Date, the principal amount outstanding under the Short-Term CEBURES was approximately $39.5 million. Moreover, as described in Article IV herein, shortly after the Petition Date, the Debtors began negotiating possible restructurings of the Short-Term CEBURES that culminated in certain Bankruptcy Court-approved settlement agreements, which were subsequently amended in July and August 2021.

*Santander PDP Facility*. On March 29, 2017, Trust No. F/1930 (to which Aerovías is a settlor) as borrower, and Aerovías, Grupo Aeroméxico and Aeroméxico Connect, as guarantors, entered into a loan agreement with Banco Santander (Mexico), S.A. and Banco Nacional de Comercio Exterior, S.N.C., Institución de Banca de Desarrollo, as lenders (the "**Santander PDP Facility**") to finance pre-delivery payments (PDPs) relating to six aircraft, three of which remain subject to the Santander PDP Facility. Part of the Santander PDP Facility (approx. $4.3 million) is secured by cash collateral. As of the Petition Date, the principal amount outstanding under the Santander PDP Facility was approximately $37.3 million.

*Hermes Facility*.  On December 4, 2018, Aerovías, as borrower, and Grupo Aeroméxico and Aeroméxico Connect, as guarantors, entered into a facility agreement with Banco Bilbao Vizcaya Argentaria, S.A., as lender, for a principal amount of EUR26 million, to be used to finance contracted engine maintenance services as well as the payment of insurance premiums in connection with the guarantee of a portion of the maintenance contract value by the Federal Republic of Germany (the "**Hermes Facility**").  The Hermes Facility accrues interest at a variable rate and has a maturity date of June 28, 2024.  In case of breach of any event of default set forth in the Hermes Facility, including among others, cross-defaults and bankruptcy of Aerovías, Grupo Aeroméxico or Aeroméxico Connect, the lenders may accelerate the loan.  As of the Petition Date, the principal amount outstanding was approximately $26 million.

*HSBC Facilities*.  Aerovías, as borrower, has entered into a number of facilities with HSBC Bank USA, N.A., HSBC Mexico, S.A., Institución de Banca Múltiple, and/or Grupo Financiero HSBC, each to be used to finance certain goods and services and benefitting from a guarantee from the Ex-Im Bank.  These facilities include:

(a)    *2019 HSBC Facility*.  On December 23, 2019, Aerovías, as borrower, and Grupo Aeroméxico, as guarantor, entered into a credit agreement with HSBC Mexico, S.A., Institución de Banca Múltiple, Grupo Financiero HSBC, as lender, for a principal amount of MEX$469,803,388 (the "**2019 HSBC Facility**").  As of the Petition Date, the principal amount outstanding under the 2019 HSBC Facility was approximately $16.6 million

(b)    *2018 HSBC Facility*.  On June 26, 2018, Aerovías, as borrower, and Grupo Aeroméxico, as guarantor, entered into a credit agreement with HSBC Bank USA, N.A., as lender, for a principal amount of approximately $10.2 million (the "**2018 HSBC Facility**").  The 2018 HSBC Facility was issued in three tranches, accrues interest at a variable rate, and matures on October 9, 2021.  As of the Petition Date, the principal amount outstanding under the 2018 HSBC Facility was approximately $4.0 million.

(c)    *2017 HSBC Facility*.  On June 28, 2017, Aerovías, as borrower, and Grupo Aeroméxico, as guarantor, entered into a credit agreement with HSBC Bank USA, N.A., as lender, for a principal amount of approximately $10.2 million (the "**2017 HSBC Facility**").  The 2017 HSBC Facility was issued in three tranches, accrues interest at a variable rate, and matures on October 9, 2021.  As of the Petition Date, the principal amount outstanding under the 2017 HSBC Facility was approximately $900,000.

*BBVA Credit Line*.  On March 4, 2020, the Debtors and BBVA entered into a certain promissory note pursuant to which the Debtor agreed to pay BBVA a principal amount of MEX$180 million in a single amortization on August 31, 2020.  As of the Petition Date, the principal amount outstanding was approximately $7.8 million.

*MTG Citi Loan*.    On June 26, 2019, Aerovías, as borrower, and Grupo Aeroméxico, as guarantor, entered into a credit agreement with Banco Nacional de Mexico, S.A. Integrante del Grupo Financiero Banamex.  As of the Petition Date, the principal amount outstanding under the MTG Citi Loan was approximately $4.9 million.

*IBM Loan*.  On June 25, 2018, Aerovías, as borrower, entered into a loan agreement with IBM Capital Mexico I, S. de R.L. de C.V., as lender, for a principal amount of approximately $9 million to be used for the acquisition of IT products and services.  As of the Petition Date, the principal amount outstanding under this loan agreement was approximately $4.3 million.  The loan has a 42-month term as of July 1, 2018 and shall mature on January 1, 2022, and accrues interest at a fixed rate (6.52% including VAT).

*East West Bank Loan*.  On April 27, 2015, Aeroméxico Servicios, as borrower, and Aerovías, as guarantor, entered into a credit agreement with East West Bank.  As of the Petition Date, the principal amount outstanding under the East West Bank Loan was approximately $83,710; however, this amount has subsequently been paid off in the ordinary course of business.

### iii.    Other Unsecured Debt

*Trade Payables.*  The Debtors estimate that in the aggregate, they owed approximately $197.6 million in unsecured trade payables as of the Petition Date.  However, the Debtors have reduced a substantial amount of these prepetition trade payables as a result of payments made pursuant to the First Day Orders as described below.  Further, since the Petition Date, the Debtors have incurred and paid new trade debt in the ordinary course of business.

*Tarifa de Uso Aeroportuario* [*Airport Use Fee*].  The Debtors estimate that in the aggregate, they owed approximately $79.3 million in unsecured Tarifa de Uso Aeroportuario ("**TUA**") as of the Petition Date.  However, the Debtors have reduced all of their prepetition TUA obligations as a result of payments made pursuant to the Final Airline Contracts Order as described below.  Further, since the Petition Date, the Debtors have incurred and paid new TUA in the ordinary course of business.

*Aircraft and Engine.*  The Debtors estimate that in the aggregate, they owed approximately $82.4 million in unsecured aircraft and engine related obligations as of the Petition Date.  However, the Debtors have reduced a substantial amount of these prepetition payables as a result of payments made pursuant to the various court orders granted during the Chapter 11 Cases, as more fully exemplified in Article IV below.

*Fuel.*  The Debtors estimate that in the aggregate, they owed approximately $29.7 million in unsecured fuel-related obligations as of the Petition Date.  However, the Debtors have reduced a substantial amount of these prepetition fuel-related obligations as a result of payments made pursuant to the First Day Orders and the WFS Assumption Order, each as described below.  Further, since the Petition Date, the Debtors have incurred and paid new fuel related obligations in the ordinary course of business.

*Tax Obligations.* The Debtors have reduced a substantial amount of their tax-related obligations as a result of payments made pursuant to the First Day Orders as described below.

Further, since the Petition Date, the Debtors have incurred and paid new tax related obligations in the ordinary course of business.

*Intercompany Claims.* In the ordinary course of the Debtors' business, the Debtors and their non-Debtor affiliates utilize a cash management system that engages in intercompany transactions between themselves (collectively, the "**Intercompany Transactions**"). Such Intercompany Transactions may result in the creation of intercompany receivables and payables among the Debtors and non-Debtors, as applicable (the "**Intercompany Claims**"), which would be reflected in their respective accounting systems. The non-Debtor affiliates greatly enhance the value of the Debtors' estates, but could not function properly without being able to partake in Intercompany Transactions with the Debtors.

As of the Petition Date, the Debtors estimate that the following Intercompany Claims:

- Approximately $214.1 million and $0.1 million of Intercompany Claims were owed to Grupo Aeroméxico by Aerovías and non-Debtor affiliates, respectively;
- Approximately $644.4 million, $7.7 million and $15.4 million of Intercompany Claims were owed to Aerovías by Aeroméxico Connect, Aeroméxico Cargo and non-Debtor affiliates, respectively;
- No Intercompany Claims were owed to Aeroméxico Connect; and
- Less than $10 thousand of Intercompany Claims were owed to Aeroméxico Cargo by each of Aeroméxico Connect and non-Debtor affiliates.

Since the Petition Date, certain Intercompany Claims were equitized in order to capture certain tax savings; however, such equitization will not affect distributions made pursuant to the Plan (as more fully described in Article IV below).

### iv.    Surety Bonds and Letters of Credit

Applicable laws and certain vendors require the Company to assure payment or performance of certain obligations including, among others, (a) obligations owed to municipalities, (b) obligations associated with operations, (c) contractual or permit obligations, (d) airport obligations and (e) customs requirements. The Company satisfies these requirements by obtaining surety bonds and letters of credit from a variety of third-party providers. As of the Petition Date, the Company had approximately $251 million in outstanding letters of credit, collateralized by approximately $34.2 million of cash collateral, and had approximately $35.2 million in outstanding surety bonds, including the following facilities:

*Wells Fargo LC Facility/BBVA LC Facility.* On June 20, 2013, Aerovías and Aeroméxico Connect and BBVA entered into an agreement for the issuance of standby letters of credit (the "**Prepetition BBVA LC Facility**"). Letters of credit issued under the Prepetition BBVA LC Facility principally supported the Debtors' obligations to fleet and airport counterparties, and were exclusively issued in the form of back-to-back letters of credit to backstop letters of credit issued by Wells Fargo Bank, N.A. under a Standby Letter of Credit Agreement dated June 28, 2013 between Wells Fargo and Aerovías (the "**Wells Fargo LC Facility**," and together with the Prepetition BBVA LC Facility, the "**Wells Fargo/BBVA Prepetition LC Facility**")). As of September 16, 2020, BBVA had issued letters of credit under the Prepetition BBVA LC Facility

in the aggregate principal amount of $87.39 million, each of which were to expire by June 24, 2021. In addition, as of the Petition Date, Wells Fargo held approximately $3 million in cash collateral for letters of credit issued under the Wells Fargo LC Facility. The Prepetition BBVA LC Facility was secured by a trust agreement pursuant to which Aerovías purported to transfer in favor of the trustee its rights to (a) credit card receivables derived from the purchase of passenger tickets and related services arising under certain payment processing service contracts and (b) certain collection rights derived from certain agreement entered into with different travel agencies and the International Air Transport Association. As described in Article IV herein, during these Chapter 11 Cases, the Bankruptcy Court approved a settlement between Debtors and BBVA that provided for the parties to enter into a new letter of credit facility (the "**BBVA LC Facility**"), as well as a revolving credit agreement (the "**BBVA Revolving Credit Facility**" and, together with the BBVA LC Facility, the "**BBVA Facility**") to ultimately replace the Wells Fargo/BBVA Prepetition LC Facility.

### v.    PLM Pre-Purchase Seat Agreement

Pursuant to that certain Pre-Paid Seat Asset Purchase Agreement, dated as of September 13, 2010, by and between Aerovías and PLM (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**PLM PPSA**"), the Company held approximately $35 million on deposit to be applied in due course as PLM's payment and settlement for the future purchase of certain award ticket redemption seats as of May 2021.

### 2.    *Post-Emergence Capital Structure*

Upon their emergence from bankruptcy and pursuant to the Plan, the Reorganized Debtors expect to have the capital structure as described below:

### i.    Equity

*Grupo Aeroméxico's New Stock.* Pursuant to the Plan, Grupo Aeroméxico expects to issue, if approved by shareholders at the Shareholder Meeting, single series shares (*Serie Unica*) of Reorganized Grupo Aeromexico's common stock (the "**New Stock**").[8]

### ii.    Secured Non-Fleet Related Debt

As of the Effective Date, the Reorganized Debtors expect to have obligations under new senior secured first lien notes (the "**New Notes**") in an aggregate principal amount of up to $537.5 million.[9] In addition, as of the Effective Date, the Reorganized Debtors expect to have approximately $679 million in secured financing obligations, including certain transaction costs and adjustments and the Trust Certificates, EDC Loan, BBVA Revolving Credit Facility, DB/AMEX Facility, HSBC Facilities, MTG Citi Loan and PLM Intercompany Loan, each as described herein.

---

[8] *See also* Article III of this Disclosure Statement (further describing the characteristics of the New Stock).

[9] The terms of the New Notes will be set forth in the Plan Supplement.

### iii.    Aircraft and Equipment-Related Obligations

As of the Effective Date, the Reorganized Debtors expect to have approximately $348 million in secured financing arrangements and approximately $1.6 billion in operating leases related to aircraft and equipment.

### iv.    Non-Aircraft Lease Obligations

As of the Effective Date, the Reorganized Debtors expect to have approximately $56 million in non-fleet lease obligations.

### v.    Surety Bonds and Letters of Credit

Applicable laws and certain vendors require the Company to assure payment or performance of certain obligations including, among others, (a) obligations owed to municipalities, (b) obligations associated with operations, (c) contractual or permit obligations, (d) airport obligations and (e) customs requirements.  The Company satisfies these requirements by obtaining surety bonds and letters of credit a variety of third-party providers.  The Company anticipates maintaining letters of credit and surety bonds in the amount of approximately $70 million.

## D.    Additional Information and Historical Financials

Additional information concerning the Debtors' business operations and financial results are set forth in Aeroméxico's filings with the Bolsa Mexicana de Valores [Mexican Stock Exchange], including its annual report for the year ended December 31, 2020.  These filings are available on the Mexican Stock Exchange's website at www.bmv.com.mx or on Aeroméxico's website at www.aeromexico.com.

### *1.*    Material Prepetition Litigation

*Rojas v. Delta Airlines, Inc.*, No. 19-cv-00665 (GJH) (D. Md. Mar. 1, 2019):  On March 1, 2019, a putative class of passengers brought an action against Aeroméxico (and other major airlines) alleging violations of the Racketeer Influenced and Corrupt Organizations ("RICO") Act, the Sherman Act, and other state causes of action.  The *Rojas* action stemmed from an unreimbursed "Mexican Tourism Tax" that the *Rojas* plaintiffs paid to Aeroméxico (and other major airlines) in connection with air travel from the United States to Mexico.  The *Rojas* complaint represented the fourth attempt by a putative class of passengers to sue major airlines— including Aeroméxico—for failing to reimburse exempt individuals for the "Mexican Tourism Tax" those airlines had collected from them.  *See Sanchez v. Aerovías de Mexico, S.A. de C.V.*, 590 F.3d 1027 (9th Cir. 2010) (alleged breach of contract); *McMullen v. Delta Air Lines, Inc.*, 361 F. App'x 757 (9th Cir. 2010) (alleged breach of contract); *Almanza v. United Airlines, Inc.*, 851 F. 3d 1060 (11th Cir. 2017) (alleged RICO conspiracy).

On November 12, 2019, the United States District Court for the District of Maryland dismissed the *Rojas* plaintiffs' complaint.  *See Rojas*, No. 19-cv-00665 (GJH) at ECF No. 118.  The *Rojas* plaintiffs responded on April 22, 2020, by asking the appellate court—in this case, the United States Court of Appeals for the Fourth Circuit—to reverse the dismissal by the trial court.

*See id.* at ECF No. 127.  On or before July 22, 2020, the *Rojas* plaintiffs were required to submit an opening brief setting forth why the appellate court should reverse the trial court's decision, *see Rojas v. Delta Airlines, Inc.*, No. 20-1480 (4th Cir., June 16, 2020), ECF No. 46, but before the *Rojas* appellants submitted their opening brief, Aeroméxico filed a Notice of Bankruptcy Filing and Imposition of Automatic Stay in the appellate court.  *See id.* at ECF No. 47.

In response to the Notice of Bankruptcy Filing and Imposition of Automatic Stay, and pursuant to the automatic stay provisions of the Bankruptcy Code, the United States Court of Appeals for the Fourth Circuit administratively closed the case on July 17, 2020—consistent with its "general practice . . . to administratively close the appeal without prejudice to [plaintiffs' ability to] fil[e] a motion to reopen the appeal upon termination or lifting of the stay in bankruptcy." *Rojas*, No. 20-1480 at ECF Nos. 48–50.  The Fourth Circuit's order closed the appeal and noted that a motion to reopen the appeal may be filed in the event that the Bankruptcy Court terminates or lifts the automatic stay to permit the continued prosecution of the appeal.

*Snyder v. Grupo Aeroméxico S.A.B. de C.V.*, No. 20-cv-3649 (PA) (MAA) (C.D. Cal. Apr. 20, 2020):  On April 20, 2020, an individual plaintiff purporting to represent a putative class of passengers brought an action against Aeroméxico, alleging that Aeroméxico breached its contract of carriage when it failed to provide her with monetary refunds for tickets on flights that Aeroméxico canceled because of the COVID-19 pandemic.  Specifically, the *Snyder* plaintiff alleged that: (1) *Snyder* had used the Aeroméxico website to purchase roundtrip airfare for *Snyder's* family on flights operated by Aeroméxico; (2) Aeroméxico canceled those flights during the COVID-19 pandemic; (3) Aeroméxico offered only a travel credit—as opposed to a cash refund—to compensate the *Snyder* plaintiff for the cancellations; and (4) in doing so, Aeroméxico breached its contract of carriage.  *See Snyder*, No. 20-cv-3649 (PA) (MAA) at ECF No. 1.

Aeroméxico was required to respond to *Snyder's* allegations on or before July 2, 2020.  However, these Chapter 11 Cases were commenced before Aeroméxico was required to file its response to the *Snyder* plaintiff's complaint.  As in the *Rojas* case, Aeroméxico filed with the *Snyder* court a Notice of Bankruptcy Filing and Imposition of Automatic Stay on July 2, 2020.  *See Snyder*, No. 20-cv-3649 (PA) (MAA) at ECF No. 32.  In response, and given the general practice that "a bankruptcy petition operates as an automatic stay of judicial actions against debtors," the *Snyder* court directed the *Snyder* plaintiff to file "a dismissal of claims against [Aeroméxico] (if she intends to pursue claims in the bankruptcy case) …." *Id.* at ECF No. 33.  On July 13, 2020 the *Snyder* plaintiff filed a Notice of Dismissal Without Prejudice dismissing this action.  *Id.* at ECF No. 34.  As noted above, *Snyder* has not yet pursued any claims in the Chapter 11 Cases.

## E.    Summary of Events Leading to the Chapter 11 Filings

Prior to the COVID-19 pandemic, the Debtors were well-capitalized and positioned for success.  In short, the singular reason the Debtors sought chapter 11 relief was to mitigate the effects of the pandemic.

### 1.    *The Effects of the COVID-19 Pandemic on the Travel Industry*

Entering 2020, Aeroméxico was the leading airline in Mexico and sufficiently capitalized to continue its operational initiatives and take advantage of its strategic partnerships. However, due to worldwide travel restrictions and a collapse in consumer demand due to the COVID-19 pandemic, the airline industry generally and Aeroméxico specifically were suddenly faced with "the most disruptive financial crisis in the history of aviation."[10]  Shortly after the World Health Organization declared the outbreak of the novel COVID-19 virus a global pandemic, countries around the world, including each of those in which Aeroméxico primarily operates, announced severe travel restrictions and/or outright closure of their borders—restrictions that continue in some capacity or another to today.  And upon borders closing and air travel drying up almost completely, airlines started seeking governmental bail-outs or court-supervised restructuring processes to avoid liquidation.  Aeroméxico's experience during the pandemic is a microcosm of what has happened in the airline industry more broadly.

The COVID-19 crisis' impact on travel restrictions and thereby airline demand was almost instantaneous.  Almost overnight, by April 15, 2020, Mexican domestic capacity was reduced by as much as 75% and international capacity was reduced as much as 90%.  As of the Petition Date, Aeroméxico's passenger flight operations were drastically limited to approximately 12% of the number of flights operated before the COVID-19 crisis.  Moreover, at the beginning of the crisis, Argentina, Brazil, Colombia, Chile, and Canada each closed their borders to international travel and there were severe restrictions on travel for non-nationals to Schengen countries and Japan. Each of these countries and regions is an important market for the Company, and with the travel restrictions in place demand was almost entirely eliminated overnight.  And as intra- and intercountry shutdowns remained in place across the globe, demand for Aeroméxico flights remained severely depressed.

## 2.    *The Response to the COVID-19 Pandemic*

Pre-pandemic, Aeroméxico's balance sheet was strong and it reflected Aeroméxico's position in the marketplace and the results of its employees' hard work.  Moreover, over recent years, Aeroméxico had reinvested all of its profits back into the Company to acquire its own aircraft and easily satisfy its financial obligations.  Even still, this was not enough to mitigate the effects of the COVID-19 crisis, so the Company had to take additional steps to protect itself while continuing to serve its customers, employees, and other stakeholders.  As the crisis unfolded, the Company promptly implemented a range of mitigation measures, including to: (a) stop incurring costs considered not absolutely necessary for the running of the Company's business; (b) postpone all non-critical expenses for its operations and capital goods; (c) engage with supplier, aircraft lessors, and airport groups to obtain various payment concessions; and (d) consensual salary reductions and a voluntary unpaid leave program.

In addition, with these efforts, Aeroméxico retained Davis Polk & Wardwell LLP as legal counsel, AlixPartners, LLP to provide management support and strategic advice, Rothschild & Co and SkyWorks Capital, LLC to provide financial advice, and Cervantes Sainz, S.C. (subsequently substituted for Sainz Abogados, S.C.), as local Mexican counsel to help the Company plan the

---

[10] United Airlines, *United Expects To Have Approximately $17 Billion in Available Liquidity By September 2020* (June 15, 2020), https://hub.united.com/2020-06-15-united-expects-to-have-approximately-17-billion-in-available-liquidity-by-september-2020-2646173793.html.

most responsible path through and ultimately out of the COVID-19 crisis. Notwithstanding, as the pandemic continued to hamper demand, the Company's liquidity position continued to deteriorate significantly. Therefore, in order to, among other things, prevent the exercise of self-help and other remedies against the Debtors' assets, including with regard to its leased aircraft, the Company decided that filing these Chapter 11 Cases provided the best option for obtaining the necessary funding to sustain operations and preventing any avoidable disruption for the Company's vendors and customers.

## ARTICLE III

## CERTAIN MEXICAN LAW CONSIDERATIONS[11]

### 1.    *Foreign Investment Law and Neutral Investment Shares*

The Company is subject to a variety of Mexican laws and regulations that affect, among other things, its ownership structure. Pursuant to the Ley de Inversion Extranjera[12] (the "**Foreign Investment Law**"), non-Mexican investors can only own a limited amount of equity[13] in companies (each a "**Regulated Company**") that perform certain commercial activities, including commercial air transportation services. The Foreign Investment Law mandates that foreign investors can only own, directly or indirectly (through other entities or vehicles), up to 49% of a Regulated Company's full voting shares. However, through neutral investment, which may be represented by neutral shares and must be approved by the *Dirección General de Inversión Extranjera* (the "**Mexican General Directorate of Foreign Investment**") and the *Secretaría de Economía* (the "**Ministry of Economy**") (as further described below), non-Mexican investors can own (directly or indirectly) a set of shares that otherwise provide for a majority of the economic interests in a Regulated Company (without assuming control); subsequently, a Regulated Company's capital stock could be structured in a way that non-Mexican investors receive the majority of the economic distributions that a Regulated Company pays to all of its shareholders—it is only the majority of full voting shares (or control) that cannot be held by non-Mexican investors, including the right to elect or select the majority of the Regulated Company's board of directors.

As a consequence of having to comply with the Foreign Investment Law, Grupo Aeroméxico's bylaws contain various provisions that provide mechanisms to limit the rights of non-Mexican investment in the Company and to ensure that the Company continues complying with all applicable Mexican laws. Any amendment to such provisions within Grupo Aeroméxico's bylaws requires prior approval from the Mexican General Directorate of Foreign Investment and a formal resolution of the General Extraordinary Shareholders Meeting of Grupo Aeroméxico. Moreover, prior to any General Shareholders Meeting (which shall be duly called and convened

---

[11] The provisions highlighted in this section do not constitute all relevant or applicable Mexican laws and/or regulations. All creditors are advised to seek independent legal advice from Mexican counsel regarding all specific Mexican law issues.

[12] Including, but not limited to, Articles 4, 7, 8 and Title Five.

[13] Title Five of the Foreign Investment Law allows Neutral Investment, which does not fall within the restrictions otherwise imposed by the Foreign Investment Law.

pursuant to the Grupo Aeroméxico's bylaws), each shareholder must submit certain identifying documentation to obtain a proof of admission card, which details such shareholders' nationality, from the Company's secretary. This admission card helps the company ensure compliance with the Foreign Investment Law.

In particular, the Title Five of the Foreign Investment Law provides the mechanism through which a non-Mexican investor can hold equity in a Regulated Company through a neutral investment. A "**Neutral Investment**" is defined as an equity investment in a Regulated Company that shall not compute for purposes of the foreign investment restrictions provided in the Foreign Investment Law. The exact design or construction of such Neutral Investment equity is flexible, but any issuance of a Neutral Investment equity instrument (including the scope of any voting or corporate rights conferred to such series of shares) must be approved by the Mexican General Directorate of Foreign Investment that depends on the Ministry of Economy, and, if applicable (considering that such authorization may amend corporate bylaws or other regulatory rules that apply to the Company), the CNBV. The Company is currently permitted to receive Neutral Investment (represented by a unique series of shares (*Serie Unica*)) pursuant to an authorization (as amended, the "**2011 Neutral Investment Authorization**") issued in 2011.

The 2011 Neutral Investment Authorization provides that the Company may issue up to 90% of the Company's equity (the "**Neutral Investment Shares**" and any such shares issued pursuant to the Plan, the "**Reorganized Neutral Shares**") in the form of Neutral Investment with the following conditions:

(a) at least 10% of the capital stock must be held, at all times, by Mexican investors (including, pursuant to such 2011 Neutral Investment Authorization, Mexican individuals and/or Mexican companies with an express clause (in such company's bylaws) excluding foreign investment;

(b) that the control of the Company shall be always in hands of Mexican individuals, Mexican companies with an express clause (in such company's bylaws) excluding foreign investment or Mexican companies with majority of Mexican investment;

(c) shares owned by non-Mexican investors may only confer full voting rights that, in aggregate, represent 49% of the shares that are present and voting at a shareholders' meeting; and

(d) the majority of the Company's board of directors shall be comprised by Mexican nationals and be appointed by Mexican shareholders.

The Neutral Investment Shares are not represented by a distinct or separately tradeable security. Rather, the citizenship of the holder determines whether or not the share is a Neutral Investment Share at the time of voting within any General Shareholder Meeting exclusively for the purposes of voting at such General Shareholder Meeting. As currently structured, the Neutral Investment Shares have the following voting and/or corporate rights:

(a) if such shareholder(s), individually or collectively as part of a group, hold 10% or more of the Company's capital stock, then they can (i) designate and revoke any member of the board of directors (*provided, however*, that the board of directors shall always be controlled by Mexican individuals), (ii) demand a call to a General Shareholders Meeting, and (iii) request a shareholder

vote on any matter be deferred if such shareholder believes they are not sufficiently informed to vote;

(b) if such shareholder(s), individually or collectively as part of a group, hold 10% or more of the Company's capital stock, then they can judicially oppose any resolution set for a shareholder vote;

(c) vote such shares in any General Extraordinary Shareholder Meeting that contemplates that contemplates a shareholder vote (i) on a transaction that implicates 20% or more of the Company's assets, (ii) that seeks to cancel the Company's shares from being registered on the Mexican National Registry of Securities, and (iii) that would increase the Company's capital stock (provided, however, that the Reorganized Neutral Shares will be considered as such for purposes of maintaining compliance with the Foreign Investment Law);

(d) if such shareholder(s), individually or collectively as part of a group, hold 5% or more of the Company's capital stock, then they have the right to bring legal actions against another on the Company's behalf pursuant to sections 38 and 52 of Mexico's Securities Market Law; and

(e) any other rights that may be duly added to the Grupo Aeroméxico's bylaws.  At any time, the Reorganized Neutral Shares' voting rights may only be amended with the prior approval of the Ministry of Economy and a shareholder vote that approves a bylaw amendment that implements such voting right changes.

[RESERVED]

### 2.    *Capital Stock Increases and Mexican Corporate Governance Requirements*

As discussed in Article IV of the Plan, the Company will effectuate the equitization of certain Claims and the issuance of the New Stock to be acquired, in part, by the Equity Financing Commitment Parties (including Equity Commitment Premium) through, among other things, increasing the Company's capital stock and providing such newly issued shares to such claimants as their Plan consideration or in exchange for their direct investment in the Reorganized Debtors, as applicable.  These steps will take place pursuant to certain applicable Mexican corporate laws, including, among others, Articles 130, 132, 213 of the Ley General de Sociedades Mercantiles ("**General Law of Business Organizations**" or "**GLBO**") and Articles 48, 83 of the Mexican Securities Exchange Law or LMV.

Article 213 of the GLBO permits a company to increase its capital stock if approved by a General Ordinary Shareholders Meeting.  A company's capital stock may be increased as a result of new shareholder consideration being provided to the company or shareholders being granted new shares in the company.  Moreover, in the case of public companies, any newly issued shares must be registered before the Registro Nacional de Valores ("**National Registry of Securities**" or "**NRS**"), since the NRS certifies such shares to trade on the Mexican stock exchange.

Grupo Aeroméxico's bylaws, in Article Eight thereof, require that any increase in the Company's capital stock be approved by a General Ordinary Shareholders Meeting.  At such meeting, the existing shareholders elect whether or not to accept the terms and conditions of any such capital increase, which means accepting the Company's valuation at which the new shares

-38-

will be issued.  Furthermore, Grupo Aeroméxico's bylaws also provide all existing shareholders with preemptive rights (unless waived by such shareholders), which rights are also otherwise provided for by the GLBO.  Therefore, all existing shareholders with preemptive rights have the right to exercise their preemptive rights (except for those who have agreed to waive to such preemptive rights) and invest new money, on a pro rata basis with their existing holdings, into the Company at the valuation put forth at the General Shareholders Meeting, so as to maintain up to their present ownership percentage.  If such shareholder(s) do not exercise their preemptive rights, totally or partially, they will be diluted by the newly issued shares.  Moreover, as further described in Article IV below, the Company, certain of the DIP Lenders and certain holders of at least a majority of the Company's outstanding voting shares entered into a Shareholder Support Agreement (as defined below) whereby, among other things, such shareholders waived their preemptive rights in the event of a Capital Increase (as defined below).

Following the date hereof, a General Ordinary Shareholder Meeting (the "**Shareholder Meeting**") will be called and held to, among other things, consider: (a) an increase to the Company's capital stock (the "**2021 Capital Increase**"); (b) [RESERVED]; (c) the ratification of all acts from the Company and its subsidiaries during the Chapter 11 proceeding; and (d) the equitization of certain Claims for New Stock (the "**Equitization**").

As a result of the Distributions, certain other Mexican corporate governance reporting and authorization requirements within the LMV and Grupo Aeroméxico's bylaws will also likely be implicated for certain holders of the Grupo Aeroméxico's New Stock either immediately upon emergence or at some time thereafter.

- First, pursuant to Article 109 of the LMV, any person or group of persons who acquire shares in a Mexican public company, which results in such person holding 10% or more and less than 30% of the total amount of the company's capital stock, must inform the public of such ownership no later than the business day immediately following their acquisition of such shares.

- Second, pursuant to Article 111 of the LMV, any person or group of persons who directly or indirectly own 10% or more of the shares of a Mexican public company must inform the CNBV, and in certain instances the general public, any time such person or group of persons acquires or sells any shares in such public company. This requirement is applicable for certain periods as further prescribed in the CNBV.

- Third, pursuant to Article 110 of the LMV, any insider of a Mexican public company who increases or decreases their ownership of the company's capital stock by 5% or more must inform the public of such circumstance no later than the business day immediately following the applicable transaction.

Furthermore, all investors should be informed that pursuant to Grupo Aeroméxico's bylaws, any person or group of persons who intend to acquire or accumulate, in one or several acts, 2.5% or more of the Company's outstanding shares, even if they already hold 2.5% or more of the Company's outstanding shares, must seek authorization (the "**2.5% Authorization**") from the Company's board of directors before such shares are acquired.  In determining whether or not to approve the acquisition of 2.5% or more of the Company's outstanding shares, the Company's

board must take into account, among other things, (a) the Company's benefit, (b) the adequate protection of the Company's minority shareholders, (c) the increase in value inured to shareholders, (d) if the acquiring party is a direct or indirect competitor of the Company, (e) the acquiring party's moral and economic position, (f) the protection of the Company's employees, (g) the need to maintain a solid investment base, (h) that no shareholder is excluded from the economic benefits associated with such acquisition, and (i) any other consideration deemed relevant by the board.  In the event that the Company's board of directors denies the 2.5% Authorization, the Company's board of directors must provide a buyer for such New Stock, and such buyer must pay for the shares an amount based on the value of the shares (a) as of the previous calendar day, if such shares are publicly traded, or (b) as determined by an independent third-party appraiser appointed by the Company's board of directors if the shares are not publicly traded.

Given the 2.5% Authorization requirement, before any Distributions are made, the Company's board of directors shall approve such Distributions.

[RESERVED]

3.    *[RESERVED]*

## ARTICLE IV

## THE CHAPTER 11 CASES

On the Petition Date, the Debtors filed voluntary petitions for relief under the Bankruptcy Code.  The Chapter 11 Cases are being jointly administered under the caption *In re Grupo Aeroméxico, S.A.B. de C.V.*, Case No. 20-11563 (SCC).  The Debtors have continued in possession of their property and have continued to operate and manage their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

On July 13, 2020, the U.S. Trustee appointed the Creditors' Committee.  *See Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 92].  The current members of the Creditors' Committee include the following parties:  (a) The Bank of New York Mellon, as Indenture Trustee [for the Senior Notes]; (b) ASPA; (c) Nordic Aviation Capital; (d) Falko Regional Aircraft Limited; and (e) Sabre GLBL Inc.

No request has been made for the appointment of a trustee or examiner in the Chapter 11 Cases.

## A.    First and Second Day Motions

On the Petition Date, the Debtors filed a number of "first day" motions (the "**First Day Motions**" and the order granting the relief requested therein, the "**First Day Orders**") designed to ease the Debtors' transition into chapter 11, maximize the value of the Debtors' assets, and minimize the effects of the commencement of the Chapter 11 Cases on the Debtors' business and operations.  Some of these motions were granted on an interim basis at the first day hearing on July 1, 2020, and then on a final basis at the second day hearing held July 29, 2020.  Capitalized terms that are used in this Article IV but not otherwise defined in this Disclosure Statement shall have the meanings ascribed to them in the relevant motions.  These motions include, among others:

1.    *Joint Administration*

On the Petition Date, the Debtors filed the *Debtors' Motion for an Order Directing Joint Administration of Chapter 11 Cases* [Docket No. 2] (the "**Joint Administration Motion**"). Through the Joint Administration Motion, the Debtors sought entry of an order directing joint administration of the Chapter 11 Cases for procedural purposes only.

The Bankruptcy Court granted the relief requested in the Joint Administration Motion on July 1, 2020 [Docket No. 30].

2.    *Schedules Extension*

On the Petition Date, the Debtors filed the *Debtors' Motion for Order (I) Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases and Statements of Financial Affairs and (ii) Waiving the Requirements to File Equity Lists and Provide Notice to Equity Security Holders* [Docket No. 3] (the "**Extension of Schedules Motion**"). Pursuant to the Extension of Schedules Motion, the Debtors sought entry of an order (a) extending the deadline by which the Debtors must file their (i) schedules of assets and liabilities, (ii) schedules of current income and expenditures, (iii) schedules of executory contracts and unexpired leases and (iv) statements of financial affairs (collectively, the "**Schedules**" and "**Statements**") by 20 days, for a total of 34 days from the Petition Date, through and including August 3, 2020, without prejudice to the Debtors' ability to request additional extensions for cause shown; and (b) waiving the requirements that the Debtors file lists of equity security holders and give notice of the order for relief to all equity security holders of the Debtors.

The Bankruptcy Court granted the relief requested in the Extension of Schedules Motion on July 1, 2020 [Docket No. 31] (the "**Extension of Schedules Order**"). On July 31, 2020, the Debtors filed a *Notice of Presentment of an Order Further Extending the Debtors' Time to File Schedules and Statements of Financial Affairs* [Docket No. 227] giving notice of a proposed further extension of the deadline by which the Debtors must file their Schedules and Statements by an additional 21 days, for a total of 55 days from the Petition Date, through and including August 24, 2020. On August 10, 2020, the deadline by which the Debtors were required to file their Schedules and Statements was extended by the Bankruptcy through and including August 24, 2020 [Docket No. 256], and the Debtors' Schedules and Statements were filed at Docket Nos. 326–33.

3.    *Cash Management*

On July 1, 2020, the Debtors filed the *Motion of Debtors for an Order Authorizing (I) Debtors to Continue to Use Existing Cash Management System and Maintain Existing Bank Accounts and Business Forms and (II) Financial Institutions to Honor and Process Related Checks and Transfers* [Docket No. 15] (the "**Cash Management Motion**"). Pursuant to the Cash Management Motion, the Debtors sought entry of interim and final orders (a) authorizing the Debtors to (i) continue to operate their prepetition Cash Management System; (ii) fund the operations of affiliates and subsidiaries; (iii) maintain the Debtors' existing bank accounts; and (iv) maintain the Debtors' existing business forms, in each case in the ordinary course of business

and consistent with prepetition practice; (b) authorizing all Banks to receive, process, honor and pay any and all checks, drafts and other forms of payment, including fund transfers, on account of the Cash Management System, whether such checks or other requests were submitted before, on or after the Petition Date; (c) authorizing the Banks to rely on the representations of the Debtors as to which checks and fund transfers are subject to the Cash Management Motion; (d) prohibiting the Banks from placing any holds on, or attempting to reverse, any automatic transfers to any account of the Cash Management System; and (e) authorizing the Debtors to issue new postpetition checks or effect new postpetition fund transfers to replace any checks, drafts and other forms of payment which may be dishonored or rejected and to reimburse any expenses that may be incurred as a result of any Bank's failure to honor a prepetition check or other form of payment.

The Bankruptcy Court granted the relief requested in the Cash Management Motion on an interim basis on July 2, 2020 [Docket No. 45].  On July 29, 2020 and September 28, 2020, the Debtors filed (a) a revised proposed *Second Interim Order Authorizing (I) Debtors to Continue to Use Existing Cash Management System and Maintain Existing Bank Accounts and Business Forms and (II) Financial Institutions to Honor and Process Related Checks and Transfers* [Docket No. 198] (the "**Second Interim Cash Management Order**") and (b) a revised proposed *Third Interim Order Authorizing (I) Debtors to Continue to Use Existing Cash Management System and Maintain Existing Bank Accounts and Business Forms and (II) Financial Institutions to Honor and Process Related Checks and Transfers* [Docket No. 487] (the "**Third Interim Cash Management Order**").

On July 29, 2020 and September 29, 2020, the Bankruptcy Court entered a Second Interim Order [Docket No. 212] and a Third Interim Order [Docket No. 490], respectively, each authorizing the (a) Debtors to continue to use their existing Cash Management System and maintain their existing Bank Accounts and Business Forms and (b) financial institutions to honor and process related checks and transfers.

On December 10, 2020, the Debtors filed a *Notice of Presentment of a Final Order Authorizing (I) Debtors to Continue to Use Existing Cash Management System and Maintain Existing Bank Accounts and Business Forms and (II) Financial Institutions to Honor and Process Related Checks and Transfers* [Docket No. 715].  The Bankruptcy Court granted the relief requested in the Cash Management Motion on a final basis on December 18, 2020 [Docket No. 746] (the "**Final Cash Management Order**").  In addition, the Final Cash Management Order authorized the Debtors to equitize certain intercompany claims to capture certain tax savings; however, such equitization by the Debtors (a) will be disregarded for all purposes in these bankruptcy cases as it relates to recoveries of creditors and distributions to such creditors in these bankruptcy cases, (b) will have no impact on the treatment of the equitized intercompany claims in these bankruptcy cases and such claims shall be treated for all purposes in these bankruptcy cases as if such equitization had not occurred, and (c) will have no impact on the recoveries of any creditor of any of the applicable Debtors under any chapter 11 plan or otherwise, and for plan and distribution purposes it shall be as if such equitization did not occur.

### 4.    Wages

On July 1, 2020, the Debtors filed the *Motion of Debtors for an Order Authorizing (I) Debtors to (A) Pay Prepetition Wages, Salaries, Employee Benefits and Other Compensation and*

*(B) Maintain Employee Benefits Programs and Pay Related Administrative Obligations, (II) Employees and Retirees to Proceed with Outstanding Workers Compensation Claims and (III) Financial Institutions to Honor and Process Related Checks and Transfers* [Docket No. 19] (the "**Wages Motion**").  Pursuant to the Wages Motion, the Debtors sought entry of interim and final orders (a) authorizing, but not requiring, the Debtors to pay or cause to be paid, in their sole discretion, all or a portion of the amounts owing (and associated costs) under or related to Prepetition Employee Obligations; (b) authorizing, but not directing, the Debtors to continue, in their sole discretion, their plans, practices, programs and policies for their Employees and Retirees, as those plans, practices, programs and policies were in effect as of the Petition Date and as may be modified, terminated, amended or supplemented in the ordinary course of business from time to time, in their sole discretion, and to make payments pursuant to such plans, practices, programs and policies in the ordinary course of business, as well as to pay related administrative obligations; (c) permitting Employees and Retirees holding claims under the Workers' Compensation Programs to proceed with such claims in the appropriate judicial or administrative fora and to permit insurers to continue to access collateral and security provided by the Debtors pursuant to the Workers' Compensation Programs; and (d) authorizing applicable banks and other financial institutions to receive, process and pay any and all checks drawn on the Debtors' payroll and general disbursement accounts and automatic payroll and other transfers to the extent that those checks or transfers relate to any of the foregoing

The Bankruptcy Court granted the relief requested in the Wages Motion on an interim basis on July 2, 2020 [Docket No. 48].  On July 29, 2020, the Debtors filed a revised proposed final order granting the relief requested in the Wages Motion [Docket No. 201].  The Bankruptcy Court granted the relief requested in the Wages Motion on a final basis on July 30, 2020 [Docket No. 216].

### 5.    *Insurance*

On July 1, 2020, the Debtors filed the *Motion of Debtors for Entry of Interim and Final Orders Authorizing (I) the Debtors to Continue and Renew their Liability, Property, Casualty and Other Insurance Policies and Honor all Obligations in Respect Thereof and (II) Financial Institutions to Honor and Process Related Checks and Transfers* [Docket No. 16] (the "**Insurance Motion**").  Pursuant to the Insurance Motion, the Debtors sought entry of interim and final orders authorizing (a) the Debtors to maintain, continue, renew or purchase, in their sole discretion, Insurance Policies on an uninterrupted basis and in accordance with the practices and procedures in effect before the Petition Date and (b) the Debtors' financial institutions to receive, process, honor and pay checks or wire transfers used by the Debtors to pay the foregoing.

The Bankruptcy Court granted the relief requested in the Insurance Motion on an interim basis on July 1, 2020 [Docket No. 38].  On July 29, 2020, the Debtors filed a revised proposed final order granting the relief requested in the Insurance Motion [Docket No. 196].  The Bankruptcy Court granted the relief requested in the Insurance Motion on a final basis on July 29, 2020 [Docket No. 209].

### 6.    Taxes

On July 1, 2020, the Debtors filed the *Debtors' Motion for an Order Authorizing (I) Debtors to Pay Certain Prepetition Taxes, Governmental Assessments and Fees and (II) Financial Institutions to Honor and Process Related Checks and Transfers* [Docket No. 4] (the "**Taxes Motion**"). Pursuant to the Taxes Motion, the Debtors sought entry of interim and final orders (a) authorizing, but not directing, the Debtors to pay certain Taxes and Fees to various Governmental Authorities, whether asserted before, on or after the Petition Date, and without prejudice to the Debtors' rights to contest the amounts of any Taxes and Fees on any grounds available under applicable law; (b) authorizing and directing all Banks to receive, process, honor and pay any and all checks, drafts and other forms of payment, including fund transfers, on account of the Taxes and Fees, whether such checks or other requests were submitted before, on or after the Petition Date; (c) authorizing the Banks to rely on the representations of the Debtors as to which checks and fund transfers are subject to the Taxes Motion; (d) prohibiting the Banks from placing any holds on, or attempting to reverse, any automatic transfers on account of the Taxes and Fees; and (e) authorizing the Debtors to issue new post-petition checks or effect new post-petition fund transfers to replace any checks, drafts and other forms of payment, which may be dishonored or rejected and to reimburse any expenses that may be incurred as a result of any Bank's failure to honor a prepetition check or other form of payment.

The Bankruptcy Court granted the relief requested in the Taxes Motion on an interim basis on July 1, 2020 [Docket No. 33]. On July 29, 2020, the Debtors filed a revised proposed final order granting the relief requested in the Taxes Motion [Docket No. 199]. The Bankruptcy Court granted the relief requested in the Taxes Motion on a final basis on July 29, 2020 [Docket No. 206].

### 7.    Customer Programs

On July 1, 2020, the Debtors filed the *Motion of Debtors for Entry of Interim and Final Orders Authorizing (I) Debtors to Honor Prepetition Obligations to Customers and Related Third Parties and to Otherwise Continue Customer Programs, (II) Relief from Stay to Permit Setoff in Connection with the Customer Programs and (III) Financial Institutions to Honor and Process Checks and Transfers* [Docket No. 10] (the "**Customer Programs Motion**"). Pursuant to the Customer Programs Motion, the Debtors sought entry of interim and final orders authorizing, but not directing, the Debtors in their business judgment to (a) perform and honor prepetition obligations related to the Customer Programs as they deem appropriate and (b) continue, renew, replace, implement new, and/or terminate Customer Programs as they deem appropriate, in each case in the ordinary course of business and without further application to the Bankruptcy Court. Importantly, by the Customer Programs Motion, the Debtors sought to honor prepetition obligations in connection with Club Premier, including obligations (the "**Club Premier Obligations**") to PLM, including, without limitation, honoring miles earned or purchased by the Debtors' customers and Club Premier members, and to continue to honor Club Premier Obligations in the ordinary course of business.

The Bankruptcy Court granted the relief requested in the Customer Programs Motion on an interim basis on July 1, 2020 [Docket No. 33]. On July 29, 2020, the Debtors filed a revised proposed final order granting the relief requested in the Customer Programs Motion [Docket No.

195].  The Bankruptcy Court granted the relief requested in the Customer Programs Motion on a final basis on July 29, 2020 [Docket No. 205].

### 8.    Airline Contracts Motion

On July 1, 2020, the Debtors filed the *Motion of Debtors for Interim and Final Orders (i) Authorizing Debtors to Honor Interline Agreements, Clearinghouse Agreements, Industry Agreements, Protection Agreements, Alliance Agreements, Delta Airlines Agreements, Club Premier Loyalty Program Agreements and Prepetition Obligations Related Thereto, (ii) Modifying the Automatic Stay Solely to the Extent Necessary to Effectuate the Intended Relief and (iii) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers* [Docket No. 11] (the "**First Day Airline Contracts Motion**").  Pursuant to the First Day Airline Contracts Motion, the Debtors sought entry of interim and final orders authorizing, but not directing, the Debtors to (a) assume the Critical Airline Agreements pursuant to specified assumption procedures, to the extent the Debtors deem, in their sole direction and discretion, that the assumption of such agreements is in the best interest of the estates; (b) continue to perform, as deemed necessary, all obligations arising under the Critical Airline Agreements; and (c) honor all obligations (whether prepetition or postpetition) owed under such Critical Airline Agreements pending assumption.

The Bankruptcy Court granted the relief requested in the First Day Airline Contacts Motion on an interim basis on July 1, 2020 [Docket No. 34].

On August 5, 2020, the Debtors filed a *Supplement to Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to Honor Interline Agreements, Clearinghouse Agreements, Industry Agreements, Protection Agreements, Alliance Agreements, Delta Airlines Agreements, Club Premier Loyalty Program Agreements and Prepetition Obligations Related Thereto, (II) Modifying the Automatic Stay Solely to the Extent Necessary to Effectuate the Intended Relief and (III) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers* [Docket No. 247] (the "**Airline Supplement**," and together with the First Day Airline Contracts Motion, the "**Airline Contracts Motion**"), and on August 19, 2020, the Debtors filed a revised proposed final order granting the relief requested in the Airline Contacts Motion [Docket No. 301] (the "**Revised Airline Contracts Proposed Order**").  The Airline Supplement highlighted the necessity of maintaining an ongoing relationship with certain Mexican airports and described the terms of the Mexican Airport Agreements, pursuant to which, among other things, the Debtors remit payment of TUA and receive necessary services including security, baggage, handling, check-in and ticketing and airport transportation at various airports throughout Mexico.  By the Airline Supplement and the Revised Airline Contracts Proposed Order, the Debtors sought entry of a final order authorizing the Debtors to (a) assume the Critical Airline Agreements pursuant to certain procedures set forth in the Revised Airline Contracts Proposed Order; (b) honor their prepetition obligations under the Critical Airline Agreements, subject to a $12 million Payment Cap; (c) remit TUA payable under the Mexican Airline Agreements on account of August 2020 and September 2020 and, subject to certain notice requirements, on a go-forward basis; and (d) adjourn the relief requested in the Airline Contracts Motion as it relates to any agreements with Delta.

The Bankruptcy Court granted the relief requested in the Airline Contacts Motion on a final basis on August 20, 2020 [Docket No. 307] (the "**Final Airline Contracts Order**").

### 9.    *Automatic Stay*

On July 1, 2020, the Debtors filed the *Motion of Debtors for Entry of an Order Confirming the Statutory Protections of the Bankruptcy Code* [Docket No. 9] (the "**Automatic Stay Motion**"). Pursuant to the Automatic Stay Motion, the Debtors sought entry of an order confirming the application of (a) the automatic stay provisions of section 362 of the Bankruptcy Code, (b) the anti-termination and anti-modification provisions of section 365 of the Bankruptcy Code, (c) the anti-discrimination provisions of section 525 of the Bankruptcy Code and (d) the anti-transfer provisions of section 541 of the Bankruptcy Code.

The Bankruptcy Court granted the relief requested in the Automatic Stay Motion on July 1, 2020 [Docket No. 43].

### 10.    *Foreign Representative*

On July 1, 2020, the Debtors filed the *Motion of Debtors for Entry of an Order (i) Authorizing Aerovías de Mexico, S.A. de C.V. to Act as Foreign Representative and (ii) Granting Related Relief* [Docket No. 7] (the "**Foreign Representative Motion**"). Pursuant to the Foreign Representative Motion, the Debtors sought entry of an order authorizing Aerovías to seek recognition of the Chapter 11 Cases in any judicial or other proceedings in any foreign country, and upon recognition any foreign jurisdiction, seek any other appropriate relief that is just and proper in furtherance of the protection of the Debtors' estates. To date, Aerovías has not sought recognition of these Chapter 11 Cases in any other jurisdiction.

The Bankruptcy Court granted the relief requested in the Foreign Representative Motion on July 1, 2020 [Docket No. 42].

### 11.    *Reclamation*

On July 1, 2020, the Debtors filed the *Debtors' Motion Pursuant to Sections 105(a) and 546(c) of the Bankruptcy Code for Approval of Procedures for the Treatment of Reclamation Claims* [Docket No. 5] (the "**Reclamation Motion**"), which sought authority, pursuant to sections 105(a) and 546(c) of the Bankruptcy Code, to establish certain procedures for the resolution of reclamation claims against the Debtors.

The Bankruptcy Court granted the relief requested in the Reclamation Motion on July 1, 2020 [Docket No. 39] (the "**Reclamation Order**"). Pursuant to the Reclamation Order, on October 29, 2020, the Debtors filed a *Reclamation Report and Notice of Objection Procedures* [Docket No. 591].

### 12.    *Critical Vendors and Foreign Vendors*

On July 1, 2020, the Debtors filed the *Motion of Debtors for Interim and Final Orders Authorizing (i) Payment of Certain Prepetition Claims of Critical Vendors and Foreign Vendors and (ii) Financial Institutions to Honor and Process Related Checks and Transfers* [Docket No. 14] (the "**Critical and Foreign Vendors Motion**"). Pursuant to the Critical and Foreign Vendors Motion, the Debtors sought entry of an interim order and finals orders authorizing the Debtors to

pay, in their sole discretion and business judgment, some or all of the prepetition obligations of certain critical and foreign vendors. The Critical and Foreign Vendors Motion sought to make such payments subject to an Interim Vendor Cap of $20 million.

The Bankruptcy Court granted the relief requested in the Critical and Foreign Vendors Motion on an interim basis on July 1, 2020 [Docket No. 41]. On August 5, 2020, the Debtors filed a *Supplement to the Debtors' Motion for Interim and Final Orders Authorizing (i) Payment of Certain Prepetition Claims of Critical Vendors and Foreign Vendors and (ii) Financial Institutions to Honor and Process Related Checks and Transfers* [Docket No. 245] (the "**Critical and Foreign Vendor Supplement**") in further support of the Critical and Foreign Vendors Motion. The Critical and Foreign Vendor Supplement sought authorization to pay critical and foreign vendors on a final basis, subject to a Vendors Claims Cap of $57.7 in addition to the Interim Vendor Cap. On August 19, 2020, the Debtors filed a revised proposed final order granting the relief requested in the Critical and Foreign Vendors Motion [Docket No. 299]. The Bankruptcy Court granted the relief requested in the Critical and Foreign Vendors Motion on a final basis on August 20, 2020 [Docket No. 300].

### 13. *Prepetition Purchase Orders*

On July 1, 2020, the Debtors filed the *Debtors' Motion for an Order (i) Granting Administrative Expense Status to Debtors' Undisputed Obligations to Vendors Arising from the Postpetition Delivery of Goods Ordered Prepetition, (ii) Authorizing Debtors to Pay Those Obligations in the Ordinary Course of Business and (iii) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers* [Docket No. 18] (the "**Prepetition Purchase Orders Motion**"). Pursuant to the Prepetition Purchase Orders Motion, the Debtors sought entry of an order (a) authorizing certain Vendors administrative priority status for undisputed obligations arising from outstanding Prepetition Purchase Orders for parts, inventory, supplies, equipment and other goods delivered after the Petition Date; (b) authorizing the Debtors to pay such obligations in the ordinary course of business; and (c) permitting all applicable banks and financial institutions to pay all checks presented for the payment of such obligations.

The Bankruptcy Court granted the relief requested in the Prepetition Purchase Orders Motion on July 1, 2020 [Docket No. 36].

### 14. *Derivative Contracts*

On July 1, 2020, the Debtors filed the *Motion of Debtors for Authorization, but not Direction, to (i) Enter into Derivative Contracts and (ii) Pledge Collateral under Derivative Contracts* [Docket No. 17] (the "**Derivative Contracts Motion**"). Pursuant to the Derivative Contracts Motion, the Debtors sought authority, but not direction, to (a) continue entering into, "rolling over," adjusting, modifying, and settling Derivative Contracts to hedge the Debtors' risk of fluctuations in jet fuel prices, changes in interest rates and exchange rates (if deemed necessary), and to (b) perform all such actions necessary or appropriate to implement, execute, and perform these transactions, including paying premiums, posting letters of credit, entering into escrow agreements, opening and funding escrow accounts, posting collateral or margin, prepayment, taking physical delivery of commodities, and effecting settlement of Derivative Contracts.

The Bankruptcy Court granted the relief requested in the Derivative Contracts Motion on an interim basis on July 1, 2020 [Docket No. 37].  On July 29, 2020, the Debtors filed a revised proposed final order granting the relief requested in the Derivative Contracts Motion [Docket No. 200].  The Bankruptcy Court granted the relief requested in the Derivative Contracts Motion on a final basis on July 29, 2020 [Docket No. 207].

### 15.    *Letters of Credit and Surety Bonds*

On July 1, 2020, the Debtors filed the *Motion of Debtors for Entry of Interim and Final Orders Authorizing the Debtors to Continue and Renew their Letter of Credit and Surety Bond Programs* [Docket No. 6] (the "**Letter of Credit and Surety Bond Motion**").  Pursuant to the Letter of Credit and Surety Bond Motion, the Debtors sought (a) authority, to maintain, continue and renew, in their sole discretion, their Letter of Credit and Surety Bond Programs on an uninterrupted basis and in accordance with the same practices and procedures, including, but not limited to, the maintenance of cash collateral, as were in effect before the Petition Date; and (b) authority, but not direction, to, in their sole discretion, assume certain Indemnity Agreements and continue all obligations thereunder.

The Bankruptcy Court granted the relief requested in the Letter of Credit and Surety Bond Motion on an interim basis on July 1, 2020 [Docket No. 35].  On July 29, 2020, the Debtors filed a revised proposed final order granting the relief requested in the Letter of Credit and Surety Bond Motion [Docket No. 197].  The Bankruptcy Court granted the relief requested in the Letter of Credit and Surety Bond Motion on a final basis on July 29, 2020 [Docket No. 211].

## B.    Professional Advisors

The Debtors' retained the following professional advisors:

- On July 30, 2020, the Debtors filed the *Application of Debtors for Authority to Employ and Retain Davis Polk & Wardwell LLP as Attorneys for the Debtors* Nunc Pro Tunc *to the Petition Date* [Docket No. 217] (the "**Davis Polk Retention Application**").  On September 8, 2020, the Bankruptcy Court entered an order approving the **Davis Polk Retention Application** [Docket No. 361].

- On July 30, 2020, the Debtors filed the *Application to Employ Cervantes Sainz, S.C. as Special Mexican Counsel for the Debtors* Nunc Pro Tunc *to the Petition Date* [Docket No. 221] (the "**Cervantes Sainz Retention Application**").  On September 22, 2020, the Bankruptcy Court entered an order approving the Cervantes Sainz Retention Application [Docket No. 448].  On March 10, 2021, the Debtors filed the *Notice of Presentment of an Order Authorizing Debtors to Substitute Sainz Abogados, S.C. for Cervantes Sainz, S.C. as Special Mexican Counsel for the Debtors* Nunc Pro Tunc *to November 1, 2020* [Docket No. 960] (the "**Sainz Abogados Substitution Motion and Retention Application**") for Sainz Abogados, S.C. to be Special Mexican Counsel for the Debtors as, effective November 1, 2020, Cervantes Sainz, S.C. spun-off into two new firms, and the services formerly provided to the Debtors, and the existing legal teams that provided such services, were transitioned to Sainz Abogados, S.C.  On March 19,

2021, the Bankruptcy Court entered an order approving the Sainz Abogados Substitution Motion and Retention Application [Docket No. 1008].

- On July 30, 2020, the Debtors filed the *Application of Debtors Pursuant to 11 U.S.C. § 327(e) and Fed. R. Bankr. P. 2014 and 2016 Authorizing Debtors to Retain White & Case LLP as Special Counsel* Nunc Pro Tunc *to the Petition Date* [Docket No. 218] (the "**White & Case Retention Application**").  On September 23, 2020, the Bankruptcy Court entered an order approving the White & Case Retention Application [Docket No. 456].

- On July 30, 2020, the Debtors filed the *Application to Employ SkyWorks Capital, LLC as Aircraft Fleet Restructuring Financial Advisor Effective as of the Petition Date* [Docket No. 219] (the "**SkyWorks Retention Application**").  On September 23, 2020, the Bankruptcy Court entered an order approving the Skyworks Retention Application [Docket No. 459].

- On July 1, 2020, the Debtors filed the *Application of Debtors for Authorization to Retain and Employ Epiq Corporate Restructuring, LLC as Claims and Noticing Agent* Nunc Pro Tunc *to the Commencement Date* [Docket No. 12] (the "**Epiq Noticing Agent Retention Application**").  On July 2, 2020, the Bankruptcy Court entered an order approving the Epiq Noticing Agent Retention Application [Docket No. 47].  On July 30, 2020, the Debtors filed the *Application of Debtors for Authorization to Retain and Employ Epiq Corporate Restructuring, LLC as Administrative Agent* Nunc Pro Tunc *to the Commencement Date* [Docket No. 220] (the "**Epiq Administrative Agent Retention Application**").  On November 10, 2020, the Bankruptcy Court entered an order approving the Epiq Administrative Agent Retention Application [Docket No. 626].

- On July 30, 2020, the Debtors filed the *Application to Employ AlixPartners, LLC as Financial Advisor* Nunc Pro Tunc *to the Petition Date* [Docket No. 222] (the "**AlixPartners Retention Application**").  On September 22, 2020, the Bankruptcy Court entered an order approving the AlixPartners Retention Application [Docket No. 452].

- On August 5, 2020, the Debtors filed the *Application of Debtors for Entry of an Order Under 11 U.S.C. §§ 327(a), 328(a), and 1107(b), Fed. R. Bankr. P. 2014 and 2016, and S.D.N.Y. LBR 2014-1 and 2016-1, Authorizing Retention and Employment of Morris, Nichols, Arsht & Tunnell LLP as Bankruptcy Co-Counsel for the Debtors* Nunc Pro Tunc *to July 23, 2020* [Docket No. 240] (the "**MNAT Retention Application**").  On September 22, 2020, the Bankruptcy Court entered an order approving the MNAT Retention Application [Docket No. 444].

- On August 5, 2020, the Debtors filed the *Debtors' Application for Entry of an Order (I) Authorizing Them to Employ and Retain Rothschild & Co US Inc. and Rothschild & Co Mexico S.A. de C.V. as Financial Advisors and Investment Bankers to the Debtors Effective* Nunc Pro Tunc *to the Petition Date, (II) Approving the Terms of the Engagement Letter, (III) Waiving Certain Time Keeping*

*Requirements and (IV) Granting Related Relief* [Docket No. 246] (the "**Rothschild Retention Application**").  On January 21, 2021, the Bankruptcy Court entered an order approving the Rothschild Retention Application [Docket No. 828].

- On May 14, 2021, the Debtors filed the *Application of Debtors for Authorization to Employ and Retain The Lee Group PLLC as Special Airline Transaction Counsel to the Debtors* Nunc Pro Tunc *to April 15, 2021* [Docket No. 1193] (the "**Lee Retention Application**").  On July 19, 2021, the Bankruptcy Court entered an order approving the Lee Retention Application [Docket No. 1437].

- On June 4, 2021, the Debtors filed the *Application of Debtors for Authorization to Employ and Retain De la Vega & Martínez Rojas, S.C. as Special Labor Counsel to the Debtors* Nunc Pro Tunc *to April 30, 2021*  [Docket No. 1281] (the "**DLVMR Retention Application**").  On July 21, 2021, the Bankruptcy Court entered an order approving the DLVMR Retention Application [Docket No. 1457].

- On August 12, 2021, the Debtors filed the *Debtors' Application for an Order Authorizing the Retention and Employment of KPMG Cardenas Dosal, S.C. as Independent Auditor to the Debtors* Nunc Pro Tunc *to the Petition Date* [Docket No. 1586] (the "KPMG Retention Application").

- The Bankruptcy Court approved procedures for the Debtors to retain and employ certain professionals utilized by the Debtors in the ordinary course of business pursuant to an order entered on July 29, 2020 [Docket No. 213].

The Creditors' Committee retained the following professional advisors:

- On August 5, 2020, the Creditors' Committee filed the *Application for Entry of an Order Authorizing the Retention and Employment of Morrison & Foerster LLP as Counsel to the Official Committee of Unsecured Creditors* Nunc Pro Tunc *to July 15, 2020* [Docket No. 241] (the "**Morrison Foerster Retention Application**").  On September 25, 2020, the Bankruptcy Court entered an order approving the Morrison Foerster Retention Application [Docket No. 473].  On June 4, 2021, the Creditors' Committee filed the *Application for Entry of an Order Authorizing the Retention and Employment of Willkie Farr & Gallagher LLP as Counsel to the Official Committee of Unsecured Creditors* Nunc Pro Tunc *to May 1, 2021* [Docket No. 1280] (the "**Willkie Retention Application**") as a result of the attorneys with primary responsibility for the Creditors' Committee's representation in the Chapter 11 Cases having resigned from their positions at Morrison & Foerster LLP and joined Willkie Farr & Gallagher LLP.  On June 29, 2021, the Bankruptcy Court entered an order approving the Willkie Retention Application [Docket No. 1367].

- On August 5, 2020, the Creditors' Committee filed the *Application for Entry of an Order Authorizing the Employment and Retention of FTI Consulting, Inc. as Financial Advisor to the Official Committee of Unsecured Creditors* Nunc Pro Tunc *to July 17, 2020* [Docket No. 242] (the "**FTI Retention Application**").  On October 2, 2020, the Bankruptcy Court entered an order approving the FTI

Retention Application [Docket No. 501].

- On August 5, 2020, the Creditors' Committee filed the *Application for Entry of an Order Authorizing the Retention and Employment of Santamarina y Steta S.C. as Mexican Counsel to the Official Committee of Unsecured Creditors* Nunc Pro Tunc *to November 10, 2020* [Docket No. 714] (the "**Santamarina y Steta Retention Application**"). On January 25, 2021, the Bankruptcy Court entered an order approving the Santamarina y Steta Retention Application [Docket No. 834].

## C.    Other Key Filings and Developments in the Chapter 11 Cases[14]

### 1.    Schedules and Statements of Financial Affairs

On August 25, 2020, all of the Debtors filed their respective Schedules [Docket Nos. 326, 328, 330, 332] and Statements [Docket Nos. 327, 329, 331, 333]. On August 28, 2021, the Debtors filed an amendment to the Statement filed by Aerovías [Docket No. 342]. The Debtors filed amendments to certain Schedules on December 17, 2020 [Docket Nos. 737–40], as well as on January 15, 2021 [Docket Nos. 808–10].

### 2.    Utilities

On July 3, 2020, the Debtors filed the *Motion of Debtors for Entry of an Order (I) Prohibiting Utilities from Altering, Refusing or Discontinuing Service, (II) Deeming Utilities Adequately Assured of Future Performance and (III) Establishing Procedures for Determining Requests for Additional Adequate Assurance* [Docket No. 51] (the "**Utilities Motion**"). Pursuant to the Utilities Motion, the Debtors sought entry of an order (a) prohibiting the Debtors' U.S. Utility Providers and the Consenting Foreign Utility Providers from altering, refusing or discontinuing service on account of prepetition amounts outstanding or on account of any perceived inadequacy of the Debtors' Adequate Assurance Procedures; (b) determining that the Utility Providers and the Consenting Foreign Utility Providers have been provided with adequate assurance of payment within the meaning of Bankruptcy Code section 366; (c) approving the Debtors' Adequate Assurance Procedures; and (d) determining that the Debtors are not required to provide any additional adequate assurance beyond what was proposed by the Utilities Motion and the Adequate Assurance Procedures. The Bankruptcy Court granted the relief requested in the Utilities Motion on July 20, 2020 [Docket No. 135].

### 3.    DIP Financing

On August 13, 2020, the Debtors filed the (a) *Motion of Debtors for Entry of an Order Authorizing Incurrence and Payment of Certain Fees in Connection with Postpetition Financing* [Docket No. 269] (the "**Commitment Letter Motion**"); and (b) *Motion of Debtors for Entry of Interim and Final Orders, Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 506, 507 and 552 (I) Authorizing the Debtors to Obtain Secured Superpriority Postpetition Financing, (II)*

---

[14] Capitalized terms that are used in this Article IV.C but not otherwise defined in this Disclosure Statement shall have the meanings ascribed to them in the relevant motions or orders, as applicable.

*Granting Liens and Superpriority Administrative Expense Claims, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief* [Docket No. 271] (the "**DIP Motion**").

Pursuant to the Commitment Letter Motion, the Debtors sought entry of an order authorizing the Debtors to enter into and perform under that certain Commitment Letter with Apollo Management Holdings, L.P. (on behalf of one or more affiliates and/or funds or separate accounts managed by it and its affiliates) (collectively, "**Apollo**") for a fully underwritten commitment for a $1.0 billion secured superpriority debtor-in-possession financing, including payment of the fees in connection therewith. The Bankruptcy Court granted the relief requested in the Commitment Letter Motion on August 21, 2020 [Docket No. 317].

Pursuant to the DIP Motion, the Debtors sought entry of interim and final orders, among other things, authorizing (a) Grupo Aeroméxico, and certain of its Debtor and non-Debtor subsidiaries (collectively, the "**Loan Parties**") to guaranty the DIP Facility; (b) the Debtors, subject to compliance with the DIP Loan Documents to (i) upon entry of the Interim Order, incur Tranche 1 DIP Loans in an aggregate principal amount not to exceed $100 million, and (ii) upon entry of the Final Order and thereafter until the Termination Date, to incur Tranche 1 DIP Loans and Tranche 2 DIP Loans not to exceed $1.0 billion (including the aggregate amount borrowed under the DIP Facility pursuant to the Interim Order); (c) the Loan Parties, to (i) enter into, execute and deliver the DIP Loan Documents; and (d) entry into a Shareholder Support Agreement (as defined below). The DIP Motion also requested authority to, among other things, (x) grant automatically perfected security interests in and liens on all of the DIP Collateral to the DIP Agent for the benefit of the DIP Lenders; (y) grant superpriority administrative claims to the DIP Lenders and the DIP Agent, and (z) continue to use the Cash Collateral. The Bankruptcy Court granted the relief requested in the DIP Motion on an interim basis on August 21, 2020 [Docket No. 318] and on a final basis (the "**Final DIP Order**") on October 13, 2020 [Docket No. 527].

As a condition to the initial DIP draw, Aeroméxico and certain holders of at least two-thirds of the outstanding voting shares of Aeroméxico entered into a support agreement, dated September 4, 2020 (the "**Shareholder Support Agreement**"), whereby such supporting shareholders agreed to, among other things, (a) refrain from voting its shares in furtherance of any plan of reorganization in the Chapter 11 Cases to the extent such plan of reorganization fails to provide for the payment in full of all obligations under the DIP Facility, (b) vote its shares in favor of taking the necessary corporate actions, as shareholder to effectuate a plan of reorganization in the Chapter 11 Cases that (i) is approved by the Board of Directors of Aeroméxico and satisfies in full all obligations under the DIP Facility and (ii) provides for Capital Increase (as defined below), (c) unconditionally vote in favor of approving the requisite Capital Increase, including the amount of the capital increase and the issuance of the number of Voluntary Conversion Shares (as defined below) to be authorized, issued and listed on the Mexican Stock Exchange to effectuate any Voluntary Equity Conversion Election, (d) refrain from directly or indirectly assigning and/or exercising any such shareholder's preemptive rights to subscribe shares issued in any capital increase of Aeroméxico or any of its direct or indirect subsidiaries directly in which any creditor of the Company (including the DIP Lenders) is permitted to participate, or which is contemplated by the Plan (a "**Capital Increase**"), and agrees that it shall be deemed to have unconditionally and irrevocably waive any such shareholder's preemptive rights in any such Capital Increase and (e) use its best efforts to support and continue the Chapter 11 Cases and to not take any action or

proceeding intended to (i) terminate the Chapter 11 Cases or (ii) support any involuntary concurso mercantil or other insolvency proceeding in respect of Aeroméxico.

### *Voluntary Equity Conversion*

The DIP Facility approved by the Final DIP Order consists of (a) the Tranche 1 DIP Facility in an aggregate principal amount of $200 million (the "**Tranche 1 DIP Facility**") and (b) the Tranche 2 DIP Facility in an aggregate principal amount of $800 million (the "**Tranche 2 DIP Facility**"). Pursuant to specific terms and conditions set forth in the DIP Facility, the Tranche 2 DIP Facility lenders (the "**Tranche 2 DIP Lenders**") had the option to (i) elect to convert their loans (the "**Tranche 2 DIP Loans**"), and receive, in full satisfaction of the Debtors' Tranche 2 DIP Facility obligations (the "**Tranche 2 DIP Obligations**"), shares in reorganized Grupo Aeroméxico (the "**Voluntary Conversion Shares**"), on a dollar-for-dollar basis, based on the Debtors' plan valuation, or any other lower valuation at which any party is permitted to subscribe for shares in reorganized Grupo Aeroméxico, or (ii) be paid in cash at 105% of the face amount of the Tranche 2 DIP Loans.

Pursuant to Schedule 2.12 of the DIP Credit Agreement ("**Schedule 2.12**"), provides certain key timelines and requirements for filing a plan, while also providing the Tranche 2 DIP Lenders with the necessary information needed to choose whether to elect to convert their Tranche 2 DIP Loans (and receive Voluntary Conversion Shares) or to be paid in cash at 105% of the face amount of the Tranche 2 DIP Loans. Among other things, Section 3(i) of Schedule 2.12 provides that at least 50 days (but no later than 75 days) prior to the Debtors filing a Chapter 11 Plan and accompanying disclosure statement, the Debtors are required to provide the Tranche 2 DIP Lenders with Initial Valuation Materials (as defined below). The Debtors provided the Initial Valuation Materials to the Tranche 2 DIP Lenders on June 29, 2021. The Debtors' delivery of the Initial Valuation Materials on June 29, 2021 set the Debtors' window for filing a Chapter 11 Plan and disclosure statement (*i.e.*, 50 to 75 days after delivering the Initial Valuation Materials) as between August 18, 2021 to September 12, 2021.

In addition, Section 3(ii) of Schedule 2.12 provides that within 14 days of receipt of the Initial Valuation Materials, each Tranche 2 Lender shall deliver to the Debtors a non-binding initial indication as to whether they would elect to convert their Tranche 2 DIP Loans (and receive Voluntary Conversion Shares) based on the Initial Valuation Materials. The Tranche 2 DIP Lenders (which include Apollo and certain of members of the Ad Hoc Group of Senior Noteholders), delivered their non-binding indications of interest on July 13, 2021.

In accordance with Sections 3(i) and 4(a)(i) of Schedule 2.12, the Debtors delivered the Final Valuation Materials and the Refinancing Qualification Certificate[15] to the Tranche 2 DIP Lenders on September 10, 2021. The Refinancing Qualification Certification certified that as of

---

[15] A "**Refinancing Qualification**" is defined in the DIP Credit Agreement as "a determination by the Investment Bank as of the Determination Date that all outstanding DIP Loans and all other DIP Obligations owing under the DIP Loan Documents through the effective date of the Plan (the "Effective Date") can be repaid in full in cash (at par plus accrued interest and fees) as of the Effective Date through the issuance of debt or equity securities, to the extent (i) on terms that would not impair the ability of the Borrower to reorganize and emerge successfully from the Chapter 11 proceedings, and (ii) evidenced by a [Refinancing Commitment]."

September 10, 2021, Rothschild & Co could not determine that the Refinancing Qualification had been met. Delivery of the Final Valuation Materials triggered the running of (a) the 10-day[16] time period (the "**Equity Subscription Notice Deadline**") pursuant to Section 4(a)(ii) of Schedule 2.12 for the Tranche 2 DIP Lenders' to elect whether to (i) deliver an Equity Subscription Notice and receive reorganized equity or (ii) receive cash on the Effective Date in satisfaction of the Debtors' Tranche 2 DIP Obligations, and (b) the Debtors' 20-day time period (the "**Schedule 2.12 Plan Filing Deadline**") pursuant to Section 4(a)(i) of Schedule 2.12 to file a Chapter 11 Plan.[17]

Certain Tranche 2 DIP Lenders that are members of the Ad Hoc Group of Senior Noteholders timely exercised their option to receive Voluntary Conversion Shares on September 20, 2021, subject to such Holders' right to revoke or modify its Voluntary Equity Conversion Election and related Election Subscription Notice in the event of any Material Change (each as defined in Schedule 2.12). Apollo did not submit an Equity Subscription Notice by the Equity Subscription Notice Deadline and, by not doing so, has elected to receive its pro rata share of the Debtors' Tranche 2 DIP Obligations in cash on the Effective Date.

### 4.    *Lease and Executory Contract Assumption & Rejection Procedures*

On October 13, 2020, the Debtors filed the *Debtors' Motion for Approval of Procedures for the Rejection of Executory Contracts and Unexpired Leases and the Abandonment of Personal Property* [Docket No. 529] (the "**Rejection Procedures Motion**"). Pursuant to the Rejection Procedures Motion, the Debtors sought entry of an order establishing procedures for the (a) rejection of executory contracts and unexpired leases and subleases; and (b) abandonment of personal property associated with any rejected Leases in each case provided that the Procedures shall not apply to the rejection of any Lease or Contracts or the abandonment of any Expendable Property subject to or in connection with a Court-approved stipulation that provides for separate rejection or abandonment procedures. The Bankruptcy Court granted the relief requested in the Rejection Procedures Motion on October 27, 2020 [Docket No. 584] (the "**Rejection Procedures Order**").

Pursuant to the Rejection Procedures Order, the Debtors filed a *Notice of Rejection of Executory Contracts and Unexpired Leases and the Abandonment of Personal Property* on November 20, 2020, November 25, 2020, January 21, 2021, and February 25, 2021, with each such rejection subsequently being approved by the Bankruptcy Court [Docket Nos. 691, 712 and 957].

On April 7, 2021, the Debtors filed the *Debtors' Motion for Approval of Procedures for the Assumption of Executory Contracts and Unexpired Leases* [Docket No. 1064] (the "**Assumption Procedures Motion**"). Pursuant to the Assumption Procedures Motion, the Debtors sought entry of an order establishing procedures for the assumption or assumption and assignment

---

[16]   During the Mediation, the Debtors agreed to extend the 5-day time period set forth in Section 4(ii) of Schedule 2.12 for delivery of the Equity Subscription Notice to ten days.

[17]   Additionally, pursuant to Section 7 of Schedule 2.12, in the event that the Tranche 2 DIP Lenders deliver an Equity Subscription Notice, the Debtors are required to file a Chapter 11 Plan no later than 15 days after delivery of the Election Subscription Notice.

of certain executory contracts and unexpired leases and subleases.  The Bankruptcy Court granted the relief requested in the Assumption Procedures Motion on April 20, 2021 [Docket No. 1085] (the "**Assumption Procedures Order**").

### 5.    *Assumed Agreements*

On September 2, 2020, the Debtors filed the *Debtors' Motion to Assume Certain Agreements with Grupo Aeroportuario del Centro Norte, S.A.B. de C.V.* [Docket No. 349] (the "**OMA Assumption Motion**").  Prepetition, *Grupo Aeroportuario del Centro Norte, S.A.B. de C.V.* ("**OMA**"), a privately owned airport group, and the Debtors were party to certain agreements (the "**Amended OMA Agreements**") under which OMA provides the Debtors with necessary Airport Services at thirteen (13) airports throughout Mexico.  Pursuant to the OMA Assumption Motion, the Debtors sought authority to assume the Amended OMA Agreements and to pay the Cure Amounts in order to maintain the Debtors' uninterrupted ability to fly into airports operated by OMA at a reduced cost, while preserving the Debtors' ability to reject the Amended OMA Agreements at a later date.  The Bankruptcy Court granted the relief requested in the OMA Assumption Motion on September 21, 2020 [Docket No. 395].

On September 8, 2020, the Debtors filed the *Debtors' Motion Pursuant to Section 365 of the Bankruptcy Code and Rule 6006 of the Federal Rules of Bankruptcy Procedure for Authorization to Assume Certain Agreements with World Fuel Services, Inc.* [Docket No. 365] (the "**WFS Assumption Motion**").  Pursuant to the WFS Assumption Motion, the Debtors sought authority to assume the World Fuel Agreements and to pay the Cure Amounts in order to maintain the Debtors' uninterrupted ability to obtain fuel and related services from World Fuel Services, Inc., an important operational partner.  The Bankruptcy Court granted the relief requested in the WFS Assumption Motion on September 22, 2020 [Docket No. 447] (the "**WFS Assumption Order**").

On November 9, 2020, the Debtors filed the *Debtors' Motion to Assume Certain Agreements with Aeropuerto Internacional de la Ciudad de Mexico, S.A. de C.V.* [Docket No. 624] (the "**AICM Assumption Motion**").  *Aeropuerto Internacional de la Ciudad de Mexico, S.A. de C.V.* ("**AICM**") is an entity wholly-owned by the Mexican government that is responsible for managing and operating the Mexico City International Airport, and is party to certain agreements (the "**AICM Agreements**") with the Debtors in such capacity.  In light of the Debtors' severe liquidity difficulties caused by the COVID-19 pandemic, AICM and the Debtors entered into certain amendments to the AICM Agreements (the "**Amended AICM Agreements**").  Pursuant to the AICM Assumption Motion, the Debtors sought authority to assume the Amended AICM Agreements and to pay the Cure Amounts in order to maintain the Debtors' uninterrupted ability to fly into the Mexico City International Airport at a reduced cost, while preserving the Debtors' ability to reject the Amended AICM Agreements at a later date.  The Bankruptcy Court granted the relief requested in the AICM Assumption Motion on November 23, 2020 [Docket No. 665].

On April 26, 2021, the Debtors filed the *Debtors' Motion to Assume Certain Agreements with Grupo Aeroportuario del Centro Norte, S.A.B. de C.V. and Aeropuerto Internacional de la Ciudad de Mexico, S.A. de C.V.* [Docket No. 1127] (the "**OMA & AICM Assumption Motion**").  Pursuant to the OMA & AICM Assumption Motion, the Debtors sought authority to assume certain real property agreements with OMA & AICM that were not previously assumed.  The Bankruptcy

Court granted the relief requested in the OMA & AICM Assumption Motion on May 19, 2021 [Docket No. 1214].

On April 26, 2021, the Debtors filed the *Debtors' Motion to Assume Debtors' Motion to Assume Agreements with Grupo Aeroportuario del Pacifico, S.A.B. de C.V.* [Docket No. 1122] (the "**GAP Assumption Motion**"). *Grupo Aeroportuario del Pacifico, S.A.B. de C.V.* ("**GAP**") is a private airport concessionaire that is party to various critically important agreements with the Debtors that enable the Debtors' flight operations. Pursuant to the GAP Assumption Motion, the Debtors sought authority to assume certain service agreements with GAP, lease agreements pursuant to which the Debtors lease certain physical space at GAP airports, and certain TUA-related agreements with GAP (collectively, the "**GAP Agreements**"), while preserving the Debtors' ability to reject the GAP Agreements at a later date. The Bankruptcy Court granted the relief requested in the GAP Assumption Motion on May 19, 2021 [Docket No. 1212].

On April 26, 2021, the Debtors filed the *Debtors Motion to Assume Agreements with Grupo Aeroportuario del Sureste, S.A.B. de C.V.* [Docket No. 1123] (the "**ASUR Assumption Motion**"). *Grupo Aeroportuario del Sureste, S.A.B. de C.V.* ("**ASUR**") is a private airport concessionaire that is party to various critically important agreements with the Debtors that enable the Debtors' flight operations. Pursuant to the ASUR Assumption Motion, the Debtors sought authority to assume certain service agreements with ASUR, lease agreements pursuant to which the Debtors lease certain physical space at ASUR airports, and certain TUA-related agreements with ASUR (collectively the "**ASUR Agreements**"), while preserving the Debtors' ability to reject the ASUR Agreements at a later date. The Bankruptcy Court granted the relief requested in the ASUR Assumption Motion on May 19, 2021 [Docket No. 1213].

Pursuant to the Assumption Procedures Order, on April 26, 2021, the Debtors filed their *First Notice of Assumption of Executory Contracts and Unexpired Leases* [Docket No. 1124] and *Second Notice of Assumption of Executory Contracts and Unexpired Leases* [Docket No. 1125] (collectively, the "**First and Second Assumption Notices**"). On May 20, 2021, the Bankruptcy Court entered orders approving the Debtors' assumption of the executory contracts and unexpired leases set forth in the First and Second Assumption Notices [Docket Nos. 1223–24]. On June 4, 2021, the Debtors filed their *Third Notice of Assumption of Executory Contracts and Unexpired Leases* [Docket No. 1282] (the "**Third Assumption Notice**"), and the Bankruptcy Court approved the Debtors' assumption of the executory contracts and unexpired leases in the Third Assumption Notice on July 1, 2021 [Docket No. 1377]. On August 9, 2021, the Debtors filed their *Fourth Notice of Assumption of Executory Contracts and Unexpired Leases* [Docket No. 1533] (the "**Fourth Assumption Notice**"), and the Bankruptcy Court approved the Debtors' assumption of the executory contracts and unexpired leases in the Fourth Assumption Notice on September 1, 2021 [Docket No. 1680]. On August 31, 2021, the Debtors filed their *Fifth Notice of Assumption of Executory Contracts and Unexpired Leases* [Docket No. 1676] (the "**Fifth Assumption Notice**"), and the Bankruptcy Court approved the Debtors' assumption of the executory contracts and unexpired leases in the Fifth Assumption Notice on September 27, 2021 [Docket No. 1780].

### 6. *Debtors' Fleet Optimization Process*

Throughout these Chapter 11 Cases, the Debtors have been engaged in a multi-step process to (a) analyze their anticipated fleet needs, (b) make corresponding adjustments to the size and

composition of their operating fleet, and (c) seek to obtain the most favorable terms for new and amended agreements for aircraft equipment.

Shortly after the Debtors commenced these Chapter 11 Cases, the Debtors determined that it would be an economic burden to their estates if they were required to comply with all of their obligations under their aircraft equipment leases, which were negotiated in a pre-COVID-19 environment. In order to continue business operations in the ordinary course while considering their future fleet needs, the Debtors negotiated interim agreements with certain of their aircraft leasing and finance counterparties and rejected other agreements. As the Chapter 11 Cases have progressed, the Debtors have negotiated and reached long-term agreements with many of those counterparties and they continue negotiating with certain others. The Debtors are confident that prior to emergence, they will have reached definitive agreements with the new and remaining aircraft counterparties such that they will have a fleet composition that matches their post-emergence business plan.

On July 3, 2020, the Debtors filed the *Debtors' Motion for Entry of an Order (i) Authorizing Debtors to Reject Certain Aircraft Leases,* Nunc Pro Tunc *and (ii) Approving Lease Rejection-Return Procedures* [Docket No. 52] (the "**First Rejection Motion**"). Pursuant to the First Rejection Motion, the Debtors sought entry of an order (a) authorizing the Debtors to reject certain leases for aircraft and engines, effective *nunc pro tunc* to the respective dates set forth in First Rejection Motion; and (b) approving the Lease Rejection-Return Procedures. Several of the affected Aircraft Lessors filed objections and/or reservations of rights to the First Rejection Motion. On July 23, 2020, the Bankruptcy Court entered an order approving the First Rejection Motion [Docket No. 177] (the "**First Rejection Order**").

On July 15, 2020, the Debtors filed the *Debtors' Motion for Entry of an Order Authorizing Debtors to Reject Certain Engine Leases,* Nunc Pro Tunc [Docket No. 120] (the "**Engine Lease Rejection Motion**"). Pursuant to the Engine Lease Rejection Motion, the Debtors sought entry of an order authorizing the Debtors to reject certain leases for spare aircraft engines. The Bankruptcy Court granted the relief requested in the Engine Lease Rejection Motion on July 29, 2020 [Docket No. 210].

On September 15, 2020, the Debtors filed the *Debtors' Motion for Approval of Stipulations and Orders Between Debtors and Counterparties Concerning Certain Aircraft and Engines* [Docket No. 373] (the "**Equipment Stipulation Motion**"). Pursuant to the Equipment Stipulation Motion, the Debtors sought entry of an order (a) authorizing the Debtors to enter into power-by-the-hour stipulations (the "**PBH Stipulations**") with certain aircraft finance Counterparties that would enable the Debtors to continue to utilize the Equipment on their operating routes and to maintain the Equipment when not being operated; (b) approval of the PBH Stipulations; and (c) approval of procedures for the expedited consideration of similar stipulations in the future. Broadly speaking, the PBH Stipulations provide, with limited variation, for payment of rent under operating leases, calculated based on actual usage of the Equipment (called a "power by the hour" or "PBH" arrangement), rather than the industry standard fixed monthly rental payment under the subject leases. The PBH Stipulations generally provided that, if the Equipment was not used or operated, the Debtors were not required to pay rent, but were required to, among other things, (a) maintain and store the Equipment in accordance with agreed standards, (b) insure the Equipment as required by the underlying operating leases, and (c) provide the applicable

Counterparty with reasonable inspection rights.  If the Equipment is used or operated, the Debtors were required to, among other things, report to each relevant Counterparty each month the number of hours flown by its Equipment and to pay for such usage on a "power by the hour" basis.

On September 18, 2020, the Debtors filed the *Notice of Final Proposed Stipulations and Supplement to the Debtors' Motion for Approval of Stipulations and Orders Between Debtors and Counterparties Concerning Certain Aircraft and Engines* [Docket No. 391].  On September 21, 2020, the Bankruptcy Court (a) granted the relief requested in the PBH Stipulation Motion [Docket No. 396] (the "**PBH Stipulation Order**"); and (b) so-ordered 31 PBH Stipulations [Docket Nos. 399–429].  Thereafter, pursuant to the PBH Stipulation Order, the Bankruptcy Court has so-ordered an additional three (3) PBH Stipulations [Docket Nos. 475, 491 and 502].

On October 30, 2020, the Debtors filed the *Debtors' Motion for Approval of Stipulations and Orders Between Debtors and Counterparties Concerning Certain Aircraft Financing Agreements* [Docket No. 601] (the "**Aircraft Financing Stipulation Motion**").  Pursuant to the Aircraft Financing Stipulation Motion, the Debtors sought entry of an order authorizing the Debtors to enter into stipulations (the "**Aircraft Financing Stipulations**") with the Counterparties concerning a different set of aircraft than those addressed by the PBH Stipulation Motion.  Under the Aircraft Financing Stipulations, which dealt with aircraft that were subject to mortgage loan or capital lease financings (as opposed to the operating lease financings that were the subject of the PBH Stipulations) principal payments are deferred during the Stipulation period, minimizing the Debtors' costs and counterparties' administrative claims.  Pursuant to the Aircraft Financing Stipulation Motion, the Debtors sought approval of (a) three Aircraft Financing Agreement Stipulations; and (b) procedures for expedited consideration of similar Aircraft Financing Stipulations.

On November 18, 2020, the Bankruptcy Court (a) granted the relief requested in the Aircraft Financing Stipulation Motion [Docket No. 650] (the "**Aircraft Financing Stipulation Order**"); and (b) so-ordered three Aircraft Financing Stipulations [Docket Nos. 651–53].  Thereafter, pursuant to the Aircraft Financing Stipulation Order, the Bankruptcy Court has so-ordered an additional four Aircraft Financing Stipulations [Docket Nos. 692–94 and 835].

On March 2, 2021, the Debtors filed the *Debtors' Motion for Authorization to Enter Into Interim Aircraft PBH Lease with BBAM Aviation Services Limited* (the "**BBAM Motion**") [Docket No. 935].  The Debtors' original lease with BBAM Aviation Services Limited ("**BBAM**") for a Boeing 737-800W aircraft bearing manufacturer's serial number 34954 (the "**Boeing 737-800W Aircraft**") was rejected pursuant to the First Rejection Order.  However, subsequent to the First Rejection Order, the Boeing 737-800W Aircraft remained in the Debtors' possession and the Debtors concluded that entry into a new lease with BBAM for the Boeing 737-800W Aircraft on a temporary "power by the hour" basis was the best and most cost-effective means to address the Debtors' fleet needs at that time.  Pursuant to the BBAM Motion, the Debtors sought entry of an order authorizing the Debtor lessee to enter into a "power by the hour" Interim Lease with BBAM for the Boeing 737-800W Aircraft.  The Bankruptcy Court granted the relief requested in the BBAM Motion on March 16, 2021 [Docket No. 984].

On March 3, 2021, the Debtors filed the *Debtors' Motion for Approval of Adequate Protection Stipulation Between Certain Debtors and Export Development Canada Concerning*

*Certain Aircraft Simulator Loan Agreement* (the "**EDC Adequate Protection Stipulation Motion**") [Docket No. 940]. Pursuant to the EDC Adequate Protection Stipulation Motion, certain of the Debtors sought entry of an order approving an adequate protection Stipulation (the "**EDC Adequate Protection Stipulation**") between the Debtors and Export Development Canada ("**EDC**") concerning that certain Loan Agreement, dated May 16, 2019, between Aerovías and EDC in connection with an aircraft simulator. On March 17, 2021, the Bankruptcy Court so-ordered the EDC Adequate Protection Stipulation [Docket No. 991].

On March 9, 2021, the Debtors filed the *Debtors' Motion for Authorization to Enter Into Aircraft Lease Agreements with Certain Counterparties* [Docket No. 954] (the "**Merx/BBAM Aircraft Lease Motion**"). Pursuant to the Merx/BBAM Aircraft Lease Motion, the Debtors sought entry of an order authorizing the Debtors lessee's entry into letters of intent and new long-term aircraft lease agreements (the "**New Merx/BBAM Aircraft Leases**") pursuant to which, (a) BBAM or its nominee will lease three Boeing model 737-800 aircraft to the Debtors and (b) Merx Aviation Servicing Limited ("**Merx**") or its nominee will lease three additional Boeing model 737-800 to the Debtors. The Bankruptcy Court granted the relief requested in the Merx/BBAM Aircraft Lease Motion on April 22, 2021 [Docket No. 1100].

On April 23, 2021 the Debtors filed the *Debtors' Motion for (I) Approval of Compromises with Boeing and other Counterparties, (II) Authorization to (A) Enter into Amended Aircraft Purchase Agreement with Boeing and (B) Enter into Agreements with other Counterparties Relating to the Boeing Transaction, (III) Approval of the Assumption of such Amended Agreements, as Applicable, and (IV) Approval to Settle Certain Prepetition Claims of Counterparties* [Docket No. 1108] (the "**Boeing Motion**"). Pursuant to the Boeing Motion, the Debtors sought entry of an order approving a series of integrated transactions and modifications of prepetition agreements that would result in the Debtors adding 20 new Boeing 737 MAX and four new Boeing 787-9 aircraft to their fleet, and assuming amended agreements for three Boeing 787-9 aircraft, two Boeing 787-8 aircraft, six  Boeing 737MAX aircraft and five Boeing 737-800 aircraft, on terms consistent with current market conditions. The Boeing Motion represented an important step towards transforming the Debtors' fleet for these Chapter 11 Cases and for years to come.

On April 23, 2021, to complement the aircraft secured pursuant to the Boeing Motion, the Debtors also filed the *Debtors' Motion for (I) Authorization to (A) Enter into New Aircraft Lease Agreements and (B) Amend and Assume Certain Existing Aircraft Lease Agreements and (II) Approval of Compromise Regarding Prepetition Claims with Air Lease Corporation* [Docket No. 1113] (the "**Air Lease Motion**") seeking approval of the agreements reached between the Debtors and Air Lease Corporation to (a) enter into new long-term aircraft lease agreements with respect to three Boeing model 737-9 aircraft and (b) amend and assume unexpired aircraft leases with respect to two Boeing model 787-8 aircraft, four Boeing 787-9 aircraft and one 737-9 aircraft. The Bankruptcy Court entered an *Order Authorizing Debtors to (A) Enter into New Aircraft Lease Agreements, (B) Amend and Assume Certain Existing Aircraft Lease Agreements, and (C) Settle Prepetition Claims with Air Lease Corporation* [Docket No. 1156] granting the relief requested in the Air Lease Motion on May 5, 2021.

On: (a) April 30, 2021, the Bankruptcy Court entered an (i) *Order Authorizing the Debtors to Enter into an Amended Agreement with the Boeing Company and Approval of Compromises Reflected Therein* [Docket No. 1141] (the "**Boeing Order**"); and (ii) *Order Authorizing the*

*Debtors to Enter into Amended Engine Maintenance Agreements with GE Engine Services, LLC and CFM International, Inc. and Granting Related Relief* [Docket No. 1142] (the "**GE and CFM Order**"); (b) May 4, 2021, the Bankruptcy Court entered an *Order Authorizing the Debtors to Enter into Amended PDP Financing Arrangements with Banco Santander and Runway PDP Lender One DAC and Granting Related Relief* [Docket No. 1145] (the "**Carlyle and Santander Order**"); (c) May 5, 2021, the Bankruptcy Court entered an (i) *Order Authorizing the Lessee Debtor to Effectuate the Transactions Related to the Sale-Leaseback Agreements and Related Transactions with Jackson Square Aviation* [Docket No. 1154] (the "**JSA Order**"); (ii) *Order Authorizing the Lessee Debtor to Effectuate the Transactions Related to the Sale-Leaseback Agreements and Related Transactions with AerCap Ireland Limited* [Docket No. 1157] (the "**AerCap Order**"); and (iii) *Amended Stipulation and Order Between Certain Debtors and Counterparties Concerning Certain Equipment* [Docket No. 1160] (the "**Amended So-Ordered AerCap Stipulation**") and (d) May 6, 2021, the Bankruptcy Court entered an (i) *Order Authorizing the Debtors (I) to Enter into and Perform Under Certain Transaction Documents and Other Amendment Agreements with Mexican Dragon Aircraft Holdings Limited, Paal Cetus Company Limited, and Clover Aircraft Leasing Company Limited Related to Certain Sale-Leaseback Agreements and (II) to Assume Certain Agreements in Connection Therewith* [Docket No. 1161] (the "**Clover Order**") and (ii) *Order Authorizing the Debtors (I) to Enter into and Perform Under the Omnibus Amendment and Other Amendment Documents with Mayan Aircraft Holdings Limited, Sumidero Limited, Sumitomo Mitsui Banking Corporation, Brussels Branch, as Facility Agent, SMBC Bank International PLC, as Security Agent, Sumitomo Mitsui Banking Corporation, Brussels Branch and Natixis S.A., as Lenders, and SMBC Aviation Capital Limited Related to Certain Sale-Leaseback Agreements and (II) to Assume Certain Agreements in Connection Therewith* [Docket No. 1162] (the "**SMBC/Natixis Order**"), which, collectively, granted the relief requested in the Boeing Motion.

On July 17, 2021, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Authorizing Debtor Aerovías de México, S.A. de C.V. To Assume (On an Amended Basis) that Certain Engine Lease Agreement and (II) Approving the Claims Settlement with North Shore Aviation Capital, LLC* [Docket No. 1432] (the "**North Shore Motion**"). Pursuant to the North Shore Motion, the Debtors sought entry of an order (a) authorizing the Debtor Lessee to assume that certain Engine Lease Agreement, dated as of October 31, 2013, on an amended basis, relating to an aircraft engine lease and (b) approving a settlement between the Debtors and North Shore resolving certain pre- and post-petition claims that North Shore had asserted in the Chapter 11 Cases.[18] The Bankruptcy Court granted the relief requested in the North Shore Motion on August 12, 2021 [Docket No. 1579].

On July 19, 2021, the Debtors filed the *Debtors' Motion for (I) Authorization to (A) Enter Into New Aircraft Lease Agreements and (B) Amend and Assume a Certain Existing Aircraft Lease Agreement, and (II) Approval of Compromise Regarding Prepetition Claims with Affiliates of Dubai Aerospace Enterprise (DAE) Ltd.* [Docket No. 1452] (the "**DAE Motion**"). Pursuant to the DAE Motion, the Debtors sought entry of an order (a) authorizing the Debtor Lessee to (i) enter into new long-term aircraft lease agreements with certain affiliates of Dubai Aerospace Enterprise

---

[18] Settlements between the Debtors and a counterparty resolving certain or all of any such counterparty's pre- and postpetition claims is referred to herein as a "**Claims Settlement**."

(DAE) Ltd. ("**DAE**"), pursuant to which the Debtor lessee will take delivery of up to 12 new Boeing 737MAX aircraft and (ii) assume a certain aircraft lease agreement, as amended and restated, for one Boeing 737-800 aircraft that the Debtor lessee currently operates as part of its existing fleet; and (b) approving the Claims Settlement, which resolves certain pre- and post-petition claims that DAE had asserted in the Chapter 11 Cases.  On August 7, 2021, the Creditors' Committee filed a limited objection to the DAE Motion [Docket No. 1529].  Upon further negotiations between the Debtors, DAE, and the Creditors' Committee, the parties agreed that the Debtors would file a revised proposed order seeking approval of the DAE Motion on an interim basis, which was filed on August 10, 2021 [Docket No. 1542].  The Bankruptcy Court granted the DAE Motion on an interim basis on August 11, 2021 [Docket No. 1544].  On August 24, 2021, the Creditors' Committee filed a reservation of rights in connection with the DAE Motion [Docket No. 1626].  On August 30, 2021, the Bankruptcy Court granted the relief requested in the DAE Motion on a final basis [Docket No. 1659].

On July 28, 2021, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Authorizing Debtor Aerolitoral, S.A. de C.V. To Assume (On an Amended Basis) those Certain Aircraft Lease Agreements and (II) Approving the Claims Settlement with Aviator Ireland Aeroméxico 188, DAC and Aviator Ireland AMX 216, DAC* [Docket No. 1481] (the "**Aviator Motion**").  Pursuant to the Aviator Motion, the Debtors sought entry of an order (a) authorizing the Debtor lessee to (i) assume that certain Aircraft Lease Agreement, dated as of December 20, 2013, on an amended basis for one Embraer E190 aircraft that the Debtor lessee currently operates as part of its existing fleet and (ii) assume that certain Aircraft Lease Agreement, dated as of December 20, 2013, on an amended basis for one Embraer E190 aircraft that the Debtor lessee currently operates as part of its existing fleet and (b) approving the Claims Settlement, which resolves certain pre- and postpetition claims that the lessors had in the Chapter 11 Cases.  The Bankruptcy Court granted the relief requested in the Aviator Motion on August 12, 2021 [Docket No. 1572].

On July 29, 2021, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Authorizing Debtor Aerovías de México, S.A. de C.V. To Assume (On an Amended Basis) that Certain Lease Agreement and (II) Approving the Claims Settlement with FGL Aircraft Ireland Limited and Related Parties* [Docket No. 1490] (the "**Fuyo Motion**").  Pursuant to the Fuyo Motion, the Debtors sought entry of an order (a) authorizing the Debtor Lessee to assume that certain Operating Lease Agreement, dated as of April 1, 2014, on an amended basis for one Boeing 737-800 aircraft that the Debtor Lessee currently operates as part of its existing fleet and (b) approving the Claims Settlement, which resolves certain pre- and postpetition claims that the lessors had in the Chapter 11 Cases.  The Bankruptcy Court granted the relief requested in the Fuyo Motion on August 12, 2021 [Docket No. 1573].

On August 20, 2021, the Debtors filed the *Debtors' Motion for Entry of an Order Authorizing Debtor Aerovías de México, S.A. de C.V. To Enter into New Simulator Purchase Agreement with CAE Inc.* [Docket No. 1604] (the "**CAE Motion**").  Pursuant to the CAE Motion, the Debtors sought entry of an order authorizing (but not directing) the Debtor Purchaser to enter into the Simulator Purchase Documents to acquire a new flight Simulator.  The Bankruptcy Court granted the relief requested in the CAE Motion on September 2, 2021 [Docket No. 1690].

On August 20, 2021, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Authorizing Debtor Aerovías de México, S.A. de C.V. To Assume (On an Amended Basis) those Certain Aircraft Lease Agreements and (II) Approving the Claims Settlement* [Docket No. 1611] (the "**SMBC Motion**").  Pursuant to the SMBC Motion, the Debtors sought entry of an order (a) authorizing (but not directing) the Debtor Lessee to assume the Aircraft Leases on an amended basis, substantially in accordance and (b) approving the Claims Settlement.  The Bankruptcy Court granted the relief requested in the SMBC Motion on September 3, 2021 [Docket No. 1693].

On August 31, 2021, the Debtors filed the *Debtors' Motion for Entry of an Order Authorizing Debtors To Assume Certain Aircraft Leases* [Docket No. 1677] (the "**JOLCO Motion**").  Pursuant to the JOLCO Motion, the Debtors sought entry of an order authorizing the Debtors to assume certain Aircraft Leases with respect to three Aircraft in the Debtors' existing fleet.  Subsequently, the Debtors came to terms with one of the Lessors related to the JOLCO Motion in connection with one of the Aircraft subject to the JOLCO Motion and, consequently, on September 24, 2021, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Authorizing Debtor Aerovías de México, S.A. de C.V. To Assume (On an Amended Basis) that Certain Lease Agreement and (II) Approving the Claims Settlement with Jupiter Aviation Partners LLC and Related Parties* [Docket No. 1777] (the "**Jupiter Motion**").  Pursuant to the Jupiter Motion, the Debtors sought entry of an order (a) authorizing the Debtor Lessee to assume that certain Aircraft Operating Lease Agreement, dated as of September 23, 2016, on an amended basis  for one Boeing 787-9 aircraft that the Debtor Lessee currently operates as part of its existing fleet and (b) approving the Claims Settlement, which resolves certain claims that the Claimants had in the Chapter 11 Cases.

On September 3, 2021, the Debtors filed the *Debtors' Motion for Entry of an Order Authorizing Certain of the Debtors To Implement Certain Transactions with Ex-Im Bank, Including (I) Entry Into Omnibus Amendment Agreements, (II) Assumption (on an Amended Basis) of Certain Aircraft Leases, and (III) Claims Settlement* [Docket No. 1697] (the "**Ex-Im Motion**").  Pursuant to the Ex-Im Motion, the Debtors sought entry of an order (a) authorizing, but not directing, Aerovías, Grupo Aeroméxico, and Aeroméxico Connect, as applicable, to enter into the Omnibus Amendment Agreements with the Aircraft Counterparties and the CGF Counterparties, as applicable; (b) authorizing, but not directing, Aeroméxico to assume the Aircraft Leases on an amended basis in accordance with the terms and conditions set forth in the Aircraft Omnibus Amendment Agreements, and (c) approving the Claims Settlement, which resolves claims held by Ex-Im and the Security Trustee's in the Chapter 11 Cases.  The Bankruptcy Court granted the relief requested in the Ex-Im Motion on September 20, 2021 [Docket No. 1759].

### 7.    Key Settlements in the Chapter 11 Cases

#### i.    CEBURES

On August 5, 2020, the Debtors filed the *Debtors' Motion for an Order Pursuant to 11 U.S.C. §§ 105 and 363(b), and Fed. R. Bankr. P. 9019 Approving Settlement Agreements Regarding Series AERMXCB 17 and AERMXCB 19 CEBURES Senior Trust* [Docket No. 248] (the "**CEBURES Motion**").  The Debtors had entered into various prepetition transactions backed by the Company's credit card Receivables, including the issuance of Certificados Bursátiles Fiduciarios, or trust certificates ("**CEBURES**").  In 2013, Aerovías and the Common

Representative of the CEBURES Holders entered into a trust agreement governed by Mexican law, pursuant to which the Company transferred to the Trust certain credit card Receivables arising from Visa and MasterCard transactions, and the Trust issued certain series of CEBURES backed by such credit card Receivables, including the Series AERMXCB 17 Trust Certificates and the Series AERMXCB 19 Trust Certificates. As of the Petition Date, the aggregate liability with respect to these Trust Certificates was approximately MEX\$5,350,000,000. Pursuant to the CEBURES Motion, the Debtors sought entry of an order authorizing Aerovías to be bound to, and abide by, the terms and conditions of that certain Fifth Amendment to the Irrevocable Trust Agreement Number F/1748, dated August 4, 2020, which was structured to avoid an acceleration or retention event under the Trust Agreement for 18 months and to allow for excess credit card receivables to be released to the Debtors in the ordinary course, and embodies the comprehensive settlement of various disputes and potential disputes between the Parties relating to the impact of the commencement of the Chapter 11 Cases. The Bankruptcy Court granted the relief requested in the CEBURES Motion on August 20, 2020 [Docket No. 306].

On September 8, 2020, the Debtors filed the *Debtors' Motion for an Order Pursuant to 11 U.S.C. §§ 105 and 363(b), and Fed. R. Bankr. 9019 Approving Settlement Regarding Certain Series of Short-Term CEBURES Bonds* [Docket No. 362] (the "**Short-Term CEBURES Motion**"). Certain of the short-term Mexican Bonds, or CEBURES, that the Debtors had issued prepetition are unsecured, short term bonds that are publicly-traded solely on the Mexican stock exchange. The Short-Term CEBURES Motion implicates four series of Short-Term CEBURES, which trade under the ticker symbols AEROMEX 01119, AEROMEX 01219, AEROMEX 00120 and AEROMEX 00220. Shortly after the Petition Date, the Debtors, the Common Representative of the Short-Term CEBURES holders and the holders negotiated a possible restructuring of the Short-Term CEBURES. Such negotiations culminated in that certain Standstill Agreement, dated August 18, 2020 (the "**Short-Term CEBURES Standstill Agreement**"), whereby, among other things, the Holders and the Common Representative agreed to refrain from exercising, for a certain period of time, the rights they may have pursuant to the terms of the Short-Term CEBURES certificates in exchange for the Debtors' agreement that the Short-Term CEBURES holders have an allowed claim in the Chapter 11 Cases in the amount of MEX\$914,339,152.22, which shall be converted for distribution, voting and all other purposes to US\$39,526,171.07, in addition to certain fees payable under the Standstill Agreement. Pursuant to the Short-Term CEBURES Motion, the Debtors sought entry of an order authorizing the Debtors to be bound to, and abide by, the terms and conditions of Short-Term CEBURES Standstill Agreement. The Bankruptcy Court granted the relief requested in the Short-Term CEBURES Motion on September 22, 2020 [Docket No. 445]. Subsequently, in July and August 2021, the Short-Term CEBURES Standstill Agreement was amended and a revised order was entered by the Bankruptcy Court on September 22, 2021 [Docket No. 1763].

On December 3, 2020, the Debtors filed the *Debtors' Motion for an Order Pursuant to 11 U.S.C. §§ 105 and 363(b), and Fed. R. Bankr. P. 9019, Approving the Settlement Regarding Series Aeromex 00320 CEBURES Bonds* [Docket No. 695] (the "**320 CEBURES Motion**"). Grupo Aeroméxico issued MEX\$250 million of certificates with the ticker symbol AEROMEX 00320 on May 28, 2020, which are partially secured, short-term bonds that are publicly-traded solely on the Mexican stock exchange. As of the Petition Date, approximately \$10.84 million USD in the aggregate was outstanding under the 320 CEBURES, of which US\$3.25 million is secured by certain cash collateral. As part of that certain Standstill Agreement, dated November 18, 2020 (the

"**320 CEBURES Standstill Agreement**"), the Debtors agreed, among other things, to make certain adequate protection interest payments and that the holders of 320 CEBURES have an allowed (a) secured claim of approximately MEX\$75,093,750, which shall be converted for distribution, voting and all other purposes to US\$3,248,257.85, and (b) an unsecured claim of MEX\$175,218,750.00, which shall be converted for distribution, voting and all other purposes to US\$7,588,742.40, in the Chapter 11 Cases. Pursuant to the 320 CEBURES Standstill Agreement, in exchange, the Holders and the Common Representative agreed, for a certain period of time, to refrain from, among other things, attempting to collect certain principal or interest payments, enforcing certain covenants under the 320 CEBURES certificates, or bringing any type of judicial, insolvency, bankruptcy or other type of proceeding in the United States, Mexico or elsewhere. Pursuant to the 320 CEBURES Motion, the Debtors sought entry of an order authorizing the Debtors to be bound to, and abide by, the terms and conditions of the 320 CEBURES Standstill Agreement. The Bankruptcy Court granted the relief requested in the 320 CEBURES Motion on December 17, 2020 [Docket No. 735]. Subsequently, in July 2021, the 320 CEBURES Standstill Agreement was amended and a revised proposed order was entered by the Bankruptcy Court on August 12, 2021 [Docket No. 1574].

### ii.    BBVA Facility

On September 17, 2020, the Debtors filed the *Debtors' Motion for an Order Pursuant to 11 U.S.C. §§ 105 and 363(B) and Fed. R. Bankr. P. 9019 Approving Settlement Between BBVA and Aeroméxico Regarding Letter of Credit Facility* [Docket No. 384] (the "**BBVA Settlement Motion**"). The Prepetition BBVA LC Facility, under which BBVA had issued letters of credit in the aggregate principal amount of \$87.39 million as of September 16, 2020, was secured by a trust agreement pursuant to which Aerovías purported to transfer, in favor of the trustee, Aerovías' rights to (a) credit card receivables derived from the purchase of passenger tickets and related services arising under certain payment processing service contracts and (b) certain collection rights derived from a certain agreement entered into with different travel agencies and the International Air Transport Association (the "**BBVA Facility Collection Rights**"). Letters of credit issued under the Prepetition BBVA LC Facility were exclusively issued in the form of back-to-back letters of credit to backstop letters of credit issued under the Wells Fargo LC Facility. Pursuant to the BBVA Settlement Motion, the Debtors sought entry of an order approving the comprehensive settlement (the "**BBVA Settlement**") between Aerovías, Aeroméxico Connect, and BBVA. The BBVA Settlement provided that the parties shall enter into a new BBVA LC Facility that would ultimately replace the Wells Fargo/BBVA Prepetition LC Facility, as well as a new BBVA Revolving Credit Facility. The new BBVA Facility is secured by the BBVA Facility Collection Rights. Among other things, the BBVA Settlement (a) ensured that the Debtors' Letters of Credit are maintained on an ongoing and uninterrupted basis; (b) ensured the release of certain BBVA Facility Collection Rights to the Debtors, as well as the Debtors' continued access to the cash generated from the Debtors' BBVA Facility Collection Rights; and (c) avoided unnecessary, protracted and costly litigation. The Bankruptcy Court granted the relief requested in the BBVA Settlement Motion on September 24, 2020 [Docket No. 467].

### iii.    DB/AMEX Facility

On October 23, 2020, the Debtors filed the *Debtors' Motion for an Order Pursuant to 11 U.S.C. §§ 105 and 363(B) and Fed. R. Bankr. P. 9019 Approving the Settlement Agreement*

*Regarding the Loan Agreement Secured by AMEX Receivables Between the Debtors and Deutsche Bank Trust Company Americas, as Administrative Agent* [Docket No. 570] (the "**DB/AMEX Settlement Motion**"). As of the Petition Date, a principal amount of $268.75 million remained outstanding under the DB/AMEX Facility. As set forth above, the DB/AMEX Facility is secured by (a) a trust agreement pursuant to which Aerovías purported to transfer, in favor of the trustee, Aerovías' collection rights to certain AMEX Receivables as the source of payment of Aerovías' obligations arising under the DB/AMEX Facility, (b) a Mexican non-possessory pledge agreement, dated as of October 27, 2016, over the AMEX Receivables, and (c) a New York law first-priority floating pledge agreement over the AMEX Receivables. Pursuant to the DB/AMEX Settlement Motion, the Debtors sought entry of an order approving a comprehensive settlement (the "**DB/AMEX Settlement**"), which resolved various disputes and potential disputes between the Parties and provided significant additional liquidity to the Debtors. The DB/AMEX Settlement provided for the Parties to amend and restate the DB/AMEX Facility agreements. Among other things, the DB/AMEX Settlement (a) ensured the release of certain AMEX Receivables to the Debtors, as well as the Debtors' continued access to the AMEX Receivables; (b) significantly reduced the Debtors' obligations under the DB/Amex Facility on a go-forward basis through an 18-month deferment and the application of certain trapped funds; and (c) avoided unnecessary, protracted and costly litigation. The Bankruptcy Court granted the relief requested in the DB/AMEX Settlement Motion on November 10, 2020 [Docket No. 625].

### 8.    Labor Negotiations

Beginning in October 2020, the Debtors and their advisors engaged in negotiations with each of their employee unions to achieve necessary cost savings to enable the Debtors to successfully restructure. After many months of tireless and good faith negotiations, the Debtors reached consensual agreements with each of their unions.

On April 6, 2021, the Debtors filed the Motion of the Debtors for Entry of an Order Pursuant to 11 U.S.C. §§ 363(b) and 105(a) and Fed. R. Bankr. P. 9019(a) Authorizing Entry into Agreements Establishing New Labor Conditions with ASPA, ASSA, STIA, and Independencia [Docket No. 1058] (the "**New CBA Motion**"). Pursuant to the New CBA Motion, the Debtors sought entry of an order authorizing the Debtors' entry into agreements (the "New CBAs") establishing new labor conditions under the Debtors' collective bargaining agreements with the ASPA, ASSA, STIA, and Independencia Unions (each as defined in the New CBA Motion and collectively, the "**Unions**"). In connection with entering into the New CBAs, the Debtors also sought approval to provide each of the Unions with allowed general unsecured claims (the "**Union Claims**") in the Chapter 11 Cases; the terms of which are documented in a bankruptcy protection covenant (the "**Bankruptcy Protection Covenant**") attached to the CBA Order (as defined below). The Bankruptcy Protection Covenant provides, among other things, Union Claims that are equal to the savings provided by the respective Union pursuant to the terms of their New CBA and requires that the Unions vote their Union Claims in favor of the Plan so long as the Plan (a) treats the Union Claims as an allowed general unsecured non-priority claim not subject to reconsideration under Section 502 of the Bankruptcy Code; (b) treats the Union Claims no less favorably than any other prepetition general unsecured non-priority claim against the applicable Debtor (other than de minimis "convenience class" claims); and (c) assumes the collective labor agreement between the Company and the ASPA (as modified). On April 22, 2021, the Bankruptcy Court entered an order [Docket No. 1101] (the "**CBA Order**") granting the relief requested in the

New CBA Motion, including allowing general non-priority unsecured claims by (i) ASPA of $268,050,000.00 against Aerovías, and $48,410,000.00 against Aeroméxico Connect; (ii) STIA of $7,340,000.00 against Aeroméxico Connect; (iii) ASSA of $126,790,000.00 against Aerovías; and (iv) Independencia of $44,090,000.00 against Aerovías, $2,530,000.00 against Aeroméxico Connect, and $1,110,000.00 against Aeroméxico Cargo, *provided, however*, that Independencia's claims are subject to offset in the event that, prior to the applicable record date for initial distributions, a change in Mexican law occurs that prohibits the outsourcing of certain activities that were previously performed by employees represented by Independencia, in which event the amount of offset shall be an amount equal to the present value of the outsourced work anticipated to be performed by employees represented by Independencia as a result of such change in Mexican law, as reasonably determined by the Debtors in good faith in consultation with Apollo, the Creditors' Committee, the Ad Hoc Group of Senior Noteholders, and Independencia. The CBA Order also (x) deemed all other Union Claims other than those granted under the CBA Order waived by the Unions, and (y) authorized the Debtors to enter into documentation necessary for the implementation of, and performance of obligations under, the New CBAs (including documents relating to profit sharing arrangements and payment of deferred compensation). The CBA Order further provided that all obligations under the Bankruptcy Protection Covenant (including, without limitation, the obligation to vote claims in favor of a Complying Plan (as defined in the Bankruptcy Protection Covenant) shall be binding on the Debtors, the Unions, and each successor or assignee, or the transferee of the Union Claims.

### 9. Severance Motions

#### i. Flight Attendants

On October 15, 2020, the Debtors filed the *Motion of the Debtors for Entry of an Order (I) Authorizing the Debtors to Make Payments to Certain Non-Insider, Flight Attendants and (II) Granting Related Relief* [Docket No. 534] (the "**Flight Attendant Severance Motion**"). Pursuant to the Flight Attendant Severance Motion, the Debtors sought entry of an order authorizing the Debtors to pay severance to laid-off Flight Attendants. The Severance Scheme set forth in the Flight Attendant Severance Motion was the product of the Debtors working in close consultation with the Flight Attendant Unions, and in accordance with the relevant collective bargaining agreements and Mexican labor laws, to reach Severance Agreements that permitted the Debtors to reduce—by up to 766 Flight Attendants—their flight attendant staff to a level that is appropriate for a post-COVID world, while providing, approximately $6.2 million in severance benefits to laid-off flights attendants. On October 27, 2020, the Bankruptcy Court entered an order granting the relief requested in the Flight Attendant Severance Motion [Docket No. 583] (the "**Flight Attendant Severance Order**"). As a result of the relief granted therein, and the underlying reductions in force, the Debtors were expected to save approximately $33 million annually from reduced labor costs.

#### ii. Unionized and Non-Unionized Employees

On November 3, 2020, the Debtors filed the *Motion of the Debtors for Entry of an Order (I) Authorizing the Debtors to Make Certain Payments to Non-Insider, Unionized Employees and (II) Granting Related Relief* [Docket No. 608] (the "**First Unionized Employee Severance Motion**"). Pursuant to the First Unionized Employee Severance Motion, the Debtors sought entry

of an order authorizing the Debtors to pay severance to 855 laid-off Union Employees. The First Unionized Employee Severance Motion set forth a negotiated severance schedule that provided for the Debtors to pay the Union Employees in aggregate approximately $13.8 million in total severance in the fourth quarter of 2020. On November 17, 2020, the Bankruptcy Court entered an order granting the relief requested in the First Unionized Employee Severance Motion [Docket No. 646] (the "**First Unionized Employee Severance Order**"). As a result of the relief granted therein, and the underlying reductions in force, the Debtors were expected to save approximately $17.8 million annually from reduced labor costs.

On November 3, 2020, the Debtors filed the *Motion of the Debtors for Entry of an Order (I) Authorizing the Debtors to Make Payments to Certain Non-Insider, Non-Unionized Employees and (II) Granting Related Relief* [Docket No. 609] (the "**First Non-Unionized Employee Severance Motion**"). Pursuant to the First Non-Unionized Employee Severance Motion, the Debtors sought entry of an order authorizing the Debtors to pay approximately $17.72 million in total severance benefits to laid-off Non-Unionized Employees.

On November 17, 2020, the Bankruptcy Court entered an order granting, in part, the relief requested in the First Non-Unionized Employee Severance Motion [Docket No. 645] (the "**Initial Non-Unionized Employee Severance Order**"). The Initial Non-Unionized Employee Severance Order authorized the Debtors to pay severance and to provide Outplacement and Medical Services to 553 laid-off Debtor Non-Union Employees, in an aggregate amount of approximately $12.83 million, and deferred consideration of the 11 Senior Managers included in the First Non-Unionized Employee Severance Motion.

The Bankruptcy Court entered a second order granting, in part, the relief sought in the Non-Unionized Employee Severance Motion on December 7, 2020 [Docket No. 699] (the "**Subsequent Non-Unionized Employee Severance Order**," and together with the Initial Non-Unionized Employee Severance Order, the "**First Non-Unionized Employee Severance Order**"). The Subsequent Non-Unionized Employee Severance Order (a) provided that the balance of the relief requested by the Debtors was limited to nine Senior Managers; and (b) authorized the Debtors to pay severance and to provide Outplacement and Medical Services to the nine Senior Managers that remained employed by the Debtors, in an aggregate amount of approximately $790,000. As a result of the relief granted in the First Non-Unionized Employee Severance Order, and the underlying reductions in force, the Debtors were expected to save approximately $26.2 million annually from reduced labor costs.

On March 3, 2021, the Debtors filed the *Motion of the Debtors for Entry of an Order (I) Authorizing the Debtors to Make Payments to Certain Non-Insider, Non-Unionized Employees and (II) Granting Related Relief* [Docket No. 943] (the "**Second Non-Unionized Employee Severance Motion**"). Pursuant to the Second Non-Unionized Employee Severance Motion, the Debtors sought entry of an order authorizing the Debtors to pay approximately $1.26 million in total severance benefits to an additional thirty-four (34) laid-off Non-Unionized Employees. On March 15, 2021, the Bankruptcy Court entered an order granting the relief requested in the Second Non-Unionized Employee Severance Motion [Docket No. 976] (the "**Second Non-Unionized Employee Severance Order**"). As a result of the relief granted in the Second Non-Unionized

Employee Severance Order, and the underlying reductions in the Debtors' labor force, the Debtors anticipate saving approximately $1.22 million annually from reduced labor costs.

On June 24, 2021, the Debtors filed the *Motion of the Debtors for Entry of an Order (I) Authorizing the Debtors to Make Payments to Certain Non-Insider Employees and (II) Granting Related Relief* [Docket No. 1352] (the "**Second Unionized/Third Non-Unionized Employee Severance Motion**"). Pursuant to the Second Unionized/Third Non-Unionized Employee Severance Motion, the Debtors sought entry of an order authorizing the Debtors to pay approximately $9.4 million in total severance benefits to 365 Unionized Employees and one Non-Unionized Employee that were being laid-off as part of larger workforce rationalization (that also involves certain non-Debtor employees) consistent with the authority already granted by the Bankruptcy Court in the CBA Order. On July 9, 2021, the Bankruptcy Court entered an order granting the relief requested in the Second Unionized/Third Non-Unionized Employee Severance Motion [Docket No. 1402] (the "**Second Unionized/Third Non-Unionized Employee Severance Order**," and together with the First Unionized Employee Severance Order, the First Non-Unionized Employee Severance Order, the Second Non-Unionized Employee Severance Order, the "**Unionized/Non-Unionized Employee Severance Orders**"). As a result of the relief granted in the Second Unionized/Third Non-Unionized Employee Severance Order, and the underlying reductions in the Debtors' labor force, the Debtors anticipate saving approximately $9.26 million annually.

### iii.    Pilots

On March 3, 2021, the Debtors filed the *Motion of the Debtors for Entry of an Order (I) Authorizing the Debtors to Make Severance Payments to Certain Pilots and (II) Granting Related Relief* (the "**Pilot Severance Motion**") [Docket No. 941]. Pursuant to the Pilot Severance Motion, the Debtors sought entry of an order authorizing the Debtors to pay approximately $1.12 million in total severance benefits to sixty-three (63) Pilots that were being laid off as part of the Debtors broader labor agreements with the ASPA. On March 15, 2021, the Bankruptcy Court entered an order granting the relief requested in the Pilot Severance Motion [Docket No. 977] (the "**Pilot Severance Order**"). As a result of the relief granted therein, and the underlying reductions in force, the Debtors were expected to save approximately $3.16 million annually from reduced labor costs.

On May 18, 2021, the Debtors filed the *Motion of the Debtors for Entry of an Order (I) Authorizing the Debtors to Make Payments to Certain Retiring Pilots and (II) Granting Related Relief* (the "**Pilot Early Retirement Motion**") [Docket No. 1202]. Pursuant thereto, the Debtors sought entry of an order authorizing the Debtors to pay certain early retirement payments to pilots pursuant to a voluntary retirement program that the Debtors had offered and that 83 pilots and first-officers had elected to participate in. On June 1, 2021, the Bankruptcy Court entered an order granting the relief requested in the Pilot Early Retirement Motion [Docket No. 1243]. As a result of the relief granted therein, and the resultant reduction in the Debtors' labor force, the Debtors were expected to save approximately $25 million between 2021 and 2025.

As a result of the relief granted pursuant to the orders described in this Article IV.C.9, the Debtors anticipate saving approximately $86 million per annum.

### 10.    Intercompany Mergers

On December 16, 2020, the Debtors filed the *Debtors' Motion for an Order Pursuant to 11 U.S.C. §§ 105(a) and 363(b) Authorizing the Debtors to Effectuate Merger Transactions* [Docket No. 730] (the "**Mergers Motion**").  Pursuant to the Mergers Motion, the Debtors sought entry of an order authorizing Aerovías to effectuate merger transactions with (a) non-Debtor Rempresac Comercial, S.A. de C.V. ("**Rempresac**"), a subsidiary of Grupo Aeroméxico, and (b) non-Debtor Inmobiliaria Paseo de la Reforma 445, S.A. de C.V. ("**Inmobiliaria**"), a subsidiary of Aerovías, with each of Rempresac and Inmobiliaria merging into Aerovías.  The Debtors sought the relief requested in the Mergers Motion, which the Bankruptcy Court granted on December 29, 2020 [Docket No. 771], to simplify its corporate structure and achieve certain other corporate, administrative and accounting benefits.

### 11.    Joint Venture Divestment Motion

On March 3, 2021, the Debtors filed the *Motion of the Debtors for Entry of an Order Pursuant to 11 U.S.C. §§ 363(b) and 105(a) (I) Authorizing the Divestment of Gran Plan and (II) Granting Related Relief* [Docket No. 942] (the "**Joint Venture Divestment Motion**").  Pursuant to the Joint Venture Divestment Motion, the Debtors sought entry of an order authorizing the Debtors to wind down Gran Plan, the joint venture created by Grupo Aeroméxico and Viajes Beda, S.A. de C.V. ("**Best Day**") (a majority-owned subsidiary of Grupo Aeroméxico) that sold bespoke Vacation Packages.  As a result of decreased sales, increased cancellations and refund requests, rising operating, loss of commercial opportunities and limited competitiveness, the Debtors (as well as Best Day) concluded that winding down the Joint Venture was in the best interests of the Debtors' estates and will be value-accretive to all stakeholders.  The Bankruptcy Court granted the relief requested in the Joint Venture Divestment Motion on March 16, 2021 [Docket No. 981].

### 12.    Bar Date

On November 2, 2020, the Debtors filed the *Motion for Entry of an Order (I) Establishing Deadlines for Filing Proofs of Claim and Procedures Relating Thereto and (II) Approving the Form and Manner of Notice Thereof* [Docket No. 604] (the "**Bar Date Motion**").  Pursuant to the Bar Date Motion, the Debtors sought entry of an order (a) establishing deadlines and procedures for filing Proofs of Claim in the Chapter 11 Cases, (b) approving the Bar Date Notice, in substantially the form attached thereto, (c) approving the manner of filing Proofs of Claim and the form of Proof of Claim attached thereto and (d) approving the proposed manner and sufficiency of service and publication of the Bar Date Notice.

On November 18, 2020, the Bankruptcy Court entered an order approving the Bar Date Motion [Docket No. 648] (the "**Bar Date Order**").  The Bar Date Order established, among other things, the following deadlines for filing Proof of Claims:

- **General Bar Date**: January 15, 2021, at 5:00 p.m. (prevailing Pacific Time), (the "**General Bar Date**") was established as the deadline for all persons and entities, (including, without limitation, individuals, partnerships, corporations, joint ventures, trusts and governmental units) that assert a claim, as defined in Section 101(5) of the Bankruptcy Code, against the Debtors, which arose on or prior to the

Petition Date, to file a Proof of Claim.

- **Amended Schedules Bar Date**: the later of: (a) the General Bar Date; and (b) thirty (30) days after such holders of affected claims are served with notice that the Debtors amended their Schedules and/or Statements to identify, reduce, delete, or change the amount, priority, classification, or other status of such a claim, was established as the deadline by which claimants holding claims affected by such amendment or supplement must file a Proof of Claim with respect to such claim.

- **Rejection Damages Bar Date**: the later of: (a) the General Bar Date; and (b) thirty (30) days after entry of any order authorizing the rejection of such executory contract or unexpired lease of the Debtors as the deadline by which claimants asserting claims resulting from the Debtors' rejection of an executory contract or unexpired lease must file a Proofs of Claim for damages arising from such rejection.

The Debtors published notice of the above bar dates in the United States, via the national and international edits of the *Wall Street Journal* and *New York Times*, and in Mexico, via the Mexican national edition of *El Economista*.

### 13.    *Civil Action Removal Extension*

On September 8, 2020, the Debtors filed the *Motion of Debtors to Extend the Time to File Notices of Removal of Civil Actions* [Docket No. 364] (the "**Civil Action Removal Extension Motion**"). Pursuant to the Civil Action Removal Extension Motion, the Debtors sought entry of an order granting a 180-day extension of the 90-day period, set to expire September 28, 2020, during which the Debtors may file notices of removal under Bankruptcy Rule 9027(a)(2) and an extension of the period during which the Debtors may file notices of removal under Bankruptcy Rule 9027(a)(3) through and including March 29, 2021. On September 22, 2020, the Bankruptcy Court entered an order approving the Civil Action Removal Extension Motion and extending the removal deadline through and including March 29, 2021 [Docket No. 446].

On March 23, 2021, the Debtors filed the *Debtors' Second Motion to Extend the Time to File Notices of Removal of Civil Actions* [Docket No. 1011] (the "**Second Civil Action Removal Extension Motion**"). Pursuant to the Second Civil Action Removal Extension Motion, the Debtors sought entry of an order extending the time in which the Debtors may file (a) notices of removal under Bankruptcy Rule 9027(a)(2) and (b) notices of removal under Bankruptcy Rule 9027(a)(3) for an additional 180 days, through and including September 27, 2021. On April 20, 2021, the Bankruptcy Court entered an order approving the Second Civil Action Removal Extension Motion and extending the removal deadline through and including September 27, 2021 [Docket No. 1084].

On September 3, 2021, the Debtors filed the *Debtors' Third Motion to Extend the Time to File Notices of Removal of Civil Actions* [Docket No. 1694] (the "**Third Civil Action Removal Extension Motion**"). Pursuant to the Third Civil Action Removal Extension Motion, the Debtors sought entry of an order extending the time in which the Debtors may file (a) notices of removal under Bankruptcy Rule 9027(a)(2) and (b) notices of removal under Bankruptcy Rule 9027(a)(3) for an additional 180 days, through and including March 28, 2022. On September 20, 2021, the

Bankruptcy Court entered an order approving the Third Civil Action Removal Extension Motion and extending the removal deadline through and including March 28, 2022 [Docket No. 1757].

### 14.    Deadline to Assume or Reject Unexpired Leases of Nonresidential Real Property

On October 13, 2020, the Debtors filed the *Motion of Debtors for Entry of an Order Extending the Deadline To Assume or Reject Unexpired Leases of Nonresidential Real Property* [Docket No. 528] (the "**Leases Assumption/Rejection Deadline Extension Motion**").  Pursuant to the Leases Assumption/Rejection Deadline Extension Motion, the Debtors sought the entry of an order granting a 90-day extension to assume or reject unexpired leases of nonresidential real property through and including January 26, 2021.  On October 26, 2020, the Bankruptcy Court entered an order approving the Leases Assumption/Rejection Deadline Extension Motion [Docket No. 578].

On January 22, 2021, the Debtors filed the *Notice of Presentment of Second Order Extending the Deadline to Assume or Reject Unexpired Leases of Nonresidential Real Property* [Docket No. 831] (the "**Second Leases Assumption/Rejection Deadline Extension Motion**").  On January 26, 2021, the Bankruptcy Court entered an order approving the Second Leases Assumption/Rejection Deadline Extension Motion and extending the deadline to assume or reject unexpired leases of nonresidential real property through and including April 26, 2021 [Docket No. 843].

### 15.    Plan Exclusivity Extension

On October 14, 2020, the Debtors filed the *Motion of Debtors for Entry of an Order Extending the Exclusive Periods Within Which to File a Chapter 11 Plan and Solicit Acceptances Thereof* [Docket No. 530] (the "**First Exclusive Periods Extension Motion**").  Pursuant to the First Exclusive Periods Extension Motion, the Debtors sought the entry of an order extending the Debtors' exclusive periods to (a) file a chapter 11 plan (the "**Exclusive Filing Period**") by 120 days through and including February 25, 2021; and (b) solicit votes thereon (the "**Exclusive Solicitation Period**") by 120 days through and including April 26, 2021.  On October 26, 2020, the Bankruptcy Court entered an order granting the relief requested in the First Exclusive Periods Extension Motion [Docket No. 577].

On February 3, 2021, the Debtors filed the *Debtors' Second Motion for Entry of an Order Extending the Exclusive Periods Within Which to File a Chapter 11 Plan and Solicit Acceptances Thereof* [Docket No. 877] (the "**Second Exclusive Periods Extension Motion**").  Pursuant to the Second Exclusive Periods Extension Motion, the Debtors sought the entry of an order extending (a) the Exclusive Filing Period by 120 days through and including June 25, 2021; and (b) the Exclusive Solicitation Period by 120 days through and including August 24, 2021.  On February 17, 2021, the Bankruptcy Court entered an order granting the relief requested in the Second Exclusive Periods Extension Motion [Docket No. 905].

On June 8, 2021, the Debtors filed the *Debtors' Third Motion for Entry of an Order Extending the Exclusive Periods Within Which to File a Chapter 11 Plan and Solicit Acceptances Thereof* [Docket No. 1291] (the "**Third Exclusive Periods Extension Motion**").  Pursuant to the

Third Exclusive Periods Extension Motion, the Debtors sought the entry of an order extending (a) the Exclusive Filing Period by 122 days through and including October 25, 2021; and (b) the Exclusive Solicitation Period by 120 days through and including December 22, 2021. On June 21, 2021, the Debtors filed a revised proposed order granting the Third Exclusive Periods Extension Motion and extending (a) the Exclusive Filing Period by 75 days through and including September 8, 2021 and (b) the Exclusive Solicitation Period by 76 days through and including November 8, 2021 [Docket No. 1330]. On Jun 23, 2021, the Bankruptcy Court entered an order granting the relief requested in the Third Exclusive Periods Extension Motion [Docket No. 1338].

On September 3, 2021, the Debtors filed the *Debtors' Fourth Motion for Entry of an Order Extending the Exclusive Periods Within Which to File a Chapter 11 Plan and Solicit Acceptances Thereof* [Docket No. 1700] (the "**Fourth Exclusive Periods Extension Motion**"). By operation of Local Rule 9006-2, and pursuant to the Case Management Order, exclusivity was automatically extended to the hearing date, scheduled for September 20, 2021. Pursuant to the Fourth Exclusive Periods Extension Motion, the Debtors sought entry of an order extending (a) the Exclusive Filing Period through and including October 8, 2021; and (b) the Exclusive Solicitation Period through and including December 8, 2021. On September 6, 2021, the Creditors' Committee filed a reservation of rights in connection with the Fourth Exclusive Periods Extension Motion [Docket No. 1701], which the Creditors' Committee supplemented on September 17, 2021 [Docket No. 1735]. On September 17, 2021, (i) the Ad Hoc Group of Senior Noteholders, (ii) the Trades Claimants Group, and (iii) Apollo each filed a reservation of rights in connection with the Fourth Exclusive Periods Extension Motion [Docket Nos. 1732, 1734, 1743]. On September 20, 2021, the Bankruptcy Court entered an order granting the relief requested in the Fourth Exclusive Periods Extension Motion [Docket No. 1753].

### 16.    Omnibus Claims Objections Procedures and Omnibus Claims Objections

On February 3, 2021, the Debtors filed the *Motion of Debtors for Entry of Order Approving (I) Omnibus Claims Objection Procedures, (II) Omnibus Claims Settlement Procedures and (III) Omnibus Claims Hearing Procedures* [Docket No. 878] (the "**Omnibus Claims Procedures Motion**"). Pursuant to the Omnibus Claims Procedures Motion, the Debtors sought entry of an order approving certain procedures to (a) object to claims (the "**Omnibus Claims Objection Procedures**"), (b) settle disputed claims without further Bankruptcy Court approval (the "**Omnibus Claims Settlement Procedures**"), and (c) streamline hearings on contested claims (the "**Omnibus Claims Hearing Procedures**"). The Bankruptcy Court granted the relief requested in the Omnibus Claims Procedures Motion on February 17, 2021 [Docket No. 904].

On March 16, 2021, the Debtors filed the *Debtors' First Omnibus Claims Objection to Proofs of Claim (Satisfied Claims)* [Docket No. 985] (the "**First Omnibus Claims Objection**"). Pursuant to the First Omnibus Claims Objection, the Debtors sought to disallow and expunge certain Claims on the grounds that such Claims have been paid or otherwise satisfied after the Petition Date in accordance with the Bankruptcy Code, applicable rules, or an order issued by the Bankruptcy Court. The Bankruptcy Court sustained the Debtors' First Omnibus Claims Objection on April 20, 2021 [Docket No. 1086], disallowing and expunging 250 Claims.

On March 16, 2021, the Debtors filed the *Debtors' Second Omnibus Claims Objection to Proofs of Claim (Satisfied Claims)* [Docket No. 986] (the "**Second Omnibus Claims Objection**").

Pursuant to the Second Omnibus Claims Objection, the Debtors sought to disallow and expunge certain Claims on the grounds that such Claims have been paid or otherwise satisfied after the Petition Date in accordance with the Bankruptcy Code, applicable rules, or an order issued by the Bankruptcy Court.  The Bankruptcy Court sustained the Debtors' Second Omnibus Claims Objection on April 20, 2021, disallowing and expunging 93 Claims [Docket No. 1087].

On March 16, 2021, the Debtors filed the *Debtors' Third Omnibus Claims Objection to Proofs of Claim (Amended and Duplicate Claims)* [Docket No. 987] (the "**Third Omnibus Claims Objection**").  Pursuant to the Third Omnibus Claims Objection, the Debtors sought to disallow and expunge certain Claims on the grounds that such Claims have been amended or superseded by other Claims, or are duplicative of other Claims filed by or on behalf of the same claimants relating to the same purported liabilities.  The Bankruptcy Court sustained the Debtors' Third Omnibus Claims Objection on April 22, 2021, disallowing and expunging 207 claims [Docket No. 1102].

On April 16, 2021, the Debtors filed the *Debtors' Fourth Omnibus Claims Objection to Proofs of Claim (Satisfied Claims)* [Docket No. 1074] (the "**Fourth Omnibus Claims Objection**").  Pursuant to the Fourth Omnibus Claims Objection, the Debtors sought to disallow and expunge certain Claims have been paid or otherwise satisfied after the Petition Date in accordance with the Bankruptcy Code, applicable rules, or an order issued by the Bankruptcy Court.  The Bankruptcy Court sustained the Debtors' Fourth Omnibus Claims Objection on May 19, 2021, disallowing and expunging 214 claims [Docket No. 1207].

On April 16, 2021, the Debtors filed the *Debtors' Fifth Omnibus Claims Objection to Proofs of Claim (Amended and Duplicate Claims)* [Docket No. 1075] (the "**Fifth Omnibus Claims Objection**").  Pursuant to the Fifth Omnibus Claims Objection, the Debtors sought to disallow and expunge certain Claims on the grounds that such Claims have been amended or superseded by other Claims, or are duplicative of other Claims filed by or on behalf of the same claimants relating to the same purported liabilities.  The Bankruptcy Court sustained the Debtors' Fifth Omnibus Claims Objection on May 19, 2021, disallowing and expunging 37 claims  [Docket No. 1208].

On June 3, 2021, the Debtors filed the *Debtors' Sixth Omnibus Claims Objection to Proofs of Claim (Satisfied Claims and Incorrectly Classified Claims)* [Docket No. 1265] (the "**Sixth Omnibus Claims Objection**").  Pursuant to the Sixth Omnibus Claims Objection, the Debtors sought to (a) disallow and expunge certain Claims on the grounds that such Claims have been paid or otherwise satisfied after the Petition Date and (b) reclassify certain Claims on the grounds that such Claims are not unliquidated nor are the claimants owed any additional unliquidated amounts in connection with their Claims.  The Bankruptcy Court sustained the Debtors' Sixth Omnibus Claims Objection on July 12, 2021 [Docket No. 1403], disallowing and expunging 97 Claims and reclassifying 118 other claims.

On June 3, 2021, the Debtors filed the *Debtors' Seventh Omnibus Claims Objection to Proofs of Claim (Wrong Debtor Claims)* [Docket No. 1266] (the "**Seventh Omnibus Claims Objection**").  Pursuant to the Seventh Omnibus Claims Objection, the Debtors objected to certain claims filed against the incorrect Debtor according to the Debtors' Books and Records, and requested that each such claim be reclassified as Claims against the proper Debtor(s).  The

Bankruptcy Court sustained the Debtors' Seventh Omnibus Claims Objection on July 12, 2021, [Docket No. 1404], modifying 70 claims.

On July 8, 2021, the Debtors filed the *Debtors' Eighth Omnibus Claims Objection to Proofs of Claim (Satisfied, Amended, and Duplicate Claims)* [Docket No. 1393] (the "**Eighth Omnibus Claims Objection**"). Pursuant to the Eighth Omnibus Claims Objection, the Debtors sought to disallow and expunge certain Claims on the grounds that such Claims (a) have been paid or otherwise satisfied after the Petition Date, (b) have been amended or superseded by other Claims or (c) are duplicative of other Claims filed by or on behalf of the same claimants relating to the same purported liabilities. The Bankruptcy Court sustained the Debtors' Eighth Omnibus Claims Objection on August 12, 2021 [Docket No. 1575], disallowing and expunging 54 claims.

On July 8, 2021, the Debtors filed the *Debtors' Ninth Omnibus Claims Objection to Proofs of Claim (Wrong Debtor, Incorrectly Classified, Misclassified Unliquidated, No Liability, and Foreign Currency Claims)* [Docket No. 1394] (the "**Ninth Omnibus Claims Objection**"). Pursuant to the Ninth Omnibus Claims Objection, the Debtors (a) objected to certain claims filed against the incorrect Debtor according to the Debtors' Books and Records and requested that each such Claim be reclassified as Claims against the proper Debtor; (b) sought to reclassify certain claims as the claimant for such Claims is not entitled to the asserted status or other priority; (c) sought to reclassify certain Claims on the grounds that such Claims are not unliquidated nor are the claimants owed any additional unliquidated amounts in connection with their Claims; (d) sought to expunge certain Claims as such Claims seek to recover amounts for which the Debtors are not liable; and (e) requested that certain Claims be converted to United States dollars as such Claims were asserted in a currency other than United States dollars or Mexican pesos. The Bankruptcy Court sustained the Debtors' Ninth Omnibus Claims Objection on August 12, 2021 [Docket No. 1577], reclassifying and/or modifying 115 claims and disallowing and expunging 2 claims.

On July 8, 2021, the Debtors filed the *Debtors' Tenth Omnibus Claims Objection to Proofs of Claim (Reduced Claims)* [Docket No. 1395] (the "**Tenth Omnibus Claims Objection**"). Pursuant to the Tenth Omnibus Claims Objection, the Debtors objected and sought to reduce certain claims that asserted an amount that is not supported by the documentation provided by the claimant. The Bankruptcy Court sustained the Debtors' Tenth Omnibus Claims Objection on August 12, 2021 [Docket No. 1578], modifying 18 claims.

On July 8, 2021, the Debtors filed the *Debtors' Eleventh Omnibus Claims Objection to Proofs of Claim (Foreign Currency and Wrong Debtor Claims)* [Docket No. 1396] (the "**Eleventh Omnibus Claims Objection**"). Pursuant to the Eleventh Omnibus Claims Objection, the Debtors (a) objected to certain claims filed against the incorrect Debtor according to the Debtors' Books and Records and requested that each such Claim be reclassified as Claims against the proper Debtor and (b) requested that certain Claims be converted to United States dollars as such Claims were asserted in a currency other than United States dollars or Mexican pesos. The Bankruptcy Court sustained the Debtors' Eleventh Omnibus Claims Objection on August 12, 2021 [Docket No. 1580], modifying 226 claims.

On July 8, 2021, the Debtors filed the *Debtors' Twelfth Omnibus Claims Objection to Proofs of Claim (Wrong Debtor Claims)* [Docket No. 1397] (the "**Twelfth Omnibus Claims**

Objection"). Pursuant to the Twelfth Omnibus Claims Objection, the Debtors objected to certain claims filed against the incorrect Debtor according to the Debtors' Books and Records and requested that each such Claim be reclassified as Claims against the proper Debtor. The Bankruptcy Court sustained the Debtors' Twelfth Omnibus Claims Objection on August 12, 2021, [Docket No. 1581], modifying 246 claims.

On July 8, 2021, the Debtors filed the *Debtors' Thirteenth Omnibus Claims Objection to Proofs of Claim (Wrong Debtor Claims)* [Docket No. 1398] (the "**Thirteenth Omnibus Claims Objection**"). Pursuant to the Thirteenth Omnibus Claims Objection, the Debtors objected to certain claims filed against the incorrect Debtor according to the Debtors' Books and Records and requested that each such Claim be reclassified as Claims against the proper Debtor. The Bankruptcy Court sustained the Debtors' Thirteenth Omnibus Claims Objection on August 12, 2021 [Docket No. 1582], modifying 247 claims.

On July 8, 2021, the Debtors filed the *Debtors' Fourteenth Omnibus Claims Objection to Proofs of Claim (Wrong Debtor Claims)* [Docket No. 1399] (the "**Fourteenth Omnibus Claims Objection**"). Pursuant to the Fourteenth Omnibus Claims Objection, the Debtors objected to certain claims filed against the incorrect Debtor according to the Debtors' Books and Records and requested that each such Claim be reclassified as Claims against the proper Debtor. The Bankruptcy Court sustained the Debtors' Fourteenth Omnibus Claims Objection on August 12, 2021 [Docket No. 1583], modifying 245 claims.

On July 8, 2021, the Debtors filed the *Debtors' Fifteenth Omnibus Claims Objection to Proofs of Claim (Wrong Debtor Claims)* [Docket No. 1400] (the "**Fifteenth Omnibus Claims Objection**"). Pursuant to the Fifteenth Omnibus Claims Objection, the Debtors objected to certain claims filed against the incorrect Debtor according to the Debtors' Books and Records and requested that each such Claim be reclassified as Claims against the proper Debtor. The Bankruptcy Court sustained the Debtors' Fifteenth Omnibus Claims Objection on August 12, 2021 [Docket No. 1585], modifying 247 claims.

On July 8, 2021, the Debtors filed the *Debtors' Sixteenth Omnibus Claims Objection to Proofs of Claim (Wrong Debtor Claims)* [Docket No. 1401] (the "**Sixteenth Omnibus Claims Objection**"). Pursuant to the Sixteenth Omnibus Claims Objection, the Debtors objected to certain claims filed against the incorrect Debtor according to the Debtors' Books and Records and requested that each such Claim be reclassified as Claims against the proper Debtor. The Bankruptcy Court sustained the Debtors' Sixteenth Omnibus Claims Objection on August 12, 2021 [Docket No. 1584], modifying 192 claims.

On August 18, 2021, the Debtors filed the *Debtors' Seventeenth Omnibus Claims Objection to Proofs of Claim (Misclassified Unliquidated, Wrong Debtor, Incorrectly Classified, No Liability, Satisfied, Amended, Duplicate, Reduced, and/or Foreign Currency Claims)* [Docket No. 1593] (the "**Seventeenth Omnibus Claims Objection**"). Pursuant to the Seventeenth Omnibus Claims Objection, the Debtors (a) sought to modify certain Claims on the grounds that such Claims (i) were not unliquidated and/or (ii) were filed against the incorrect Debtor; (b) sought to reclassify certain claims as the claimant for such Claims is not entitled to the asserted status or other priority; (c) sought to expunge certain Claims as such Claims (i) seek to recover amounts for which the Debtors are not liable, (ii) have been paid or otherwise satisfied after the Petition Date,

(iii) have been amended or superseded by other Claims, and/or (iv) are duplicative of other Claims filed by or on behalf of the same claimants relating to the same purported liabilities; (d) sought to reduce certain claims that asserted a claim amount that is not supported by the Debtors' books and records; and/or (e) requested that certain Claims be converted to United States dollars.   The Bankruptcy Court sustained the Debtors' Seventeenth Omnibus Claims Objection on September 20 2021, [Docket No. 1755], modifying 67 claims and expunging 115 claims.

On August 18, 2021, the Debtors filed the *Debtors' Eighteenth Omnibus Claims Objection to Proofs of Claim (Wrong Debtor, Incorrectly Classified, Foreign Currency, Amended And Duplicate, and/or Reduced Claims)* [Docket No. 1594] (the "**Eighteenth Omnibus Claims Objection**").   Pursuant to the Eighteenth Omnibus Claims Objection, the Debtors (a) objected to certain claims filed against the incorrect Debtor; (b) sought to reclassify certain claims as the claimant for such Claims was not entitled to the asserted status or other priority; (c) requested that certain Claims be converted to United States dollars; (d) sought to expunge (i) certain amended and/or superseded Claims and (ii) certain Claims that are duplicative of other Claims filed by or on behalf of the same claimants relating to the same purported liabilities; and (e) sought to reduce certain claims that asserted an amount that is not supported by the documentation provided by the claimant.   The Bankruptcy Court sustained the Debtors' Eighteenth Omnibus Claims Objection on September 24, 2021 [Docket No. 1771], reclassifying and/or modifying 243 claims.

### 17.    *Customer Refunds and Voucher Process*

[●]

### 18.    *Relief From the Automatic Stay*

On October 6, 2020, certain Tort Claimants filed a motion seeking relief from the automatic stay to permit the Tort Claimants to litigate their claims to judgment and obtain payment, if entitled, from third-party insurers [Docket No. 508] (the "**Tort Claimants Motion**"), which was granted by the Bankruptcy Court on October 22, 2020 [Docket No. 560].

On July 7, 2021, the Bankruptcy Court entered a *Stipulation and Agreed Order Between the Debtors and Zaira S. Llancan Azocar* [Docket No. 1387] approving a stipulation between the Debtors and Zaira S. Llancan Azocar ("**Azocar**") modifying the automatic stay to permit Azocar to the limited extent necessary to enable Azocar to pursue certain Claims to final judgment or settlement, and to attempt to recover any liquidated final judgment or settlement on account of the Claims solely from the insurance coverage, if any.

### 19.    *Newrest Adversary Proceeding*

On December 14, 2020, the Debtors commenced an adversary proceeding (the "**Adversary Proceeding**") by filing a complaint against defendants Newrest Group Holding S.A., Newrest España, S.L., Newrest Toronto Corporation, and Casa Proveedora Phillips, S.A. (collectively "**Newrest**") that sought to enforce the automatic stay and obtain a declaratory judgment and injunction.   *See Aerovias de Mexico, S.A. de C.V. v. Newrest Group Holding, S.A.*, Adv. Proc. No. 20-01346 (SCC) (Bankr. S.D.N.Y. Dec. 14, 2020), Docket No. 1.   On December 16, 2020, the Bankruptcy Court issued an order temporarily enjoining Newrest, pending a hearing on the

Debtors' motion for a preliminary injunction (the "**Preliminary Injunction Motion**"), from taking any action in certain proceedings pending before the Madrid Court. *See id.* at Docket No. 13. On December 30, 2020, the Bankruptcy Court granted the relief requested in the Preliminary Injunction Motion and issued a preliminary injunction against Newrest until further order of the Court (the "**Preliminary Injunction**"). *Id.* at Docket No. 20. On February 10, 2021, the Bankruptcy Court entered an order holding Newrest in civil contempt for willful violations of the automatic stay and the Preliminary Injunction, *see id.* at Docket No. 35, and on February 22, 2021, the Bankruptcy Court entered an order imposing *per diem* monetary sanctions against Newrest. *Id.* at Docket No. 40. After further negotiations with Newrest, on August 17, 2021, the Company filed the *Debtors' Motion for an Order Pursuant to 11 U.S.C. 105 and 363(b), and Fed. R. Bankr. P. 9019, Approving the Settlement Between Debtors and Newrest* seeking approval of its settlement with Newrest (the "**Newrest Settlement**"). *Id.* at Docket No. 42   On August 30, 2021, the Bankruptcy Court approved the Newrest Settlement, *see id.* at Docket No. 50, and on September 7, 2021, the Adversary Proceeding was dismissed with prejudice. *Id.* at Docket No. 53.

### 20.    *PLM and Club Premier*

On April 22, 2021, PLM filed a motion [Docket No. 1103] (the "**PLM Motion**") requesting that the Bankruptcy Court approve an agreement (the "**PLM Stipulation**") among Aerovías, Grupo Aeroméxico, PLM and Aimia Holdings UK I Limited and Aimia Holdings UK II Limited (collectively "**Aimia**"). The PLM Stipulation provided that the Debtors would assume certain agreements between the Company, PLM and/or Aima with respect to Club Premier in the Chapter 11 Cases, and that the parties would mutually release each other. The PLM Stipulation set January 6, 2021 as the deadline to submit the Stipulation to the Bankruptcy Court for approval. The Debtors did not file the Stipulation by the January 6, 2021 deadline.

On May 14, 2021, Aeroméxico filed an objection to the PLM Motion [Docket No. 1187] (the "**Debtors' PLM Objection**"), arguing that, among other things, PLM lacked standing to seek the relief sought in the PLM Motion and, even if PLM did have standing, PLM cannot satisfy the standard for approval because, submitting the PLM Stipulation at that time was contrary to the Debtors' business judgment. Apollo [Docket No. 1190], the Creditors' Committee [Docket No. 1191] and the Ad Hoc Group of Senior Noteholders [Docket No. 1199] each filed statements with the Bankruptcy Court in support of the Debtors' PLM Objection and in opposition to the PLM Motion.

The PLM Motion, initially scheduled to be heard on May 21, 2021, was adjourned to June 22, 2021 [Docket No. 591], August 12, 2021 [Docket No. 1369], September 20, 2021 [Docket No. 1504], and most recently to the October omnibus hearing date [Docket No. 1709].

### 21.    *Delta Contract Assumptions*

All Executory Contracts and Unexpired Leases between Delta (and any of its subsidiaries or affiliates) and any of the Debtors (including any amendments, supplements or other modifications thereto through the Effective Date), shall be deemed automatically assumed by the applicable Debtor Entity on the Effective Date. In exchange for the assumption, amendment and extension of all such agreements, as mutually agreed to by Delta and the Debtors, to the extent applicable, which will require the continuation of the scope and level of support services provided

by Delta (and any of its subsidiaries or affiliates) under such agreements or otherwise, currently provided in connection with the Delta JCA, Delta shall receive the Delta Contract Amendment Fee. The New Stock issued on account of the Delta Contract Amendment Fee shall not dilute any New Stock issued on account of the Equity Financing.

### 22.    *Exit Financing Process*

As contemplated by, and in accordance with, Schedule 2.12 to the DIP Credit Agreement, beginning in May 2021, Rothschild & Co commenced a robust marketing process for an exit financing commitment to potentially satisfy the Refinancing Qualification while simultaneously enabling the successful reorganization of the Debtors. Rothschild & Co reached out to over 125 institutions and investors to gauge interest in providing an exit financing commitment to the Debtors. Following the initial outreach, Rothschild & Co engaged in a series of discussions and presentations with over 50 potential investors that had executed confidentiality agreements, and Rothschild & Co provided those potential investors with access to diligence materials. In connection with this process, the Debtors initially set a deadline of July 5, 2021, which was extended to July 26, 2021, for the receipt of binding commitments, so that the Debtors could evaluate and (potentially) execute such binding commitments within the time constraints of Schedule 2.12. As part of the exit financing process, certain parties, including certain members of the Crossover Group, received nonpublic information about the Company.

*Apollo Non-Binding Indication of Interest Letter*: On July 13, 2021, Apollo submitted its non-binding indication of interest (the "**Apollo Letter**") in response to the delivery of Initial Valuation Materials. The Apollo Letter provided a "binding proposal" where it committed to exercise its option to receive shares in reorganized Grupo Aeroméxico in exchange for its Tranche 2 DIP Obligations (the "**Voluntary Equity Conversion**"), provided that the Debtors' delivered Final Valuation Materials in accordance with a certain timeline and with a plan equity value of $1.217 billion. The Apollo Letter also provided that the Debtors should deliver Final Valuation Materials and a draft disclosure statement that reflect the terms set forth in the Apollo Letter by July 29, 2021 (the earliest date such a delivery would be permitted under Schedule 2.12), and that Apollo's offer to convert (on the terms set forth in the Apollo Letter) would terminate after such date. The Apollo Letter contemplates (a) Apollo's willingness to coordinate the incurrence of a first-lien term loan facility, in an aggregate original principal amount of at least $200 million to be used for, among other things, repaying Tranche 1 of the DIP Facility, (b) Apollo's willingness to provide and/or secure debt financing and additional equity on acceptable terms to fund all or a portion of the PLM Stock Participation Transaction, and (c) the conversion of the Tranche 2 DIP Lenders' DIP Facility claims for 83% of the equity of reorganized Grupo Aeroméxico (subject to dilution from the Management Incentive Plan). The Apollo Letter also highlighted Apollo's interest and ability to serve as strategic partner as well as Apollo's extensive airline experience.

Under the Apollo Letter, the conversion of Tranche 2 DIP Facility claims for 83% reorganized Grupo Aeroméxico equity is based upon a plan enterprise valuation of $5 billion and plan equity value of $1.217 billion. The remaining 17% of the equity of reorganized Grupo Aeroméxico (subject to dilution from the Management Incentive Plan) will be offered to holders of allowed general unsecured claims. Apollo subsequently modified the proposal in the Apollo Letter to provide for a total enterprise value of $5.499 billion with a plan equity value of $1.35 billion. This would result in holders of allowed general unsecured claims receiving 25% of the

equity of reorganized Grupo Aeroméxico (subject to dilution from the Management Incentive Plan).

*Ad Hoc Group Proposal*: On June 9, 2021, a group of potential exit financing providers, which includes certain members of Ad Hoc Group of Senior Noteholders (collectively, the "**AHG Members**") represented by Akin Gump Strauss Hauer & Feld LLP ("**Akin Gump**"), as well as investment funds represented by Milbank LLP (such third parties, together with the AHG Members, the "**AHG Commitment Parties**"), delivered a non-binding indication of interest to provide exit financing that could potentially satisfy the Refinancing Qualification. After initial feedback from the Debtors' advisors, the AHG Commitment Parties submitted a revised non-binding indication of interest on June 14, 2021 and binding commitment letters on July 26, 2021. The proposal (the "**AHG Proposal**") contemplated (a) the incurrence of a first-lien term loan facility, in an aggregate original principal amount of $200 million provided by certain of the AHG Commitment Parties to be used for among other things, repaying Tranche 1 of the DIP Facility, and (b) an equity rights offering of up to $1 billion (subject to a potential upsize of up to an additional $375 million) (the "**AHG Proposal Equity Rights Offering**"), the proceeds of which would be used to repay the Tranche 2 DIP Lenders that did not elect to convert their Tranche 2 DIP Loans for the Voluntary Conversion Shares. Under the AHG Proposal, the total enterprise value was $5.3 billion with a plan equity value that was $2.397 billion (assuming a payoff of Tranche 2 DIP Obligations and no incremental proceeds under the PLM Stock Participation Transaction), and provided for an equity rights offering will be offered at a 10% discount to plan equity value.

In addition to customary fees, expenses, and indemnities, under the AHG Proposal, certain of the AHG Commitment Parties would be entitled to a commitment fee (the "**Commitment Fee**") in exchange for their equity commitment. The Commitment Fee would be payable in the same quantum irrespective of whether the AHG Proposal is consummated or terminated. The Commitment Fee totaled (a) 13.5% multiplied by $1 billion divided by the Discounted Plan Equity Value (i.e., a 10% discount to plan equity value), to be paid in shares of reorganized Grupo Aeroméxico, or (b) in the event a sale of (i) all or substantially all of the assets of the Debtors or (ii) all or substantially all of the equity of the Debtors, $135 million (to be paid in cash).

*Trade Claimants Proposal*: On July 26, 2021, a group of potential exit financing providers, which includes four recent purchasers of claims allowed by the Debtors, holding approximately $400 million of unsecured claims represented by Gibson, Dunn & Crutcher LLP (together, the "**Trade Claimants Group**"), delivered a binding commitment letter. The proposal (the "**Trade Claimants Proposal**," and together with the AHG Proposal, the "**New Money Exit Financing Proposals**") contemplated an agreement by the Trade Claimants Group to backstop up to $900 million of an equity rights offering (the "**Trade Claimants Equity Rights Offering**"). Fifty percent of shares to be issued under the Trade Claimants Equity Rights Offering would be shares of reorganized Grupo Aeroméxico common stock, and 50% of issued shares would be a series of the Reorganized Grupo Aeroméxico's perpetual convertible preferred stock (together, the "**Securities**").

The Trade Claimants Proposal further provided that the Trade Claimants Group were in active discussions with multiple third-party lenders interested in committing to incur a first-lien

term loan facility, in an aggregate original principal amount of at least $300 million to be used for among other things, repaying Tranche 1 of the DIP Facility. Under the Trade Claimants Proposal, the total enterprise value was $5.4 billion with a plan equity value of $5.4 billion less the net debt of reorganized Grupo Aeroméxico on the effective date of the Chapter 11 Plan.

In addition to customary fees, expenses, and indemnities, under the Trade Claimants Proposal, each member of the Trade Claimants Group would be entitled to a commitment fee (the "**Trade Claimants Commitment Fee**") in exchange for its equity commitment. The Trade Claimants Commitment Fee would be payable in the same quantum irrespective of whether the Trade Claimants Proposal is consummated or terminated. The Trade Claimants Commitment Fee totaled 12% of the aggregate purchase price of the Securities. At each member of the Trade Claimants Group's option, the Trade Claimants Commitment Fee would be payable with (a) additional shares of common stock valued at the plan equity value per share, or (b) cash.

*Joint Proposal*: During the Mediation, the AHG Commitment Parties and the Trade Claimants' Group combined their efforts to submit a joint exit financing proposal. On August 20, 2021, a group of potential exit financing providers, which group includes certain of the AHG Commitment Parties and members of the Trade Claimants Group (together, the "**Crossover Group**"), first delivered an exit financing term sheet, and on August 22, 2021, the Crossover Group first delivered commitment letters and accompanying term sheets (as amended, collectively the "**Joint Proposal Term Sheets**") with respect to the same. The Crossover Group's proposal (the "**Joint Proposal**") contemplates an agreement to (a) purchase or fund, as applicable, $1.1875 billion of new equity (such amount, including, for the avoidance of doubt, the amount committed in respect of equity related to the PLM Stock Participation Transaction, the "**Committed Equity Amount**") consisting of either a single series shares (*Serie Unica*) or "N" shares with limited voting rights and "O" shares will full voting rights, of reorganized Grupo Aeromexico's common stock (each of the *Serie Unica*, the "N" shares and the "O" shares, as applicable, and together with any shares issued in connection with the PLM Stock Participation Transaction, the "**New Common Shares**") (such financing, the "**Equity Financing**") and (b) purchase or fund, as applicable, senior secured first lien notes (*i.e.*, the New Notes) in an aggregate principal amount of up to $537.5 million (the "**New Debt**" or the such financing, the "**Debt Financing**," and together with the Equity Financing, the "**Exit Financing**"). Under the Joint Proposal, the total enterprise value (the "**Joint Proposal Plan Enterprise Value**") is $5.4 billion with a plan equity value of $2.680 billion (assuming a payoff of Tranche 2 DIP Obligations and funding in connection with the PLM Stock Participation Transaction).

Among other things, the proceeds of the Exit Financing shall be used for: (a) refinancing all or a portion of the Tranche 2 Loans; (b) funding necessary costs of emerging from bankruptcy; (c) funding a cash out option to holders of the Debtors' general unsecured claims; (d) the refinancing or retiring of the total claims under the Tranche 1 Loans; (e) the PLM Stock Participation Transaction, as applicable; and (f) such other uses as shall be mutually agreed by the Company and the Required Commitment Parties.

## 23.   Mediation

On July 26, 2021 and July 28, 2021, the Restructuring Committee met with the Debtors' professionals to consider both Apollo's conversion proposal and the New Money Exit Financing

Proposals. After duly considering the merits of each of those proposals, following the July 28, 2021 meeting, the Restructuring Committee recommended to the Board that it proceed in accordance with Apollo's proposed terms, subject to higher and better proposals, to set a "floor" for creditor recoveries and to deliver Apollo with Final Valuation Materials. The Board of Directors decided to (i) seek an extension of the deadline to submit Final Valuation Materials from Apollo, (ii) seek a chambers' conference with the Judge Chapman to discuss entry of a Mediation Order (as defined below), and (iii) to deliver the Final Valuation Materials to Apollo.

Based upon the chambers conference with Judge Chapman, the Final Valuation Materials were not sent at that time and, on August 6, 2021, the Court entered the *Order Appointing the Honorable Sean H. Lane as Mediator* [Docket No. 1527] (the "**Mediation Order**"). Shortly thereafter, and pursuant to the confidentiality and other protections afforded to Mediation Parties by the Mediation Order, each of the Apollo Letter and the New Money Exit Financing Proposals were shared among and between the Mediation Parties. After multiple weeks of good-faith negations, on August 18, 2021, the Mediator and the Mediation Parties agreed that in order to further facilitate a global settlement, the Debtors would share their independent valuation with each of the Mediation Parties. Thereafter, on August 20, 2021, the Debtors first received the Joint Proposal. The Mediation is continuing with the consent of the Mediation Parties.

### 24. The Ad Hoc Group of Senior Noteholders

The Ad Hoc Group of Senior Noteholders formed on or about July 2020. On July 8, 2020, the Ad Hoc Group of Senior Noteholder engaged Akin Gump to represent the group in connection with the Chapter 11 Cases. Shortly thereafter, the Ad Hoc Group of Senior Noteholders engaged Nader, Hayaux y Goebel, S.C. as Mexican counsel and Ducera Securities LLC and Banco BTG Pactual S.C., as financial advisor (collectively with Akin Gump, the "**Ad Hoc Group Advisors**").

Since the inception of the Chapter 11 Cases, the Ad Hoc Group of Senior Noteholders, with the assistance of the Ad Hoc Group Advisors, has worked diligently with the Debtors and their professionals in order to help maximize the value of the estates for the benefit of all stakeholders and to facilitate a successful exit from chapter 11.

In addition, the Ad Hoc Group of Senior Noteholders spent the last several months of these Chapter 11 Cases conducting diligence and putting together exit financing proposals, as described above. Ultimately, certain members of the Ad Hoc Group of Senior Noteholders, together with the Trade Claimants Group, formed the Crossover Group and submitted the Joint Proposal to the Debtors, which provided for a Joint Proposal Plan Enterprise Value of $5.4 billion and a plan equity value of $2.680 billion (assuming a payoff of Tranche 2 DIP Obligations and funding in connection with the PLM Stock Participation Transaction).

### 25. Exit Financing Outcome

The Debtors and their advisors are continuing to actively negotiate with various stakeholders regarding an exit financing package based on the Joint Proposal, in order to resolve as many contingencies, and obtain as much stakeholder support, as practicable. The Joint Proposal, if consummated, would deliver the greatest value to its creditors and positions the Company for long-term profitability and growth.

**D.    Disclosure Statement Hearing and Confirmation Hearing**

On October 1, 2021, the Debtors filed the *Debtors' Motion to Approve the (I) Shortened Notice and Objection Periods for Debtors' Disclosure Statement Motion, (II) Adequacy of Information in the Disclosure Statement, (III) Solicitation and Voting Procedures (IV) Forms of Ballots, Notices and Notice Procedures in Connection Therewith, and (V) Certain Dates with Respect Thereto* (the "**Disclosure Statement Approval and Solicitation Motion**"). The hearing to consider the Disclosure Statement and Solicitation Motion was held on [October 21] at [9:00 a.m.] (prevailing Eastern Time). On [●], 2021, the Bankruptcy Court [entered the order] approving the relief sought in the Disclosure Statement Approval and Solicitation Motion (the "**Approval Order**").

The Confirmation Hearing will be held on [November 29] at [11:00 a.m.] (prevailing Eastern Time). The deadline to object to the confirmation of the Plan is [November 19, 2021] at [4:00] p.m. (prevailing Eastern Time). Pursuant to the terms of the Approval Order, the Debtors anticipate that notice of the Confirmation Hearing will be mailed to all known Holders of Claims and interests at least 28 days before the date by which objections to the Plan must be filed with the Bankruptcy Court.

## ARTICLE V

## SUMMARY OF THE PLAN

The Debtors believe that the Plan provides the best and most prompt possible recovery to Holders of Claims. The Debtors believe that (a) through the Plan, Holders of Allowed Claims will obtain a recovery from the Estates equal to or greater than the recovery that they would receive if the Debtors' assets were liquidated under chapter 7 of the Bankruptcy Code and (b) consummation of the Plan will maximize the recovery of the Holders of Allowed Claims.

The consummation of a plan is the principal objective of a chapter 11 case. A plan sets forth the means for satisfying claims against, and interests in, a debtor. Confirmation of a plan makes the plan binding upon the debtor and any creditor of, or equity holder in, the debtor, wherever located and whether or not such creditor or equity holder (a) is impaired under or has accepted or rejected (or did not vote) the plan or (b) receives or retains any property under the plan. Subject to certain limited exceptions and other than as provided in the plan itself or the confirmation order, a confirmation order discharges the debtor from any debt that arose prior to the effective date of the plan and substitutes therefor the obligations specified under the confirmed plan.

A chapter 11 plan may specify that the legal, contractual and equitable rights of the holders of claims or interests in certain classes are to remain unaltered by the plan. Such classes are referred to as "unimpaired" and, because of such favorable treatment, are deemed to accept the plan. Accordingly, a debtor need not solicit votes from the holders of claims or interests in such classes. A chapter 11 plan may also specify that certain classes will not receive any distribution of property or retain any claim against a debtor. Such classes are deemed not to accept the plan and, therefore, need not be solicited to vote to accept or reject the plan. Any classes that are

receiving a distribution of property under the plan but are not unimpaired will be solicited to vote to accept or reject the plan.

Prior to soliciting acceptances of the proposed plan, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding the plan.  To satisfy the requirements of section 1125 of the Bankruptcy Code, the Debtors are submitting this Disclosure Statement to Holders of Claims against the Debtors who are entitled to vote to accept or reject the Plan.

THE REMAINDER OF THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND MEANS FOR IMPLEMENTATION OF THE PLAN AND THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN. THIS SECTION IS QUALIFIED IN ITS ENTIRETY BY AND IS SUBJECT TO THE PLAN, AS WELL AS THE EXHIBITS THERETO AND DEFINITIONS THEREIN.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN.  REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN.

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN CONTROL THE ACTUAL TREATMENT OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS. UPON OCCURRENCE OF THE EFFECTIVE DATE, THE PLAN AND ALL SUCH DOCUMENTS WILL BE BINDING UPON ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS AND THEIR ESTATES AND ALL OTHER PARTIES IN INTEREST.  IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT, ON THE ONE HAND, AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, ON THE OTHER HAND, THE TERMS OF THE PLAN AND SUCH OTHER OPERATIVE DOCUMENT SHALL CONTROL.

STATEMENTS AS TO THE RATIONALE UNDERLYING THE TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN ARE NOT INTENDED TO, AND SHALL NOT, WAIVE, COMPROMISE, OR LIMIT ANY RIGHTS, CLAIMS, OR CAUSES OF ACTION IN THE EVENT THE PLAN IS NOT CONFIRMED.

## A.    Administrative Expense Claims and Priority Tax Claims

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims (including DIP Facility Claims, United States Trustee Fees, the Commitment Premiums and Fees and the Commitment Party Expense Reimbursement) and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III.

### 1.    *DIP Facility Claims*

(a)    **Treatment of Allowed Tranche 1 DIP Facility Claims**. Except to the extent a Holder of an Allowed Tranche 1 DIP Facility Claim and the Debtors agree to different treatment, on the Effective Date, or as soon as reasonably practicable thereafter, each Holder of an Allowed Tranche 1 DIP Facility Claim shall receive, on account of such Allowed Tranche 1 DIP Facility Claim, payment in full in Cash from the proceeds of the Debt Financing.

(b)    **Treatment of Allowed Tranche 2 DIP Facility Claims Exercising the Voluntary Equity Conversion.** Except to the extent that a Holder of an Allowed Tranche 2 DIP Facility Claim and the Debtors agree to different treatment, on the Effective Date, each Electing Tranche 2 Lender, including Delta, shall receive, on account of such Allowed Tranche 2 DIP Facility Claim (inclusive of the Conversion Exit Fee), New Stock, the amount of which will be determined based on Plan Equity Value (subject to dilution from the Management Incentive Plan) on the Effective Date on the terms set forth in Schedule 2.12 of the DIP Credit Agreement.

With respect to any Electing Tranche 2 Lender whose ownership interest in reorganized Grupo Aeroméxico is diluted in a manner not disclosed to such Electing Tranche 2 Lender at the time of such election, either due to a change in the price or number of shares that were issued, then, unless otherwise agreed by such Electing Tranche 2 Lender, the shares to be received by such Electing Tranche 2 Lender shall be adjusted to take that into account.

(c)    **Treatment of Allowed Tranche 2 DIP Facility Claims Receiving Cash.** Except to the extent that a Holder of an Allowed Tranche 2 DIP Facility Claim and the Debtors agree to different treatment, on the Effective Date, each Holder of an Allowed Tranche 2 DIP Facility Claim who did not exercise the Voluntary Equity Conversion Election shall receive, on account of such Allowed Tranche 2 DIP Facility Claim, payment in full in Cash, including, without limitation an exit fee, with the proceeds of the Equity Financing, and under the terms set forth in the DIP Credit Agreement.

(d)    **Payment of DIP Reimbursement Claims.** Treatment of Allowed Tranche 2 DIP Facility Claims Receiving Cash. Except to the extent that a Holder of a DIP Reimbursement Claim and the Debtors agree to different treatment, on the Effective Date, each Holder of a DIP Reimbursement Claim shall receive, on account of such DIP Reimbursement Claim, payment in full in Cash and under the terms set forth in the DIP Credit Agreement and the DIP Order.

### 2.    *Administrative Expense Claims*

(a)    **Time for Filing Administrative Expense Claims.** The Holder of an Administrative Expense Claim, other than a Holder of an Administrative Expense Claim that has been Allowed on or before the Effective Date (and, for the avoidance of doubt, other than a Holder of a DIP Facility Claim, a Professional Fee Claim, a Priority Tax Claim, or with respect to United States Trustee Fees, the Commitment Premiums and Fees and the Commitment Party Expense Reimbursement) must file with the Bankruptcy Court and serve on the Debtors, the Claims and Solicitation Agent, and the United States Trustee, proof of such Administrative Expense Claim by the Administrative Bar Date. Such Proof of Claim must include at a minimum: (i) the name of the applicable Debtor that is purported to be liable for the Administrative Expense Claim and if the

Administrative Expense Claim is asserted against more than one Debtor, the exact amount asserted to be owed by each such Debtor; (ii) the name of the Holder of the Administrative Expense Claim; (iii) the asserted amount of the Administrative Expense Claim; (iv) the basis of the Administrative Expense Claim; and (v) supporting documentation for the Administrative Expense Claim. FAILURE TO FILE AND SERVE SUCH PROOF OF ADMINISTRATIVE EXPENSE CLAIM TIMELY AND PROPERLY SHALL RESULT IN SUCH CLAIM BEING FOREVER BARRED, DISALLOWED AND DISCHARGED.    IF FOR ANY REASON ANY SUCH ADMINISTRATIVE EXPENSE CLAIM IS INCAPABLE OF BEING FOREVER BARRED, DISALLOWED AND DISCHARGED, THEN THE HOLDER OF SUCH CLAIM SHALL IN NO EVENT HAVE RECOURSE TO ANY PROPERTY TO BE DISTRIBUTED PURSUANT TO THE PLAN.  A notice setting forth the Administrative Bar Date will be (i) filed on the Bankruptcy Court's docket and served with the notice of the Effective Date and (ii) posted on the Debtors' Case Information Website.  No other notice of the Administrative Bar Date will be provided.

(b)    **Treatment of Administrative Expense Claims**. Except to the extent a Holder of an Allowed Administrative Expense Claim and the Debtor against which such Claim is asserted agree to different treatment, or as otherwise set forth in an order of the Bankruptcy Court (including pursuant to the procedures specified therein), as applicable, each Holder of an Allowed Administrative Expense Claim (other than a Holder of a DIP Facility Claim, a Professional Fee Claim, a Priority Tax Claim, or with respect to United States Trustee Fees, the Commitment Premiums and Fees and the Commitment Party Expense Reimbursement, the treatment of which is set forth elsewhere in the Plan) related to the Chapter 11 Cases will receive in full and final satisfaction of its Administrative Expense Claim an amount of Cash equal to the amount of such Allowed Administrative Expense Claim in accordance with the following: (1) if an Administrative Expense Claim is Allowed as of the Effective Date, on or as soon as reasonably practicable after the Effective Date (or, if not then due, when such Allowed Administrative Expense Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Expense Claim is not Allowed as of the Effective Date, no later than 60 days after the date on which either [(i) such Administrative Expense Claim is Allowed pursuant to the Claims Objection and Settlement Procedures Order], or (ii) an order Allowing such Administrative Expense Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Expense Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Expense Claim without any further action by the Holders of such Allowed Administrative Expense Claim; or (4) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.

### 3.    *Professional Fee Claims*

(a)    **Professional Fee Escrow Account**.  As soon as reasonably practicable after the Confirmation Date, and no later than one Business Day prior to the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and for no other Entities until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court. No Liens, Claims or interests shall encumber the

Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way. Such funds shall not be considered property of the Estates, the Debtors or the Reorganized Debtors. The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals from the funds held in the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by an order of the Bankruptcy Court; provided, however, that obligations with respect to Allowed Professional Fee Claims shall not be limited nor be deemed limited to funds held in the Professional Fee Escrow Account. When all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court, any remaining funds held in the Professional Fee Escrow Account shall promptly be paid to the Reorganized Debtors without any further notice to or action, order or approval of the Bankruptcy Court or any other Entity.

(b)    **Final Fee Applications**. All final requests for payment of Professional Fee Claims must be filed with the Bankruptcy Court by the date that is 45 calendar days after the Effective Date. Such requests shall be filed with the Bankruptcy Court and served as required by the Case Management Order; provided that if any Professional is unable to file its own request with the Bankruptcy Court, such Professional may deliver an original, executed copy and an electronic copy to the Debtors' attorneys at least three Business Days prior to the deadline, and the Debtors' attorneys shall file such request with the Bankruptcy Court. The objection deadline relating to the final requests shall be 4:00 p.m. (prevailing Eastern Time) on the date that is 14 calendar days after the filing deadline. If no objections are timely filed and properly served in accordance with the Case Management Order with respect to a given request, or all timely objections are subsequently resolved, such Professional shall submit to the Bankruptcy Court for consideration a proposed order approving the Professional Fee Claim as an Allowed Administrative Expense Claim in the amount requested (or otherwise agreed), and the order may be entered without a hearing or further notice to any party. The Allowed amounts of any Professional Fee Claims subject to unresolved timely objections shall be determined by the Bankruptcy Court at a hearing to be held no sooner than 10 calendar days after the objection deadline. Notwithstanding Section 5.3(a) of the Plan, distributions on account of Allowed Professional Fee Claims shall be made as soon as reasonably practicable after such Claims become Allowed.

(c)    **Payment of Interim Amounts**. Professionals shall be paid pursuant to the "Monthly Statement" process set forth in the Interim Compensation Order with respect to all calendar months ending prior to the Confirmation Date.

(d)    **Post-Confirmation Date Fees**. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors and Reorganized Debtors may employ and pay all Professionals in the ordinary course of business (including with respect to the month in which the Confirmation Date occurred) without any further notice to, action by or order or approval of the Bankruptcy Court or any other party.

### 4.    *United States Trustee Fees*

All United States Trustee Fees shall be paid on or before the Effective Date by the Debtors. After the Effective Date, the Reorganized Debtors shall assume liability for and shall pay, or cause

to be paid, any and all quarterly fees owed to the United States Trustee when due in accordance with applicable law, and shall continue to file, or cause to be filed, with the Bankruptcy Court quarterly reports to show the calculation of such fees for the Debtors' Estates. Each of the Debtors shall remain obligated to pay quarterly fees to the United States Trustee until such Debtor's Chapter 11 Case is closed, dismissed or converted to a case under chapter 7 of the Bankruptcy Code.

### 5.      *Priority Tax Claims*

Except to the extent a Holder of an Allowed Priority Tax Claim and the Debtor against which such Claim is asserted agree to different treatment, on the Effective Date or as soon as reasonably practicable thereafter, each Holder of an Allowed Priority Tax Claim shall receive, on account of such Allowed Priority Tax Claim, either Cash in an amount equal to the Allowed amount of such Claim or such other treatment as may satisfy section 1129(a)(9) of the Bankruptcy Code and the Mexican Federal Tax Code, Mexican Income Tax Law, Mexican Valued Added Tax Law, General Rules issued by the Ministry of Finance and Public Credit and/or any other law, act, rule, regulation or norm that allows Mexican tax authorities (including, without limitation, federal tax authorities, customs authorities, authorities of services of air navigation, etc.), as applicable and any other law, regulation, general rule and/or legislation, as may be applicable.

### 6.      *Commitment Premiums and Fees; Commitment Party Expense Reimbursement*

Subject to the terms and conditions of the Exit Financing Documents and the Exit Financing Commitment Order, the Exit Financing Obligations constitute Allowed Administrative Expense Claims with priority over all administrative expenses of the kind specified in sections 503(b) and 507 of the Bankruptcy Code, junior only to the DIP Loans (as defined in the DIP Credit Agreement) and shall be paid in full in New Stock or cash, as applicable, no later than the Effective Date or such earlier or other date(s), in each case as provided in the Exit Financing Documents and the Exit Financing Commitment Order, as applicable. The Exit Financing Obligations shall not be discharged, modified or otherwise affected by the Plan, dismissal of the Chapter 11 Cases or conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code.  Neither the Exit Financing Obligations nor any portion thereof shall be subject to disgorgement, setoff, disallowance, impairment, challenge, contest, attack, rejection, recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance or other claim, cause of action or other challenge of any nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise absent a final, non-appealable finding of gross negligence, willful misconduct, criminal conduct, or fraud by a Debt Financing Commitment Party or Equity Financing Commitment Party in connection with the Exit Financing Documents, as applicable, and, in any such case, solely with respect to such Debt Financing Commitment Party or Equity Financing Commitment Party.

**B.      Classification and Treatment of Claims and Interests**

*1.        Classification of Claims and Interests*

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation and distributions under the Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or Interest is classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent any portion of such Claim or Interest qualifies within the description of such other Classes. A Claim or Interest is also classified in a particular Class for the purpose of receiving distributions hereunder only to the extent such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been satisfied, released or otherwise settled prior to the Effective Date. In no event shall any Holder of an Allowed Claim or Allowed Interest be entitled to receive payments under the Plan that, in the aggregate, exceed the Allowed amount of such Holder's Claim or Interest.

The Plan constitutes a separate chapter 11 plan of reorganization for each Debtor. The Plan does not contemplate and is conditioned on there being no substantive consolidation of any of the Debtors. The classification of Claims and interests against each Debtor pursuant to the Plan shall not affect any Debtor's status as a separate legal entity, change the organization or corporate governance structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merge or consolidation of any legal entities, or cause the transfer of any assets; and, except as otherwise provided by or permitted under the Plan, all Debtors shall continue to exist as separate legal entities.

The following table designates the Classes of Claims against and interests in the Debtors and specifies which Classes are (a) Impaired or Unimpaired under the Plan, (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code or (c) presumed to accept or deemed to reject the Plan:

| Class | Claims or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Secured Claims against the Debtors | Unimpaired | Presumed to Accept |
| 2 | Other Priority Claims against the Debtors | Unimpaired | Presumed to Accept |
| 3(a) | Aerovías and Grupo Aeroméxico Recourse Claims against Grupo Aeroméxico and Aerovías | Impaired | Entitled to Vote |
| 3(b) | General Unsecured Claims against Grupo Aeroméxico | Impaired | Entitled to Vote |
| 3(c) | General Unsecured Claims against Aerovías | Impaired | Entitled to Vote |
| 3(d) | General Unsecured Claims against Aeroméxico Connect | Impaired | Entitled to Vote |
| 3(e) | General Unsecured Claims against Aeroméxico Cargo | Impaired | Entitled to Vote |
| [4(a) | Unsecured Convenience Class Claims against Grupo Aeroméxico | [·] | [·] |
| 4(b) | Unsecured Convenience Class Claims against Aerovías | [·] | [·] |
| 4(c) | Unsecured Convenience Class Claims against Aeroméxico Connect | [·] | [·] |
| 4(d) | Unsecured Convenience Class Claims against Aeroméxico Cargo] | [·] | [·] |
| 5(a) | Intercompany Claims against Grupo Aeroméxico | [·] | [·] |
| 5(b) | Intercompany Claims against Aerovías | [·] | [·] |
| 5(c) | Intercompany Claims against Aeroméxico Connect | [·] | [·] |

| Class | Claims or Interest | Status | Voting Rights |
|-------|--------------------|--------|---------------|
| 5(d) | Intercompany Claims against Aeroméxico Cargo | [·] | [·] |
| 6 | Intercompany Interests | [·] | [·] |
| 7 | Interests in Grupo Aeroméxico | Impaired | Deemed to Reject |

*2.*      **Treatment of Classes of Claims and Interests**

**(i)**      **Secured Claims against the Debtors (Class 1)**

a.      *Classification*: Class 1 consists of Secured Claims against any of the Debtors.

b.      *Treatment*: Except to the extent a Holder of an Allowed Secured Claim and the Debtor against which such Claim is asserted agree to different treatment, on the Effective Date, or as soon as reasonably practicable thereafter, each Holder of an Allowed Secured Claim shall receive, on account of such Allowed Claim, (i) payment in full in Cash in accordance with section 506(a) of the Bankruptcy Code, (ii) Reinstatement of such Allowed Claim pursuant to section 1124 of the Bankruptcy Code or (iii) such other treatment as may be necessary to render such Claim Unimpaired.

c.      *Impairment and Voting*: Secured Claims are Unimpaired under the Plan. Holders of Secured Claims are conclusively presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Secured Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Secured Claims.

**(ii)**      **Other Priority Claims against the Debtors (Class 2)**

a.      *Classification*: Class 2 consists of Other Priority Claims against any of the Debtors.

b.      *Treatment*: Except to the extent a Holder of an Allowed Other Priority Claim and the Debtor against which such Claim is asserted agree to different treatment, on the Effective Date, or as soon as reasonably practicable thereafter, each Holder of an Allowed Other Priority Claim shall receive, on account of such Allowed Claim, (i) payment in full in Cash or (ii) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

c.      *Impairment and Voting*: Other Priority Claims are Unimpaired under the Plan. Holders of Other Priority Claims are conclusively presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Other

Priority Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Other Priority Claims.

### (iii)    Aerovías and Grupo Aeroméxico Recourse Claims (Class 3(a))

a.    *Classification*: Class 3(a) consists of Aerovías and Grupo Aeroméxico Recourse Claims against Aerovías and Grupo Aeroméxico.

b.    *Allowance:* The Senior Notes Claims are Allowed in an amount of $411,355,556.

c.    *Treatment*: [Except to the extent a Holder of an Allowed Aerovías and Grupo Aeroméxico Recourse Claim against Aerovías and Grupo Aeroméxico and the applicable Debtor agree to different treatment on the Effective Date, or as soon as reasonably practicable thereafter, each Holder of an Allowed Aerovías and Grupo Aeroméxico Recourse Claim shall receive, at its option, either its Pro Rata share of (i) each of the Grupo Aeroméxico New Stock Allocation and the Aerovías New Stock Allocation or (ii) the Aerovías/Grupo Claimholder Cash Pool; *provided* that if the elections made by holders of Class 3(a) Claims would result in (x) less than the full amount of the Aerovías/Grupo Claimholder Cash Pool being distributed, such remaining amount (the "**Remaining Cash Pool**") shall be allocated to Classes 3(b), 3(c), 3(d) and 3(e) based upon the same allocation of New Stock to such Classes and correspondingly reduce the amount of New Stock to be received by the Holders of Allowed Claims in such Classes in an amount equal to such portion of the Remaining Cash Pool allocated to such Classes, and such New Stock instead shall be distributed to the Holders of Allowed Class 3(a) Claims that elect to receive New Stock so as to effectuate the last sentence of this paragraph or (y) more than the full amount of the Aerovías/Grupo Claimholder Cash Pool being distributed, such elections shall be reduced Pro Rata and each Holder of an Allowed Class 3(a) Claim shall receive additional New Stock in lieu of such reduced amount received from the Aerovías/Grupo Claimholder Cash Pool].  [The aggregate value of the consideration to be received by Holders of Allowed Class 3(a) Claims will be in an amount equal to the full amounts due and owing on account of such Claims as of the Petition Date, including any accrued and unpaid interest as of the Petition Date, but excluding any interest accruing after the Petition Date].

d.    *Impairment and Voting*: Aerovías and Grupo Aeroméxico Recourse Claims are Impaired under the Plan.  Holders of Aerovías and Grupo Aeroméxico Recourse Claims, including Senior Notes Claims, are entitled to vote to accept or reject the Plan, and the votes of such Holders will be solicited with respect to such Aerovías and Grupo Aeroméxico Recourse Claims, including Senior Notes Claims.

### (iv)    General Unsecured Claims against Grupo Aeroméxico (Class 3(b))

a.    *Classification*: 3(b) consists of General Unsecured Claims against Grupo Aeroméxico.

b.    *Treatment*: [Except to the extent a Holder of an Allowed General Unsecured Claim against Grupo Aeroméxico and Grupo Aeroméxico agree to different treatment, on the Effective Date, or as soon as reasonably practicable thereafter, each Holder of an Allowed General Unsecured Claim against Grupo Aeroméxico shall receive its Pro Rata share of the Grupo Aeroméxico New Stock Allocation, and, if applicable, its Pro Rata Share of the Remaining Cash Pool allocated to Class 3(b); *provided*, that cash received from the Remaining Cash Pool will correspondingly reduce the amount of New Stock to be received.].

c.    *Impairment and Voting*: General Unsecured Claims against Grupo Aeroméxico are Impaired under the Plan.  Holders of General Unsecured Claims against Grupo Aeroméxico are entitled to vote to accept or reject the Plan, and the votes of such Holders will be solicited with respect to such General Unsecured Claims against Grupo Aeroméxico.

### (v)    General Unsecured Claims against Aerovías (Class 3(c))

a.    *Classification*: Class 3(c) consists of General Unsecured Claims against Aerovías.

b.    *Treatment*: [Except to the extent a Holder of an Allowed General Unsecured Claim against Aerovías and Aerovías agree to different treatment, on the Effective Date, or as soon as reasonably practicable thereafter, each Holder of a General Unsecured Claim against Aerovías shall receive its Pro Rata share of the Aerovías New Stock Allocation and, if applicable, its Pro Rata Share of the Remaining Cash Pool allocated to Class 3(c); *provided*, that cash received from the Remaining Cash Pool will correspondingly reduce the amount of New Stock to be received.].

c.    *Impairment and Voting*: General Unsecured Claims against Aerovías are Impaired under the Plan.  Holders of General Unsecured Claims against Aerovías are entitled to vote to accept or reject the Plan, and the votes of such Holders will be solicited with respect to such General Unsecured Claims against Aerovías.

### (vi)    General Unsecured Claims against Aeroméxico Connect (Class 3(d))

a.    *Classification*: Class 3(d) consists of General Unsecured Claims against Aeroméxico Connect.

b.    *Treatment*: [Except to the extent a Holder of an Allowed General Unsecured Claim against Aeroméxico Connect and Aeroméxico Connect agree to different treatment, on the Effective Date, or as soon as reasonably practicable thereafter, each Holder of a General Unsecured Claim against Aeroméxico Connect shall receive its Pro Rata share of the Aeroméxico Connect New Stock Allocation and, if applicable, its Pro Rata Share of the Remaining Cash Pool allocated to Class 3(d); *provided*, that cash received from the Remaining Cash Pool will correspondingly reduce the amount of New Stock to be received.].

c.    *Impairment and Voting*: General Unsecured Claims against Aeroméxico Connect are Impaired under the Plan.  Holders of General Unsecured Claims against Aeroméxico Connect are entitled to vote to accept or reject the Plan, and the votes of such Holders will be solicited with respect to such General Unsecured Claims against Aeroméxico Connect.

**(vii)    General Unsecured Claims against Aeroméxico Cargo (Class 3(e))**

a.    *Classification:* Class 3(e) consists of General Unsecured Claims against Aeroméxico Cargo.

b.    *Treatment*: [Except to the extent a Holder of an Allowed General Unsecured Claim against Aeroméxico Cargo and Aeroméxico Cargo agree to different treatment, on the Effective Date, or as soon as reasonably practicable thereafter, each Holder of a General Unsecured Claim against Aeroméxico Cargo shall receive its Pro Rata share of the Aeroméxico Cargo New Stock Allocation and, if applicable, its Pro Rata Share of the Remaining Cash Pool allocated to Class 3(e); *provided*, that cash received from the Remaining Cash Pool will correspondingly reduce the amount of New Stock to be received.].

c.    *Impairment and Voting*: General Unsecured Claims against Aeroméxico Cargo are Impaired under the Plan.  Holders of General Unsecured Claims against Aeroméxico Cargo are entitled to vote to accept or reject the Plan, and the votes of such Holders will be solicited with respect to such General Unsecured Claims against Aeroméxico Cargo.

**(viii)    Unsecured Convenience Class Claims against Grupo Aeroméxico (Class 4 (a))**

a.    *Classification:* Class 4(a) consists of Unsecured Convenience Class Claims against Grupo Aeroméxico.

b.    *Treatment:* [Except to the extent a Holder of an Allowed Unsecured Convenience Class Claim against Grupo Aeroméxico and Grupo Aeroméxico agree to different treatment, on the Effective Date or as soon as reasonably practicable thereafter, each Holder of an Allowed Unsecured Convenience Class Claim against Grupo Aeroméxico shall receive, on account of such Allowed Claim against Grupo Aeroméxico, payment [of its Pro Rata share of [___]] in Cash].

c.    *Impairment and Voting*: [·].

**(ix)    Unsecured Convenience Class Claims against Aerovías (Class 4 (b))**

a.    *Classification:* Class 4(b) consists of Unsecured Convenience Class Claims against Aerovías.

b.    *Treatment*: [Except to the extent a Holder of an Allowed Unsecured Convenience Class Claim against Aerovías and Aerovías agree to different treatment,

on the Effective Date or as soon as reasonably practicable thereafter, each Holder of an Allowed Unsecured Convenience Class Claim against Aerovías shall receive, on account of such Allowed Claim against Aerovías, payment [of its Pro Rata share of [____]] in Cash].

c.    *Impairment and Voting*: [·].

**(x)    Unsecured Convenience Class Claims against Aeroméxico Connect (Class 4 (c))**

a.    *Classification:* Class 4(c) consists of Unsecured Convenience Class Claims against Aeroméxico Connect.

b.    *Treatment*: [Except to the extent a Holder of an Allowed Unsecured Convenience Class Claim against Aeroméxico Connect and Aeroméxico Connect agree to different treatment, on the Effective Date or as soon as reasonably practicable thereafter, each Holder of an Allowed Unsecured Convenience Class Claim against Aeroméxico Connect shall receive, on account of such Allowed Claim against Aeroméxico Connect, payment [of its Pro Rata share of [____]] in Cash].

c.    *Impairment and Voting*: [·].

**(xi)    Unsecured Convenience Class Claims against Aeroméxico Cargo (Class 4 (d))**

a.    *Classification*: Class 4(d) consists of Unsecured Convenience Class Claims against Aeroméxico Cargo.

b.    *Treatment*: [Except to the extent a Holder of an Allowed Unsecured Convenience Class Claim against Aeroméxico Cargo and Aeroméxico Cargo agree to different treatment, on the Effective Date or as soon as reasonably practicable thereafter, each Holder of an Allowed Unsecured Convenience Class Claim against Aeroméxico Cargo shall receive, on account of such Allowed Claim against Aeroméxico Cargo, payment [of its Pro Rata share of [____]] in Cash].

c.    *Impairment and Voting*: [·].

**(xii)    Intercompany Claims (Class 5 (a))**

a.    *[Classification*: Class 5 consists of Intercompany Claims against Grupo Aeroméxico.

b.    *Treatment*: Each Allowed Intercompany Claim against Grupo Aeroméxico shall, at the option of Grupo Aeroméxico, on or after the Effective Date, be Reinstated, extinguished, compromised, addressed, setoff, canceled, or settled, potentially without any distribution on account of such Claim.

c.    *Impairment and Voting*:  Holders of Allowed Intercompany Claims against Grupo Aeroméxico are conclusively deemed to have accepted the Plan pursuant to section 1126(f) or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.   Holders of Allowed Intercompany Claims against Grupo Aeroméxico are not entitled to vote to accept or reject the Plan.]

**(xiii)    Intercompany Claims (Class 5(b))**

a.    *[Classification:* Class 5 consists of Intercompany Claims against Aerovías.

b.    *Treatment*: Each Allowed Intercompany Claim against Aerovías shall, at the option of Aerovías, on or after the Effective Date, be Reinstated, extinguished, compromised, addressed, setoff, canceled, or settled, potentially without any distribution on account of such Claim.

c.    *Impairment and Voting*:  Holders of Allowed Intercompany Claims against Aerovías are conclusively deemed to have accepted the Plan pursuant to section 1126(f) or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Allowed Intercompany Claims against Aerovías are not entitled to vote to accept or reject the Plan.]

**(xiv)    Intercompany Claims (Class 5(c))**

a.    [*Classification:* Class 5(c) consists of Intercompany Claims against Aeroméxico Connect.

b.    *Treatment*: Each Allowed Intercompany Claim against Aeroméxico Connect shall, at the option of Aeroméxico Connect, on or after the Effective Date, be Reinstated, extinguished, compromised, addressed, setoff, canceled, or settled, potentially without any distribution on account of such Claim.

c.    *Impairment and Voting*:  Holders of Allowed Intercompany Claims against Aeroméxico Connect are conclusively deemed to have accepted the Plan pursuant to section 1126(f) or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Allowed Intercompany Claims against Aeroméxico Connect are not entitled to vote to accept or reject the Plan.]

**(xv)    Intercompany Claims (Class 5(d))**

a.    [*Classification:* Class 5(d) consists of Intercompany Claims against Aeroméxico Cargo.

b.    *Treatment*: Each Allowed Intercompany Claim against Aeroméxico Cargo shall, at the option of Aeroméxico Cargo, on or after the Effective Date, be Reinstated, extinguished, compromised, addressed, setoff, canceled, or settled, potentially without any distribution on account of such Claim.

c.    *Impairment and Voting*:  Holders of Allowed Intercompany Claims against Aeroméxico Cargo are conclusively deemed to have accepted the Plan pursuant to section 1126(f) or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Allowed Intercompany Claims against Aeroméxico Cargo are not entitled to vote to accept or reject the Plan.]

**(xvi)    Intercompany Interests (Class 6)**

a.    *Classification*: Class 6 consists of Intercompany Interests in Aerovías, Aeroméxico Connect and Aeroméxico Cargo, respectively.

b.    *Treatment*: [On the Effective Date, all existing Intercompany Interests shall be Reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.]

c.    *Impairment and Voting*: [Intercompany Interests are Unimpaired under the Plan. Holders of Intercompany Interests are conclusively presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.]

**(xvii)    Interests in Grupo Aeroméxico (Class 7)**

a.    *Classification*: Class 7 consists of Interests in Grupo Aeroméxico.

b.    *Treatment*: Holders of Interests in Grupo Aeroméxico's capital stock that (1) do not exercise their preemptive rights pursuant to a Statutory Equity Rights Offering (either by waiver or lack of exercise) will be diluted and any possible recovery related to such Interests shall be deemed waived and the owners of such Interests in Grupo Aeroméxico shall receive no distribution on account of such Interests and (2) do exercise their preemptive rights pursuant to a Statutory Equity Rights Offering will receive a Pro Rata share of the New Stock representing the subscription and payment of the exercised preemptive rights.

c.    *Impairment and Voting*:  [Interests in Grupo Aeroméxico are Impaired under the Plan. Holders of Interests in Grupo Aeroméxico are conclusively presumed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Interests in Grupo Aeroméxico are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Interests in Grupo Aeroméxico.]

*3.*    ***Special Provision Governing Unimpaired Claims***

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Debtors with respect to an Unimpaired Claim, including all rights with respect to legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

*4.*    ***Voting Classes; Presumed Acceptance by Non-Voting Classes***

With respect to each Debtor, if a Class contains Claims eligible to vote and no Holder of Claims eligible to vote in such Class votes to accept or reject the Plan by the Voting Deadline, the Plan shall be presumed accepted by the Holders of Claims in such Class.

### 5.    *Elimination of Vacant Classes*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the Voting Deadline shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

### 6.    *Subordinated Claims and Interests*

The allowance, classification and treatment of all Claims and Interests and their respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtors reserve the right to reclassify any Allowed Claim or Allowed Interest in accordance with any contractual, legal or equitable subordination relating thereto.

### 7.    *Intercompany Interests*

To the extent Reinstated under the Plan, distributions on account of Intercompany Interests are not being received by Holders of Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience, for the ultimate benefit of the Holders of the New Stock, and in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to make certain distributions to the Holders of Allowed Claims. For the avoidance of doubt, to the extent Reinstated pursuant to the Plan, on and after the Effective Date, all Intercompany Interests shall be owned by the same Reorganized Debtor that corresponds with the Debtor that owned such Intercompany Interests prior to the Effective Date (subject to the Restructuring Transactions).

### 8.    *Controversy Concerning Impairment*

If a controversy arises as to whether any Claims or interests, or any Class of Claims or interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

### 9.    *Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code*

If any Class of Claims is deemed to reject the Plan or is entitled to vote on the Plan and does not vote to accept the Plan, the Debtors may (a) seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code [with respect to such Classes] and/or (b) amend or modify the Plan in accordance with the terms hereof and the Bankruptcy Code.

**C.    Implementation of the Plan**

*1.*    [RESERVED]

*2.    Continued Corporate Existence*

Except as otherwise provided in the Plan, the Plan Documents or the Plan Supplement, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective incorporation deed and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such incorporation deed and bylaws (or other formation documents) are amended under the Plan, the New Corporate Governance Documents, the Registration Rights Agreement or otherwise.

*3.    Restructuring Transactions*

On or after the Confirmation Date, the Debtors or the Reorganized Debtors, as applicable, may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan that are consistent with and pursuant to the terms and conditions of the Plan, including, without limitation, the PLM Stock Participation Transaction, the Equity Financing, the Debt Financing, and all steps necessary to effectuate the Plan pursuant to any corporate governance obligation from any of the Debtors (collectively, the "**Restructuring Transactions**"). The Confirmation Order shall be deemed, pursuant to both section 1123 and section 363 of the Bankruptcy Code, to authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

*4.    Exemption from Registration Requirements for New Stock*

Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance and distribution of shares of the New Stock on account of the Equity Commitment Premium shall be exempt from, among other things, the registration and prospectus delivery requirements of section 5 of the Securities Act and any other applicable state and federal law of the United States requiring registration and/or delivery of a prospectus prior to the offering, issuance, distribution or sale of securities.  To the maximum extent provided by section 1145 of the Bankruptcy Code and applicable non-bankruptcy law, the offering, issuance and distribution of all other shares of the New Stock shall be exempt from, among other things, the registration and prospectus delivery requirements of section 5 of the Securities Act and any other applicable state and federal law of the United States requiring registration and/or delivery of a prospectus prior to the offering, issuance, distribution or sale of securities, subject to the provisions of section 1145(b)(1) of the Bankruptcy Code.

The offering, issuance and sale of the New Stock that are not exempt from registration under section 5 of the Securities Act and any other applicable securities laws is being made in reliance on the exemption from registration set forth in section 4(a)(2) of the Securities Act and/or Regulation D thereunder or, solely to the extent section 4(a)(2) of the Securities Act or Regulation

D thereunder is not available, any other available exemption from registration under the Securities Act. Such securities will be considered "restricted securities", will bear customary legends and transfer restrictions, and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act.

### 5.    *Cancellation of Notes, Instruments, Certificates and Other Documents*

On the Effective Date, except to the extent otherwise provided in the Plan and to the extent permitted by applicable law (including, without limitation, [Mexican law]), all notes, instruments, certificates, shares and other documents evidencing Claims or interests shall be canceled, and the obligations and duties of the Debtors or the Reorganized Debtors, the DIP Agent, and the Senior Notes Indenture Trustee thereunder,  or in any way related thereto shall be discharged and deemed satisfied in full, except that each of the foregoing shall continue in effect solely to the extent necessary to (a) allow Holders of Claims or interests described herein to receive distributions under the Plan; (b) allow the Debtors, the DIP Agent, and the Senior Notes Indenture Trustee, as applicable, to make post-Effective Date Distributions or take such other actions pursuant to the Plan on account of such Claims or interests; (c) allow Holders of Claims or interests to retain their respective rights and obligations vis-à-vis other Holders of Claims or interests pursuant to any such applicable document or instrument; (d) allow the DIP Agent and the Senior Notes Indenture Trustee to enforce their rights, claims, and interests vis-à-vis any party other than the Debtors, including, but not limited to, any indemnification rights or any rights with respect to priority or payment or to exercise charging liens (including the Senior Notes Indenture charging lien); (e) preserve any rights of the DIP Agent and/or the Senior Notes Indenture Trustee to payment of fees, expenses and indemnification obligations against money or property distributed to the lenders under the DIP Credit Agreement, including any rights of enforcement, rights to priority of payment or to maintain, exercise, and/or enforce charging liens; (f) preserve the rights of the DIP Agent and/or the Senior Notes Indenture Trustee to appear and be heard in these Chapter 11 Cases to the extent such rights exist, and (g) permit the DIP Agent and/or the Senior Notes Indenture Trustee to perform any function necessary to effectuate the foregoing. Notwithstanding the foregoing, any provision in any such agreement, instrument, note, certificates, indenture, mortgage, security document, or other instrument or document that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, the Debtors of their interests as a result of the cancellations, terminations, satisfaction, or releases provided for in this Article V shall be deemed null and void and shall be of no force and effect.

On and after the final distribution on account of the Allowed Senior Notes Claims, the Senior Notes shall be deemed to be worthless, and DTC shall take down the relevant positions at the request of the Senior Notes Indenture Trustee without any requirement of indemnification or security on the part of the Senior Notes Indenture Trustee.

On the Effective Date, the Debtors shall pay all reasonable and documented Senior Notes Indenture Trustee Fees that have accrued and are unpaid as of the Effective Date, without the need for further Bankruptcy Court approval, subject to receipt by the Debtors of invoices from the Senior Notes Indenture Trustee.  On and after the Effective Date, to the extent the Senior Notes Indenture Trustee provides services or incurs expenses, including professional fees, related to the Plan or the Senior Notes Indenture, including with respect to effectuation of any distributions under the Plan or any action the Debtors or Reorganized Debtors request to be taken, the Debtors or the

Reorganized Debtors, as applicable, shall pay all Senior Notes Indenture Trustee Fees within ten (10) Business Days of receipt by the Debtors or the Reorganized Debtors, as applicable, of an invoice from the Senior Notes Indenture Trustee. Notwithstanding this section, the Senior Notes Indenture Trustee shall have the right to exercise its charging lien for the payment of the Senior Notes Indenture Trustee's fees and expenses, to the extent not otherwise paid, against any and all distributions on account of the Senior Notes, including but not limited to any distribution made under the Plan or held by any Disbursing Agent or any other entity appointed to disburse distributions on account of Senior Notes Claims under the Plan.

### 6.    *Issuance of New Securities; Execution of Related Documents*

[On the Effective Date, all securities, notes, instruments, certificates and other documents required to be issued pursuant to the Restructuring Transactions, including the New Stock approved by the General Ordinary Shareholders Meeting of Grupo Aeroméxico (including on account of the Equity Commitment Premium) and the New First Lien Notes, shall be deemed as issued and distributed by the Disbursing Agent to the Entities entitled to receive the securities, notes, instruments, certificates and other documents pursuant to, and in accordance with, the terms of the Plan, the Subscription Agreement, the New First Lien Notes Indenture [and New First Lien Notes Purchase Agreement] and the New Corporate Governance Documents; *provided* that the New Stock shall be issued and registered before the CNBV of the Mexican National Commission of Securities and Banking (*Comisión Nacional Bancaria y de Valores*) and be listed at the Mexican Stock Exchange on the Effective Date. Any Entity receiving New Stock should coordinate all necessary actions in order for said Entity to be able to receive such shares.

In connection with the foregoing, Grupo Aeroméxico shall undertake and execute all necessary actions in order to comply with the terms and conditions of the Plan Documents. Each distribution and issuance of the New Stock shall be governed by the terms and conditions approved by the General Ordinary Shareholders Meeting, which shall be in accordance with and pursuant to the terms and conditions set forth in the Plan applicable to such distribution, issuance, and/or dilution, as applicable, and by the terms and conditions of the instruments evidencing or relating to such distribution, issuance, and/or dilution, as applicable, including the New Corporate Governance Documents, the terms and conditions of which shall bind each Entity receiving such distribution of the New Stock. Any Entity's receipt of New Stock shall be deemed as its acceptance and agreement to be bound by the New Corporate Governance Documents, as the same may be amended or modified from time to time following the Effective Date in accordance with their terms.

The delivery of the New Stock will be made by the issuance of a provisional share certificate issued by Grupo Aeroméxico in favor of the corresponding Holder of the New Stock.

### 7.    *Authorization and Issuance of New First Lien Notes*

On the Effective Date, Reorganized Grupo Aeroméxico issue the New First Lien Notes on the terms set forth in the Plan, the New First Lien Notes Indenture [and New First Lien Notes Purchase Agreement]. Pursuant to Section 4(a)(2) of the Securities Act and/or Regulation D promulgated thereunder, the offering, issuance, distribution and sale of New First Lien Notes (and the guarantees thereof) shall be exempt from, among other things, the registration and prospectus delivery requirements of Section 5 of the Securities Act and any other applicable law requiring

registration and/or delivery of prospectuses prior to the offering, issuance, distribution or sale of securities.

On the Effective Date, the New First Lien Notes Indenture [and New First Lien Notes Purchase Agreement] shall be executed and delivered. The Reorganized Debtors shall be authorized to execute, deliver, and enter into and perform under the New First Lien Notes Indenture [and New First Lien Notes Purchase Agreement] without the need for any further corporate or limited liability company action and without further action by the holders of Claims or Interests. Each of the New First Lien Notes Indenture [and New First Lien Notes Purchase Agreement] shall constitute legal, valid, binding, and authorized joint and several obligations of the applicable Debt Financing Commitment Parties and Reorganized Debtors, enforceable in accordance with their terms, and, except as provided for thereunder, such obligations shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination (including equitable subordination) under applicable law, the Plan, or the Confirmation Order and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law.

Confirmation of the Plan shall be deemed (i) approval of each of the New First Lien Notes Indenture [and New First Lien Notes Purchase Agreement], and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Debt Financing Commitment Parties and Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, and expenses as and when due provided for by the New First Lien Notes Indenture [and New First Lien Notes Purchase Agreement] and (ii) authorization to enter into and perform under the New First Lien Notes Indenture [and New First Lien Notes Purchase Agreement].

On the Effective Date, all Liens and security interests granted pursuant to, or in connection with the New First Lien Notes Indenture [and New First Lien Notes Purchase Agreement] (i) shall be deemed to be approved and shall, without the necessity of the execution, recordation, or filing of mortgages, security agreements, control agreements, pledge agreements, financing statements, or other similar documents, be valid, binding, fully perfected, fully enforceable Liens on, and security interests in, the property described in the New First Lien Notes Indenture [and New First Lien Notes Purchase Agreement], with the priorities established in respect thereof under applicable non-bankruptcy law, and (ii) shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law, the Plan or the Confirmation Order.

The Reorganized Debtors and the Persons granted Liens and security interests under the New First Lien Notes Indenture [and New First Lien Notes Purchase Agreement] are authorized to make all filings and recordings and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order without the need for any filings or recordings) and will thereafter cooperate to make all other filings and recordings that otherwise

would be necessary under applicable law to give notice of such Liens and security interests to third parties.

### 8.  *The Equity and Debt Financing*

The Debtors shall raise up to an aggregate of $1.1875 billion of equity capital through the Equity Financing and up to $537.5 million of debt through the Debt Financing.  In connection with the consummation of the Plan, the Equity Financing shall be consummated in accordance with the terms of the Equity Financing Commitment Letter, the Subscription Agreement, and the Plan Documents and the Debt Financing shall be consummated in accordance with the terms of the Debt Financing Commitment Letter and the Plan Documents, as applicable.

On the Effective Date, the Debtors shall consummate the Equity Financing, through which Reorganized Grupo Aeroméxico shall issue up to $1.1875 billion of New Stock plus New Stock on account of the Equity Commitment Premium.  The New Stock issued pursuant to the Equity Financing and on account of the Equity Commitment Premium shall be purchased and/or subscribed by the Equity Financing Commitment Parties on the terms and conditions set forth in the Equity Financing Commitment Letter and the Subscription Agreement.  Also on the Effective Date, the Debtors shall consummate the Debt Financing, through which Reorganized Grupo Aeroméxico shall issue up to $537.5 million in New First Lien Notes, which shall be purchased by the Debt Financing Commitment Parties on the terms and conditions set forth in the Debt Financing Commitment Letter, New First Lien Notes Indenture [and New First Lien Notes Purchase Agreement].

### 9.  *Corporate Action*

(a)    On or before the Effective Date, as applicable, and subject to applicable governmental authorizations, if any, all actions contemplated under the Plan or the Plan Supplement shall be deemed authorized and approved in all respects by the Board of Directors and at the General Ordinary Shareholders Meeting and General Extraordinary Shareholders Meeting of Grupo Aeroméxico, as the case may be, including: (a) adoption or assumption, as applicable, of the agreements with existing management; (b) ratification and/or designation of the directors, managers and officers for the Reorganized Debtors; (c) implementation of the Restructuring Transactions, including but not limited to any required amendments to Grupo Aeroméxico's bylaws, as the case may be; (d) rejection or assumption, as applicable, of Executory Contracts and Unexpired Leases; (e) the adoption and filing of the New Corporate Governance Documents; (f) the consummation of the PLM Stock Participation Transaction; (g) the issuance and distribution of the New Stock and the New First Lien Notes; (h) the applicable Reorganized Debtors' entry into the Registration Rights Agreement; and (i) all other acts or actions contemplated, or reasonably necessary or appropriate to promptly consummate the transactions contemplated under the Plan (whether to occur before, on or after the Effective Date).

(b)    On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized to issue, execute and deliver the agreements, documents, securities and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors, and any and all other agreements, documents, securities or

instruments related to the foregoing. The authorizations and approvals contemplated by this Article IV shall be effective and shall be replicated, to the extent required, for any corporate authorization or power of attorney required under Mexican common or commercial law.

### 10.    PLM Stock Participation Transaction

In addition to the following, further details regarding the PLM Stock Participation Transaction will be set forth in the Plan Supplement.

The Plan and the Confirmation Order shall authorize (but not direct the Debtors' entry into) the PLM Stock Participation Transaction pursuant to section 363 of the Bankruptcy Code under the terms and conditions of the PLM Stock Participation Transaction Agreement.  As a result of the PLM Stock Participation Transaction, PLM will become a wholly owned subsidiary of Reorganized Grupo Aeroméxico.

Subject to and in connection with the occurrence of the Effective Date, Grupo Aeroméxico, Aerovías, PLM and Aimia shall be authorized to take all such actions as may be necessary or appropriate to effect the PLM Stock Participation Transaction on the terms and subject to the conditions to be set forth in the PLM Stock Participation Transaction Agreement. Without limiting the generality of the immediately preceding sentence, upon the satisfaction or waiver of each of the conditions set forth in Section 9.1 of the Plan and the applicable conditions of the PLM Stock Participation Transaction Agreement, on the Effective Date, Grupo Aeroméxico, Aerovías, PLM and Aimia shall be authorized to take or cause to be taken all actions, including making appropriate filings or recordings, that may be required by applicable law in connection with the PLM Stock Participation Transaction.

In the event of any conflict whatsoever between the terms of the Plan and the PLM Stock Participation Transaction Agreement with respect to the PLM Stock Participation Transaction, the terms of the PLM Stock Participation Transaction Agreement shall control, and the Plan shall be deemed to incorporate in their entirety the terms, provisions and conditions of the PLM Stock Participation Transaction Agreement.

### 11.    New Corporate Governance Documents

(a)    The Required Equity Commitment Parties, the Debtors and Delta shall use commercially reasonable efforts to determine the substance of New Corporate Governance Documents which are mutually acceptable to the Required Equity Commitment Parties, the Debtors and Delta, and in compliance with Mexican law.

(b)    On or immediately before the Effective Date, Reorganized Grupo Aeroméxico shall obtain, if necessary and applicable, authorization from the General Direction of Foreign Investment of the Ministry of Economy regarding the New Corporate Governance Documents and/or other applicable authorities in its jurisdiction of incorporation in accordance with the applicable laws of its respective jurisdiction of incorporation, to the extent required for such New Corporate Governance Documents to become effective.  Pursuant to section 1123(a)(6) of the Bankruptcy Code, the New Corporate Governance Documents will prohibit the issuance of non-voting equity securities, but only to the extent required by section 1123(a)(6) of the Bankruptcy Code; provided, however, that any such restriction will not apply to non-voting shares required to

be issued pursuant to Mexican Foreign Investment Law.  After the Effective Date, Reorganized Grupo Aeroméxico may amend and restate its New Corporate Governance Documents and constituent documents as permitted by the laws of its jurisdiction of formation and the terms of such documents.

(c)      [The bylaws of Reorganized Grupo Aeroméxico shall continue to provide, with requisite government authorization, if any, that foreign investment, including neutral investment, shall never represent more than 90% of the total equity, and any foreign investor not considered a Mexican Person shall never vote more than 49% of the total voting outstanding shares].

## 12.     Directors and Officers

(a)      On the Effective Date, the terms of the current members of the board of directors of each of the Debtors shall expire, unless such member is selected as a member of the New Board in accordance with the terms of the Equity Financing Commitment Letter and the Subscription Agreement, as applicable.  The members of the New Board shall be determined in accordance with the terms of the Equity Financing Commitment Letter and the Subscription Agreement, as applicable, (subject to any applicable required prior approval by each General Ordinary Shareholders Meeting of Grupo Aeroméxico and the board of each other Debtor, individually). Compensation for the officers of each of the Debtors shall be set forth in the Plan Supplement.

(b)      On the Effective Date, the officers and overall management structure of each of the Debtors, and all officers and management decisions with respect to each of the Debtors (and/or any of their direct or indirect subsidiaries), and affiliate transactions shall only be subject to the approval of their respective board of directors.  From and after the Effective Date, each director, officer or manager of the Reorganized Debtors shall be appointed and serve pursuant to the terms of their respective charters and bylaws or other formation and constituent documents, the New Corporate Governance Documents and applicable laws of the respective Reorganized Debtor's jurisdiction of formation.

## 13.     Effectuating Documents; Further Transactions

On and after the Effective Date, the Reorganized Debtors, and the officers and members of the boards of directors and managers thereof, are authorized to and shall issue, execute, deliver, file or record such contracts, securities, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan, the PLM Stock Participation Transaction, the Statutory Equity Rights Offering,  the Equity Financing, the Debt Financing, the New Corporate Governance Documents and the securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations or consents except for those expressly required under the Plan, it being understood that all such actions contemplated hereby shall be consistent in all respects with the Plan.

## 14.     Management Incentive Plan

[Up to [•]% of the fully diluted New Stock shall be reserved for the Management Incentive Plan. [•]% of the Management Incentive Plan New Stock shall be granted on the Effective Date

and shall vest over a period of [•] years following the Effective Date on a schedule to be mutually agreed among the Required Equity Commitment Parties, Delta and the Debtors.

The Required Equity Commitment Parties, Delta and the Debtors shall negotiate in good faith regarding the additional material terms of the Management Incentive Plan, which shall be on market terms, [in consultation with the Creditors' Committee] and to be acknowledged and implemented, in due course, by the New Board as set forth in the Plan; *provided*, that to the extent the additional material terms cannot be agreed to in the reasonable discretion of the Required Equity Commitment Parties, Delta and the Debtors, the material terms of the Management Incentive Plan shall be determined by the New Board.

The New Board, directly, or through its compensation committee, shall be authorized to take all actions to adopt, supervise and implement the Management Incentive Plan including, without limitation, to enact and enter into related policies and agreements, and grant awards under the Management Incentive Plan to participants in such forms and subject to the material terms and conditions (including anti-dilution protections and vesting conditions) set forth in the Plan Supplement and with additional terms to be determined by the New Board.

[Members of Grupo Aeroméxico's executive management team shall be entitled to receive the Management True-Up Payment in an aggregate amount of $[•] million, based upon such members' contribution to the Company during the pendency of, and the Debtors' emergence from, their Chapter 11 Cases, subject to further discussion and agreement by the Required Equity Commitment Parties, Grupo Aeroméxico's executive management team, Delta and the [independent members][compensation committee] of Grupo Aeroméxico's Board of Directors.]]

### 15.  *Sources of Consideration for Plan Distributions*

The Debtors shall fund distributions under the Plan with (a) the proceeds of the Equity Financing; (b) the proceeds of the Debt Financing; and (c) Cash on hand. Each distribution and issuance referred to in this Article IV shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

### 16.  *Closing of Chapter 11 Cases*

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases; provided, however, that, as of the Effective Date, the Reorganized Debtors may submit separate orders previously provided to the United States Trustee to the Bankruptcy Court under certification of counsel closing certain individual Chapter 11 Cases and changing the caption of the Chapter 11 Cases accordingly; provided further that matters concerning Claims may be heard and adjudicated in one of the Debtors' Chapter 11 Cases that remains open regardless of whether the applicable Claim is against a Debtor in a Chapter 11 Case that is closed.

### D.    Provisions Governing Distributions

#### 1.    *Disbursing Agent*

Except as otherwise provided in the Plan, the Disbursing Agent shall make all distributions required under the Plan, except with respect to a Holder of a Claim or Interest whose distribution is governed by an agreement and is administered by a Servicer, which distributions shall be deposited with the appropriate Servicer for distribution to the Holders of Claims or Interests in accordance with the provisions of the Plan and the terms of the governing agreement. Plan Distributions on account of such Claims or Interests shall be deemed complete upon delivery to the appropriate Servicer; *provided*, *however*, that if any such Servicer is unable to make such distributions, the Disbursing Agent, with the cooperation of such Servicer, shall make such distributions to the extent reasonably practicable to do so. The DIP Agent will be considered the Servicer for DIP Facility Claims other than DIP Reimbursement Claims and the Senior Notes Indenture Trustee will be considered the Disbursing Agent for Senior Notes Claims.

The Reorganized Debtors shall be authorized, without further Bankruptcy Court approval, to reimburse any Servicer for their reasonable and customary servicing fees and expenses incurred in providing postpetition services directly related to Plan Distributions. These reimbursements will be made on terms agreed to with the Reorganized Debtors and will not be deducted from distributions to be made pursuant to the Plan to Holders of Allowed Claims or Interests, as applicable, receiving Plan Distributions from a Servicer.

Notwithstanding any provision of the Plan to the contrary, any distributions to a Holder of a Senior Notes Claim shall be made to or at the direction of the Senior Notes Indenture Trustee which shall act as Disbursing Agent for distributions to such Holders in accordance with the Plan and the Senior Notes Indenture. The Senior Notes Indenture Trustee shall not incur any liability whatsoever on account of any distributions under the Plan except for gross negligence or willful misconduct. Notwithstanding anything to the contrary herein, such distributions shall be subject in all respects to any rights of the Senior Notes Indenture Trustee to assert a charging lien against such distributions. The Senior Notes Indenture Trustee may transfer or direct the transfer of such distributions directly through the facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise) and will be entitled to recognize and deal for all purposes under the Plan with such respective Holders of Allowed Senior Notes Claims to the extent consistent with the customary practices of DTC; provided, that, for the avoidance of doubt, any charging lien asserted by the Senior Notes Indenture Trustee shall attach to the property to be distributed in the same manner as if such distributions were made through the Senior Notes Indenture Trustee. All distributions to be made to Holders of Allowed Senior Notes Claims shall be eligible to be distributed through the facilities of DTC and as provided for under the Senior Notes Indenture.

#### 2.    *Rights and Powers of Disbursing Agent*

The Disbursing Agent shall be empowered to (a) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Plan, (b) make all distributions contemplated by the Plan, (i) employ professionals to represent it with respect to its responsibilities and (ii) exercise such other powers as may be vested in the Disbursing

Agent by order of the Bankruptcy Court, pursuant to the Plan or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

The Disbursing Agent shall only be required to act and make Plan Distributions in accordance with the terms of the Plan, and shall have no liability for actions taken in accordance with the Plan or in reliance upon information provided to it in accordance with the Plan or obligation or liability for Plan Distributions under the Plan to any party who does not hold an Allowed Claim or an Allowed Interest at the time of such distribution or who does not otherwise comply with the terms of the Plan; *provided*, *however*, that the foregoing shall not affect the liability that otherwise would result from any such act or omission to the extent such act or omission is determined by a Final Order to have constituted willful misconduct, gross negligence, intentional fraud or criminal conduct of any such Person. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

3. *Timing and Delivery of Distributions*

(i) **Timing**

Subject to any reserves or holdbacks established pursuant to the Plan, and taking into account the matters discussed in Article III and Section 5.4 of the Plan, on the appropriate Distribution Date or as soon as practicable thereafter, Holders of Allowed Claims and Allowed Interests against the Debtors shall receive the distributions provided for Allowed Claims and Allowed Interests in the applicable Classes as of such date. Plan Distributions on account of General Unsecured Claims Allowed as of the Effective Date, other than on account of Senior Notes Claims Allowed as of the Effective Date (for which distributions shall be made on the Effective Date), shall be made on or as soon as reasonably practicable after the Initial Distribution Date.

If and to the extent there are Disputed Claims or Disputed Interests as of the Effective Date, distributions on account of such Disputed Claims or Disputed Interests (which will only be made if and when they become Allowed Claims or Allowed Interests, as applicable) shall be made pursuant to the provisions set forth in the Plan on or as soon as reasonably practicable after the next Distribution Date that is at least 20 calendar days after the Allowance of each such Claim or Interest; provided, however, that distributions on account of the Claims set forth in [Article II] of the Plan shall be made as set forth therein and Professional Fee Claims shall be made as soon as reasonably practicable after their Allowance. Because of the size and complexities of the Chapter 11 Cases, the Debtors at the present time cannot accurately predict the timing of the Final Distribution Date.

(ii) **De Minimis Distributions**

[Holders of Allowed Claims or Allowed interests entitled to distributions of [$100] or less shall not receive Plan Distributions, and each Claim or Interest to which this limitation applies shall be discharged pursuant to Article VII of the Plan, and its Holder shall be forever barred pursuant to Article VII of the Plan from asserting that Claim or Interest against the Reorganized Debtors or their property. Cash that otherwise would be payable under the Plan to Holders of

Allowed Claims or interests but for Section 5.3(b) of the Plan shall be available for distributions to Holders of other Allowed Claims or Interests].

### (iii)    Distribution Record Date

Except as otherwise provided in the Plan, Plan Distributions shall only be made to the record holders of such Allowed Claims or Allowed Interests as of the Distribution Record Date. On the Distribution Record Date, at the close of business for the relevant register, all registers maintained by the Debtors, Disbursing Agent, mortgagees, other Servicers and each of the foregoing's respective agents, successors and assigns shall be deemed closed for purposes of determining whether a holder of such a Claim or Interest is a record holder entitled to distributions under the Plan. The Debtors, Reorganized Debtors, Disbursing Agent, mortgagees, other Servicers and all of their respective agents, successors and assigns shall have no obligation to recognize, for purposes of distributions pursuant to or in any way arising from the Plan (or for any other purpose), any Claims or Interests that are transferred after the Distribution Record Date. Instead, they shall be entitled to recognize only those record holders set forth in the registers as of the Distribution Record Date, irrespective of the number of distributions made under the Plan or the date of such distributions. Furthermore, if a Claim or Interest other than one based on a publicly traded equity security, note, bond or debenture (as set forth in Bankruptcy Rule 3001(e)) is transferred 20 or fewer calendar days before the Distribution Record Date, the Disbursing Agent shall make distributions to the transferee only if the transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor. For the avoidance of doubt, the Distribution Record Date shall not apply to the Senior Notes or any other debt or equity securities of the Debtors deposited with DTC, the holders of which shall receive a distribution in accordance with the customary procedures of DTC.]

If any dispute arises as to the identity of a Holder of an Allowed Claim or Allowed Interest that is entitled to receive a Plan Distribution, the Disbursing Agent or the Servicer, as applicable, may, in lieu of making such distribution to such person, make the distribution into an escrow account until the disposition thereof is determined by Final Order or by written agreement among the interested parties to such dispute.

Subject to Bankruptcy Rule 9010, a distribution to a Holder of an Allowed Claim may be made by the Disbursing Agent, in its sole discretion: (i) to the address set forth on the first page of the Proof of Claim filed by such Holder (or at the last known addresses of such Holder if no Proof of Claim is filed or if the Debtors have been notified in writing of a change of address), (ii) to the address set forth in any written notice of an address change delivered to the Disbursing Agent after the date of any related Proof of Claim, (iii) to the address set forth on the Schedules filed with the Bankruptcy Court, if no Proof of Claim has been filed and the Disbursing Agent has not received a written notice of an address change, (iv) in the case of a Holder whose Claim is governed by an agreement and administered by a Servicer, to the address contained in the official records of such Servicer or (v) at the address of any counsel that has appeared in the Chapter 11 Cases on such holder's behalf.

### (iv)    Delivery of Distributions

Subject to the provisions of Section 5.4 of the Plan, with respect to Holders of Allowed Senior Notes Claims, distributions shall only be made to Holders of such Allowed Claims who surrender their Senior Notes in accordance with the provisions of Section 5.2(d) of the Plan:

With respect to any holder of an Allowed Claim relating to a note that is a [CEBURES] or promissory note, such holder shall either (x) surrender such note to the Disbursing Agent or (y) with respect to an note in certificated form that is governed by an agreement and administered by a Servicer, surrender such note to the respective Servicer (along with a letter of transmittal to be provided by the Servicer or the Disbursing Agent), and such note shall be canceled. No distribution of property hereunder shall be made to or on behalf of any holder of an Allowed Claim relating to a [CEBURES] or promissory note unless and until such note is received by the Disbursing Agent or the appropriate Servicer.  In the event of the loss, theft or destruction of a note certificate, the unavailability of such note certificate or promissory note must be reasonably established to the satisfaction of the Disbursing Agent or the respective Servicer, including by executing and delivering (x) an affidavit of loss setting forth the unavailability of the note or promissory note, as applicable, reasonably satisfactory to the Disbursing Agent or the respective Servicer and (y) such additional security or indemnity as may be reasonably required.  A distribution to a holder of an Allowed Claim relating to an note that is a [CEBURES] or promissory note may be made by the Disbursing Agent, in its sole discretion: (x) to the address of the Holder thereof or (y) to the address indicated in any letter of transmittal submitted to the Servicer by a Holder.

With respect to any Allowed Claim relating to a note that is held in the name of, or by a Nominee of, DTC, the Disbursing Agent shall seek the cooperation of DTC to facilitate distributions to Holders in exchange for such notes.

Any holder of an Allowed Claim relating to a note who fails to surrender such note in accordance with Section 5.2(d) of the Plan within one year after the Effective Date shall be deemed to have forfeited all rights and Claims in respect of such note and shall not participate in any distribution hereunder, and all property in respect of such forfeited distribution, including any dividends or interest attributable thereto, shall revert to [Reorganized Grupo Aeroméxico,], notwithstanding any federal or state escheat laws to the contrary.

Notwithstanding the foregoing, Section 5.2(d) of the Plan shall not apply to any Claims Reinstated pursuant to the terms of the Plan or any Claims relating to notes not being canceled under the Plan.]

### 4.    *Manner of Payment Under Plan*

At the option of the Debtors, any Cash payment to be made hereunder may be made by check, wire transfer or any other customary payment method.

The Disbursing Agent shall make distributions of New Stock or Cash as required under the Plan on behalf of the applicable Reorganized Debtor. [Where the applicable Reorganized Debtor is a subsidiary of Reorganized Grupo Aeroméxico, Reorganized Grupo Aeroméxico shall be deemed to have made a direct or indirect capital contribution to the applicable Reorganized Debtor of an amount of New Stock or Cash to be distributed to the Creditors of such Debtor, but only at such time as, and to the extent that, the amounts are actually distributed to Holders of Allowed

Claims or Allowed Interests.  Any distributions of New Stock or Cash that revert to Reorganized Grupo Aeroméxico or are otherwise canceled (such as to the extent any distributions have not been claimed within one year or are forfeited pursuant to Section 5.2]) shall revest solely in Reorganized Grupo Aeroméxico, and no other Reorganized Debtor shall have (nor shall it be considered to ever have had) any ownership Interest in such amounts.]

### 5.      *Allocation of Plan Distributions Between Principal and Interest*

[To the extent that any Allowed Claim entitled to a distribution under the Plan is based upon any obligation or instrument that is treated for federal income tax purposes as indebtedness of any Debtor and other amounts (such as accrued but unpaid interest thereon), such distribution shall be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts.]

### 6.      *No Postpetition or Default Interest on Claims*

Unless otherwise provided for in the Plan or the Confirmation Order or required by the Bankruptcy Code, no Holder of a Claim shall be entitled to (a) interest accruing on or after the Petition Date on any such Claim, or interest at the contract default rate, as applicable, or (b) penalties on any Claim. Any such interest or penalty component of any such Claims, if Allowed, shall be paid only in accordance with section 726(b) of the Bankruptcy Code.

### 7.      *Foreign Currency Exchange Rate*

As of the Effective Date, any General Unsecured Claim or Interest asserted in Mexican pesos shall be automatically deemed converted using the applicable conversion rate in place on the Petition Date determined by the *Banco de México* (The Central Bank of Mexico) as published in the *Diario Oficial de la Federación* (Federal Gazette of the Federation) on the Petition Date, in accordance with the Bar Date Order.  As of the Effective Date, any General Unsecured Claim or Interest asserted in a currency other than U.S. dollars and Mexican pesos shall be automatically deemed converted—by first converting any such General Unsecured Claim or Interest to Mexican pesos and then converting each such Claim from Mexican pesos to United States dollars—based on the applicable conversion rate in place on the Petition Date from *Banco de México* (The Central Bank of Mexico).

### 8.      *Fractional Shares*

Notwithstanding any other provision in the Plan to the contrary, no fractional shares of New Stock will be issued or distributed under the Plan.  The actual distribution of shares of New Stock on the applicable Distribution Date will be rounded to the next higher or lower whole number as follows: (i) fractions less than one-half (½) shall be rounded to the next lower whole number and (ii) fractions equal to or greater than one-half (½) shall be rounded to the next higher whole number.  If two or more Holders are entitled to equal fractional entitlements and the number of Holders so entitled exceeds the number of whole shares, as the case may be, which remain to be allocated, the Debtors shall allocate the remaining whole shares to such Holders by random lot or such other impartial method as the Debtors deem fair, in the Debtors' sole discretion. No consideration will be provided in lieu of fractional shares that are rounded down. Upon the

allocation of all of the whole New Stock authorized under the Plan, all remaining fractional portions of the entitlements shall be canceled and shall be of no further force and effect.

### 9.     Undeliverable Distributions and Unclaimed Property

If any Plan Distribution is returned as undeliverable or is otherwise unclaimed, no further distributions to the applicable Holder of an Allowed Claim or Allowed Interest shall be made unless and until the Disbursing Agent or appropriate Servicer is notified in writing of such Holder's then-current address, at which time the undeliverable distribution shall be made to such Holder without interest or dividends. Undeliverable distributions shall be returned to the Reorganized Debtors until such distributions are claimed. Any Holder of an Allowed Claim or Allowed Interest that does not claim an undeliverable or unclaimed distribution within 90 calendar days after the date such distribution was returned undeliverable shall be deemed to have forfeited its Claim or Interest for such undeliverable or unclaimed distribution and shall be forever barred and enjoined from asserting any such Claim or Interest for an undeliverable or unclaimed distribution against the Debtors, the Reorganized Debtors, the Disbursing Agent and each of the foregoing's respective agents, attorneys, representatives, employees or independent contractors and/or any of its or their property. Nothing contained in the Plan shall require the Reorganized Debtors or the Disbursing Agent to attempt to locate any Holder of an Allowed Claim or Allowed Interest.

All title to and all beneficial interests in the Cash relating to such undeliverable or unclaimed distribution, including any dividends or interest attributable thereto, shall automatically revert to the Reorganized Debtors. The reversion of such Cash shall be without need for a further order by the Bankruptcy Court and shall be free of any restrictions thereon notwithstanding any federal or state escheat laws to the contrary.

Any Plan Distribution of New Stock under the Plan on account of an Allowed Claim or Allowed Interest relating to such undeliverable or unclaimed distribution shall be deemed forfeited and such New Stock shall be canceled notwithstanding any state, federal, foreign or other escheat or similar laws to the contrary without need for a further order by the Bankruptcy Court, and the entitlement by the Holder of such unclaimed Allowed Claim to such Plan Distribution or any subsequent Plan Distribution on account of such Allowed Claim shall be extinguished and forever barred.

### 10.    Claims Paid or Payable by Third Parties

### (i)    Claims Paid by Third Parties.

To the extent a Holder of a Claim receives a distribution on account of a Claim and also receives payment (before or after the Effective Date) from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within 30 calendar days of receipt thereof, repay and/or return the distribution to the Reorganized Debtors, to the extent such Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of the Claim as of the date of any such distribution under the Plan.

The Claims and Solicitation Agent shall reduce in full or part a Claim on the official claims register, without a claims objection having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court, to the extent that such Holder receives payment on

account of such Claim from a party that is not a Debtor or a Reorganized Debtor; *provided*, *however*, that to the extent the non-Debtor party rendering the payment is subrogated to such Holder's Claim, the non-Debtor party shall have a [30]-calendar-day grace period from the date of payment to notify the Claims and Solicitation Agent of such subrogation rights.

### (ii)    Claims Payable by Third Parties.

To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged (to the extent of any agreed-upon satisfaction) on the official claims register by the Claims and Solicitation Agent without a claims objection having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court.

### 11.    *Setoffs and Recoupments*

The Debtors and Reorganized Debtors may, but shall not be required to, setoff or recoup against any Claim and any distribution to be made on account of such Claim, any and all claims, rights and Causes of Action of any nature whatsoever (to the extent permitted by applicable law) that the Debtors may have against the Holder of such Claim pursuant to the Bankruptcy Code or applicable non-bankruptcy law; *provided*, *however*, that neither the failure to effect such a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver, abandonment or release by the Debtors or the Reorganized Debtors of any such claims, rights and Causes of Action that the Debtors or the Reorganized Debtors may have against the Holder of such Claim.

### 12.    *Withholding and Reporting Requirements*

### (i)    Withholding Rights

In connection with the Plan, to the extent applicable, the Reorganized Debtors and the Disbursing Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. All Holders of Claims or Interests shall be required to provide any information necessary to allow the Reorganized Debtors and the Disbursing Agent to comply with all withholding, payment and reporting requirements with respect to such taxes. The Reorganized Debtors and the Disbursing Agent reserve the right to withhold the full amount required by law on any distribution on account of any Holder of an Allowed Claim or an Allowed Interest that fails to timely provide to the Reorganized Debtors and the Disbursing Agent the required information. The Reorganized Debtors reserve the right to allocate all Plan Distributions in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, liens and

encumbrances. For the avoidance of doubt, any amounts withheld pursuant to Section 5.12 of the Plan shall be treated as if distributed to the Holder of the Allowed Claim or Allowed Interest.

### (ii)    Obligation

Notwithstanding the above, each Holder of an Allowed Claim or Allowed Interest that is to receive a Plan Distribution shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such Holder by any Governmental Unit, including income, withholding and other tax obligations, on account of such Plan Distribution.

## E.    Disputed Claims or Interests

### 1.    Objections to Claims or Interests

After the Effective Date, except as otherwise provided in the Plan, objections to Claims against or Interests in the Debtors may be interposed and prosecuted only by the Reorganized Debtors; *provided, however*, that the Reorganized Debtors shall not be entitled to object to any Claim or Interest that has been expressly allowed by Final Order or under the Plan.  Except as otherwise provided in Article II of the Plan with respect to Administrative Expense Claims, any objections to Claims or Interests shall be served on the respective Holders of such Claims or Interests and filed with the Bankruptcy Court (a) on or before [one year] following the later of (i) the Effective Date and (ii) the date that a Proof of Claim is filed or amended or a Claim or Interest is otherwise asserted or amended in writing by or on behalf of a Holder of such Claim or Interest or (b) on such later date as may be fixed by the Bankruptcy Court. For the avoidance of doubt, except as otherwise provided in the Plan, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest.

Any Claims filed after the applicable Bar Date (including, for the avoidance of doubt and without limitation, the Administrative Bar Date) shall be Disallowed and forever barred, estopped and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any further notice to, or action, order or approval of, the Bankruptcy Court.

Claims or Interest objections filed before, on or after the Effective Date shall be filed, served and administered in accordance with the Claims Objection and Settlement Procedures Order, which shall remain in full force and effect; *provided*, *however*, that, on and after the Effective Date, filings and notices need only be served on the relevant claimants and otherwise as required by the Case Management Order.

### 2.    Resolution of Disputed Claims or Interests

On and after the Effective Date, the Reorganized Debtors shall have the authority to compromise, settle, otherwise resolve or withdraw any objections to Claims or Interests and to compromise, settle or otherwise resolve any Disputed Claims or Interests without notice to or approval by the Bankruptcy Court or any other party; [*provided* that any such compromise, settlement, resolution or withdrawal with respect to any General Unsecured Claim that is not an Unsecured Convenience Class Claim shall be reasonably acceptable to the Post-Effective Date

Committee] and consistent with the terms of the Claims Objection and Settlement Procedures Order or the Approval Order.

### 3.    *Estimation of Claims*

[The Debtors (before the Effective Date) or the Reorganized Debtors (on or after the Effective Date, [and in consultation with the Post-Effective Date Committee]) may determine, resolve and otherwise adjudicate Contingent Claims, Unliquidated Claims and Disputed Claims in the Bankruptcy Court or such other court of the Debtors' choice having jurisdiction over the validity, nature or amount thereof.  The Debtors (before the Effective Date) or the Reorganized Debtors (on or after the Effective Date, [and in consultation with the Post-Effective Date Committee]), at any time request that the Bankruptcy Court estimate any Contingent Claim, Unliquidated Claim or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code for any reason or purpose, regardless of whether an objection was previously filed with the Bankruptcy Court with respect to such Claim, or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any such Claim, including, without limitation, during the pendency of any appeal relating to any such objection.]  In the event that the Bankruptcy Court estimates any Contingent Claim, Unliquidated Claim or Disputed Claim, such estimated amount shall constitute either the Allowed amount of such Claim, the amount used to determine the Disputed Claims Reserves or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If such estimated amount constitutes a maximum limitation on such Claim, the Debtors (before the Effective Date) or Reorganized Debtors (on or after the Effective Date, [and in consultation with the Post-Effective Date Committee]), may elect to pursue any supplemental proceeding to object to any ultimate distribution on account of such Claim.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such Claim unless the Holder of such Claim has filed a motion requesting the right to seek such reconsideration on or before 20 calendar days after the date such Claim is estimated by the Bankruptcy Court.

### 4.    *Payments and Distributions with Respect to Disputed Claims or Interests*

#### (i)    **No Distributions Pending Allowance**

Notwithstanding any other provision in the Plan, no payments or distributions shall be made with respect to a Disputed Claim or Interest unless and until all objections to such Disputed Claim or Interest have been settled or withdrawn or have been determined by a Final Order, and the Disputed Claim or Interest has become an Allowed Claim or Allowed Interest.

#### (ii)    **No Postpetition Interest or Penalties on Disputed Claims**

Interest and penalties shall not accrue or be paid upon any Disputed Claim with respect to the period from the Effective Date to the date a Plan Distribution is made thereon, if and when such Disputed Claim becomes an Allowed Claim.

#### (iii)    **Disputed Claims Reserves.**

[On or before the Effective Date, the Reorganized Debtors shall [be authorized, but not directed, to] establish one or more Disputed Claims Reserves, which Disputed Claims Reserves shall be administered by the Reorganized Debtors, to the extent applicable. The Reorganized Debtors may, [with the consent of the Post-Effective Date Committee], hold New Stock and Cash, in the same proportions and amounts as provided for in the Plan, in any Disputed Claims Reserve in trust for the benefit of Holders of Claims or Interests ultimately determined to be Allowed after the Effective Date. The Reorganized Debtors shall distribute such amounts (net of any expenses, including any taxes relating thereto), as provided herein, as such Claims or Interests are resolved by a Final Order or agreed to by settlement in accordance with Section 6.2 of the Plan, and such amounts will be distributable on account of such Claims or Interests as such amounts would have been distributable had such Claims or Interests been Allowed Claims or Allowed Interests, respectively, as of the Effective Date under Article III of the Plan solely to the extent of the amounts available in the applicable Disputed Claims Reserve.]

[For federal income tax purposes, absent definitive guidance from the IRS or a contrary determination by a court of competent jurisdiction, the Disbursing Agent shall (i) treat each Disputed Claims Reserve as a discrete trust for federal income tax purposes (which trust may consist of separate and independent shares) in accordance with the trust provisions of the Internal Revenue Code (section 641, *et seq.*) and (ii) to the extent permitted by applicable law, report consistently with the foregoing characterization for state and local income tax purposes. All Holders of Disputed Claims shall report, for income tax purposes, consistently with the foregoing.]

**(iv)     Distributions after Allowance.**

To the extent that a Disputed Claim or Interest becomes an Allowed Claim or Interest after the Effective Date, the Disbursing Agent will, out of the relevant Disputed Claims Reserve, distribute to the Holder thereof the distribution, if any, to which such Holder is entitled under the Plan in accordance with Section 5.3(a) of the Plan. Subject to the Plan, all distributions made under this paragraph (d) on account of Allowed Claims or Allowed Interests will be made together with any dividends, payments or other distributions made on account of, as well as any obligations arising from, the distributed property, then held in the relevant Disputed Claims Reserve as if such Allowed Claim or Allowed Interest had been an Allowed Claim or Allowed Interest on the dates distributions were previously made to Holders of Allowed Claims or Allowed Interests included in the applicable class.

**5.     *No Amendments to Claims***

A Claim may be amended prior to the Confirmation Date only as agreed upon by the Debtors and the Holder of such Claim or as otherwise permitted by the Bankruptcy Court, the Bankruptcy Rules or applicable non-bankruptcy law. On or after the Confirmation Date, the Holder of a Claim (other than a Professional Fee Claim) must obtain prior authorization from the Bankruptcy Court or the Debtors to file or amend a Claim. [Any new or amended Claim (other than Claims filed by the Rejection Damages Bar Date that are related to Executory Contracts or Unexpired Leases rejected pursuant to the Plan or an order of the Bankruptcy Court) filed after the Confirmation Date without such prior authorization will not appear on the register of claims maintained by the Claims and Solicitation Agent and will be deemed Disallowed in full and

expunged without any action required of the Debtors or the Reorganized Debtors and without the need for any court order.]

## F.    Executory Contracts and Unexpired Leases

### 1.    Assumption and Rejection of Executory Contracts and Unexpired Leases

As of and subject to the occurrence of the Effective Date, all Executory Contracts and Unexpired Leases to which any Debtor is a party shall be deemed assumed by the applicable Debtor, except for any Executory Contract or Unexpired Lease that (i) has previously been assumed or rejected pursuant to a Final Order of the Bankruptcy Court, (ii) is specifically identified on the Schedule of Rejected Contracts, (iii) is the subject of a separate assumption or rejection motion filed by the Debtors under section 365 of the Bankruptcy Code pending on the Effective Date, (iv) is the subject of a Contract Dispute pending on the Effective Date, (v) has previously expired or terminated pursuant to its own terms, or (vi) is being otherwise treated pursuant to the Plan. The Debtors reserve the right to modify the treatment of any particular Executory Contract or Unexpired Lease pursuant to the Plan. Furthermore, notwithstanding anything to the contrary in the Plan, the Debtors may alter, amend, modify or supplement the Schedule of Rejected Contracts and assume, assume and assign or reject Executory Contracts and Unexpired Leases at any time prior to the Effective Date or, with respect to any Executory Contract or Unexpired Lease subject to a Contract Dispute that is resolved after the Effective Date, within 30 days following entry of a Final Order of the Bankruptcy Court resolving such Contract Dispute.

Subject to the occurrence of the Effective Date, the payment of any applicable Cure Amount and the resolution of any Contract Dispute, the entry of the Confirmation Order shall constitute approval of the rejections, assumptions and assumptions and assignments provided for in the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Unless otherwise indicated herein or provided in a separate order of the Bankruptcy Court, rejections, assumptions and assumptions and assignments of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Each Executory Contract and Unexpired Lease assumed pursuant to the Plan or by order of the Bankruptcy Court shall vest in and be fully enforceable by the applicable Debtor, in each case in accordance with its terms, except as modified by the provisions of the Plan, any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law.

Unless otherwise provided herein or by separate order of the Bankruptcy Court, each Executory Contract or Unexpired Lease that is assumed or assumed and assigned shall include any and all modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affects such Executory Contract or Unexpired Lease, without regard to whether such agreement, instrument or other document is listed in an Assumption Notice.

### 2.    Determination of Contract Disputes and Deemed Consent

The Debtors shall serve Assumption Notices in accordance with the Approval Order. If a counterparty to an Executory Contract or Unexpired Lease receives an Assumption Notice, but such Executory Contract or Unexpired Lease is not listed therein, or does not receive such a notice,

the proposed Cure Amount for such Executory Contract or Unexpired Lease shall be deemed to be zero dollars ($0).

Any counterparty to an Executory Contract or Unexpired Lease shall have the time prescribed in the Approval Order to object to (i) the Cure Amount identified on the Assumption Notice, (ii) the ability of the applicable Debtor or its assignee to provide adequate assurance of future performance (within the meaning of section 365 of the Bankruptcy Code) and (iii) any other matter pertaining to assumption or assumption and assignment of such Executory Contract or Unexpired Lease on the terms set forth in the Plan and such Assumption Notice.

To the extent a Contract Dispute is asserted in an objection filed in accordance with the procedures set forth in the Assumption Notice, such Contract Dispute shall be heard by the Bankruptcy Court [at the Confirmation Hearing]. Following resolution of a Contract Dispute by Final Order of the Bankruptcy Court, or agreement by the Debtors or the Reorganized Debtors, as applicable, and the applicable contract counterparty, the applicable Executory Contract or Unexpired Lease shall be deemed assumed or assumed and assigned effective as of the Effective Date, subject to the Debtors' right to reject such Executory Contract or Unexpired Lease at any time prior to the Effective Date or, if any Contract Dispute is resolved after the Effective Date, within 30 days following entry of such Final Order of the Bankruptcy Court resolving the applicable Contract Dispute.

To the extent a Contract Dispute has not been resolved prior to the Effective Date, the Debtors shall establish the Disputed Claims Reserve. Any amounts in the Disputed Claims Reserve remaining after the resolution of all Disputed Claims [and the payment of all Cure Amounts with respect to Allowed Cure Claims for contracts and leases to be assumed or assumed and assigned shall be applied in accordance with Section [•] of the Plan.]

To the extent an objection is not timely filed and properly served on the Debtors with respect to a Contract Dispute, then the counterparty to the applicable contract or lease shall be deemed to have assented to (i) the Cure Amount proposed by the Debtors and (ii) the assumption or assumption and assignment of such contract or lease on the terms set forth in the Plan and the Assumption Notice, notwithstanding any provision of the applicable contract or lease that (A) prohibits, restricts or conditions the transfer or assignment of such contract or lease or (B) terminates or permits the termination of such contract or lease as a result of any direct or indirect transfer or assignment of the rights of the Debtors under such contract or lease or a change in the ownership or control as contemplated by the Plan, and shall forever be barred and enjoined from asserting such objection against the Debtors or terminating or modifying such contract or lease on account of transactions contemplated by the Plan.

With respect to payment of any Cure Amounts or resolution of Contract Disputes, the Debtors shall not have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable Executory Contract or Unexpired Lease, even if such non-Debtor party has sold, assigned or otherwise transferred its Cure Claim.

### *3.     Payments Related to Assumption of Contracts and Leases*

Subject to resolution of any Contract Dispute, any Cure Claim shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, from the Disputed Claims Reserve or in the ordinary course of business upon assumption thereof.

Assumption or assumption and assignment of any Executory Contract or Unexpired Lease pursuant to the Plan, or otherwise, shall result in the full release and satisfaction of any Claims or defaults, subject to satisfaction of the Cure Amount, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the effective date of assumption or assumption and assignment. Any Proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed Disallowed and expunged, without further notice, or action, order or approval of the Bankruptcy Court or any other Person.

### 4.    Rejection Claims

In the event that the rejection of an Executory Contract or Unexpired Lease by any of the Debtors herein results in damages to the other party or parties to such contract or lease, any Claim for such damages shall be forever barred and shall not be enforceable against the Debtors or their Estates, properties or interests in property, unless a Proof of Claim is filed with the Bankruptcy Court and served upon the Debtors no later than 30 days after the entry of the order of the Bankruptcy Court (including the Confirmation Order) authorizing the rejection of such Executory Contract or Unexpired Lease. Any such Claim shall be classified in accordance with the classification of Claims set forth in Article III of the Plan. The Confirmation Order shall constitute the Bankruptcy Court's authorization of the rejection of all the leases and contracts identified in the Schedule of Rejected Contracts, subject to the rights of the Debtors or Reorganized Debtors to modify or amend such schedule pursuant to the terms of Section 7.2.

### 5.    Delta Contracts

All Executory Contracts and Unexpired Leases between Delta (and any of its subsidiaries or affiliates) and any of the Debtors (including any amendments, supplements or other modifications thereto through the Effective Date), shall be deemed automatically assumed by the applicable Debtor Entity on the Effective Date.  In exchange for the assumption, amendment and extension of all such agreements, as mutually agreed to by Delta and the Debtors, to the extent applicable, which will require the continuation of the scope and level of support services provided by Delta (and any of its subsidiaries or affiliates) under such agreements or otherwise, currently provided in connection with the Delta JCA, Delta shall receive the Delta Contract Amendment Fee.  The New Stock issued on account of the Delta Contract Amendment Fee shall not dilute any New Stock issued on account of the Equity Financing.

### 6.    Club Premier Agreements

Pursuant to and in accordance with section 365 of the Bankruptcy Code, on the Effective Date, and concurrent with the PLM Stock Participation Transaction, the Reorganized Debtors shall assume the Club Premier Agreements.  Other than the Reorganized Debtors' assumption of the Club Premier Agreements, consummation of the PLM Stock Participation Transaction, and/or as

provided in the PLM Stock Participation Transaction Agreement, the Club Premier Agreements shall otherwise remain unaffected by the Chapter 11 Cases. Upon the Effective Date, the Debtors shall pay $0.00 to PLM in satisfaction of the Debtors' obligation to cure any defaults under the Club Premier Agreements in accordance with section 365(b)(1)(A) of the Bankruptcy Code.

### 7.    *Restructured Collective Labor Agreements*

The Collective Bargaining Agreements, which contain new labor conditions with ASPA, ASSA, STIA and Independencia shall be deemed automatically assumed by the applicable Debtor Entity on the Effective Date pursuant to the terms of the Bankruptcy Protection Covenant and the Labor Conditions Order.

### 8.    *[RESERVED]*

### 9.    *Employee-Related Agreements*

Except as otherwise provided in the Plan, on and after the Effective Date, subject to any Final Order and, without limiting any authority provided to the New Board under the Reorganized Debtors' respective formation and constituent documents, the Reorganized Debtors shall: (a) amend, adopt, assume and/or honor in the ordinary course of business any contracts, agreements, policies, programs and plans, in accordance with their respective terms, for, among other things, compensation, including any incentive plans (but not equity or equity based compensation plans), retention plans, health care benefits, disability benefits, deferred compensation benefits, savings, severance benefits, retirement benefits, welfare benefits, workers' compensation insurance, and accidental death and dismemberment insurance for the directors, officers and employees of any of the Debtors who served in such capacity from and after the Petition Date and (b) honor, in the ordinary course of business, Claims of employees employed as of the Effective Date for accrued vacation time arising prior to the Petition Date and not otherwise paid pursuant to a Bankruptcy Court order. Pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

### 10.    *Customer Programs*

Except as otherwise provided in the Plan, the Debtors and the Reorganized Debtors, in their sole and absolute discretion, may honor, in the ordinary course of business, all of the Debtors' customer and loyalty programs, travel credit programs, charter sales program, leisure sales programs, barter arrangements, corporate incentive programs, alternative ticket arrangements or vouchers, cash refunds or cargo programs, including, without limitation, as authorized by the Supplemental Customer Programs Order, as such programs may be amended from time to time. All Proofs of Claim filed on account of any benefits under such programs (including Proofs of Claims filed on account of ticket refunds, ticket vouchers, and similar programs authorized to continue by the Supplemental Customer Programs Order) shall be deemed withdrawn, Disallowed, and forever barred from assertion automatically and without any further notice to or action, order or approval of the Bankruptcy Court.

### 11.    *Indemnification Provisions*

On and as of the Effective Date, the Indemnification Obligations will be assumed and irrevocable and will survive the effectiveness of the Plan, and the Reorganized Debtors' New Corporate Governance Documents will provide for the indemnification, defense, reimbursement, exculpation and/or limitation of liability of, and advancement of fees and expenses to, the Debtors' and the Reorganized Debtors' current and former directors, officers, employees and agents to the fullest extent permitted by law and at least to the same extent as the organizational documents of each of the respective Debtors on the Petition Date, against any claims or Causes of Action whether direct or derivative, liquidated or unliquidated, fixed or contingent, Disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted occurring before the Effective Date. None of the Debtors, or the Reorganized Debtors, as applicable, will amend and/or restate their respective governance documents before or after the Effective Date to amend, augment, terminate or adversely affect any of the Debtors' or the Reorganized Debtors' obligations to provide such indemnification rights or such directors', officers', employees', equityholders' or agents' indemnification rights.

On and as of the Effective Date, any of the Debtors' Indemnification Obligations with respect to any contract or agreement that is the subject of or related to any litigation against the Debtors or Reorganized Debtors, as applicable, shall be assumed by the Reorganized Debtors and otherwise remain unaffected by the Chapter 11 Cases.

### 12.    *Insurance Policies*

Each of the Debtors' Insurance Policies, and any agreements, documents or instruments relating thereto, are treated as Executory Contracts under the Plan. On the Effective Date, the Debtors shall be deemed to have assumed all Insurance Policies and any agreements, documents and instruments relating to coverage of all insured Claims. Except as set forth in Section 7.12 of the Plan, nothing in the Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order or any other order of the Bankruptcy Court (including any other provision that purports to be preemptory or supervening), (a) alters, modifies or otherwise amends the terms and conditions of (or the coverage provided by) any of such Insurance Policies or (b) alters or modifies the duty, if any, that the insurers or third-party administrators pay Claims covered by such Insurance Policies and their right to seek payment or reimbursement from the Debtors (or after the Effective Date, the Reorganized Debtors) or draw on any collateral or security therefor. For the avoidance of doubt, insurers and third-party administrators shall not need to nor be required to file or serve a cure objection or a request, application, Claim, Proof of Claim or motion for payment and shall not be subject to any claims bar date or similar deadline governing cure amounts or Claims.

### 13.    *[Director, Officer, Manager and Employee Liability Insurance]*

[On the Effective Date, pursuant to section 365(a) of the Bankruptcy Code, the Debtors shall be deemed to have assumed all of the D&O Liability Insurance Policies and any agreements, documents, or instruments relating thereto. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' assumption of all such policies (including, if applicable, any "tail policy").]

[After the Effective Date, except as authorized by the New Board (provided, the New Board shall not reduce coverage under any "tail policy"), none of the Debtors or the Reorganized Debtors

shall terminate or otherwise reduce the coverage under any such policies (including, if applicable, any "tail policy") with respect to conduct occurring as of the Effective Date, and all officers, directors, managers and employees of the Debtors who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of any such policies regardless of whether such officers, directors, managers or employees remain in such positions after the Effective Date. Directors and officers shall be exculpated and indemnified by the Debtors and Reorganized Debtors to the extent of such insurance.]

[On and after the Effective Date, upon approval of the New Board, each of the Reorganized Debtors shall be authorized to purchase, at their sole discretion and pursuant to their business judgment and ordinary course of business, any and all directors' and officers' liability insurance policy for the benefit of their respective directors, members, trustees, officers and managers in the ordinary course of business.]

### 14.    Reservation of Rights

(a)    Neither the exclusion nor the inclusion by the Debtors of any contract or lease on any exhibit, schedule or other annex to the Plan or in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is or is not an Executory Contract or Unexpired Lease or that the Debtors have any liability thereunder.

(b)    Except as explicitly provided in the Plan, nothing herein shall waive, excuse, limit, diminish or otherwise alter any of the defenses, Claims, Causes of Action or other rights of the Debtors under any Executory Contract or non-Executory Contract or Unexpired Lease.

(c)    Nothing in the Plan shall increase, augment or add to any of the duties, obligations, responsibilities or liabilities of the Debtors under any Executory Contract or non- Executory Contract or Unexpired Lease or expired lease.

(d)    If there is a dispute regarding whether a contract or lease is or was an Executory Contract or Unexpired Lease at the time of its assumption under the Plan, the Debtors shall have 30 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

## G.    Effect of Confirmation

### 1.    Compromise and Settlement of Claims, Interests and Controversies

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests and controversies relating to the contractual, legal and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Allowed Interest, or any distribution to be made on account of such Allowed Claim or Allowed Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of this and all other such Claims, Interests and controversies, as well as a finding by the Bankruptcy Court that such compromises or settlements are in the best interest of the Debtors, their Estates and Holders of Claims and Interests and are fair, equitable and reasonable.  In

accordance with the provisions of the Plan and, to the extent applicable, pursuant to Bankruptcy Rule 9019, without any further notice to, or action, order or approval of, the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against, and Interests in, the Debtors and their Estates and Causes of Action against other Entities.

### 2. Binding Effect

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, and subject to the occurrence of the Effective Date, on and after the entry of the Confirmation Order, the provisions of the Plan and any transactions contemplated hereunder shall bind every Holder of a Claim against or interest in any Debtor and inure to the benefit of, and be binding on, such Holder's respective successors and assigns, regardless of whether the Claim or Interest of such Holder is Impaired under the Plan or whether such Holder has accepted the Plan.

On the Effective Date, any Holder of a Claim or Interest that is entitled to receive or who receives a Plan Distribution shall be deemed to have waived all rights and remedies under any non-U.S. jurisdiction's laws (including, without limitation, Mexican law) to receive any further distributions or recoveries for such Claim or Interest, and such Plan Distribution shall be the sole distribution that such Holder shall receive in any jurisdiction on account of such Claim or Interest, which shall be deemed as fully paid to the fullest extent permitted by any applicable law, including Mexican law.

### 3. Vesting of Assets

Except as otherwise provided in the Plan or the Plan Supplement, or in any agreement, instrument or other document incorporated in the Plan, on the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property in each Debtor's Estate, all Causes of Action, and any property acquired by any of the Debtors under the Plan, the Equity Financing, the Debt Financing and/or Statutory Equity Rights Offering or the PLM Stock Participation Transaction, shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances as set forth in Section [8.4]. On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire or dispose of property without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

### 4. Release of Liens

[Except (i) with respect to Liens securing obligations under (a) the New First Lien Notes, (b) the [Receivables Facilities], (c) the Secured CEBURES  and (d) the [Aircraft Financings], or (ii) as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document created pursuant to the Plan or the Confirmation Order, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date in accordance with the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, discharged and compromised, without any further approval or order of the Bankruptcy Court and without any action or filing being required to be made by the Debtors or the Reorganized Debtors, as applicable,

(except for any filing, registration or submission before any Governmental agency, dependency or authority, as the case may be, but always under the authority to release Liens herein granted) and all rights, titles and Interests of any Holder of such mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estates shall revert to the Reorganized Debtors and their successors and assigns. The Reorganized Debtors shall be authorized to file any necessary or desirable documents to evidence such release in the name of the party secured by such pre-Effective Date mortgages, deeds of trust, Liens, pledges or other security interests.]

5.      *Releases*

The releases of Claims and Causes of Action described in the Plan, including releases by the Debtors and by Holders of Claims or Interests, constitute good faith compromises and settlements of the matters covered thereby and are consensual. Such compromises and settlements are made in exchange for consideration and are in the best interest of Holders of Claims or Interests, are fair, equitable, reasonable and are integral elements of the resolution of the Chapter 11 Cases in accordance with the Plan. Each of the release, indemnification and exculpation provisions set forth in the Plan (a) is within the jurisdiction of the Bankruptcy Court under sections 1334(a), 1334(b) and 1334(e) of title 28 of the United States Code, (b) is an essential means of implementing the Plan, (c) is an integral and non-severable element of the transactions incorporated into the Plan, (d) confers a material benefit on, and is in the best interests of, the Debtors, their Estates and their Creditors, (e) is important to the overall objectives of the Plan to finally resolve all Claims among or against the parties in interest in the Chapter 11 Cases with respect to the Debtors, (f) is fair, equitable and reasonable and in exchange for good and valuable consideration, and (g) is consistent with sections 105, 1123, 1129 and other applicable provisions of the Bankruptcy Code.

6.      *Release by the Debtors*

**As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties before and during the Chapter 11 Cases to facilitate the reorganization of the Debtors and the implementation of the Restructuring Transactions, and except as otherwise explicitly provided in the Plan or in the Confirmation Order, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably and forever released, to the maximum extent permitted by law, as such law may be extended subsequent to the Effective Date, by the Debtors and the Estates from any and all Claims, counterclaims, disputes, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, Liens, remedies, losses, contributions, indemnities, costs, liabilities, attorneys' fees and expenses whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors or their Estates (including any Causes of Action arising under chapter 5 of the Bankruptcy Code), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that the Debtors or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder**

of any Claim against or Interest in the Debtors or on behalf of any other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (as such entities existed prior to or after the Petition Date), their Estates, the Chapter 11 Cases, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements or interactions between any Debtor and any Released Party (including the exercise of any common law or contractual rights of setoff or recoupment by any Released Party at any time on or prior to the Effective Date), the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the Disclosure Statement, the Plan, the DIP Facility, the Subscription Agreement, the Equity Financing Commitment Letter, the Debt Financing Commitment Letter, the exit financing process, the preparation and delivery of the Initial Valuation Materials and the Final Valuation Materials; the Restructuring Transactions, the PLM Stock Participation Transaction, the Equity Financing, the Statutory Equity Rights Offering, the Debt Financing, and related agreements, instruments and other documents, and the negotiation, formulation, preparation or implementation thereof, the solicitation of votes with respect to the Plan, or any other act or omission in any way relating to any of the foregoing, in each case, arising on or prior to the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that is determined in a final order to have constituted willful misconduct (including, without limitation, actual fraud) or gross negligence.

Notwithstanding anything herein to the contrary, (i) nothing in the Plan shall release any (A) Retained Causes of Action listed on the Schedule of Retained Causes of Action, [(B) any Claims or Causes of Action that may be asserted against any Excluded Party] or (C) any Claims or Causes of Action against any Holder of a Claim against a Debtor to the extent necessary for the administration and resolution of such Claim in accordance with the Plan and (ii) nothing in Section 8.6 of the Plan shall be construed to impair in any way the Effective Date or post-Effective Date rights and obligations of any Person under the Plan, the Plan Documents, the Confirmation Order or the Restructuring Transactions.

7.    *Voluntary Releases by the Releasing Parties*

Except as otherwise provided in the Plan, on and after the Effective Date, each of the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably and forever released, to the maximum extent permitted by law, as such law may be extended subsequent to the Effective Date, except as otherwise explicitly provided herein, by the Releasing Parties from any and all Claims, counterclaims, disputes, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, Liens, remedies, losses, contributions, indemnities, costs, liabilities, attorneys' fees and expenses, in each case, of any kind, character or nature whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors or their Estates (including any Causes of Action arising under chapter 5 of the Bankruptcy Code), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that any Releasing Party or any other Persons or parties claiming under or through them would have been legally entitled to assert in their

**own right (whether individually or collectively) or on behalf of the Releasing Party or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (as such entities existed prior to or after the Petition Date), their Estates, the Chapter 11 Cases, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements or interactions between any Debtor and any Released Party (including the exercise of any common law or contractual rights of setoff or recoupment by any Released Party at any time on or prior to the Effective Date), the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the Disclosure Statement, the Plan, the DIP Facility, the Subscription Agreement, the Equity Financing Commitment Letter, the Debt Financing Commitment Letter, the exit financing process, the preparation and delivery of the Initial Valuation Materials and the Final Valuation Materials; the Restructuring Transactions, the PLM Stock Participation Transaction, the Statutory Equity Rights Offering, the Equity Financing, the Debt Financing, and related agreements, instruments and other documents, and the negotiation, formulation, preparation or implementation thereof, the solicitation of votes with respect to the Plan, or any other act or omission in any way relating to any of the foregoing, in each case, arising on or prior to the Effective Date, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that is determined in a final order to have constituted willful misconduct (including, without limitation, actual fraud) or gross negligence.**

**Notwithstanding anything herein to the contrary, (i) nothing in the Plan shall release any (A) Retained Causes of Action listed on the Schedule of Retained Causes of Action, [(B) any Claims or Causes of Action that may be asserted against any Excluded Party] or (C) any Claims or Causes of Action against any Holder of a Claim against a Debtor to the extent necessary for the administration and resolution of such Claim against the Debtor in accordance with the Plan; and (ii) nothing in Section 8.7 of the Plan shall be construed to impair in any way the Effective Date or post-Effective Date rights and obligations of any Person under the Plan, the Plan Documents, the Confirmation Order or the Restructuring Transactions.**

### 8.    *Discharge of Claims and Termination of Interests*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, or in any contract, instrument or other agreement or document created or entered into pursuant to the Plan, the distributions, rights and treatment that are provided in the Plan shall be in complete satisfaction, discharge and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and interests in, the Debtors, Reorganized Debtors, their successors or assigns or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and interests, including demands, liabilities and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability

on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in section 502(g), 502(h) or 502(i) of the Bankruptcy Code, in each case whether or not: (a) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Interest based upon such debt, right or interest is Allowed pursuant to section 502 of the Bankruptcy Code; (c) the Holder of such a Claim or Interest has accepted or rejected the Plan; or (d) the Holder of such a Claim or Interest has failed to vote to accept or reject the Plan . The Confirmation Order shall be a judicial determination of the discharge of all Claims and interests subject to the occurrence of the Effective Date, except as otherwise specifically provided in the Plan or in any contract, instrument or other agreement or document created or entered into pursuant to the Plan. Except as otherwise provided herein, upon the Effective Date, all such Holders of Claims and interests shall be forever precluded and enjoined, pursuant to sections 105, 524 and 1141 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against, or terminated interest in, any Debtor or any property, wherever located, of the Estates.

The Plan shall bind all Holders of Claims and Interests notwithstanding whether any such Holders failed to vote to accept or reject the Plan.  The Ballots for Classes voting on the Plan shall provide that by signing the Ballot, the Claim or Interest Holder agrees (i) to waive any rights and claim against Grupo Aeroméxico and any of the other Debtors (directly or indirectly) after receiving their full Plan Distribution (if any) and agrees to not pursue any action or remedy in México or in any other non-U.S. jurisdiction in order to recover on such same Claim or Interest and/or to obtain additional distributions or recoveries for the same Claim or Interest following the receipt of its full Plan Distribution, and (ii) that the Plan Distribution (if any) provided to the undersigned is the sole Plan Distribution (if any) that the Claim or Interest Holder shall receive in any jurisdiction from the Debtors on account of their Claim or Interest.

### 9.    Term of Injunction or Stays

**Unless otherwise provided herein, all injunctions or stays provided in the Chapter 11 Cases arising prior to the Confirmation Date in accordance with sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.**

### 10.    Exculpation

**To the maximum extent permitted by applicable law, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from: any Claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, remedy, loss and liability for any Claim in connection with, related to, or arising out of, the administration of the Chapter 11 Cases; the negotiation and pursuit of the Disclosure Statement (including any information provided, or statements made, in the Disclosure Statement or omitted therefrom) and the solicitation of votes for, and confirmation of, the Plan; the funding of the Plan; the occurrence of the Effective Date; the DIP Facility, the Subscription Agreement, the Equity Financing Commitment Letter, the Debt Financing Commitment Letter, the exit financing process, preparation and delivery of the Initial Valuation Materials and the Final**

**Valuation Materials; the administration of the Plan and the property to be distributed under the Plan; the Restructuring Transactions, the PLM Stock Participation Transaction, the Statutory Equity Rights Offering, the Equity Financing, the Debt Financing, and related agreements, instruments and other documents, and the negotiation, formulation, preparation or implementation thereof, and the transactions in furtherance of any of the foregoing, in each case other than Claims or Causes of Action arising out of, or related to, any act or omission of an Exculpated Party that is a criminal act or constitutes gross negligence or willful misconduct (including, without limitation, actual fraud).    This exculpation shall be in addition to, and not in limitation of, all other Releases, indemnities, exculpations and any other applicable law or rules protecting such Exculpated Parties from liability.  Notwithstanding anything herein to the contrary, nothing in the Plan shall release (a) any Claims or Causes of Action that may be asserted against any Excluded Party and/or (b) any post-Effective Date obligations of any Entity.**

## 11.    *Plan Injunction*

Effective as of the Effective Date, to the fullest extent permissible under applicable law, and except as otherwise expressly provided in the Plan or the Confirmation Order and except with respect to any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, the PLM Stock Participation Transaction, the Statutory Equity Rights Offering, the Equity Financing, the Debt Financing or any document, instrument or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, all Entities that have held, hold, or may hold Claims or interests that arose prior to the Effective Date and/or that have been released, discharged or are subject to exculpation under the Plan, along with each of their respective Related Parties, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties or the Released Parties: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or interests; (b) enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order on account of, in connection with or with respect to any such Claims or interests; (c) creating, perfecting or enforcing any encumbrance of any kind against such entities or the property, interests in property, or the estates of such entities on account of, in connection with or with respect to any such Claims or interests; (d) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from such entities or against the property, interests in property or estates of such entities on account of, in connection with or with respect to any such Claims or interests unless such Holder has filed a motion requesting the right to perform such setoff, subrogation or recoupment on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has or intends to preserve any right of setoff, subrogation or recoupment pursuant to applicable law or otherwise.

## 12.    *Injunction Related to Releases and Exculpation*

To the maximum extent permitted under applicable law, the Confirmation Order shall permanently enjoin the commencement or prosecution by any Person, whether directly, derivatively or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses or liabilities released or exculpated pursuant to the Plan, including,

without limitation, the Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities released or exculpated in the Plan under sections [8.5, 8.6, 8.7 and 8.10] [and the Claims, interests, Liens, other encumbrances or liabilities described in Sections 8.3 and 8.4 of the Plan.].

### 13.    Avoidance Actions

[On the Effective Date, the Reorganized Debtors shall be deemed to waive and release all avoidance and recovery actions other than those listed on the Schedule of Retained Causes of Action, *provided* that the Reorganized Debtors shall retain the right to assert such avoidance actions or recovery actions as defenses or counterclaims in any Cause of Action brought by any creditor.  The Reorganized Debtors shall retain the right, after the Effective Date, to prosecute any of the avoidance or recovery actions listed on the Schedule of Retained Causes of Action.]

### 14.    Preservation of Causes of Action

In accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue any and all Causes of Action, whether arising before or after the Petition Date, and the Reorganized Debtors' rights to commence, prosecute or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, which shall be deemed released and waived by the Debtors and Reorganized Debtors as of the Effective Date. The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against it. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity. Unless any Cause of Action against an Entity is expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or a final order of the Bankruptcy Court, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise) or laches, shall apply to such Causes of Action upon, after or as a consequence of the Confirmation or Effective Date.

### 15.    Ipso Facto and Similar Provisions Ineffective

Any term of any policy, contract or other obligation applicable to a Debtor shall be void and of no further force or effect with respect to any Debtor to the extent such policy, contract, or other obligation is conditioned on, creates an obligation of any Debtor as a result of, or gives rise to a right of any Person based on any of the following: (a) the insolvency or financial condition of a Debtor; (b) the commencement of the Chapter 11 Cases; (c) the confirmation or consummation of the Plan, including, without limitation, any change of control, assignment, or similar provision that shall occur as a result of such consummation; or (d) the Restructuring Transactions.

**H.    Conditions Precedent to Effectiveness of the Plan**

*1.    Conditions to Effectiveness*

The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied or waived in accordance with Section 9.2 of the Plan.

    i.    the Confirmation Order shall have been entered by the Bankruptcy Court and shall not be subject to a stay nor have been rescinded, vacated or reversed on appeal;

    ii.    the Debtors shall have obtained all authorizations, consents, corporate and regulatory approvals, rulings or documents that are necessary to implement and effectuate the Plan, implying that any and all corporate resolutions adopted by, or to be adopted by, the [New Board] and/or General Ordinary Shareholders Meeting of Reorganized Grupo Aeroméxico and any other Debtor, as the case may be, required to effectively implement the Plan, have become effective or will become effective at the Effective Date;

    iii.    all Professional Fee Claims required to be approved by the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date shall have been placed in the Professional Fee Escrow Account pending approval by the Bankruptcy Court;

    iv.    the conditions to closing under the Subscription Agreement, including the payment of the Equity Commitment Party Expense Reimbursement owed or estimated to be owed as of the Effective Date, shall have been satisfied or waived in accordance with the terms thereof, and the transactions contemplated by the Subscription Agreement shall have been consummated;

    v.    the conditions to closing under the Debt Financing Commitment Letter, the New First Lien Notes Indenture [and the New First Lien Purchase Agreement], including the payment of the Debt Commitment Party Expense Reimbursement owed or estimated to be owed as of the Effective Date, shall have been satisfied or waived in accordance with the terms thereof, and the transactions contemplated by the Debt Financing Commitment Letter, the New First Lien Notes Indenture [and the New First Lien Purchase Agreement] shall have been consummated;

    vi.    the Plan Documents shall have been approved or accepted by all applicable Persons in accordance with the respective consent rights under the Plan, the Subscription Agreement and the Debt Financing Commitment Letter, and shall have been filed, executed and delivered, as applicable, and the conditions precedent contained therein shall have been satisfied or waived in accordance with the terms thereof, except with respect to such conditions that by their terms shall be satisfied substantially simultaneously with or after consummation of the Plan;

    vii.    [all amendments, supplements or other modifications necessary or required to be entered into with respect to any Executory Contracts and Unexpired Leases

between Delta (and any of its subsidiaries or affiliates) and any of the Debtors prior to, and as a condition to the occurrence of the Effective Date, shall have been entered into;]

viii.    the Plan shall not have been amended, altered or modified from the Plan as confirmed by the Confirmation Order, unless such material amendment, alteration or modification has been made in accordance with the Plan;

ix.    the payment in Cash in full of all DIP Reimbursement Claims;

x.    [the conditions to closing under the PLM Stock Participation Transaction Agreement have been satisfied or waived in accordance with the terms thereof, and the PLM Stock Participation Transaction Agreement is in full force and effect and binding on all parties thereto;]

xi.    the payment in Cash in full of all reasonable and documented Senior Notes Indenture Trustee Fees that are accrued and unpaid as of the Effective Date;

xii.    all approvals required under Hart-Scott-Rodino Antitrust Improvements Act of 1976 (as amended from time to time), Mexican Federal Antitrust Law, and other regulatory approvals (such as any approval under Mexican Foreign Investment Law and under the Mexican Securities Exchange Act) having been obtained; [*provided*, *however*, that such approvals for the PLM Stock Participation Transaction shall not be a condition precedent to the occurrence of the Effective Date];

xiii.    the Debtors shall have complied, in all material respects, with the terms of the Plan that are to be performed by the Debtors on or prior to the Effective Date; and

xiv.    all other actions, documents and agreements necessary to implement and effectuate the Plan (including, without limitation, completion of the Statutory Equity Rights Offering and the Equity Financing) shall have been effected or executed.

## 2. *Waiver of Conditions to Effectiveness*

The Debtors may waive in whole or in part any of the conditions precedent to the Effective Date at any time, with the consent of the Required Equity Commitment Parties and any other parties with applicable consent rights set forth in the Debt Financing Commitment Letter and the Subscription Agreement, as applicable, [and the reasonable consent of the Creditors' Committee (to the extent such waiver materially and adversely impacts the rights of Holders of General Unsecured Claims)] without any notice to other parties in interest or the Bankruptcy Court and without any formal action other than proceeding to confirm and/or consummate the Plan.  If any such condition precedent is waived pursuant to this Section and the Effective Date occurs, each party agreeing to waive such condition precedent shall be estopped from withdrawing such waiver after the Effective Date or otherwise challenging the occurrence of the Effective Date on the basis that such condition was not satisfied, the waiver of such condition precedent shall benefit from the "equitable mootness" doctrine, and the occurrence of the Effective Date shall foreclose any ability to challenge the Plan in any court.

Except as otherwise provided herein, all actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously and no such action shall be deemed to have occurred prior to the taking of any other such action.

The stay of the Confirmation Order pursuant to Bankruptcy Rule 3020(e) shall be deemed waived by and upon entry of the Confirmation Order, and the Confirmation Order shall take effect immediately upon its entry.

### 3. *Substantial Consummation*

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

### 4. *Effect of Non-Occurrence of Conditions to Consummation*

If the Effective Date does not occur with respect to any of the Debtors, the Plan shall be null and void in all respects with respect to such Debtor, and nothing contained in the Plan or the Disclosure Statement shall: (a) constitute a waiver or release of any Claims by or Claims against or interests in such Debtors; (b) prejudice in any manner the rights of such Debtors, any Holders of a Claim or Interest, or any other Entity; or (c) constitute an admission, acknowledgment, offer or undertaking by such Debtors, any Holders or any other Entity in any respect.

## I. **Retention of Jurisdiction by the Bankruptcy Court**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction of all matters arising under, arising out of or related to the Chapter 11 Cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

    i.    to resolve any matters related to Executory Contracts or Unexpired Leases, including: (A) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine and, if necessary, liquidate, any Cure Amount arising therefrom, including pursuant to section 365 of the Bankruptcy Code; (B) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; and (C) any dispute regarding whether a contract or lease is or was executory or expired;

    ii.    to hear and determine any motions, adversary proceedings, applications, contested matters and other litigated matters pending on, or commenced after, entry of the Confirmation Order;

    iii.    to hear and resolve any disputes arising from or related to (A) any orders of the Bankruptcy Court granting relief under Bankruptcy Rule 2004 or (B) any protective orders entered by the Bankruptcy Court in connection with the foregoing;

    iv.    to ensure that Plan Distributions to Holders of Allowed Claims and interests (as applicable) are accomplished as provided in the Plan and the Confirmation Order

and to adjudicate any and all disputes arising from or relating to distributions under the Plan and the Confirmation Order;

v.      to consider Claims or the allowance, classification, priority, compromise, estimation or payment of any Claim, including any Administrative Expense Claim;

vi.     to enter, implement or enforce such orders as may be appropriate in the event that the Confirmation Order is, for any reason, stayed, reversed, revoked, modified or vacated;

vii.    to issue and enforce injunctions, enter and implement other orders and take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation or enforcement of the Plan, the Confirmation Order or any other order of the Bankruptcy Court;

viii.   to consider any modifications to the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order or remedy any defect or omission or reconcile or clarify any inconsistency in any Bankruptcy Court order, the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into, delivered or created in connection with the Plan, the Disclosure Statement or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan;

ix.     to resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof;

x.      to hear and determine any disputes with the Post-Effective Date Committee;

xi.     to hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan, the Confirmation Order, any transactions or payments in furtherance of the Plan or the Confirmation Order or any agreement, instrument or other document governing, or related to, any of the foregoing;

xii.    to take any action and issue such orders, including any such action or orders as may be necessary after entry of the Confirmation Order or the occurrence of the Effective Date, as may be necessary to construe, enforce, implement, execute and consummate the Plan, including any release, exculpation or injunction provisions set forth in the Plan, or to maintain the integrity of the Plan following the occurrence of the Effective Date;

xiii.   to adjudicate, decide or resolve any and all matters related to the Restructuring Transactions, including disputes related to the Subscription Agreement, the Debt Financing, the Equity Financing and any Executory Contracts or Unexpired Leases

between Delta (and any of its subsidiaries or affiliates) and any of the Debtors (including the Delta JCA);

xiv.    [RESERVED]

xv.    to hear and determine any other matters related to the Chapter 11 Cases and not inconsistent with the Bankruptcy Code or title 28 of the United States Code;

xvi.    to resolve any disputes concerning whether a Person had sufficient notice of the Chapter 11 Cases, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, any Bar Date established in the Chapter 11 Cases or any deadline for responding or objecting to a Cure Amount, in each case, for the purpose of determining whether a Claim or Interest is discharged hereunder or for any other purpose;

xvii.    to hear and determine all matters relating to the plan settlements, to the extent permitted under applicable law;

xviii.    to enforce any order for the sale of property pursuant to section 363, 1123, or 1146(a) of the Bankruptcy Code;

xix.    to determine such other matters, and for such other purposes, as may be provided in the Confirmation Order;

xx.    to resolve all disputes related to the PLM Stock Participation Transaction and the PLM Stock Participation Transaction Agreement to the fullest extent permitted by law; and

xxi.    to enter a final decree closing each of the Chapter 11 Cases.

The Bankruptcy Court shall retain jurisdiction of all matters arising under, arising out of or related to the Chapter 11 Cases and the Plan to, among other things, hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including the expedited determination of taxes under section 505(b) of the Bankruptcy Code).

To the extent that it is legally impermissible for the Bankruptcy Court to have exclusive jurisdiction over any of the foregoing matters, the Bankruptcy Court will have non-exclusive jurisdiction over such matters to the extent legally permissible.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter, including the matters set forth in Article X of the Plan, the provisions of Article X of the Plan shall have no effect upon and shall not control, prohibit or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

## J.    Miscellaneous

### 1.    *Exemption from Transfer Taxes and Recording Fees*

To the maximum extent permitted by section 1146(a) of the Bankruptcy Code and to the maximum extent permitted by law, none of the issuance, transfer or exchange of notes or equity securities under the Plan, the creation, the filing or recording of any mortgage, deed of trust or other security interest, the making, assignment, filing or recording of any lease or sublease, the transfer of title to or ownership of any of the Debtors' interest in any Aircraft Equipment or the making or delivery of any deed, bill of sale or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including, without limitation, the Debt Financing, the Equity Financing, the Voluntary Equity Conversion or any merger agreements or agreements of consolidation, deeds, bills of sale or assignments executed in connection with any of the transactions contemplated under the Plan, shall be subject to any document recording tax, sales tax, use tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, Cape Town filing or recording fee, FAA filing or recording fee or other similar tax or governmental assessment in the United States.  The Confirmation Order shall direct the appropriate federal, state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### 2.    *Expedited Tax Determination*

[The Reorganized Debtors may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all returns filed for or on behalf of such Debtors or Reorganized Debtors for all taxable periods through the Effective Date.]

### 3.    *Plan Modifications and Amendments*

Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and those restrictions on, and consents required with respect to, modifications set forth in the Plan, the Debt Financing Commitment Letter and the Subscription Agreement, [and in consultation with the Creditors' Committee, to the extent such modification impacts the rights of Holders of General Unsecured Claims], the Debtors may alter, amend or modify the Plan, without additional disclosure pursuant to section 1125 of the Bankruptcy Code, and, as appropriate, not resolicit votes on such modified Plan.  Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.  A Holder of a Claim or Interest that has accepted the Plan shall be presumed to have accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim or Interest of such Holder.

After the Confirmation Date and prior to substantial consummation of the Plan, the Debtors, subject to the consent rights set forth in the Debt Financing Commitment Letter and Subscription Agreement, may institute proceedings in the Bankruptcy Court pursuant to section 1127(b) of the Bankruptcy Code to remedy any defect or omission or reconcile any inconsistencies in the Plan,

the Disclosure Statement or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes and effects of the Plan.

Prior to the Effective Date, subject to the consent rights set forth in Debt Financing Commitment Letter and the Subscription Agreement, make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court; provided that such technical adjustments and modifications do not materially and adversely affect the treatment of Holders of Claims or interests.

### 4.    *Revocation or Withdrawal of Plan*

The Debtors reserve the right to revoke, withdraw or delay consideration of the Plan prior to the Confirmation Date, either entirely or with respect to any one or more of the Debtors, and to file subsequent amended plans of reorganization, in each case, subject to the consent rights set forth in the Debt Financing Commitment Letter and the Subscription Agreement [and in consultation with the Creditors' Committee]. If the Plan is revoked, withdrawn or delayed with respect to fewer than all of the Debtors, that shall not affect the enforceability of the Plan as it relates to the Debtors for which the Plan is not revoked, withdrawn or delayed. If the Debtors revoke or withdraw the Plan in its entirety, then the Plan shall be null and void in all respects, any settlement or compromise not previously approved by Final Order of the Bankruptcy Court embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan and any document or agreement executed pursuant hereto shall be deemed null and void, and nothing contained in the Plan shall constitute a waiver or release of any Claims by or against, or any Interests in, such Debtors or any other Person, or prejudice in any manner the rights of such Debtors or any other Person or constitute an admission of any sort by the Debtors or any other Person.

### 5.    *No Admission*

Other than as expressly provided under the Plan or the Confirmation Order, nothing in the Plan or Disclosure Statement or any document or pleading filed in connection therewith shall constitute or be deemed to constitute an admission that any of the Debtors are subject to or liable for any Claim.

### 6.    *Waiver or Estoppel*

Each Holder of a Claim or Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors or their counsel or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement or papers filed with the Bankruptcy Court prior to the Confirmation Date.

### 7.    *Dissolution of Creditors' Committee and Formation of Post-Effective Date Committee*

After the occurrence of the Effective Date, the Creditors' Committee shall automatically dissolve, and the members thereof and their respective officers, employees, counsel, advisors and agents shall be released and discharged of and from all rights, duties, responsibilities and liabilities

arising from, or related to, the Chapter 11 Cases and under the Bankruptcy Code, except with respect to (a) applications filed pursuant to sections 330 and 331 of the Bankruptcy Code; (b) continuing confidentiality obligations; and (c) in the event that the Bankruptcy Court's entry of the Confirmation Order is appealed, participating in such appeal.  From and after the Effective Date, the Reorganized Debtors shall continue to pay, when due and payable in the ordinary course of business, the reasonable and documented fees and expenses of the Creditors' Committee's professionals, solely to the extent arising out of or related to the foregoing, without further order of the Bankruptcy Court.

[On the Effective Date, there shall be formed a Post-Effective Date Committee with its duties limited to the oversight of certain actions of the Reorganized Debtors, which actions shall remain the sole responsibility of the Reorganized Debtors, including:  (a) overseeing the General Unsecured Claims' reconciliation and settlement process conducted by or on behalf of the Reorganized Debtors pursuant to the Claims Objection and Settlement Procedures Order, as applicable; (b) overseeing the (i) establishment and (ii) maintenance of the Disputed Claims Reserve(s); (c) overseeing the distributions to the Holders of General Unsecured Claims under the Plan; (d) appearing before and being heard by the Bankruptcy Court and other Courts of competent jurisdiction in connection with the above duties; and (e) such other matters as may be agreed upon between the Reorganized Debtors, the Required Equity Commitment Parties and the Post-Effective Date Committee or as otherwise specified in the Plan.]

[The Post-Effective Date Committee shall consist of three members to be appointed by and from the Creditors' Committee and may adopt by-laws governing its conduct.  The Creditors' Committee shall notify the Debtors, in writing, of the identities of the three members of the Post-Effective Date Committee at least five Business Days prior to the Confirmation Hearing.  The Reorganized Debtors may seek the removal of a member of the Post-Effective Date Committee for cause.  In the event of a disagreement regarding the membership of the Post-Effective Date Committee, the Creditors' Committee or Post-Effective Date Committee, as applicable, may apply to the Bankruptcy Court for appropriate relief.  Pending a determination by the Bankruptcy Court, the member shall not be given access to confidential or proprietary information concerning any of the Reorganized Debtors.  In the event of the resignation or removal of a member of the Post-Effective Date Committee for any reason, a replacement shall be designated by the remaining members of the Post-Effective Date Committee.  If the Reorganized Debtors object to the selection of any initial or replacement member of the Post-Effective Date Committee, such person shall not serve on the Post-Effective Date Committee; provided, however, that, in such an instance, the Creditors' Committee or Post-Effective Date Committee, as applicable, may apply to the Bankruptcy Court for appropriate relief.  Pending a determination by the Bankruptcy Court, the proposed member shall not be given access to confidential or proprietary information concerning any of the Reorganized Debtors.]

[The Post-Effective Date Committee may employ, without further order of the Bankruptcy Court, professionals to assist it in carrying out its duties as limited above, including any professionals retained in these Chapter 11 Cases.  The Reorganized Debtors shall pay, as soon as reasonably practicable after invoiced, the reasonable, actual and documented costs and expenses of the Post-Effective Date Committee, including reasonable professional fees, in the ordinary course without further order of the Bankruptcy Court; *provided* that the aggregate amount of fees and expenses to be incurred by the Post-Effective Date Committee, its members and its

Professionals that any of the Reorganized Debtors shall be obligated to pay or reimburse shall not exceed the Post-Effective Date Committee Expense Cap. In the event that, on the Effective Date, an objection to any Claim by the Creditors' Committee is pending, the Post-Effective Date Committee shall have the right to continue prosecution of such objection.]

[For so long as the claims reconciliation process shall continue, the Reorganized Debtors shall make regular reports to the Post-Effective Date Committee as and when the Reorganized Debtors and the Post-Effective Date Committee may reasonably agree.]

[Notwithstanding anything contained in the Plan to the contrary, the rights and powers of the Post-Effective Date Committee are strictly limited to those matters in Section 11.7 of the Plan, and such rights and powers may only be exercised in a manner consistent with the terms and conditions set forth therein. The Post-Effective Date Committee shall be bound in all respects by the terms of the Plan and by any and all order(s) entered in the Chapter 11 Cases or orders of the Bankruptcy Court after the Effective Date.]

### 8.    *Plan Supplement*

The Plan Supplement shall be filed with the Bankruptcy Court no later than seven calendar days prior to the deadline to object to the Plan. Unless otherwise expressly provided in the Plan and subject to the consent rights set forth in the Plan and the Debt Financing Commitment Letter and the Subscription Agreement, as applicable, the Debtors shall remain free to modify or amend any such documents after such date. Upon filing with the Bankruptcy Court, the Plan Supplement may be inspected in the office of the clerk of the Bankruptcy Court during normal court hours. Holders of Claims or Interests may also obtain a copy of the Plan Supplement on the Debtors' Case Information Website at https://dm.epiq11.com/aeromexico or the Bankruptcy Court's website at www.nysb.uscourts.gov.

### 9.    *Claims Against Other Debtors*

Nothing in the Plan or the Disclosure Statement or any document or pleading filed in connection therewith shall constitute or be deemed to constitute an admission that any of the Debtors are subject to or liable for any Claim against any other Debtor.

### 10.    *Section 1125 of the Bankruptcy Code*

As of and subject to the occurrence of the Confirmation Date: the Debtors shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including, without limitation, sections 1125(a) and 1125(e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in connection with such solicitation and the Debtors and each of their respective Affiliates, agents, directors, officers, employees, advisors and attorneys shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of any securities under the Plan and, therefore, are not, and on account of such offer, issuance and solicitation will not be, liable at any time for any violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or the offer and issuance of any securities under the Plan.

### 11. Severability

In the event that any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### 12. Governing Law

Except to the extent that the Bankruptcy Code, Bankruptcy Rules or other federal or international law, as applicable, or to the extent an exhibit hereto or a Schedule or Plan Documents provides otherwise, the rights, duties and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof; *provided*, *however*, that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, shall be governed by the laws of the jurisdiction of incorporation or formation of the relevant Debtor or Reorganized Debtor, as applicable.

### 13. Entire Agreement

On the Effective Date, the Plan, the Plan Supplement and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings and representations concerning such documents, all of which have become merged and integrated into the Plan.

### 14. Exhibit to Plan

All exhibits, schedules, supplements and appendices to the Plan (including the Plan Supplement) are incorporated into and are part of the Plan as if set forth in full herein.

### 15. Binding Effect

The Plan shall be binding upon and inure to the benefit of the Debtors, the Reorganized Debtors, all present and former Holders of Claims or interests, and all of their respective heirs, executors, administrators, successors and assigns.

### 16. Notices

To be effective, any notice, request or demand to or upon, as applicable, the Debtors, the Creditors' Committee, the DIP Agent or the United States Trustee must be in writing in English

or Spanish, and unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually received and confirmed by the relevant party as follows:

If to the Debtors:

> Grupo Aeroméxico S.A.B. de C.V.
> Av. Paseo de la Reforma 243, piso 25
> Cuauhtémoc, Mexico City, Mexico, 06500
> Attn.: Ricardo Javier Sánchez Baker and Claudia Angelica Cervantes
> Email: rsbaker@aeromexico.com
>         ccervantes@aeromexico.com

> with a copy to:

> Davis Polk & Wardwell LLP
> 450 Lexington Avenue
> New York, NY 10017
> Attn.: Timothy Graulich, Stephen Piraino and Erik Jerrard
> Email: timothy.graulich@davispolk.com
>         stephen.piraino@davispolk.com
>         erik.jerrard@davispolk.com

> and, if to the Debtors on an aircraft-related matter, with a copy to:

> White & Case LLP
> 1221 Avenue of the Americas
> New York, NY 10020
> Attn:  Christian Hansen, Anna Andreeva, and Todd K. Wolynski
> Email:  chansen@whitecase.com
>         aandreeva@whitecase.com
>         todd.wolynski@whitecase.com

If to the Creditors' Committee:

> Willkie Farr and Gallagher LLP
> 787 Seventh Avenue
> New York, NY 10019
> Attn:  Brett H. Miller and Todd M. Goren
> Email:  bmiller@willkie.com
>         tgoren@willkie.com

If to the DIP Agent:

> UMB Bank National Association
> 2 South Broadway, Suite 600
> St. Louis, MO 63102
> Attn.: Julius Zamora
> Email: julius.zamora@umb.com

If to the United States Trustee:

>Office of the U.S. Trustee
>U.S. Department of Justice
>201 Varick Street, Rm 1006
>New York, NY 10014
>Attn.: Andrea B. Schwartz
>Email: andrea.b.schwartz@usdoj.gov

If to the Equity Financing Commitment Parties and/or Debt Financing Commitment Parties:

>If to a member of the Ad Hoc Group of Senior Noteholders:

>>Akin Gump Strauss Hauer & Feld LLP
>>One Bryant Park
>>New York, NY 10036
>>Attn.:   David Botter, Jason Rubin, Meng Ru and Alan J. Feld
>>Email:  dbotter@akingump.com
>>        jrubin@akingump.com
>>        mru@akingump.com
>>        ajfeld@akingump.com

>If to a BSPO Investor:

>>Milbank LLP
>>55 Hudson Yards
>New York, NY 10003
>Attn.: Dennis F. Dunne, Scott Golenbock, Andrew M. Leblanc, and Matthew L.
>Brod
>Email: DDunne@milbank.com
>>        SGolenbock@milbank.com
>>        aleblanc@milbank.com
>>        mbrod@milbank.com

>If to Delta:

>>Hughes Hubbard & Reed LLP
>>One Battery Park Plaza
>>New York, NY 10004
>>Attn.: Kathryn A. Coleman and Jeffrey S. Margolin
>>Email: katie.coleman@hugheshubbard.com
>>        jeff.margolin@hugheshubbard.com

If to a member of the Ad Hoc Group of Unsecured Claimholders:

> Gibson, Dunn & Crutcher LLP
> 200 Park Avenue
> New York, NY 10166
> Attn.: Scott J. Greenberg, Matthew J. Williams, Josh Brody
> Email: sgreenberg@gibsondunn.com
>         mjwilliams@gibsondunn.com
>         jbrody@gibsondunn.com

### 17.   *Reservation of Rights*

Except as expressly set forth herein, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  Prior to the Effective Date, none of the filing of the Plan, any statement or provision contained herein or the taking of any action by the Debtors with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of the Debtors of any kind, including with respect to the Holders of Claims or interests or as to any treatment or classification of any contract or lease.

### 18.   *Further Assurances*

The Debtors, Reorganized Debtors and all Holders of Claims receiving distributions hereunder and all other parties in interest may and shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

## ARTICLE VI

## VOTING REQUIREMENTS; ACCEPTANCE AND CONFIRMATION OF THE PLAN

### A.   General

The following is a brief summary of the Plan confirmation process.  Holders of Claims or interests are encouraged to review the relevant provisions of the Bankruptcy Code and/or consult their own attorneys.

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a confirmation hearing.  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan.

Section 1129 of the Bankruptcy Code requires that, in order to confirm the Plan, the Bankruptcy Court must make a series of findings concerning the Plan and the Debtors, including that (a) the Plan has classified Claims and interests in a permissible manner, (b) the Plan complies with applicable provisions of the Bankruptcy Code, (c) the Plan has been proposed in good faith and not by any means forbidden by law, (d) the disclosure required by section 1125 of the Bankruptcy Code has been made, (e) the Plan has been accepted by the requisite votes of Holders of Claims and interests (except to the extent that cramdown is available under section 1129(b) of the Bankruptcy Code), (f) the Plan is feasible and confirmation is not likely to be followed by the

liquidation or the need for further financial reorganization of the Debtors, unless such liquidation or reorganization is proposed in the Plan, (g) the Plan is in the "best interests" of all Holders of Claims and interests in an Impaired Class by providing to such holders on account of their Claims and interests property of a value, as of the Effective Date, that is not less than the amount that such holders would receive or retain in a chapter 7 liquidation, unless each holder of a Claim and interest in such Class has accepted the Plan, and (h) all fees and expenses payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of such fees on the Effective Date. The Debtors believe that the Plan satisfies section 1129 of the Bankruptcy Code.

**B.     Parties in Interest Entitled to Vote**

Pursuant to the Bankruptcy Code, only Classes of Claims that are "impaired" (as defined in section 1124 of the Bankruptcy Code) under the Plan are entitled to vote to accept or reject the Plan. A Class is impaired if the legal, equitable or contractual rights to which the Claims of that Class entitled the Holders of such Claims are modified by the Plan, other than by curing defaults and reinstating the Claims. Classes that are not impaired are not entitled to vote on the Plan and are conclusively presumed to have accepted the Plan. In addition, Classes that receive no distributions under the Plan are not entitled to vote on the Plan and are deemed to have rejected the Plan.

**C.     Classes Impaired and Entitled to Vote Under the Plan**

The following Classes are Impaired under the Plan and entitled to vote on the Plan:

| Class | Claims or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Secured Claims against the Debtors | Unimpaired | Presumed to Accept |
| 2 | Other Priority Claims against the Debtors | Unimpaired | Presumed to Accept |
| 3(a) | Aerovías and Grupo Aeroméxico Recourse Claims against Grupo Aeroméxico and Aerovías | Impaired | Entitled to Vote |
| 3(b) | General Unsecured Claims against Grupo Aeroméxico | Impaired | Entitled to Vote |
| 3(c) | General Unsecured Claims against Aerovías | Impaired | Entitled to Vote |
| 3(d) | General Unsecured Claims against Aeroméxico Connect | Impaired | Entitled to Vote |
| 3(e) | General Unsecured Claims against Aeroméxico Cargo | Impaired | Entitled to Vote |

| 4(a) | Unsecured Convenience Class Claims against Grupo Aeroméxico | [·] | [·] |
|---|---|---|---|
| 4(b) | Unsecured Convenience Class Claims against Aerovías | [·] | [·] |
| 4(c) | Unsecured Convenience Class Claims against Aeroméxico Connect | [·] | [·] |
| 4(d) | Unsecured Convenience Class Claims against Aeroméxico Cargo | [·] | [·] |
| 5(a) | Intercompany Claims against Grupo Aeroméxico | [·] | [·] |
| 5(b) | Intercompany Claims against Aerovías | [·] | [·] |
| 5(c) | Intercompany Claims against Aeroméxico Connect | [·] | [·] |
| 5(d) | Intercompany Claims against Aeroméxico Cargo | [·] | [·] |
| 6 | Intercompany Interests | [·] | [·] |
| 7 | Interests in Grupo Aeroméxico | Impaired | Deemed to Reject |

In general, if a Claim or Interest is unimpaired under a plan, section 1126(f) of the Bankruptcy Code deems the holder of such Claim or Interest to have accepted the plan. Therefore, the holders of claims or interests in such unimpaired classes are not entitled to vote on the plan. Because Classes [1 and 2] are Unimpaired under the Plan, the Holders of Claims in these Classes are not entitled to vote.

In general, if the holder of an impaired claim or impaired interest will not receive any distribution under a plan in respect of such Claim or Interest, section 1126(g) of the Bankruptcy Code deems the holder of such Claim or Interest to have rejected the plan, and thus, the holders of claims or interests in such classes are not entitled to vote on the plan. The Holders of Interests in Class [7] are conclusively presumed to have rejected the Plan and are, therefore, not entitled to vote.

## D.    Voting Procedures and Requirements

The Bankruptcy Court can confirm the Plan only if it determines that the Plan, among other things, complies with the technical requirements of chapter 11 of the Bankruptcy Code. One of these technical requirements is that the Bankruptcy Court find, among other things, that the Plan

has been accepted by the requisite votes of all Classes of impaired Claims unless approval will be sought under section 1129(b) of the Bankruptcy Code in spite of the nonacceptance by one or more such Classes.

If you have any questions about (a) the procedures for voting your Claim or with respect to the packet of materials that you have received as part of the Solicitation Package or (b) the amount of your Claim, please contact the Debtors' Claims and Solicitation Agent at (855) 917-3578 (Toll-Free U.S.) OR +1 (503) 520-4473 (if calling from outside the U.S.). If you wish to obtain (at no charge) an additional copy of the Plan, this Disclosure Statement, or other solicitation documents, you can obtain them from the Debtors' Case Information Website located at https://dm.epiq11.com/case/aeromexico or by requesting a copy from the Debtors' Claims and Solicitation Agent, which can be reached at the telephone number directly above or by email at aeromexicoinfo@epiqglobal.com.

### 1. *Ballots*

The record date for purposes of determining which Holders of Claims are entitled to receive Solicitation Packages and, where applicable, vote on the Plan shall be [October 14], 2021 (the "**Voting Record Date**"). Accordingly, only Holders of record as of the Voting Record Date that are otherwise entitled to vote under the Plan will receive a Ballot and may vote on the Plan.

In voting for or against the Plan, please use (a) only the Ballot sent to you with this Disclosure Statement and as part of the Solicitation Package or (b) the online electronic ballot portal. If you are a Holder of a Claim in Classes [3(a), 3(b), 3(c), 3(d) or 3(e)] and did not receive a Ballot, if your Ballot is damaged or lost, or if you have any questions concerning voting procedures, please contact the Claims and Solicitation Agent at (855) 917-3578 (Toll-Free U.S.) OR +1 (503) 520-4473 (if calling from outside the U.S.) or by email at aeromexicoinfo@epiqglobal.com.

### 2. *Submitting Ballots*

If you are entitled to vote to accept or reject the Plan, you should read carefully, complete, and submit your Ballot in accordance with the instructions set forth in your Ballot, the Approval Order and the Solicitation and Voting Procedures (as defined in the Approval Order).

Holders of Senior Notes Claims or Unsecured CEBURES who hold their position through a broker, bank, common representative or other nominee or an agent of a broker, bank, common representative or other nominee should carefully review the voting instructions contained on their Beneficial Holder Ballot (as defined in the Approval Order) and provided by their Nominee.

Except as otherwise ordered by the Bankruptcy Court, any Ballots received after the Voting Deadline will not be counted absent the consent of the Debtors (in their sole discretion). No Ballot should be sent to the Debtors, their agents (other than the Claims and Solicitation Agent), any administrative agent (unless specifically instructed to do so) or the Debtors' financial or legal advisors, and if so sent the Ballot will not be counted. If no Holders of Claims in a particular Class that is entitled to vote on the Plan vote to accept or reject the Plan, then such Class shall be deemed to accept the Plan.

3.      *Voting*

If a Claim is subject to an objection that is filed with the Court on or prior to five (5) days prior to the Voting Deadline, such Disputed Claim is temporarily disallowed for voting purposes, except as otherwise provided in a stipulation, settlement, or other agreement filed by the Debtors or as ordered by the Court at least two (2) days prior to the Voting Deadline, including pursuant to an order on any Rule 3018 motion filed regarding such Claim; *provided* that if the objection seeks to reclassify or reduce the allowed amount of such Claim, then such Claim is temporarily allowed for voting purposes in the reduced amount and/or as reclassified, except as otherwise provided in a stipulation, settlement, or other agreement filed by the Debtors or as may be otherwise ordered by the Court at least two (2) days prior to the Voting Deadline.

4.      *Releases, Exculpations, and Injunctions Provisions Under the Plan*

The Plan contains certain releases, exculpations, and injunctions (as described more fully in Article VIII of the Plan), including releases between the Debtors, on the one hand, and certain Releasing Parties on the other hand.  The Releasing Parties under the Plan include the following: (a) the Creditors' Committee and each of its members in their capacity as such; (b) the DIP Lenders (as defined in the DIP Credit Agreement); (c) the DIP Agent; (d) the Senior Notes Indenture Trustee; (e) the Equity Financing Commitment Parties; (f) the Debt Financing Commitment Parties; (g) the Debtors' current and former officers and directors; (h) each of the Unions; (i) the Ad Hoc Group of Senior Noteholders and its members; (j) the Ad Hoc Group of Unsecured Claimholders and its members; (k) each Holder of a Claim that votes to accept the Plan; and (l) with respect to each of the Persons referred to in clauses (a) through (k), such Person's Related Parties, in each case only in their capacity as such. The release, exculpation, and injunction provisions in Article VIII of the Plan are integral to the Plan.

## E.    Acceptance of Plan

As a condition to confirmation of a plan, the Bankruptcy Code requires that each class of impaired claims votes to accept the plan, except under certain circumstances.  See "Confirmation Without Necessary Acceptances; Cramdown" below.  A class of claims or interests that is unimpaired under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.  A class is impaired if the plan (a) leaves unaltered the legal, equitable, and contractual rights to which the Claim or Interest entitles the holder of such Claim or Interest or (b) cures any default, reinstates the original terms of the obligation and does not otherwise alter the legal, equitable or contractual rights to which the Claim or Interest entitles the holder of such Claim or Interest.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by an impaired class as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class.  Only those holders that are eligible to vote and that actually vote to accept or reject the plan are counted for purposes of determining whether these dollar and number thresholds are met.  Thus, a class of claims will have voted to accept a plan only if two-thirds in amount and a majority in number that actually vote cast their ballots in favor of acceptance.  Under section 1126(d) of the Bankruptcy Code, a class of interests has accepted a plan if holders of such interests holding at least two-thirds in amount that actually vote have voted to accept the plan.

In addition to this voting requirement, section 1129 of the Bankruptcy Code requires that a plan be accepted by each holder of a Claim or Interest in an impaired class or that the plan otherwise be found by a court to be in the best interests of each holder of a Claim or Interest in such class. See "Best Interests Test" below. Moreover, each impaired class must accept the plan for the plan to be confirmed without application of the "fair and equitable" and "unfair discrimination" tests set forth in section 1129(b) of the Bankruptcy Code discussed below. See "Confirmation Without Necessary Acceptances; Cramdown" below.

## F.    Confirmation Without Necessary Acceptances; Cramdown

In the event that any impaired class of claims or interests does not accept a plan, a debtor nevertheless may seek confirmation of the plan. A plan may be confirmed, even if it is not accepted by all impaired classes, if the plan has been accepted by at least one impaired class of claims and the plan meets the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code. Section 1129(b) of the Bankruptcy Code requires that a court find that a plan (a) "does not discriminate unfairly" and (b) is "fair and equitable" with respect to each non-accepting impaired class of claims or interests. Here, because Holders of Claims or Interests in Class [7] are deemed to reject the Plan, the Debtors will seek confirmation of the Plan from the Bankruptcy Court by satisfying the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code. The Debtors believe that such requirements are satisfied, as no Holder of a Claim or Interest junior to those Classes will receive any property under the Plan.

A plan "does not discriminate unfairly" if (a) the legal rights of a nonaccepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are similar to those of the nonaccepting class and (b) no class receives payments in excess of that which it is legally entitled to receive for its claims or interests. The Debtors believe that, under the Plan, all Impaired Classes of Claims and interests are treated in a manner that is consistent with the treatment of other Classes of Claims and interests that are similarly situated, if any, and no class of Claims or Interests will receive payments or property with an aggregate value greater than the aggregate value of the Allowed Claims or Allowed interests in such Class. Accordingly, the Debtors believe that the Plan does not discriminate unfairly as to any Impaired Class of Claims or interests.

The Bankruptcy Code provides a non-exclusive definition of the phrase "fair and equitable." In order to determine whether a plan is "fair and equitable," the Bankruptcy Code establishes "cram down" tests for secured creditors, unsecured creditors, and equity holders, as follows:

(i)    Secured Creditors. Either (a) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred cash payments having a present value equal to the amount of its allowed secured claim, (b) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim, or (c) subject to section 363(k) of the Bankruptcy Code, the property securing the claim is sold free and clear of liens, with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (a) or (b) above.

-146-

(ii)     <u>Unsecured Creditors</u>.  Either (a) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim or (b) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

(iii)    <u>Equity Interests</u>.  Either (a) each holder of an equity interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of the interest or (b) the holder of an interest that is junior to the nonaccepting class will not receive or retain any property under the plan.

As discussed above, the Debtors believe that the Distributions provided under the Plan satisfy the "fair and equitable" standard, where required.

## G.    Classification

The Bankruptcy Code requires that, for purposes of treatment and voting, a chapter 11 plan divide the different claims (excluding Administrative Claims) against, and equity interests in, a debtor into separate classes based upon their legal nature.  Pursuant to section 1122 of the Bankruptcy Code, a plan may place a claim or an interest in a particular class only if such Claim or Interest is substantially similar to the other claims or interests of such class.  The Debtors believe that the Plan classifies all Claims and interests in compliance with the provisions of the Bankruptcy Code because valid business, factual, and legal reasons exist for separately classifying the various Classes of Claims and interests created under the Plan.  Accordingly, the classification of Claims and interests in the Plan complies with section 1122 of the Bankruptcy Code.

## ARTICLE VII

## BEST INTERESTS OF CREDITORS AND FEASIBILITY

## A.    Best Interests Test

As noted above, even if a plan is accepted by the holders of each class of claims and interests, the Bankruptcy Code requires a court to determine that such plan is in the best interests of all holders of claims or interests that are impaired by that plan and that have not accepted the plan.  The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a court to find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code (the "**Best Interests Test**").

To calculate the probable distribution to holders of each impaired class of claims and interests if the debtor were liquidated under chapter 7, a court must first determine the aggregate dollar amount that would be generated from a debtor's assets if its chapter 11 cases were converted to chapter 7 cases under the Bankruptcy Code. To determine if a plan is in the best interests of

each Impaired class, the potential range of distributions from the proceeds of a liquidation of the debtor's assets, after subtracting the amounts attributable to costs and expenses associated with a chapter 7 liquidation, must be compared with the value offered to such Impaired classes under the plan.  If the hypothetical liquidation distribution to holders of claims or interests in any impaired class is greater than the distributions to be received by such parties under the plan, then such plan is not in the best interests of the holders of claims or interests in such impaired class.

**B.    Liquidation Analysis**

Amounts that Holders of Claims or interests in Impaired Classes would receive in a hypothetical chapter 7 liquidation are discussed in the liquidation analysis of the Debtors prepared by the Debtors' management with the assistance of the Debtors' advisors (the "**Liquidation Analysis**"), which is attached hereto as Appendix B.

As described in Appendix B, the Debtors developed the Liquidation Analysis using the most recent available balance sheet as of June 30, 2021 as the basis for book value of the Assets.

As described in the Liquidation Analysis, underlying the analysis is a number of estimates and assumptions that, although developed and considered reasonable by the Debtors' management and advisors, are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management or a chapter 7 trustee.  The Liquidation Analysis is based on assumptions with regard to liquidation decisions that are subject to change.  Accordingly, the values reflected in the Liquidation Analysis might not be realized if the Debtors were, in fact, to undergo a liquidation.

This Liquidation Analysis is solely for the purposes of (a) providing "adequate information" under section 1125 of the Bankruptcy Code to enable the Holders of Claims entitled to vote under the Plan to make an informed judgment about the Plan and (b) providing the Bankruptcy Court with appropriate support for the satisfaction of the "Best Interests Test," pursuant to section 1129(a)(7) of the Bankruptcy Code, and should not be used or relied upon for any other purpose, including the purchase or sale of securities of, or Claims or interests in, the Debtors or any of their Affiliates.

Events and circumstances occurring subsequent to the date on which the Liquidation Analysis was prepared may be different from those assumed, or, alternatively, may have been unanticipated, and thus the occurrence of these events may affect financial results in a materially adverse or materially beneficial manner.  The Debtors do not intend to and do not undertake any obligation to update or otherwise revise the Liquidation Analysis to reflect events or circumstances existing or arising after the date the Liquidation Analysis is initially filed or to reflect the occurrence of unanticipated events.  Therefore, the Liquidation Analysis may not be relied upon as a guarantee or other assurance of the actual results that will occur.

In deciding whether to vote to accept or reject the Plan, Holders of Claims must make their own determinations as to the reasonableness of any assumptions underlying the Liquidation Analysis and the reliability of the Liquidation Analysis.

### C.    Application of the Best Interests Test

The Debtors believe that the continued operation of the Debtors as a going concern satisfies the Best Interests Test for the Impaired Classes.  Notwithstanding the difficulties in quantifying recoveries to holders of Claims and interests with precision, the Debtors believe that, based on the Liquidation Analysis, the Plan meets the Bests Interests Test.  As the Plan and the Liquidation Analysis attached hereto as Appendix B indicate, Confirmation of the Plan will provide each holder of an Allowed Claim in an Impaired Class with an equal or greater recovery than the value of any distributions if the Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code.

### D.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).  To determine whether the Plan meets this feasibility requirement, the Debtors, with the assistance of their advisors, have analyzed their ability to meet their respective obligations under the Plan.  As part of this analysis, the Debtors have prepared their projected consolidated balance sheet, income statement, and statement of cash flows (the "**Financial Projections**"), attached hereto as Appendix C and incorporated herein by reference.  The Debtors' business plan, which is predicated on the Debtors maintaining their long-term strategic partnership with Delta and other airlines in the SkyTeam Alliance, forms the basis of the Financial Projections.

The Debtors have prepared the Financial Projections solely for the purpose of providing "adequate information" under section 1125 of the Bankruptcy Code to enable Holders of Claims entitled to vote under the Plan to make an informed judgment about the Plan and should not be used or relied upon for any other purpose, including the purchase or sale of securities of, or Claims and interests in, the Debtors.

In addition to the cautionary notes contained elsewhere in this Disclosure Statement and in the Financial Projections, it is underscored that the Debtors make no representation as to the accuracy of the Financial Projections or their ability or the Reorganized Debtors' ability to achieve the projected results.  Many of the assumptions on which the Financial Projections are based are subject to significant uncertainties.  Inevitably, some assumptions will not materialize, and unanticipated events and circumstances may affect the financial results.  Therefore, actual results achieved throughout the Projected Period (as defined in the Financial Projections) may vary from the Financial Projections, and the variations may be material.  All holders of Claims in the Impaired Classes are urged to examine carefully all of the assumptions on which the Financial Projections are based in connection with their evaluation of, and voting on, the Plan.

Based upon the Financial Projections, the Debtors believe that they will be able to make all distributions and payments under the Plan and that confirmation of the Plan is not likely to be followed by liquidation of the Reorganized Debtors or the need for further restructuring.

E.    **Valuation of the Debtors**

In conjunction with formulating the Plan and satisfying its obligations under section 1129 of the Bankruptcy Code, the Debtors, with the assistance of their advisors, produced the valuation analysis (the "**Valuation Analysis**") estimating the post-confirmation going concern value of the Debtors that is set forth in <u>Appendix D</u> attached hereto and incorporated herein by reference.

## ARTICLE VIII

## EFFECT OF CONFIRMATION

A.    **Binding Effect of Confirmation**

Confirmation will bind the Debtors and all Holders of Claims and interests to the provisions of the Plan, whether or not the Claim or Interest of any such Holder is Impaired under the Plan and whether or not any such Holder of a Claim has accepted, rejected or abstained from voting on the Plan.  Confirmation will have the effect of converting all Claims into rights to receive the treatment specified in the Plan and cancelling or diluting to a de minimis amount all interests in the Debtors.  Moreover, as a matter of Mexican law, confirmation of the Plan will have the same binding effect (subject to certain risks as described in Article VI herein) as otherwise described in this Disclosure Statement.  All Holders of Claims or interests, whether located in the United States, Mexico or elsewhere, will only receive payment in accordance with the Plan, in full and final satisfaction of the Claim or Interest.

B.    **Good Faith**

Confirmation of the Plan will constitute a finding that (a) the Plan has been proposed in good faith and in compliance with applicable provisions of the Bankruptcy Code and (b) all solicitations of acceptances or rejections of the Plan have been in good faith and in compliance with applicable provisions of the Bankruptcy Code.

## ARTICLE IX

## SECURITIES LAW MATTERS

A.    **Bankruptcy Code Exemptions from Registration Requirements for the New Stock**

1.    *1145 Securities*

The offering, issuance and distribution of the New Stock pursuant to the Plan (the "**1145 Securities**") will be exempt, without further act or actions by any entity, from registration under section 5 of the Securities Act and any other applicable securities laws to the fullest extent permitted by section 1145 of the Bankruptcy Code.

Section 1145 of the Bankruptcy Code generally exempts from registration under the Securities Act and state and local securities laws the offer or sale under a chapter 11 plan of a security of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under a plan, if such securities are offered or sold in exchange for a claim against, or

an interest in, the debtor or such affiliate, or principally in such exchange and partly for cash. Section 1145 of the Bankruptcy Code also exempts from registration the offer of a security through any right to subscribe sold in the manner provided in the prior sentence, and the sale of a security upon the exercise of such right. In reliance upon this exemption, the 1145 Securities will be exempt from the registration requirements of the Securities Act, and state and local securities laws. These securities may be resold without registration under the Securities Act or other federal or state securities laws pursuant to the exemption provided by section 4(a)(1) of the Securities Act, unless the holder is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code. In addition, 1145 Securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

Section 1145(b) of the Bankruptcy Code defines "underwriter" for purposes of the Securities Act as one who, except with respect to ordinary trading transactions, (a) purchases a claim with a view to distribution of any security to be received in exchange for the claim, (b) offers to sell securities issued under a plan for the holders of such securities, (c) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution or (d) is an issuer, as used in section 2(a)(11) of the Securities Act, with respect to such securities, which includes control persons of the issuer.

"Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. The legislative history of Section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent (10%) or more of a class of voting securities of a reorganized debtor may be presumed to be a "controlling person" and, therefore, an underwriter.

Notwithstanding the foregoing, control person underwriters may be able to sell securities without registration pursuant to the resale limitations of Rule 144 of the Securities Act which, in effect, permit the resale of securities received by such underwriters pursuant to a chapter 11 plan, subject to applicable volume limitations, notice and manner of sale requirements, and certain other conditions. Parties who believe they may be statutory underwriters as defined in section 1145 of the Bankruptcy Code are advised to consult with their own legal advisers as to the availability of the exemption provided by Rule 144.

## 2.    *Section 4(a)(2) Securities*

The offering, issuance and sale of the New Stock that are not 1145 Securities is being made in reliance on the exemption from registration set forth in section 4(a)(2) of the Securities Act and/or Regulation D thereunder (the "**4(a)(2) Securities**") or, solely to the extent section 4(a)(2) of the Securities Act or Regulation D thereunder is not available, any other available exemption from registration under the Securities Act. Such securities will be considered "restricted securities", will bear customary legends and transfer restrictions, and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act.

Rule 144 provides a limited safe harbor for the public resale of restricted securities if certain conditions are met. These conditions vary depending on whether the holder of the restricted securities is an "affiliate" of the issuer. Rule 144 defines an affiliate of the issuer as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer."

A non-affiliate of an issuer that is not subject to the reporting requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934 (the "Exchange Act") and who has not been an affiliate of the issuer during the 90 days preceding such sale may resell restricted securities after a one-year holding period whether or not there is current public information regarding the issuer.

An affiliate of an issuer that is not subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act may resell restricted securities after the one-year holding period if at the time of the sale certain current public information regarding the issuer is available. An affiliate must also comply with the volume, manner of sale and notice requirements of Rule 144. First, the rule limits the number of restricted securities (plus any unrestricted securities) sold for the account of an affiliate (and related persons) in any three-month period to the greater of 1% of the outstanding securities of the same class being sold or, if the class is listed on a stock exchange, the average weekly reported volume of trading in such securities during the four weeks preceding the filing of a notice of proposed sale on Form 144 or if no notice is required, the date of receipt of the order to execute the transaction by the broker or the date of execution of the transaction directly with a market maker. Second, the manner of sale requirement provides that the restricted securities must be sold in a broker's transaction, directly with a market maker or in a riskless principal transaction (as defined in Rule 144). Third, if the amount of securities sold under Rule 144 in any three month period exceeds 5,000 shares or has an aggregate sale price greater than $50,000, an affiliate must file or cause to be filed with the SEC three copies of a notice of proposed sale on Form 144, and provide a copy to any exchange on which the securities are traded.

The Debtors believe that the Rule 144 exemption will not be available with respect to any 4(a)(2) Securities (whether held by non-affiliates or affiliates) until at least one year after the New Stock is issued. Accordingly, unless transferred pursuant to an effective registration statement or another available exemption from the registration requirements of the Securities Act, nonaffiliated holders of 4(a)(2) Securities will be required to hold their 4(a)(2) Securities for at least one year and, thereafter, to sell them only in accordance with the applicable requirements of Rule 144, pursuant to an effective registration statement or pursuant to another available exemption from the registration requirements of applicable securities laws.

\* \* \* \* \*

*Legends*. To the extent certificated or issued by way of direct registration on the records of the Company's stock registry book, the New Stock held by holders of 10% or more of the outstanding New Stock, or who are otherwise underwriters as defined in section 1145(b) of the Bankruptcy Code, would be subject to the following, which would be set forth in an entry to be recorded in the Company's stock registry book:

THE SECURITIES ISSUED BY THE COMPANY HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "**ACT**"),

OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER.

The Company reserves the right to reasonably require certification, legal opinions or other evidence of compliance with Rule 144 as a condition to any resale of the 4(a)(2) Securities. The Company also reserves the right to stop the transfer of any 4(a)(2) Securities if such transfer is not in compliance with Rule 144, pursuant to an effective registration statement or pursuant to another available exemption from the registration requirements of applicable securities laws. All persons who receive 4(a)(2) Securities will be required to acknowledge and agree, that (a) they will not offer, sell or otherwise transfer any 4(a)(2) Securities except in accordance with an exemption from registration, including under Rule 144 under the Securities Act, if and when available, or pursuant to an effective registration statement, and (b) the 4(a)(2) Securities will be subject to the other restrictions described above.

In any case, recipients of securities issued under or in connection with the Plan are advised to consult with their own legal advisers as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER OR AN AFFILIATE AND THE HIGHLY FACT-SPECIFIC NATURE OF THE AVAILABILITY OF EXEMPTIONS FROM REGISTRATION UNDER THE SECURITIES ACT, INCLUDING THE EXEMPTIONS AVAILABLE UNDER SECTION 1145 OF THE BANKRUPTCY CODE AND RULE 144 UNDER THE SECURITIES ACT, NONE OF THE DEBTORS MAKE ANY REPRESENTATION CONCERNING THE ABILITY OF ANY PERSON TO DISPOSE OF THE SECURITIES TO BE ISSUED UNDER OR OTHERWISE ACQUIRED PURSUANT TO THE PLAN. THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF THE SECURITIES TO BE ISSUED UNDER OR OTHERWISE ACQUIRED PURSUANT TO THE PLAN CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES AND THE CIRCUMSTANCES UNDER WHICH THEY MAY RESELL SUCH SECURITIES.

## ARTICLE X

### CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING

THE PLAN AND ITS IMPLEMENTATION ARE SUBJECT TO CERTAIN RISKS, INCLUDING, BUT NOT LIMITED TO, THE RISK FACTORS SET FORTH BELOW. HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH, REFERRED TO, OR INCORPORATED BY REFERENCE HEREIN, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN. THESE FACTORS SHOULD NOT, HOWEVER, BE

REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.  DOCUMENTS FILED WITH THE MEXICAN STOCK EXCHANGE, INCLUDING THE COMPANY'S ANNUAL REPORTS, MAY CONTAIN IMPORTANT RISK FACTORS THAT DIFFER FROM THOSE DISCUSSED BELOW AND INCLUDE ADDITIONAL APPLICABLE RISK FACTORS.  SUCH RISK FACTORS ARE INCORPORATED AS IF FULLY SET FORTH HEREIN AND ARE A PART OF THIS DISCLOSURE STATEMENT.  COPIES OF ANY DOCUMENT FILED WITH THE MEXICAN STOCK EXCHANGE MAY BE OBTAINED BY VISITING WWW.BMV.COM.MX OR ON THE COMPANY'S WEBSITE WWW.AEROMEXICO.COM.

## A.    Certain Bankruptcy, Tax, Corporate and Securities Law Considerations

### 1.    *Plan confirmation*

The Debtors can make no assurances that the conditions to confirmation of the Plan will be satisfied or waived or that they will receive the requisite acceptances to confirm the Plan.  If the requisite acceptances are not received, the Debtors may seek to obtain acceptances to an alternative plan for the Debtors and/or may be required to liquidate these Estates under chapter 7 or 11 of the Bankruptcy Code.  There can be no assurance that the terms of any such alternative restructuring arrangement or plan would be similar to or as favorable to Creditors as those proposed in the Plan.

Even if the Debtors receive the requisite acceptances, there is no assurance that the Bankruptcy Court will confirm the Plan.  Further, even if the Bankruptcy Court determines that the Disclosure Statement and the balloting procedures and results are appropriate, the Bankruptcy Court could still deny confirmation of the Plan if it finds that any of the statutory requirements for confirmation have not been met.  Moreover, there can be no assurance that modifications to the Plan will not be required for confirmation or that such modifications would not necessitate the resolicitation of votes.  If the Plan is not confirmed, it is unclear what distributions, if any, holders of Claims or interests ultimately would receive with respect to their Claims or interests in a subsequent plan.

### 2.    *Objections to classification of claims*

Section 1122 of the Bankruptcy Code requires that the Plan classify Claims against, and interests in, the Debtors.  The Bankruptcy Code also provides that the Plan may place a Claim or Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or interests of such Class.  The Debtors believe that all Claims and interests have been appropriately classified in the Plan.

To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Debtors would seek (a) to modify the Plan to provide for whatever classification might be required for confirmation and (b) to use the acceptances received from any holder of Claims pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such Holder ultimately is deemed to be a member.  Any such reclassification of Claims, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such Holder was initially a member, or any other Class under

the Plan, by changing the composition of such Class and the vote required for approval of the Plan. There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Plan based upon such reclassification.  Except to the extent that modification of classification in the Plan requires resolicitation, the Debtors will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan by any holder of Claims pursuant to this solicitation will constitute a consent to the Plan's treatment of such Holder, regardless of the Class as to which such holder is ultimately deemed to be a member.

### 3.    *The Debtors may object to the amount or classification of a claim*

Except as otherwise provided in the Plan or by an order of the Bankruptcy Court, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any holder of a Claim where such Claim is subject to an objection.  Any holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 4.    *Nonconsensual Confirmation*

In the event that any Impaired Class of Claims does not vote to accept the Plan, the Bankruptcy Court may nevertheless confirm the Plan if at least one Impaired Class has accepted the Plan, and, as to each Impaired Class that has not accepted the Plan, the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting Impaired Class or Classes. The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual confirmation in accordance with section 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual confirmation may result in, among other things, increased expenses relating to professional compensation.

### 5.    *Failure to consummate the Plan*

As of the date of this Disclosure Statement, there can be no assurance that the conditions to consummation of the Plan will be satisfied or waived.  Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated and the restructuring completed.

### 6.    *The Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code*

The Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code if the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case.  In such event, a chapter 7 trustee would be appointed or elected to liquidate the Debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code.  The Debtors believe that liquidation under chapter 7 would result in significantly lower recovery than those provided for in the Plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion

over a short period of time, rather than reorganizing or selling the business as a going concern at a later time in a controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of unexpired leases and other executory contracts in connection with cessation of operations.

> **7.    *The Debtors cannot predict the amount of time needed to implement the Plan and undue delay in confirmation could materially affect the Debtors' operations***

Although the Plan is designed to minimize the length of the Chapter 11 Cases, it is impossible to predict with certainty the amount of time that the Debtors may spend in bankruptcy or to assure parties in interest that the Plan will be confirmed.

The continuation of the Chapter 11 Cases, particularly if the Plan is not confirmed in the time frame currently contemplated, could adversely affect operations and relationships with the Debtors' customers, vendors, employees, regulators and other stakeholders. If confirmation and consummation of the Plan do not occur expeditiously, the Chapter 11 Cases could result in, among other things, increased costs for professional fees and similar expenses. Significant delay may also result in the termination of the DIP Facility and/or the [commitments under the Joint Proposal], due to missed milestones, other termination events, or other applicable events of default, to the extent that the Debtors are unable to obtain waivers or amendments from the relevant parties. In addition, prolonging the Chapter 11 Cases may make it more difficult to retain and attract management and other key personnel and would require senior management to continue to spend a significant amount of time and effort dealing with the Debtors' financial reorganization instead of focusing on the operation of the Debtors' businesses.

Further, if the Debtors are unable to obtain confirmation of the Plan for any reason, the Debtors may be forced to operate in chapter 11 for an extended period while trying to develop a different chapter 11 plan that can be confirmed. The Debtors cannot assure parties in interest that the Plan will be confirmed, and even after confirmation of the Plan, it is impossible to predict with certainty the amount of time that will be needed to implement the complex transactions that the Plan anticipates. Moreover, the Bankruptcy Court limits the time during which the Debtors will have the exclusive right to file a plan, before other parties in interest are permitted to propose and file alternative plans.

> **8.    *The Effective Date may not occur***

Although the Debtors believe that the Effective Date will occur soon after the Confirmation Date and that there is not a material risk that the Debtors will not be able to obtain the necessary governmental approvals, there can be no assurance as to the occurrence or timing of the Effective Date. The Effective Date is subject to certain conditions precedent, as set forth in IX of the Plan. Failure to meet any of these conditions could prevent the Effective Date from occurring.

If the Effective Date does not occur, the Plan will be null and void in all respects and the Confirmation Order may be vacated. In that case, no distributions will be made under the Plan, the Debtors and all holders of Claims and interests will be restored to the status quo ante

immediately prior to Confirmation, and the Debtors' obligations with respect to Claims and interests will remain unchanged.

9.      **Plan releases, injunctions, and exculpations may not be approved**

There can be no assurance that the Plan releases, injunctions, and exculpations as provided in Article VIII of the Plan, will be granted.  Failure of the Bankruptcy Court to grant such relief may result in a plan of reorganization that differs from the Plan or the Plan not being confirmed.

10. **The ability to enforce U.S. judgments and court orders outside of the United States may be limited**

Aeroméxico is a Mexican company with most of its assets, directors and officers located in Mexico.  While the Debtors believe that sufficient legal grounds exist to enforce any U.S. court judgment in Mexico, a third party may nevertheless attempt to argue that such U.S. court judgments are unenforceable in Mexico or that a separate order from a Mexican court would be required, and in such situation, it is possible that a Mexican court would find a U.S. court judgment to be unenforceable against persons or assets in Mexico.  Accordingly, the ability to pursue remedies in Mexico may be limited as compared to the ability to pursue remedies against a U.S. company and its assets, directors and officers.  Similarly, the Company may also have difficultly enforcing a U.S. court judgment in any other non-U.S. court, as it is also possible that such non-U.S. court would find a U.S. court judgment to be unenforceable against persons or assets in such non-U.S. jurisdiction.

Similarly, although unlikely, it is possible that a third party may try to file, before the Mexican federal courts, an involuntary petition for *concurso* against the Company that, if accepted by the Mexican federal courts through the issuance of a *concurso* judgment, would initiate a parallel *concurso* proceeding governed by applicable Mexican laws and which could cause material negative ramifications for the Company under its various financing and other contracts.

11.      **As a result of the Chapter 11 Cases, the Debtors' historical financial information may not be indicative of its future financial performance**

The Debtors' capital structure will be significantly altered under any plan ultimately confirmed by the Bankruptcy Court.  Under fresh start reporting rules that may apply to the Debtors upon the effective date of a chapter 11 plan, the Debtors' assets and liabilities would be adjusted to fair values and its accumulated deficit would be restated to zero.  Accordingly, if fresh start reporting rules apply, the Debtors' financial condition and results of operations following its emergence from chapter 11 would not be comparable to the financial condition and results of operations reflected in its historical financial statements.  In connection with the Chapter 11 Cases and the development of a chapter 11 plan, it is also possible that additional restructuring and related charges may be identified and recorded in future periods.  Such charges could be material to the Debtors' consolidated financial position and results of operations in any given period.

12.    *Certain Mexican corporate and governmental authorizations are required to implement the Plan and may not be successfully obtained*

As further discussed in Article III herein, the Company is subject to a variety of Mexican corporate and foreign investment laws and regulations that will dictate how the Plan is implemented.  There can be no guarantee that the Shareholder Meeting to approve the steps required to implement the Plan, including, without limitation, the 2021 Capital Increase, Equitization are approved by the Company's Shareholder Meeting.  Similarly, there can be no guarantee that governmental authorizations contemplated by the Plan will be granted.

14.    *Certain claims may not be discharged and may have a material adverse effect on the Debtors' financial condition and results of operations*

The Bankruptcy Code provides that the confirmation of a plan of reorganization discharges a debtor from substantially all debts arising prior to confirmation.  With few exceptions, all Claims or interests that arise prior to the Debtors' filing of their petitions or before confirmation of the plan of reorganization (a) would be subject to compromise and/or treatment under the plan of reorganization and/or (b) would be discharged and/or released in accordance with the terms of the plan of reorganization.  Any Claims or interests not ultimately discharged or released through a plan of reorganization could be asserted against the Reorganized Debtors and may have an adverse effect on the Reorganized Debtors' financial condition and results of operations.

15.    *Allowance of Claims may substantially dilute the recovery to Holders of Claims under the Plan*

There can be no assurance that the estimated Claim or Interest amounts set forth in this Disclosure Statement are correct, and the actual Allowed amounts of Claims or interests may differ from these estimates.  These estimated amounts are based on certain assumptions with respect to a variety of factors.  Should these underlying assumptions prove incorrect, the actual Allowed amounts of Claims or interests may vary from those estimated herein.  Because certain distributions under the Plan are linked to the amount and value of Allowed Claims or interests, any material increase in the amount of Allowed Claims or interests over the amounts estimated by the Debtors would materially reduce the recovery to certain Holders of Allowed Claims or interests under the Plan.

16.    *The DIP Facility may be terminated*

The DIP Facility, along with the use of cash collateral, is intended to provide liquidity to the Debtors during the pendency of the Chapter 11 Cases.  If the Chapter 11 Cases take longer than expected to conclude, and the Debtors do not receive necessary waivers or are able to refinance the DIP Facility, the DIP Facility will mature 18 months after the Petition Date.  If the DIP Facility matures, the Debtors also would lose access to cash collateral to operate their business.  There is no assurance that the Debtors will be able to obtain additional financing from the Debtors' existing lenders or otherwise, nor is there any assurance that the Debtors will receive consent from the DIP Lenders to continue to use their cash collateral in the event that the DIP Facility matures.

17.    *Certain tax implications of the Plan*

For a discussion of certain applicable income tax consequences of the implementation of the Plan to the Debtors and to Holders of certain Claims and interests, see Article XI of this Disclosure Statement.

### 18.    *The implementation of the Plan may result in adverse and/or complex tax consequences to Holders*

None of the Debtors is providing tax advice to any Holder in connection with the Plan and each Holder should consult its own tax advisor regarding tax consequences of the Plan.

Uncertainty may exist with respect to some of the Mexican federal income tax consequences described in section "Certain Mexican Income Tax Consequences of the Plan," including but not limiting to withholding obligations and applicable tax withholding rates. In addition, the U.S. federal income tax consequences of the Plan to any U.S. Holder of a Relevant Claim (as such terms are defined below under "Certain U.S. Federal Income Tax Consequences of the Plan") may be uncertain (for additional discussion see "Certain U.S. Federal Income Tax Consequences of the Plan").

No opinion of counsel has been obtained and the Debtors do not intend to seek a ruling from any tax authorities as to any of the tax consequences of the Plan. The discussion contained in each of the sections "Certain Mexican Income Tax Consequences of the Plan" and "Certain U.S. Federal Income Tax Consequences of the Plan" is based on the relevant legislation, guidance judicial decisions and applicable tax treaties, as in effect on the date of this Disclosure Statement, and all of which are subject to change or differing interpretations, possibly with retroactive effect. Such discussion is not binding upon the applicable tax authorities or the courts. No assurance can be given that the applicable tax authorities would not assert, or that a court would not sustain, a different position than any position discussed therein.

Each Holder should consult its own U.S., Mexican and/or local tax advisors regarding the tax consequences of the Plan, based upon the particular circumstances pertaining to such Holder.

## B.    **Risks Related to Exit Financing, New Notes and New Stock**

### 1.    *The New Stock may be subject to restrictions on transfers*

Any New Stock issued to an entity that is an "underwriter," as defined in section 1145(b) of the Bankruptcy Code, will be "restricted securities" subject to resale restrictions and may be resold, exchanged, assigned or otherwise transferred only pursuant to registration or an applicable exemption from registration under the Securities Act and other applicable law. In addition, the New Stock will not be freely tradable if, at the time of a transfer, the holder is an "affiliate" of the Reorganized Debtor as defined in Rule 144(a)(1) under the Securities Act or had been such an "affiliate" within 90 days of the transfer. "Affiliate" holders will be permitted to sell New Stock without registration only if they comply with an exemption from registration, including Rule 144 under the Securities Act.

The New Stock will not be registered under the Securities Act or any other securities laws, and the Debtors make no representation regarding the right of any holder to freely resell securities.

-159-

See Article VIII, "Securities Law Matters," for additional information regarding restrictions on resale of the New Stock.

### 2.   Foreign Shareholders may have limited voting rights

In accordance with the Foreign Investment Act, Grupo Aeroméxico's bylaws and the Amended Neutral Investment Authorization, the Company is only authorized to issue shares representing foreign investment that provide non-Mexican investors up to 49% of the full voting rights in the Company and up to 90% of the neutral investment, respectively. And, at any General Shareholders Meeting, foreign shareholders' shares will only represent a maximum equivalent of 49% of the shares with voting rights attending or represented at a General Shareholders Meeting. Therefore, depending on the composition of any such shareholders meeting, foreign shareholders may have voting rights that are more limited than their economic rights, as the same are represented by their Neutral Investment in the Reorganized Debtors.

### 3.   A liquid trading market for the New Stock may not develop

There is currently no market for the New Stock, and there can be no assurance as to the development or liquidity of any market for any such securities. The New Stock may, therefore, be illiquid securities without an active trading market. There can be no assurance that an active trading market for the New Stock will develop, nor can any assurance be given as to the prices at which the New Stock might be traded, even if an active trading market develops. Accordingly, holders of the New Stock may bear certain risks associated with holding securities for an indefinite period of time.

### 4.   Implied valuation of New Stock not intended to represent trading value of New Stock

The valuation of the Reorganized Debtors is not intended to represent the trading value of the New Stock in public or private markets and is subject to additional uncertainties and contingencies, all of which are difficult to predict. Actual market prices of such securities at issuance will depend upon, among other things: (a) prevailing interest rates; (b) conditions in the financial markets; (c) anticipated initial securities holdings of prepetition creditors, some of whom may prefer to liquidate their investment rather than hold it on a long-term basis; and (d) other factors that generally influence the prices of securities. The actual market price of the New Stock is likely to be volatile. Many factors including factors unrelated to the Reorganized Debtors' actual operating performance and other factors not possible to predict, could cause the market price of the New Stock to rise and fall. Accordingly, the implied value, stated herein and in the Plan, of the New Stock to be issued does not necessarily reflect, and should not be construed as reflecting, values that will be attained for these securities in the public or private markets.

### 5.   Protections for minority shareholders could be less developed than those holding securities from issuers in the United States or other foreign markets

The protections granted to minority shareholders under Mexican law are different than those granted to minority shareholders and investors in securities issued in the United States and elsewhere and could be less broad or developed under legal precedents. The legislation applicable

to duties of board members for Mexican issuers (particularly, the duties of loyalty and diligence) is relatively new and has not been the subject of legal interpretation in Mexico as much as the duties of diligence and loyalty have been subject of legal rulings in several states in the U.S., which has contributed to defining and effectively protecting the rights of minority shareholders.

Pursuant to the Mexican Securities Exchange Act, any liability stemming from a breach of the duties of diligence or loyalty will only benefit the issuer or its controlled entities and not the shareholders, directly, and may only be initiated by the issuer itself or by a shareholder or a group of shareholders with at least 5% of all shares in circulation, including restricted or limited voting shares.  Regulations and policies on conflicts of interest or internal controls could also be less defined and demanding in Mexico than in the United States.  In Mexico, class action lawsuits are permitted; however, there is limited experience with respect to these actions, the admissibility requirements are ambiguous and the outcomes are not predictable.  These factors could affect and inhibit any class action in Mexico.  Because of these factors, in practice, it may be more difficult for minority shareholders to enforce their rights against the Company, members of the Company's Board of Directors or the Company's majority shareholders than it would be for shareholders of a company domiciled in the United States or some other non-Mexican jurisdiction.

### 6.    *Preemptive rights may be unavailable to non-Mexican investors*

As required by Mexican law, whenever the Company issues new shares for cash (except in certain cases), the Company must grant preemptive rights to its shareholders, giving them the right to purchase enough shares to maintain their existing ownership percentage.  The Company may not be able, however, to offer shares to certain non-Mexican shareholders pursuant to the preemptive rights granted to such shareholders in connection with any future issuance of shares unless a registration statement under the Securities Act for U.S. shareholders or under similar legislation for all other shares is effective with respect to such rights and shares or an exemption from the registration requirements of the Securities Act for U.S. shareholders or similar legislation for all other shareholders is available.

If the Company does not file the aforementioned registration statement, certain non-Mexican shareholders may not be able to exercise their preemptive rights in connection with future issuances of the Company's shares.  In this event, the economic interest of certain non-Mexican shareholders in the total equity would decrease in proportion to the size of the issuance.  Depending on the offering price of the shares, such issuance may dilute certain non-Mexican shareholders.

### 7.    *Potential dilution*

The ownership percentage represented by the New Stock that may be distributed on the Effective Date under the Plan will be subject to dilution from the equity issued in connection with any management incentive plan and any other shares that may be issued post-emergence, including on account of the exercise of any preemptive rights, and the conversion of any options, warrants, convertible securities, exercisable securities, or other securities that may be issued post-emergence in accordance with the Reorganized Debtors' organizational documents and Mexican corporate law.  In the future, similar to all companies, additional equity financings or other share issuances by any of the Reorganized Debtors could adversely affect the value of the New Stock issuable upon such conversion.  The amount and dilutive effect of any of the foregoing could be material.

### 8. *The Reorganized Debtors may be owned by significant holders*

If the Plan is confirmed and consummated, certain parties will receive New Stock as consideration for their Claim, pursuant to their direct investment in the Reorganized Debtors, as part of the Delta Contract Amendment Fee or otherwise. Some of these parties will own significant equity in the Reorganized Debtors, including Delta who will own approximately 21% of the New Stock (subject to dilution on account of the Management Incentive Plan). Moreover, certain of the Reorganized Debtors' shareholders may have certain governance rights, either as a matter of Mexican corporate law, any applicable shareholder agreement or otherwise, which may provide such shareholders control in excess of their voting shares alone.

### 9. *Defects may exist in the collateral securing the New Notes*

The indebtedness under the New Notes will be secured, subject to certain exceptions and permitted liens, by security interests and liens (collectively, the "Liens") in all of the Note Parties (as defined in the Joint Proposal Term Sheets) rights, title and interests in all of its property, whether real or personal, tangible or intangible, now existing or hereafter acquired, including without limitation, unencumbered aircraft (subject to the succeeding proviso), inventory, equipment, fixtures, leasehold interests, commercial tort claims, deposit accounts investment property, documents, accounts, chattel paper (whether electronic or tangible), intercompany loans, general intangibles (including patents, trademarks and other intellectual property), instruments, business interruption insurance, supporting obligations and proceeds of all of the foregoing (collectively, the "**Collateral**"), provided that the Collateral shall not include (collectively, the "**Excluded Assets**") property that cannot be subject to liens pursuant to applicable law, rule, contract or regulation (including any requirement to obtain the consent (after the use of commercially reasonable efforts to obtain such consent) of any governmental authority (other than any authorization from the Mexican Federal Agency of Civil Aeronautics to grant a mortgage in respect of owned aircraft) or third party, unless such consent has been obtained), or restrictions of contract (including federal concessions or rights of use of landing and take-off in airports in saturation conditions which were published by the General Directorate of Civil Aeronautics on September 29, 2017 (*Bases generales para la asignación de horarios de aterrizaje y despegue en aeropuertos en condiciones de saturación publicadas por la Dirección General de Aeronáutica Civil en el DOF el 29 de septiembre de 2017*)) existing on the Closing Date or the time of entry of such contract (other than to the extent such restriction is ineffective under the UCC or other applicable law); and other specified excluded property to be agreed.

The Collateral securing the New Notes may be subject to exceptions, defects, encumbrances, liens and other imperfections. Further, it cannot be assured that the remaining proceeds from a sale of the Collateral would be sufficient to repay holders of the obligations under the New Notes all amounts owed in accordance therewith. The fair market value of the Collateral is subject to fluctuations based on factors that include, among other things, the ability to sell Collateral in an orderly manner, general economic conditions, the availability of buyers, the Reorganized Debtors' failure to implement their business strategy, and similar factors. The amount received upon a sale of Collateral would be dependent on numerous factors, including the actual fair market value of the Collateral at such time, and the timing and manner of the sale. By its nature, portions of the Collateral may be illiquid and may not have readily ascertainable market value. In the event of a subsequent foreclosure, liquidation, bankruptcy or similar proceeding, it

cannot be assured that the proceeds from any sale or liquidation of the Collateral will be sufficient to pay the Reorganized Debtors' obligations under the Exit Facility, in full or at all. There can also be no assurance that the Collateral will be saleable, and, even if saleable, the timing of its liquidation would be uncertain. Accordingly, there may not be sufficient collateral to pay all or any of the amounts due under the New Notes.

**C.    Certain Risks Associated with the Debtors' and the Reorganized Debtors' Business Operations and Financial Condition**

>  *1.    Continued disruptions caused by the COVID-19 outbreak*

The full extent of the ongoing impact of COVID-19 on the Debtors' longer-term operational and financial performance will depend on future developments, many of which are outside the Debtors' control, including potential complications posed by COVID-19 variants (including, without limitation, the delta variant) and travel restrictions imposed as a result, the effectiveness of spread mitigation and prevention strategies, vaccination efficacy and rates, the duration and spread of COVID-19 and related COVID-19 variants, including any recurrence of the pandemic, and related travel advisories and restrictions, the impact of COVID-19 on overall long-term demand for air travel, the impact on demand and capacity which could result from government mandates on air service including, for instance, any requirement for passengers to wear face coverings while traveling or have their temperature checked or have administered vaccines or other tests or examinations prior to entering an airport or boarding an airplane, or which would limit the number of seats that can be occupied on an aircraft to allow for social distancing, if the Debtors' employees are unable to work because they are quarantined or sickened as a result of exposure to COVID-19, or if they are subject to additional governmental COVID-19 curfews or "shelter in place" health order or similar restrictions, the impact of COVID-19 on the financial health and operations of the Debtors' business partners and future governmental actions, all of which are highly uncertain and cannot be predicted and which may have a material adverse effect on the Debtors' business, financial condition, and operating results.

At this time, the Debtors are also unable to predict whether the COVID-19 pandemic and responses governmental responses thereto will result in permanent changes to the Debtors' customers' behavior, with such changes including but not limited to a permanent reduction in business travel as a result of increased usage of "virtual" and "teleconferencing" products and more broadly a general reluctance to travel by consumers, each of which could have a material impact on the Debtors' business, financial condition and operating results. In addition, an outbreak of another disease or public health threat, or fear of such an event, that affects travel demand, travel behavior or travel restrictions could adversely impact the Debtors' business, financial condition, and operating results. Outbreaks of other diseases could also result in increased government restrictions and regulation, such as those actions described above or otherwise, which could adversely affect the Debtors' business, financial condition, and operating results.

>  *2.    Reductions in levels of business and leisure travel*

The airline industry is particularly affected by reductions in business and leisure travel. The reduction in air travel, whether caused by public health crises like, without limitation, COVID-19 and related variants, general economic conditions, terrorist incidents, natural disaster, or

government response to any of the foregoing could materially and adversely affect the Debtors. In particular, the Debtors derive a substantial proportion of their revenues from travel between the United States and Mexico and the level of travel between these two countries is dependent upon (a) the ability and willingness of consumers to travel and (b) continued governmental willingness to permit cross-border travel. Therefore, while the Debtors are unable to predict the level of such cross-border travel, a decrease may have a material adverse impact on the Debtors' business, financial condition, and operating results.

### 3. *Employee strikes and other labor-related disruptions may adversely affect the Debtors' operations*

The Debtors' business is labor intensive, utilizing large number of pilots, flight attendants and other personnel. As of June 30, 2021, approximately 73% of the Debtors' workforce is unionized. Strikes, work interruptions, stoppages, labor disputes, labor claims or any prolonged dispute between the Company and its unionized employees may adversely affect the Company's ability to conduct business. If the Company is unable to reach agreement with any of its unionized work groups on future negotiations regarding the terms of their collective bargaining agreements, then the Company may experience labor actions, including strikes, and such negotiations may result in wage increases and a consequent increase in operating expenses. Further, if additional segments of the Company's workforce become unionized, the Company may be subject to work interruptions or stoppages and such employees may also seek further wage increases or benefits.

### 4. *Interruptions or disruptions in service at one of the Debtors' or Reorganized Debtors' hub airports could have a material adverse impact on its operations*

The Debtors' business is heavily dependent on its operations at the Mexico City International Airport (AICM) and at its other hub airports such as Monterrey and Guadalajara. Each of these hub operations includes flights that gather and distribute traffic from markets in the geographic region surrounding the hub to other major cities and to other Aeroméxico hubs. A significant interruption or disruption in service at AICM or at one of the Company's other hubs could have a serious impact on its business, financial condition and results of operations.

### 5. *Financial strength and future of Codeshare Partners, including Delta*

Aeroméxico is directly affected by the operational and financial strength of the airlines (the "**Codeshare Partners**") that it has codeshare arrangements or agreements with, and in particular the operational and financial strength of Delta. In the event of a decrease in the financial or operational strength of any of its Codeshare Partners, such Codeshare Partner may be unable to market Aeroméxico's flights or make the payments due to Aeroméxico under the respective codeshare agreement, and as a result Aeroméxico's ability to maintain capacity at the same margins may be mitigated. In addition, the Codeshare Partner may reduce utilization of Aeroméxico's aircraft to the minimum levels specified in the applicable codeshare agreement, and it is possible that any codeshare agreement with a Codeshare Partner that files for reorganization under chapter 11 may not be assumed in the bankruptcy and could be modified or terminated. Any

such event could have an adverse effect on Aeroméxico's business, financial condition and results of operations.

**6.      The U.S. Federal Aviation Administration (FAA) could further downgrade Mexico's aviation safety rating or maintain such current downgrade, prohibiting Aeroméxico and other Mexican airlines from, among other things, operating new routes to the United States**

The FAA periodically analyzes the compliance with civil aviation regulatory authorities in different countries.  As a result of this analysis, each country receives a rating under the FAA's International Aviation Safety Assessment, or IASA.  However, should the Mexican authorities fail to comply with the FAA recommendations, Mexico's IASA rating could be downgraded at any time. For example, in July 2010 and May 2021, Mexico's IASA classification dropped from Category 1 to Category 2, and as of the date of this Disclosure Statement Mexico's IASA classification remains Category 2.  There is no guarantee that the Agencia Federal de Aviación Civil [Federal Civil Aviation Agency] will continue to comply with International Civil Aviation Organization (ICAO) or FAA standards or that the FAA will raise Mexico's IASA classification back to Category 1.  The Company depends on the Mexican government to maintain the Category 1 rating so that the Company can establish new routes to the United States, increase the frequency of operations on those routes, or increase the number of aircraft serving those routes, and to share codes with U.S. airlines. Therefore, if the FAA maintains Mexico's IASA at anything less than Category 1 or downgrades Mexico's IASA classification in the future, either when Mexico's IASA is Category 1 again or not, the Company's business, financial condition and operating results could be adversely affected.

**7.      Fluctuations in the price and availability of fuel could negatively impact the Debtors' financial results**

The Debtors' operating results are significantly impacted by changes in the price and availability of aircraft fuel.  Periods of high volatility in jet fuel costs, increased jet fuel prices and significant disruptions in the supply of jet fuel could have a material adverse impact on the Company's business, financial condition and operating results.  Jet fuel costs represents the single largest item in the Company's operating expenses, accounting for 21% and 36% of the Company's total operating expenses for the years ended December 31, 2020 and 2019, respectively.  The Debtors' ability to pass along the increased costs of fuel to their customers is limited by the competitive nature of the airline industry.  The Company's ability to pass on any increases in jet fuel costs to its passengers may be limited, delayed, or not possible due to variety of reasons, including, among others, prevailing industry norms and practices, competitive pressures and applicable legal and/or regulatory regimes.  Additionally, the sale of jet fuel for the airline industry in Mexico and internationally could undergo relevant changes that, at this time, are not possible to determine with accuracy.

**8.      Political events in Mexico may result in disruptions to our business operations and decreases in our sales and revenues**

The Mexican government has exercised, and continues to exercise, significant influence over many aspects of the Mexican economy.  Therefore, the actions and policies of the Mexican

federal, state or municipal governments relating to the economy as a whole, and in particular taxes, foreign investment, labor, air transport and similar services, could have a significant impact on us, as well as a more general impact on market conditions, prices, and yields on variable income and Mexican debt securities.  Whether or not certain changes in the law, policy, and regulations in Mexico, including measures related to new or increases taxes, cannot be predicted and neither can how such changes could affect the Company's business activities, financial condition, operating results, cash flows and prospects.  Further, the impact that political, economic and social conditions will have on the Mexican economy and thereby the Company's business cannot be predicted.  In addition, we cannot guarantee that political, economic or social developments in Mexico, over which we have no control, will not have an adverse effect on the Company's business, financial condition, operating results, and prospects.

9.     *Fluctuations in the peso relative to the U.S. dollar could adversely affect the Company's financial condition and operating results*

A significant portion of the Company's expenses is denominated in U.S. dollars or are pegged to the U.S. dollar, such as expenses related to fuel, the leasing of aircraft, debt instruments, rent and aircraft maintenance.  As a result, a depreciation of the peso against the U.S. dollar would increase the Company's expenses and reduce our operating profit and our net profit, to the extent that we could not recover such increased expenses through fare increases or other increases in revenue, which would likely affect our financial condition and operating results.

A depreciation of the pesos or any currency of the countries in which we operate may limit our ability to transfer or convert pesos into U.S. dollar and other currencies in order to make timely payments of interest and principal or income of our financial obligations denominated in U.S. dollar or obligations in other currencies.  While the Mexican government does not currently restrict, and since 1982 has not restricted, the right or ability of Mexican or foreign persons or entities to convert pesos to U.S. dollars or to transfer other currencies outside of Mexico, the Mexican government could institute policies that restrict the Company's ability to exchange currencies in the future.  Such restrictions on the transfer of foreign exchange currencies outside of Mexico could have an adverse effect on the Company's business, financial position or operating results, and this could significant affect the Company's ability to earn U.S. dollars or convert pesos to U.S. dollars in order to make interest and principal payments under the Company's obligations that are denominated in U.S. dollars.

10.    *The Company's operations are subject to the supervision and control of various antitrust authorities, including the Comisión Federal de Competencia Económica ("COFECE"), which may take measures that affect our business*

The Company is subject to continued oversight and control by antitrust authorities in the jurisdictions in which it operates, and such authorities may issue rulings that affect the Company's operations, including routes we operate or prices we charge customers.  In fact, the Company has been subject to investigations related to antitrust practices by COFECE in the past.  The Company also requires authorization from COFECE.  The Company cannot give any guarantee that no

sanctions or measures will be imposed in the future, which could adversely affect our operations, financial condition and operating results.

### 11.    *Risks that cannot be covered by insurance and increases in insurance costs or inadequate insurance coverage may have a material adverse effect on the Debtors' business, operating results, and financial condition*

There are certain business risks that cannot be insured or that, in line with industry practice, the Debtors may leave uninsured, including business interruption, loss of profit or revenue, maintenance and consequential losses arising from mechanical breakdown or losses related to the non-performance of suppliers or repair shops. To the extent actual losses incurred by the Debtors arise from these uninsured risks, the Debtors may have to bear substantial losses, which may have a material adverse effect on the Debtors' business, financial condition and operating results.

In the future, certain insurance coverage could become more expensive, unavailable or available only for reduced amounts or in respect of limited events that are not sufficient to comply with the levels required by, among others, the Debtors' aircraft lessors, financiers or applicable government regulations. Any inability to obtain insurance on commercially acceptable terms could adversely affect the Debtors' business, financial condition, and operating results and potentially cause the Debtors to ground its aircraft and/or to lose possession of leased or securitized aircraft in favor of lenders.

Furthermore, the Debtors cannot assure that its existing coverage will be sufficient to protect against all potential losses, that the Debtors will be able to maintain its existing coverage in the future or that the premiums will not increase substantially, any of which could have a material adverse effect on the Debtors' business, operating results or financial condition.

### 12.    *The Debtors are at risk of losses and adverse publicity stemming from any accident involving its aircraft*

An aircraft crash or other accident could expose the Company to significant tort liability. The insurance the Debtors carry to cover damages arising from any future accidents may be inadequate. In the event that the insurance is not adequate, the Company may be forced to bear substantial losses from an accident. In addition, any accident involving an aircraft that Aeroméxico operates or an aircraft that is operated by an airline that is one of Aeroméxico's Codeshare Partners could create a public perception that Aeroméxico's aircraft are not safe or reliable, which could harm the Company's reputation, result in air travelers being reluctant to fly on its aircraft and harm its business.

### 13.    *The Debtors' business is subject to complex laws and regulations that can adversely affect the cost, manner or feasibility of doing business*

The Debtors' operations are subject to extensive laws and regulations including complex aviation-related laws and regulations. The Debtors may be required to make large expenditures to comply with such laws and regulations. Failure to comply with these laws and regulations may result in the suspension or termination of operations and subject the Debtors to administrative, civil and criminal penalties. These liabilities and costs could have a material adverse effect on the business, financial condition, results of operations and cash flows of the Reorganized Debtors.

### 14.    *The Reorganized Debtors may be adversely affected by potential litigation, including litigation arising out of or related-to the Chapter 11 Cases*

In the future, the Reorganized Debtors may become parties to litigation.  In general litigation can be expensive and time consuming to bring or defend against.  Such litigation could result in settlements or damages that could significantly affect the Reorganized Debtors' financial results.  It is also possible that certain parties will commence litigation with respect to the treatment of their Claims and interests under the Plan.  Despite discharge or injunction, parties outside of the United States may nevertheless choose to proceed with claims against the Reorganized Debtors.  It is not possible to predict the potential litigation that the Reorganized Debtors may become party to, nor the final resolution of such litigation.  The impact of any such litigation on the Reorganized Debtors' businesses and financial stability, however, could be material.

### 15.    *The loss of key personnel could adversely affect the Debtors' operations*

The Debtors' operations are dependent on a relatively small group of key management personnel and a highly-skilled employee base.  The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees.  Because competition for experienced personnel can be significant, the Debtors may be unable to find acceptable replacements with comparable skills and experience and the loss of key management personnel could adversely affect the Debtors' ability to operate their businesses.  In addition, a loss of key personnel or material erosion of employee morale could have a material adverse effect on the Debtors' ability to meet expectations, thereby adversely affecting the Debtors' businesses and results of operations.

### 16.    *The Reorganized Debtors may not be able to achieve its projected financial results*

Actual financial results may differ materially from the Financial Projections.  If the Reorganized Debtors do not achieve projected revenue or cash flow levels, the Reorganized Debtors may lack sufficient liquidity to continue operating their business consistent with the Financial Projections after the Effective Date.  The Financial Projections represent management's view based on currently known facts and hypothetical assumptions about their future operations; they do not guarantee the Reorganized Debtors' future financial performance.

The Financial Projections are based on numerous assumptions including, without limitation, the timing, confirmation, and consummation of the Plan in accordance with its terms, the anticipated future performance of the Reorganized Debtors, airline travel industry performance, general business and economic conditions, and other matters, many of which are beyond the control of the Reorganized Debtors and some or all of which may not materialize.  Particular uncertainties with respect to the Reorganized Debtors' operations and financial results arise from the risks and uncertainties relating to, among other things, the following: changes in the demand for the Debtors' airline services; legislation and regulations relating to the airline industry and other environmental initiatives; regional, national and global scale health crises; operational, permit, labor, and weather-related factors; fluctuations in the amount of cash the Debtors generate from operations; and numerous other matters of regional, national, and global scale, including those of a political, economic, business, health, competitive, terrorist, or regulatory nature.

Because the actual results achieved throughout the periods covered by the Financial Projections may vary from the projected results, the Financial Projections should not be relied upon as an assurance of the actual results that will occur.

### 17.    *The Reorganized Debtors' effective tax rate may vary from projections*

The Financial Projections include assumptions as to the Reorganized Debtors' effective tax rate in future years. This assumed tax rate may be higher or lower than the Reorganized Debtors' actual tax rate, which will vary depending upon available tax deductions and changes in statutory tax rates.

### 18.    *The Debtors will be subject to the risks and uncertainties associated with the Chapter 11 Cases*

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy. These risks include the following: (a) ability to develop, confirm, and consummate the Plan and transactions contemplated thereunder; (b) ability to obtain Bankruptcy Court approval with respect to motions filed in the Chapter 11 Cases from time to time; (c) ability to maintain relationships with suppliers, vendors, service providers, customers, employees, and other third parties; (d) ability to maintain contracts that are critical to the Debtors' operations; (e) ability of third parties to seek and obtain Bankruptcy Court approval to terminate contracts and other agreements with the Debtors; (f) ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (g) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' businesses and operations in various ways. For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition. Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

### 19.    *The Reorganized Debtors may not be able to generate sufficient cash to service all of their indebtedness*

The Reorganized Debtors' ability to make scheduled payments on, or refinance their debt obligations, depends on the Reorganized Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Reorganized Debtors' control. The Reorganized Debtors may be unable to maintain a level of cash flow from operating

activities sufficient to permit the Reorganized Debtors to pay the principal, premium, if any, and interest on their indebtedness upon emergence.

### 20.    The Debtors' substantial liquidity needs may impact revenue

The Debtors operate in a capital-intensive industry. If the Debtors' cash flow from operations remains depressed or decreases, the Debtors may not have the ability to expend the capital necessary to improve or maintain their current operations, resulting in decreased revenues over time.

The Debtors face uncertainty regarding the adequacy of their liquidity and capital resources. In addition to the cash necessary to fund ongoing operations, the Debtors have incurred significant professional fees and other costs in connection with preparing for the Chapter 11 Cases and expect to continue to incur significant professional fees and costs throughout the Chapter 11 Cases. The Debtors cannot guarantee that cash on hand, cash flow from operations, and cash provided by the DIP Facility will be sufficient to continue to fund their operations and allow the Debtors to satisfy obligations related to the Chapter 11 Cases until the Debtors are able to emerge from bankruptcy protection.

The Debtors' liquidity, including the ability to meet ongoing operational obligations, will be dependent upon, among other things: (a) their ability to raise sufficient additional capital, if required, and to comply with the terms and conditions of any debtor-in-possession financing and/or cash collateral order entered by the Bankruptcy Court in connection with the Chapter 11 Cases; (b) their ability to maintain adequate cash on hand; (c) their ability to develop, confirm, and consummate the Plan or other alternative restructuring transaction; and (d) the cost, duration and outcome of the Chapter 11 Cases. The Debtors' ability to maintain adequate liquidity depends, in part, upon industry conditions and general economic, financial, competitive, public health, regulatory, and other factors beyond the Debtors' control. In the event that cash on hand, cash flow from operations, and cash provided under the DIP Facilities are not sufficient to meet the Debtors' liquidity needs, the Debtors may be required to seek additional financing. The Debtors can provide no assurance that additional financing would be available or, if available, offered to the Debtors on acceptable terms. The Debtors' access to additional financing is, and for the foreseeable future likely will continue to be, extremely limited if it is available at all. The Debtors' long-term liquidity requirements and the adequacy of their capital resources are difficult to predict at this time.

### D.    Other Risks

### 1.    The Debtors may withdraw the Plan

Subject to, and without prejudice to, the rights of any party in interest, the Plan may be revoked or withdrawn before the Confirmation Date by the Debtors.

### 2.    No representations outside the Disclosure Statement are authorized

No representations concerning or related to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in the Disclosure Statement. Any representations or inducements made to secure your vote for

acceptance or rejection of the Plan that are other than those contained in, or included with, the Disclosure Statement should not be relied upon in making the decision to vote to accept or reject the Plan.

### 3.    *No legal or tax advice is provided by, or admissions made in, the Disclosure Statement or the Plan*

The contents of the Disclosure Statement should not be construed as legal, business, or tax advice.  Each holder of a Claim or Interest should consult their own legal counsel, financial advisor, and accountant as to legal, financial, tax, and other matters concerning their Claim or Interest. Nothing contained herein or in the Plan will constitute an admission of, or will be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or holders of Claims or interests.

## ARTICLE XI

## CERTAIN MEXICAN AND U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.    Certain Mexican Federal Income Tax Consequences of the Plan

#### 1.    Introduction

The following is a summary of exclusively certain Mexican Federal income tax consequences of the consummation of the Plan to the Debtors and certain Holders of Claims. This summary is based on the Mexican Income Tax Law (*Ley del Impuesto sobre la Renta* or "LISR"), rules and regulations of Mexico issued by the Tax Administration Service (*Servicio de Administración Tributaria or SAT*) and other applicable authorities, all in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect.

Uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained and the Debtors do not intend to seek a ruling from the SAT as to any of the tax consequences of the Plan discussed below. The discussion below is not binding upon the SAT or the courts. No assurance can be given that the SAT would not assert, or that a court would not sustain, a different position than any position discussed herein. This discussion does not purport to address all aspects of Mexican Federal income taxation that may be relevant to Debtors and certain Holders of Claims in light of their individual circumstances, does not address any tax consequences under the tax laws of any state or municipality of Mexico nor does it describe any tax consequences arising under the laws of any state, locality or taxing jurisdiction other than Mexico.

This summary of certain Mexican Federal income tax considerations deals with Debtors, and Holders of Claims that (a) are individuals or legal entities that are residents of Mexico (each, a "Mexican Holder") or (b) are individuals or entities that are not residents of Mexico for Mexican tax purposes and do not conduct a trade or business through a permanent establishment in Mexico (each, a "Foreign Holder"). For purposes of Mexican Taxation, tax residency is a highly technical definition which involves several factual situations.

In general terms, an individual is a resident of Mexico if he or she has established his or her home in Mexico. When such person also has a home in another country different from Mexico, the individual will be considered a resident of Mexico for tax purposes if his/her center of vital interests is located in Mexico, which is deemed to occur if (i) more than 50% of such individual's total income, in any calendar year, is from Mexican sources, or (ii) such individual's principal center of professional activities is located in Mexico.

An individual who is a Mexican national and filed a change of tax residence to a country or jurisdiction that does not have a comprehensive exchange of information agreement with Mexico in which his/her income is considered as subject to a preferential tax regime pursuant to the provisions of the Mexican Income Tax Law, will be considered Mexican residents for tax purposes during the year of filing of the notice of such residence change and during the following three years. Unless proven otherwise, a Mexican national is deemed a resident of Mexico for tax purposes.

A corporation is considered a resident of Mexico for tax purposes if it maintains the principal administration of its business or the effective location of its management in Mexico, regardless of the country in which such entity was incorporated. A permanent establishment in Mexico of a non-resident person will be treated under the same rules applicable to a resident of Mexico for tax purposes and will be required to pay taxes in Mexico in accordance with applicable tax laws with respect to income attributable to such permanent establishment. However, any attribution of residence should be made considering the particular situation of each person or legal entity.

The tax implications described herein may vary depending on the applicability of a treaty to avoid double taxation in effect. Mexico has entered into several treaties regarding the avoidance of double taxation with different countries that may have an impact on the tax treatment of the Plan.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN MEXICAN FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR MEXICAN FEDERAL, STATE, LOCAL, AND NON-MEXICAN TAX CONSEQUENCES OF THE PLAN.**

## *2.* **General**

In accordance with LISR, individuals and entities are obliged to pay income tax in Mexico in the following cases:

- Mexican residents: on all their income, regardless of the location of the source of wealth of such income.

- Foreign residents who have a permanent establishment in Mexico: on income attributable to said permanent establishment.

- Foreign residents: on income in cash, goods, services or credit, including deemed income that is presumptively determined by the tax authorities, coming from sources of wealth located in Mexican territory, whenever they do not have a permanent establishment in Mexico; or when they have such permanent establishment and said income is not attributable to it.

In accordance with Title V of the LISR ("Foreign residents with Income from Source of Wealth Located in National Territory"), payments (including reductions in expenditures) made in connection with an act or activity referred to in Title V that benefit a foreign resident are to be treated as income subject to Mexican federal income taxation based on the acts or activities underlying such payments.

In the terms of Title V of the LISR, whenever it is established that the tax is paid by withholding, the withholder will be obliged to pay to the Tax authorities, an amount equivalent to the one that should have been withheld on the date on which the obligation becomes enforceable or at the time the payment is made, whichever comes first. In the case the consideration is agreed in any currency other than pesos, the tax will be paid by making the conversion into national currency at the time the consideration is enforceable or paid. For these purposes, any other legal act by virtue of which the debtor extinguishes the obligation in question shall have the same effect as payment.

### 3. Mexican Federal Income Tax Considerations for Debtors

### i. Withholding

In general, Mexican residents such as the Debtors are obliged to withhold Mexican income tax ("MIT") when they make payments (including any other legal act by virtue of which the debtor extinguishes the payment obligation) that qualify as certain categories of Mexican source income obtained by Foreign Holders. Payments to Mexican Holders are not subject to MIT withholding.

The categories of income that are subject to MIT withholding for Foreign Holders include, but are not limited, to interest, royalties, technical assistance, advertising, indemnities for damages, penalties or conventional clauses, among others. In general terms, the underlying activities or transactions that gave rise to a Holder's Claim determine whether a payment made with respect to such Claim pursuant to the Plan would be treated as being within a category of income that is subject to withholding of MIT.

To the extent that any Allowed Claim entitled to a distribution under the Plan is based upon any obligation or instrument that is treated, for MIT purposes, as indebtedness of any Debtor and other amounts (such as accrued but unpaid interest thereon), such distribution shall be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts. Under the LISR, loan principal payments are not subject to MIT withholding.

Please refer to the sections of this summary related to withholding consequences to Foreign Holders and for Mexican Holders that are individuals, for a specific description of MIT withholding to respect to Relevant Claims, including types of income subject to withholding and the applicable tax rates.

If any of the Debtors is required to withhold MIT with respect to an exchange of a Claim for Cash or New Stock (as applicable), such withholding will be carried out by payment of such withholding taxes by the Debtors and a corresponding reduction in the amount of Cash or New Stock (as applicable) received by a Foreign Holder on account of its Claim.

If a Holder of a General Unsecured Claim receives a combination of Cash and New Stock of shares issued by Reorganized Grupo Aeroméxico, please consider (A) the treatment described below (i) under "—Mexican Federal Income Tax Considerations for Foreign Holders—Payments in cash" for Foreign Holders, (ii) under "—Mexican Federal Income Tax Considerations for Mexican Holders—Payments in cash to entities" for Mexican Holders that are entities and (iii) under "—Mexican Federal Income Tax Considerations for Mexican Holders—Payments in cash to individuals" for Mexican Holders that are individuals, for the part of the Claims that is paid in Cash and (B) the treatment described below (i) under "—Mexican Federal Income Tax Considerations for Foreign Holders—Equitization" for Foreign Holders, (ii) under "—Mexican Federal Income Tax Considerations for Mexican Holders—Equitization – entities" for Mexican Holders that are entities and (iii) under "—Mexican Federal Income Tax Considerations for Mexican Holders—Equitization – individuals" for Mexican Holders that are individuals, for the part of the Claims that is converted in shares of New Stock of shares issued by Reorganized Grupo Aeroméxico, as applicable for each part received in Cash and in New Stock.

## ii.    Equitization

The equitization will be treated for tax purposes as an increase of Reorganized Grupo Aeroméxico's paid-in capital. Consequently, the Reorganized Grupo Aeroméxico, should increase the balance of the paid-in capital account ("Cuenta de Capital de Aportación or CUCA by its acronym in Spanish"). Such treatment is associated with certain requirements that must be met, such as the issuance of a report by a Mexican public accountant registered before the SAT for these purposes, by which the amount of the increase paid-in capital account is certified. Cancellation of debt income is not expected as a result of the equitization.

## iii.    CODI

Whenever there is a cancellation of debt ("COD") as a consequence of the Plan, the respective Debtor should recognize a taxable income for MITL ("CODI"). CODI might be recognized as a result of the exchange of: (a) Unsecured Convenience Class Claims; or, (b) General Unsecured Claims if such General Unsecured Claims are exchanged for Cash (or for a combination of Cash and New Stock), in each case pursuant the Plan.

## 4.    Mexican Federal Income Tax Considerations for Foreign Holders

### i.    Payments in cash

-174-

Debtors shall withhold MIT on payments to Foreign Holders in cash that qualify as Mexican source income. In the case the consideration is paid in currency other than Mexican pesos, the tax will be calculated by making the conversion into Mexican pesos at the time the consideration is paid, considering the exchange rate published by the Bank of Mexico (Banco de México) in the Mexican Federal Official Gazette the day prior to the day in which the consideration is paid. On days when the Bank of Mexico does not publish this exchange rate, the last exchange rate published prior to the day of payment will be applied.

Among other characteristics, the nature of the payments and of the recipient must be taken into consideration for applying the corresponding tax withholding rates. General withholding tax rates ranges in the case of interest from 4.9% (e.g., for foreign banks residing in a country that has entered into a treaty to avoid double taxation with Mexico and that meet certain requirements), 10% (e.g., for foreign banks residing in a country that has not entered into a treaty to avoid double taxation with Mexico and that meet certain requirements), 15% to reinsurers, 21% (e.g., for suppliers of machinery and equipment that meet certain requirements) to 35% (general tax rate); 1% for the use or enjoyment of aircraft that have Federal Government permit to be commercially exploited; 25% for royalties and technical assistance; 35% for advertising, indemnities for damages and penalties or conventional clauses. Notwithstanding the foregoing, a 40% withholding tax rate may be applied instead of the general withholding tax rates, in the case the corresponding payment is made to an individual or a corporation or any legal entity deemed transparent for tax purposes, whose income is subject to a preferential tax regime. There are several exceptions in which the 40% withholding tax rate would not be applicable.

Each of the Foreign Holders is urged to consult its own tax advisors to determine the withholding rate, if any, that applies with respect to its Relevant Claims, based upon the particular circumstances pertaining to such Holder and the nature of such Relevant Claim.

Withholding tax implications described herein may vary depending on the applicability of a treaty to avoid double taxation in effect and the withholding rates may be reduced if the applicable requirements set forth in both the LISR and the corresponding treaty are met. In case a treaty is applicable, but these requirements are not met, the MIT shall be withheld according with the LISR provisions, and the Foreign Holder may request a refund of the amounts withheld in excess of the rate established by the applicable treaty to the Mexican Tax authorities.

ii.    **Equitization**

Debtors shall withhold MIT on the Claims that qualify as Mexican source income upon the date in which each Foreign Holder of a General Unsecured Claim shall receive New Stock in Reorganized Grupo Aeroméxico, considering the tax rates described below.

Among other characteristics, the nature of the payments and of the recipient must be taken into consideration for applying the corresponding tax withholding rates. General withholding tax rates ranges in the case of interest from 4.9% (e.g., for foreign banks residing in a country that has entered into a treaty to avoid double taxation with Mexico and that meet certain requirements), 10% (e.g., for foreign banks residing in a country that has not entered into a treaty to avoid double

taxation with Mexico and that meet certain requirements), 15% to reinsurers, 21% (e.g., for suppliers of machinery and equipment that meet certain requirements) to 35% (general tax rate); 1% for the use or enjoyment of aircraft that have Federal Government permit to be commercially exploited; 25% for royalties and technical assistance; 35% for advertising, indemnities for damages, penalties or conventional clauses. Notwithstanding the foregoing, a 40% withholding tax rate may be applied instead of the general withholding tax rates, in the case Mexican Preferential Tax Regime is applicable to the corresponding payment. There are several exceptions in which the 40% withholding tax rate would not be applicable.

Each of the Foreign Holders is urged to consult its own tax advisors to determine the withholding rate, if any, that applies with respect to its Relevant Claims, based upon the particular circumstances pertaining to such Holder and the nature of such Relevant Claim.

If any of the Debtors is required to withhold MIT with respect to the equitization, such withholding will be carried out by payment of such withholding taxes by the Debtors and a corresponding reduction in the amount of New Stock received by a Foreign Holder on account of its Claim.

For the purposes of the LISR, the acquisition cost of the shares received by each of the Foreign Holders as a result of the conversion, shall be equal to the remaining amount of the corresponding Claim after reduction for the withholding tax.

In the case the consideration is in currency other than Mexican pesos, the tax will be calculated by making the conversion into Mexican pesos at the time the conversion into New Stock in Reorganized Grupo Aeroméxico takes place, considering the fix exchange rate published by the Bank of Mexico in the Mexican Federal Official Gazette the day prior to the day in which the conversion is made. On days when the Bank of Mexico does not publish this exchange rate, the last exchange rate published prior to the day of conversion will be applied.

Withholding tax implications described herein may vary depending on the applicability of a treaty for the avoidance of double taxation in effect and the withholding rates may be reduced if the applicable requirements set forth in both the LISR and the corresponding treaty are met. In case a treaty is applicable, but these requirements are not met, the MIT shall be withheld according with the LISR provisions, and the Foreign Holder may request a refund of the amounts withheld in excess of the rate established by the applicable treaty to the Mexican Tax authorities.

### iii.    Disposition of New Stock issued by Reorganized Grupo Aeroméxico

In case the shares of Reorganized Grupo Aeroméxico New Stock are placed among the general public in accordance with general administrative rules, and they are disposed by a Foreign Holder through the stock Exchange or derivatives markets recognized in the terms of the Securities Market Law, including disposals made through derivative financial transactions that are linked to shares of Reorganized Grupo Aeroméxico New Stock, the MIT shall be withheld by the stock market intermediary, applying the rate of 10% on the capital gain. This treatment has several restrictions which, if applicable, would make the withholding rate to be 35% instead of 10%.

In case such shares of stock are not placed among the general public, or they are not disposed through the stock Exchange or derivatives markets as described, the disposition thereof as a general rule, would be subject to taxation in Mexico at the 25% tax rate on the sales price, without any deduction. Alternatively, in this case, a 35% tax rate on capital gains is applicable to those foreign taxpayers whose income is not subject to a preferential tax regime in accordance with the LISR or are not resident in a country in which a territorial taxation system governs, and comply with certain requirements, such as having a legal representative in Mexico and submitting an opinion formulated by a public accountant registered for these purposes to the tax authorities.

Tax implications described herein may vary depending on the applicability of a treaty to avoid double taxation in effect and the withholding rates may be reduced if the applicable requirements set forth in both the LISR and the corresponding treaty are met. In case a treaty is applicable, but these requirements are not met, the MIT shall be withheld according with the LISR provisions, and the Foreign Holder may request the refund of amounts withheld in excess of the rate established by the applicable treaty to the Mexican Tax authorities.

### iv.    Dividends of Reorganized Grupo Aeroméxico

A 10% withholding tax rate would be applicable for dividends paid by Reorganized Grupo Aeroméxico to a Foreign Holder.

Tax implications described herein may vary depending on the applicability of a treaty for the avoidance of double taxation in effect and the withholding rates may be reduced if the applicable requirements set forth in both the LISR and the corresponding treaty are met. In case a treaty is applicable, but these requirements are not met, the MIT shall be withheld according with the LISR provisions, and the Foreign Holder may request a refund of the amounts withheld in excess of the rate established by the applicable treaty to the Mexican Tax authorities.

### 5.    Mexican Federal Income Tax Considerations for Mexican Holders

### i.    Payments in cash to entities

Mexican resident entities shall be obliged to recognize payments in cash made by the Debtors as MIT taxable income, unless they have already recognized such amounts as taxable prior to the payment or if that payment is not considered as taxable income, such as principal loan payments.

Each of the Mexican Holders is urged to consult its own tax advisors to determine whether the payment in cash made by the Debtors would be considered as taxable income for MIT purposes or not, based upon the particular circumstances pertaining to such Holder and the nature of corresponding Relevant Claim.

### ii.    Equitization - entities

Mexican resident entities shall be obliged to recognize the value of the Claims that will be taken into consideration for the conversion of shares of Reorganized Grupo Aeroméxico New

Stock as MIT taxable income, unless they have already recognized such amounts as taxable prior to the conversion or if that payment is not considered as taxable income, such as principal loan payments.

Each of the Mexican Holders is urged to consult its own tax advisors to determine whether the conversion of Relevant Claims for shares of Reorganized Grupo Aeroméxico New Stock would be considered as taxable income for MIT purposes or not, based upon the particular circumstances pertaining to such Holder and the nature of corresponding Relevant Claim.

For the purposes of the LISR, the acquisition cost of the shares received by each of the Mexican Holders as a result of the conversion, shall be equal to the amount of the corresponding converted Claim.

### iii.    Disposition of New Stock issued by Reorganized Grupo Aeroméxico by entities

The gain obtained in the disposition of shares of New Stock issued by the Reorganized Grupo Aeroméxico by Mexican resident entities are taxable for MIT. As a general rule, any loss obtained in the disposition of shares would not be deductible, unless certain requirements are met.

### iv.    Dividends of Reorganized Grupo Aeroméxico obtained by entities

Dividends paid by reorganized Grupo Aeroméxico to Mexican resident entities are not taxable for MIT. Mexican resident entities are obliged to increase the balance of their net-after-taxes account balance (*Cuenta de Utilidad Fiscal Neta or CUFIN by its acronym in Mexico"*) with the amount of the dividends paid by Grupo Aeroméxico.

### v.    Payments in cash to individuals

Debtors shall withhold MIT on payments in cash to Mexican Holders that are individuals if such payments are treated as taxable income in those cases established by LISR. In the case the consideration is paid in currency other than Mexican pesos, the tax will be calculated by making the conversion into Mexican pesos at the time the consideration is paid, considering the exchange rate published by the Bank of Mexico (Banco de México) in the Mexican Federal Official Gazette the day prior to the day in which the consideration is paid. On days when the Bank of Mexico does not publish this exchange rate, the last exchange rate published prior to the day of payment will be applied.

The categories of income that are subject to MIT withholding for individuals that are Mexican Holders include, but are not limited, to interest, professional fees, indemnities for damages or penalties or conventional clauses, among others. In general terms, the underlying activities or transactions that gave rise to a Holder's Claim determine whether a payment made with respect to such Claim pursuant to the Plan would be treated as being within a category of income that is subject to withholding of MIT.

Among other characteristics, the nature of the payments and of the recipient must be taken into consideration for applying the corresponding tax withholding rates. General withholding tax rates in the case of interest is 20%; 10% for professional services; and 20% for indemnities for damages or penalties or conventional clauses.

Additionally, individuals that are Mexican Holders, must determine the corresponding annual MIT. MIT withheld by the Debtors is creditable against the annual MIT.

Each of the individuals that are Mexican Holders is urged to consult its own tax advisors to determine the withholding rate, if any, that applies with respect to its Relevant Claims, based upon the particular circumstances pertaining to such Holder and the nature of such Relevant Claim.

### vi.    Equitization - individuals

Debtors shall withhold MIT with respect to the equitization, if it is treated as giving rise to taxable income in those cases established by LISR, in which each individual that is a Mexican Holder of a General Unsecured Claim shall receive New Stock in Reorganized Grupo Aeroméxico, considering the withholding tax rates described below.

Among other characteristics, the nature of the payments and of the recipient must be taken into consideration for applying the corresponding tax withholding rates. General withholding tax rates in the case of interest is 20%; 10% for professional services; and 20% for indemnities for damages or penalties or conventional clauses.

Additionally, individuals that are Mexican Holders, must determine the corresponding annual MIT. MIT withheld by the Debtors is creditable against the annual MIT.

Each of the individuals that are Mexican Holders is urged to consult its own tax advisors to determine the withholding rate, if any, that applies with respect to its Relevant Claims, based upon the particular circumstances pertaining to such Holder and the nature of such Relevant Claim.

If any of the Debtors is required to withhold MIT with respect to the equitization, such withholding will be carried out by payment of such withholding taxes by the Debtors and a corresponding reduction in the amount of New Stock received by a individual that is a Mexican Holder on account of its Claim.

For the purposes of the LISR, the acquisition cost of the shares received by each of the individuals that is a Mexican Holder as a result of the conversion, shall be equal to the remaining amount of the corresponding Claim after reduction for the withholding tax.

In the case the consideration is in currency other than Mexican pesos, the tax will be calculated by making the conversion into Mexican pesos at the time the conversion into New Stock in Reorganized Grupo Aeroméxico takes place, considering the fix exchange rate published by the Bank of Mexico in the Mexican Federal Official Gazette the day prior to the day in which the conversion is made. On days when the Bank of Mexico does not publish this exchange rate, the last exchange rate published prior to the day of conversion will be applied.

### vii.    Disposition of New Stock issued by Reorganized Grupo Aeroméxico by individuals

In case the shares of Reorganized Grupo Aeroméxico New Stock are placed among the general public in accordance with general administrative rules, and they are disposed by a Mexican Holder that is an individual through the stock Exchange or derivatives markets recognized in the terms of the Securities Market Law, including disposals made through derivative financial transactions that are linked to shares of Reorganized Grupo Aeroméxico New Stock, MIT shall be triggered 10% on the capital gain. If a capital loss is incurred, subject to several requirements, Mexican Holders that are individuals may deduct it against other capital gains obtained in the dispositions on shares that are placed among the general public. This treatment is subject to several restrictions which, if applicable, would make the capital gain or loss as applicable to be treated in the general regime established in the LISR for disposition of goods that is described below.

In case such shares of stock are not placed among the general public, or they are not disposed through the stock Exchange or derivatives markets as described, the disposition thereof as a general rule, would be subject to taxation in Mexico according with general regimen established in the LISR, in general the capital gain would be treated as taxable income and depending on the amount it could be subject to a tax up to 35% by applying a progressive tariff that ranges between 2% up to 35%. Capital losses are deductible subject to requirements.

### viii.    Dividends of Reorganized Grupo Aeroméxico obtained by individuals

A 10% withholding tax rate would be applicable for dividends paid by Reorganized Grupo Aeroméxico to a Mexican Holder that is an individual.

## B.    Certain U.S. Federal Income Tax Consequences of the Pla

### *1.*    General

The following discussion summarizes certain material U.S. federal income tax consequences of the implementation of the Plan to the Debtors and to certain U.S. Holders (as defined below) of Allowed Claims. This summary does not address the U.S. federal income tax consequences to (1) Holders of Claims who are deemed to have rejected the Plan in accordance with the provisions of section 1126(g) of the Bankruptcy Code (e.g., Holders of existing Interests in Grupo Aeroméxico's capital stock), (2) Holders whose Claims are Unimpaired or otherwise entitled to payment in full in Cash under the Plan (e.g., Secured Claims and Other Priority Claims) or (3) purchasers of Claims following the Effective Date. Thus, this summary applies only to U.S. Holders of General Unsecured Claims and Unsecured Convenience Class Claims (collectively, the "**Relevant Claims**"). This summary also does not address the federal income tax consequences to a U.S. Holder of a Relevant Claim that is not treated as debt for U.S. federal income tax purposes.

This summary is based on the Internal Revenue Code of 1986, as amended ("**IRC**"), existing and proposed U.S. Treasury Regulations, judicial decisions, published administrative rules and pronouncements of the Internal Revenue Service ("**IRS**") and the income tax treaty between the United States and Mexico (the "**U.S.-Mexico Tax Treaty**"), all as in effect on the

date of this Disclosure Statement and all of which are subject to change, possibly on a retroactive basis. Any such change could significantly affect the U.S. federal income tax consequences described below. The tax consequences described herein are uncertain. The Debtors have not requested an opinion of counsel or a ruling from the IRS with respect to any of the tax aspects of the Plan.

This discussion does not address non-U.S. or U.S. state or local tax consequences of the Plan, nor does it purport to address the U.S. federal income tax consequences of the Plan to special classes of taxpayers (e.g., non-U.S. taxpayers, small business investment companies, regulated investment companies, real estate investment trusts, broker-dealers, banks and certain other financial institutions, insurance companies, tax-exempt organizations, retirement plans, individual retirement and other tax deferred accounts, governmental authorities or agencies, Holders that are, or hold Claims through, S corporations, partnerships or other pass-through entities for U.S. federal income tax purposes, persons whose functional currency is not the U.S. dollar, dealers in securities or foreign currency, traders that mark to market their securities for tax purposes, persons subject to the alternative minimum tax or the "Medicare" tax on unearned income, persons who use the accrual method of accounting and report income on an "applicable financial statement," persons that actually (or constructively) owned, own or will own 5% or more of Grupo Aeroméxico's capital stock by vote or value, persons holding Claims that are part of a straddle, hedging, constructive sale, or conversion transaction, persons who are themselves in bankruptcy, and any U.S. Holder of a Claim that is not considered debt for U.S. federal income tax purposes). In addition, this discussion does not address U.S. federal taxes other than income taxes. This discussion does not apply to Holders of Claims that are not U.S. Holders. Non-U.S. Holders should consult their own tax advisors with respect to the tax consequences of the Plan applicable to them.

This discussion assumes that the applicable U.S. Holder has not claimed a bad debt deduction with respect to a Claim (or any portion thereof) in the current or any prior year and that such Claim did not become completely or partially worthless in a prior taxable year. Additionally, this discussion assumes that (1) the various debt and other arrangements to which any of the Debtors is a party will be respected for U.S. federal income tax purposes in accordance with their form and (2) except where otherwise indicated, the Claims are held as "capital assets" (generally, property held for investment) within the meaning of section 1221 of the IRC.

If an entity that is classified as a partnership for U.S. federal income tax purposes holds a Relevant Claim, the U.S. federal income tax treatment of a partner will generally depend on the status of the partner and the activities of the partnership. Partnerships holding a Relevant Claim and partners in such partnerships should consult their own tax advisors as to the particular U.S. federal income tax consequences of the implementation of the Plan.

**ACCORDINGLY, THE FOLLOWING SUMMARY IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING OR FOR ADVICE BASED UPON THE PARTICULAR CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. EACH HOLDER OF A CLAIM OR INTEREST SHOULD CONSULT ITS OWN TAX ADVISORS FOR THE U.S. FEDERAL, STATE, LOCAL, AND NON-U.S. INCOME AND OTHER TAX CONSEQUENCES APPLICABLE TO IT UNDER THE PLAN.**

**2.    Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors**

The U.S. federal income tax consequences to the Debtors as a result of the Plan are not expected to be material.

**3.    Consequences to U.S. Holders of Relevant Claims**

As used in this Disclosure Statement, the term "U.S. Holder" means a beneficial owner of Relevant Claims that is for U.S. federal income tax purposes:

- a citizen or resident of the United States;

- a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States or any state therein or the District of Columbia; or

- an estate or trust, the income of which is subject to U.S. federal income taxation regardless of its source.

**i.    Consequences to U.S. Holders of General Unsecured Claims**

Pursuant to the Plan, each U.S. Holder of a General Unsecured Claim will receive in satisfaction of its General Unsecured Claim (i) New Stock, (ii) Cash or (iii) a combination of New Stock and Cash (as determined under the Plan).

The U.S. federal income tax consequences to a U.S. Holder of a General Unsecured Claim who receives New Stock, or a combination of New Stock and Cash, will depend on whether: (i) the General Unsecured Claim is treated as a security for purposes of the reorganization provisions of the IRC, (ii) the General Unsecured Claim is treated as a security of Grupo Aeroméxico for purposes of the reorganization provisions of the IRC and (iii) the restructuring of the Debtors qualifies as a tax-free reorganization.

Whether a debt instrument constitutes a security is determined based on all the facts and circumstances, but most authorities have held that the term of a debt instrument (i.e., the time period between its issue date and maturity date) at the time of its issuance is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of 10 years or more is evidence that it is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including, among others: whether the debt instrument is secured; the creditworthiness of the obligor; the subordination or lack thereof to other creditors; the right to vote or otherwise participate in the management of the obligor; convertibility of the instrument into an equity interest of the obligor; whether payments of interest are fixed, variable or contingent; and whether such payments are made on a current basis or accrued.

**a.    Tax-Free Reorganization**

Assuming that some of the General Unsecured Claims are treated as securities of Grupo Aeroméxico, the Plan pursuant to which the General Unsecured Claims are exchanged for New

Stock or a combination of New Stock and Cash should be treated as a tax-free reorganization. In such a case, a U.S. Holder of a General Unsecured Claim that is treated as a security of Grupo Aeroméxico and is exchanged for New Stock or a combination of New Stock and Cash should not recognize loss upon such exchange, but may recognize gain (calculated as described under "—Taxable Exchange" below), if any, to the extent of any Cash received in satisfaction of its General Unsecured Claim. The character of such gain would also be determined in accordance with the principles discussed under "—Taxable Exchange" below.

Such a U.S. Holder's aggregate tax basis in the New Stock received in satisfaction of its General Unsecured Claim should equal the U.S. Holder's aggregate adjusted tax basis in its General Unsecured Claim decreased by the amount of any Cash received in the exchange and increased by any gain recognized by such U.S. Holder in the exchange. In general, the U.S. Holder's holding period for the New Stock received in the exchange should include the U.S. Holder's holding period for the General Unsecured Claim.

For the treatment of the exchange to the extent a portion of the consideration received is allocable to accrued but unpaid interest, original issue discount ("**OID**") or market discount, see the sections entitled "—Accrued Interest and OID" and "—Market Discount" below.

### b.    Taxable Exchange

If (A) a General Unsecured Claim is not treated as a security or is treated as a security of an issuer other than Grupo Aeroméxico (e.g., treated as a security of (i) Aerovias, (ii) Aeroméxico Connect or (iii) Aeroméxico Cargo) or (B) a General Unsecured Claim is exchanged solely for Cash, a U.S. Holder of such a General Unsecured Claim generally should be treated as exchanging its General Unsecured Claim for New Stock and any Cash received in the exchange in a taxable exchange under section 1001 of the IRC. Accordingly, such a U.S. Holder generally should recognize gain or loss equal to the difference between: (x) the sum of (i) the fair market value of any New Stock (as of the date the stock is distributed to the U.S. Holder) received in the exchange and (ii) the amount of any Cash received in the exchange and (y) the U.S. Holder's adjusted basis, if any, in the General Unsecured Claim. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the General Unsecured Claim in such U.S. Holder's hands, and whether the General Unsecured Claim was purchased at a discount. If any recognized gain is capital gain, it generally would be long-term capital gain if the U.S. Holder held its General Unsecured Claim for more than one year at the time of the exchange. The deductibility of capital losses is subject to certain limitations. Any New Stock received by a U.S. Holder of such a General Unsecured Claim generally should have a basis equal to the fair market value of the New Stock as of the date the stock is distributed to the U.S. Holder and a holding period starting on the day following the applicable Distribution Date to such U.S. Holder.

For the treatment of the exchange to the extent a portion of the consideration received is allocable to accrued but unpaid interest, OID or market discount, see the sections entitled "—Accrued Interest and OID" and "—Market Discount" below.

### ii.    Consequences to U.S. Holders of Unsecured Convenience Class Claims

Pursuant to the Plan, each U.S. Holder of an Unsecured Convenience Class Claim will receive Cash in satisfaction of its Unsecured Convenience Class Claim.

A U.S. Holder of an Unsecured Convenience Class Claim generally should be treated as exchanging its Unsecured Convenience Class Claim for Cash in a taxable exchange under section 1001 of the IRC. Accordingly, such a U.S. Holder generally should recognize gain or loss equal to the difference between: (x) the Cash received in exchange for the Unsecured Convenience Class Claim and (y) the U.S. Holder's adjusted basis, if any, in the Unsecured Convenience Class Claim. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the Unsecured Convenience Class Claim in such U.S. Holder's hands and whether the Unsecured Convenience Class Claim was purchased at a discount. If any recognized gain is capital gain, it generally would be long-term capital gain if the U.S. Holder held its Unsecured Convenience Class Claim for more than one year at the time of the exchange. The deductibility of capital losses is subject to certain limitations.

For the treatment of the exchange to the extent a portion of the consideration received is allocable to accrued but unpaid interest, OID or market discount, see the sections entitled "—Accrued Interest and OID" and "—Market Discount" below.

### iii.    Accrued Interest and OID

To the extent that any amount received by a U.S. Holder of a Relevant Claim is attributable to accrued but unpaid interest (or OID) on the Relevant Claim, the receipt of such amount should be recognized by the U.S. Holder as ordinary interest income (to the extent not already included in income by the U.S. Holder). Conversely, a U.S. Holder may be able to recognize a deductible loss to the extent that any accrued interest previously was recognized by the U.S. Holder but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point. The tax basis of any New Stock treated as received in satisfaction of accrued but unpaid interest (or OID) should equal the amount of such accrued but unpaid interest (or OID). The holding period for such New Stock should begin on the day following the receipt of such consideration.

If the fair market value of the consideration received by a U.S. Holder is not sufficient to fully satisfy all the principal and interest on a Relevant Claim, the extent to which such consideration will be attributable to accrued interest (or OID) is unclear. Under the Plan, the aggregate consideration received in respect of Relevant Claims will be allocated first to the principal amount of such a Relevant Claim, with any excess allocated to unpaid interest, if any, that accrued on such Claim before the Petition Date. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain U.S. Treasury Regulations treat such payments as allocated first to any accrued but unpaid interest. The IRS could take the position that the consideration received by a U.S. Holder should be allocated in some way other than as provided in the Plan. U.S. Holders of Relevant Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

### iv.    Relevant Claims That Are Denominated in Foreign Currency

The rules applicable to a Relevant Claim that is denominated in any currency other than the U.S. dollar (including pesos) ("**foreign currency**") could require some or all of the gain or loss realized on the exchange of a Relevant Claim (with respect to an exchange of General Unsecured Claim for New Stock or a combination of New Stock and Cash, whether or not such exchange qualifies for tax-free treatment) that is attributable to fluctuations in currency exchange rates, to be treated as ordinary income or loss. The rules applicable to a Relevant Claim that is denominated in any foreign currency are complex, and their application may depend on the circumstances of the applicable U.S. Holder. For example, various elections are available under these rules, and whether a U.S. Holder has made (or makes) any of these elections may affect the U.S. Holder's tax treatment. Each U.S. Holder of a Relevant Claim that is denominated in any foreign currency should consult its own tax advisor regarding the U.S. federal income tax consequences of the exchange of such Relevant Claim, including the proper method for establishing the U.S. Holder's tax basis in the Relevant Claim and in any New Stock received pursuant to these rules.

### v.    Market Discount

U.S. Holders of Relevant Claims may be affected by the market discount provisions of sections 1276 through 1278 of the IRC. Under these rules, some or all of any gain realized by a U.S. Holder may be treated as ordinary income (instead of capital gain) to the extent of the amount of market discount on such Relevant Claims.

In general, a debt obligation with a fixed maturity of more than one year that is acquired by a holder on the secondary market (or, in certain circumstances, upon original issuance) is considered to be acquired with market discount as to that holder if the debt obligation's stated redemption price at maturity (or revised issue price, in the case of a debt obligation issued with OID) exceeds the tax basis of the debt obligation in the holder's hands immediately after its acquisition. However, a debt obligation will not be a market discount obligation if such excess is less than a statutory *de minimis* amount (equal to 0.25% of the debt obligation's stated redemption price at maturity or revised issue price, in the case of a debt obligation issued with OID, multiplied by the number of complete years remaining to maturity as of the time the holder acquired the debt obligation).

Any gain recognized by a U.S. Holder on the taxable disposition of a Relevant Claim (determined as described above) that was acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Relevant Claim was considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued). If a General Unsecured Claim that was acquired with market discount is exchanged in a tax-free reorganization (as described above) for New Stock, any market discount that accrued on the Relevant Claim (i.e., up to the time of the exchange) but was not recognized by the U.S. Holder is carried over to the New Stock received therefor and any gain recognized on the subsequent sale, exchange, redemption or other disposition of such New Stock is treated as ordinary income to the extent of such accrued market discount.

### vi.    U.S. Federal Income Tax Consequences of Any Mexican Taxes and Foreign Tax Credits

As described under "—Certain Mexican Income Tax Consequences of the Plan," Mexican taxes, including withholding taxes, may apply on distributions or other payments with respect to a Relevant Claim to a U.S. Holder, depending on the particular circumstances of the U.S. Holder and the nature of the Relevant Claim.

### a.  Mexican Withholding Taxes

Withholding taxes remitted by the Debtors in connection with distributions or other payments with respect to a Relevant Claim to a U.S. Holder should be treated, for U.S. federal income tax purposes, as an additional amount realized by the U.S. Holder on the exchange or as an additional amount paid with respect to accrued and unpaid interest, as the case may be.

Each U.S. Holder of a Relevant Claim the exchange of which is subject to Mexican withholding taxes paid by the Debtors should consult its own tax advisor regarding the U.S. federal income tax treatment of such withheld taxes.

### b.  Foreign Tax Credits

A U.S. Holder may use foreign tax credits to offset a tax liability considered to be attributable to income from sources outside the United States. Generally, gain or loss from the disposition of a Relevant Claim should be treated as U.S. source for foreign tax credit limitation purposes, which will generally limit the availability of foreign tax credits to offset any related U.S. tax thereon. However, a U.S. Holder of a Relevant Claim who is eligible for the benefits of the U.S.-Mexico Tax Treaty may be entitled to treat gain, if any, realized on the exchange of a Relevant Claim pursuant to the Plan that is subject to Mexican income tax as gain from sources outside the United States for U.S. foreign tax credit purposes. Consequently, a U.S. Holder may be entitled to benefit from the foreign tax credit for any Mexican income tax, subject to a number of complex limitations and conditions. If a U.S. Holder of a Relevant Claim is not eligible for the benefits of the U.S.-Mexico Tax Treaty or does not elect to treat any gain as gain from sources outside the United States, then such U.S. Holder would generally not be entitled to use any foreign tax credit arising from any Mexican tax imposed on the exchange of a Relevant Claim, unless such credit can be applied (subject to applicable limitations) against tax due on other income treated as derived from sources outside the United States. Amounts, if any, received pursuant to the Plan that are treated as interest income (or as accrued market discount not previously included in income by the U.S. Holder) should constitute income from sources outside the United States and generally should constitute "passive category income" for U.S. foreign tax credit purposes. Subject to certain conditions and limitations, if any Mexican income taxes were to be paid or withheld on interest and were nonrefundable under the U.S.-Mexico Tax Treaty, a U.S. Holder may be entitled to a foreign tax credit in respect of any such Mexican income taxes or, alternatively, a U.S. Holder may deduct such taxes in computing its taxable income provided that such U.S. Holder does not elect to claim a foreign tax credit for the relevant taxable year. An election to deduct foreign taxes instead of claiming foreign tax credit applies to all taxes paid or accrued in the taxable year to foreign countries and possessions of the United States.

THE RULES GOVERNING U.S. FOREIGN TAX CREDITS ARE COMPLEX AND U.S. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS REGARDING THEIR ELIGIBILITY FOR BENEFITS UNDER THE U.S.-MEXICO TAX TREATY AND THE

AVAILABILITY OF FOREIGN TAX CREDITS OR DEDUCTIONS IN LIGHT OF THEIR PARTICULAR CIRCUMSTANCES.

### 4. Consequences of Ownership of New Stock

#### i. Distributions

Subject to the discussion below under "—Passive Foreign Investment Company Considerations," the gross amount of any distribution on New Stock that is made out of Reorganized Grupo Aeroméxico's current or accumulated earnings and profits (as determined for U.S. federal income tax purposes), without reduction for Mexican withholding tax, if any, generally should be taxable to a U.S. Holder as ordinary dividend income on the date such distribution is actually or constructively received. Any such dividends generally will not be eligible for the dividends received deduction allowed to corporations in respect of dividends received from U.S. corporations. To the extent that the amount of the distribution exceeds Reorganized Grupo Aeroméxico's current and accumulated earnings and profits (as determined under U.S. federal income tax principles), such excess amount should be treated first as a nontaxable return of capital to the extent of the U.S. Holder's tax basis in its New Stock, and thereafter as capital gain recognized on a sale or exchange. However, it is not expected that Reorganized Grupo Aeroméxico will maintain calculations of its earnings and profits in accordance with U.S. federal income tax principles. U.S. Holders should therefore assume that any distribution by Reorganized Grupo Aeroméxico with respect to its New Stock will be reported as dividend income. U.S. Holders should consult their own tax advisors with respect to the appropriate U.S. federal income tax treatment of any distribution received from Reorganized Grupo Aeroméxico.

If distributions are paid in pesos, such distributions should be includible in the income of a U.S. Holder in a U.S. dollar amount calculated by reference to the exchange rate in effect on the date that they are received by the U.S. Holder (regardless of whether such pesos are in fact converted into U.S. dollars on such date). If such distributions are converted into U.S. dollars on the date of such receipt, a U.S. Holder generally should not be required to recognize foreign currency gain or loss in respect of the distributions. U.S. Holders should consult their own tax advisors regarding the treatment of foreign currency gain or loss, if any, on any pesos received by a U.S. Holder that are converted into U.S. dollars on a date subsequent to receipt.

It is not clear whether dividends paid by Reorganized Grupo Aeromexico to non-corporate U.S. Holders will be eligible to be treated as "qualified dividend income" and therefore taxable at rates applicable to long-term capital gains. U.S. Holders should consult their own tax advisors regarding the availability of these favorable tax rates on dividends in their particular circumstances.

A U.S. Holder may be entitled, subject to a number of complex limitations and conditions (including a minimum holding period requirement), to claim a U.S. foreign tax credit in respect of any Mexican income taxes withheld on dividends received in respect of the New Stock. A U.S. Holder who does not elect to claim a credit for any foreign income taxes paid during the taxable year may instead claim a deduction in respect of such income taxes, provided the U.S. Holder elects to deduct (rather than credit) all foreign income taxes for that year. Dividends received in respect of the New Stock are generally expected to be treated as income from sources outside the United States, and generally should be treated as passive category income for most U.S. Holders.

The rules relating to foreign taxes are complex, and U.S. Holders should consult their own tax advisors regarding the availability of foreign tax credits under their particular circumstances.

### ii.     Sale, Exchange, Redemption or Other Taxable Disposition of New Stock

Subject to the discussion below under "—Passive Foreign Investment Company Considerations," a U.S. Holder generally should recognize gain or loss on any sale, exchange, redemption or other taxable disposition of New Stock in an amount equal to the difference between (i) the amount realized on the disposition and (ii) such U.S. Holder's adjusted tax basis in such New Stock, in each case as determined in U.S. dollars. Any gain or loss recognized by a U.S. Holder on a taxable disposition of New Stock generally should be capital gain or loss and should be long-term capital gain or loss if the U.S. Holder's holding period in such New Stock exceeds one year at the time of the disposition. Preferential tax rates may apply to long-term capital gains of non-corporate U.S. Holders (including individuals). The deductibility of capital losses is subject to limitations.

If Mexican income tax is withheld on the sale or other taxable disposition of the New Stock, the amount realized by a U.S. Holder should include the gross amount of the proceeds of that sale or other taxable disposition before deduction of the Mexican income tax. A U.S. Holder who is eligible for the benefits of the U.S.-Mexico Tax Treaty can elect to treat capital gain or loss, if any, realized on the sale or other taxable disposition of the New Stock that is subject to Mexican income tax as gain or loss from sources outside the United States for U.S. foreign tax credit purposes. Consequently, in the case of a gain from the disposition of New Stock that is subject to Mexican income tax, a U.S. Holder, subject to a number of complex limitations and conditions (including a minimum holding period requirement), may be able to benefit from the foreign tax credit for that Mexican income tax. Otherwise, any gain from the disposition of the New Stock that is subject to Mexican income tax should be treated as a U.S. source gain and a U.S. Holder may not be able to benefit from the foreign tax credit for that Mexican income tax, unless the U.S. Holder can apply the credit against U.S. federal income tax payable on other income from sources outside the United States. Alternatively, the U.S. Holder may elect to take a deduction for the Mexican income tax, provided that the U.S. Holder elects to deduct all foreign taxes paid or accrued for the taxable year. The rules governing foreign tax credits are complex, and a U.S. Holder should consult its own tax advisor regarding the availability of foreign tax credits under its particular circumstances.

If a U.S. Holder receives foreign currency in connection with a sale or other taxable disposition of the New Stock, such U.S. Holder may be required to recognize a foreign currency gain or loss for U.S. federal income tax purposes because of differences between the U.S. dollar value of the foreign currency received prevailing on the date of the sale or other taxable disposition of the New Stock and the date of payment.  Any such foreign currency gain or loss generally should constitute gain or loss from U.S. sources and should be treated as ordinary income or loss and would be in addition to gain or loss, if any, recognized on the sale or other taxable disposition of New Stock.  The rules applicable to a foreign currency gain or loss are complex and their application may depend on whether the New Stock is traded on an established securities market as of the time of the sale or other taxable disposition of the New Stock and the circumstances of the applicable U.S. Holder. For example, various elections are available under these rules, and whether a U.S. Holder should make any of these elections may depend on its particular U.S. federal income

tax situation. Each U.S. Holder that receives foreign currency in connection with a sale or other taxable disposition of the New Stock should consult its own tax advisor regarding whether it is required to recognize any foreign currency gain or loss and, if so, the amount and appropriate tax treatment of such foreign currency gain or loss.

### iii.   Passive Foreign Investment Company Considerations

Reorganized Grupo Aeroméxico will be classified as a PFIC for any taxable year if either: (a) at least 75% of its gross income is "passive income" for purposes of the PFIC rules or (b) at least 50% of the value of its assets (determined on the basis of a quarterly average) is attributable to assets that produce or are held for the production of passive income. For this purpose, Reorganized Grupo Aeroméxico will be treated as owning its proportionate share of the assets and earning its proportionate share of the income of any other corporation in which it owns, directly or indirectly, 25% or more (by value) of the shares.

Under the PFIC rules, if Reorganized Grupo Aeroméxico were considered a PFIC at any time that a U.S. Holder holds the New Stock, Reorganized Grupo Aeroméxico would continue to be treated as a PFIC with respect to such U.S. Holder's New Stock unless (i) Reorganized Grupo Aeroméxico ceased to be a PFIC and (ii) the U.S. Holder made a "deemed sale" election under the PFIC rules.

Based on the composition of the income, assets and operations of Grupo Aeroméxico and its subsidiaries, Grupo Aeroméxico does not believe that it is currently a PFIC, and does not currently expect Reorganized Grupo Aeroméxico to be a PFIC in the future. However, this is a factual determination that depends on, among other things, the composition of the income and assets, and the market value of the shares and assets, of Reorganized Grupo Aeroméxico and its subsidiaries from time to time, and thus the determination can only be made annually after the close of each taxable year. Therefore, no assurance can be given that Reorganized Grupo Aeroméxico will not be classified as a PFIC for any future taxable year.

If Reorganized Grupo Aeroméxico is considered a PFIC at any time that a U.S. Holder holds New Stock, any gain recognized by the U.S. Holder on a sale or other disposition of the New Stock, as well as the amount of any "excess distribution" (as defined below) received by the U.S. Holder, would be allocated ratably over the U.S. Holder's holding period for the New Stock. The amounts allocated to the taxable year of the sale or other disposition (or the taxable year of receipt, in the case of an excess distribution) and to any year before Reorganized Grupo Aeroméxico became a PFIC would be taxed as ordinary income. The amount allocated to each other taxable year would be subject to tax at the highest rate in effect for individuals or corporations, as appropriate, for that taxable year, and an interest charge would be imposed. For the purposes of these rules, an excess distribution is the amount by which any distribution received by a U.S. Holder on New Stock exceeds 125 percent of the average of the annual distributions on the New Stock received during the preceding three years or the U.S. Holder's holding period, whichever is shorter. In addition, if Reorganized Grupo Aeroméxico is a PFIC and any of its subsidiaries is also a PFIC, a U.S. Holder may also be subject to the adverse tax consequences described above with respect to any gain or "excess distribution" realized or deemed realized in respect of such subsidiary PFIC. Certain elections may be available that would result in alternative treatments of the New Stock if Reorganized Grupo Aeroméxico is considered a PFIC and certain conditions are

met. However, Grupo Aeroméxico does not currently intend to prepare or provide the information that would enable a U.S. Holder to achieve an alternative treatment by making an election to treat Reorganized Grupo Aeroméxico as a qualified electing fund, and an election to be subject to mark to market treatment will be available only if the New Stock is traded on a qualified exchange or other market (as defined in applicable U.S. Treasury Regulations). In addition, if Reorganized Grupo Aeroméxico were a PFIC for any taxable year, dividends received by a non-corporate U.S. Holder in that taxable year or the subsequent taxable year would not be eligible for the lower rate of tax applicable to "qualified dividend income." If Reorganized Grupo Aeroméxico is considered a PFIC, a U.S. Holder will also be subject to annual information reporting requirements. U.S. Holders should consult their own tax advisors about the potential application of the PFIC rules with respect to Reorganized Grupo Aeroméxico and the potential consequences related thereto.

### 5. Information Reporting and Backup Withholding

Distributions or payments made (or treated as made) to a U.S. Holder of a Relevant Claim or New Stock may be subject to information reporting to the IRS and U.S. backup withholding.

A U.S. Holder may be eligible for an exemption from backup withholding if the U.S. Holder furnishes a correct taxpayer identification number and makes any other required certification or is otherwise exempt from backup withholding. U.S. Holders who are required to establish their exempt status may be required to provide such certification on IRS Form W-9. U.S. Holders should consult their tax advisors regarding the application of the U.S. information reporting and backup withholding rules.

Backup withholding is not an additional tax. Amounts withheld as backup withholding may be credited against a U.S. Holder's U.S. federal income tax liability, and such U.S. Holder may obtain a refund of any excess amounts withheld under the backup withholding rules by timely filing an appropriate claim for refund with the IRS and furnishing any required information.

In addition, U.S. Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. U.S. Holders are urged to consult their own tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the U.S. Holders' tax returns.

U.S. Holders should be aware that additional reporting requirements may apply with respect to the holding of certain non-U.S. financial assets (including stock of non-U.S. issuers which is not held in an account maintained by certain financial institutions). U.S. Holders are encouraged to consult their own tax advisors regarding the application of the information reporting rules to the New Stock and the application of these additional reporting requirements to their particular situations.

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX**

**SITUATION. ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR OWN TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY NON-U.S. OR U.S. STATE OR LOCAL TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## ARTICLE XII

## RECOMMENDATION

The Debtors believe that Confirmation and Consummation of the Plan are in the best interests of the Debtors, their Estates and their creditors.  The Plan provides for an equitable distribution to Holders of Claims and interests.  The Debtors believe that any alternative to Confirmation of the Plan, such as liquidation under chapter 7 of the Bankruptcy Code, could result in significant delay, litigation, and additional costs, as well as a reduction in the distributions to Holders of Claims in certain Classes.  **Consequently, the Debtors urge all eligible Holders of Impaired Claims to vote to ACCEPT the Plan and to complete and submit their Ballots so that they will be RECEIVED by the Claims and Solicitation Agent on or before the Voting Deadline.**

*[Remainder of Page Intentionally Left Blank]*

-191-

Dated:    October 1, 2021

Respectfully submitted,

Grupo Aeroméxico, S.A.B. de C.V. (for itself and on behalf of all Debtors)

*/s/ DRAFT*
Name: Ricardo Javier Sánchez Baker
Title:   Chief Financial Officer


**GRUPO AEROMÉXICO, S.A.B. DE C.V.**
**AEROVÍAS DE MÉXICO, S.A. DE C.V.**
**AEROLITORAL, S.A. DE C.V.**
**AEROVÍAS EMPRESA DE CARGO, S.A. DE C.V.**

## Appendix A

**Plan of Reorganization**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re:<br><br>**GRUPO AEROMÉXICO, S.A.B. de C.V.,** *et al.*,<br><br>Debtors[1] | **Chapter 11**<br><br>**Case No. 20-11563 (SCC)**<br><br>**(Jointly Administered)** |

**DEBTORS' JOINT PLAN OF REORGANIZATION UNDER**
**CHAPTER 11 OF THE BANKRUPTCY CODE**

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Timothy Graulich
James I. McClammy
Stephen D. Piraino
Erik Jerrard (admitted *pro hac vice*)

*Counsel to the Debtors*
*and Debtors in Possession*

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street, 16th Floor
Wilmington, Delaware 19899
Tel.: (302) 658-9200
Fax: (302) 658-3989
Derek C. Abbott (admitted *pro hac vice*)
Andrew R. Remming (admitted *pro hac vice*)
Joseph C. Barsalona II
Taylor M. Haga (admitted *pro hac vice*)

*Counsel to the Debtors*
*and Debtors in Possession*

Dated: October 1, 2021
New York, New York

---

[1] The Debtors in these cases, along with each Debtor's registration number in the applicable jurisdiction, are as follows: Grupo Aeroméxico, S.A.B. de C.V. 286676; Aerovías de México, S.A. de C.V. 108984; Aerolitoral, S.A. de C.V. 217315; Aerovías Empresa de Cargo, S.A. de C.V. 437094-1. The Debtors' corporate headquarters is located at Paseo de la Reforma No. 243, piso 25 Colonia Cuauhtémoc, Mexico City, C.P. 06500.

# TABLE OF CONTENTS

PAGE

INTRODUCTION.................................................................................................................. 1

ARTICLE I            DEFINITIONS AND RULES OF INTERPRETATION ........................... 2

Section 1.1.    Definitions..................................................................................2
Section 1.2.    Rules of Interpretation ................................................................24
Section 1.3.    Computation of Time ..................................................................24
Section 1.4.    References to Monetary Figures ..................................................24
Section 1.5.    Certain Consent Rights ...............................................................24
Section 1.6.    Exhibits; Schedules; Plan Supplement; Plan Documents ..........................25

ARTICLE II           ADMINISTRATIVE EXPENSE CLAIMS AND PRIORITY TAX
                     CLAIMS................................................................................ 25

Section 2.1.    DIP Facility Claims.....................................................................25
Section 2.2.    Administrative Expense Claims....................................................26
Section 2.3.    Professional Fee Claims...............................................................27
Section 2.4.    United States Trustee Fees...........................................................28
Section 2.5.    Priority Tax Claims.....................................................................28
Section 2.6.    Commitment Premiums and Fees; Commitment Party Expense
                Reimbursement .........................................................................29

ARTICLE III          CLASSIFICATION AND TREATMENT OF CLAIMS AND
                     INTERESTS ........................................................................... 29

Section 3.1.    Classification of Claims and Interests...........................................29
Section 3.2.    Treatment of Classes of Claims and Interests................................31
Section 3.3.    Special Provision Governing Unimpaired Claims ..........................38
Section 3.4.    Voting Classes; Presumed Acceptance by Non-Voting Classes...............38
Section 3.5.    Elimination of Vacant Classes ....................................................38
Section 3.6.    Subordinated Claims and Interests................................................38
Section 3.7.    Intercompany Interests................................................................38
Section 3.8.    Controversy Concerning Impairment ...........................................39
Section 3.9.    Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code........39

ARTICLE IV           IMPLEMENTATION OF THE PLAN ....................................... 39

Section 4.1.    [RESERVED] ............................................................................39
Section 4.2.    Continued Corporate Existence ...................................................39
Section 4.3.    Restructuring Transactions ........................................................39
Section 4.4.    Exemption from Registration Requirements for New Stock ...................40
Section 4.5.    Cancellation of Notes, Instruments, Certificates and Other Documents ...40
Section 4.6.    Issuance of New Securities; Execution of Related Documents ................41
Section 4.7.    Authorization and Issuance of New First Lien Notes..............................42

i

Section 4.8.    The Equity and Debt Financing ................................................43
Section 4.9.    Corporate Action..................................................................44
Section 4.10.    PLM Stock Participation Transaction.......................................44
Section 4.11.    New Corporate Governance Documents ....................................45
Section 4.12.    Directors and Officers...........................................................45
Section 4.13.    Effectuating Documents; Further Transactions ...........................46
Section 4.14.    Management Incentive Plan....................................................46
Section 4.15.    Sources of Consideration for Plan Distributions .........................47
Section 4.16.    Closing of Chapter 11 Cases..................................................47

**ARTICLE V    PROVISIONS GOVERNING DISTRIBUTIONS.................................... 47**

Section 5.1.    Disbursing Agent .................................................................47
Section 5.2.    Rights and Powers of Disbursing Agent.....................................48
Section 5.3.    Timing and Delivery of Distributions........................................49
Section 5.4.    Manner of Payment Under Plan................................................51
Section 5.5.    Allocation of Plan Distributions Between Principal and Interest .............51
Section 5.6.    No Postpetition or Default Interest on Claims..............................52
Section 5.7.    Foreign Currency Exchange Rate .............................................52
Section 5.8.    Fractional Shares..................................................................52
Section 5.9.    Undeliverable Distributions and Unclaimed Property.....................52
Section 5.10.    Claims Paid or Payable by Third Parties ...................................53
Section 5.11.    Setoffs and Recoupments.......................................................54
Section 5.12.    Withholding and Reporting Requirements ..................................54

**ARTICLE VI    DISPUTED CLAIMS OR INTERESTS.................................................... 55**

Section 6.1.    Objections to Claims or Interests.............................................55
Section 6.2.    Resolution of Disputed Claims or Interests .................................55
Section 6.3.    Estimation of Claims.............................................................55
Section 6.4.    Payments and Distributions with Respect to Disputed Claims or
                Interests.............................................................................56
Section 6.5.    No Amendments to Claims.......................................................57

**ARTICLE VII    EXECUTORY CONTRACTS AND UNEXPIRED LEASES .................. 58**

Section 7.1.    Assumption and Rejection of Executory Contracts and Unexpired
                Leases................................................................................58
Section 7.2.    Determination of Contract Disputes and Deemed Consent ..............58
Section 7.3.    Payments Related to Assumption of Contracts and Leases ..............60
Section 7.4.    Rejection Claims..................................................................60
Section 7.5.    Delta Contracts....................................................................60
Section 7.6.    Club Premier Agreements.......................................................60
Section 7.7.    Restructured Collective Labor Agreements.................................61
Section 7.8.    [RESERVED] .......................................................................61
Section 7.9.    Employee-Related Agreements .................................................61
Section 7.10.    Customer Programs...............................................................61

Section 7.11.   Indemnification Provisions ...................................................................62
Section 7.12.   Insurance Policies ...............................................................................62
Section 7.13.   [Director, Officer, Manager and Employee Liability Insurance] .............62
Section 7.14.   Reservation of Rights ...........................................................................63

## ARTICLE VIII   EFFECT OF CONFIRMATION .................................................... 64

Section 8.1.    Compromise and Settlement of Claims, Interests and Controversies ........64
Section 8.2.    Binding Effect ....................................................................................64
Section 8.3.    Vesting of Assets ................................................................................64
Section 8.4.    Release of Liens .................................................................................65
Section 8.5.    Releases ...........................................................................................65
Section 8.6.    Release by the Debtors ........................................................................65
Section 8.7.    Voluntary Releases by the Releasing Parties ...........................................67
Section 8.8.    Discharge of Claims and Termination of Interests ....................................68
Section 8.9.    Term of Injunction or Stays .................................................................69
Section 8.10.   Exculpation .......................................................................................69
Section 8.11.   Plan Injunction ..................................................................................69
Section 8.12.   Injunction Related to Releases and Exculpation .......................................70
Section 8.13.   Avoidance Actions ..............................................................................70
Section 8.14.   Preservation of Causes of Action ...........................................................70
Section 8.15.   Ipso Facto and Similar Provisions Ineffective ..........................................71

## ARTICLE IX   CONDITIONS PRECEDENT TO EFFECTIVENESS OF THE PLAN ........................................................................................... 71

Section 9.1.    Conditions to Effectiveness ..................................................................71
Section 9.2.    Waiver of Conditions to Effectiveness ....................................................73
Section 9.3.    Substantial Consummation ...................................................................73
Section 9.4.    Effect of Non-Occurrence of Conditions to Consummation .......................73

## ARTICLE X   RETENTION OF JURISDICTION BY THE BANKRUPTCY COURT ............................................................................................ 73

## ARTICLE XI   MISCELLANEOUS ........................................................................ 76

Section 11.1.   Exemption from Transfer Taxes and Recording Fees ................................76
Section 11.2.   Expedited Tax Determination ...............................................................77
Section 11.3.   Plan Modifications and Amendments ......................................................77
Section 11.4.   Revocation or Withdrawal of Plan .........................................................77
Section 11.5.   No Admission ....................................................................................78
Section 11.6.   Waiver or Estoppel .............................................................................78
Section 11.7.   Dissolution of Creditors' Committee and Formation of Post-Effective Date Committee ....................................................................78
Section 11.8.   Plan Supplement ...............................................................................80
Section 11.9.   Claims Against Other Debtors ..............................................................80
Section 11.10.  Section 1125 of the Bankruptcy Code ....................................................80

Section 11.11. Severability ........................................................................................................80
Section 11.12. Governing Law ..................................................................................................81
Section 11.13. Entire Agreement ..............................................................................................81
Section 11.14. Exhibit to Plan...................................................................................................81
Section 11.15. Binding Effect ...................................................................................................81
Section 11.16. Notices ...............................................................................................................81
Section 11.17. Reservation of Rights.........................................................................................83
Section 11.18. Further Assurances.............................................................................................84

## INTRODUCTION

Pursuant to section 1121(a) of the Bankruptcy Code,[2] Grupo Aeroméxico and its Debtor Subsidiaries in the above-captioned Chapter 11 Cases respectfully propose the following joint chapter 11 plan of reorganization.  The Debtors are the proponents of this Plan under section 1129 of the Bankruptcy Code.

A complete list of the Debtors is set forth below.  The list identifies each Debtor by its jurisdiction of organization and case number in these Chapter 11 Cases.

| **Debtor** | **Jurisdiction** | **Case Number** |
|---|---|---|
| Grupo Aeroméxico, S.A.B. de C.V. | Mexico | 20-11563 |
| Aerovías de México, S.A. de C.V. | Mexico | 20-11561 |
| Aerolitoral, S.A. de C.V. | Mexico | 20-11565 |
| Aerovías Empresa de Cargo, S.A. de C.V. | Mexico | 20-11566 |

If any Impaired Class of Claims against the Debtors entitled to vote on this Plan does not accept the Plan by the requisite statutory majority required by section 1126(c) of the Bankruptcy Code, then the Debtors may take any of the actions specified in Section [3.9] of the Plan (with any necessary consents as specified therein), including proceeding to confirm the Plan under section 1129(b) of the Bankruptcy Code.

Pursuant to section 1125(b) of the Bankruptcy Code, votes to accept or reject a plan of reorganization cannot be solicited from Holders of Claims or interests entitled to vote on the plan until a disclosure statement has been approved by a bankruptcy court and distributed to such Holders.  On [      ], 2021, the Bankruptcy Court entered the Approval Order that, among other things, approved the Disclosure Statement, set voting procedures and scheduled the Confirmation Hearing.  The Disclosure Statement that accompanies this Plan contains, among other things, a discussion of the Debtors' history, businesses, assets and operations projections for those operations, risk factors associated with the businesses and the Plan, a discussion of applicable Mexican law and a summary and analysis of the Plan and certain related matters, including, among other things, the securities to be issued under the Plan.

---

[2] Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in Section 1.1 of this Plan.

## ARTICLE I    DEFINITIONS AND RULES OF INTERPRETATION

### Section 1.1.    Definitions

Unless the context requires otherwise, the following terms used in the Plan shall have the following meanings:

"**Ad Hoc Group of Senior Noteholders**" means the Ad Hoc Group of Senior Noteholders of the Senior Notes identified in the *Third Amended Verified Statement of the Ad Hoc Group of Senior Noteholders Pursuant to Bankruptcy Rule 2019* [ECF No. 1731], as may be further amended from time to time.

"**Ad Hoc Group of Unsecured Claimholders**" means the Ad Hoc Group of Unsecured Claimholders of certain unsecured Claims identified in the *First Amended Verified Statement of the Ad Hoc Group of Unsecured Claimholders Pursuant to Bankruptcy Rule 2019* [ECF No. 1733], as may be further amended from time to time.

"**Administrative Bar Date**" means the date that is 30 calendar days after the Effective Date.

"**Administrative Expense Claim**" means a Claim for payment of an administrative expense of a kind specified in sections 328, 330, 363, 364(c)(1), 365, 503(b), 507(a)(2) or 507(b) of the Bankruptcy Code, including, but not limited to (a) the actual and necessary costs and expenses of preserving the Estates and operating the Debtors' businesses incurred on or after the Petition Date until and including the Effective Date; (b) DIP Facility Claims (including DIP Reimbursement Claims); (c) United States Trustee Fees; (d) Professional Fee Claims; (e) the Commitment Premiums and Fees; and (f) the Commitment Party Expense Reimbursement.

"**Aeroméxico Cargo**" means Aerovías Empresa de Cargo, S.A. de C.V.

"**Aeroméxico Cargo New Stock Allocation**" means the New Stock allocable to Class 3(e), based upon the portion of the Reorganized Debtors' value allocable to Aeroméxico Cargo.

"**Aeroméxico Connect**" means Aerolitoral, S.A. de C.V.

"**Aeroméxico Connect New Stock Allocation**" means the New Stock allocable to Class 3(d), based upon the portion of the Reorganized Debtors' value allocable to Aeroméxico Connect.

"**Aerovías**" means Aerovías de México, S.A. de C.V.

"**Aerovías and Grupo Aeroméxico Recourse Claims**" means the Senior Notes Claims and other General Unsecured Claims with recourse to both Aerovías and Grupo Aeroméxico.

"**Aerovías/Grupo Claimholder Cash Pool**" means Cash in the amount of up to [$300,000,000] for purposes of distributions to Cash Opt-In Eligible Claimholders that duly elect to receive Cash in lieu of New Stock on their Ballot(s), which amount shall be determined as set forth in the Equity Financing Commitment Letter and the Subscription Agreement.

2

"**Aerovías New Stock Allocation**" means the New Stock allocable to Classes 3(a) and 3(c), based upon the portion of the Reorganized Debtors' value allocable to Aerovías.

"**Affiliate**" has the meaning set forth in section 101(2) of the Bankruptcy Code.

"**Aimia**" means Aimia Holdings UK Limited and Aimia Holdings UK II Limited.

"**Aircraft Equipment**" means an aircraft, aircraft engine, propeller, appliance or spare part (as each of these terms is defined in section 40102 of title 49 of the United States Code), including all records and documents relating to such equipment that are required under the terms of any applicable security agreement, lease or conditional sale contract to be surrendered or returned in connection with the surrender or return of such equipment, that is leased to, subject to a security interest granted by or conditionally sold to one of the Debtors.

"**Aircraft Financings**" means [those certain transactions pursuant to which the Debtors financed their acquisition and/or ongoing ownership of certain Aircraft Equipment that is part of the Debtors' existing fleet, as such transactions may be amended, amended and restated, modified, supplemented or assumed on or before the Confirmation Date].

"**Allowed**" means all or that portion, as applicable, of any Claim or Interest against any Debtor (a) that has been listed by the Debtors in the Schedules, as such Schedules may be amended by the Debtors from time to time, as liquidated in amount and not Disputed or Contingent, and for which no contrary or superseding Proof of Claim has been filed, (b) that has been expressly allowed by Final Order or under the Plan, (c) that has been compromised, settled or otherwise resolved pursuant to the Claims Objection and Settlement Procedures Order, another Final Order of the Bankruptcy Court or [Section 6.2] of the Plan, or (d) that the Debtors do not timely object to in accordance with Section 6.1] of the Plan; *provided*, *however*, that Claims [or Interests] allowed solely for the purpose of voting to accept or reject the Plan shall not be considered "Allowed Claims" [or "Allowed Interests"] for any other purpose under the Plan or otherwise, except if and to the extent otherwise determined to be Allowed as provided herein.

"**Apollo**" means Apollo Management Holdings, L.P., on behalf of one or more affiliates and/or funds or separate accounts managed by it and its affiliates.

"**Approval Order**" means the [*Order (i) Approving the Disclosure Statement; (ii) Approving Solicitation Procedures; (iii) Allowing and Estimating Certain Claims for Voting Purposes; (iv) Approving Forms of Ballots and Establishing Procedures for Voting on the Debtors' Joint Plan of Reorganization; and (v) Scheduling a Hearing and Establishing Notice and Objection Procedures in Respect of Confirmation of the Debtors' Joint Plan of Reorganization*], entered by the Bankruptcy Court on [    ], 2021.

"**ASPA**" means the Asociación Sindical de Pilotos Aviadores de México.

"**ASSA**" means the Asociación Sindical de Sobrecargos de Aviación de México.

"**Assumption Notice**" means a notice of the assumption, assumption and assignment or assumption and amendment and any proposed Cure Amount provided to counterparties to Executory Contracts and Unexpired Leases pursuant to the Approval Order.

"**Avoidance Actions**" means any and all avoidance, recovery, subordination or other Claims, actions or remedies which any of the Debtors, the debtors in possession, the Estates or other appropriate parties in interest have asserted or may assert under sections 502, 510, 542, 544, 545, 547 through 553, or section 724(a) of the Bankruptcy Code or under similar or related state or federal statutes and common law.

"**Ballot**" means the voting form distributed to each Holder of an Impaired Claim entitled to vote, on which the Holder is to indicate acceptance or rejection of the Plan in accordance with the Voting Instructions and make any other elections or representations required pursuant to the Plan or the Approval Order.

"**Bankruptcy Code**" means title 11 of the United States Code, as applicable to the Chapter 11 Cases.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of New York with jurisdiction over these Chapter 11 Cases and, to the extent any reference made under section 157 of title 28 of the United States Code is withdrawn or the Bankruptcy Court is determined not to have authority to enter a Final Order on an issue, the United States District Court for the Southern District of New York.

"**Bankruptcy Protection Covenant**" means the Amended and Restated Bankruptcy Protection Covenant, dated April 6, 2021, among Grupo Aeroméxico, Aerovías, and Aeroméxico Connect, and ASPA [ECF No. 1101, Annex 1].

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Cases, and any local rules of the Bankruptcy Court.

"**Bar Date**" means, as applicable, the General Bar Date, the Amended Schedules Bar Date, the Rejection Damages Bar Date, the Special Bar Date, the Administrative Bar Date (each as defined in the Bar Date Order), or any other date established by the Bankruptcy Court as the deadline by which Proofs of Claim must be filed.

"**Bar Date Order**" means the *Order (I) Establishing Deadline for Filing Proofs of Claim and Procedures Relating Thereto and (II) Approving the Form and Manner of Notice Thereof*, entered by the Bankruptcy Court on November 18, 2020 [ECF No. 648].

"**Beneficial Holder**" or "**Beneficial Ownership**" means, with respect to any security, having "beneficial ownership" of such security (as determined pursuant to Rule 13d-3 under the Exchange Act) and including for the avoidance of doubt, the Unsecured CEBURES.

"**Beneficial Holder Ballots**" means the Ballots upon which Beneficial Holders shall indicate to Nominees their acceptance or rejection of the Plan in accordance with the Voting Instructions.

"**Board of Directors**" means the board of directors of Grupo Aeroméxico.

"**BSPO Investors**" means The Baupost Group, L.L.C., Silver Point Capital, L.P., Oaktree Capital Management, L.P. and Invictus Global Management, LLC (each acting solely in its capacity as an investment advisor on behalf of certain funds or accounts or wholly owned entities of such funds or accounts).

"**Business Day**" means any day other than a Saturday, a Sunday, a "legal holiday" (as defined in Bankruptcy Rule 9006(a)), or any other day on which banking institutions in New York, New York or Mexico City, Mexico are required or authorized to close by law or executive order.

"**Case Management Order**" means the *Order Establishing Certain Notice, Case Management, and Administrative Procedures*, entered by the Bankruptcy Court on July 8, 2020 [ECF No. 79]

"**Cash**" means legal tender of the United States of America or equivalents thereof (as well as any and all foreign currencies), including, without limitation, payment in such tender by check, wire transfer or any other customary payment method.

"**Cash Opt-In Eligible Claimholders**" means Holders of Aerovías and Grupo Aeroméxico Recourse Claims.

"**Cause of Action**" means any actual or potential Claims, interests, damages, remedies, causes of action, demands, rights, actions, Avoidance Actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, Liens, indemnities, guaranties and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, Disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on or after the Petition Date, in contract, tort, law, equity or otherwise.

"**Chapter 11 Cases**" means the cases under chapter 11 of the Bankruptcy Code commenced by the Debtors on the Petition Date, with case numbers as set forth in the Introduction to this Plan, that are jointly administered in the case styled *In re Grupo Aeroméxico, S.A.B. de C.V., et al.*, Case No. 20-11563 (SCC).

"**Claim**" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors, whether or not assessed or Allowed.

"**Claims and Solicitation Agent**" means Epiq Corporate Restructuring, LLC, the notice, claims, solicitation, balloting, and administrative agent retained by the Debtors in the Chapter 11

5

Cases as approved by the *Order Authorizing Debtors to Retain and Employ Epiq Corporate Restructuring, LLC as Claims and Noticing Agents* Nunc Pro Tunc *to the Petition Date* [ECF No. 47] entered by the Bankruptcy Court on July 2, 2020 and the *Order Authorizing Debtors to Retain and Employ Epiq Corporate Restructuring, LLC as Administrative Agent* Nunc Pro Tunc *to the Commencement Date* [ECF No. 626].

"**Claims Objection and Settlement Procedures Order**" means the *Order Approving (I) Omnibus Claims Objection Procedures, (II) Omnibus Claims Settlement Procedures and (III) Omnibus Claims Hearing Procedures* [ECF No. 904].

"**Class**" means any group of Claims or interests classified under this Plan pursuant to section 1122(a) of the Bankruptcy Code.

"**Club Premier**" means Club Premier Loyalty Program, the Debtors' loyalty program.

"**Club Premier Agreements**" means, collectively, those certain agreement by and between the Debtors, PLM and Aimia, in connection with Club Premier and PLM, without limitation, the: (a) Commercial Participation & Services Agreement, dated as of September 13, 2010, by and between Aerovías and PLM (as amended, amended and restated, supplemented or otherwise modified from time to time); (b) Intercompany Revolving Loan Agreement, dated as of January 20, 2016, by and between Aerovías and PLM (as amended, amended and restated, supplemented or otherwise modified from time to time); (c) Shareholders Agreement, dated as of September 13, 2010, by and between Grupo Aeroméxico, Aerovías, Aimia and PLM (as amended, amended and restated, supplemented or otherwise modified from time to time); (d) Pre-Paid Seat Asset Purchase Agreement, dated as of September 13, 2010, by and between Aerovías and PLM (as amended, amended and restated, supplemented or otherwise modified from time to time); (e) Co-Branded Card Program Agreement, dated as of February 23, 2016, by and among Aerovías, PLM, Banco Santander (México), S.A., Grupo Financiero Santander México, and Santander Consumo; (f) Aeroméxico – Club Premier – American Express Consumer Co-Brand Card Program Agreement, dated as of November 1, 2016, by and between Aerovías, PLM and American Express Company (Mexico), S.A. de C.V.; (g) Visa Co-Brand Merchant Incentive Agreement, dated as of February 23, 2016, by and between Aerovías, PLM and Visa International Service Association; and (h) Irrevocable Security Trust Agreement with Reversion Rights, No. F/1416 (*Contrato de Fideicomiso Irrevocable de Garantía con Derechos de Reversión No. F/1416*), dated as of September 13, 2010, by and between Grupo Aeroméxico, Aerovías, PLM, and the Trustee (as amended, amended and restated, supplemented or otherwise modified from time to time).

"**CNBV**" means the *Comisión Nacional Bancaria y de Valores* (Mexican National Commission of Banking and Securities).

"**Collateral**" means any property or interest in property of the Debtors subject to a Lien to secure the payment or performance of a Claim, which Lien is not subject to avoidance and is not otherwise invalid under the Bankruptcy Code or other applicable law.

"**Collective Bargaining Agreements**" means the collective labor agreements in effect as of the date hereof between the Debtors and each of ASPA, ASSA, STIA and Independencia pursuant to the Bankruptcy Protection Covenant and the Labor Conditions Order.

"**Commitment Party Expense Reimbursement**" means the Equity Commitment Party Expense Reimbursement and the Debt Commitment Party Expense Reimbursement.

"**Commitment Premiums and Fees**" means, collectively, the Equity Commitment Premium, the Debt Commitment Premium and the Debt Termination Fee.

"**Committed Equity Amount**" means $1.1875 billion.

"**Company**" means Grupo Aeroméxico together with its direct and indirect subsidiaries.

"**Confirmation**" means confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.

"**Confirmation Date**" means the date on which the Confirmation Order is entered by the Bankruptcy Court on the docket of the Chapter 11 Cases.

"**Confirmation Hearing**" means the hearing held by the Bankruptcy Court to consider confirmation of the Plan pursuant to sections 1128 and 1129 of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

"**Confirmation Order**" means the order of the Bankruptcy Court entered pursuant to section 1129 of the Bankruptcy Code confirming the Plan. [The Creditors' Committee shall have consultation rights with respect to the provisions of the Confirmation Order to the extent such provisions materially impact the rights of Holders of General Unsecured Claims].

"**Contingent**" means, when used in reference to a Claim, any Claim the liability for which attaches or is dependent upon the occurrence or happening of, or is triggered by, an event that has not yet occurred as of the date on which such Claim is sought to be estimated or on which an objection to such Claim is filed, whether or not such event is within the actual or presumed contemplation of the Holder of such Claim and whether or not a relationship between the Holder of such Claim and the applicable Debtor now or hereafter exists or previously existed.

"**Contract Dispute**" means an unresolved objection regarding assumption or assumption and assignment, Cure Amount, "adequate assurance of future performance" (within the meaning in section 365 of the Bankruptcy Code) or other issues related to assumption or assumption and assignment of an Executory Contract or Unexpired Lease.

"**Conversion Exit Fee**" has the meaning ascribed to such term in the DIP Credit Agreement.

"**Creditor**" means any Holder of a Claim.

"**Creditors' Committee**" means the statutory committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code by the

United States Trustee, as set forth in the *Notice of Appointment of Official Committee of Unsecured Creditors* [ECF No. 92], as such may be reconstituted from time to time.

"**Cure Amount**" means the payment of Cash or the distribution of other property (as the parties may agree or the Bankruptcy Court may order) as necessary to (a) cure a monetary default by the Debtors in accordance with terms of an Executory Contract or Unexpired Lease of the Debtors, and (b) permit the Debtors to assume such Executory Contract or Unexpired Lease under section 365(a) of the Bankruptcy Code.

"**Cure Claim**" means a Claim for a Cure Amount in connection with the assumption or assumption and assignment of an Executory Contract or Unexpired Lease under section 365(a) of the Bankruptcy Code.

"**Customer Programs**" means the Debtors' customer programs and practices, including among others, advance ticket sales, frequent flyer credit card programs, tour operator programs, airport lounge programs, corporate incentive programs, cargo programs, vouchers and alternative ticket arrangements that the Debtors were authorized to honor (including prepetition obligations) and otherwise continue in the ordinary course of business by the Customer Programs Order.

"**Customer Programs Order**" means the *Final Order Authorizing (I) Debtors to Honor Prepetition Obligations to Customers and Related Third Parties and to Otherwise Continue Customer Programs (II) Relief from Stay to Permit Setoff in Connection with the Customer Programs and (III) Financial Institutions to Honor and Process Checks and Transfers* [ECF No. 205].

["**D&O Liability Insurance Policies**" means all insurance policies (including any "tail policy") maintained by the Debtors as of the Petition Date for liabilities against any of the Debtors' current or former directors, managers and officers, and all agreements, documents or instruments relating thereto.]

"**Debt Commitment Party Expense Reimbursement**" means the Reimbursed Fees and Expenses (as defined in the Debt Financing Commitment Letter).

"**Debt Commitment Premium**" has the meaning ascribed to it in the Debt Financing Commitment Letter.

"**Debt Financing**" means the financing consisting of the issuance of New First Lien Notes in an aggregate principal amount of up to $537.5 million to be purchased by the Debt Financing Commitment Parties, the proceeds of which will be used for, among things, payment of Allowed Tranche 1 DIP Facility Claims and, in the case of the PLM Upsizing, the PLM Stock Participation Transaction.

"**Debt Financing Commitment Parties**" means at any time and from time to time, certain members of the BSPO Investors and certain members of the Ad Hoc Group of Senior Noteholders, and the affiliated funds and accounts of each of the foregoing that, in each case, have commitments under and are signatories to the Debt Financing Commitment Letter, solely in their capacities as such, to the extent provided in the Debt Financing Commitment Letter.

8

"**Debt Financing Commitment Letter**" means that certain Debt Financing Commitment Letter, dated as of [•], by and among the Debt Financing Commitment Parties and Grupo Aeroméxico, as may be amended, supplemented, or modified from time to time, in accordance with the terms thereof, setting forth, among other things, the terms and conditions of the Debt Financing.

"**Debtor Subsidiary**" means each of Aerovías, Aeroméxico Connect and Aeroméxico Cargo.

"**Debtors**" means, individually or collectively, as the context requires, each of Grupo Aeroméxico, Aerovías, Aeroméxico Connect and Aeroméxico Cargo.  To the extent the context requires any reference to the Debtors after the Effective Date, Debtors shall mean the Reorganized Debtors.

"**Debtors' Case Information Website**" means the website established by the Claims and Solicitation Agent after the Petition Date that contains information regarding the Chapter 11 Cases, available https://dm.epiq11.com/aeromexico.

"**Debt Termination Fee**" has the meaning ascribed to it in the Debt Financing Commitment Letter.

"**Delta**" means Delta Air Lines, Inc.

"**Delta Contract Amendment Fee**" means an amendment fee, payable in New Stock on the Effective Date, in exchange for the assumption, amendment and extension of all existing agreements between Delta (and any of its subsidiaries or affiliates) and the Company as of the Petition Date (and any amendments, supplements or other modifications thereto through the Effective Date), as mutually agreed to by Delta and the Debtors, which shall require the continuation of the scope and level of support services provided by Delta (and any of its subsidiaries or affiliates) under such agreements or otherwise, currently provided in connection with the joint venture and strategic alliance between Delta and the Company, which fee shall equal 21.0% of the New Stock less the New Stock that Delta receives on account of (i) the Delta Purchase Amount, (ii) the Voluntary Equity Conversion of the Tranche 2 DIP Facility Claims held by Delta, and (iii) the Equity Commitment Premium, provided that (i)-(iii) may be subject to dilution on account of the Management Incentive Plan.

"**Delta JCA**" means that certain joint cooperation agreement, dated May 27, 2015, by and among Aerovías and Delta.

"**Delta Purchase Amount**" means $100 million of New Stock, to be subscribed and paid for by Delta pursuant to the Subscription Agreement, in connection with the Equity Financing.

"**DIP Agent**" means UMB Bank National Association, in its capacity as administrative and collateral agent under the DIP Facility.

"**DIP Credit Agreement**" means that certain secured superpriority debtor-in-possession facility dated as of November 6, 2020, by and among the Debtors and the DIP Lenders, as

approved by the Bankruptcy Court pursuant to the DIP Order, as the same may be amended, restated, modified or extended.

"**DIP Facility**" means that certain senior, secured, superpriority, priming, debtor-in-possession credit facility provided pursuant to the DIP Credit Agreement.

"**DIP Facility Claim**" means a Claim against a Debtor arising pursuant to the DIP Facility and/or the DIP Order, including any Tranche 1 DIP Facility Claim, any Tranche 2 DIP Facility Claim and any DIP Reimbursement Claim.

"**DIP Lenders**" means the Tranche 1 DIP Lenders and the Tranche 2 DIP Lenders, each as of or after the Effective Date.

"**DIP Order**" means the *Final Order Granting Debtors' Motion to (I) Authorize Certain Debtors in Possession to Obtain Post-Petition Financing; (II) Grant Liens and Superpriority Administrative Expense Claims to DIP Lenders; (III) Modify Automatic Stay; and (IV) Grant Related Relief*, entered by the Bankruptcy Court on October 13, 2020 [ECF No. 527].

"**DIP Reimbursement Claim**" means a Claim against a Debtor pursuant to Section 11.04 of the DIP Credit Agreement and/or Paragraph 16 of the DIP Order.

"**Disallowed**" means a finding or conclusion of law of the Bankruptcy Court in a Final Order, or provision in this Plan or the Confirmation Order, disallowing a Claim.

"**Disallowed Claim**" means any Claim or any portion thereof that (a) has been disallowed by a Final Order of the Bankruptcy Court, (b) is listed in the Schedules as "$0," Contingent, Disputed or unliquidated and as to which a Bar Date has been established but no Proof of Claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely filed under applicable law, (c) has been agreed to be equal to "$0" or to be expunged pursuant to the Claims Objection and Settlement Procedures Order or otherwise or (d) is not listed on the Schedules and as to which a Bar Date has been established but no Proof of Claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely filed under applicable law.

"**Disbursing Agent**" means, as applicable, the Reorganized Debtors or any entity designated by the Reorganized Debtors to make or to facilitate Plan Distributions, including, without limitation, the Senior Notes Indenture Trustee and the DIP Agent, to the extent they make or facilitate distributions under the Plan.

"**Disclosure Statement**" means the disclosure statement for this Plan, as may be amended or supplemented from time to time, prepared and distributed in accordance with sections 1125, 1126(b) and 1145 of the Bankruptcy Code, Bankruptcy Rules 3016 and 3018 and other applicable law, and all exhibits, appendices, schedules, supplements, modifications, amendments, annexes and attachments to such disclosure statement.

"**Disputed**" means, with respect to a Claim against a Debtor, a Claim that is not yet Allowed or Disallowed.

"**Disputed Claims Reserve**" means a reserve established to pay the aggregate amount of Disputed Claims or such lower amount as ordered by the Bankruptcy Court or agreed to by the parties to the applicable agreement. The Disputed Claims Reserve shall be (a) funded on the Effective Date in an amount determined by the Debtors and (b) held by the [•] in a segregated account and administered by the [•] on and after the Effective Date.

"**Distribution Date**" means any of (a) the Initial Distribution Date, (b) each Interim Distribution Date and (c) the Final Distribution Date.

["**Distribution Record Date**" with respect to all Classes for which Plan Distributions are to be made, the Confirmation Date.  The Distribution Record Date shall not apply to the Senior Notes or any securities of the Debtors deposited with DTC prior to the Effective Date, the holders of which shall receive a distribution in exchange for such Senior Notes or securities.]

"**DTC**" means the Depository Trust Company.

"**Effective Date**" means the date selected by the Debtors for the consummation of the Plan, or as soon thereafter as reasonably practicable, on which no stay of the Confirmation Order is in effect and all of the conditions precedent specified in Article IX hereof have been satisfied or waived in accordance with the terms hereof.

"**Electing Tranche 2 DIP Lenders**" means the Holders of Allowed Tranche 2 DIP Facility Claims who exercised the Voluntary Equity Conversion Election.

"**Entity**" means an entity as defined in section 101(15) of the Bankruptcy Code.

"**Equity Commitment Party Expense Reimbursement**" means the Expense Reimbursement and the Financing Fee (each as defined in the Subscription Agreement)[, which shall also apply to the fees and expenses of the Mexican Investors].

"**Equity Commitments**" means the commitments, on the terms set forth in the Equity Financing Commitment Letter, Subscription Agreement or any other agreement, as applicable, of the Equity Financing Commitment Parties to purchase New Stock pursuant to, and through the Equity Financing.  The Equity Commitments shall total the Committed Equity Amount.

"**Equity Commitment Premium**" shall mean, in the aggregate, [15.0]% of the Committed Equity Amount, payable in New Stock on the Effective Date; *provided* that such premium shall be payable in an amount calculated at Plan Equity Value in cash in certain alternative scenarios, including in the event of a sale or other disposition of (i) all or substantially all of the assets of the Company or (ii) all or substantially all of the equity of the Company (including for the avoidance of doubt, equity of all or substantially all of Grupo Aeroméxico's subsidiaries), where payment in New Stock is not feasible.

"**Equity Financing**" means up to $1.1875 billion worth of New Stock (such amount, including, for the avoidance of doubt, the amount committed in respect of equity related to the

PLM Upsizing) to be purchased by the Equity Financing Commitment Parties in a direct capital raise pursuant to the Plan, the Equity Financing Commitment Letter, the Subscription Agreement and any other agreement to acquire New Stock, on, and as a condition to, the Effective Date.

"**Equity Financing Commitment Letter**" means that certain Equity Financing Commitment Letter, dated as of [•], by and among the Equity Financing Commitment Parties and Grupo Aeroméxico, as may be amended, supplemented, or modified from time to time, in accordance with the terms thereof, setting forth, among other things, the terms and conditions of the Equity Financing, substantially in the form attached to the Exit Financing Commitment Motion as Exhibit [•], including all schedules and exhibits thereto.

"**Equity Financing Commitment Parties**" means at any time and from time to time, Delta, the BSPO Investors, certain members of the Ad Hoc Group of Senior Noteholders, and which may include, without limitation, the Mexican Investors, and the affiliated funds and accounts of each of the foregoing that, in each case, have Equity Commitments under and are signatories to the Equity Financing Commitment Letter and/or the Subscription Agreement, solely in their capacities as such, to the extent provided in the Equity Financing Commitment Letter, Subscription Agreement, or other agreement to acquire New Stock, as applicable.

"**Estate**" means the bankruptcy estate of each Debtor created pursuant to section 541 of the Bankruptcy Code.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

["**Excluded Party**" means each Person identified on the Schedule of Excluded Parties.]

"**Exculpated Party**" means, collectively, and in each case in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) the Debtors' current and former officers, directors, and managers; (d) the DIP Lenders; (e) the DIP Agent; (f) the Senior Notes Indenture Trustee; (g) the Creditors' Committee and each of its current and former members, each in their capacity as such; (h) each of the Unions; (i) the Equity Financing Commitment Parties; (j) the Debt Financing Commitment Parties; (k) the Ad Hoc Group of Senior Noteholders and its members; (l) the Ad Hoc Group of Unsecured Claimholders and its members; and (m) with respect to each of the foregoing clauses (a) through (l), to the fullest extent permitted by law, such Person's Related Parties, in each case only in their capacity as such.

"**Executory Contract**" means a contract or lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

"**Exit Financing Commitment Motion**" means [•] [ECF No. [•]].

"**Exit Financing Commitment Order**" means [•] [ECF No. [•]].

"**Exit Financing Documents**" means the Debt Financing Commitment Letter, the Equity Financing Commitment Letter, the Subscription Agreement or any other agreement to acquire New Stock.

"**Exit Financing Obligations**" means the related fees, premiums, indemnities, costs and expenses under the Exit Financing Documents, including without limitation, the Commitment Premiums and Fees, the Commitment Party Expense Reimbursement and the indemnification provisions in the Exit Financing Documents.

"**FAA**" means the Federal Aviation Administration.

"**Final Distribution Date**" means a day selected by the Reorganized Debtors, [in consultation with the Post-Effective Date Committee], that is after the Initial Distribution Date and is no earlier than [20] calendar days after the date on which all Disputed Claims have become either Allowed Claims or Disallowed Claims.

"**Final Valuation Materials**" means the Final Valuation Materials (as defined in the DIP Credit Agreement) delivered by the Debtors to the Tranche 2 DIP Lenders on September 10, 2021.

"**Final Order**" means an order or judgment of the Bankruptcy Court as entered on its docket that has not, in whole or in part, been reversed, vacated, modified, amended or stayed pursuant to any applicable Bankruptcy Law or any other applicable rule of civil or appellate procedure, and as to which the time to appeal, petition for certiorari or seek reargument or rehearing has expired, or as to which any right to appeal, petition for certiorari or seek re-argument or rehearing has been waived in writing in a manner satisfactory to the parties in interest, or if a notice of appeal, petition for certiorari or motion for reargument or rehearing was timely filed, the order or judgment has been affirmed by the highest court to which the order or judgment was appealed or from which the reargument or rehearing was sought, or certiorari has been denied, and the time to file any further appeal or to petition for certiorari or to seek further reargument has expired.

"**General Direction of Foreign Investment of the Ministry of Economy**" means the directorate (known as the *Dirección General de Inversión Extranjera* of the Mexican *Secretaría de Economía*) that supervises and authorizes foreign investment in Mexican entities that are subject to restrictions thereon.

"**General Extraordinary Shareholders Meeting**" means the shareholders meeting legally called and convened (pursuant to Grupo Aeroméxico's corporate bylaws) to resolve, among other matters, the amendment of the corporate bylaws of Reorganized Grupo Aeroméxico.

"**General Law of Business Organizations**" means the *Ley General de Sociedades Mercantiles*.

"**General Ordinary Shareholders Meeting**" means the shareholders meeting legally called and convened (pursuant to Grupo Aeroméxico's corporate bylaws) to resolve, among other matters, the designation of the New Board, capital stock increase and issuance of the New Stock.

"**General Rules Issued by the Ministry of Finance and Public Credit**" means any rule or regulation, with general and broad interpretation, issued, from time to time, by the Mexican Ministry of Finance and Public Credit to complement any Mexican tax law or regulation, applicable from time to time, as the case may be, including the *Resolución Miscelánea Fiscal para 2021* (or any successor provisions).

"**General Unsecured Claim**" means any Claim against any Debtor that is not an Administrative Expense Claim, a Secured Claim, a Priority Tax Claim, an Other Priority Claim, a Senior Notes Claim, an Aerovías and Grupo Aeroméxico Recourse Claim, [an Unsecured Convenience Class Claim,] or an Intercompany Claim, including any such Claim arising under those certain Unsecured CEBURES.

"**Governmental Unit**" has the meaning set forth in section 101(27) of the Bankruptcy Code.

"**Grupo Aeroméxico**" means Grupo Aeroméxico, S.A.B. de C.V.

"**Grupo Aeroméxico New Stock Allocation**" means the New Stock allocable to Classes 3(a) and 3(b), based upon the portion of the Reorganized Debtors' value allocable to Grupo Aeroméxico.

"**Holder**" means an Entity holding a Claim or interest, as applicable.

"**Impaired**" means any Claim or interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

"**Indemnification Obligation**" means any obligation of any Debtor to indemnify directors, officers or employees of any of the Debtors who served in such capacity, with respect to or based upon any act or omission taken or omitted in any of such capacities, or for or on behalf of any Debtor, whether pursuant to agreement, the Debtors' respective articles or certificates of incorporation, corporate charters, bylaws, operating agreements or similar corporate documents or applicable law in effect as of the Effective Date.

"**Independencia**" means the Sindicato Nacional de Trabajadores al Servicio de las Líneas Aéreas, Transportes, Servicios, Similares y Conexos.

"**INDEVAL**" means *S.D., Indeval Institución para el Depósito de Valores, S.A. de C.V.*, Mexico's custodian of publicly listed securities.

"**Initial Distribution Date**" means a date selected by the Reorganized Debtors, [in consultation with the Post-Effective Date Committee,] that is as soon as reasonably practicable after, but not later than 60 calendar days after, the Effective Date.

"**Initial Valuation Materials**" means the Initial Valuation Materials (as defined in the DIP Credit Agreement) delivered by the Debtors to the Tranche 2 DIP Lenders on June 29, 2021.

"**Insurance Policies**" means the Debtors' insurance policies and any agreements, documents or instruments relating thereto entered into prior to the Petition Date.

14

"**Intercompany Claim**" means any Claim against a Debtor that is held by another Debtor or an Affiliate of a Debtor, other than the PLM Prepetition Claims.

"**Intercompany Interest**" means any Interest in a Debtor (other than an Interest in Grupo Aeroméxico) that is held by another Debtor.

"**Interest**" means the interest (whether legal, equitable, contractual or otherwise) of any Holders of any class of equity securities of any of the Debtors, represented by shares of common or preferred stock, limited partnership interests or other instruments evidencing an ownership interest in any of the Debtors, whether or not certificated, transferable, voting or denominated "stock" or a similar security, or any option, warrant or right, contractual or otherwise, to acquire any such interest.

"**Interim Compensation Order**" means the *Order Establishing Procedures for Monthly and Interim Compensation and Reimbursement of Expenses for Retained Professionals*, entered by the Bankruptcy Court on September 8, 2020 [ECF No. 360].

"**Interim Distribution Date**" means the date that is 180 calendar days after the Initial Distribution Date or the most recent Interim Distribution Date thereafter, with such periodic Interim Distribution Dates occurring until the Final Distribution Date has occurred.

"**Internal Revenue Code**" means the Internal Revenue Code of 1986, as amended.

"**IRS**" means the Internal Revenue Service.

"**Labor Conditions Order**" means the *Order Authorizing Entry into New Agreements Establishing New Labor Conditions with ASPA, ASSA, STIA, and Independencia* [ECF No. 1101].

"**Lien**" has the meaning set forth in section 101(37) of the Bankruptcy Code.

"**Management Incentive Plan**" means the management incentive plan to be established and implemented with respect to the Reorganized Debtors [(and/or their subsidiaries)] by the New Board after the Effective Date.  Up to [•]% of the fully diluted New Stock shall be reserved for the Management Incentive Plan.  [•]% of the Management Incentive Plan New Stock shall be granted on the Effective Date and shall vest over a period of [•] years following the Effective Date on a schedule to be mutually agreed among the Required Equity Commitment Parties, Delta and the Debtors.  The additional material terms of the Management Incentive Plan shall be included in the Plan Supplement [in consultation with the Creditors' Committee] and to be acknowledged and implemented, in due course, by Company's New Board; *provided* that to the extent the material terms cannot be agreed to in the reasonable discretion of the Required Equity Commitment Parties, Delta and the Debtors, the material terms of the MIP shall be determined by the New Board.

"**Management True-Up Payment**" means a cash payment in an aggregate amount of $[•] million to which members of Grupo Aeroméxico's executive management team shall be

entitled, based upon such members' contribution to the Company during the pendency of, and the Debtors' emergence from, their Chapter 11 Cases.

"**Mexican Federal Antitrust Law**" means the *Ley Federal de Competencia Económica* (and any general rules and regulations applicable to it, including, without limitation, the guidelines issued by the Mexican Antitrust Authority).

"**Mexican Federal Tax Code**" means the *Código Fiscal Federal de la Federación* currently effective in Mexico, or any other law, code or act that substitutes such Mexican Federal Tax Code.

"**Mexican Foreign Investment Law**" means the *Ley de Inversión Extranjera* and its corresponding regulation.

"**Mexican Income Tax Law**" means the *Ley del Impuesto Sobre la Renta*.

"**Mexican Investors**" means those Mexican Persons who agree to purchase New Stock at Plan Equity Value.

"**Mexican Person**" means, jointly and individually, (a) an individual who is a citizen of México, or (b) a legal entity (i) organized under the laws of México and (ii) that is at least majority owned by Mexican citizens or that has Mexican citizens who are the majority of its beneficiaries and who exercise control of such legal entity.

"**Mexican Securities Exchange Act**" means the *Ley del Mercado de Valores*.

"**Mexican Stock Exchange**" means the *Bolsa Mexicana de Valores*, S.A.B. de C.V., which is the stock exchange market in which shares of Grupo Aeroméxico are traded.

"**Mexican Value Added Tax Law**" means the Ley del Impuesto al Valor Agregado.

"**New Board**" means the board of directors of Reorganized Grupo Aeroméxico on the Effective Date, which shall be appointed on the Effective Date pursuant to a resolution to be adopted in a General Ordinary Shareholders Meeting of Grupo Aeroméxico, or by any future shareholders meeting of Reorganized Grupo Aeroméxico to be held after the Effective Date of the Plan, and in accordance with the terms set forth in the Equity Financing Commitment Letter and the Subscription Agreement, as applicable, Reorganized Grupo Aeroméxico's corporate bylaws and Mexican corporate and securities law, including the Mexican Securities Exchange Act (*Ley del Mercado de Valores*) and General Law of Business Organizations (*Ley General de Sociedades Mercantiles*).

"**New Corporate Governance Documents**" means the form of certificate or articles of incorporation, bylaws, limited liability company agreement, partnership agreement or such other applicable formation documents (if any) of the Reorganized Debtors, including any certificates of designation.

16

"**New First Lien Notes**" means the senior secured first lien notes to be issued by the Reorganized Debtors pursuant to the terms and conditions set forth in the Debt Financing Commitment Letter.

"**New First Lien Notes Indenture**" means the indenture for the New First Lien Notes to be entered into on, and as a condition precedent to, the Effective Date.

["**New First Lien Notes Purchase Agreement**" means the purchase agreement for the New First Lien Notes to be entered into on, and as a condition precedent to, the Effective Date.]

"**New Stock**" means single series shares (*Serie Unica*) of Reorganized Grupo Aeroméxico's common stock.

"**NOL**" means any net operating loss that could be carried forward to reduce taxes.

"**Nominee**" means any broker, dealer, commercial loans institution, financial institution, common representative or other nominee in whose name securities are registered or held of record on behalf of a Beneficial Holder.

"**Ordinary Course Professionals Order**" means the *Order Authorizing Debtors to Employ Professionals Used in the Ordinary Course of Business* Nunc Pro Tunc *to the Petition Date*, entered by the Bankruptcy Court on July 29, 2020 [ECF No. 213].

"**Other Priority Claim**" means any Claim, other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in right of payment pursuant to section 507(a) of the Bankruptcy Code.

"**Person**" or "**person**" means a person as defined in section 101(41) of the Bankruptcy Code.

"**Petition Date**" means June 30, 2020, the date on which the Debtors commenced the Chapter 11 Cases, and, where relevant, the time of the filing of the Debtors' chapter 11 petitions on such date.

"**Plan**" means this Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code, including the Plan Supplement and all exhibits, supplements, appendices and schedules to the foregoing, as any of them may be amended or modified from time to time in accordance with the terms hereunder or in accordance with applicable law.

"**Plan Distribution**" means a payment or distribution to Holders of Allowed Claims under the Plan or Plan Supplement documents.

"**Plan Documents**" means, collectively, the Plan and all documents to be executed, delivered, assumed or performed in connection with the Restructuring Transactions and the occurrence of the Effective Date, including the New Corporate Governance Documents and the documents to be included in the Plan Supplement. The Plan Documents shall be subject to the consent rights set forth in the Debt Financing Commitment Letter, Equity Financing Commitment Letter and the Subscription Agreement, as applicable, [and the Creditors'

17

Committee shall have consultation rights with respect to the provisions of any of the Plan Documents to the extent such provisions materially impact the rights of Holders of General Unsecured Claims].

"**Plan Equity Value**" has the meaning ascribed to it in the Subscription Agreement.

"**Plan Settlement**" means the settlement of certain Claims and controversies described in Section 8.1 of the Plan, and as further described and explained in the Disclosure Statement.

"**Plan Supplement**" means a compilation of documents and draft forms of documents, schedules and exhibits to the Plan, containing as specified in Section 11.8 of the Plan, and which may include substantially final forms (as may be amended, supplemented, altered or modified from time to time on the terms set forth herein) of:  (a) the New Corporate Governance Documents; (b) the Schedule of Rejected Contracts; (c) the Schedule of Retained Causes of Action; (d) the Schedule of Directors and Officers; (e) the compensation for the officers of each of the Debtors; (f) documents setting forth the material terms of the Management Incentive Plan, to the extent such terms are determined prior to the Confirmation Hearing; (g) documents setting forth the material terms of the Debt Financing, including the New First Lien Notes Indenture [and New First Lien Notes Purchase Agreement]; (h) the Subscription Agreement; (i) the Registration Rights Agreement; (j) the PLM Stock Participation Transaction Agreement; and (k) other documents, instruments or agreements necessary or appropriate to implement the Plan and the transactions contemplated thereby.  Each such document, agreement, instrument, schedule or exhibit or form thereof is referred to herein as a "Plan Supplement."  [The Creditors' Committee shall have consultation rights with respect to the documents included in the Plan Supplement (including any amendments, supplements, and/or modifications thereto) to the extent such documents materially impact the rights of Holders of General Unsecured Claims].

"**PLM**" means PLM Premier, S.A.P.I. de C.V.

"**PLM Stock Participation Transaction Agreement**" means the Acquisition Agreement by and among Grupo Aeroméxico, PLM and Aimia, to be included in the Plan Supplement and in form and substance reasonably acceptable to Grupo Aeroméxico, PLM and Aimia, including all schedules, exhibits, instruments and other documents to be delivered pursuant thereto or in connection therewith.

"**PLM Stock Participation Transaction**" means Grupo Aeroméxico's acquisition of Aimia's ownership Interest in PLM pursuant to the Plan and the PLM Stock Participation Transaction Agreement.

"**PLM Upsizing**" means an aggregate amount of $375,000,000 consisting of (i) $187,500,000 of New Stock to be acquired by certain of the Equity Financing Commitment Parties and (ii) $187,500,000 of New First Lien Notes, to be purchased by certain of the Debt Financing Commitment Parties, the proceeds of which will be used solely in connection with the PLM Stock Participation Transaction.

["**Post-Effective Date Committee**" means the committee to be formed on the Effective Date in accordance with Section 11.7 of the Plan].

18

["**Post-Effective Date Committee Expense Cap**" means $[•]].

"**Priority Tax Claim**" means an unsecured Claim of a Governmental Unit entitled to priority pursuant to section 507(a)(8) or specified under section 502(i) of the Bankruptcy Code.

"**Pro Rata**" means, for the Holder of an Allowed Claim or Interest in a particular Class at a Debtor, proportional to the ratio of the amount of such Allowed Claim or Interest to the amount of all Allowed Claims or Allowed Interests, as applicable, in the same Class at that Debtor or, as applicable and as specifically set forth in the Plan, multiple Classes.

"**Professional**" means a person retained in the Chapter 11 Cases by separate Bankruptcy Court order pursuant to sections 327 and/or 1103 of the Bankruptcy Code or otherwise, but not including any person retained pursuant to the Ordinary Course Professionals Order.

"**Professional Fee Claims**" means all Claims for accrued, contingent and/or unpaid fees and expenses (including transaction and success fees) incurred by a Professional in the Chapter 11 Cases on or after the Petition Date and through and including the Effective Date that the Bankruptcy Court has not denied by Final Order.  To the extent that the Bankruptcy Court or any higher court of competent jurisdiction denies or reduces by a Final Order any amount of a Professional's fees or expenses, then those reduced or denied amounts shall no longer constitute Professional Fee Claims.

"**Professional Fee Escrow Account**" means an interest-bearing account funded by the Debtors with Cash on or before the Effective Date in an amount equal to the Professional Fee Escrow Amount; *provided, however*, that the Cash funds in the Professional Fee Escrow Account shall be increased from Cash on hand at the Reorganized Debtors to the extent applications are filed after the Effective Date in excess of the amount of Cash funded into the escrow as of the Effective Date.

"**Professional Fee Escrow Amount**" means the aggregate amount of Professional Fee Claims and other unpaid fees and expenses that Professionals reasonably estimate they have incurred or will incur in rendering services to the Debtors prior to and as of the Effective Date, which estimates Professionals shall deliver to the Debtors as set forth in Section 2.3 of the Plan.

"**Proof of Claim**" means a proof of claim filed by a Holder of a Claim in accordance with the Bar Date Order.

"**Reinstate**," "**Reinstated**" or "**Reinstatement**" means, with respect to any Claim against or interest in a Debtor, that such Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

"**Registration Rights Agreement**" has the meaning ascribed to it in the Subscription Agreement.

"**Rejection Claim**" means a Claim under section 502(g) of the Bankruptcy Code.

"**Related Parties**" means with respect to a Person, such Person's predecessors, successors, assigns, subsidiaries, Affiliates, managed accounts and funds, and all of their

19

respective current and former officers and directors, principals, equity holders, members, partners, managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, investment managers, investment advisors, management companies, fund advisors and other professionals, and such Persons' respective heirs, executors, estates and nominees.

"**Released Parties**" means (a) each of the Debtors; (b) the Reorganized Debtors; (c) the Creditors' Committee and each of its present and former members in their capacity as such; (d) the DIP Lenders; (e) the DIP Agent; (f) the Senior Notes Indenture Trustee; (g) the Equity Financing Commitment Parties; (h) the Debt Financing Commitment Parties; (i) the Debtors' current and former officers and directors; (j) each of the Unions; (k) the Ad Hoc Group of Senior Noteholders and its members; (l) the Ad Hoc Group of Unsecured Claimholders and its members; and (m) with respect to each of the Persons referred to in clauses (a) through (l), such Person's Related Parties, in each case only in their capacity as such.

"**Releases**" means the releases provided for in Sections 8.5, 8.6 and 8.7 of the Plan.

"**Releasing Parties**" means: (a) the Creditors' Committee and each of its members in their capacity as such; (b) the DIP Lenders (as defined in the DIP Credit Agreement); (c) the DIP Agent; (d) the Senior Notes Indenture Trustee; (e) the Equity Financing Commitment Parties; (f) the Debt Financing Commitment Parties; (g) the Debtors' current and former officers and directors; (h) each of the Unions; (i) the Ad Hoc Group of Senior Noteholders and its members; (j) the Ad Hoc Group of Unsecured Claimholders and its members; (k) each Holder of a Claim that votes to accept the Plan; and (l) with respect to each of the Persons referred to in clauses (a) through (k), such Person's Related Parties, in each case only in their capacity as such.

"**Reorganized Debtors**" means, collectively, each of the Debtors on and after the Effective Date.

"**Reorganized Grupo Aeroméxico**" means Grupo Aeroméxico on and after the Effective Date.

"**Restructuring Transactions**" means those transactions described in Section 4.3 of the Plan.

"**Retained Causes of Action**" means all Estate Causes of Action that are not expressly settled or released under the Plan on or prior to the Effective Date, and which shall include all Causes of Action against Excluded Parties and the Causes of Action set forth on the Schedule of Retained Causes of Action.

"**Required Debt Commitment Parties**" means the Required Debt Commitment Parties (as defined in the Debt Financing Commitment Letter).

"**Required Equity Commitment Parties**" means the Required Commitment Parties (as defined in the Subscription Agreement).

"**Required Noteholder Investors**" means the Requisite Noteholder Investors (as defined in the Subscription Agreement).

 "**Schedule of Directors and Officers**" means the schedule listing the identity of the members of the New Board and the officers of the Reorganized Debtors filed by the Debtors with the Plan Supplement.

"**Schedule of Rejected Contracts**" means the schedule of all Executory Contracts and Unexpired Leases to be rejected by the Debtors, if any, filed by the Debtors in the Plan Supplement.

"**Schedules**" means the schedules of assets and liabilities, statements of financial affairs, lists of Holders of Claims and interests and all amendments or supplements thereto filed by the Debtors with the Bankruptcy Court.

"**Secured CEBURES**" means the Series AERMXCB 17 and Series AERMXCB 19 *Certificados Bursátiles Fiduciarios*, or trust certificates, issued in September 2017 and June 2019, respectively, and only with respect to the secured portion of those certain Mexican bonds, or CEBURES, issued by the Debtors and publicly traded under the ticker symbol AEROMEX 00320.

"**Secured Claim**" means any Claim or portion thereof (a) that is reflected in the Schedules or a Proof of Claim as a secured claim and is secured by a Lien on Collateral, to the extent of the value of such Collateral, as determined in accordance with section 506(a) and, if applicable, section 1129(b) of the Bankruptcy Code, (b) to the extent that the Holder thereof has a valid right of setoff pursuant to section 553 of the Bankruptcy Code, and (c) including any such Claim arising under those certain Secured CEBURES.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Senior Noteholders**" means the Holders of Senior Notes on and as of the Effective Date.

"**Senior Notes**" means those certain unsecured 7.000% Senior Notes due in 2025 issued by Aerovías and guaranteed by Grupo Aeroméxico pursuant to the Senior Notes Indenture.

"**Senior Notes Claim**" means a Claim on account of the Senior Notes arising under or related to the Senior Notes Indenture, which Claims are $411,355,556 as of the Petition Date.

"**Senior Notes Indenture**" means that certain Indenture dated as of February 5, 2020 (as amended, restated, supplemented or otherwise modified from time to time), by and among Aerovías as issuer, Grupo Aeroméxico as guarantor, and The Bank of New York Mellon, as trustee, transfer agent, registrar and paying agent.

"**Senior Notes Indenture Trustee**" means The Bank of New York Mellon in its capacity as trustee, transfer agent, registrar and paying agent under the Senior Notes Indenture.

"**Senior Notes Indenture Trustee Fees**" means, collectively, all reasonable and documented compensation, fees, and expenses, incurred in connection with the Senior Notes prior to or after the Effective Date, of (a) the Senior Notes Indenture Trustee, (b) any counsel to the Senior Notes Indenture Trustee, and (c) any other advisors to the Senior Notes Indenture Trustee.

"**Servicer**" means an indenture trustee, owner trustee, pass through trustee, subordination agent, agent, servicer or any other authorized representative of Creditors recognized by the Debtors.

"**Statutory Equity Rights Offering**" means the statutory rights offering (preemptive rights) required pursuant to applicable Mexican law and the corporate bylaws of Grupo Aeroméxico.

"**STIA**" means the *Sindicato de Trabajadores de la Industria Aeronáutica, Comunicaciones Similares y Conexos de la República Mexicana*.

"**Subscription Agreement**" means that certain Subscription Agreement, dated as of [•], by and among the Equity Financing Commitment Parties, the Debtors and certain other parties thereto, as may be amended, supplemented, or modified from time to time, in accordance with the terms thereof, setting forth, among other things, the terms and conditions of the Equity Financing

"**Supplemental Customer Programs Order**" means an order, to be entered on or before the Confirmation Date, supplementing the relief approved in the Customer Programs Order, authorizing, among other things, the honoring of alternative ticket arrangements, vouchers, and similar programs before and after the Effective Date.

"**Tranche 1 DIP Facility**" means the Tranche 1 Facility (as defined in the DIP Credit Agreement).

"**Tranche 1 DIP Facility Claim**" means claims arising from the Tranche 1 Obligations (as defined in the DIP Order).

"**Tranche 1 DIP Lenders**" means the lenders under the Tranche 1 DIP Facility.

"**Tranche 2 DIP Facility**" means the Tranche 2 Facility (as defined in the DIP Credit Agreement).

"**Tranche 2 DIP Facility Claim**" means claims arising from the Tranche 2 Obligations (as defined in the DIP Order).

"**Tranche 2 DIP Lenders**" means Apollo and the other lenders under the Tranche 2 DIP Facility.

"**Unexpired Lease**" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

"**Unimpaired**" refers to any Claim or interest that is not Impaired.

"**Union**" shall have the meaning set forth in the Labor Conditions Order.

"**United States Trustee**" means the United States Trustee for the Southern District of New York.

"**United States Trustee Fees**" means fees arising under section 1930(a)(6) of title 28 of the United States Code and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717.

"**Unliquidated**" means, when used in reference to a Claim, any Claim, the amount of liability for which has not been fixed, whether pursuant to agreement, applicable law or otherwise, as of the date on which such Claim is sought to be estimated.

"**Unsecured CEBURES**" means those certain Mexican bonds, or CEBURES, issued by the Debtors and publicly traded under the ticker symbols AEROMEX 00119, AEROMEX 01219, AEROMEX 00120, AEROMEX 00220 and only with respect to the portion of the CEBURES that is unsecured, AEROMEX 00320.

["**Unsecured Convenience Class Claim**" means a Claim against any of the Debtors that would otherwise be a General Unsecured Claim and that is greater than $0 and less than or equal to $[•] in Allowed amount; *provided*, *however*, that a General Unsecured Claim originally Allowed in an amount in excess of $[•] may not be sub-divided into multiple Claims of $[•] or less for purposes of receiving treatment as an Unsecured Convenience Class Claim.]

"**Valuation Analyses**" has the meaning set forth in Appendix D of the Disclosure Statement.

"**Voluntary Equity Conversion**" means the issuance of New Stock, the amount of which will be determined based on Plan Equity Value, in full and final satisfaction, settlement, release and discharge of, and in exchange for, the Allowed Tranche 2 DIP Facility Claims on account of which the Holders of such Claims made the Voluntary Equity Conversion Election.

"**Voluntary Equity Conversion Election**" means the Tranche 2 DIP Lenders' election to receive, on the Effective Date, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, its Tranche 2 DIP Facility Claims, New Stock, the amount of which will be determined based on Plan Equity Value, in accordance with the terms set forth in Schedule 2.12 to the DIP Credit Agreement.

"**Voting Deadline**" means the date established by the Approval Order by which the Claims and Solicitation Agent must actually receive an otherwise valid vote on the Plan in order for such vote to count as a vote to accept or reject the Plan.

"**Voting Instructions**" means the instructions for voting on the Plan contained in the Approval Order, the Ballots and Beneficial Holder Ballots.

### Section 1.2.    Rules of Interpretation

For purposes of the Plan, except as otherwise provided in the Plan: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) unless otherwise specified, any reference in the Plan to an existing document, schedule, or exhibit, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (c) unless otherwise specified, all references in the Plan to "Articles" and "Sections" are references to Articles and Sections, respectively, hereof or hereto; (d) the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to any particular portion of the Plan; (e) any effectuating provisions may be interpreted by the Debtors or the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; (f) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (g) unless otherwise specified in the Plan, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (h) any term used in capitalized form in the Plan that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (i) references to docket numbers of documents filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (j) the terms "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; and (k) except as otherwise provided in the Plan, any reference to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter.

### Section 1.3.    Computation of Time

In computing any period of time prescribed or allowed by the Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006(a) shall apply.  In the event that any payment, distribution, act or deadline under the Plan is required to be made or performed or occurs on a day that is not a Business Day, then the making of such payment or distribution, the performance of such act or the occurrence of such deadline shall be deemed to be on the next succeeding Business Day, but shall be deemed to have been completed or to have occurred as of the required date.

### Section 1.4.    References to Monetary Figures

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

### Section 1.5.    Certain Consent Rights

Notwithstanding anything in the Plan to the contrary, any and all notice and applicable consent rights the Required Equity Commitment Parties, Required Debt Commitment Parties, or Required Noteholder Investors, as applicable, as set forth in the Debt Financing Commitment Letter, the Equity Financing Commitment Letter and the Subscription Agreement (including all

exhibits and schedules thereto), as applicable, with respect to the form and substance of the Plan, the Plan Supplement, and any Plan Documents, including any amendments, restatements, supplements or other modifications to such documents, and any and all consents, waivers or other deviations under or from any such documents, shall be incorporated herein by this reference and fully enforceable as if stated in full herein.  In the event of a conflict between the consent rights set forth in the Debt Financing Commitment Letter, the Equity Financing Commitment Letter and the Subscription Agreement, on one hand, and the Plan, on the other, the consent rights set forth in the Debt Financing Commitment Letter, the Equity Financing Commitment Letter and the Subscription Agreement, as applicable, shall control.

### Section 1.6.    Exhibits; Schedules; Plan Supplement; Plan Documents

All exhibits (as amended from time to time following their initial filing with the Bankruptcy Court) to the Plan are incorporated into and are a part of the Plan as if set forth in full herein, and, to the extent not attached hereto, such exhibits shall be filed with the Bankruptcy Court as part of the Plan Supplement.  Copies of such exhibits, schedules and the Plan Supplement can be obtained by visiting the Debtors' Case Information Website or the Bankruptcy Court's website at www.nysb.uscourts.gov.  To the extent any exhibit contradicts the non-exhibit portion of the Plan, unless otherwise ordered by the Bankruptcy Court the non-exhibit portion of the Plan shall control.

## ARTICLE II    ADMINISTRATIVE EXPENSE CLAIMS AND PRIORITY TAX CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims (including DIP Facility Claims, United States Trustee Fees, the Commitment Premiums and Fees and the Commitment Party Expense Reimbursement) and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III.

### Section 2.1.    DIP Facility Claims

(a)    **Treatment of Allowed Tranche 1 DIP Facility Claims**. Except to the extent a Holder of an Allowed Tranche 1 DIP Facility Claim and the Debtors agree to different treatment, on the Effective Date, or as soon as reasonably practicable thereafter, each Holder of an Allowed Tranche 1 DIP Facility Claim shall receive, on account of such Allowed Tranche 1 DIP Facility Claim, payment in full in Cash from the proceeds of the Debt Financing.

(b)    **Treatment of Allowed Tranche 2 DIP Facility Claims Exercising the Voluntary Equity Conversion**. Except to the extent that a Holder of an Allowed Tranche 2 DIP Facility Claim and the Debtors agree to different treatment, on the Effective Date, each Electing Tranche 2 Lender, including Delta, shall receive, on account of such Allowed Tranche 2 DIP Facility Claim (inclusive of the Conversion Exit Fee), New Stock, the amount of which will be determined based on Plan Equity Value (subject to dilution from the Management Incentive Plan) on the Effective Date on the terms set forth in Schedule 2.12 of the DIP Credit Agreement.

With respect to any Electing Tranche 2 Lender whose ownership interest in reorganized Grupo Aeroméxico is diluted in a manner not disclosed to such Electing Tranche 2 Lender at the time of such election, either due to a change in the price or number of shares that were issued, then, unless otherwise agreed by such Electing Tranche 2 Lender, the shares to be received by such Electing Tranche 2 Lender shall be adjusted to take that into account.

**(c)    Treatment of Allowed Tranche 2 DIP Facility Claims Receiving Cash**. Except to the extent that a Holder of an Allowed Tranche 2 DIP Facility Claim and the Debtors agree to different treatment, on the Effective Date, each Holder of an Allowed Tranche 2 DIP Facility Claim who did not exercise the Voluntary Equity Conversion Election shall receive, on account of such Allowed Tranche 2 DIP Facility Claim, payment in full in Cash, including, without limitation an exit fee, with the proceeds of the Equity Financing, and under the terms set forth in the DIP Credit Agreement.

**(d)    Payment of DIP Reimbursement Claims**. Treatment of Allowed Tranche 2 DIP Facility Claims Receiving Cash. Except to the extent that a Holder of a DIP Reimbursement Claim and the Debtors agree to different treatment, on the Effective Date, each Holder of a DIP Reimbursement Claim shall receive, on account of such DIP Reimbursement Claim, payment in full in Cash, and under the terms set forth in the DIP Credit Agreement and the DIP Order.

### Section 2.2.    Administrative Expense Claims

**(a)    Time for Filing Administrative Expense Claims**. The Holder of an Administrative Expense Claim, other than a Holder of an Administrative Expense Claim that has been Allowed on or before the Effective Date (and, for the avoidance of doubt, other than a Holder of a DIP Facility Claim, a Professional Fee Claim, a Priority Tax Claim, or with respect to United States Trustee Fees, the Commitment Premiums and Fees and the Commitment Party Expense Reimbursement) must file with the Bankruptcy Court and serve on the Debtors, the Claims and Solicitation Agent, and the United States Trustee, proof of such Administrative Expense Claim by the Administrative Bar Date.  Such Proof of Claim must include at a minimum: (i) the name of the applicable Debtor that is purported to be liable for the Administrative Expense Claim and if the Administrative Expense Claim is asserted against more than one Debtor, the exact amount asserted to be owed by each such Debtor; (ii) the name of the Holder of the Administrative Expense Claim; (iii) the asserted amount of the Administrative Expense Claim; (iv) the basis of the Administrative Expense Claim; and (v) supporting documentation for the Administrative Expense Claim.  FAILURE TO FILE AND SERVE SUCH PROOF OF ADMINISTRATIVE EXPENSE CLAIM TIMELY AND PROPERLY SHALL RESULT IN SUCH CLAIM BEING FOREVER BARRED, DISALLOWED AND DISCHARGED.  IF FOR ANY REASON ANY SUCH ADMINISTRATIVE EXPENSE CLAIM IS INCAPABLE OF BEING FOREVER BARRED, DISALLOWED AND DISCHARGED, THEN THE HOLDER OF SUCH CLAIM SHALL IN NO EVENT HAVE RECOURSE TO ANY PROPERTY TO BE DISTRIBUTED PURSUANT TO THE PLAN.  A notice setting forth the Administrative Bar Date will be (i) filed on the Bankruptcy Court's docket and served with the notice of the Effective Date and (ii) posted on the Debtors' Case Information Website.  No other notice of the Administrative Bar Date will be provided.

(b)    **Treatment of Administrative Expense Claims**. Except to the extent a Holder of an Allowed Administrative Expense Claim and the Debtor against which such Claim is asserted agree to different treatment, or as otherwise set forth in an order of the Bankruptcy Court (including pursuant to the procedures specified therein), as applicable, each Holder of an Allowed Administrative Expense Claim (other than a Holder of a DIP Facility Claim, a Professional Fee Claim, a Priority Tax Claim, or with respect to United States Trustee Fees, the Commitment Premiums and Fees and the Commitment Party Expense Reimbursement, the treatment of which is set forth elsewhere in the Plan) related to the Chapter 11 Cases will receive in full and final satisfaction of its Administrative Expense Claim an amount of Cash equal to the amount of such Allowed Administrative Expense Claim in accordance with the following: (1) if an Administrative Expense Claim is Allowed as of the Effective Date, on or as soon as reasonably practicable after the Effective Date (or, if not then due, when such Allowed Administrative Expense Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Expense Claim is not Allowed as of the Effective Date, no later than 60 days after the date on which either [(i) such Administrative Expense Claim is Allowed pursuant to the Claims Objection and Settlement Procedures Order], or (ii) an order Allowing such Administrative Expense Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Expense Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Expense Claim without any further action by the Holders of such Allowed Administrative Expense Claim; or (4) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.

**Section 2.3.    Professional Fee Claims**

(a)    **Professional Fee Escrow Account**.  As soon as reasonably practicable after the Confirmation Date, and no later than one Business Day prior to the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount.  The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and for no other Entities until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court.  No Liens, Claims or interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way.  Such funds shall not be considered property of the Estates, the Debtors or the Reorganized Debtors.  The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals from the funds held in the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by an order of the Bankruptcy Court; *provided*, *however*, that obligations with respect to Allowed Professional Fee Claims shall not be limited nor be deemed limited to funds held in the Professional Fee Escrow Account. When all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court, any remaining funds held in the Professional Fee Escrow Account shall promptly be paid to the Reorganized Debtors without any further notice to or action, order or approval of the Bankruptcy Court or any other Entity.

**(b)      Final Fee Applications**.  All final requests for payment of Professional Fee Claims must be filed with the Bankruptcy Court by the date that is 45 calendar days after the Effective Date.  Such requests shall be filed with the Bankruptcy Court and served as required by the Case Management Order; *provided* that if any Professional is unable to file its own request with the Bankruptcy Court, such Professional may deliver an original, executed copy and an electronic copy to the Debtors' attorneys at least three Business Days prior to the deadline, and the Debtors' attorneys shall file such request with the Bankruptcy Court.  The objection deadline relating to the final requests shall be 4:00 p.m. (prevailing Eastern Time) on the date that is 14 calendar days after the filing deadline.  If no objections are timely filed and properly served in accordance with the Case Management Order with respect to a given request, or all timely objections are subsequently resolved, such Professional shall submit to the Bankruptcy Court for consideration a proposed order approving the Professional Fee Claim as an Allowed Administrative Expense Claim in the amount requested (or otherwise agreed), and the order may be entered without a hearing or further notice to any party.  The Allowed amounts of any Professional Fee Claims subject to unresolved timely objections shall be determined by the Bankruptcy Court at a hearing to be held no sooner than 10 calendar days after the objection deadline.  Notwithstanding Section 5.3(a) of this Plan, distributions on account of Allowed Professional Fee Claims shall be made as soon as reasonably practicable after such Claims become Allowed.

**(c)      Payment of Interim Amounts**.  Professionals shall be paid pursuant to the "Monthly Statement" process set forth in the Interim Compensation Order with respect to all calendar months ending prior to the Confirmation Date.

**(d)      Post-Confirmation Date Fees**. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors and Reorganized Debtors may employ and pay all Professionals in the ordinary course of business (including with respect to the month in which the Confirmation Date occurred) without any further notice to, action by or order or approval of the Bankruptcy Court or any other party.

### Section 2.4.    United States Trustee Fees

All United States Trustee Fees shall be paid on or before the Effective Date by the Debtors.  After the Effective Date, the Reorganized Debtors shall assume liability for and shall pay, or cause to be paid, any and all quarterly fees owed to the United States Trustee when due in accordance with applicable law, and shall continue to file, or cause to be filed, with the Bankruptcy Court quarterly reports to show the calculation of such fees for the Debtors' Estates.  Each of the Debtors shall remain obligated to pay quarterly fees to the United States Trustee until such Debtor's Chapter 11 Case is closed, dismissed or converted to a case under chapter 7 of the Bankruptcy Code.

### Section 2.5.    Priority Tax Claims

Except to the extent a Holder of an Allowed Priority Tax Claim and the Debtor against which such Claim is asserted agree to different treatment, on the Effective Date or as soon as reasonably practicable thereafter, each Holder of an Allowed Priority Tax Claim shall receive, on

28

account of such Allowed Priority Tax Claim, either Cash in an amount equal to the Allowed amount of such Claim or such other treatment as may satisfy section 1129(a)(9) of the Bankruptcy Code and the Mexican Federal Tax Code, Mexican Income Tax Law, Mexican Valued Added Tax Law, General Rules issued by the Ministry of Finance and Public Credit and/or any other law, act, rule, regulation or norm that allows Mexican tax authorities (including, without limitation, federal tax authorities, customs authorities, authorities of services of air navigation, etc.), as applicable and any other law, regulation, general rule and/or legislation, as may be applicable.

**Section 2.6.    Commitment Premiums and Fees; Commitment Party Expense Reimbursement**

Subject to the terms and conditions of the Exit Financing Documents and the Exit Financing Commitment Order, the Exit Financing Obligations constitute Allowed Administrative Expense Claims with priority over all administrative expenses of the kind specified in sections 503(b) and 507 of the Bankruptcy Code, junior only to the DIP Loans (as defined in the DIP Credit Agreement) and shall be paid in full in New Stock or cash, as applicable, no later than the Effective Date or such earlier or other date(s), in each case as provided in the Exit Financing Documents and the Exit Financing Commitment Order, as applicable. The Exit Financing Obligations shall not be discharged, modified or otherwise affected by the Plan, dismissal of the Chapter 11 Cases or conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code.  Neither the Exit Financing Obligations nor any portion thereof shall be subject to disgorgement, setoff, disallowance, impairment, challenge, contest, attack, rejection, recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance or other claim, cause of action or other challenge of any nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise absent a final, non-appealable finding of gross negligence, willful misconduct, criminal conduct, or fraud by a Debt Financing Commitment Party or Equity Financing Commitment Party in connection with the Exit Financing Documents, as applicable, and, in any such case, solely with respect to such Debt Financing Commitment Party or Equity Financing Commitment Party.

## ARTICLE III  CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

**Section 3.1.    Classification of Claims and Interests**

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation and distributions under this Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or Interest is classified in a particular Class for the purpose of receiving distributions pursuant to this Plan only to the extent such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent any portion of such Claim or Interest qualifies within the description of such other Classes.  A Claim or Interest is also classified in a particular Class for the purpose of receiving distributions hereunder only to the extent such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been satisfied, released or otherwise settled prior to the Effective Date. In no event shall any Holder of an Allowed Claim or Allowed Interest be entitled to receive

payments under this Plan that, in the aggregate, exceed the Allowed amount of such Holder's Claim or Interest.

The Plan constitutes a separate chapter 11 plan of reorganization for each Debtor. The Plan does not contemplate and is conditioned on there being no substantive consolidation of any of the Debtors. The classification of Claims and interests against each Debtor pursuant to the Plan shall not affect any Debtor's status as a separate legal entity, change the organization or corporate governance structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merge or consolidation of any legal entities, or cause the transfer of any assets; and, except as otherwise provided by or permitted under the Plan, all Debtors shall continue to exist as separate legal entities.

The following table designates the Classes of Claims against and interests in the Debtors and specifies which Classes are (a) Impaired or Unimpaired under this Plan, (b) entitled to vote to accept or reject this Plan in accordance with section 1126 of the Bankruptcy Code or (c) presumed to accept or deemed to reject this Plan:

| Class | Claims or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Secured Claims against the Debtors | Unimpaired | Presumed to Accept |
| 2 | Other Priority Claims against the Debtors | Unimpaired | Presumed to Accept |
| 3(a) | Aerovías and Grupo Aeroméxico Recourse Claims against Grupo Aeroméxico and Aerovías | Impaired | Entitled to Vote |
| 3(b) | General Unsecured Claims against Grupo Aeroméxico | Impaired | Entitled to Vote |
| 3(c) | General Unsecured Claims against Aerovías | Impaired | Entitled to Vote |
| 3(d) | General Unsecured Claims against Aeroméxico Connect | Impaired | Entitled to Vote |
| 3(e) | General Unsecured Claims against Aeroméxico Cargo | Impaired | Entitled to Vote |
| [4(a) | Unsecured Convenience Class Claims against Grupo Aeroméxico | [·] | [·] |
| 4(b) | Unsecured Convenience Class Claims against Aerovías | [·] | [·] |

| Class | Claims or Interest | Status | Voting Rights |
|-------|--------------------|--------|---------------|
| 4(c) | Unsecured Convenience Class Claims against Aeroméxico Connect | [·] | [·] |
| 4(d) | Unsecured Convenience Class Claims against Aeroméxico Cargo] | [·] | [·] |
| 5(a) | Intercompany Claims against Grupo Aeroméxico | [·] | [·] |
| 5(b) | Intercompany Claims against Aerovías | [·] | [·] |
| 5(c) | Intercompany Claims against Aeroméxico Connect | [·] | [·] |
| 5(d) | Intercompany Claims against Aeroméxico Cargo | [·] | [·] |
| 6 | Intercompany Interests | [·] | [·] |
| 7 | Interests in Grupo Aeroméxico | Impaired | Deemed to Reject |

**Section 3.2.**        **Treatment of Classes of Claims and Interests**

**(a)   Secured Claims against the Debtors (Class 1)**

(i)    *Classification*: Class 1 consists of Secured Claims against any of the Debtors.

(ii)    *Treatment*: Except to the extent a Holder of an Allowed Secured Claim and the Debtor against which such Claim is asserted agree to different treatment, on the Effective Date, or as soon as reasonably practicable thereafter, each Holder of an Allowed Secured Claim shall receive, on account of such Allowed Claim, (i) payment in full in Cash in accordance with section 506(a) of the Bankruptcy Code, (ii) Reinstatement of such Allowed Claim pursuant to section 1124 of the Bankruptcy Code or (iii) such other treatment as may be necessary to render such Claim Unimpaired.

(iii)    *Impairment and Voting*: Secured Claims are Unimpaired under the Plan. Holders of Secured Claims are conclusively presumed to accept this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Secured Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Secured Claims.

**(b)   Other Priority Claims against the Debtors (Class 2)**

(i)    *Classification*: Class 2 consists of Other Priority Claims against any of the Debtors.

(ii)    *Treatment*: Except to the extent a Holder of an Allowed Other Priority Claim and the Debtor against which such Claim is asserted agree to different treatment, on the Effective Date, or as soon as reasonably practicable thereafter, each Holder of an Allowed Other Priority Claim shall receive, on account of such Allowed Claim, (i) payment in full in Cash or (ii) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

(iii)    *Impairment and Voting*: Other Priority Claims are Unimpaired under the Plan. Holders of Other Priority Claims are conclusively presumed to accept this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Other Priority Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Other Priority Claims.

**(c)    Aerovías and Grupo Aeroméxico Recourse Claims (Class 3(a))**

(i)    *Classification*: Class 3(a) consists of Aerovías and Grupo Aeroméxico Recourse Claims against Aerovías and Grupo Aeroméxico.

(ii)    *Allowance*: The Senior Notes Claims are Allowed in an amount of $411,355,556.

(iii)    *Treatment*: [Except to the extent a Holder of an Allowed Aerovías and Grupo Aeroméxico Recourse Claim against Aerovías and Grupo Aeroméxico and the applicable Debtor agree to different treatment on the Effective Date, or as soon as reasonably practicable thereafter, each Holder of an Allowed Aerovías and Grupo Aeroméxico Recourse Claim shall receive, at its option, either its Pro Rata share of (i) each of the Grupo Aeroméxico New Stock Allocation and the Aerovías New Stock Allocation or (ii) the Aerovías/Grupo Claimholder Cash Pool; *provided* that if the elections made by holders of Class 3(a) Claims would result in (x) less than the full amount of the Aerovías/Grupo Claimholder Cash Pool being distributed, such remaining amount (the "**Remaining Cash Pool**") shall be allocated to Classes 3(b), 3(c), 3(d) and 3(e) based upon the same allocation of New Stock to such Classes and correspondingly reduce the amount of New Stock to be received by the Holders of Allowed Claims in such Classes in an amount equal to such portion of the Remaining Cash Pool allocated to such Classes, and such New Stock instead shall be distributed to the Holders of Allowed Class 3(a) Claims that elect to receive New Stock so as to effectuate the last sentence of this paragraph or (y) more than the full amount of the Aerovías/Grupo Claimholder Cash Pool being distributed, such elections shall be reduced Pro Rata and each Holder of an Allowed Class 3(a) Claim shall receive additional New Stock in lieu of such reduced amount received from the Aerovías/Grupo Claimholder Cash Pool]. [The aggregate value of the consideration to be received by Holders of Allowed Class 3(a) Claims will be

32

in an amount equal to the full amounts due and owing on account of such Claims as of the Petition Date, including any accrued and unpaid interest as of the Petition Date, but excluding any interest accruing after the Petition Date].

(iv) *Impairment and Voting*:  Aerovías and Grupo Aeroméxico Recourse Claims are Impaired under the Plan.  Holders of Aerovías and Grupo Aeroméxico Recourse Claims, including Senior Notes Claims, are entitled to vote to accept or reject the Plan, and the votes of such Holders will be solicited with respect to such Aerovías and Grupo Aeroméxico Recourse Claims, including Senior Notes Claims.

**(d)    General Unsecured Claims against Grupo Aeroméxico (Class 3(b))**

(i) *Classification*: 3(b) consists of General Unsecured Claims against Grupo Aeroméxico.

(ii) *Treatment*: [Except to the extent a Holder of an Allowed General Unsecured Claim against Grupo Aeroméxico and Grupo Aeroméxico agree to different treatment, on the Effective Date, or as soon as reasonably practicable thereafter, each Holder of an Allowed General Unsecured Claim against Grupo Aeroméxico shall receive its Pro Rata share of the Grupo Aeroméxico New Stock Allocation, and, if applicable, its Pro Rata Share of the Remaining Cash Pool allocated to Class 3(b); *provided*, that cash received from the Remaining Cash Pool will correspondingly reduce the amount of New Stock to be received.].

(iii) *Impairment and Voting*: General Unsecured Claims against Grupo Aeroméxico are Impaired under the Plan.  Holders of General Unsecured Claims against Grupo Aeroméxico are entitled to vote to accept or reject the Plan, and the votes of such Holders will be solicited with respect to such General Unsecured Claims against Grupo Aeroméxico.

**(e)    General Unsecured Claims against Aerovías (Class 3(c))**

(i) *Classification*: Class 3(c) consists of General Unsecured Claims against Aerovías.

(ii) *Treatment*: [Except to the extent a Holder of an Allowed General Unsecured Claim against Aerovías and Aerovías agree to different treatment, on the Effective Date, or as soon as reasonably practicable thereafter, each Holder of a General Unsecured Claim against Aerovías shall receive its Pro Rata share of the Aerovías New Stock Allocation and, if applicable, its Pro Rata Share of the Remaining Cash Pool allocated to Class 3(c); *provided*, that cash received from the Remaining Cash Pool will correspondingly reduce the amount of New Stock to be received.].

(iii) *Impairment and Voting*: General Unsecured Claims against Aerovías are Impaired under the Plan.  Holders of General Unsecured Claims against Aerovías are entitled to vote to accept or reject the Plan, and the votes of such

33

Holders will be solicited with respect to such General Unsecured Claims against Aerovías.

**(f)    General Unsecured Claims against Aeroméxico Connect (Class 3(d))**

(i)    *Classification*: Class 3(d) consists of General Unsecured Claims against Aeroméxico Connect.

(ii)    *Treatment*: [Except to the extent a Holder of an Allowed General Unsecured Claim against Aeroméxico Connect and Aeroméxico Connect agree to different treatment, on the Effective Date, or as soon as reasonably practicable thereafter, each Holder of a General Unsecured Claim against Aeroméxico Connect shall receive its Pro Rata share of the Aeroméxico Connect New Stock Allocation and, if applicable, its Pro Rata Share of the Remaining Cash Pool allocated to Class 3(d); *provided*, that cash received from the Remaining Cash Pool will correspondingly reduce the amount of New Stock to be received.].

(iii) *Impairment and Voting*: General Unsecured Claims against Aeroméxico Connect are Impaired under the Plan.  Holders of General Unsecured Claims against Aeroméxico Connect are entitled to vote to accept or reject the Plan, and the votes of such Holders will be solicited with respect to such General Unsecured Claims against Aeroméxico Connect.

**(g)    General Unsecured Claims against Aeroméxico Cargo (Class 3(e))**

(i)    *Classification*: Class 3(e) consists of General Unsecured Claims against Aeroméxico Cargo.

(ii)    *Treatment*: [Except to the extent a Holder of an Allowed General Unsecured Claim against Aeroméxico Cargo and Aeroméxico Cargo agree to different treatment, on the Effective Date, or as soon as reasonably practicable thereafter, each Holder of a General Unsecured Claim against Aeroméxico Cargo shall receive its Pro Rata share of the Aeroméxico Cargo New Stock Allocation and, if applicable, its Pro Rata Share of the Remaining Cash Pool allocated to Class 3(e); *provided*, that cash received from the Remaining Cash Pool will correspondingly reduce the amount of New Stock to be received.].

(iii) *Impairment and Voting*: General Unsecured Claims against Aeroméxico Cargo are Impaired under the Plan.  Holders of General Unsecured Claims against Aeroméxico Cargo are entitled to vote to accept or reject the Plan, and the votes of such Holders will be solicited with respect to such General Unsecured Claims against Aeroméxico Cargo.

**(h)    Unsecured Convenience Class Claims against Grupo Aeroméxico (Class 4(a))**

(i)    *Classification*: Class 4(a) consists of Unsecured Convenience Class Claims against Grupo Aeroméxico.

(ii)  *Treatment*: [Except to the extent a Holder of an Allowed Unsecured Convenience Class Claim against Grupo Aeroméxico and Grupo Aeroméxico agree to different treatment, on the Effective Date or as soon as reasonably practicable thereafter, each Holder of an Allowed Unsecured Convenience Class Claim against Grupo Aeroméxico shall receive, on account of such Allowed Claim against Grupo Aeroméxico, payment [of its Pro Rata share of [_____]] in Cash].

(iii)  *Impairment and Voting*: [·].

**(i)   Unsecured Convenience Class Claims against Aerovías (Class 4(b))**

(i)  *Classification*: Class 4(b) consists of Unsecured Convenience Class Claims against Aerovías.

(ii)  *Treatment*: [Except to the extent a Holder of an Allowed Unsecured Convenience Class Claim against Aerovías and Aerovías agree to different treatment, on the Effective Date or as soon as reasonably practicable thereafter, each Holder of an Allowed Unsecured Convenience Class Claim against Aerovías shall receive, on account of such Allowed Claim against Aerovías, payment [of its Pro Rata share of [_____]] in Cash].

(iii)  *Impairment and Voting*: [·].

**(j)   Unsecured Convenience Class Claims against Aeroméxico Connect (Class 4(c))**

(i)  *Classification*: Class 4(c) consists of Unsecured Convenience Class Claims against Aeroméxico Connect.

(ii)  *Treatment*: [Except to the extent a Holder of an Allowed Unsecured Convenience Class Claim against Aeroméxico Connect and Aeroméxico Connect agree to different treatment, on the Effective Date or as soon as reasonably practicable thereafter, each Holder of an Allowed Unsecured Convenience Class Claim against Aeroméxico Connect shall receive, on account of such Allowed Claim against Aeroméxico Connect, payment [of its Pro Rata share of [_____]] in Cash].

(iii)  *Impairment and Voting*: [·].

**(k)   Unsecured Convenience Class Claims against Aeroméxico Cargo (Class 4(d))**

(i)  *Classification*: Class 4(d) consists of Unsecured Convenience Class Claims against Aeroméxico Cargo.

(ii)  *Treatment*: [Except to the extent a Holder of an Allowed Unsecured Convenience Class Claim against Aeroméxico Cargo and Aeroméxico Cargo agree to different treatment, on the Effective Date or as soon as reasonably practicable thereafter, each Holder of an Allowed Unsecured Convenience Class Claim against

Aeroméxico Cargo shall receive, on account of such Allowed Claim against Aeroméxico Cargo, payment [of its Pro Rata share of [____]] in Cash].

(iii)  *Impairment and Voting*: [·].

**(l)    Intercompany Claims (Class 5(a))**

(i)    [*Classification*: Class 5 consists of Intercompany Claims against Grupo Aeroméxico.

(ii)  *Treatment*: Each Allowed Intercompany Claim against Grupo Aeroméxico shall, at the option of Grupo Aeroméxico, on or after the Effective Date, be Reinstated, extinguished, compromised, addressed, setoff, canceled, or settled, potentially without any distribution on account of such Claim.

(iii)  *Impairment and Voting*:  Holders of Allowed Intercompany Claims against Grupo Aeroméxico are conclusively deemed to have accepted the Plan pursuant to section 1126(f) or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Allowed Intercompany Claims against Grupo Aeroméxico are not entitled to vote to accept or reject the Plan.]

**(m)   Intercompany Claims (Class 5(b))**

(i)    [*Classification*: Class 5 consists of Intercompany Claims against Aerovías.

(ii)  *Treatment*: Each Allowed Intercompany Claim against Aerovías shall, at the option of Aerovías, on or after the Effective Date, be Reinstated, extinguished, compromised, addressed, setoff, canceled, or settled, potentially without any distribution on account of such Claim.

(iii)  *Impairment and Voting*:  Holders of Allowed Intercompany Claims against Aerovías are conclusively deemed to have accepted the Plan pursuant to section 1126(f) or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Allowed Intercompany Claims against Aerovías are not entitled to vote to accept or reject the Plan.]

**(n)   Intercompany Claims (Class 5(c))**

(i)    [*Classification*: Class 5(c) consists of Intercompany Claims against Aeroméxico Connect.

(ii)  *Treatment*: Each Allowed Intercompany Claim against Aeroméxico Connect shall, at the option of Aeroméxico Connect, on or after the Effective Date, be Reinstated, extinguished, compromised, addressed, setoff, canceled, or settled, potentially without any distribution on account of such Claim.

36

(iii) *Impairment and Voting*:  Holders of Allowed Intercompany Claims against Aeroméxico Connect are conclusively deemed to have accepted the Plan pursuant to section 1126(f) or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Allowed Intercompany Claims against Aeroméxico Connect are not entitled to vote to accept or reject the Plan.]

**(o)    Intercompany Claims (Class 5(d))**

(i)    [*Classification*: Class 5(d) consists of Intercompany Claims against Aeroméxico Cargo.

(ii)    *Treatment*: Each Allowed Intercompany Claim against Aeroméxico Cargo shall, at the option of Aeroméxico Cargo, on or after the Effective Date, be Reinstated, extinguished, compromised, addressed, setoff, canceled, or settled, potentially without any distribution on account of such Claim.

(iii) *Impairment and Voting*:  Holders of Allowed Intercompany Claims against Aeroméxico Cargo are conclusively deemed to have accepted the Plan pursuant to section 1126(f) or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Allowed Intercompany Claims against Aeroméxico Cargo are not entitled to vote to accept or reject the Plan.]

**(p)    Intercompany Interests (Class 6)**

(i)    *Classification*: Class 6 consists of Intercompany Interests in Aerovías, Aeroméxico Connect and Aeroméxico Cargo, respectively.

(ii)    *Treatment*: [On the Effective Date, all existing Intercompany Interests shall be Reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.]

(iii) *Impairment and Voting*: [Intercompany Interests are Unimpaired under the Plan.  Holders of Intercompany Interests are conclusively presumed to accept this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.]

**(q)    Interests in Grupo Aeroméxico (Class 7)**

(i)    *Classification*: Class 7 consists of Interests in Grupo Aeroméxico.

(ii)    *Treatment*: Holders of Interests in Grupo Aeroméxico's capital stock that (1) do not exercise their preemptive rights pursuant to a Statutory Equity Rights Offering (either by waiver or lack of exercise) will be diluted and any possible recovery related to such Interests shall be deemed waived and the owners of such Interests in Grupo Aeroméxico shall receive no distribution on account of such Interests and (2) do exercise their preemptive rights pursuant to a Statutory Equity

Rights Offering will receive a Pro Rata share of the New Stock representing the subscription and payment of the exercised preemptive rights.

(iii) *Impairment and Voting*: [Interests in Grupo Aeroméxico are Impaired under the Plan. Holders of Interests in Grupo Aeroméxico are conclusively presumed to reject this Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Interests in Grupo Aeroméxico are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Interests in Grupo Aeroméxico.]

### Section 3.3.    Special Provision Governing Unimpaired Claims

Except as otherwise provided in this Plan, nothing under the Plan shall affect the rights of the Debtors with respect to an Unimpaired Claim, including all rights with respect to legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

### Section 3.4.    Voting Classes; Presumed Acceptance by Non-Voting Classes

With respect to each Debtor, if a Class contains Claims eligible to vote and no Holder of Claims eligible to vote in such Class votes to accept or reject this Plan by the Voting Deadline, this Plan shall be presumed accepted by the Holders of Claims in such Class.

### Section 3.5.    Elimination of Vacant Classes

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the Voting Deadline shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

### Section 3.6.    Subordinated Claims and Interests

The allowance, classification and treatment of all Claims and Interests and their respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtors reserve the right to reclassify any Allowed Claim or Allowed Interest in accordance with any contractual, legal or equitable subordination relating thereto.

### Section 3.7.    Intercompany Interests

To the extent Reinstated under the Plan, distributions on account of Intercompany Interests are not being received by Holders of Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience, for the ultimate benefit of the Holders of the New Stock, and in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to make certain distributions to the Holders of Allowed

Claims. For the avoidance of doubt, to the extent Reinstated pursuant to the Plan, on and after the Effective Date, all Intercompany Interests shall be owned by the same Reorganized Debtor that corresponds with the Debtor that owned such Intercompany Interests prior to the Effective Date (subject to the Restructuring Transactions).

**Section 3.8.    Controversy Concerning Impairment**

If a controversy arises as to whether any Claims or interests, or any Class of Claims or interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

**Section 3.9.    Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code**

If any Class of Claims is deemed to reject this Plan or is entitled to vote on this Plan and does not vote to accept this Plan, the Debtors may (a) seek confirmation of this Plan under section 1129(b) of the Bankruptcy Code [with respect to such Classes] and/or (b) amend or modify this Plan in accordance with the terms hereof and the Bankruptcy Code.

## ARTICLE IV    IMPLEMENTATION OF THE PLAN

**Section 4.1.    [RESERVED]**

**Section 4.2.    Continued Corporate Existence**

Except as otherwise provided in the Plan, the Plan Documents or the Plan Supplement, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective incorporation deed and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such incorporation deed and bylaws (or other formation documents) are amended under the Plan, the New Corporate Governance Documents, the Registration Rights Agreement or otherwise.

**Section 4.3.    Restructuring Transactions**

On or after the Confirmation Date, the Debtors or the Reorganized Debtors, as applicable, may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan that are consistent with and pursuant to the terms and conditions of the Plan, including, without limitation, the PLM Stock Participation Transaction, the Equity Financing, the Debt Financing, and all steps necessary to effectuate the Plan pursuant to any corporate governance obligation from any of the Debtors (collectively, the "**Restructuring Transactions**"). The Confirmation Order shall be deemed, pursuant to both section 1123 and section 363 of the Bankruptcy Code, to authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

**Section 4.4.        Exemption from Registration Requirements for New Stock**

Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance and distribution of shares of the New Stock on account of the Equity Commitment Premium shall be exempt from, among other things, the registration and prospectus delivery requirements of section 5 of the Securities Act and any other applicable state and federal law of the United States requiring registration and/or delivery of a prospectus prior to the offering, issuance, distribution or sale of securities.   To the maximum extent provided by section 1145 of the Bankruptcy Code and applicable non-bankruptcy law, the offering, issuance and distribution of all other shares of the New Stock shall be exempt from, among other things, the registration and prospectus delivery requirements of section 5 of the Securities Act and any other applicable state and federal law of the United States requiring registration and/or delivery of a prospectus prior to the offering, issuance, distribution or sale of securities, subject to the provisions of section 1145(b)(1) of the Bankruptcy Code.

The offering, issuance and sale of the New Stock that are not exempt from registration under section 5 of the Securities Act and any other applicable securities laws is being made in reliance on the exemption from registration set forth in section 4(a)(2) of the Securities Act and/or Regulation D thereunder or, solely to the extent section 4(a)(2) of the Securities Act or Regulation D thereunder is not available, any other available exemption from registration under the Securities Act. Such securities will be considered "restricted securities", will bear customary legends and transfer restrictions, and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act.

**Section 4.5.        Cancellation of Notes, Instruments, Certificates and Other Documents**

On the Effective Date, except to the extent otherwise provided in the Plan and to the extent permitted by applicable law (including, without limitation, Mexican law), all notes, instruments, certificates, shares and other documents evidencing Claims or interests shall be canceled, and the obligations and duties of the Debtors or the Reorganized Debtors, the DIP Agent, and the Senior Notes Indenture Trustee thereunder, or in any way related thereto shall be discharged and deemed satisfied in full, except that each of the foregoing shall continue in effect solely to the extent necessary to (a) allow Holders of Claims or interests described herein to receive distributions under this Plan; (b) allow the Debtors, the DIP Agent, and the Senior Notes Indenture Trustee, as applicable, to make post-Effective Date Distributions or take such other actions pursuant to this Plan on account of such Claims or interests; (c) allow Holders of Claims or interests to retain their respective rights and obligations vis-à-vis other Holders of Claims or interests pursuant to any such applicable document or instrument; (d) allow the DIP Agent and the Senior Notes Indenture Trustee to enforce their rights, claims, and interests vis-à-vis any party other than the Debtors, including, but not limited to, any indemnification rights or any rights with respect to priority or payment or to exercise charging liens (including the Senior Notes Indenture charging lien); (e) preserve any rights of the DIP Agent and/or the Senior Notes Indenture Trustee to payment of fees, expenses and indemnification obligations against money or property distributed to the lenders under the DIP Credit Agreement, including any rights of enforcement, rights to priority of payment or to maintain, exercise, and/or enforce charging liens;

40

(f) preserve the rights of the DIP Agent and/or the Senior Notes Indenture Trustee to appear and be heard in these Chapter 11 Cases to the extent such rights exist, and (g) permit the DIP Agent and/or the Senior Notes Indenture Trustee to perform any function necessary to effectuate the foregoing. Notwithstanding the foregoing, any provision in any such agreement, instrument, note, certificates, indenture, mortgage, security document, or other instrument or document that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, the Debtors of their interests as a result of the cancellations, terminations, satisfaction, or releases provided for in this Article V shall be deemed null and void and shall be of no force and effect.

On and after the final distribution on account of the Allowed Senior Notes Claims, the Senior Notes shall be deemed to be worthless, and DTC shall take down the relevant positions at the request of the Senior Notes Indenture Trustee without any requirement of indemnification or security on the part of the Senior Notes Indenture Trustee.

On the Effective Date, the Debtors shall pay all reasonable and documented Senior Notes Indenture Trustee Fees that have accrued and are unpaid as of the Effective Date, without the need for further Bankruptcy Court approval, subject to receipt by the Debtors of invoices from the Senior Notes Indenture Trustee. On and after the Effective Date, to the extent the Senior Notes Indenture Trustee provides services or incurs expenses, including professional fees, related to the Plan or the Senior Notes Indenture, including with respect to effectuation of any distributions under the Plan or any action the Debtors or Reorganized Debtors request to be taken, the Debtors or the Reorganized Debtors, as applicable, shall pay all Senior Notes Indenture Trustee Fees within ten (10) Business Days of receipt by the Debtors or the Reorganized Debtors, as applicable, of an invoice from the Senior Notes Indenture Trustee. Notwithstanding this section, the Senior Notes Indenture Trustee shall have the right to exercise its charging lien for the payment of the Senior Notes Indenture Trustee's fees and expenses, to the extent not otherwise paid, against any and all distributions on account of the Senior Notes, including but not limited to any distribution made under the Plan or held by any Disbursing Agent or any other entity appointed to disburse distributions on account of Senior Notes Claims under the Plan.

### Section 4.6.    Issuance of New Securities; Execution of Related Documents

[On the Effective Date, all securities, notes, instruments, certificates and other documents required to be issued pursuant to the Restructuring Transactions, including the New Stock approved by the General Ordinary Shareholders Meeting of Grupo Aeroméxico (including on account of the Equity Commitment Premium) and the New First Lien Notes, shall be deemed as issued and distributed by the Disbursing Agent to the Entities entitled to receive the securities, notes, instruments, certificates and other documents pursuant to, and in accordance with, the terms of the Plan, the Subscription Agreement, the New First Lien Notes Indenture [and New First Lien Notes Purchase Agreement] and the New Corporate Governance Documents; *provided* that the New Stock shall be issued and registered before the CNBV of the Mexican National Commission of Securities and Banking (*Comisión Nacional Bancaria y de Valores*) and be listed at the Mexican Stock Exchange on the Effective Date. Any Entity receiving New Stock should coordinate all necessary actions in order for said Entity to be able to receive such shares.]

41

In connection with the foregoing, Grupo Aeroméxico shall undertake and execute all necessary actions in order to comply with the terms and conditions of the Plan Documents. Each distribution and issuance of the New Stock shall be governed by the terms and conditions approved by the General Ordinary Shareholders Meeting, which shall be in accordance with and pursuant to the terms and conditions set forth in the Plan applicable to such distribution, issuance, and/or dilution, as applicable, and by the terms and conditions of the instruments evidencing or relating to such distribution, issuance, and/or dilution, as applicable, including the New Corporate Governance Documents, the terms and conditions of which shall bind each Entity receiving such distribution of the New Stock. Any Entity's receipt of New Stock shall be deemed as its acceptance and agreement to be bound by the New Corporate Governance Documents, as the same may be amended or modified from time to time following the Effective Date in accordance with their terms.

The delivery of the New Stock will be made by the issuance of a provisional share certificate issued by Grupo Aeroméxico in favor of the corresponding Holder of the New Stock.

**Section 4.7.      Authorization and Issuance of New First Lien Notes**

On the Effective Date, Reorganized Grupo Aeroméxico issue the New First Lien Notes on the terms set forth in the Plan, the New First Lien Notes Indenture [and New First Lien Notes Purchase Agreement]. Pursuant to Section 4(a)(2) of the Securities Act and/or Regulation D promulgated thereunder, the offering, issuance, distribution and sale of New First Lien Notes (and the guarantees thereof) shall be exempt from, among other things, the registration and prospectus delivery requirements of Section 5 of the Securities Act and any other applicable law requiring registration and/or delivery of prospectuses prior to the offering, issuance, distribution or sale of securities.

On the Effective Date, the New First Lien Notes Indenture [and New First Lien Notes Purchase Agreement] shall be executed and delivered. The Reorganized Debtors shall be authorized to execute, deliver, and enter into and perform under the New First Lien Notes Indenture [and New First Lien Notes Purchase Agreement] without the need for any further corporate or limited liability company action and without further action by the holders of Claims or Interests. Each of the New First Lien Notes Indenture [and New First Lien Notes Purchase Agreement] shall constitute legal, valid, binding, and authorized joint and several obligations of the applicable Debt Financing Commitment Parties and Reorganized Debtors, enforceable in accordance with their terms, and, except as provided for thereunder, such obligations shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination (including equitable subordination) under applicable law, the Plan, or the Confirmation Order and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law.

Confirmation of the Plan shall be deemed (i) approval of each of the New First Lien Notes Indenture [and New First Lien Notes Purchase Agreement], and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Debt Financing Commitment Parties and Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, and expenses as and when due provided for by the New First Lien Notes Indenture [and New First Lien Notes Purchase

Agreement] and (ii) authorization to enter into and perform under the New First Lien Notes Indenture [and New First Lien Notes Purchase Agreement].

On the Effective Date, all Liens and security interests granted pursuant to, or in connection with the New First Lien Notes Indenture [and New First Lien Notes Purchase Agreement] (i) shall be deemed to be approved and shall, without the necessity of the execution, recordation, or filing of mortgages, security agreements, control agreements, pledge agreements, financing statements, or other similar documents, be valid, binding, fully perfected, fully enforceable Liens on, and security interests in, the property described in the New First Lien Notes Indenture [and New First Lien Notes Purchase Agreement], with the priorities established in respect thereof under applicable non-bankruptcy law, and (ii) shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law, the Plan or the Confirmation Order.

The Reorganized Debtors and the Persons granted Liens and security interests under the New First Lien Notes Indenture [and New First Lien Notes Purchase Agreement] are authorized to make all filings and recordings and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order without the need for any filings or recordings) and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

### Section 4.8.    The Equity and Debt Financing

The Debtors shall raise up to an aggregate of $1.1875 billion of equity capital through the Equity Financing and up to $537.5 million of debt through the Debt Financing.  In connection with the consummation of the Plan, the Equity Financing shall be consummated in accordance with the terms of the Equity Financing Commitment Letter, the Subscription Agreement, and the Plan Documents and the Debt Financing shall be consummated in accordance with the terms of the Debt Financing Commitment Letter and the Plan Documents, as applicable.

On the Effective Date, the Debtors shall consummate the Equity Financing, through which Reorganized Grupo Aeroméxico shall issue up to $1.1875 billion of New Stock plus New Stock on account of the Equity Commitment Premium.  The New Stock issued pursuant to the Equity Financing and on account of the Equity Commitment Premium shall be purchased and/or subscribed by the Equity Financing Commitment Parties on the terms and conditions set forth in the Equity Financing Commitment Letter and the Subscription Agreement.  Also on the Effective Date, the Debtors shall consummate the Debt Financing, through which Reorganized Grupo Aeroméxico shall issue up to $537.5 million in New First Lien Notes, which shall be purchased by the Debt Financing Commitment Parties on the terms and conditions set forth in the Debt Financing Commitment Letter, New First Lien Notes Indenture [and New First Lien Notes Purchase Agreement].

**Section 4.9.    Corporate Action**

(a)    On or before the Effective Date, as applicable, and subject to applicable governmental authorizations, if any, all actions contemplated under the Plan or the Plan Supplement shall be deemed authorized and approved in all respects by the Board of Directors and at the General Ordinary Shareholders Meeting and General Extraordinary Shareholders Meeting of Grupo Aeroméxico, as the case may be, including: (a) adoption or assumption, as applicable, of the agreements with existing management; (b) ratification and/or designation of the directors, managers and officers for the Reorganized Debtors; (c) implementation of the Restructuring Transactions, including but not limited to any required amendments to Grupo Aeroméxico's bylaws, as the case may be; (d) rejection or assumption, as applicable, of Executory Contracts and Unexpired Leases; (e) the adoption and filing of the New Corporate Governance Documents; (f) the consummation of the PLM Stock Participation Transaction; (g) the issuance and distribution of the New Stock and the New First Lien Notes; (h) the applicable Reorganized Debtors' entry into the Registration Rights Agreement; and (i) all other acts or actions contemplated, or reasonably necessary or appropriate to promptly consummate the transactions contemplated under the Plan (whether to occur before, on or after the Effective Date).

(b)    On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized to issue, execute and deliver the agreements, documents, securities and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors, and any and all other agreements, documents, securities or instruments related to the foregoing. The authorizations and approvals contemplated by this Article IV shall be effective and shall be replicated, to the extent required, for any corporate authorization or power of attorney required under Mexican common or commercial law.

**Section 4.10.    PLM Stock Participation Transaction**

**(a)**    In addition to the following, further details regarding the PLM Stock Participation Transaction will be set forth in the Plan Supplement.

**(b)**    The Plan and the Confirmation Order shall authorize (but not direct the Debtors' entry into) the PLM Stock Participation Transaction pursuant to section 363 of the Bankruptcy Code under the terms and conditions of the PLM Stock Participation Transaction Agreement.  As a result of the PLM Stock Participation Transaction, PLM will become a wholly owned subsidiary of Reorganized Grupo Aeroméxico.

**(c)**    Subject to and in connection with the occurrence of the Effective Date, Grupo Aeroméxico, Aerovías, PLM and Aimia shall be authorized to take all such actions as may be necessary or appropriate to effect the PLM Stock Participation Transaction on the terms and subject to the conditions to be set forth in the PLM Stock Participation Transaction Agreement. Without limiting the generality of the immediately preceding sentence, upon the satisfaction or waiver of each of the conditions set forth in Section 9.1 of the Plan and the applicable conditions of the PLM Stock Participation Transaction Agreement, on the Effective Date, Grupo Aeroméxico, Aerovías, PLM and Aimia shall be authorized to take or cause to be taken all

44

actions, including making appropriate filings or recordings, that may be required by applicable law in connection with the PLM Stock Participation Transaction.

(d)    In the event of any conflict whatsoever between the terms of the Plan and the PLM Stock Participation Transaction Agreement with respect to the PLM Stock Participation Transaction, the terms of the PLM Stock Participation Transaction Agreement shall control, and the Plan shall be deemed to incorporate in their entirety the terms, provisions and conditions of the PLM Stock Participation Transaction Agreement.

### Section 4.11.    New Corporate Governance Documents

(a)    The Required Equity Commitment Parties, the Debtors and Delta shall use commercially reasonable efforts to determine the substance of New Corporate Governance Documents which are mutually acceptable to the Required Equity Commitment Parties, the Debtors and Delta, and in compliance with Mexican law.

(b)    On or immediately before the Effective Date, Reorganized Grupo Aeroméxico shall obtain, if necessary and applicable, authorization from the General Direction of Foreign Investment of the Ministry of Economy regarding the New Corporate Governance Documents and/or other applicable authorities in its jurisdiction of incorporation in accordance with the applicable laws of its respective jurisdiction of incorporation, to the extent required for such New Corporate Governance Documents to become effective.  Pursuant to section 1123(a)(6) of the Bankruptcy Code, the New Corporate Governance Documents will prohibit the issuance of non-voting equity securities, but only to the extent required by section 1123(a)(6) of the Bankruptcy Code; *provided*, *however*, that any such restriction will not apply to non-voting shares required to be issued pursuant to Mexican Foreign Investment Law.  After the Effective Date, Reorganized Grupo Aeroméxico may amend and restate its New Corporate Governance Documents and constituent documents as permitted by the laws of its jurisdiction of formation and the terms of such documents.

(c)    [The bylaws of Reorganized Grupo Aeroméxico shall continue to provide, with requisite government authorization, if any, that foreign investment, including neutral investment, shall never represent more than 90% of the total equity, and any foreign investor not considered a Mexican Person shall never vote more than 49% of the total voting outstanding shares].

### Section 4.12.    Directors and Officers

(a)    On the Effective Date, the terms of the current members of the board of directors of each of the Debtors shall expire, unless such member is selected as a member of the New Board in accordance with the terms of the Equity Financing Commitment Letter and the Subscription Agreement, as applicable.  The members of the New Board shall be determined in accordance with the terms of the Equity Financing Commitment Letter and the Subscription Agreement, as applicable, (subject to any applicable required prior approval by each General Ordinary Shareholders Meeting of Grupo Aeroméxico and the board of each other Debtor, individually).  Compensation for the officers of each of the Debtors shall be set forth in the Plan Supplement.

(b)    On the Effective Date, the officers and overall management structure of each of the Debtors, and all officers and management decisions with respect to each of the Debtors (and/or any of their direct or indirect subsidiaries), and affiliate transactions shall only be subject to the approval of their respective board of directors.  From and after the Effective Date, each director, officer or manager of the Reorganized Debtors shall be appointed and serve pursuant to the terms of their respective charters and bylaws or other formation and constituent documents, the New Corporate Governance Documents and applicable laws of the respective Reorganized Debtor's jurisdiction of formation.

### Section 4.13.    Effectuating Documents; Further Transactions

On and after the Effective Date, the Reorganized Debtors, and the officers and members of the boards of directors and managers thereof, are authorized to and shall issue, execute, deliver, file or record such contracts, securities, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan, the PLM Stock Participation Transaction, the Statutory Equity Rights Offering, the Equity Financing, the Debt Financing, the New Corporate Governance Documents and the securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations or consents except for those expressly required under the Plan, it being understood that all such actions contemplated hereby shall be consistent in all respects with the Plan.

### Section 4.14.    Management Incentive Plan

[Up to [•]% of the fully diluted New Stock shall be reserved for the Management Incentive Plan.  [•]% of the Management Incentive Plan New Stock shall be granted on the Effective Date and shall vest over a period of [•] years following the Effective Date on a schedule to be mutually agreed among the Required Equity Commitment Parties, Delta and the Debtors.

The Required Equity Commitment Parties, Delta and the Debtors shall negotiate in good faith regarding the additional material terms of the Management Incentive Plan, which shall be on market terms, [in consultation with the Creditors' Committee] and to be acknowledged and implemented, in due course, by New Board as set forth in the Plan; *provided*, that to the extent the additional material terms cannot be agreed to in the reasonable discretion of the Required Equity Commitment Parties, Delta and the Debtors, the material terms of the Management Incentive Plan shall be determined by the New Board.

The New Board, directly, or through its compensation committee, shall be authorized to take all actions to adopt, supervise and implement the Management Incentive Plan including, without limitation, to enact and enter into related policies and agreements, and grant awards under the Management Incentive Plan to participants in such forms and subject to the material terms and conditions (including anti-dilution protections and vesting conditions) set forth in the Plan Supplement and with additional terms to be determined by the New Board.

[Members of Grupo Aeroméxico's executive management team shall be entitled to receive the Management True-Up Payment in an aggregate amount of $[•] million, based upon

46

such members' contribution to the Company during the pendency of, and the Debtors' emergence from, their Chapter 11 Cases, subject to further discussion and agreement by the Required Equity Commitment Parties, Grupo Aeroméxico's executive management team, Delta and the [independent members][compensation committee] of Grupo Aeroméxico's Board of Directors.]]

### Section 4.15.    Sources of Consideration for Plan Distributions

The Debtors shall fund distributions under the Plan with (a) the proceeds of the Equity Financing; (b) the proceeds of the Debt Financing; and (c) Cash on hand. Each distribution and issuance referred to in this Article IV shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

### Section 4.16.    Closing of Chapter 11 Cases

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases; *provided*, *however*, that, as of the Effective Date, the Reorganized Debtors may submit separate orders previously provided to the United States Trustee to the Bankruptcy Court under certification of counsel closing certain individual Chapter 11 Cases and changing the caption of the Chapter 11 Cases accordingly; *provided* further that matters concerning Claims may be heard and adjudicated in one of the Debtors' Chapter 11 Cases that remains open regardless of whether the applicable Claim is against a Debtor in a Chapter 11 Case that is closed.

## ARTICLE V    PROVISIONS GOVERNING DISTRIBUTIONS

### Section 5.1.    Disbursing Agent

Except as otherwise provided in the Plan, the Disbursing Agent shall make all distributions required under this Plan, except with respect to a Holder of a Claim or Interest whose distribution is governed by an agreement and is administered by a Servicer, which distributions shall be deposited with the appropriate Servicer for distribution to the Holders of Claims or Interests in accordance with the provisions of this Plan and the terms of the governing agreement.  Plan Distributions on account of such Claims or Interests shall be deemed complete upon delivery to the appropriate Servicer; *provided*, *however*, that if any such Servicer is unable to make such distributions, the Disbursing Agent, with the cooperation of such Servicer, shall make such distributions to the extent reasonably practicable to do so.  The DIP Agent will be considered the Servicer for DIP Facility Claims other than DIP Reimbursement Claims and the Senior Notes Indenture Trustee will be considered the Disbursing Agent for Senior Notes Claims.

The Reorganized Debtors shall be authorized, without further Bankruptcy Court approval, to reimburse any Servicer for their reasonable and customary servicing fees and

expenses incurred in providing postpetition services directly related to Plan Distributions. These reimbursements will be made on terms agreed to with the Reorganized Debtors and will not be deducted from distributions to be made pursuant to the Plan to Holders of Allowed Claims or Interests, as applicable, receiving Plan Distributions from a Servicer.

Notwithstanding any provision of this Plan to the contrary, any distributions to a Holder of a Senior Notes Claim shall be made to or at the direction of the Senior Notes Indenture Trustee which shall act as Disbursing Agent for distributions to such Holders in accordance with this Plan and the Senior Notes Indenture. The Senior Notes Indenture Trustee shall not incur any liability whatsoever on account of any distributions under the Plan except for gross negligence or willful misconduct. Notwithstanding anything to the contrary herein, such distributions shall be subject in all respects to any rights of the Senior Notes Indenture Trustee to assert a charging lien against such distributions. The Senior Notes Indenture Trustee may transfer or direct the transfer of such distributions directly through the facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise) and will be entitled to recognize and deal for all purposes under the Plan with such respective Holders of Allowed Senior Notes Claims to the extent consistent with the customary practices of DTC; *provided* that, for the avoidance of doubt, any charging lien asserted by the Senior Notes Indenture Trustee shall attach to the property to be distributed in the same manner as if such distributions were made through the Senior Notes Indenture Trustee. All distributions to be made to Holders of Allowed Senior Notes Claims shall be eligible to be distributed through the facilities of DTC and as provided for under the Senior Notes Indenture.

### Section 5.2.    Rights and Powers of Disbursing Agent

The Disbursing Agent shall be empowered to (a) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Plan, (b) make all distributions contemplated by the Plan, (c) employ professionals to represent it with respect to its responsibilities and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

The Disbursing Agent shall only be required to act and make Plan Distributions in accordance with the terms of the Plan, and shall have no liability for actions taken in accordance with the Plan or in reliance upon information provided to it in accordance with the Plan or obligation or liability for Plan Distributions under the Plan to any party who does not hold an Allowed Claim or an Allowed Interest at the time of such distribution or who does not otherwise comply with the terms of the Plan; *provided*, *however*, that the foregoing shall not affect the liability that otherwise would result from any such act or omission to the extent such act or omission is determined by a Final Order to have constituted willful misconduct, gross negligence, intentional fraud or criminal conduct of any such Person. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

**Section 5.3.        Timing and Delivery of Distributions**

**(a)    Timing**

Subject to any reserves or holdbacks established pursuant to the Plan, and taking into account the matters discussed in Article III and Section 5.4 of the Plan, on the appropriate Distribution Date or as soon as practicable thereafter, Holders of Allowed Claims and Allowed Interests against the Debtors shall receive the distributions provided for Allowed Claims and Allowed Interests in the applicable Classes as of such date. Plan Distributions on account of General Unsecured Claims Allowed as of the Effective Date, other than on account of Senior Notes Claims Allowed as of the Effective Date (for which distributions shall be made on the Effective Date), shall be made on or as soon as reasonably practicable after the Initial Distribution Date.

If and to the extent there are Disputed Claims or Disputed Interests as of the Effective Date, distributions on account of such Disputed Claims or Disputed Interests (which will only be made if and when they become Allowed Claims or Allowed Interests, as applicable) shall be made pursuant to the provisions set forth in this Plan on or as soon as reasonably practicable after the next Distribution Date that is at least 20 calendar days after the Allowance of each such Claim or Interest; *provided*, *however*, that distributions on account of the Claims set forth in Article II of this Plan shall be made as set forth therein and Professional Fee Claims shall be made as soon as reasonably practicable after their Allowance. Because of the size and complexities of the Chapter 11 Cases, the Debtors at the present time cannot accurately predict the timing of the Final Distribution Date.

**(b)    De Minimis Distributions**

[Holders of Allowed Claims or Allowed interests entitled to distributions of [$100] or less shall not receive Plan Distributions, and each Claim or interest to which this limitation applies shall be discharged pursuant to Article VII of the Plan, and its Holder shall be forever barred pursuant to Article VII of the Plan from asserting that Claim or interest against the Reorganized Debtors or their property. Cash that otherwise would be payable under the Plan to Holders of Allowed Claims or interests but for this Section 5.3(b) of the Plan shall be available for distributions to Holders of other Allowed Claims or Interests].

**(c)    Distribution Record Date**

[Except as otherwise provided in the Plan, Plan Distributions shall only be made to the record holders of such Allowed Claims or Allowed Interests as of the Distribution Record Date. On the Distribution Record Date, at the close of business for the relevant register, all registers maintained by the Debtors, Disbursing Agent, mortgagees, other Servicers and each of the foregoing's respective agents, successors and assigns shall be deemed closed for purposes of determining whether a holder of such a Claim or Interest is a record holder entitled to distributions under this Plan. The Debtors, Reorganized Debtors, Disbursing Agent, mortgagees, other Servicers and all of their respective agents, successors and assigns shall have no obligation to recognize, for purposes of distributions pursuant to or in any way arising from this Plan (or for any other purpose), any Claims or Interests that are transferred after the Distribution Record

49

Date. Instead, they shall be entitled to recognize only those record holders set forth in the registers as of the Distribution Record Date, irrespective of the number of distributions made under this Plan or the date of such distributions. Furthermore, if a Claim or Interest other than one based on a publicly traded equity security, note, bond or debenture (as set forth in Bankruptcy Rule 3001(e)) is transferred 20 or fewer calendar days before the Distribution Record Date, the Disbursing Agent shall make distributions to the transferee only if the transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor. For the avoidance of doubt, the Distribution Record Date shall not apply to the Senior Notes or any other debt or equity securities of the Debtors deposited with DTC, the holders of which shall receive a distribution in accordance with the customary procedures of DTC.]

If any dispute arises as to the identity of a Holder of an Allowed Claim or Allowed Interest that is entitled to receive a Plan Distribution, the Disbursing Agent or the Servicer, as applicable, may, in lieu of making such distribution to such person, make the distribution into an escrow account until the disposition thereof is determined by Final Order or by written agreement among the interested parties to such dispute.

Subject to Bankruptcy Rule 9010, a distribution to a Holder of an Allowed Claim may be made by the Disbursing Agent, in its sole discretion: (i) to the address set forth on the first page of the Proof of Claim filed by such Holder (or at the last known addresses of such Holder if no Proof of Claim is filed or if the Debtors have been notified in writing of a change of address), (ii) to the address set forth in any written notice of an address change delivered to the Disbursing Agent after the date of any related Proof of Claim, (iii) to the address set forth on the Schedules filed with the Bankruptcy Court, if no Proof of Claim has been filed and the Disbursing Agent has not received a written notice of an address change, (iv) in the case of a Holder whose Claim is governed by an agreement and administered by a Servicer, to the address contained in the official records of such Servicer or (v) at the address of any counsel that has appeared in the Chapter 11 Cases on such holder's behalf.

**(d)    Delivery of Distributions**

Subject to the provisions of Section 5.4 of this Plan, with respect to Holders of Allowed Senior Notes Claims, distributions shall only be made to Holders of such Allowed Claims who surrender their Senior Notes in accordance with the provisions of this Section 5.2(d):

With respect to any holder of an Allowed Claim relating to a note that is a [CEBURES] or promissory note, such holder shall either (x) surrender such note to the Disbursing Agent or (y) with respect to an note in certificated form that is governed by an agreement and administered by a Servicer, surrender such note to the respective Servicer (along with a letter of transmittal to be provided by the Servicer or the Disbursing Agent), and such note shall be canceled. No distribution of property hereunder shall be made to or on behalf of any holder of an Allowed Claim relating to a [CEBURES] or promissory note unless and until such note is received by the Disbursing Agent or the appropriate Servicer. In the event of the loss, theft or destruction of a note certificate, the unavailability of such note certificate or promissory note must be reasonably established to the satisfaction of the Disbursing Agent or the respective Servicer, including by executing and delivering (x) an affidavit of loss setting forth the

50

unavailability of the note or promissory note, as applicable, reasonably satisfactory to the Disbursing Agent or the respective Servicer and (y) such additional security or indemnity as may be reasonably required. A distribution to a holder of an Allowed Claim relating to an note that is a [CEBURES] or promissory note may be made by the Disbursing Agent, in its sole discretion: (x) to the address of the Holder thereof or (y) to the address indicated in any letter of transmittal submitted to the Servicer by a Holder.

With respect to any Allowed Claim relating to a note that is held in the name of, or by a Nominee of, DTC, the Disbursing Agent shall seek the cooperation of DTC to facilitate distributions to Holders in exchange for such notes.

Any holder of an Allowed Claim relating to a note who fails to surrender such note in accordance with this Section 5.2(d) within one year after the Effective Date shall be deemed to have forfeited all rights and Claims in respect of such note and shall not participate in any distribution hereunder, and all property in respect of such forfeited distribution, including any dividends or interest attributable thereto, shall revert to [Reorganized Grupo Aeroméxico,], notwithstanding any federal or state escheat laws to the contrary.

Notwithstanding the foregoing, this Section 5.2(d) shall not apply to any Claims Reinstated pursuant to the terms of this Plan or any Claims relating to notes not being canceled under the Plan.]

### Section 5.4.    Manner of Payment Under Plan

**(a)**    At the option of the Debtors, any Cash payment to be made hereunder may be made by check, wire transfer or any other customary payment method.

**(b)**    The Disbursing Agent shall make distributions of New Stock or Cash as required under the Plan on behalf of the applicable Reorganized Debtor. [Where the applicable Reorganized Debtor is a subsidiary of Reorganized Grupo Aeroméxico, Reorganized Grupo Aeroméxico shall be deemed to have made a direct or indirect capital contribution to the applicable Reorganized Debtor of an amount of New Stock or Cash to be distributed to the Creditors of such Debtor, but only at such time as, and to the extent that, the amounts are actually distributed to Holders of Allowed Claims or Allowed Interests. Any distributions of New Stock or Cash that revert to Reorganized Grupo Aeroméxico or are otherwise canceled (such as to the extent any distributions have not been claimed within one year or are forfeited pursuant to Section 5.2]) shall revest solely in Reorganized Grupo Aeroméxico, and no other Reorganized Debtor shall have (nor shall it be considered to ever have had) any ownership Interest in such amounts.]

### Section 5.5.    Allocation of Plan Distributions Between Principal and Interest

[To the extent that any Allowed Claim entitled to a distribution under the Plan is based upon any obligation or instrument that is treated for federal income tax purposes as indebtedness of any Debtor and other amounts (such as accrued but unpaid interest thereon), such distribution shall be allocated first to the principal amount of the Claim (as determined for federal income tax

purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts.]

### Section 5.6.        No Postpetition or Default Interest on Claims

Unless otherwise provided for in the Plan or the Confirmation Order or required by the Bankruptcy Code, no Holder of a Claim shall be entitled to (a) interest accruing on or after the Petition Date on any such Claim, or interest at the contract default rate, as applicable, or (b) penalties on any Claim. Any such interest or penalty component of any such Claims, if Allowed, shall be paid only in accordance with section 726(b) of the Bankruptcy Code.

### Section 5.7.        Foreign Currency Exchange Rate

As of the Effective Date, any General Unsecured Claim or Interest asserted in Mexican pesos shall be automatically deemed converted using the applicable conversion rate in place on the Petition Date determined by the *Banco de México* (The Central Bank of Mexico) as published in the *Diario Oficial de la Federación* (Federal Gazette of the Federation) on the Petition Date, in accordance with the Bar Date Order.  As of the Effective Date, any General Unsecured Claim or Interest asserted in a currency other than U.S. dollars and Mexican pesos shall be automatically deemed converted—by first converting any such General Unsecured Claim or Interest to Mexican pesos and then converting each such Claim from Mexican pesos to United States dollars—based on the applicable conversion rate in place on the Petition Date from *Banco de México* (The Central Bank of Mexico).

### Section 5.8.        Fractional Shares

Notwithstanding any other provision in this Plan to the contrary, no fractional shares of New Stock will be issued or distributed under this Plan.  The actual distribution of shares of New Stock on the applicable Distribution Date will be rounded to the next higher or lower whole number as follows: (i) fractions less than one-half (½) shall be rounded to the next lower whole number and (ii) fractions equal to or greater than one-half (½) shall be rounded to the next higher whole number.  If two or more Holders are entitled to equal fractional entitlements and the number of Holders so entitled exceeds the number of whole shares, as the case may be, which remain to be allocated, the Debtors shall allocate the remaining whole shares to such Holders by random lot or such other impartial method as the Debtors deem fair, in the Debtors' sole discretion. No consideration will be provided in lieu of fractional shares that are rounded down. Upon the allocation of all of the whole New Stock authorized under this Plan, all remaining fractional portions of the entitlements shall be canceled and shall be of no further force and effect.

### Section 5.9.        Undeliverable Distributions and Unclaimed Property

If any Plan Distribution is returned as undeliverable or is otherwise unclaimed, no further distributions to the applicable Holder of an Allowed Claim or Allowed Interest shall be made unless and until the Disbursing Agent or appropriate Servicer is notified in writing of such Holder's then-current address, at which time the undelivered distribution shall be made to such Holder without interest or dividends.  Undeliverable distributions shall be returned to the Reorganized Debtors until such distributions are claimed.  Any Holder of an Allowed Claim or

Allowed Interest that does not claim an undeliverable or unclaimed distribution within 90 calendar days after the date such distribution was returned undeliverable shall be deemed to have forfeited its Claim or Interest for such undeliverable or unclaimed distribution and shall be forever barred and enjoined from asserting any such Claim or Interest for an undeliverable or unclaimed distribution against the Debtors, the Reorganized Debtors, the Disbursing Agent and each of the foregoing's respective agents, attorneys, representatives, employees or independent contractors and/or any of its or their property. Nothing contained in the Plan shall require the Reorganized Debtors or the Disbursing Agent to attempt to locate any Holder of an Allowed Claim or Allowed Interest.

All title to and all beneficial interests in the Cash relating to such undeliverable or unclaimed distribution, including any dividends or interest attributable thereto, shall automatically revert to the Reorganized Debtors. The reversion of such Cash shall be without need for a further order by the Bankruptcy Court and shall be free of any restrictions thereon notwithstanding any federal or state escheat laws to the contrary.

Any Plan Distribution of New Stock under this Plan on account of an Allowed Claim or Allowed Interest relating to such undeliverable or unclaimed distribution shall be deemed forfeited and such New Stock shall be canceled notwithstanding any state, federal, foreign or other escheat or similar laws to the contrary without need for a further order by the Bankruptcy Court, and the entitlement by the Holder of such unclaimed Allowed Claim to such Plan Distribution or any subsequent Plan Distribution on account of such Allowed Claim shall be extinguished and forever barred.

**Section 5.10.    Claims Paid or Payable by Third Parties**

**(a)    Claims Paid by Third Parties.**

To the extent a Holder of a Claim receives a distribution on account of a Claim and also receives payment (before or after the Effective Date) from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within 30 calendar days of receipt thereof, repay and/or return the distribution to the Reorganized Debtors, to the extent such Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of the Claim as of the date of any such distribution under the Plan.

The Claims and Solicitation Agent shall reduce in full or part a Claim on the official claims register, without a claims objection having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court, to the extent that such Holder receives payment on account of such Claim from a party that is not a Debtor or a Reorganized Debtor; *provided, however,* that to the extent the non-Debtor party rendering the payment is subrogated to such Holder's Claim, the non-Debtor party shall have a [30]-calendar-day grace period from the date of payment to notify the Claims and Solicitation Agent of such subrogation rights.

**(b)    Claims Payable by Third Parties.**

To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately

upon such insurers' agreement, such Claim may be expunged (to the extent of any agreed-upon satisfaction) on the official claims register by the Claims and Solicitation Agent without a claims objection having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court.

### Section 5.11.    Setoffs and Recoupments

The Debtors and Reorganized Debtors may, but shall not be required to, setoff or recoup against any Claim and any distribution to be made on account of such Claim, any and all claims, rights and Causes of Action of any nature whatsoever (to the extent permitted by applicable law) that the Debtors may have against the Holder of such Claim pursuant to the Bankruptcy Code or applicable non-bankruptcy law; *provided*, *however*, that neither the failure to effect such a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver, abandonment or release by the Debtors or the Reorganized Debtors of any such claims, rights and Causes of Action that the Debtors or the Reorganized Debtors may have against the Holder of such Claim.

### Section 5.12.    Withholding and Reporting Requirements

**(a)  Withholding Rights**. In connection with the Plan, to the extent applicable, the Reorganized Debtors and the Disbursing Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. All Holders of Claims or Interests shall be required to provide any information necessary to allow the Reorganized Debtors and the Disbursing Agent to comply with all withholding, payment and reporting requirements with respect to such taxes. The Reorganized Debtors and the Disbursing Agent reserve the right to withhold the full amount required by law on any distribution on account of any Holder of an Allowed Claim or an Allowed Interest that fails to timely provide to the Reorganized Debtors and the Disbursing Agent the required information. The Reorganized Debtors reserve the right to allocate all Plan Distributions in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, liens and encumbrances. For the avoidance of doubt, any amounts withheld pursuant to this Section 5.12 shall be treated as if distributed to the Holder of the Allowed Claim or Allowed Interest.

**(b)  Obligation**.  Notwithstanding the above, each Holder of an Allowed Claim or Allowed Interest that is to receive a Plan Distribution shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such Holder by any Governmental Unit, including income, withholding and other tax obligations, on account of such Plan Distribution.

**ARTICLE VI   DISPUTED CLAIMS OR INTERESTS**

**Section 6.1.        Objections to Claims or Interests**

(a)    After the Effective Date, except as otherwise provided in the Plan, objections to Claims against or Interests in the Debtors may be interposed and prosecuted only by the Reorganized Debtors; *provided*, *however*, that the Reorganized Debtors shall not be entitled to object to any Claim or Interest that has been expressly allowed by Final Order or under the Plan.  Except as otherwise provided in Article II of the Plan with respect to Administrative Expense Claims, any objections to Claims or Interests shall be served on the respective Holders of such Claims or Interests and filed with the Bankruptcy Court (a) on or before [one year] following the later of (i) the Effective Date and (ii) the date that a Proof of Claim is filed or amended or a Claim or Interest is otherwise asserted or amended in writing by or on behalf of a Holder of such Claim or Interest or (b) on such later date as may be fixed by the Bankruptcy Court.  For the avoidance of doubt, except as otherwise provided in the Plan, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest.

(b)    Any Claims filed after the applicable Bar Date (including, for the avoidance of doubt and without limitation, the Administrative Bar Date) shall be Disallowed and forever barred, estopped and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any further notice to, or action, order or approval of, the Bankruptcy Court.

(c)    Claims or Interest objections filed before, on or after the Effective Date shall be filed, served and administered in accordance with the Claims Objection and Settlement Procedures Order, which shall remain in full force and effect; *provided*, *however*, that, on and after the Effective Date, filings and notices need only be served on the relevant claimants and otherwise as required by the Case Management Order.

**Section 6.2.        Resolution of Disputed Claims or Interests**

On and after the Effective Date, the Reorganized Debtors shall have the authority to compromise, settle, otherwise resolve or withdraw any objections to Claims or Interests and to compromise, settle or otherwise resolve any Disputed Claims or Interests without notice to or approval by the Bankruptcy Court or any other party; [*provided* that any such compromise, settlement, resolution or withdrawal with respect to any General Unsecured Claim that is not an Unsecured Convenience Class Claim shall be reasonably acceptable to the Post-Effective Date Committee] and consistent with the terms of the Claims Objection and Settlement Procedures Order or the Approval Order.

**Section 6.3.        Estimation of Claims**

[The Debtors (before the Effective Date) or the Reorganized Debtors (on or after the Effective Date, [and in consultation with the Post-Effective Date Committee]) may determine, resolve and otherwise adjudicate Contingent Claims, Unliquidated Claims and Disputed Claims in the Bankruptcy Court or such other court of the Debtors' choice having jurisdiction over the validity, nature or amount thereof.  The Debtors (before the Effective Date) or the Reorganized

Debtors (on or after the Effective Date, [and in consultation with the Post-Effective Date Committee]), at any time request that the Bankruptcy Court estimate any Contingent Claim, Unliquidated Claim or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code for any reason or purpose, regardless of whether an objection was previously filed with the Bankruptcy Court with respect to such Claim, or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any such Claim, including, without limitation, during the pendency of any appeal relating to any such objection.]   In the event that the Bankruptcy Court estimates any Contingent Claim, Unliquidated Claim or Disputed Claim, such estimated amount shall constitute either the Allowed amount of such Claim, the amount used to determine the Disputed Claims Reserves or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If such estimated amount constitutes a maximum limitation on such Claim, the Debtors (before the Effective Date) or Reorganized Debtors (on or after the Effective Date, [and in consultation with the Post-Effective Date Committee]), may elect to pursue any supplemental proceeding to object to any ultimate distribution on account of such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such Claim unless the Holder of such Claim has filed a motion requesting the right to seek such reconsideration on or before 20 calendar days after the date such Claim is estimated by the Bankruptcy Court.

**Section 6.4.        Payments and Distributions with Respect to Disputed Claims or Interests**

(a)   **No Distributions Pending Allowance**.  Notwithstanding any other provision in the Plan, no payments or distributions shall be made with respect to a Disputed Claim or Interest unless and until all objections to such Disputed Claim or Interest have been settled or withdrawn or have been determined by a Final Order, and the Disputed Claim or Interest has become an Allowed Claim or Allowed Interest.

(b)   **No Postpetition Interest or Penalties on Disputed Claims**.  Interest and penalties shall not accrue or be paid upon any Disputed Claim with respect to the period from the Effective Date to the date a Plan Distribution is made thereon, if and when such Disputed Claim becomes an Allowed Claim.

(c)   **Disputed Claims Reserves.**

[On or before the Effective Date, the Reorganized Debtors shall [be authorized, but not directed, to] establish one or more Disputed Claims Reserves, which Disputed Claims Reserves shall be administered by the Reorganized Debtors, to the extent applicable.  The Reorganized Debtors may, [with the consent of the Post-Effective Date Committee], hold New Stock and Cash, in the same proportions and amounts as provided for in the Plan, in any Disputed Claims Reserve in trust for the benefit of Holders of Claims or Interests ultimately determined to be Allowed after the Effective Date.  The Reorganized Debtors shall distribute such amounts (net of any expenses, including any taxes relating thereto), as provided herein, as such Claims or Interests are resolved by a Final Order or agreed to by settlement in accordance with Section 6.2 hereof, and such amounts will be distributable on account of such Claims or Interests as such

56

amounts would have been distributable had such Claims or Interests been Allowed Claims or Allowed Interests, respectively, as of the Effective Date under Article III of the Plan solely to the extent of the amounts available in the applicable Disputed Claims Reserve.]

[For federal income tax purposes, absent definitive guidance from the IRS or a contrary determination by a court of competent jurisdiction, the Disbursing Agent shall (i) treat each Disputed Claims Reserve as a discrete trust for federal income tax purposes (which trust may consist of separate and independent shares) in accordance with the trust provisions of the Internal Revenue Code (section 641, *et seq.*) and (ii) to the extent permitted by applicable law, report consistently with the foregoing characterization for state and local income tax purposes. All Holders of Disputed Claims shall report, for income tax purposes, consistently with the foregoing.]

**(d)    Distributions after Allowance.**

To the extent that a Disputed Claim or Interest becomes an Allowed Claim or Interest after the Effective Date, the Disbursing Agent will, out of the relevant Disputed Claims Reserve, distribute to the Holder thereof the distribution, if any, to which such Holder is entitled under the Plan in accordance with Section 5.3(a) of this Plan. Subject to this Plan, all distributions made under this paragraph (d) on account of Allowed Claims or Allowed Interests will be made together with any dividends, payments or other distributions made on account of, as well as any obligations arising from, the distributed property, then held in the relevant Disputed Claims Reserve as if such Allowed Claim or Allowed Interest had been an Allowed Claim or Allowed Interest on the dates distributions were previously made to Holders of Allowed Claims or Allowed Interests included in the applicable class.

**Section 6.5.    No Amendments to Claims**

A Claim may be amended prior to the Confirmation Date only as agreed upon by the Debtors and the Holder of such Claim or as otherwise permitted by the Bankruptcy Court, the Bankruptcy Rules or applicable non-bankruptcy law. On or after the Confirmation Date, the Holder of a Claim (other than a Professional Fee Claim) must obtain prior authorization from the Bankruptcy Court or the Debtors to file or amend a Claim. [Any new or amended Claim (other than Claims filed by the Rejection Damages Bar Date that are related to Executory Contracts or Unexpired Leases rejected pursuant to this Plan or an order of the Bankruptcy Court) filed after the Confirmation Date without such prior authorization will not appear on the register of claims maintained by the Claims and Solicitation Agent and will be deemed Disallowed in full and expunged without any action required of the Debtors or the Reorganized Debtors and without the need for any court order.]

## ARTICLE VII  EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**Section 7.1.        Assumption and Rejection of Executory Contracts and Unexpired Leases**

(a)    As of and subject to the occurrence of the Effective Date, all Executory Contracts and Unexpired Leases to which any Debtor is a party shall be deemed assumed by the applicable Debtor, except for any Executory Contract or Unexpired Lease that (i) has previously been assumed or rejected pursuant to a Final Order of the Bankruptcy Court, (ii) is specifically identified on the Schedule of Rejected Contracts, (iii) is the subject of a separate assumption or rejection motion filed by the Debtors under section 365 of the Bankruptcy Code pending on the Effective Date, (iv) is the subject of a Contract Dispute pending on the Effective Date, (v) has previously expired or terminated pursuant to its own terms, or (vi) is being otherwise treated pursuant to the Plan. The Debtors reserve the right to modify the treatment of any particular Executory Contract or Unexpired Lease pursuant to the Plan. Furthermore, notwithstanding anything to the contrary in the Plan, the Debtors may alter, amend, modify or supplement the Schedule of Rejected Contracts and assume, assume and assign or reject Executory Contracts and Unexpired Leases at any time prior to the Effective Date or, with respect to any Executory Contract or Unexpired Lease subject to a Contract Dispute that is resolved after the Effective Date, within 30 days following entry of a Final Order of the Bankruptcy Court resolving such Contract Dispute.

(b)    Subject to the occurrence of the Effective Date, the payment of any applicable Cure Amount and the resolution of any Contract Dispute, the entry of the Confirmation Order shall constitute approval of the rejections, assumptions and assumptions and assignments provided for in this Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Unless otherwise indicated herein or provided in a separate order of the Bankruptcy Court, rejections, assumptions and assumptions and assignments of Executory Contracts and Unexpired Leases pursuant to this Plan are effective as of the Effective Date.  Each Executory Contract and Unexpired Lease assumed pursuant to this Plan or by order of the Bankruptcy Court shall vest in and be fully enforceable by the applicable Debtor, in each case in accordance with its terms, except as modified by the provisions of this Plan, any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law.

(c)    Unless otherwise provided herein or by separate order of the Bankruptcy Court, each Executory Contract or Unexpired Lease that is assumed or assumed and assigned shall include any and all modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affects such Executory Contract or Unexpired Lease, without regard to whether such agreement, instrument or other document is listed in an Assumption Notice.

**Section 7.2.        Determination of Contract Disputes and Deemed Consent**

(a)    The Debtors shall serve Assumption Notices in accordance with the Approval Order. If a counterparty to an Executory Contract or Unexpired Lease receives an Assumption Notice, but such Executory Contract or Unexpired Lease is not listed therein, or does not receive

58

such a notice, the proposed Cure Amount for such Executory Contract or Unexpired Lease shall be deemed to be zero dollars ($0).

(b)    Any counterparty to an Executory Contract or Unexpired Lease shall have the time prescribed in the Approval Order to object to (i) the Cure Amount identified on the Assumption Notice, (ii) the ability of the applicable Debtor or its assignee to provide adequate assurance of future performance (within the meaning of section 365 of the Bankruptcy Code) and (iii) any other matter pertaining to assumption or assumption and assignment of such Executory Contract or Unexpired Lease on the terms set forth in the Plan and such Assumption Notice.

(c)    To the extent a Contract Dispute is asserted in an objection filed in accordance with the procedures set forth in the Assumption Notice, such Contract Dispute shall be heard by the Bankruptcy Court [at the Confirmation Hearing]. Following resolution of a Contract Dispute by Final Order of the Bankruptcy Court, or agreement by the Debtors or the Reorganized Debtors, as applicable, and the applicable contract counterparty, the applicable Executory Contract or Unexpired Lease shall be deemed assumed or assumed and assigned effective as of the Effective Date, subject to the Debtors' right to reject such Executory Contract or Unexpired Lease at any time prior to the Effective Date or, if any Contract Dispute is resolved after the Effective Date, within 30 days following entry of such Final Order of the Bankruptcy Court resolving the applicable Contract Dispute.

(d)    To the extent a Contract Dispute has not been resolved prior to the Effective Date, the Debtors shall establish the Disputed Claims Reserve. Any amounts in the Disputed Claims Reserve remaining after the resolution of all Disputed Claims [and the payment of all Cure Amounts with respect to Allowed Cure Claims for contracts and leases to be assumed or assumed and assigned shall be applied in accordance with Section [•] of the Plan].

(e)    To the extent an objection is not timely filed and properly served on the Debtors with respect to a Contract Dispute, then the counterparty to the applicable contract or lease shall be deemed to have assented to (i) the Cure Amount proposed by the Debtors and (ii) the assumption or assumption and assignment of such contract or lease on the terms set forth in the Plan and the Assumption Notice, notwithstanding any provision of the applicable contract or lease that (A) prohibits, restricts or conditions the transfer or assignment of such contract or lease or (B) terminates or permits the termination of such contract or lease as a result of any direct or indirect transfer or assignment of the rights of the Debtors under such contract or lease or a change in the ownership or control as contemplated by the Plan, and shall forever be barred and enjoined from asserting such objection against the Debtors or terminating or modifying such contract or lease on account of transactions contemplated by the Plan.

(f)    With respect to payment of any Cure Amounts or resolution of Contract Disputes, the Debtors shall not have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable Executory Contract or Unexpired Lease, even if such non-Debtor party has sold, assigned or otherwise transferred its Cure Claim.

**Section 7.3.**     **Payments Related to Assumption of Contracts and Leases**

**(a)**   Subject to resolution of any Contract Dispute, any Cure Claim shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, from the Disputed Claims Reserve or in the ordinary course of business upon assumption thereof.

**(b)**   Assumption or assumption and assignment of any Executory Contract or Unexpired Lease pursuant to the Plan, or otherwise, shall result in the full release and satisfaction of any Claims or defaults, subject to satisfaction of the Cure Amount, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the effective date of assumption or assumption and assignment. Any Proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed Disallowed and expunged, without further notice, or action, order or approval of the Bankruptcy Court or any other Person.

**Section 7.4.**     **Rejection Claims**

In the event that the rejection of an Executory Contract or Unexpired Lease by any of the Debtors herein results in damages to the other party or parties to such contract or lease, any Claim for such damages shall be forever barred and shall not be enforceable against the Debtors or their Estates, properties or interests in property, unless a Proof of Claim is filed with the Bankruptcy Court and served upon the Debtors no later than 30 days after the entry of the order of the Bankruptcy Court (including the Confirmation Order) authorizing the rejection of such Executory Contract or Unexpired Lease. Any such Claim shall be classified in accordance with the classification of Claims set forth in Article III of the Plan. The Confirmation Order shall constitute the Bankruptcy Court's authorization of the rejection of all the leases and contracts identified in the Schedule of Rejected Contracts, subject to the rights of the Debtors or Reorganized Debtors to modify or amend such schedule pursuant to the terms of Section 7.2.

**Section 7.5.**     **Delta Contracts**

All Executory Contracts and Unexpired Leases between Delta (and any of its subsidiaries or affiliates) and any of the Debtors (including any amendments, supplements or other modifications thereto through the Effective Date), shall be deemed automatically assumed by the applicable Debtor Entity on the Effective Date.  In exchange for the assumption, amendment and extension of all such agreements, as mutually agreed to by Delta and the Debtors, to the extent applicable, which will require the continuation of the scope and level of support services provided by Delta (and any of its subsidiaries or affiliates) under such agreements or otherwise, currently provided in connection with the Delta JCA, Delta shall receive the Delta Contract Amendment Fee.  The New Stock issued on account of the Delta Contract Amendment Fee shall not dilute any New Stock issued on account of the Equity Financing.

**Section 7.6.**     **Club Premier Agreements**

Pursuant to and in accordance with section 365 of the Bankruptcy Code, on the Effective Date, and concurrent with the PLM Stock Participation Transaction, the Reorganized Debtors

shall assume the Club Premier Agreements. Other than the Reorganized Debtors' assumption of the Club Premier Agreements, consummation of the PLM Stock Participation Transaction, and/or as provided in the PLM Stock Participation Transaction Agreement, the Club Premier Agreements shall otherwise remain unaffected by the Chapter 11 Cases. Upon the Effective Date, the Debtors shall pay $0.00 to PLM in satisfaction of the Debtors' obligation to cure any defaults under the Club Premier Agreements in accordance with section 365(b)(1)(A) of the Bankruptcy Code.

Section 7.7.        **Restructured Collective Labor Agreements**

The Collective Bargaining Agreements, which contain new labor conditions with ASPA, ASSA, STIA and Independencia shall be deemed automatically assumed by the applicable Debtor Entity on the Effective Date pursuant to the terms of the Bankruptcy Protection Covenant and the Labor Conditions Order.

Section 7.8.        **[RESERVED]**

Section 7.9.        **Employee-Related Agreements**

Except as otherwise provided in the Plan, on and after the Effective Date, subject to any Final Order and, without limiting any authority provided to the New Board under the Reorganized Debtors' respective formation and constituent documents, the Reorganized Debtors shall: (a) amend, adopt, assume and/or honor in the ordinary course of business any contracts, agreements, policies, programs and plans, in accordance with their respective terms, for, among other things, compensation, including any incentive plans (but not equity or equity based compensation plans), retention plans, health care benefits, disability benefits, deferred compensation benefits, savings, severance benefits, retirement benefits, welfare benefits, workers' compensation insurance, and accidental death and dismemberment insurance for the directors, officers and employees of any of the Debtors who served in such capacity from and after the Petition Date and (b) honor, in the ordinary course of business, Claims of employees employed as of the Effective Date for accrued vacation time arising prior to the Petition Date and not otherwise paid pursuant to a Bankruptcy Court order. Pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

Section 7.10.      **Customer Programs**

Except as otherwise provided in the Plan, the Debtors and the Reorganized Debtors, in their sole and absolute discretion, may honor, in the ordinary course of business, all of the Debtors' customer and loyalty programs, travel credit programs, charter sales program, leisure sales programs, barter arrangements, corporate incentive programs, alternative ticket arrangements or vouchers, cash refunds or cargo programs, including, without limitation, as authorized by the Supplemental Customer Programs Order, as such programs may be amended from time to time. All Proofs of Claim filed on account of any benefits under such programs (including Proofs of Claims filed on account of ticket refunds, ticket vouchers, and similar programs authorized to continue by the Supplemental Customer Programs Order) shall be

61

deemed withdrawn, Disallowed, and forever barred from assertion automatically and without any further notice to or action, order or approval of the Bankruptcy Court.

### Section 7.11.    Indemnification Provisions

On and as of the Effective Date, the Indemnification Obligations will be assumed and irrevocable and will survive the effectiveness of the Plan, and the Reorganized Debtors' New Corporate Governance Documents will provide for the indemnification, defense, reimbursement, exculpation and/or limitation of liability of, and advancement of fees and expenses to, the Debtors' and the Reorganized Debtors' current and former directors, officers, employees and agents to the fullest extent permitted by law and at least to the same extent as the organizational documents of each of the respective Debtors on the Petition Date, against any claims or Causes of Action whether direct or derivative, liquidated or unliquidated, fixed or contingent, Disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted occurring before the Effective Date. None of the Debtors, or the Reorganized Debtors, as applicable, will amend and/or restate their respective governance documents before or after the Effective Date to amend, augment, terminate or adversely affect any of the Debtors' or the Reorganized Debtors' obligations to provide such indemnification rights or such directors', officers', employees', equityholders' or agents' indemnification rights.

On and as of the Effective Date, any of the Debtors' Indemnification Obligations with respect to any contract or agreement that is the subject of or related to any litigation against the Debtors or Reorganized Debtors, as applicable, shall be assumed by the Reorganized Debtors and otherwise remain unaffected by the Chapter 11 Cases.

### Section 7.12.    Insurance Policies

Each of the Debtors' Insurance Policies, and any agreements, documents or instruments relating thereto, are treated as Executory Contracts under the Plan.  On the Effective Date, the Debtors shall be deemed to have assumed all Insurance Policies and any agreements, documents and instruments relating to coverage of all insured Claims. Except as set forth in Section 7.12 of the Plan, nothing in the Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order or any other order of the Bankruptcy Court (including any other provision that purports to be preemptory or supervening), (a) alters, modifies or otherwise amends the terms and conditions of (or the coverage provided by) any of such Insurance Policies or (b) alters or modifies the duty, if any, that the insurers or third-party administrators pay Claims covered by such Insurance Policies and their right to seek payment or reimbursement from the Debtors (or after the Effective Date, the Reorganized Debtors) or draw on any collateral or security therefor. For the avoidance of doubt, insurers and third-party administrators shall not need to nor be required to file or serve a cure objection or a request, application, Claim, Proof of Claim or motion for payment and shall not be subject to any claims bar date or similar deadline governing cure amounts or Claims.

### Section 7.13.    [Director, Officer, Manager and Employee Liability Insurance]

[On the Effective Date, pursuant to section 365(a) of the Bankruptcy Code, the Debtors shall be deemed to have assumed all of the D&O Liability Insurance Policies and any

agreements, documents, or instruments relating thereto.  Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' assumption of all such policies (including, if applicable, any "tail policy").]

[After the Effective Date, except as authorized by the New Board (provided, the New Board shall not reduce coverage under any "tail policy"), none of the Debtors or the Reorganized Debtors shall terminate or otherwise reduce the coverage under any such policies (including, if applicable, any "tail policy") with respect to conduct occurring as of the Effective Date, and all officers, directors, managers and employees of the Debtors who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of any such policies regardless of whether such officers, directors, managers or employees remain in such positions after the Effective Date. Directors and officers shall be exculpated and indemnified by the Debtors and Reorganized Debtors to the extent of such insurance.]

[On and after the Effective Date, upon approval of the New Board, each of the Reorganized Debtors shall be authorized to purchase, at their sole discretion and pursuant to their business judgment and ordinary course of business, any and all directors' and officers' liability insurance policy for the benefit of their respective directors, members, trustees, officers and managers in the ordinary course of business.]

### Section 7.14.    Reservation of Rights

(a)    Neither the exclusion nor the inclusion by the Debtors of any contract or lease on any exhibit, schedule or other annex to this Plan or in the Plan Supplement, nor anything contained in this Plan, shall constitute an admission by the Debtors that any such contract or lease is or is not an Executory Contract or Unexpired Lease or that the Debtors have any liability thereunder.

(b)    Except as explicitly provided in this Plan, nothing herein shall waive, excuse, limit, diminish or otherwise alter any of the defenses, Claims, Causes of Action or other rights of the Debtors under any Executory Contract or non-Executory Contract or Unexpired Lease.

(c)    Nothing in this Plan shall increase, augment or add to any of the duties, obligations, responsibilities or liabilities of the Debtors under any Executory Contract or non-Executory Contract or Unexpired Lease or expired lease.

(d)    If there is a dispute regarding whether a contract or lease is or was an Executory Contract or Unexpired Lease at the time of its assumption under this Plan, the Debtors shall have 30 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

**ARTICLE VIII        EFFECT OF CONFIRMATION**

**Section 8.1.        Compromise and Settlement of Claims, Interests and Controversies**

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests and controversies relating to the contractual, legal and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Allowed Interest, or any distribution to be made on account of such Allowed Claim or Allowed Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of this and all other such Claims, Interests and controversies, as well as a finding by the Bankruptcy Court that such compromises or settlements are in the best interest of the Debtors, their Estates and Holders of Claims and Interests and are fair, equitable and reasonable. In accordance with the provisions of the Plan and, to the extent applicable, pursuant to Bankruptcy Rule 9019, without any further notice to, or action, order or approval of, the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against, and Interests in, the Debtors and their Estates and Causes of Action against other Entities.

**Section 8.2.        Binding Effect**

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, and subject to the occurrence of the Effective Date, on and after the entry of the Confirmation Order, the provisions of this Plan and any transactions contemplated hereunder shall bind every Holder of a Claim against or interest in any Debtor and inure to the benefit of, and be binding on, such Holder's respective successors and assigns, regardless of whether the Claim or interest of such Holder is Impaired under this Plan or whether such Holder has accepted this Plan.

On the Effective Date, any Holder of a Claim or interest that is entitled to receive or who receives a Plan Distribution shall be deemed to have waived all rights and remedies under any non-U.S. jurisdiction's laws (including, without limitation, Mexican law) to receive any further distributions or recoveries for such Claim or interest, and such Plan Distribution shall be the sole distribution that such Holder shall receive in any jurisdiction on account of such Claim or interest, which shall be deemed as fully paid to the fullest extent permitted by any applicable law, including Mexican law.

**Section 8.3.        Vesting of Assets**

Except as otherwise provided in the Plan or the Plan Supplement, or in any agreement, instrument or other document incorporated in the Plan, on the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property in each Debtor's Estate, all Causes of Action, and any property acquired by any of the Debtors under the Plan, the Equity Financing, the Debt Financing and/or Statutory Equity Rights Offering or the PLM Stock Participation Transaction, shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances as set forth in Section 8.4. On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its

business and may use, acquire or dispose of property without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

### Section 8.4.    Release of Liens

[Except (i) with respect to Liens securing obligations under (a) the New First Lien Notes, (b) the [Receivables Facilities], (c) the Secured CEBURES and (d) the [Aircraft Financings], or (ii) as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document created pursuant to the Plan or the Confirmation Order, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date in accordance with the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, discharged and compromised, without any further approval or order of the Bankruptcy Court and without any action or filing being required to be made by the Debtors or the Reorganized Debtors, as applicable, (except for any filing, registration or submission before any Governmental agency, dependency or authority, as the case may be, but always under the authority to release Liens herein granted) and all rights, titles and Interests of any Holder of such mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estates shall revert to the Reorganized Debtors and their successors and assigns.  The Reorganized Debtors shall be authorized to file any necessary or desirable documents to evidence such release in the name of the party secured by such pre-Effective Date mortgages, deeds of trust, Liens, pledges or other security interests.]

### Section 8.5.    Releases

The releases of Claims and Causes of Action described in the Plan, including releases by the Debtors and by Holders of Claims or Interests, constitute good faith compromises and settlements of the matters covered thereby and are consensual.  Such compromises and settlements are made in exchange for consideration and are in the best interest of Holders of Claims or Interests, are fair, equitable, reasonable and are integral elements of the resolution of the Chapter 11 Cases in accordance with the Plan.  Each of the release, indemnification and exculpation provisions set forth in the Plan (a) is within the jurisdiction of the Bankruptcy Court under sections 1334(a), 1334(b) and 1334(e) of title 28 of the United States Code, (b) is an essential means of implementing the Plan, (c) is an integral and non-severable element of the transactions incorporated into the Plan, (d) confers a material benefit on, and is in the best interests of, the Debtors, their Estates and their Creditors, (e) is important to the overall objectives of the Plan to finally resolve all Claims among or against the parties in interest in the Chapter 11 Cases with respect to the Debtors, (f) is fair, equitable and reasonable and in exchange for good and valuable consideration, and (g) is consistent with sections 105, 1123, 1129 and other applicable provisions of the Bankruptcy Code.

### Section 8.6.    Release by the Debtors

**As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties before and during the Chapter 11 Cases to facilitate the reorganization of the Debtors and**

the implementation of the Restructuring Transactions, and except as otherwise explicitly provided in the Plan or in the Confirmation Order, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably and forever released, to the maximum extent permitted by law, as such law may be extended subsequent to the Effective Date, by the Debtors and the Estates from any and all Claims, counterclaims, disputes, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, Liens, remedies, losses, contributions, indemnities, costs, liabilities, attorneys' fees and expenses whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors or their Estates (including any Causes of Action arising under chapter 5 of the Bankruptcy Code), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that the Debtors or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against or Interest in the Debtors or on behalf of any other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (as such entities existed prior to or after the Petition Date), their Estates, the Chapter 11 Cases, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements or interactions between any Debtor and any Released Party (including the exercise of any common law or contractual rights of setoff or recoupment by any Released Party at any time on or prior to the Effective Date), the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the Disclosure Statement, the Plan, the DIP Facility, the Subscription Agreement, the Equity Financing Commitment Letter, the Debt Financing Commitment Letter, the exit financing process, the preparation and delivery of the Initial Valuation Materials and the Final Valuation Materials; the Restructuring Transactions, the PLM Stock Participation Transaction, the Equity Financing, the Statutory Equity Rights Offering, the Debt Financing, and related agreements, instruments and other documents, and the negotiation, formulation, preparation or implementation thereof, the solicitation of votes with respect to the Plan, or any other act or omission in any way relating to any of the foregoing, in each case, arising on or prior to the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that is determined in a final order to have constituted willful misconduct (including, without limitation, actual fraud) or gross negligence.

Notwithstanding anything herein to the contrary, (i) nothing in the Plan shall release any (A) Retained Causes of Action listed on the Schedule of Retained Causes of Action, [(B) any Claims or Causes of Action that may be asserted against any Excluded Party] or (C) any Claims or Causes of Action against any Holder of a Claim against a Debtor to the extent necessary for the administration and resolution of such Claim in accordance with the Plan and (ii) nothing in this Section 8.6 shall be construed to impair in any way the Effective Date or post-Effective Date rights and obligations of any Person under the Plan, the Plan Documents, the Confirmation Order or the Restructuring Transactions.

**Section 8.7.        Voluntary Releases by the Releasing Parties**

Except as otherwise provided in the Plan, on and after the Effective Date, each of the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably and forever released, to the maximum extent permitted by law, as such law may be extended subsequent to the Effective Date, except as otherwise explicitly provided herein, by the Releasing Parties from any and all Claims, counterclaims, disputes, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, Liens, remedies, losses, contributions, indemnities, costs, liabilities, attorneys' fees and expenses, in each case, of any kind, character or nature whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors or their Estates (including any Causes of Action arising under chapter 5 of the Bankruptcy Code), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that any Releasing Party or any other Persons or parties claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Releasing Party or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (as such entities existed prior to or after the Petition Date), their Estates, the Chapter 11 Cases, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements or interactions between any Debtor and any Released Party (including the exercise of any common law or contractual rights of setoff or recoupment by any Released Party at any time on or prior to the Effective Date), the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the Disclosure Statement, the Plan, the DIP Facility, the Subscription Agreement, the Equity Financing Commitment Letter, the Debt Financing Commitment Letter, the exit financing process, the preparation and delivery of the Initial Valuation Materials and the Final Valuation Materials; the Restructuring Transactions, the PLM Stock Participation Transaction, the Statutory Equity Rights Offering, the Equity Financing, the Debt Financing, and related agreements, instruments and other documents, and the negotiation, formulation, preparation or implementation thereof, the solicitation of votes with respect to the Plan, or any other act or omission in any way relating to any of the foregoing, in each case, arising on or prior to the Effective Date, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that is determined in a final order to have constituted willful misconduct (including, without limitation, actual fraud) or gross negligence.

Notwithstanding anything herein to the contrary, (i) nothing in the Plan shall release any (A) Retained Causes of Action listed on the Schedule of Retained Causes of Action, [(B) any Claims or Causes of Action that may be asserted against any Excluded Party] or (C) any Claims or Causes of Action against any Holder of a Claim against a Debtor to the extent necessary for the administration and resolution of such Claim against the Debtor in accordance with the Plan; and (ii) nothing in this Section 8.7 shall be

67

construed to impair in any way the Effective Date or post-Effective Date rights and obligations of any Person under the Plan, the Plan Documents, the Confirmation Order or the Restructuring Transactions.

### Section 8.8.    Discharge of Claims and Termination of Interests

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, or in any contract, instrument or other agreement or document created or entered into pursuant to the Plan, the distributions, rights and treatment that are provided in the Plan shall be in complete satisfaction, discharge and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and interests in, the Debtors, Reorganized Debtors, their successors or assigns or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and interests, including demands, liabilities and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in section 502(g), 502(h) or 502(i) of the Bankruptcy Code, in each case whether or not: (a) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or interest based upon such debt, right or interest is Allowed pursuant to section 502 of the Bankruptcy Code; (c) the Holder of such a Claim or interest has accepted or rejected the Plan; or (d) the Holder of such a Claim or interest has failed to vote to accept or reject the Plan. The Confirmation Order shall be a judicial determination of the discharge of all Claims and interests subject to the occurrence of the Effective Date, except as otherwise specifically provided in the Plan or in any contract, instrument or other agreement or document created or entered into pursuant to the Plan. Except as otherwise provided herein, upon the Effective Date, all such Holders of Claims and interests shall be forever precluded and enjoined, pursuant to sections 105, 524 and 1141 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against, or terminated interest in, any Debtor or any property, wherever located, of the Estates.

The Plan shall bind all Holders of Claims and Interests notwithstanding whether any such Holders failed to vote to accept or reject the Plan.  The Ballots for Classes voting on the Plan shall provide that by signing the Ballot, the Claim or Interest Holder agrees (i) to waive any rights and claim against Grupo Aeroméxico and any of the other Debtors (directly or indirectly) after receiving their full Plan Distribution (if any) and agrees to not pursue any action or remedy in México or in any other non-U.S. jurisdiction in order to recover on such same Claim or Interest and/or to obtain additional distributions or recoveries for the same Claim or Interest following the receipt of its full Plan Distribution, and (ii) that the Plan Distribution (if any) provided to the undersigned is the sole Plan Distribution (if any) that the Claim or Interest Holder shall receive in any jurisdiction from the Debtors on account of their Claim or Interest.

Section 8.9.    Term of Injunction or Stays

Unless otherwise provided herein, all injunctions or stays provided in the Chapter 11 Cases arising prior to the Confirmation Date in accordance with sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

Section 8.10.    Exculpation

To the maximum extent permitted by applicable law, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from: any Claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, remedy, loss and liability for any Claim in connection with, related to, or arising out of, the administration of the Chapter 11 Cases; the negotiation and pursuit of the Disclosure Statement (including any information provided, or statements made, in the Disclosure Statement or omitted therefrom) and the solicitation of votes for, and confirmation of, the Plan; the funding of the Plan; the occurrence of the Effective Date; the DIP Facility, the Subscription Agreement, the Equity Financing Commitment Letter, the Debt Financing Commitment Letter, the exit financing process, preparation and delivery of the Initial Valuation Materials and the Final Valuation Materials; the administration of the Plan and the property to be distributed under the Plan; the Restructuring Transactions, the PLM Stock Participation Transaction, the Statutory Equity Rights Offering, the Equity Financing, the Debt Financing, and related agreements, instruments and other documents, and the negotiation, formulation, preparation or implementation thereof, and the transactions in furtherance of any of the foregoing, in each case other than Claims or Causes of Action arising out of, or related to, any act or omission of an Exculpated Party that is a criminal act or constitutes gross negligence or willful misconduct (including, without limitation, actual fraud).  This exculpation shall be in addition to, and not in limitation of, all other Releases, indemnities, exculpations and any other applicable law or rules protecting such Exculpated Parties from liability.  Notwithstanding anything herein to the contrary, nothing in the Plan shall release (a) any Claims or Causes of Action that may be asserted against any Excluded Party and/or (b) any post-Effective Date obligations of any Entity.

Section 8.11.    Plan Injunction

Effective as of the Effective Date, to the fullest extent permissible under applicable law, and except as otherwise expressly provided in the Plan or the Confirmation Order and except with respect to any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, the PLM Stock Participation Transaction, the Statutory Equity Rights Offering, the Equity Financing, the Debt Financing or any document, instrument or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, all Entities that have held, hold, or may hold Claims or interests that arose prior to the Effective Date and/or that have been released, discharged or are subject to exculpation under the Plan, along with each

69

of their respective Related Parties, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties or the Released Parties: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or interests; (b) enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order on account of, in connection with or with respect to any such Claims or interests; (c) creating, perfecting or enforcing any encumbrance of any kind against such entities or the property, interests in property, or the estates of such entities on account of, in connection with or with respect to any such Claims or interests; (d) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from such entities or against the property, interests in property or estates of such entities on account of, in connection with or with respect to any such Claims or interests unless such Holder has filed a motion requesting the right to perform such setoff, subrogation or recoupment on or before the Effective Date, and notwithstanding an indication of a Claim or interest or otherwise that such Holder asserts, has or intends to preserve any right of setoff, subrogation or recoupment pursuant to applicable law or otherwise.

### Section 8.12.    Injunction Related to Releases and Exculpation

To the maximum extent permitted under applicable law, the Confirmation Order shall permanently enjoin the commencement or prosecution by any Person, whether directly, derivatively or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses or liabilities released or exculpated pursuant to this Plan, including, without limitation, the Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities released or exculpated in this Plan under sections [8.5, 8.6, 8.7 and 8.10] [and the Claims, interests, Liens, other encumbrances or liabilities described in Sections 8.3 and 8.4 of the Plan.].

### Section 8.13.    Avoidance Actions

[On the Effective Date, the Reorganized Debtors shall be deemed to waive and release all avoidance and recovery actions other than those listed on the Schedule of Retained Causes of Action, *provided* that the Reorganized Debtors shall retain the right to assert such avoidance actions or recovery actions as defenses or counterclaims in any Cause of Action brought by any creditor. The Reorganized Debtors shall retain the right, after the Effective Date, to prosecute any of the avoidance or recovery actions listed on the Schedule of Retained Causes of Action.]

### Section 8.14.    Preservation of Causes of Action

In accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue any and all Causes of Action, whether arising before or after the Petition Date, and the Reorganized Debtors' rights to commence, prosecute or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, which shall be deemed released and waived by the Debtors and Reorganized Debtors as of the Effective Date. The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests

of the Reorganized Debtors. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against it. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity. Unless any Cause of Action against an Entity is expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or a final order of the Bankruptcy Court, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise) or laches, shall apply to such Causes of Action upon, after or as a consequence of the Confirmation or Effective Date.

### Section 8.15.    Ipso Facto and Similar Provisions Ineffective

Any term of any policy, contract or other obligation applicable to a Debtor shall be void and of no further force or effect with respect to any Debtor to the extent such policy, contract, or other obligation is conditioned on, creates an obligation of any Debtor as a result of, or gives rise to a right of any Person based on any of the following: (a) the insolvency or financial condition of a Debtor; (b) the commencement of the Chapter 11 Cases; (c) the confirmation or consummation of this Plan, including, without limitation, any change of control, assignment, or similar provision that shall occur as a result of such consummation; or (d) the Restructuring Transactions.

## ARTICLE IX   CONDITIONS PRECEDENT TO EFFECTIVENESS OF THE PLAN

### Section 9.1.    Conditions to Effectiveness

The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied or waived in accordance with Section 9.2 of the Plan.

(a)    the Confirmation Order shall have been entered by the Bankruptcy Court and shall not be subject to a stay nor have been rescinded, vacated or reversed on appeal;

(b)    the Debtors shall have obtained all authorizations, consents, corporate and regulatory approvals, rulings or documents that are necessary to implement and effectuate the Plan, implying that any and all corporate resolutions adopted by, or to be adopted by, the [New Board] and/or General Ordinary Shareholders Meeting of Reorganized Grupo Aeroméxico and any other Debtor, as the case may be, required to effectively implement the Plan, have become effective or will become effective at the Effective Date;

(c)    all Professional Fee Claims required to be approved by the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date shall have been placed in the Professional Fee Escrow Account pending approval by the Bankruptcy Court;

(d)    the conditions to closing under the Subscription Agreement, including the payment of the Equity Commitment Party Expense Reimbursement owed or estimated to be owed as of the Effective Date, shall have been satisfied or waived in accordance with the terms thereof, and the transactions contemplated by the Subscription Agreement shall have been consummated;

(e)    the conditions to closing under the Debt Financing Commitment Letter, the New First Lien Notes Indenture [and the New First Lien Purchase Agreement], including the payment of the Debt Commitment Party Expense Reimbursement owed or estimated to be owed as of the Effective Date, shall have been satisfied or waived in accordance with the terms thereof, and the transactions contemplated by the Debt Financing Commitment Letter, the New First Lien Notes Indenture [and the New First Lien Purchase Agreement] shall have been consummated;

(f)    the Plan Documents shall have been approved or accepted by all applicable Persons in accordance with the respective consent rights under the Plan, the Subscription Agreement and the Debt Financing Commitment Letter, and shall have been filed, executed and delivered, as applicable, and the conditions precedent contained therein shall have been satisfied or waived in accordance with the terms thereof, except with respect to such conditions that by their terms shall be satisfied substantially simultaneously with or after consummation of the Plan;

(g)    all amendments, supplements or other modifications necessary or required to be entered into with respect to any Executory Contracts and Unexpired Leases between Delta (and any of its subsidiaries or affiliates) and any of the Debtors prior to, and as a condition to the occurrence of the Effective Date, shall have been entered into;

(h)    the Plan shall not have been amended, altered or modified from the Plan as confirmed by the Confirmation Order, unless such material amendment, alteration or modification has been made in accordance with the Plan;

(i)    the payment in Cash in full of all DIP Reimbursement Claims;

(j)    [the conditions to closing under the PLM Stock Participation Transaction Agreement have been satisfied or waived in accordance with the terms thereof, and the PLM Stock Participation Transaction Agreement is in full force and effect and binding on all parties thereto;]

(k)    the payment in Cash in full of all reasonable and documented Senior Notes Indenture Trustee Fees that are accrued and unpaid as of the Effective Date;

(l)    all approvals required under Hart-Scott-Rodino Antitrust Improvements Act of 1976 (as amended from time to time), Mexican Federal Antitrust Law, and other regulatory approvals (such as any approval under Mexican Foreign Investment Law and under the Mexican Securities Exchange Act) having been obtained; [*provided*, *however*, that such approvals for the PLM Stock Participation Transaction shall not be a condition precedent to the occurrence of the Effective Date];

(m)    the Debtors shall have complied, in all material respects, with the terms of the Plan that are to be performed by the Debtors on or prior to the Effective Date; and

**(n)**   all other actions, documents and agreements necessary to implement and effectuate the Plan (including, without limitation, completion of the Statutory Equity Rights Offering and the Equity Financing) shall have been effected or executed.

### Section 9.2.    Waiver of Conditions to Effectiveness

The Debtors may waive in whole or in part any of the conditions precedent to the Effective Date at any time, with the consent of the Required Equity Commitment Parties and any other parties with applicable consent rights set forth in the Debt Financing Commitment Letter and the Subscription Agreement, as applicable, [and the reasonable consent of the Creditors' Committee (to the extent such waiver materially and adversely impacts the rights of Holders of General Unsecured Claims)] without any notice to other parties in interest or the Bankruptcy Court and without any formal action other than proceeding to confirm and/or consummate the Plan.  If any such condition precedent is waived pursuant to this Section and the Effective Date occurs, each party agreeing to waive such condition precedent shall be estopped from withdrawing such waiver after the Effective Date or otherwise challenging the occurrence of the Effective Date on the basis that such condition was not satisfied, the waiver of such condition precedent shall benefit from the "equitable mootness" doctrine, and the occurrence of the Effective Date shall foreclose any ability to challenge the Plan in any court.

Except as otherwise provided herein, all actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously and no such action shall be deemed to have occurred prior to the taking of any other such action.

The stay of the Confirmation Order pursuant to Bankruptcy Rule 3020(e) shall be deemed waived by and upon entry of the Confirmation Order, and the Confirmation Order shall take effect immediately upon its entry.

### Section 9.3.    Substantial Consummation

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

### Section 9.4.    Effect of Non-Occurrence of Conditions to Consummation

If the Effective Date does not occur with respect to any of the Debtors, the Plan shall be null and void in all respects with respect to such Debtor, and nothing contained in the Plan or the Disclosure Statement shall: (a) constitute a waiver or release of any Claims by or Claims against or interests in such Debtors; (b) prejudice in any manner the rights of such Debtors, any Holders of a Claim or interest, or any other Entity; or (c) constitute an admission, acknowledgment, offer or undertaking by such Debtors, any Holders or any other Entity in any respect.

## ARTICLE X    RETENTION OF JURISDICTION BY THE BANKRUPTCY COURT

**(a)**   Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction of all matters arising

under, arising out of or related to the Chapter 11 Cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

(i)    to resolve any matters related to Executory Contracts or Unexpired Leases, including: (A) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine and, if necessary, liquidate, any Cure Amount arising therefrom, including pursuant to section 365 of the Bankruptcy Code; (B) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; and (C) any dispute regarding whether a contract or lease is or was executory or expired;

(ii)    to hear and determine any motions, adversary proceedings, applications, contested matters and other litigated matters pending on, or commenced after, entry of the Confirmation Order;

(iii)    to hear and resolve any disputes arising from or related to (A) any orders of the Bankruptcy Court granting relief under Bankruptcy Rule 2004 or (B) any protective orders entered by the Bankruptcy Court in connection with the foregoing;

(iv)    to ensure that Plan Distributions to Holders of Allowed Claims and interests (as applicable) are accomplished as provided in this Plan and the Confirmation Order and to adjudicate any and all disputes arising from or relating to distributions under the Plan and the Confirmation Order;

(v)    to consider Claims or the allowance, classification, priority, compromise, estimation or payment of any Claim, including any Administrative Expense Claim;

(vi)    to enter, implement or enforce such orders as may be appropriate in the event that the Confirmation Order is, for any reason, stayed, reversed, revoked, modified or vacated;

(vii)    to issue and enforce injunctions, enter and implement other orders and take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation or enforcement of this Plan, the Confirmation Order or any other order of the Bankruptcy Court;

(viii)    to consider any modifications to the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order or remedy any defect or omission or reconcile or clarify any inconsistency in any Bankruptcy Court order, the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument,

release or other agreement or document entered into, delivered or created in connection with the Plan, the Disclosure Statement or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan;

(ix)  to resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof;

(x)  to hear and determine any disputes with the Post-Effective Date Committee;

(xi)  to hear and determine disputes arising in connection with the interpretation, implementation or enforcement of this Plan, the Confirmation Order, any transactions or payments in furtherance of the Plan or the Confirmation Order or any agreement, instrument or other document governing, or related to, any of the foregoing;

(xii)  to take any action and issue such orders, including any such action or orders as may be necessary after entry of the Confirmation Order or the occurrence of the Effective Date, as may be necessary to construe, enforce, implement, execute and consummate this Plan, including any release, exculpation or injunction provisions set forth in this Plan, or to maintain the integrity of this Plan following the occurrence of the Effective Date;

(xiii) to adjudicate, decide or resolve any and all matters related to the Restructuring Transactions, including disputes related to the Subscription Agreement, the Debt Financing, the Equity Financing and any Executory Contracts or Unexpired Leases between Delta (and any of its subsidiaries or affiliates) and any of the Debtors (including the Delta JCA);

(xiv)  [RESERVED]

(xv)  to hear and determine any other matters related to the Chapter 11 Cases and not inconsistent with the Bankruptcy Code or title 28 of the United States Code;

(xvi)  to resolve any disputes concerning whether a Person had sufficient notice of the Chapter 11 Cases, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, any Bar Date established in the Chapter 11 Cases or any deadline for responding or objecting to a Cure Amount, in each case, for the purpose of determining whether a Claim or interest is discharged hereunder or for any other purpose;

(xvii)  to hear and determine all matters relating to the plan settlements, to the extent permitted under applicable law;

(xviii)  to enforce any order for the sale of property pursuant to section 363, 1123 or 1146(a) of the Bankruptcy Code;

(xix) to determine such other matters, and for such other purposes, as may be provided in the Confirmation Order;

(xx) to resolve all disputes related to the PLM Stock Participation Transaction and the PLM Stock Participation Transaction Agreement to the fullest extent permitted by law; and

(xxi) to enter a final decree closing each of the Chapter 11 Cases.

(b)    The Bankruptcy Court shall retain jurisdiction of all matters arising under, arising out of or related to the Chapter 11 Cases and the Plan to, among other things, hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including the expedited determination of taxes under section 505(b) of the Bankruptcy Code).

(c)    To the extent that it is legally impermissible for the Bankruptcy Court to have exclusive jurisdiction over any of the foregoing matters, the Bankruptcy Court will have non-exclusive jurisdiction over such matters to the extent legally permissible.

(d)    If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter, including the matters set forth in this Article X, the provisions of this Article X shall have no effect upon and shall not control, prohibit or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

## ARTICLE XI   MISCELLANEOUS

### Section 11.1.    Exemption from Transfer Taxes and Recording Fees

To the maximum extent permitted by section 1146(a) of the Bankruptcy Code and to the maximum extent permitted by law, none of the issuance, transfer or exchange of notes or equity securities under the Plan, the creation, the filing or recording of any mortgage, deed of trust or other security interest, the making, assignment, filing or recording of any lease or sublease, the transfer of title to or ownership of any of the Debtors' interest in any Aircraft Equipment or the making or delivery of any deed, bill of sale or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including, without limitation, the Debt Financing, the Equity Financing, the Voluntary Equity Conversion or any merger agreements or agreements of consolidation, deeds, bills of sale or assignments executed in connection with any of the transactions contemplated under the Plan, shall be subject to any document recording tax, sales tax, use tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, Cape Town filing or recording fee, FAA filing or recording fee or other similar tax or governmental assessment in the United States.   The Confirmation Order shall direct the appropriate federal, state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the

76

foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### Section 11.2.    Expedited Tax Determination

[The Reorganized Debtors may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all returns filed for or on behalf of such Debtors or Reorganized Debtors for all taxable periods through the Effective Date.]

### Section 11.3.    Plan Modifications and Amendments

**(a)**    Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and those restrictions on, and consents required with respect to, modifications set forth in the Plan, the Debt Financing Commitment Letter and the Subscription Agreement, [and in consultation with the Creditors' Committee, to the extent such modification impacts the rights of Holders of General Unsecured Claims], the Debtors may alter, amend or modify the Plan, without additional disclosure pursuant to section 1125 of the Bankruptcy Code, and, as appropriate, not resolicit votes on such modified Plan.  Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.  A Holder of a Claim or interest that has accepted the Plan shall be presumed to have accepted this Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim or interest of such Holder.

**(b)**    After the Confirmation Date and prior to substantial consummation of the Plan, the Debtors, subject to the consent rights set forth in the Debt Financing Commitment Letter and Subscription Agreement, may institute proceedings in the Bankruptcy Court pursuant to section 1127(b) of the Bankruptcy Code to remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes and effects of the Plan.

**(c)**    Prior to the Effective Date, subject to the consent rights set forth in Debt Financing Commitment Letter and the Subscription Agreement, make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court; provided that such technical adjustments and modifications do not materially and adversely affect the treatment of Holders of Claims or interests.

### Section 11.4.    Revocation or Withdrawal of Plan

The Debtors reserve the right to revoke, withdraw or delay consideration of the Plan prior to the Confirmation Date, either entirely or with respect to any one or more of the Debtors, and to file subsequent amended plans of reorganization, in each case, subject to the consent rights set forth in the Debt Financing Commitment Letter and the Subscription Agreement [and in consultation with the Creditors' Committee].  If this Plan is revoked, withdrawn or delayed with respect to fewer than all of the Debtors, that shall not affect the enforceability of this Plan as it relates to the Debtors for which the Plan is not revoked, withdrawn or delayed.  If the Debtors

revoke or withdraw the Plan in its entirety, then the Plan shall be null and void in all respects, any settlement or compromise not previously approved by Final Order of the Bankruptcy Court embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan and any document or agreement executed pursuant hereto shall be deemed null and void, and nothing contained in the Plan shall constitute a waiver or release of any Claims by or against, or any Interests in, such Debtors or any other Person, or prejudice in any manner the rights of such Debtors or any other Person or constitute an admission of any sort by the Debtors or any other Person.

Section 11.5.    No Admission

Other than as expressly provided under the Plan or the Confirmation Order, nothing in the Plan or Disclosure Statement or any document or pleading filed in connection therewith shall constitute or be deemed to constitute an admission that any of the Debtors are subject to or liable for any Claim.

Section 11.6.    Waiver or Estoppel

Each Holder of a Claim or interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors or their counsel or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement or papers filed with the Bankruptcy Court prior to the Confirmation Date.

Section 11.7.    Dissolution of Creditors' Committee and Formation of Post-Effective Date Committee

After the occurrence of the Effective Date, the Creditors' Committee shall automatically dissolve, and the members thereof and their respective officers, employees, counsel, advisors and agents shall be released and discharged of and from all rights, duties, responsibilities and liabilities arising from, or related to, the Chapter 11 Cases and under the Bankruptcy Code, except with respect to (a) applications filed pursuant to sections 330 and 331 of the Bankruptcy Code; (b) continuing confidentiality obligations; and (c) in the event that the Bankruptcy Court's entry of the Confirmation Order is appealed, participating in such appeal.  From and after the Effective Date, the Reorganized Debtors shall continue to pay, when due and payable in the ordinary course of business, the reasonable and documented fees and expenses of the Creditors' Committee's professionals, solely to the extent arising out of or related to the foregoing, without further order of the Bankruptcy Court.

[On the Effective Date, there shall be formed a Post-Effective Date Committee with its duties limited to the oversight of certain actions of the Reorganized Debtors, which actions shall remain the sole responsibility of the Reorganized Debtors, including:  (a) overseeing the General Unsecured Claims' reconciliation and settlement process conducted by or on behalf of the Reorganized Debtors pursuant to the Claims Objection and Settlement Procedures Order, as applicable; (b) overseeing the (i) establishment and (ii) maintenance of the Disputed Claims

Reserve(s); (c) overseeing the distributions to the Holders of General Unsecured Claims under this Plan; (d) appearing before and being heard by the Bankruptcy Court and other Courts of competent jurisdiction in connection with the above duties; and (e) such other matters as may be agreed upon between the Reorganized Debtors, the Required Equity Commitment Parties and the Post-Effective Date Committee or as otherwise specified in this Plan.]

[The Post-Effective Date Committee shall consist of three members to be appointed by and from the Creditors' Committee and may adopt by-laws governing its conduct. The Creditors' Committee shall notify the Debtors, in writing, of the identities of the three members of the Post-Effective Date Committee at least five Business Days prior to the Confirmation Hearing. The Reorganized Debtors may seek the removal of a member of the Post-Effective Date Committee for cause. In the event of a disagreement regarding the membership of the Post-Effective Date Committee, the Creditors' Committee or Post-Effective Date Committee, as applicable, may apply to the Bankruptcy Court for appropriate relief. Pending a determination by the Bankruptcy Court, the member shall not be given access to confidential or proprietary information concerning any of the Reorganized Debtors. In the event of the resignation or removal of a member of the Post-Effective Date Committee for any reason, a replacement shall be designated by the remaining members of the Post-Effective Date Committee. If the Reorganized Debtors object to the selection of any initial or replacement member of the Post-Effective Date Committee, such person shall not serve on the Post-Effective Date Committee; *provided*, *however*, that, in such an instance, the Creditors' Committee or Post-Effective Date Committee, as applicable, may apply to the Bankruptcy Court for appropriate relief. Pending a determination by the Bankruptcy Court, the proposed member shall not be given access to confidential or proprietary information concerning any of the Reorganized Debtors.]

[The Post-Effective Date Committee may employ, without further order of the Bankruptcy Court, professionals to assist it in carrying out its duties as limited above, including any professionals retained in these Chapter 11 Cases. The Reorganized Debtors shall pay, as soon as reasonably practicable after invoiced, the reasonable, actual and documented costs and expenses of the Post-Effective Date Committee, including reasonable professional fees, in the ordinary course without further order of the Bankruptcy Court; *provided* that the aggregate amount of fees and expenses to be incurred by the Post-Effective Date Committee, its members and its Professionals that any of the Reorganized Debtors shall be obligated to pay or reimburse shall not exceed the Post-Effective Date Committee Expense Cap. In the event that, on the Effective Date, an objection to any Claim by the Creditors' Committee is pending, the Post-Effective Date Committee shall have the right to continue prosecution of such objection.]

[For so long as the claims reconciliation process shall continue, the Reorganized Debtors shall make regular reports to the Post-Effective Date Committee as and when the Reorganized Debtors and the Post-Effective Date Committee may reasonably agree.]

[Notwithstanding anything contained in this Plan to the contrary, the rights and powers of the Post-Effective Date Committee are strictly limited to those matters in this Section 11.7, and such rights and powers may only be exercised in a manner consistent with the terms and conditions set forth therein. The Post-Effective Date Committee shall be bound in all respects by the terms of the Plan and by any and all order(s) entered in the Chapter 11 Cases or orders of the Bankruptcy Court after the Effective Date.]

**Section 11.8.    Plan Supplement**

The Plan Supplement shall be filed with the Bankruptcy Court no later than seven calendar days prior to the deadline to object to the Plan.  Unless otherwise expressly provided in the Plan and subject to the consent rights set forth in the Plan and the Debt Financing Commitment Letter and the Subscription Agreement, as applicable, the Debtors shall remain free to modify or amend any such documents after such date.  Upon filing with the Bankruptcy Court, the Plan Supplement may be inspected in the office of the clerk of the Bankruptcy Court during normal court hours.  Holders of Claims or Interests may also obtain a copy of the Plan Supplement on the Debtors' Case Information Website at https://dm.epiq11.com/aeromexico or the Bankruptcy Court's website at www.nysb.uscourts.gov.

**Section 11.9.    Claims Against Other Debtors**

Nothing in the Plan or the Disclosure Statement or any document or pleading filed in connection therewith shall constitute or be deemed to constitute an admission that any of the Debtors are subject to or liable for any Claim against any other Debtor.

**Section 11.10.    Section 1125 of the Bankruptcy Code**

As of and subject to the occurrence of the Confirmation Date: the Debtors shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including, without limitation, sections 1125(a) and 1125(e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in connection with such solicitation and  the Debtors and each of their respective Affiliates, agents, directors, officers, employees, advisors and attorneys shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of any securities under the Plan and, therefore, are not, and on account of such offer, issuance and solicitation will not be, liable at any time for any violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or the offer and issuance of any securities under the Plan.

**Section 11.11.    Severability**

In the event that any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### Section 11.12.    Governing Law

Except to the extent that the Bankruptcy Code, Bankruptcy Rules or other federal or international law, as applicable, or to the extent an exhibit hereto or a Schedule or Plan Documents provides otherwise, the rights, duties and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof; *provided*, *however*, that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, shall be governed by the laws of the jurisdiction of incorporation or formation of the relevant Debtor or Reorganized Debtor, as applicable.

### Section 11.13.    Entire Agreement

On the Effective Date, this Plan, the Plan Supplement and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings and representations concerning such documents, all of which have become merged and integrated into this Plan.

### Section 11.14.    Exhibit to Plan

All exhibits, schedules, supplements and appendices to this Plan (including the Plan Supplement) are incorporated into and are part of this Plan as if set forth in full herein.

### Section 11.15.    Binding Effect

The Plan shall be binding upon and inure to the benefit of the Debtors, the Reorganized Debtors, all present and former Holders of Claims or interests, and all of their respective heirs, executors, administrators, successors and assigns.

### Section 11.16.    Notices

To be effective, any notice, request or demand to or upon, as applicable, the Debtors, the Creditors' Committee, the DIP Agent or the United States Trustee must be in writing in English or Spanish, and unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually received and confirmed by the relevant party as follows:

If to the Debtors:

> Grupo Aeroméxico S.A.B. de C.V.
> Av. Paseo de la Reforma 243, piso 25
> Cuauhtémoc, Mexico City, Mexico, 06500
> Attn.: Ricardo Javier Sánchez Baker and Claudia Angelica Cervantes Munoz
> Email: rsbaker@aeromexico.com
>            ccervantes@aeromexico.com

> with a copy to:

> Davis Polk & Wardwell LLP

81

450 Lexington Avenue
New York, NY 10017
Attn.: Timothy Graulich, Stephen Piraino and Erik Jerrard
Email: timothy.graulich@davispolk.com
      stephen.piraino@davispolk.com
      erik.jerrard@davispolk.com

and, if to the Debtors on an aircraft-related matter, with a copy to:

White & Case LLP
1221 Avenue of the Americas
New York, New York 10020
Attn.: Christian Hansen, Anna Andreeva, and Todd K. Wolynski
Email: chansen@whitecase.com
      aandreeva@whitecase.com
      todd.wolynski@whitecase.com

If to the Creditors' Committee:

Willkie Farr and Gallagher LLP
787 Seventh Avenue
New York, NY 10019
Attn.:  Brett H. Miller and Todd M. Goren
Email:  bmiller@willkie.com
      tgoren@willkie.com

If to the DIP Agent:

UMB Bank National Association
2 South Broadway, Suite 600
St. Louis, MO 63102
Attn.: Julius Zamora
Email: julius.zamora@umb.com

If to the United States Trustee:

Office of the U.S. Trustee
U.S. Department of Justice
201 Varick Street, Rm 1006
New York, NY 10014
Attn.: Andrea B. Schwartz
Email: andrea.b.schwartz@usdoj.gov

If to a member of the Ad Hoc Group of Senior Noteholders:

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park

82

New York, NY 10036
Attn.:  David Botter, Jason Rubin, Meng Ru and Alan J. Feld
Email: dbotter@akingump.com
jrubin@akingump.com
mru@akingump.com
ajfeld@akingump.com

If to a BSPO Investor:

Milbank LLP
55 Hudson Yards
New York, NY 10003
Attn.: Dennis F. Dunne, Scott Golenbock, Andrew M. Leblanc, and Matthew L.
Brod
Email: DDunne@milbank.com
SGolenbock@milbank.com
aleblanc@milbank.com
mbrod@milbank.com

If to Delta:

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, NY 10004
Attn.: Kathryn A. Coleman and Jeffrey S. Margolin
Email: katie.coleman@hugheshubbard.com
jeff.margolin@hugheshubbard.com

If to a member of the Ad Hoc Group of Unsecured Claimholders:

Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166
Attn.: Scott J. Greenberg, Matthew J. Williams, Josh Brody
Email: sgreenberg@gibsondunn.com
mjwilliams@gibsondunn.com
jbrody@gibsondunn.com

**Section 11.17.    Reservation of Rights**

Except as expressly set forth herein, this Plan shall have no force or effect unless the
Bankruptcy Court shall enter the Confirmation Order.  Prior to the Effective Date, none of the
filing of this Plan, any statement or provision contained herein or the taking of any action by the
Debtors with respect to this Plan shall be or shall be deemed to be an admission or waiver of any
rights of the Debtors of any kind, including with respect to the Holders of Claims or interests or
as to any treatment or classification of any contract or lease.

83

**Section 11.18.    Further Assurances**

The Debtors, Reorganized Debtors and all Holders of Claims receiving distributions hereunder and all other parties in interest may and shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan.

Dated:        October 1, 2021
              New York, New York

                              Respectfully submitted,

                              Grupo Aeroméxico, S.A.B. de C.V. (for itself and on
                              behalf of all Debtors)


                              By:    /s/*DRAFT*
                                     Name:  Ricardo Javier Sánchez Baker
                                     Title:   Chief Financial Officer


                              **GRUPO AEROMÉXICO, S.A.B. DE C.V.**
                              **AEROVÍAS DE MÉXICO, S.A. DE C.V.**
                              **AEROLITORAL, S.A. DE C.V.**
                              **AEROVÍAS EMPRESA DE CARGO, S.A. DE C.V.**

**<u>Appendix B</u>**

**Liquidation Analysis**

# GRUPO AEROMEXICO, S.A.B. DE C.V., ET AL.
## HYPOTHETICAL LIQUIDATION ANALYSIS

## INTRODUCTION

Under the "best interests" of creditors test set forth in Bankruptcy Code section 1129(a)(7), a bankruptcy court may not confirm a plan of reorganization unless the plan provides, with respect to each impaired class, that each holder of a claim or interest in such class who does not otherwise vote in favor of the plan receive property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor(s) were liquidated under chapter 7 of the Bankruptcy Code as of such date. To demonstrate that the Plan satisfies the "best interests" of creditors test, the Debtors have prepared the hypothetical liquidation analysis attached herein as **Exhibit 1** (the "**Liquidation Analysis**"), which is based upon certain assumptions discussed below and in the notes accompanying the Liquidation Analysis (the "**Notes**"). To illustrate that the Plan satisfies the "best interests" of creditors test, the Debtors have also prepared a comparison of recoveries under both the Plan and the Liquidation Analysis, attached herein as **Exhibit 2**. Capitalized terms not defined in the Notes shall have the meanings ascribed to them in the Plan and the Disclosure Statement.

The Liquidation Analysis estimates potential Cash distributions to holders of Allowed Claims and Allowed Interests in a hypothetical chapter 7 liquidation of the Debtors' assets (the "**Assets**"). Asset values discussed in the Liquidation Analysis may differ materially from values referred to in the Plan and Disclosure Statement. The Debtors prepared the Liquidation Analysis with the assistance of their advisors.

## SCOPE, INTENT, AND PURPOSE OF THE LIQUIDATION ANALYSIS

The determination of the costs of, and hypothetical proceeds from, the liquidation of the Assets is an uncertain process involving the extensive use of estimates and assumptions that, although considered reasonable by the Debtors, are inherently subject to significant business, political, economic, and competitive uncertainties and contingencies beyond the control of the Debtors, their management, and their advisors. Inevitably, some assumptions in the Liquidation Analysis would not materialize in an actual chapter 7 liquidation, and unanticipated events and circumstances could affect the ultimate results in an actual chapter 7 liquidation. In addition, the Debtors' management cannot judge with any degree of certainty the effect of forced-liquidation asset sales on the recoverable value of the Assets. The Liquidation Analysis was prepared for the sole purpose of generating a reasonable, good-faith estimate of the proceeds that would be generated if the Debtors were liquidated in accordance with chapter 7 of the Bankruptcy Code. The Liquidation Analysis is not intended and should not be used for any other purpose. The underlying financial information in the Liquidation Analysis was not compiled or examined by any independent accountants. No independent appraisals were conducted in preparing the Liquidation Analysis. **NEITHER THE DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS WOULD OR WOULD NOT APPROXIMATE THE ESTIMATES AND ASSUMPTIONS**

**REPRESENTED IN THE LIQUIDATION ANALYSIS. ACTUAL RESULTS COULD VARY MATERIALLY**.

In preparing the Liquidation Analysis, the Debtors estimated Allowed Claims based upon a review of the Claims contained in the Debtors' books and records. In addition, the Liquidation Analysis includes estimates for Claims not currently reflected in the books and records or asserted in the Chapter 11 Cases, but which could be asserted and Allowed in a chapter 7 liquidation, including Administrative Claims, Unsecured Deficiency Claims, Rejection Damages Claims, wind-down costs, and trustee fees. The Bankruptcy Court has not estimated or otherwise fixed the total amount of Allowed Claims used for purposes of preparing this Liquidation Analysis. The Debtors' estimate of Allowed Claims set forth in the Liquidation Analysis should not be relied on for any other purpose, including determining the value of any distribution to be made on account of Allowed Claims under the Plan. **NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE OR CONSTITUTES A CONCESSION OR ADMISSION OF THE DEBTORS. THE ACTUAL AMOUNT OF ALLOWED CLAIMS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH IN THE LIQUIDATION ANALYSIS**.

## GLOBAL NOTES TO THE LIQUIDATION ANALYSIS

### *Liquidation Date and Appointment of a Chapter 7 Trustee*

This Liquidation Analysis assumes the conversion of the Chapter 11 Cases to chapter 7 liquidation cases on or about September 30, 2021 (the "**Liquidation Date**"). On the Liquidation Date, it is assumed that the Bankruptcy Court would appoint a chapter 7 trustee (the "**Trustee**") to oversee the liquidation of the Debtors' Estates. As the Debtors would not generate revenues or cash flows following the Liquidation Date, the Trustee would need to use cash on hand, receivables, and proceeds from the immediate liquidation of Assets to fund the ongoing expenses of the Estates. This Liquidation Analysis assumes that the Trustee would have adequate liquidity to fund the wind-down of the operations and the fees associated with such a liquidation. In the event of an actual liquidation of the Debtors, there is a risk that the Trustee would not have adequate liquidity on hand to settle administrative expenses as incurred, at which point the Trustee might request a dismissal of the chapter 7 cases. If such a scenario were to occur, the recoveries to creditors would be severely impaired as compared with the hypothetical results contained in this Liquidation Analysis.

For the purposes of this Liquidation Analysis, the Debtors are using the most recent quarter-end balance sheet as of June 30, 2021 (the "**Balance Sheet Date**") as the basis for book value of the Assets. It is assumed there would be no material change between the Debtors' Assets on the Liquidation Date and the Balance Sheet Date. This Liquidation Analysis assumes that the Trustee would have a twelve-month period to wind down and monetize the Assets of the Debtors, using cash on hand and the proceeds of the Assets to fund the expenses associated with the wind-down of operations. This Liquidation Analysis has been drafted on a legal-entity-by-legal-entity basis for each of the Debtors. The analysis contemplates a recovery to the Debtors on the assets of

Non-Debtor legal entities, including Fideicomiso Aeroméxico Servicios, Inmobiliaria Boulevard Aeropuerto 161, S.A. de C.V., and Inmobiliaria Avenida Fuerza Aérea Mexicana, S.A. de C.V. The outstanding liabilities as of the Liquidation Date of the Non-Debtor entities are anticipated to be lower than their recoverable assets, the net proceeds of which will flow to Aerovías de México, S.A. de C.V. and Aerolitoral, S.A. de C.V. The Debtors rely on industry knowledge and third-party appraisals to determine realization rates of the tax receivables, owned equipment, and real property.

### *Primary Assets of the Debtors*

The Debtors have Assets in the form of (i) cash and short term investments ("**Cash and ST Investments**"), (ii) restricted cash ("**Restricted Cash**"), (iii) third-party receivables ("**Third-Party Receivables**"), (iv) intercompany receivables ("**I/C Receivables**"), (v) other current assets ("**Other Current Assets**"), (vi) flight equipment ("**Flight Equipment**"), (vii) other property and equipment ("**Other Property and Equipment**"), (viii) investments in non-Debtor affiliates ("**Investments in Subsidiaries**") (ix) intangible assets ("**Intangible Assets**"), and (x) other non-current assets ("**Other Non-Current Assets**"). This Liquidation Analysis assumes a range (low, medium, and high) of recoveries for these Assets assuming a forced-liquidation asset sale process conducted by the Trustee. The Debtors' management believes that values derived from the liquidation assumed in the Liquidation Analysis do not generate a significant recovery for stakeholders as compared with the recovery proposed under the Plan.

This Liquidation Analysis assumes the Debtors would allow, and the Trustee would use, the proceeds of the liquidation of Assets to fund the wind-down expenses. These receivables and other proceeds would be used first to fund the liquidation of the Estates and then to satisfy Claims in the order of priority set forth in section 726 of the Bankruptcy Code (beginning with the DIP Claims.)

### *Liquidation Sale Process*

The liquidation sale process would proceed concurrently with the shutdown of facilities. The Debtors are in possession of inventory and equipment which they own directly and would need to immediately monetize to fund the liquidation process. A significant portion of the gross proceeds distributable to creditors would come from the liquidation of owned Flight Equipment, which the liquidation of is subject to various offsetting costs. This Liquidation Analysis also assumes that certain staff currently employed by the Debtors would remain with the Debtors through the course of the wind-down. Costs associated with these employees have been included in the operational wind-down expense to support the Trustee in collecting and liquidating the Assets.

This Liquidation Analysis assumes that the estimated sale proceeds for the Assets would be less than the tax basis of the Assets and would not generate any additional tax liabilities. Should the tax treatment and effect of the liquidation transactions result in a tax liability that was not reduced by other tax benefits, recoveries in the Liquidation Analysis could change materially.

### *Allocation of Proceeds to Creditors*

This Liquidation Analysis sets forth an allocation of the Liquidation Proceeds to holders of Claims and Interests in accordance with the priorities set forth in section 726 of the Bankruptcy Code.  In preparing this Liquidation Analysis, the Debtors estimated Allowed Claims based upon a review of Claims listed on the Debtors' Schedules and Proofs of Claim filed to date, and the Debtors did not contemplate subordination of any Allowed Claims in the General Unsecured Claims class.  In addition, this Liquidation Analysis includes estimates for certain claims not currently asserted in the Plan, but which could be asserted and allowed in a Chapter 7 liquidation. These claims include Unsecured Deficiency Claims related to the impairment of certain Secured Claims, additional Administrative Claims and additional Rejection Damages Claims.

To date, the Bankruptcy Court has not estimated or otherwise fixed the total amount of Allowed Claims.  For purposes of this Liquidation Analysis, the Debtors' estimates of Allowed Claims are used.  Therefore, the Debtors' estimate of Allowed Claims set forth in this Liquidation Analysis should not be relied on for any other purpose, including determining the value of any distribution to be made on account of Allowed Claims and Interests under the Plan.

## SPECIFIC NOTES TO THE ASSUMPTIONS CONTAINED IN THE LIQUIDATION ANALYSIS (EXHIBIT 1)

The Liquidation Analysis refers to certain categories of Assets, Liquidation Costs, and Claims. The numerical/alphabetical designations below correspond to the line items listed in <u>Exhibit 1</u>, each with a specific Note.

### *DIP REPAYMENT*

1.      In a liquidation scenario, the Debtors debtor-in-possession lenders (**"DIP Lenders"**) would have a senior secured and super-priority claim ("**DIP Claim**") against each of the Debtors for the outstanding balance of the Debtors post-petition debtor-in-possession financings ("**DIP Facility**").  The Liquidation Analysis assumes that the DIP Claim will be satisfied from the relevant Debtors Consolidated Cash and ST Investments prior to the Trustee's use of the Debtors liquidated assets to satisfy Liquidation Costs and remaining Claims.

As of September 30, 2021, the DIP Claim is estimated to be approximately $1.1B, which is inclusive of the outstanding principal balance, accrued interest and any penalties under the DIP facility associated with conversion to Chapter 7.

### *ASSETS*

2.      **"Cash and ST Investments"** include cash, marketable securities, and other financial instruments held in domestic and foreign bank accounts maintained by the Debtors.  The estimated recovery for cash and short term investments prior to repayment of DIP Facilities is estimated to be 100%.

3.    **"Restricted Cash"** includes cash accounts held in joint control with letter of credit issuing banks and the secured receivables' trust lenders.   The amounts in these restricted accounts represent cash collateral for letters of credit and cash held in secured receivables' trust bank accounts.   It is assumed in a liquidation that all existing letters of credit will be drawn, all cash collateral supporting these letters of credit will be swept by the issuing banks to satisfy their obligations, and all cash held in the receivables trusts will be swept by the receivables trust lenders to satisfy their obligations. The estimated recovery for restricted cash is 0%.

4.    **"Third-Party Receivables"** include amounts owed to the Debtors by various parties and are categorized into three main sub-groups: "customer receivables," "taxes," and "other receivables".   "Customer receivables" primarily include receivables from passenger credit cards, travel agencies, and Cargo sales.   It is assumed that all passenger credit card and travel agency receivables would be retained by the processor to alleviate any ATL and chargeback liabilities. No recovery is estimated on these receivables.  "Taxes" primarily include amounts for refundable VAT taxes from vendors and suppliers that Debtor entities will seek recovery through tax authorities.  "Other receivables" primarily include employee-related receivables and allowances for doubtful accounts. No recoveries are estimated for "other receivables".  The estimated range of recovery for Third Party Receivables is 39% to 54%.

5.    **"I/C Receivables"** includes the pre- and post-petition intercompany amounts owed to the respective Debtor entity by other Debtor and Non-Debtor entities. This asset is primarily comprised of DIP financing and Seguros loans that were initially issued through Grupo Aeroméxico, S.A.B. de C.V. and distributed to other debtor entities. This recovery also includes residual values from non-debtors including tax receivables, real property and ground equipment less outstanding liabilities at these entities. The estimated recovery for I/C Receivables is 8% to 10%.

6.    **"Other Current Assets"** includes amounts related to "General Warehouse Inventories", "Consumables Inventories", and "Pre-paid expenses" to third parties.  "General Warehouse Inventories" include spare parts and surpluses of other technical inventories.  "Consumable Inventories" include items used on aircrafts such as food and beverage, uniforms, and office products.  Third party pre-paid expenses include insurance pre-payments, deposits to professional firms, and deposits to IT/software vendors.  The estimated recovery range for Other Current Assets is 40% to 53%.

7.    **"Flight Equipment"** includes owned and financed aircraft, engines, simulators and rotables as well as the capitalized value of leases and Pre-Delivery Payment (**"PDP"**) facilities for aircraft and related items.  The Liquidation Analysis relies on the Debtor's extensive industry knowledge and recent third-party appraisals to determine an estimated fair market value for each owned and financed aircraft and

simulator.    These realization estimates are also based on factors such as the
maintenance history and estimated costs for each aircraft type.  Any realization
estimates below outstanding secured debt obligations would be subject to an
unsecured deficiency claim.  The analysis assumes that aircraft and related items
under capital lease would be rejected, yielding no recovery value.  Any financial
obligation for rejected capital leases executed on or after the petition date would be
subject to an unsecured lease rejection damages claim.  The analysis assumes that
any PDP facilities and other prepayments associated with contracts for future
aircraft purchases will yield no recovery.  The estimated range of recovery for
Flight Equipment is 13% to 18%.

8.    **"Other Property and Equipment"** includes land, buildings, ground equipment,
miscellaneous other equipment (including furniture, fixtures and office equipment),
leasehold improvements on ground equipment, and leasehold improvements on real
estate.  Land and buildings include amounts related to two owned properties in
Cancun and Zihuantanejo.  The Debtors rely on extensive industry knowledge and
third-party appraisals to determine realization rates for owned properties.  The
analysis assumes that property and equipment leases would be rejected, resulting
in no net realization on account of leasehold improvements.  The estimated range
of recovery for Other Property and Equipment is 9% to 14%.

9.    **"Investment in Subsidiaries"** includes investments in certain joint ventures
including MRO facility with Delta Airlines and Share Participation structure in
Grupo Aeroméxico, S.A.B. de C.V. as well as capitalizations from joint venture(s)
in Aerovías de México, S.A. de C.V.  The estimated recovery for Investment in
Subsidiaries is in excess of book value (contra-asset) and is based on third-party
appraisals.

10.    **"Intangible Assets"** include arrival/departure slots, the Grupo Aeroméxico, S.A.B.
de C.V. brand, and rights to real properties in development.  The Liquidation
Analysis bases the realizable value of arrival/departure slots at London Heathrow
(2 slots) and John F. Kennedy (8 slots) airports on factors such as location, time
(peak versus non-peak), precedent slot transactions by other airlines, and COVID-
19 impacts.  The Liquidation Analysis relies on the Debtor's extensive industry
knowledge and third-party appraisals to determine a range of recent fair market
value estimates for the aggregate realization for the Grupo Aeroméxico, S.A.B. de
C.V. brand inclusive of all owned trademarks and associated domain names. The
analysis bases the realizable value of rights to real property in Ciudad de Mexico
on third-party appraisals.    Due to the fully amortized book value of certain
Intangible Assets, the estimated range of recovery for Intangible Assets is 158% to
230%.

11.     **"Other Non-Current Assets"** consists of deposit guarantees, accrued expenses to be amortized related to principal payments on loans and accrued deferred income taxes. The estimated recovery for Other Non-Current Assets is 0%.

## *LIQUIDATION COSTS*

The Liquidation Analysis includes costs associated with the wind down of the Debtors' business as well as with the administration of a chapter 7 liquidation process.

12.     **"Chapter 7 Trustee Fees"** include all fees to be paid for the chapter 7 trustee's services in chapter 7 liquidation in accordance with the fee structure under Section 326 of the Bankruptcy Code. Based on certain benchmarks derived from the Debtors' analysis of such rates in other large chapter 11 cases, the Liquidation Analysis allocates trustee fees to each of the Debtors at a rate of 3.0% of total estimated liquidation proceeds, excluding Cash and ST Investments.

13.     **"Chapter 7 Professional Fees"** include an estimate of fees and expenses incurred by the Debtor's legal and other professionals associated with, among other things, liquidation and realization of assets, the wind-down of the Debtors Estates, and Claims reconciliation. In the analysis, Professional Fees are assumed to be 2.6% to 2.7% of total estimated liquidation proceeds, excluding Cash and ST Investments.

14.     **"Wind-Down Fees"** include expenses incurred during the Wind-Down Period and primarily relate to employee wages and benefits for personnel employed during the Wind-Down Period and other general overhead costs including aircraft, communication, and air-traffic services, insurance costs, administrative expenses, and IT requirements. The analysis assumes that Wind-Down Fees are 5.4% to 5.6% of estimated liquidation proceeds, excluding Cash and ST Investments.

## *CLAIMS*

15.     **"Remaining DIP"** includes the outstanding balance of the DIP Claim after repayment with available Consolidated Cash and ST Investments. As the DIP Claim is enforceable in full against all Debtor entities, the Remaining DIP is allocated to Grupo Aeroméxico, S.A.B. de C.V., Aerolitoral, S.A. de C.V., and Aerovías Empresa de Cargo, S.A. de C.V. for amounts equal to the Debtor's proceeds net of liquidation costs with the outstanding claim balance allocated to Aerovías de México, S.A. de C.V.

16.     **"Secured"** includes Claims secured by certain Aircraft Equipment, Receivables Trusts and ownership of shares in PLM. The Allowed Claim amount is equal to the liquidation value ascribed to the underlying collateral. Any debt that is not satisfied

by the value of the underlying collateral is subject to an unsecured deficiency Claim and is included in the estimated amount for Unsecured Claims.

17.   "**Admin**" includes, but is not limited to, claims arising during the Chapter 11 case not already paid in the ordinary course of business. Significant categories of administrative claims include estimates for post-petition employee wages and benefits, trade payables, accrued aircraft rent, air traffic liabilities, taxes, and claims arising under certain post-petition agreements.

18.   **"Priority"** includes Claims for various pre-petition federal and state tax claims and other miscellaneous taxes.

19.   "**Unsecured**" includes general unsecured claims and intercompany claims to other Debtors. Significant categories of general unsecured claims include pre-petition trade payables, the unsecured notes, employee claims, lease rejection damages pre-petition and post-petition, unsecured guarantees for claims secured by certain Aircraft Equipment, under-secured aircraft and deficiency claims, and intercompany claims to joint ventures and non-Debtor entities.

**EXHIBIT 1**

**Hypothetical Liquidation Analysis[1]**
**Consolidated Debtors[2]**
**Unaudited**

($ in millions)

| Notes | DIP Repayment | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Consolidated Cash and ST Investments | $ 834.7 | | | | | | | |
| 1 | Less: DIP Repayment | (834.7) | | | | | | | |
| | Remaining Consolidated Cash and ST Investments | $ - | | | | | | | |

| | | Net Book Value | Estimated Recovery Rate | | | Estimated Recovery Value | | |
|---|---|---|---|---|---|---|---|---|
| Notes | Assets | June 30, 2021 | Low | Mid | High | Low | Mid | High |
| 2 | Cash and ST Investments | $ - | 100.0% | 100.0% | 100.0% | $ - | $ - | $ - |
| 3 | Restricted Cash | 109.4 | 0.0% | 0.0% | 0.0% | - | - | - |
| 4 | Third-Party Receivables | 307.8 | 39.5% | 46.8% | 54.2% | 121.5 | 144.2 | 166.8 |
| 5 | I/C Receivables | 390.4 | 8.3% | 8.9% | 9.6% | 32.3 | 34.8 | 37.3 |
| 6 | Other Current Assets | 116.4 | 40.1% | 46.8% | 53.5% | 46.6 | 54.4 | 62.2 |
| 7 | Flight Equipment | 3,020.4 | 13.4% | 15.6% | 17.8% | 403.4 | 470.9 | 538.4 |
| 8 | Other Property and Equipment | 68.2 | 8.8% | 11.4% | 14.0% | 6.0 | 7.8 | 9.6 |
| 9 | Investments in Subsidiaries | (1,000.0) | N/A | N/A | N/A | 14.8 | 22.2 | 29.5 |
| 10 | Intangible Assets | 74.1 | 158.3% | 194.2% | 230.0% | 117.3 | 143.9 | 170.4 |
| 11 | Other Non-Current Assets | 330.2 | 0.0% | 0.0% | 0.0% | - | - | - |
| | **Total Assets/Proceeds** | **$ 3,417.0** | **21.7%** | **25.7%** | **29.7%** | **$ 741.9** | **$ 878.1** | **$ 1,014.3** |

| | Liquidation Costs | | | | | Low | Mid | High |
|---|---|---|---|---|---|---|---|---|
| 12 | Chapter 7 Trustee Fees | | | | | $ (22.3) | $ (26.3) | $ (30.4) |
| 13 | Chapter 7 Professional Fees | | | | | (19.9) | (23.2) | (26.5) |
| 14 | Wind-Down Fees | | | | | (41.3) | (48.1) | (55.0) |
| | **Total Liquidation Costs** | | | | | **$ (83.4)** | **$ (97.7)** | **$ (112.0)** |
| | **Net Liquidation Proceeds Available to Creditors** | | | | | **$ 658.5** | **$ 780.5** | **$ 902.4** |

| | | Estimated Claim Allowed | | | Estimated Recovery by Class of Claims ($)/(%) | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Notes | Claims | Low | Mid | High | Low | | Mid | | High | |
| 15 | Remaining DIP Facility | $ 264.3 | $ 259.5 | $ 254.8 | $ 264.3 | 100.0% | $ 259.5 | 100.0% | $ 254.8 | 100.0% |
| 16 | Secured | 391.2 | 386.5 | 381.7 | 390.8 | 99.9% | 386.1 | 99.9% | 381.3 | 99.9% |
| 17 | Admin | 2,696.6 | 2,658.1 | 2,619.6 | 3.4 | 0.1% | 134.9 | 5.1% | 266.3 | 10.2% |
| 18 | Priority | 20.9 | 20.9 | 20.9 | - | 0.0% | - | 0.0% | - | 0.0% |
| 19 | Unsecured | 8,064.8 | 7,563.7 | 7,062.6 | - | 0.0% | - | 0.0% | - | 0.0% |
| | **Total Claims** | **$ 11,437.8** | **$ 10,888.7** | **$ 10,339.5** | **$ 658.5** | **5.8%** | **$ 780.5** | **7.2%** | **$ 902.4** | **8.7%** |

[1] Liquidation Analysis has been drafted on a legal-entity-by-legal-entity basis for each of the Debtors
[2] Consolidated Debtors are the following entities: Grupo Aeroméxico, S.A.B. de C.V., Aerovías de México, S.A. de C.V., Aerolitoral, S.A. de C.V. and Aerovías Empresa de Cargo, S.A. de C.V.

# EXHIBIT 2

## Comparison of Recovery in the Plan vs. Recovery in Chapter 7 Liquidation

| Class | Description | Estimated Recovery | |
|-------|-------------|------|-------------|
| | | Plan | Liquidation[2] |
| 1 | DIP Facility Claims | TBD | 100.0% |
| 2 | Secured Claims | TBD | 45.8% - 45.7% |
| 3 | Admin Claims | TBD | 0.1% - 10.2% |
| 4 | Priority Claims | TBD | 0.0% |
| 5 | Unsecured Deficiency Claims | TBD | 0.0% |
| 6 | General Unsecured Claims[1] | TBD | 0.0% |
| 7 | Unsecured with Guarantees | TBD | 0.0% |
| 8 | Post-Petition Lease Rejection Damages | TBD | 0.0% |
| 9 | Intercompany to Other Debtors | TBD | 0.0% |

*1) Excludes guarantees, includes intercompany claims with joint ventures and non-Debtor entities*

*2) "Liquidation" represents an illustrative range of potential recoveries*

## Appendix C

**Financial Analysis**

## GRUPO AEROMEXICO, S.A.B. DE C.V., ET AL.
## FINANCIAL PROJECTIONS

**Introduction**[1]

The following financial projections for the consolidated Debtors (the "**Consolidated Financial Projections**") are based on forecasts of operating results for calendar year 2021 through calendar year 2025 (the "**Projected Period**"). For 2021, the Consolidated Financial Projections include five months of the Debtors' actual financial results (January through May), and seven months of the Debtors' projected financial results (June through December). Also attached are the notes and assumptions to the Consolidated Financial Projections (in each case, the "**Notes**"). The Consolidated Financial Projections and the Notes should be read in conjunction with the Plan and the Disclosure Statement.

The Debtors, with the assistance of their advisors, have prepared the Consolidated Financial Projections to assist the Bankruptcy Court in determining whether the Plan meets the feasibility test of section 1129(a)(11) of the Bankruptcy Code. Certain financial information was used in connection with the preparation of the Consolidated Financial Projections.

The Debtors generally do not publish their projections or their anticipated financial position or results of operations. Accordingly, the Debtors do not anticipate that they will, and disclaim any obligation to, furnish updated projections to holders of Claims or Interests, or to include such information in documents required to be filed with the Securities and Exchange Commission or the Comisión Nacional Bancaria y de Valores of the United Mexican States (the "**CNBV**") or otherwise make public such information.

THE CONSOLIDATED FINANCIAL PROJECTIONS HAVE BEEN PREPARED BY THE MANAGEMENT OF THE DEBTORS AND IN CONSULTATION WITH THE DEBTORS' FINANCIAL ADVISORS, ROTHSCHILD, INC. AND ALIXPARTNERS, LLP. THE CONSOLIDATED FINANCIAL PROJECTIONS WERE NOT PREPARED TO COMPLY WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS OR THE INTERNATIONAL ACCOUNTING STANDARDS BOARD OR THE RULES AND REGULATIONS OF THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION OR THE CNBV, AND BY THEIR NATURE ARE NOT FINANCIAL STATEMENTS PREPARED IN ACCORDANCE WITH ACCOUNTING PRINCIPLES GENERALLY ACCEPTED IN THE UNITED STATES OF AMERICA OR MEXICO.

THE DEBTORS INDEPENDENT ACCOUNTANTS HAVE NEITHER EXAMINED NOR COMPILED THE ACCOMPANYING CONSOLIDATED FINANCIAL PROJECTIONS AND ACCORDINGLY DO NOT EXPRESS AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT TO THE CONSOLIDATED FINANCIAL PROJECTIONS, ASSUME NO RESPONSIBILITY FOR THE CONSOLIDATED FINANCIAL PROJECTIONS AND DISCLAIM ANY ASSOCIATION WITH THE CONSOLIDATED FINANCIAL PROJECTIONS.

THE CONSOLIDATED FINANCIAL PROJECTIONS DO NOT REFLECT THE IMPACT OF FRESH START REPORTING IN ACCORDANCE WITH AMERICAN INSTITUTE OF CERTIFIED PUBLIC

---

[1] Capitalized terms used but not defined herein have the meanings given to such terms in the Disclosure Statement to which this Appendix C is attached or the Plan, as applicable.

ACCOUNTANTS STATEMENT OF POSITION 90-7, FINANCIAL REPORTING BY ENTITIES IN REORGANIZATION UNDER THE BANKRUPTCY CODE.  THE IMPACT OF FRESH START REPORTING, WHEN REFLECTED AT THE EFFECTIVE DATE, IS EXPECTED TO HAVE A MATERIAL IMPACT ON THE DEBTORS' CONSOLIDATED BALANCE SHEETS AND PROSPECTIVE RESULTS OF OPERATIONS. FRESH START ADJUSTMENTS ARE NOT EXPECTED TO HAVE A MATERIAL IMPACT ON THE PROJECTED RECOVERIES FOR CREDITORS.

THE CONSOLIDATED FINANCIAL PROJECTIONS CONTAIN CERTAIN STATEMENTS THAT ARE FORWARD-LOOKING STATEMENTS WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS, AND UNCERTAINTIES AS FURTHER DETAILED IN THE DISCLOSURE STATEMENT IN THE SECTION ENTITLED "CERTAIN RISKS FACTORS TO BE CONSIDERED PRIOR TO VOTING," MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS, INCLUDING THE CONFIRMATION OF THE PLAN ON THE PRESUMED EFFECTIVE DATE, THE CONTINUING AVAILABILITY OF SUFFICIENT BORROWING CAPACITY OR OTHER FINANCING TO FUND OPERATIONS, ACHIEVING OPERATING EFFICIENCIES, FLUCTUATIONS IN FUEL PRICE, COVENANTS IN NEW CREDIT FACILITIES, MAINTAINING GOOD EMPLOYEE RELATIONS, EXISTING AND FUTURE GOVERNMENTAL REGULATIONS AND ACTIONS OF GOVERNMENTAL BODIES, FUTURE PANDEMICS (INCLUDING, WITHOUT LIMITATION, COVID-19 AND ITS RELATED VARIANTS) AND ASSOCIATED TRAVEL RESTRICTIONS, ACTS OF TERRORISM OR WAR, INDUSTRY-SPECIFIC RISK FACTORS AND OTHER MARKET AND COMPETITIVE CONDITIONS.  HOLDERS OF CLAIMS AND INTERESTS ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE.  ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS, AND THE DEBTORS DO NOT UNDERTAKE ANY OBLIGATION TO UPDATE ANY SUCH STATEMENTS.

THE CONSOLIDATED FINANCIAL PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY THE DEBTORS, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS.  THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE OR ARE MADE AS TO THE ACCURACY OF THE CONSOLIDATED FINANCIAL PROJECTIONS OR TO THE DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS.  SOME ASSUMPTIONS INEVITABLY WILL BE INCORRECT.  MOREOVER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE CONSOLIDATED FINANCIAL PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED, OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. THE DEBTORS DO NOT INTEND AND DO NOT UNDERTAKE ANY OBLIGATION TO UPDATE OR OTHERWISE REVISE THE CONSOLIDATED FINANCIAL PROJECTIONS TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE THE CONSOLIDATED FINANCIAL PROJECTIONS ARE INITIALLY FILED OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS.   THEREFORE, THE CONSOLIDATED FINANCIAL PROJECTIONS MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.  IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS MUST MAKE THEIR OWN

DETERMINATIONS AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE CONSOLIDATED FINANCIAL PROJECTIONS.

THE CONSOLIDATED FINANCIAL PROJECTIONS WERE DEVELOPED FOR PURPOSES OF THE FORMULATION AND NEGOTIATION OF THE PLAN ARE TO ENABLE THE HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE UNDER THE PLAN TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN AND SHOULD NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING THE PURCHASE OR SALE OF SECURITIES OF, OR CLAIMS OR INTERESTS IN, THE DEBTORS OR ANY OF THEIR AFFILIATES.

**General Assumptions in The Consolidated Financial Projections and The Notes**

The Consolidated Financial Projections have been prepared on the assumption that the Effective Date is January 1, 2022. The Consolidated Financial Projections are based on, and assume, among other things, the successful reorganization of the Debtors and implementation of the emergence business plan. Although the Debtors presently intend to cause the Effective Date to occur as soon as practical following Confirmation of the Plan, there can be no assurance as to when the Effective Date will actually occur. If the Effective Date is delayed, the Debtors will continue to incur reorganization costs, which may be considered significant. The Consolidated Financial Projections and the Notes do not include any assumptions about employee equity awards or any equity capital or non-fleet debt financing transactions that the Debtors, in their sole discretion, may decide to carry out after the Effective Date.

Balance sheet projections include high level illustrative adjustments, assuming that Tranche 2 of the DIP Loan (including accrued interest and repayment fees) is repaid via capital raised through an equity rights offering upon emergence and that Tranche 1 of the DIP Loan is repaid via capital raised through a debt issuance upon emergence.

The Projections include certain assumptions regarding the Debtors' operating lease obligations, which may materially change as a result of discussions and negotiations with lease counterparties and final determination of the incremental borrowing rate used to capitalize lease obligations in accordance with the Debtors historical practices.

The projections assume the following USD/MXN exchange rates for MXN denominated costs:

|  | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|
| USD:MXN FX rate | 21.00 | 21.43 | 21.87 | 22.31 | 22.77 |

The projections also assume 2% inflation on USD denominated operating costs, 3.5% inflation on MXN denominated operating costs and 4.5% for certain maintenance materials.  No inflation is applied to revenue.  Inflation assumptions based on central bank forecasts and management estimates.

# CONSOLIDATED FINANCIAL PROJECTIONS

## Projected Consolidated Statements of Operations

(unaudited); (in millions); (years ending December 31)[2]

| | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|
| **Operating Revenue:** | | | | | |
| Passenger | $ 1,935 | $ 3,101 | $ 3,975 | $ 4,602 | $ 4,894 |
| Cargo | 184 | 198 | 203 | 198 | 195 |
| Other | 22 | 31 | 55 | 75 | 85 |
| **Total Operating Revenue** | **2,141** | **3,329** | **4,233** | **4,875** | **5,174** |
| **Operating Expenses:** | | | | | |
| Salaries and Benefits | (504) | (559) | (633) | (649) | (695) |
| Aircraft Fuel | (630) | (981) | (1,214) | (1,290) | (1,308) |
| Aircraft Maintenance | (163) | (179) | (195) | (207) | (213) |
| Aircraft, Communications and Traffic Services | (297) | (436) | (518) | (557) | (579) |
| Passenger Services | (48) | (95) | (105) | (111) | (116) |
| Selling Expenses | (127) | (178) | (213) | (237) | (254) |
| Other Operating Expenses | (100) | (151) | (298) | (383) | (387) |
| Depreciation, Amortization And Aircraft Rent | (450) | (619) | (567) | (631) | (726) |
| **Total Operating Expenses** | **(2,319)** | **(3,199)** | **(3,743)** | **(4,064)** | **(4,276)** |
| Other Non-Operating Income/(Expense) | 26 | 3 | 6 | 4 | 5 |
| **Operating Income** | **(152)** | **133** | **496** | **816** | **902** |
| Restructuring Costs | (62) | 185 | 8 | 2 | - |
| Finance Cost, Net | (413) | (280) | (306) | (340) | (361) |
| **Total Other** | **(474)** | **(96)** | **(298)** | **(337)** | **(361)** |
| **Pretax Income** | **(626)** | **38** | **198** | **478** | **541** |
| Income Tax | 139 | (11) | (59) | (143) | (162) |
| **Net Income** | **(487)** | **26** | **139** | **335** | **379** |

---

[2] 2021 forecast includes the Debtors' actual results for January through May

## Projected Consolidated Balance Sheets

(unaudited); (in millions); (years ending December 31)

| | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|
| **Assets** | | | | | |
| Cash and Short Term Investments | $ 436 | $ 640 | $ 828 | $ 1,209 | $ 1,716 |
| Restricted Cash (Current) | 75 | 20 | 20 | 20 | 20 |
| Other Current Assets | 337 | 386 | 429 | 448 | 462 |
| Plant, Property & Equipment | 2,929 | 3,675 | 4,221 | 4,407 | 4,654 |
| Other Long Term Assets | 639 | 941 | 897 | 763 | 638 |
| **Total Assets** | **4,416** | **5,662** | **6,395** | **6,846** | **7,490** |
| | | | | | |
| **Liabilities** | | | | | |
| Current Liabilities | 1,214 | 1,235 | 1,435 | 1,507 | 1,579 |
| Long Term Debt | 4,236 | 3,772 | 4,122 | 4,137 | 4,322 |
| Other Liabilities | 719 | 499 | 543 | 573 | 580 |
| **Total Liabilities** | **6,169** | **5,506** | **6,101** | **6,217** | **6,482** |
| | | | | | |
| **Total Shareholders' Equity** | **(1,753)** | **156** | **295** | **629** | **1,008** |
| | | | | | |
| **Total Liabilities and Shareholders' Equity** | **4,416** | **5,662** | **6,395** | **6,846** | **7,490** |

5

## Projected Consolidated Statements of Cash Flows

(unaudited); (in millions); (years ending December 31)

| | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|
| **Cash Flow from Operations** | | | | | |
| Net income before taxes | $ (626) | $ 38 | $ 198 | $ 478 | $ 541 |
| Depreciation | 505 | 508 | 561 | 631 | 726 |
| Interest and Taxes | 213 | 134 | 143 | 165 | 161 |
| Provisions and Other Cash Flow Adjustments | (136) | (125) | 25 | 31 | 38 |
| Changes in Net Working Capital | (81) | 120 | 154 | 52 | 58 |
| **Net Cash Provided by Operating Activities** | **(126)** | **676** | **1,080** | **1,358** | **1,524** |
| | | | | | |
| **Cash Flow from Investing** | | | | | |
| Capital Expenditures | (122) | (240) | (346) | (360) | (304) |
| Other | (15) | (10) | 5 | (13) | (49) |
| **Net Cash Provided by Investing Activities** | **(137)** | **(250)** | **(341)** | **(373)** | **(353)** |
| | | | | | |
| **Cash Flow from Financing** | | | | | |
| Payment of Long Term Debt and Leases | (339) | (572) | (552) | (604) | (664) |
| Debt Proceeds | 625 | 350 | - | - | - |
| Other | 42 | - | - | - | - |
| **Net Cash Provided by Financing Activities** | **328** | **(222)** | **(552)** | **(604)** | **(664)** |
| | | | | | |
| **Net Increase (Decrease) in Cash** | **66** | **203** | **188** | **381** | **507** |
| Total Unrestricted Cash at Beginning | 371 | 436 | 640 | 828 | 1,209 |
| **Total Unrestricted Cash at End** | **436** | **640** | **828** | **1,209** | **1,716** |

## A.   Projected Consolidated Income Statement Assumptions

### 1.   Operating Revenues

#### a.   Passenger Revenue

Passenger Revenue is composed of the base fare (including any fuel cost recapture) plus all passenger-related ancillary revenues (baggage fees, change fees, gift cards, vacation packages, insurance etc.).

The Debtors project Passenger Revenue of $1.9 billion for 2021, a decline of 41% compared to the Debtors' results for 2019, due to ongoing disruptions from border closures and continued COVID-19 uncertainty. Between 2019 and 2025, Passenger Revenue is forecast to increase at a compound annual rate of 7% to a total of $4.9 billion in 2025. The increase is due to demand recovery following the COVID-19 pandemic, market consolidation and market growth combined with a recovery in unit revenues.

The Debtors project Available Seat Kilometers ("ASKs") of 35.5 billion in 2021, a reduction of 31% over the Debtors' results for 2019. Between 2019 and 2025, consolidated capacity is forecasted to increase at a compound annual rate of 6%, such that consolidated capacity in 2025 is projected to be 72.4 billion ASKs.

The Debtors forecast consolidated Passenger Revenue per Available Seat Kilometer ("PRASK") of 5.0¢ for 2021, a decline of 15% compared to the Debtors' results in 2019. During the Projection Period, consolidated PRASK is forecast to increase at a compound annual rate of 5% from 2021 to 2025, such that consolidated PRASK in 2025 is forecast to be 6.0¢.

6

ASK and PRASK growth are forecast using assumptions on supply, demand, inflation, foreign exchange rate, fuel prices and planned Company Initiatives. Demand is forecast using expected recovery timing and growth rates by customer segment, region and individual markets. Supply is forecast using management estimates of the outcome of market consolidation and the recovery in load factors. Fuel recapture, inflation and the impact of foreign exchange rates are forecast using industry projections and management estimates based on historical behavior.

Company Initiatives include capitalizing on market consolidation to build Mexico City hub to optimal scale with enhanced domestic and international connectivity, shifting passengers' purchasing channel to the Aeromexico website, increasing premium revenue through enhanced distribution and revenue products, shifting to a revenue-based loyalty model that prioritizes highest value customers and strengthening ties with partner airlines to increase leadership in international markets.

### b.  Cargo Revenue

Cargo Revenue includes freight and mail revenue generated by the cargo space on passenger aircraft, cargo charters and bonded warehouse fees. Cargo Revenue is forecast to decline by 16% in 2021 compared to the Debtors' results in 2019. It is then forecast to increase by a compound annual rate of 1% between 2021 and 2025. This recovery pace reflects the relatively slower recovery of widebody flying which carries the bulk of the non-charter cargo, a reduction in charter revenue that had temporarily increased in 2020 and 2021 due to the pandemic, and a slight increase from the upgauging of the fleet over the Projection Period.

### c.  Other Operating Revenue

Other Operating Revenue is composed of unearned ticket revenue and a contra-revenue related to the mileage accrual payments to PLM. The amount of these Other Revenue components in 2019 were a positive $148M and $90M contra-revenue, respectively. The Debtors projected total Other Revenue of $22 million for 2021 represents a decline of 62% from 2019. Between 2019 and 2025, Other Revenue is expected to increase at a compound annual rate of 6%, such that in 2025 it reaches $85 million.

## 2.  Operating Expenses

### a.  Salaries and Benefits

Salaries and Benefits are projected to be the Debtors' second largest expense, representing approximately 22% of 2021 operating expense. During the post-petition period, the Debtors lowered salary and benefits costs through headcount and pay rate reductions, productivity improvements and selective outsourcing. During the Projection Period, these expenses are forecast based on anticipated operating levels, the impact of ongoing initiatives to improve productivity, the terms of renegotiated collective bargaining agreements, and the projected wages and benefits for management and other non-unionized employees and incorporating productivity improvements associated with upgauging the fleet. Certain salaries and benefits components are considered variable and scale up with operations. SG&A labor is considered fixed, but steps up in 2023 as the operation grows.

### b.  Aircraft Fuel

Aircraft Fuel is projected to be the Debtors' largest expense. The Consolidated Financial Projections assume fuel costs to be driven by a combination of Brent oil prices forecasted at $75/bbl throughout the projection period based on management estimates informed by current market pricing and forecasts, as well as an estimated conversion cost comprised of the crack spread and into plane costs based on historical data. Fuel consumption is based on the forecasted level of operations for each aircraft type.

7

The fuel expense forecast assumes no hedging, however the projections include estimated recoveries of fuel cost related to Brent oil above $65/bbl via fare increases at 30% of the difference between $75/bbl and $65/bbl in 2023 and 60% in 2024 and 2025. The forecasted fuel price recapture is recognized within passenger revenue.

The total average fuel cost for the Debtors is projected to increase from $630 million in 2021 to $1,308 million in 2025 mainly driven by a 104% increase in ASKs over the period.

### c.  Aircraft Maintenance

Aircraft maintenance includes all insourced and outsourced direct maintenance costs such as engine overhauls, airframe heavy check overhauls, engineering orders, repairs and materials.  It does not include internal labor.  It also includes an accrual for aircraft redelivery costs that will be paid at the end of the aircraft leases.  Heavy maintenance costs such as engine overhauls, airframe checks and landing gear are not included in aircraft maintenance but are treated as capital expenditures and depreciated. The projections include the benefit of replacing aging aircraft with new deliveries during the Projection Period as well as savings from restructuring vendor contracts.

### d.  Aircraft, Communications and Traffic Services

Aircraft communications and traffic services includes insourced and outsourced costs. Variable costs include landing and takeoff fees and inflight radio communication costs, driven by departures and ASKs respectively. Other station level variable costs are driven by ASDs in the forecast. Fixed costs include infrastructure such as facilities leases and are forecast to increase in 2023 as the business scales. The projections include the benefit of cost savings as a result of company initiatives including reducing airport space and renegotiating more favorable ground handling cost at international stations.

### e.  Passenger Services

Passenger services includes on-board amenities, food and beverages and airport lounge expenses. These costs are assumed to be 100% variable, increasing in line with departures, passengers and the total number of aircrafts. Company initiatives are estimated to drive cost savings per passenger compared to 2019 through a reduction in variable rate-based costs.

### f.  Selling Expenses

Selling Expenses consist of booking fees and travel agency commissions expense.  These expenses tend to vary with revenue and passenger counts. Selling Expenses are forecasted to grow over the projection period, with the variable portion driven by growth in passenger revenue over the same period. Company initiatives are estimated to drive cost savings associated with selling expenses through the renegotiation of third party booking agency contracts.

### g.  Other Operating Expenses

Other operating expenses include insurance, information technology, administrative and marketing costs. Other Operating Expenses are forecasted to grow during the projection period to reflect the increasing size of the business (both passengers and ASKs).  Other operating expenses also includes customer and employee reinvestment of $120mm in 2023, $200mm in 2024, and $200mm in 2025. These amounts are forecasted to strengthen the airline's value proposition and are considered necessary for it to be able to remain competitive in the premium market segment that Aeromexico focuses on. Up to $40mm per year of the reinvestment is forecasted for employee profit sharing.

### h.  Depreciation and Amortization and Aircraft Rent

The Consolidated Financial Projections include depreciation and amortization using the straight-line method over the estimated useful life of the property and equipment, primarily related to aircrafts and capitalized maintenance. The useful life varies between three and 30 years depending on the fixed asset. In addition, the Debtors have intangible assets related to real estate rights of use, held by trust, and software assets for which they recognize amortization expense.

Aircraft rent includes payments for leases outside of IFRS 16 scope, including "Power-by-the-Hour" agreements. Aircraft rent is forecasted based on current or expected lease rates for current and new aircraft.

### i.  Other Non-Operating Income/(Expense)

Other non-operating income includes equity income related to the investment in PLM, that owns and operates the Club Premier loyalty program, offset by estimated other non-operating expenses.

### j.  Restructuring Costs

Restructuring costs include restructuring advisor professional fees, severance payments, fleet restructuring impacts, debt extinguishment and other one-time items related to the Chapter 11 case. Restructuring costs are forecasted based on when the expense is expected to occur.

### k.  Finance Cost, Net

Finance Cost includes funded debt and implied interest on capitalized leases, as well as credit card processing fees, DIP fees (including $47 million of exit fees for Tranche 2) and implied interest on the pension plan liability. Net interest expense is forecasted based on contractual interest rates and expected debt renegotiations.

Finance Cost is forecasted to decline from 2021 to 2022 by over $100 million mainly due to repayment of the DIP Loan through an equity rights offering and new exit debt of $350mm, as well as the one-time DIP related fees in 2021 (forecasted based on contractual terms). Finance Costs are forecasted to increase from 2022 through the Projection Period due to the addition of debt from new aircraft purchases and higher credit card processing fees that are forecasted to grow in line with the growth in revenues over the same period.

### a.  Income Taxes

The Debtors assume a statutory tax rate of approximately 30% throughout the Projection Period. The Debtor expects to utilize net operating losses ("NOLs"), subject to statutory limitations, to offset part of the Debtors anticipated taxable income during the Projection Period. The NOL balance as of December 31, 2020 was $1.4 billion and is forecasted to grow to $2.1 billion by December 31, 2021.  Taxes are incurred and paid on an individual legal entity basis, and some portion of the NOL is not forecasted to be fully available to offset taxable income.

## B.  Notes to Projected Consolidated Balance Sheet Assumptions

### 1.  Cash, Short Term Investments and Restricted Cash

Restricted cash mainly relates to collateralized letters of credit and securitized cash flows from credit card ticket sales.

### 2.  Current Assets

Current Assets is comprised of receivables, inventories (flight, maintenance, fuel, operating supplies) and prepaid assets. Working capital balances are forecasted based on their historical relationships to revenue and expenses.

### 3.  Property, Plant and Equipment

Property and equipment primarily relate to flight equipment and capitalized maintenance. The useful life varies between three and 30 years depending on the fixed asset. PP&E is forecasted based on fleet planning and expected contracts renegotiation with aircraft lessors and lenders.

### 4.  Other Long Term Assets

Other Long Term Assets refer primarily to deferred tax assets (primarily net operating losses carryforward), aircraft leasing deposits, and maintenance reserves. Deferred tax assets are forecasted based on expected future profitability and NOL utilization, and leasing deposits and maintenance reserves are forecasted based on fleet planning and aircraft usage. In addition, the Debtors have a variety of intangible assets for which they recognize amortization expense.

### 5.  Current Liabilities

Current Liabilities is comprised of accounts payable, advanced ticket sales (air traffic liability), and other accrued liabilities. Working capital balances are forecasted based on their historical relationships to revenue and expenses.

The air traffic liability ("**ATL**") also includes vouchers and unflown tickets with flight dates scheduled in the past. As of April 2021, the total ATL balance was $503 million with vouchers and ATL for flights scheduled in the past accounting for $330 million.

### 6.  Long-Term Debt

The Projections assume that Tranche 1 of the DIP Loan ($200mm) is repaid via proceeds of new exit financing debt ($350mm senior secured first lien notes) and that Tranche 2 of the DIP Loan is repaid via capital raised through an equity rights offering upon emergence. The Unsecured Debt is assumed to be extinguished upon emergence. Fleet Debt and Capitalized Fleet Operating Leases are based on the fleet plan and restructured lease terms.  Capitalized Fleet Operating Leases are capitalized at a 6% discount rate.

(unaudited); (in millions); (years ending December 31)

| | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|
| DIP Loan | $ 1,121 | $ - | $ - | $ - | $ - |
| New Exit Debt | - | 350 | 350 | 350 | 350 |
| Capitalized Fleet Operating Leases | 1,648 | 2,479 | 2,882 | 2,946 | 3,178 |
| Fleet Debt | 348 | 297 | 245 | 198 | 152 |
| Secure Non-Fleet Debt | 591 | 590 | 589 | 588 | 587 |
| Non-Fleet Operating Leases | 56 | 56 | 56 | 56 | 56 |
| Unsecured | 472 | - | - | - | - |
| **Total Long-Term Debt** | **4,235** | **3,772** | **4,122** | **4,137** | **4,322** |

### 7.  Other Liabilities

Other Long Term Liabilities refer primarily to employee long term benefits, lease return accruals, and provisions. Lease return accruals are forecasted based on fleet planning and expected contracts renegotiation with aircraft lessors and lenders.

## C.  Notes to Projected Consolidated Cash Flow Assumptions

### 1.  Cash from Operating Activities

The Debtors project they will generate positive cash flow from operations from 2022. Cash flow from operating activities is projected to increase from an estimated $676 million cash inflow in 2022 to $1,524 million cash inflow in 2025.  The aggregate forecasted cash produced from operating activities during the Projection Period is over $4.5 billion. Improved cash flow is a result of, among other things, the projected growth in revenue throughout the Projection Period, coupled with reductions in salaries and related costs, reductions in aircraft rents, concessions from vendors and various other cost reduction initiatives implemented by the Debtors during the Chapter 11 restructuring.

### 2.  Cash from Investing Activities

Net cash flow from investing activities is projected to use $1.5 billion over the Projection Period. This mainly reflects capital expenditures of approximately $1.4 billion to sustain existing aircraft infrastructure, implement planned product improvements and support growth. Other cash flow from investing activities relates to dividends received from equity investments, lease deposits and lease return payments.

### 3.  Cash from Financing Activities

The Consolidated Financial Projections anticipate the use of $1.7 billion during the Projection Period to meet required principal payments related to debt secured by aircraft and capital leases. Long term debt and lease payments are partially offset by the DIP Tranche 2 draw of $625mm in 2021 and $350mm of new exit financing debt proceeds (senior secured first lien notes) forecasted on emergence. Other Cash from Financing Activities relates to letters of credit and restricted cash.

## D.  Management View Consolidated Summary P&L and Cash Flow

The Management View Consolidated Summary P&L shows EBITDAR and EBIT before one-time items such as transaction expenses and impairment losses and before certain adjustments related to IFRS 16 ("**Adjusted EBITDAR** and "**Adjusted EBIT**").  Aircraft and other operating leases are not capitalized in the Management View Consolidated Summary P&L and Consolidated Adjusted EBITDAR to Cash Flow.

## Projected Consolidated Summary P&L[3]

(unaudited); (in millions); (years ending December 31)

|  | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|
| **Operating Revenue** | $ 2,141 | $ 3,329 | $ 4,233 | $ 4,875 | $ 5,174 |
| **Operating Expenses:** | | | | | |
| Salaries and Benefits | (501) | (559) | (633) | (649) | (695) |
| Aircraft Fuel | (630) | (981) | (1,214) | (1,290) | (1,308) |
| Aircraft Maintenance | (163) | (179) | (195) | (207) | (213) |
| Aircraft, Communications and Traffic Services | (320) | (460) | (542) | (581) | (603) |
| Passenger Services | (48) | (95) | (105) | (111) | (116) |
| Selling Expenses | (128) | (178) | (213) | (237) | (254) |
| Other Operating Expenses | (122) | (151) | (298) | (383) | (387) |
| **Total Operating Expenses** | **(1,912)** | **(2,605)** | **(3,200)** | **(3,457)** | **(3,575)** |
| Other Non-Operating Income/(Expense) | 6 | 3 | 6 | 4 | 5 |
| **Adjusted EBITDAR** | **235** | **728** | **1,039** | **1,422** | **1,604** |
| *Adjusted EBITDAR Margin %* | *11.0%* | *21.9%* | *24.5%* | *29.2%* | *31.0%* |
| Aircraft Rent | (218) | (407) | (481) | (532) | (594) |
| Depreciation and Amortization | (185) | (165) | (186) | (211) | (262) |
| **Adjusted EBIT** | **(168)** | **156** | **372** | **680** | **748** |
| *Adjusted EBIT Margin %* | *(7.9%)* | *4.7%* | *8.8%* | *13.9%* | *14.5%* |
| ***Operating Statistics*** | | | | | |
| *Passengers (mm)* | *16.8* | *25.8* | *29.0* | *30.8* | *32.1* |
| *RPKs (Bn)* | *26.4* | *42.7* | *52.7* | *57.2* | *59.9* |
| *ASKs (Bn)* | *35.5* | *53.0* | *64.8* | *69.6* | *72.4* |
| *Load Factor (%)* | *75%* | *81%* | *81%* | *82%* | *83%* |
| *Total # Contracted Aircraft Hulls (Avg.)* | *111* | *136* | *141* | *149* | *150* |
| *Total Aircraft Block Hours ('000's)* | *375.5* | *546.8* | *642.2* | *675.0* | *677.6* |
| *Fuel Liters (mm)* | *1,095.9* | *1,517.7* | *1,838.6* | *1,953.1* | *1,981.1* |
| ***Operating Metrics*** | | | | | |
| *Yield (US cents)* | *6.7* | *6.5* | *6.8* | *7.2* | *7.3* |
| *TRASK (US cents)* | *6.0* | *6.3* | *6.5* | *7.0* | *7.1* |
| *PRASK (US cents)* | *5.0* | *5.3* | *5.5* | *5.9* | *6.0* |
| *Pro Forma CASK (US cents)* | *6.5* | *6.0* | *5.8* | *5.7* | *5.8* |
| ***Fleet Count (Year-end)*** | | | | | |
| *Narrowbody* | *109* | *131* | *130* | *134* | *133* |
| *Widebody* | *16* | *20* | *20* | *20* | *21* |
| *Total* | *125* | *151* | *150* | *154* | *154* |

---

[3] Pro Forma CASK metric reflects cost structure before additional investment in people and customer experience

12

## Projected Consolidated Adjusted EBITDAR to Cash Flow

(unaudited); (in millions); (years ending December 31)

|  | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---:|---:|---:|---:|---:|
| Adjusted EBITDAR | $ 235 | $ 728 | $ 1,039 | $ 1,422 | $ 1,604 |
| Aircraft Ownership Payments | (235) | (463) | (536) | (586) | (647) |
| Maintenance Capex & Redelivery Payments | (97) | (213) | (316) | (356) | (332) |
| Cash Taxes | - | - | - | - | (21) |
| Net Working Capital | 167 | 147 | 158 | 53 | 58 |
| Other Operating Items | (97) | (77) | (87) | (85) | (88) |
| **Unlevered Free Cash Flow from Operations** | **(28)** | **122** | **259** | **448** | **575** |
| Restructuring Items | (417) | (5) | (4) | (0) | - |
| Non-Fleet Cash Interest & Fees | (114) | (65) | (66) | (67) | (68) |
| DIP Loan / New Debt Proceeds | 625 | 150 | - | - | - |
| **Net Cash Flow** | **66** | **203** | **188** | **381** | **507** |

13

**<u>Appendix D</u>**

**Valuation Analysis**

**THE VALUATION INFORMATION CONTAINED IN THE FOLLOWING ANALYSIS IS NOT A PREDICTION OR GUARANTEE OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN. THIS VALUATION IS PRESENTED SOLELY FOR THE PURPOSE OF PROVIDING ADEQUATE INFORMATION AS REQUIRED BY SECTION 1125 OF THE BANKRUPTCY CODE TO ENABLE THE HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN AND SHOULD NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING THE PURCHASE OR SALE OF CLAIMS AGAINST THE DEBTORS OR ANY OF THEIR AFFILIATES.**

Solely for the purposes of the Plan and the Disclosure Statement, Rothschild & Co US Inc. ("Rothschild & Co"), as financial advisor and investment banker to the Debtors, has estimated the value of the Reorganized Debtors on a going concern basis and pro forma for the transactions contemplated by the Plan.

Rothschild & Co utilized a marketing and exit financing process to assess the plan value of the Debtors and refinance the Debtors' Tranche 1 DIP Facility Claim and Tranche 2 DIP Facility Claim.

Based on this market-based process and consistent with the prevailing bid ("Joint Creditor Proposal"), Rothschild & Co has estimated the Reorganized Debtors' going concern total enterprise value to be $5.4 billion with a plan equity value of $2.680 billion (assuming a payoff of Tranche 2 Obligations and PLM acquisition funding).

Rothschild & Co and the Debtors believe that the investment-backed value implied by the Joint Creditor Proposal following a robust marketing and exit financing process is the best available indicator of value of the Reorganized Debtors.

Additional considerations

Rothschild & Co's views are necessarily based on economic, monetary, market, and other conditions as in effect during the marketing and exit financing process. The credit, financial and stock markets have been experiencing unusual volatility, and Rothschild & Co expresses no opinion or view as to any potential effects of such volatility on the Reorganized Debtors or their value. Rothschild & Co does not have any obligation to update, revise, or reaffirm its analysis or its estimate based on subsequent developments. The estimated enterprise value set forth above represents a total enterprise value of the Reorganized Debtors as the continuing operators of the business and assets of the Debtors, after giving effect to the Plan.

The estimated values in this section do not purport to constitute an appraisal or necessarily reflect the actual market value that might be realized through a sale or liquidation of the Reorganized Debtors, their securities or their assets, which may be materially higher or lower than the estimated enterprise value range herein. The actual value of an operating business such as the Reorganized Debtors' business is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in various factors affecting the financial condition and prospects of such a business. The estimated values in this section do not constitute a recommendation to any Holder of a Claim or Interest as to how such Holder of a Claim or Interest should vote or otherwise act with respect to the Plan. Rothschild & Co has not been asked to and does not express any view as to what the trading value of the Reorganized Debtors' securities would be when issued pursuant to the Plan or the prices at which they may trade in the future. The estimated values set forth herein do not constitute an opinion as to fairness from a financial point of view to any Holder of a Claim or Interest of the consideration to be received by such Holder of a Claim or Interest under the Plan or of the terms and provisions of the Plan.

None of the Debtors, Rothschild & Co or any other person assumes responsibility for the accuracy of the estimated Plan enterprise and equity value. Depending on the actual financial results of the Debtors or changes in the economy and the financial markets, the enterprise and equity value of the Reorganized Debtors as of the Assumed Effective Date may differ from the estimated enterprise and equity value set forth herein. In addition, the market prices, to the extent there is a market, of Reorganized Debtors' securities will depend upon, among other things, prevailing interest rates, conditions in the economy and the financial markets, the investment decisions of creditors receiving

such securities under the Plan (some of whom may prefer to liquidate their investment rather than hold it on a long-term basis), and other factors that generally influence the prices of securities.

**<u>Appendix E</u>**

**Organizational Chart**



50% Mexicana de Aviacion's ownership: Sistemas Corporativos de Personal, SA de CV, Aeromexpress, Centro de Capacitación Alas de América, Fideicomiso SEAT, Aerosys

Grupo Aeromexico, S.A.B. de C.V. is the holding Company
The rest are parents and subsidiaries companies
All companies are organized under the laws of Mexico and located at Paseo de la Reforma 243, 25th floor, Cuauhtemoc, 06500, Mexico City, Mexico.