## <u>EXHIBIT 2</u>

<u>EQUITY EXIT FINANCING, DIP AMENDMENT AND SETTLEMENT TERM SHEET</u>

The following term sheet (this *"Term Sheet")* summarizes the principal terms and conditions of a proposed investment in Grupo Aeroméxico, S.A.B. de C.V. *("Grupo"* and, together with its direct and indirect subsidiaries, the *"Company")* and certain of its affiliates pursuant to a chapter 11 plan of reorganization. This Term Sheet is non-binding, and is not an express or implied offer with regard to the transactions described herein, and does not include all of the terms or conditions relating to such transactions. Any agreement with respect to the matters discussed herein shall be subject in all respect to negotiation and execution of definitive documentation.

THIS TERM SHEET IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF ANY CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE OR ANY OTHER PLAN OF REORGANIZATION OR SIMILAR PROCESS UNDER ANY OTHER APPLICABLE LAW. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS, PROVISIONS OF THE BANKRUPTCY CODE AND/OR OTHER APPLICABLE LAWS.

THIS TERM SHEET IS FOR SETTLEMENT DISCUSSION PURPOSES ONLY, SUBJECT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE. UNTIL PUBLICLY DISCLOSED WITH THE PRIOR CONSENT OF THE REQUIRED COMMITMENT PARTIES, APOLLO, DELTA, AND THE DEBTORS, THIS TERM SHEET AND THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL AND MAY NOT BE SHARED WITH ANY PERSON OTHER THAN THE COMMITMENT PARTIES, APOLLO, DELTA, THE MEXICAN INVESTORS AND THEIR RESPECTIVE PROFESSIONAL ADVISORS.

| General Terms: | |
|---|---|
| **Implementation** | The transactions contemplated by this Term Sheet shall be implemented through (i) the Exit Financing Approval Order (as defined below), (ii) the DIP Credit Agreement Amendment (as defined below) and (iii) the confirmation and effectiveness of a chapter 11 plan consistent in form and substance with this Term Sheet and otherwise subject to the consent rights set forth herein, and which shall provide for the settlement of all claims between the parties hereto and the Debtors in exchange for the consideration provided for in such plan (a *"Chapter 11 Plan",* and the date on which a Chapter 11 Plan becomes effective, the *"Effective Date"*). |

| | |
|---|---|
| **Investors** | (i) Certain of the members of the Ad Hoc Group of OpCo Creditors represented by Katten Muchin Rosenman LLP and Arnold & Porter Kaye Scholer LLP (the "***Claimholder Investors***"), (ii) other entities that execute the Equity Commitment Letter (as defined below) (the "***Other Commitment Parties***"); (iii) Delta Air Lines, Inc. ("***Delta***"), upon executing the Equity Commitment Letter, and (iv) a group of Mexican investors consisting of Eduardo Tricio Haro, Antonio Cosio Pando, Valentin Diez Morodo, and Jorge Esteve Recolons (clause (iv) collectively, the "***Mexican Investors***") ((i) through (iv), collectively, the "***Commitment Parties***" and each of (i) through (ii), an "***Investor Group***"). |
| **Exit Financing** | The Commitment Parties (other than Delta and the Mexican Investors) shall purchase or fund, as applicable, $620 million of new equity (the "***Committed Equity Amount***"), which, including the Commitment Premium (defined below), shall represent 27.2%[1] of all New Shares issued as of the Effective Date (before giving effect, solely to the extent applicable, to the exercise of any Preemptive Rights (as defined below) which any existing Grupo shareholder may be entitled to (other than any existing shareholders that (i) are party to that certain Support Agreement dated as of September 4, 2020 by and between Grupo, Alpage Debt Holdings S.à.r.l. and the shareholders party thereto from time to time (the "***Shareholder Support Agreement***") or (ii) have otherwise waived their Preemptive Rights) and concurrently with the issuance of the New Shares) and subject to *pro rata* dilution on account of the MIP (as defined below) (such aggregated dilution as described in this parenthetical, and in respect of any future equity issuances that may be consummated by Grupo after the Effective Date, collectively, the "***Specified Dilution***")), consisting of single series shares (*Serie Unica*) (the "***Serie Unica Shares***") or, in the event that, with the prior approval of the Required Commitment Parties, Apollo (as defined below) and Delta, the existing foreign investment authorization (if required) and the bylaws of Grupo are amended, in compliance with applicable Mexican law, to contemplate different series of shares, "N" shares with limited voting rights ("***Series N Shares***") no worse in any respect than the corresponding rights currently set forth in the bylaws of Grupo for ordinary shares classified as "neutral," and "O" shares with full voting rights ("***Series O Shares***"), providing for the Minimum Ownership Requirements (as defined below) of Reorganized Grupo's (as defined below) common stock (each of the *Serie Unica* Shares, Series N Shares and the Series O Shares, as |

---

[1] Percentages assume all claims on account of Tranche 2 DIP Loans receive equity.

<table>
<tr><td></td><td>applicable, the "<strong><em>New Shares</em></strong>") (such financing (constituting a capital increase in Grupo), the "<strong><em>Equity Financing</em></strong>").

In addition, certain of the Commitment Parties (other than Delta and the Mexican Investors) shall commit to purchase or fund, as applicable, senior secured first lien notes in an aggregate principal amount of up to $762.5 million (the "<strong><em>New Debt</em></strong>"), the terms of which shall be set forth in a term sheet attached to a separate debt commitment letter (the "<strong><em>Debt Financing Commitment Letter</em></strong>") to be delivered to the Debtors (as defined below) on or around the date of the delivery of the Equity Commitment Letter (as defined below) (such financing, the "<strong><em>Debt Financing</em></strong>" and, together with the Equity Financing, the "<strong><em>Financing</em></strong>"). Certain Commitment Parties (other than Delta and the Mexican Investors) and/or other third party investors may provide exit debt financing in lieu of the Debt Financing contemplated by the Debt Financing Commitment Letter through a syndication expected to be arranged by JPMorgan on terms reasonably satisfactory to the Debtors, the Required Commitment Parties, Delta and Apollo (the "<strong><em>Alternative Exit Debt Financing</em></strong>").

"<strong><em>Required Commitment Parties</em></strong>" shall mean Claimholder Investors and/or Other Commitment Parties then holding at least 50% of the Commitments held by (i) all Claimholder Investors and (ii) all Other Commitment Parties.</td></tr>
<tr><td><strong>Allocation of the Committed Equity Amount</strong></td><td>Commitments to purchase the New Shares (such equity purchase commitments, the "<strong><em>Commitments</em></strong>"), shall be memorialized in definitive documentation, including a commitment letter (the "<strong><em>Equity Commitment Letter</em></strong>") and a subscription agreement executed by the Commitment Parties and the Company for the New Shares (the "<strong><em>Subscription Agreement</em></strong>").

The Commitments in respect of the New Shares shall be allocated among the Commitment Parties as set forth on the schedules to the Equity Commitment Letter and the Subscription Agreement (the "<strong><em>Allocation</em></strong>").

The Commitments in respect of $310 million of new equity shall be allocated <em>pro rata</em> among the Commitment Parties that execute the Equity Commitment Letter (or a joinder to the Equity Commitment Letter) through and including December [__], 2021 (the "<strong><em>Initial Commitment Parties</em></strong>"). Any holder of Aerovías de México, S.A. de C.V. General Unsecured Claims may participate in the Initial Allocation.</td></tr>
</table>

3

| | |
|---|---|
| | Following the Initial Allocation, the Commitments in respect of an additional $310 million of new equity shall be allocated *pro rata* among the Initial Commitment Parties and any other holder of Aerovías de México, S.A. de C.V. General Unsecured Claims that executes the Equity Commitment Letter (or a joinder to the Equity Commitment Letter) (together with the Initial Commitment Parties, the "***Final Commitment Parties***").<br><br>The Commitment Premium shall be allocated among the Final Commitment Parties *pro rata.* |
| **PLM Stock Participation Transaction** | In the event the Company determines to acquire the equity of PLM Premier, S.A.P.I de C.V. ("***PLM***") not directly or indirectly owned by Grupo or any of its direct or indirect subsidiaries as of the Closing Date (the "***PLM Stock Participation Transaction***") after payment in full of any Tranche 2 Obligations under the DIP Credit Agreement on account of which the right to convert such claims into equity of Reorganized Grupo has not been exercised, up to $375,000,000 shall be available to the Debtors (as defined below) through the Financing to be used in connection with the PLM Stock Participation Transaction as follows:<br><br>• up to $187.5 million of the Committed Equity Amount shall be used in connection with the PLM Stock Participation Transaction; and<br><br>• up to $187.5 million in principal amount of New Debt in respect of the Notes Purchase Amount B (as defined in the Debt Financing Commitment Letter) shall be purchased by certain of the Commitment Parties (other than Delta and the Mexican Investors), or shall be available from the Alternative Exit Debt Financing.<br><br>• Whether or not there is a PLM Stock Participation Transaction, $187.5 million from the Equity Financing shall at all times constitute part of the Committed Equity Amount, including related to the calculation of the Commitment Premium (as defined below), and none of the Committed Equity Amount, the Allocations or any Commitment of any Commitment Party shall be adjusted downward except upon the prior written consent (with email being sufficient) of each affected Commitment Party. In the event that there is no PLM Stock Participation Transaction, $187.5 million from the Debt Financing shall be funded, but may be subject to repurchase pursuant to the terms of the Debt Financing Commitment |

4

| | |
|---|---|
| | Letter to the extent the PLM Stock Participation Transaction is not consummated. |
| **Delta Purchase Amount** | In addition to the Equity Financing by the Commitment Parties (other than Delta and the Mexican Investors), Delta shall subscribe and pay for $100 million of New Shares (the "***Delta Purchase Amount***") at the Price Per Share (as defined below). The investment shall be made by Delta pursuant to the Subscription Agreement. In connection with this investment, Delta shall receive the Commitment Premium in respect of the Delta Purchase Amount.

Delta shall additionally be required to convert all fully accrued amounts of its Tranche 2 Loans, including all PIK interest and its equity conversion fee[2] to New Shares at Plan Equity Value (as defined below) (the "***Delta Tranche 2 DIP Conversion***").

In exchange for (i) the assumption, amendment and extension of the joint cooperation agreement, dated May 27, 2015, by and among Aerovías de México, S.A. de C.V. and Delta, as of the Petition Date and any amendments, supplements or other modifications thereto through the Effective Date (the "***Delta JCA***"), and (ii) entry into a service agreement, as mutually agreed to by Delta and the Debtors, which shall document the continuation of the scope and level of support services Delta currently provides in support of the joint venture and strategic alliance between Delta and the Company (the "***Delta Service Agreement***"), Delta shall receive a contract fee (the "***Contract Fee***") at the Effective Date. The Contract Fee shall equal 20.0% of the New Shares *less* the New Shares Delta receives on account of (i) the Delta Purchase Amount, (ii) the Delta Tranche 2 DIP Conversion and (iii) the Commitment Premium as of the Effective Date (the "***Delta New Share Formula***"). As a result, the Chapter 11 Plan shall reflect that Delta shall receive 20.0% of all New Shares issued under the Chapter 11 Plan (which shall represent 20.0% of the capital stock of Reorganized Grupo on the Effective Date (subject to the Specified Dilution) ("***Delta Ownership Interest***").[3] In addition, any or all portions of Delta's claims asserted against the Debtors shall be allowed and satisfied in accordance with the Chapter 11 Plan and any distributions of New Shares on such claims shall be in addition to Delta's Ownership Interest. |

---

[2]    For avoidance of doubt, this fully accrued amount, including PIK interest, and the equity conversion fee, is projected to be approximately $234 million, as of December 30, 2021.

[3]    Delta's receipt of 20.0% of all New Shares issued under the Chapter 11 Plan shall not be affected by any election hereunder.

5

|  | It shall be a condition precedent to the Effective Date of the Chapter 11 Plan for the Contract Fee to have been approved by the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") as part of the Chapter 11 Plan (the "**Delta Condition Precedent**") and such Contract Fee shall be paid on the Effective Date to Delta. The Chapter 11 Plan shall provide that any waiver of the Delta Condition Precedent shall be in Delta's sole discretion. |
|---|---|
| **Apollo Settlement Consideration** | In full and final satisfaction, settlement, release, and discharge of and in exchange for Apollo Management Holdings, L.P.'s (on behalf of one or more affiliates and/or funds or separate accounts managed by it and its affiliates, including Alpage Debt Holdings S.à r.l., "**Apollo**") Tranche 2 Loans, including all PIK interest and its equity conversion fee, and in consideration for Apollo's syndication of the DIP Loans and in full settlement of all claims Apollo may have, Apollo shall receive on the Effective Date (i) accrued interest at the applicable interest rate under the DIP Credit Agreement on the outstanding obligations under the Tranche 2 DIP Loans commencing on December 31, 2021 through the Effective Date in cash and (ii) 28.28% of all New Shares issued as of the Effective Date (subject to the Specified Dilution).<br><br>The Apollo Obligations (as defined below) shall terminate (i) automatically if the Effective Date has not occurred by the Outside Date and (ii) at Apollo's option if there is a Termination of the Subscription Agreement as to all Commitment Parties. |
| **DIP Credit Agreement Amendment** | Apollo reserves all rights and remedies under the DIP Credit Agreement[4] and other DIP Loan Documents, and nothing herein shall constitute a waiver thereof, nor shall it be a bar to the exercise of Apollo's rights or remedies at a later date; *provided* that the exercise of such rights or remedies shall not be inconsistent with the terms set forth herein or otherwise frustrate the consummation of the Restructuring.<br><br>Apollo, Delta and the Mexican Pension Fund, as applicable, shall enter into an amendment to the DIP Credit Agreement (the "**DIP Credit Agreement Amendment**") to: |

---

[4]    All terms used but not defined herein shall have the meaning ascribed to such terms in that certain $1 billion super-priority debtor-in-possession term loan agreement (the "**DIP Credit Agreement**") entered into as of November 6, 2020 by and among Grupo as Borrower, the Guarantors party thereto, the DIP Lenders party thereto and UMB Bank National Association, as Administrative Agent and Collateral Agent.

6

|  | • permit the proposed Restructuring on the terms set forth in this Term Sheet, *provided* that the DIP Credit Agreement Amendment shall provide that such amendments and each applicable Tranche 2 Lender that has elected to convert its Tranche 2 Loans into New Shares pursuant to the Restructuring shall be subject to (i) the satisfaction of the applicable conditions set forth under "Conditions Precedent" below, (ii) the accuracy in all material respect of all representations of the Debtors set forth under "Debtors' Representations and Warranties" below and (iii) compliance by the Debtors with the undertakings set forth under "Debtors' Covenants" and "Interim Operating Covenants" below and any other representations, warranties, covenants and termination events set forth in the Subscription Agreement;<br><br>• amend the Milestones (as defined in the DIP Credit Agreement) thereunder to the extent necessary to comply with the timeline as set forth in this Term Sheet, including to extend the Scheduled Maturity Date (as defined in the DIP Credit Agreement) to the Outside Date (as defined below), which shall be extended without any extension fee; and<br><br>• reimburse all reasonable and documented out-of-pocket fees, costs and expenses of Apollo, including, without limitation, in connection with the preservation or enforcement of its rights under the DIP Credit Agreement, the preparation, execution and delivery of the Definitive Documentation in connection with the proposal contained within this Term Sheet and any other exit financing proposal, including the reasonable and documented fees, costs and expenses of Cleary Gottlieb Steen & Hamilton LLP, Creel, García-Cuéllar, Aiza y Enríquez, S.C., Paul, Weiss, Rifkind, Wharton & Garrison LLP, Seabury Corporate Finance LLC, Barclays Industrial Coverage, Barclays Mexico Banking and ECM, and Evercore Group L.L.C. (with the terms of reimbursement of success fees to be set forth in the Chapter 11 Plan), as advisors to Apollo. |
|  | The DIP Credit Agreement Amendment shall be approved by the Bankruptcy Court on a date no later than the date on which the Equity Financing Approval Order is approved. The DIP Credit Agreement Amendment and the order approving the DIP Credit Agreement Amendment shall be consistent with the Equity Commitment Letter and this Term Sheet and otherwise in form and substance acceptable to Apollo and reasonably acceptable to the Required Commitment Parties and Delta. |

7

| | |
|---|---|
| **Mexican Pension Fund DIP Conversion** | Banco Nacional de México, S.A., Integrante del Grupo Financiero Banamex, División Fiduciaria, solely in its capacity as trustee of the irrevocable trust (*fideicomiso irrevocable*) agreement number F/17937-8 (the "***Mexican Pension Fund***") shall convert all fully accrued amounts of its Tranche 2 Loans, including all PIK interest and its equity conversion fee, in full and final satisfaction, settlement, release, and discharge of and in exchange for the Mexican Pension Fund's Tranche 2 Loans, into approximately 3.54% of all New Shares issued as of the Chapter 11 Plan's Effective Date (subject to the Specified Dilution).[5] |
| <u>**New Shares:**</u> | |
| **Issuer** | Grupo (together with its debtor affiliates, the "***Debtors***"), as reorganized pursuant to the Chapter 11 Plan *("Reorganized Grupo"),* effective immediately after the conversion of any claims against Grupo and its Debtor affiliates into equity of Reorganized Grupo, on the Effective Date. |
| **Purchase Price** | The subscription price for the New Shares (such amount, on a per New Share basis, the "***Price Per Share***") by the Commitment Parties shall be at a price per share calculated at Plan Equity Value (as defined below), and for the avoidance of doubt, not at a discount to Plan Equity Value. |
| **Plan Enterprise Value** | $5.45 billion. |
| **Plan Equity Value** | "***Plan Equity Value***" means the Plan Enterprise Value less the Net Debt Amount (as defined in <u>Exhibit A</u>). For the avoidance of doubt, the Plan Equity Value calculation shall account for any decrease due to exit fees payable under the DIP Credit Agreement and exit debt commitment fees with respect to the Debt Financing and/or any Alternative Exit Debt Financing. |
| **Commitment Premium** | (a) For the Commitment Parties other than Delta and the Mexican Investors, 12.0% of the Committed Equity Amount (which includes, for the avoidance of doubt, the $187.5 million committed by the Commitment Parties in connection with the PLM Stock Participation Transaction, such amount not to be reduced in connection with any downward adjustment to the Equity Financing or in Commitments |

---

[5]    Transfer requirements to ensure continued Mexican holder ownership to satisfy Minimum Ownership Requirements and documentation and structures necessary to satisfy the Minimum Ownership Requirements and enforce necessary transfer requirements to be implemented.

8

by the Commitment Parties) in any case, payable in New Shares at the Effective Date; (b) for Delta, 12.0% of the Delta Purchase Amount; and (c) for the Mexican Investors, 12.0% of the Mexican Investors Purchase Amount, as applicable, the *"Commitment Premium"); provided* that the Commitment Premium for the Commitment Parties other than Delta and the Mexican Investors shall be paid in cash in certain alternative scenarios, including in the event of a sale or other disposition of (i) all or substantially all of the assets of the Company or (ii) all or substantially all of the equity of the Company (including, for the avoidance of doubt, equity of all or substantially all of Grupo's subsidiaries), where payment in New Shares is not feasible. The Commitment Premium shall be fully earned, nonrefundable and non-avoidable upon (1) entry by the Debtors and the Commitment Parties into the Subscription Agreement, (2) entry of an order of the Bankruptcy Court approving the Debtors' entry into the DIP Credit Agreement Amendment and (3) entry of an order of the Bankruptcy Court approving the Debtors' entry into the Subscription Agreement and the payment of all fees and expenses contemplated by this Term Sheet and the Subscription Agreement including, for the avoidance of doubt, the Commitment Premium, the Reimbursed Fees and Expenses (as defined below), the Financing Fee (as defined below) and the indemnification provisions contemplated by this Term Sheet and the Subscription Agreement (the *"Exit Financing Approval Order"*). The Exit Financing Approval Order and the motion seeking approval of the Exit Financing Approval Order, as may be amended or revised, shall be consistent with the Equity Commitment Letter and this Term Sheet and otherwise in form and substance acceptable to the Required Commitment Parties and reasonably acceptable to Apollo and Delta.

The Commitment Premium shall be paid to the Commitment Parties that are not Defaulting Commitment Parties (as defined below) promptly on the Effective Date by Grupo or Reorganized Grupo to satisfy the Debtors' obligation, free and clear of any deduction for any applicable taxes, as set forth above.

| | |
|---|---|
| **Mexican Investors:** | |
| **Mexican Investors Incentive Shares and Mexican Investors Purchase Amount** | The Mexican Investors shall receive 3.2% of the New Shares, payable on the Effective  Date (the *"Incentive Shares"),* in consideration of certain covenants to be made to the Company by the Mexican Investors as shall be set forth in the Chapter 11 Plan, and in connection with service as members of the New Board (as |

9

|  | defined below). The Incentive Shares shall be subject to the Specified Dilution.

In addition, and incremental to the Equity Financing by the other Commitment Parties, the Mexican Investors shall subscribe and pay for $20 million of New Shares (the "**Mexican Investors Purchase Amount**") at the Price Per Share. The investment shall be made by the Mexican Investors pursuant to the Subscription Agreement. In connection with this investment, the Mexican Investors shall receive the Commitment Premium in respect of the Mexican Investors Purchase Amount. The New Shares received by the Mexican Investors in respect of the Mexican Investors Purchase Amount, including in respect of the Commitment Premium, shall represent approximately 0.9% of all New Shares issued as of the Effective Date (subject to the Specified Dilution).

The Chapter 11 Plan shall also set forth certain transfer requirements with respect to the Incentive Shares and/or the New Shares to be received by the Mexican Investors in respect of the Mexican Investors Purchase Amount and the Commitment Premium, as applicable, as determined to be necessary and desirable to satisfy the Minimum Ownership Requirements by the Debtors, Requisite Commitment Parties, Delta, Apollo and the Mexican Investors.

If the Commitment Letter and/or the Subscription Agreement is terminated as to the Mexican Investors, the Mexican Investors shall not be Commitment Parties and the rights and obligations of the Mexican Investors as contemplated by this Term Sheet and incorporated into the Subscription Agreement or the Chapter 11 Plan, including consent rights, shall not apply or be honored.

Additional documentation, which are considered Definitive Documentation under this Term Sheet, which may include a shareholders agreement, shall be necessary to implement and govern the terms described above. |
|---|---|
| **Documentation:** | |
| **Definitive Documentation** | The Debtors and the Commitment Parties shall enter into the Subscription Agreement, in form and substance consistent with this Term Sheet, the Equity Commitment Letter and otherwise acceptable to the Debtors, Delta and the Required Commitment Parties. The Subscription Agreement and Equity Commitment Letter shall be consistent with this Term Sheet and otherwise in form and substance reasonably satisfactory to Apollo, solely to the extent impacting Apollo in its capacity as a holder of Tranche 2 DIP Loans and future |

10

shareholder of Reorganized Grupo, including with respect to Apollo's conversion of its Tranche 2 DIP Loans, receipt of New Shares, and treatment hereunder.[6]

The following definitive documentation (the "***Definitive Documentation***") shall be consistent with this Term Sheet, the Subscription Agreement and otherwise reasonably acceptable to (a) the Debtors, (b) the Required Commitment Parties, solely to the extent impacting the Commitment Parties in any respect, other than an immaterial respect, in their capacity as Commitment Parties (including, for the avoidance of doubt, related to their subscription, purchase and holding of New Shares), (c) Delta, solely to the extent impacting Delta in any respect, other than an immaterial respect, in its capacity as a holder of Tranche 2 DIP Loans and future shareholder of Reorganized Grupo, including with respect to Delta's conversion of its Tranche 2 DIP Loans, receipt of New Shares, the Delta Contract Fee and treatment hereunder, (d) Apollo, solely to the extent impacting Apollo in any respect, other than an immaterial respect, in its capacity as a holder of Tranche 2 DIP Loans and future shareholder of Reorganized Grupo, including with respect to Apollo's conversion of its Tranche 2 DIP Loans, receipt of New Shares, and treatment hereunder and (e) the Mexican Investors, solely to the extent that any Definitive Documentation directly relates to the appointment and consent rights related to the members of the New Board (as defined below), the Incentive Shares, transfer requirements on any of the Incentive Shares or New Shares to be issued to the Mexican Investors, the Mexican Investor covenants to be set forth in the Chapter 11 Plan, or to the extent such terms have a materially adverse and disproportionate impact on the Mexican Investors in their capacity as Commitment Parties as opposed to all other Commitment Parties: (i) the Chapter 11 Plan (and any and all exhibits, annexes, supplements and schedules thereto) and the order of the Bankruptcy Court confirming the Chapter 11 Plan (the "***Confirmation Order***"), (ii) the Disclosure Statement and all other solicitation materials and the order of the Bankruptcy Court approving the Disclosure Statement, (iii) all pleadings or motions (or related orders) filed by the Debtors or entered by the Bankruptcy Court in connection with the Debtors' chapter 11 cases being jointly administered under the caption In re Grupo Aeroméxico, S.A.B. de

---

[6]    The Subscription Agreement and the Chapter 11 Plan shall include the relevant terms and provisions as set forth in this Term Sheet. This Term Sheet shall be attached and incorporated into the Subscription Agreement to account for any provisions that are not appropriately incorporated directly into the Subscription Agreement or the Chapter 11 Plan. To the extent of any conflicts between the Term Sheet and the Subscription Agreement or the Chapter 11 Plan, the Subscription Agreement shall designate which of the foregoing shall prevail.

US 170829640v3

C.V., Case No. 20-11563 (SCC) (the "Chapter 11 Cases") and any and all deeds, instruments, filings, notifications, orders, certificates, letters, instruments, amendments, modifications, supplements or other documents and/or agreements, in each case that relate in any way to the Financing, any other transactions contemplated by this Term Sheet or the Chapter 11 Plan (including, for the avoidance of doubt, the Exit Financing Approval Order and the related order and related filings in respect of the DIP Credit Agreement Amendment), including the transactions contemplated by the Debt Financing Commitment Letter, the Alternative Exit Debt Financing, if applicable, and the DIP Credit Agreement Amendment, (iv) amended or new organizational documents or other governance agreements or documents of the Company or Reorganized Grupo, as applicable, (v) a management incentive plan of Reorganized Grupo (the "*MIP*"), subject, in addition, to the further consent rights set forth below under the caption "Additional Matters", (vi) documents and agreements pursuant to which the Incentive Shares shall be issued to the Mexican Investors (and other applicable documents and agreements related to the Mexican Investor covenants and transfer requirements) and the documents and agreements related to the proposed vehicle for the New Shares to be held by the Mexican Pension Funds and other investors[7] (the "*Mexican Pension Fund SPV*") and (vii) all other documents contemplated to be filed as a supplement to the Chapter 11 Plan, including the PLM Stock Participation Transaction documents; provided, that any Definitive Documentation related directly to the assumption, amendment, or extension of existing agreements with Delta, including the JCA and any effectuating, ancillary or other documents or agreements related thereto, and the Delta Services Agreement, shall be mutually acceptable solely to Delta and the Company and, to the extent such Definitive Documentation referred to in this proviso would materially and adversely impact the terms or transactions set forth in or contemplated by this Term Sheet, the Equity Commitment Letter, the Debt Commitment Letter, the Subscription Agreement or the Chapter 11 Plan, including in respect of the consummation of the

---

[7] The organizational documents for the Mexican Pension Fund SPV shall be in form and substance consistent with the terms of this Term Sheet and reasonably acceptable to the Mexican Pension Fund, the Debtors, Apollo, Delta and the Required Commitment Parties, such applicable consent of the Debtors, Delta, Apollo, the Mexican Pension Fund and the Required Commitment Parties to be limited to ensuring the structure complies with relevant Mexican legal requirements and conforms to the terms hereunder and to be set forth in the Chapter 11 Plan.

| | |
|---|---|
| | transactions contemplated thereby, shall be reasonably acceptable to the Required Commitment Parties and Apollo.<br><br>Additional consent and consultation rights over the Definitive Documentation, which may include additional consent and consultation rights for the Mexican Investors, including, without limitation, with respect to governance, other Commitment Parties, if any, and other key stakeholders, are under continuing discussion and, if any, will be set forth in the Chapter 11 Plan. |
| **Debtors' Representations and Warranties** | The Subscription Agreement shall contain customary representations and warranties on the part of the Debtors:<br><br>• corporate organization and good standing;<br><br>• requisite corporate power and authority with respect to execution and delivery of transaction documents;<br><br>• due execution and delivery and enforceability of transaction documents;<br><br>• due issuance and authorization of New Shares;<br><br>• authorized and issued capital stock;<br><br>• no consents or approvals (other than Bankruptcy Court approval and, if applicable, antitrust or other regulatory approvals);<br><br>• no conflicts;<br><br>• no violation and compliance with laws;<br><br>• no MAE;<br><br>• no undisclosed material liabilities;<br><br>• financial statements prepared in accordance with IFRS;<br><br>• internal controls;<br><br>• litigation;<br><br>• intellectual property; |

13

|  |  |
|---|---|
|  | • contracts; |
|  | • privacy / data; |
|  | • taxes; |
|  | • labor matters; |
|  | • subsidiaries; |
|  | • environmental matters; |
|  | • real property; |
|  | • licenses and permits; |
|  | • no brokers fee; |
|  | • arms' length; |
|  | • affiliate arrangements; |
|  | • investment company act; |
|  | • insurance; |
|  | • immunity and other enforceability and jurisdictional matters; |
|  | • no unlawful payments; |
|  | • compliance in material respects with applicable money laundering laws; and |
|  | • compliance in material respects with applicable sanctions laws. |
| **Commitment Parties' Representations and Warranties** | The Subscription Agreement shall contain customary representations and warranties on the part of the Commitment Parties, to be provided severally and not jointly, such representations and warranties to be provided by each of the Mexican Investors to the extent applicable given their status as individuals: <br><br> • corporate organization and good standing; <br><br> • requisite corporate power and authority with respect to execution and delivery of transaction documents; |

14

US 170829640v3

|  | • due execution and delivery and enforceability of transaction documents; |
|---|---|
|  | • no consents or approvals required; |
|  | • no conflicts, including without limitation, that the transactions contemplated hereby do not and will not conflict with, or constitute a default under any other arrangement or agreement to which any Commitment Party is a party; |
|  | • sufficiency of funds; |
|  | • no brokers fee; and |
|  | • accredited investor or qualified institutional buyer status and other customary private placement representations and warranties. |
| **Debtors' Covenants** | Customary covenants of the Debtors to: |
|  | • support the restructuring of the Debtors on terms consistent with the terms and consent rights set forth in this Term Sheet, the Subscription Agreement and the Chapter 11 Plan (the "***Restructuring***"); |
|  | • use commercially reasonable efforts to obtain entry of the Exit Financing Approval Order (including the approval of the Debtors' entry into the Subscription Agreement), and the Confirmation Order by the Bankruptcy Court as a Final Order; |
|  | • customary access to information covenant; |
|  | • comply with antitrust laws, securities laws, and any blue sky law or similar compliance; |
|  | • cooperate with the Commitment Parties to provide all information necessary for and to make any filings in connection with the Subscription Agreement required by the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended from time to time ("***HSR***") and the *Comisión Federal de Competencia Económica* ("***COFECE***"), if required, and any other applicable antitrust laws or other applicable laws, including any filings with the *Comisión Nacional Bancaria y de Valores* (the "***CNBV***") and foreign investment and sector-specific regulators (and assist any Commitment Party in making any such filings); *provided*, that |

15

US 170829640v3

| | |
|---|---|
| | such filings shall be provided in advance to counsel to the Commitment Parties and the Debtors shall consider and include any reasonable comments thereto; and *provided further*, no Commitment Party (or its affiliates) shall be required to make any divestments in connection with obtaining antitrust approvals; and<br><br>• use the net proceeds from the Financing as provided in this Term Sheet and as to be set forth in the Chapter 11 Plan. |
| **Commitment Parties' Covenants** | Customary covenants of the Commitment Parties, to:<br><br>• use commercially reasonable efforts to support the Restructuring;<br><br>• vote to accept the Chapter 11 Plan and not object to the confirmation of the Chapter 11 Plan following their actual receipt of the solicitation materials and ballots that meet the requirements of sections 1125 and 1126 of the Bankruptcy Code; and<br><br>• make any filings in connection with the Subscription Agreement required by HSR and COFECE and any other applicable antitrust laws.<br><br>The Subscription Agreement shall contain limitations and conditions on claims transfers, and other provisions related to supporting the Restructuring reasonably acceptable to the Debtors, the Required Commitment Parties and Delta. |
| **Apollo Covenants** | Customary covenants of Apollo, to:<br><br>• use commercially reasonable efforts to support the Restructuring;<br><br>• vote to accept the Chapter 11 Plan and not object to the confirmation of the Chapter 11 Plan following their actual receipt of the solicitation materials and ballots that meet the requirements of sections 1125 and 1126 of the Bankruptcy Code; and<br><br>• make any filings if required by HSR and COFECE and any other applicable antitrust laws. |

16

| | |
|---|---|
| **Interim Operating Covenants** | Before and through the Effective Date, except as set forth in the Subscription Agreement or with the written consent (which may be by email) of the Required Commitment Parties and Delta (not to be unreasonably withheld, conditioned or delayed), the Debtors shall, and shall cause the Company:<br><br>• to operate their business in the ordinary course;<br><br>• to use commercially reasonable efforts to implement the Business Plan (as defined below) and, unless inconsistent with the Business Plan, preserve intact their current material business organizations; and<br><br>• to use commercially reasonable efforts to keep available the services of their current senior executive officers and key employees and preserve its material relationships with customers, suppliers, lessors, licensors, licensees, distributors and others having material business dealings with the Company or its subsidiaries.<br><br>Any of the following transactions shall require approval by the Required Commitment Parties and Delta (not to be unreasonably withheld), except for scheduled exceptions to be set forth in the Subscription Agreement:<br><br>• an acquisition from or merger with a third party, or other change of control of another business or any assets in excess of a threshold to be agreed;<br><br>• any internal reorganization of the subsidiaries of Grupo;<br><br>• a disposal of any assets in favor of third parties with a value in excess of a threshold to be agreed;<br><br>• agreement to new employee compensation (including any key employee incentive plan or key employee key employee retention plan, other than the MIP), new deferred compensation, severance arrangements or termination agreements unless required by contract or applicable law, in which case, the Debtors shall keep the Commitment Parties and Apollo informed, or for non-executives in the ordinary course of business;<br><br>• any material changes to the Business Plan (including with regard to the number and dollar amount of aircraft leases and financings the Debtors shall be party to on the Effective Date, |

17

|  | any change to which shall be subject to the reasonable consent of the Required Commitment Parties, Delta and Apollo); and<br><br>• any significant capital expenditure (in excess of a threshold to be agreed) other than as described in the Business Plan.<br><br>"**Business Plan**" refers to the Company's business plan, as approved by the Company's applicable governing bodies and first made available to the Commitment Parties on July 9, 2021. |
|---|---|
| **Transferability of Commitments** | Each Commitment Party (other than Delta and the Mexican Investors, neither of which, for the avoidance of doubt, shall not have any rights to transfer Commitments) shall have the right to transfer all or any portion of its Commitments to (i) any investment fund the primary investment advisor to which (A) is such Commitment Party or (B) is the same investment advisor or manager to such Commitment Party, or (C) is an affiliate of such Commitment Party (other than any portfolio company) (an "**Affiliated Fund**") or (ii) (x) one or more special purpose vehicles that are wholly- owned by one or more of such Commitment Parties and its Affiliated Funds, created for the purpose of holding such Commitment or holding debt or equity of Grupo or any other Debtor, or (y) a bank or other financial institution that will hold equity of Grupo or any other Debtor for the ultimate benefit of the relevant Commitment Party, and with respect to which such Commitment Party either (A) has provided an adequate equity support letter or a guarantee of such special purpose vehicle's or bank's Commitment, in form and substance reasonably acceptable to the Debtors or (B) otherwise remains obligated to fund the Commitment to be transferred until the Effective Date; *provided*, *however*, that such special purpose vehicle shall not be related to or affiliated with any portfolio company of such Commitment Party or any of its affiliates or Affiliated Funds (other than solely by virtue of its affiliation with such Commitment Party) and the equity of such special purpose vehicle shall not be directly or indirectly transferable other than to such persons or entities described in clauses (i) or (ii) above, and in such manner as such Commitment Party's Commitment is transferable (each of the persons or entities referred to in clauses (i) and (ii), an "**Ultimate Purchaser**"), and that, in each case, (1) the Ultimate Purchaser provides a written agreement to the Debtors under which it (A) confirms the accuracy of the representations in the Subscription Agreement applicable to Commitment Parties as applied to such Ultimate Purchaser (B) agrees to purchase such portion of such Commitment Party's Commitment, and (C) agrees to be fully bound by, and subject to, the Subscription Agreement and become a Commitment Party pursuant to a joinder agreement, and (2) the |

18

transferring Commitment Party and Ultimate Purchaser shall have duly executed and delivered to Grupo written notice of such transfer.

Other than as set forth in the foregoing sentences, no Commitment Party shall be permitted to transfer all or any portion of its Commitment without the prior written consent of the Debtors, Apollo and Delta, which consent shall not be unreasonably withheld, conditioned or delayed (it being understood that (I)(A) Grupo is required, in all cases, to comply with the specific mechanisms, terms and conditions set out in Article Seventh of its corporate bylaws (which the Commitment Parties acknowledge must be complied with in connection with any transfer consent of Grupo hereunder) and (B) it would be unreasonable for the Debtors to withhold consent to any such transfer if (i) the transferee is another Commitment Party or an affiliate of another Commitment Party (other than any portfolio company), or (ii) the transferee has the financial wherewithal to fulfill its obligations with respect to the Commitment to be transferred, as determined in the Debtors' reasonable opinion after request (if any) by the Debtors to the transferee, and prompt delivery to the Debtors by the transferee, of proof of such financial wherewithal, and, in the case of clauses (i) and (ii), such transferee provides a written agreement to the Debtors under which it (x) confirms the accuracy of the representations in the Subscription Agreement applicable to Commitment Parties as applied to such transferee, (y) agrees to purchase such portion of such Commitment Party's Commitment, and (z) agrees to be fully bound by, and subject to, the Subscription Agreement and become a party thereunder pursuant to a joinder agreement in form and substance reasonably acceptable to the Debtors and (II) the consent of Delta and Apollo shall only apply if the transferee is not (A) an Affiliated Fund, Related Purchaser or Ultimate Purchaser of such Commitment Party or (B) any other Commitment Party or any of its Affiliated Funds, Related Purchasers or Ultimate Purchaser of such other Commitment Party.

Neither the Subscription Agreement nor any of the rights, interests or obligations under the Subscription Agreement shall be assigned by any party (whether by operation of law or otherwise) without the prior written consent (which may be by email) of the Debtors, the Required Commitment Parties and Delta (in each case, not to be unreasonably withheld, conditioned or delayed), other than an assignment by a Commitment Party expressly permitted by the Subscription Agreement on terms substantially similar to those set forth in the immediately preceding paragraph, and any purported assignment in violation of the Subscription Agreement shall be void

19

|  |  |
|---|---|
|  | *ab initio*. The Subscription Agreement shall include reasonable provisions to address timing considerations in connection with applicable Mexican antitrust approvals (or amendments to any filings) required for the acquisition of New Shares resulting from any assignment of rights under the Subscription Agreement.<br><br>Notwithstanding the foregoing, and upon written notice to the Debtors and the non-transferring Commitment Parties, any Commitment Party (other than Delta and the Mexican Investors) may assign all or any portion of its rights (including, for the avoidance of doubt, all or any portion of the Commitment Premium) or obligations under the Subscription Agreement, without the consent of any party, (i) to a Related Purchaser (as defined below) or (ii) to any other Commitment Party; *provided*, *however*, that such Commitment Party shall comply with the requirements set forth in the Subscription Agreement; or (iii) with the prior written consent of the Debtors (not to be unreasonably withheld, conditioned or delayed), to any other person or entity that becomes party to the Subscription Agreement. |
| **Related Purchaser** | Each Commitment Party (other than Delta and the Mexican Investors) will have the right to assign or designate by written notice to the Debtors no later than two (2) business days prior to the Debtors' consummation of the Chapter 11 Plan (the "***Closing***") that some or all of the New Shares that it has subscribed to purchase under the Subscription Agreement and the Commitment Premium be issued in the name of, and delivered to, one or more of its affiliates or to any fund, account or sub-account that is managed, advised and/or sub-advised by such holder, an affiliate of such holder, or the same entity that manages or advises such holder (each, a "***Related Purchaser***") upon receipt by the Debtors of payment therefor, which notice of designation shall (i) be addressed to the Debtors and signed by such Commitment Party and each Related Purchaser, (ii) specify the number of New Shares to be delivered to or issued in the name of each such Related Purchaser, and (iii) contain a confirmation by each such Related Purchaser of the accuracy of the representations, warranties and covenants set forth in the Subscription Agreement, subject to applicable law and regulation. |
| **Commitment Party Default** | Any Commitment Party (including Delta and the Mexican Investors) that fails to timely fund in full its Commitment by a funding deadline to be set forth in the Subscription Agreement, after written notice thereof and a three (3)-business day opportunity to cure shall be deemed a "***Defaulting Commitment Party***." Each Commitment Party that is not a Defaulting Commitment Party (other than Delta and the Mexican Investors) (each, a "***Non-Defaulting Commitment Party***") shall have the right, but not the obligation, to purchase its |

20

| | |
|---|---|
| | Adjusted Commitment Percentage (as defined below) (or such other proportion as agreed by the Non-Defaulting Commitment Parties) of such Defaulting Commitment Party's Commitment. For this purpose, the "***Adjusted Commitment Percentage***" means, with respect to any Non-Defaulting Commitment Party, a fraction, expressed as a percentage, the numerator of which is the Commitment of such Non-Defaulting Commitment Party and the denominator of which is the Committed Equity Amount. If any Non-Defaulting Commitment Party does not elect to assume its full *pro rata* share of the Commitment of the Defaulting Commitment Party, then each Non-Defaulting Commitment Party that assumed its full *pro rata* share of the Defaulting Commitment Party's Commitment shall have customary oversubscription rights to assume the unsubscribed portion of the Defaulting Commitment Party's Commitment. |
| | Any Defaulting Commitment Party shall not be entitled to its *pro rata* share of the Commitment Premium, and the portion of the Commitment Premium otherwise payable to any Defaulting Commitment Party shall be paid *pro rata* to any Commitment Parties that assume all or a portion of the Defaulting Commitment Party's Commitment. All distributions of New Shares distributable to a Defaulting Commitment Party, including on account of the Commitment Premium, shall be either (i) to the extent assumed by Non-Defaulting Commitment Parties, re-allocated contractually and turned over as liquidated damages (including any Commitment Premium) to those Non-Defaulting Commitment Parties that have elected to subscribe for their full Adjusted Commitment Percentage or (ii) if not assumed by the Non-Defaulting Commitment Parties, forfeited and retained by Reorganized Grupo, as applicable. |
| **Conditions Precedent** | The obligations of (i) Apollo to consummate the transactions pursuant to this Term Sheet and the Equity Commitment Letter (the "***Apollo Obligations***") and (ii) the Commitment Parties and the Debtors, as applicable, to consummate the transactions pursuant to the Subscription Agreement and, in the case of the Commitment Parties, to purchase the New Shares, are conditioned upon satisfaction of the following terms and conditions. All Commitment Party (other than Delta and the Mexican Investors) conditions shall be subject to waiver by the (w) Required Commitment Parties, (x) as to Delta, by Delta, (y) all Apollo conditions shall be subject to waiver by Apollo and (z) as to the Mexican Investors, by the Mexican Investors. |
| | Conditions for Apollo (solely in respect of the Apollo Obligations), the Debtors, the Commitment Parties (other than Delta and the |

Mexican Investors), Delta as to Delta, and the Mexican Investors as to the Mexican Investors:

- the Confirmation Order having been entered, and such Confirmation Order shall be a Final Order;[8]

- all conditions to the Confirmation Order and the Effective Date having been satisfied or waived by the applicable parties;

- the members of the new board of directors of Reorganized Grupo (the "***New Board***") having been appointed pursuant to a resolution of a meeting of the shareholders of Grupo, and in any event in compliance with Mexican corporate law, Mexican securities law and Grupo's corporate bylaws;

- all required HSR, COFECE, antitrust, clearances under securities laws, other regulatory approvals (including any required approvals from the *Secretaría de Economia* and the CNBV) having been obtained;

- all required consents of the board of directors of Grupo (the "***Board***") and/or the shareholders meeting of Grupo (including in order to amend the bylaws to implement the Financing on the terms set forth herein and to effectuate the approvals already obtained from the Mexican foreign investment agency), any other applicable governing body of any of the subsidiaries of Grupo, including any of the Debtors, and applicable equityholders to effectuate the terms of this Term

---

[8] "***Final Order***" means an order of the Bankruptcy Court or a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court, which has not been reversed, vacated, or stayed and as to which (i) the time to appeal, petition for certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument, or rehearing shall then be pending, or (ii) if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari, or move for a new trial, reargument, or rehearing shall have expired; *provided* that no order shall fail to be a "Final Order" solely because of the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure (as promulgated by the United States Supreme Court under section 2072 of title 28 of the United States Code), under any analogous Federal Rules of Bankruptcy Procedure (as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code) (or any analogous rules applicable in another court of competent jurisdiction) or under sections 502(j) or 1144 of the Bankruptcy Code has been or may be filed with respect to such order.

22

Sheet, the Subscription Agreement and the Chapter 11 Plan having been obtained;

- no law or order having been enacted, adopted or issued by a governmental entity of competent authority that prohibits the implementation of the Chapter 11 Plan or the transactions contemplated by this Term Sheet, the Chapter 11 Plan or the Subscription Agreement;

- no voluntary or involuntary *concurso mercantil* proceeding shall be outstanding with respect to Grupo or any of its subsidiaries;

- the proceeds of the Statutory Equity Rights Offering (as defined below) shall not exceed $250 million;

- $100 million of excess cash available at the Effective Date to fund the Cash Pool; and

- the Effective Date having occurred or to be deemed to have occurred concurrently with the Closing.

Conditions for Apollo (solely in respect of the Apollo Obligations) and the Commitment Parties only:

- the Exit Financing Approval Order having been entered by the Bankruptcy Court consistent with the Equity Commitment Letter and this Term Sheet and otherwise in form and substance acceptable to the Debtors and the Required Commitment Parties and reasonably acceptable to Delta and Apollo, and such Exit Financing Approval Order shall be a Final Order;

- the order approving the DIP Credit Agreement Amendment having been entered by the Bankruptcy Court consistent with the Equity Commitment Letter and this Term Sheet and otherwise in form and substance acceptable to the Debtors and Apollo and reasonably acceptable to Delta and the Required Commitment Parties, and such order shall be a Final Order;

- the Subscription Agreement shall be in full force and effect in accordance with the terms of this Term Sheet;

- to the extent not addressed above, the Definitive Documentation is consistent in all material respects with the terms and consent rights set forth herein and in the

23

<table>
<tr><td></td><td>Subscription Agreement, including, for the avoidance of doubt, the Confirmation Order and the governance documents for the Company;

- the Commitment Premium and Reimbursed Fees and Expenses and Financing Fee having been paid;

- the Company's representations and warranties having been brought down, subject to an all material respects standard;

- the Company having performed all covenants made by it, subject to an all material respects standard;

- the Financing shall be structured in a tax efficient manner acceptable to the Company and the Required Commitment Parties; and

- no MAE (as defined below) having occurred.

Condition for Delta only:

- Approval of the Equity Financing by Delta's Board of Directors, including authority to enter into the Subscription Agreement (the "***Delta Board Approval***").

Conditions for the Debtors only:

- the Commitment Parties' representations and warranties having been brought down, subject to an all material respects standard; and

- the Commitment Parties and Apollo (solely in respect of the Apollo Obligations) having performed all covenants made by them, subject to an all material respects standard.</td></tr>
<tr><td>**Material Adverse Effect**</td><td>A material adverse effect ("***MAE***") on, and/or material adverse developments that would reasonably be expected to result in an MAE with respect to, (a) the business, operations, properties, assets or financial condition of the Company taken as a whole; or (b) the ability of the Company to perform its material obligations under the Subscription Agreement and any other material agreement contemplated thereby, in the case of each of clauses (a) and (b), except to the extent arising from or attributable to the following (either alone or in combination): (i) the filing of the Chapter 11 cases; (ii) any change after the date hereof in global, national or regional political conditions (including hostilities, acts of war, sabotage,</td></tr>
</table>

24

|  | terrorism or military actions, or any escalation or material worsening of any such hostilities, acts of war, sabotage, terrorism, military actions existing or underway, acts of God or pandemics) or in the general business, market, financial or economic conditions affecting the industries, regions and markets in which the Company operates, including any change in the United States or applicable foreign economies or securities, commodities or financial markets, or force majeure events or "acts of God"; (iii) COVID-19 and any mutations and evolutions thereof, (iv) the filing of the Chapter 11 Plan and the other documents contemplated thereby, or any action required by the Chapter 11 Plan that is made in compliance with the Bankruptcy Code; (v) any changes in applicable law or generally accepted accounting principles in the United States or Mexico after the date hereof; (vi) declarations of national emergencies in the United States or Mexico or natural disasters in the United States or Mexico; *provided* that the exceptions set forth in clauses (ii), (iii), (iv), (v), and (vi) of this definition shall not apply to the extent that such described change has a disproportionately adverse impact on the Company as compared to other companies in the industries in which the Company operates. |
|---|---|
| **Termination of Commitment** | The Subscription Agreement shall terminate and be of no further force or effect: |

i.    by mutual written consent of the Debtors, the Required Commitment Parties and Delta;

ii.    by either the Required Commitment Parties, as to all Commitment Parties, or Delta, as to Delta, upon written notice to the Debtors if:

    1)    the Bankruptcy Court does not enter the Exit Financing Approval Order, on or prior to December [__], 2021 (subject to an automatic extension to the minimum extent required by Bankruptcy Court availability), or any order approving the Subscription Agreement or the Exit Financing Approval Order is reversed, stayed, dismissed or vacated;

    2)    the Bankruptcy Court does not enter an order approving the Disclosure Statement in form and substance acceptable in all respects to the Debtors, Delta and the Required Commitment Parties, on or before December [__], 2021;

25

| | |
|---|---|
| | 3)    the Bankruptcy Court does not enter a Confirmation Order in form and substance acceptable in all respects to the Debtors, Delta and the Required Commitment Parties, on or before February [__], 2022; |
| | 4)    the Debtors materially breach any representation, warranty, covenant or other agreement made by it in the Subscription Agreement, where any such breach is not curable by the Effective Date, or, if curable by the Effective Date, is not cured within ten (10) business days after written notice of such breach is provided to the Company by the Required Commitment Parties or Delta, as applicable; |
| | 5)    amendments or modifications are made to any of the Subscription Agreement, the Chapter 11 Plan or any other Definitive Documentation without the requisite consent of the Commitment Parties pursuant their consent rights under this Term Sheet or the Subscription Agreement; |
| | 6)    any law or final and non-appealable order shall have been enacted, adopted or issued by any governmental authority that prohibits or renders illegal the implementation of the Chapter 11 Plan or the Financing; |
| | 7)    the entry of an order by the Bankruptcy Court, or the filing of a motion or application by Grupo, any of its subsidiaries or any other Debtor seeking an order (without the prior written consent of the Required Commitment Parties and Delta), (i) converting one or more of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee under section 1104 of the Bankruptcy Code in one or more of the Chapter 11 cases, (iii) dismissing one or more of the Chapter 11 cases, (iv) terminating exclusivity under Bankruptcy Code section 1121, or (v) rejecting the Equity Commitment Letter or the Subscription Agreement; |

26

8) an order is entered by the Bankruptcy Court granting relief from the automatic stay imposed by section 362 of the Bankruptcy Code authorizing any party to proceed against any material asset of the Company or any Debtor that would materially and adversely affect the Company's operational or financial performance;

9) the Debtors publicly announce their intention not to support the Financing or the Restructuring or withdraw the Chapter 11 Plan;

10) the Debtors fail to comply with the terms of this Term Sheet, the Subscription Agreement or the Exit Financing Approval Order, or file any motion or pleading with the Bankruptcy Court that is not consistent in all material respects with this Term Sheet or the Subscription Agreement, and such motion has not been withdrawn within two (2) business days of receipt by the Debtors of written notice from the Required Commitment Parties or Delta, as applicable, that such motion or pleading is inconsistent with this Term Sheet or the Subscription Agreement;

11) upon the occurrence of an Event of Default (as defined in the DIP Credit Agreement Amendment) under the DIP Credit Agreement Amendment and the Majority DIP Lenders has taken an action or attempted to take any action to exercise rights or remedies thereunder or if Apollo shall have breached any of its obligations under the DIP Credit Agreement Amendment in any material respect;

12) three (3) Business Days after the Bankruptcy Court enters an order denying confirmation of the Plan; *provided*, the Commitment Parties and the Debtors shall use commercially reasonable efforts to agree to an approach to cure any infirmities causing the basis for the denial and, if the Debtors, Delta and the Required Commitment Parties have agreed to such approach (evidenced in writing, which may be by email) within three (3) Business Days, then no parties may terminate the Subscription Agreement; or

27

<table>
<tr><td></td><td>13)</td><td>the Board and/or the shareholders meeting of Grupo approves a competing proposal to restructure or acquire all or any material portion of the equity or assets of the Company (whether by merger, consolidation, sale of assets, sale of equity or otherwise), including, without limitation, a Superior Transaction (as defined below) (an "*Alternative Transaction*") or the Company or any of its affiliates enters into an agreement to consummate an Alternative Transaction or files a motion to propose or approve any actual or proposed Alternative Transaction (or public announcement of any of the foregoing).</td></tr>
<tr><td>iii.</td><td colspan="2">By the Debtors upon written notice to the Commitment Parties (including Delta and the Mexican Investors) and Apollo if:</td></tr>
<tr><td></td><td>1)</td><td>the Bankruptcy Court does not enter the Exit Financing Approval Order on or prior to December [__], 2021 (subject to an automatic extension to the minimum extent required by Bankruptcy Court availability), or any order approving the Subscription Agreement or the Exit Financing Approval Order is reversed, stayed, dismissed or vacated;</td></tr>
<tr><td></td><td>2)</td><td>the Commitment Parties materially breach any representation, warranty, covenant or other agreement made by them in the Subscription Agreement, where any such breach is not curable by the Effective Date, or, if curable by the Effective Date, is not cured within ten (10) business days after written notice of such breach is provided by the Debtors to the Commitment Parties;</td></tr>
<tr><td></td><td>3)</td><td>the Board reasonably determines in good faith and on the advice of its outside financial and legal advisors that failing to enter into a Superior Transaction (as defined below) would be inconsistent with the exercise of its fiduciary duties under applicable law; or</td></tr>
<tr><td></td><td>4)</td><td>any law or final and non-appealable order shall have been enacted, adopted or issued by any governmental authority that prohibits or renders</td></tr>
</table>

28

|  | illegal the implementation of the Chapter 11 Plan or the Financing. |
|--|--|
|  | iv. Automatically if the Effective Date has not occurred by the Outside Date, unless the Outside Date is amended pursuant to the terms of the Subscription Agreement. |
|  | v. Each Claimholder Investor or Other Commitment Party may terminate the Subscription Agreement, as to itself only and solely (but with respect to its Commitment (but not with respect to its support obligations), if the Financing is not structured in a tax efficient manner acceptable to such Claimholder Investor or Other Commitment Party. |
|  | Additionally, each Commitment Party may terminate the Subscription Agreement, as to itself only, upon the filing by any Debtor of a motion, application or adversary proceeding (or any of the Debtors supports any such motion, application, or adversary proceeding filed or commenced by any third party) challenging the validity or enforceability, or seeking avoidance, subordination or disallowance, of any Claim and/or Interest against any Debtor then held by such Commitment Party. |
|  | Delta may terminate the Subscription Agreement, as to itself only, if Delta has not obtained the Delta Board Approval. To the extent Delta Board Approval is not received, or if for any reason Delta does not execute the Commitment Letter and/or the Subscription Agreement and Delta is not a Commitment Party, and Delta is not able to comply with its obligations under the Subscription Agreement, the rights and obligations of Delta as contemplated by this Term Sheet and incorporated into the Subscription Agreement or the Chapter 11 Plan, including consent rights, shall not apply or be honored. |
| **Fiduciary Out and Fiduciary Duties** | The Debtors will agree to a customary non-solicit prohibiting them and their representatives from soliciting alternative proposals. If the Board reasonably determines in good faith and on the advice of its outside financial and legal advisors that (i) an unsolicited *bona fide* proposal or proposals to restructure or acquire all or substantially all of the equity or assets of the Company is or would reasonably be expected to lead to a Superior Transaction (as defined below) and (ii) the failure of the Board to pursue such proposal would reasonably be expected to result in a breach of the Board's fiduciary duties under applicable law (a "***Superior Proposal***"), the Company may decide to negotiate with the party making the Superior Proposal and will (a) notify the Commitment Parties, Apollo and Delta of such determination promptly, provide the Commitment Parties, Apollo |

29

| | |
|---|---|
| | and Delta with the identity of the party making a Superior Proposal and provide the Commitment Parties, Apollo and Delta with a copy of such Superior Proposal, and (b) keep the Commitment Parties, Apollo and Delta apprised of negotiations and material terms thereof on a current basis. |
| | A "**_Superior Transaction_**" is a transaction that the Board determines in good faith, based on the advice of its outside financial and legal advisors, would be in the best interests of the Company and its creditors and equity holders as a whole from a financial point of view, including, but not limited to the Commitment Parties; _provided_ that any such Superior Transaction must provide higher recoveries to holders of general unsecured claims than the Restructuring. |
| **Amendment / Waiver** | The Subscription Agreement may only be amended, modified, supplemented or waived by an instrument in writing executed by the Debtors, Delta and the Required Commitment Parties (and, solely to the extent any such amendment affects the rights or interests of Apollo or any DIP Lender in any respect, other than an immaterial respect, solely in its capacity as a holder of Tranche 2 DIP Loans and future shareholder of Reorganized Grupo, including with respect to Apollo's conversion of its Tranche 2 DIP Loans, receipt of New Shares, and treatment hereunder, Apollo); _provided_ that customary provisions shall be included in the Subscription Agreement to provide individual Commitment Parties or any of the individual Investor Groups consent rights to the extent there are changes (i) to the economics for any such Commitment Party or Investor Group, solely in their capacity as such and not related, for the avoidance of doubt, to their recoveries under the Chapter 11 Plan, (ii) that have a materially adverse and disproportionate effect on any such Commitment Party or Investor Group as opposed to all other Commitment Parties or Investor Groups or (iii) the definition of "Outside Date" or "Required Commitment Parties", and such other customary and related provisions to be agreed by the Required Commitment Parties and the Debtors in the Subscription Agreement. |
| | In any case, and subject to all applicable consent rights, the terms of the Equity Financing may only be amended, modified or waived (i) in writing signed by each Debtor, Delta and the Required Commitment Parties (and, solely to the extent any such amendment, modification or waiver affects the rights or interests of Apollo or any DIP Lender in any respect, other than an immaterial respect, solely in its capacity as a holder of Tranche 2 DIP Loans and future shareholder of Reorganized Grupo, including with respect to Apollo's conversion of its Tranche 2 DIP Loans, receipt of New Shares, and treatment hereunder, Apollo) or (ii) by email by both |

30

| | counsel to the Company, on the one hand, and counsels to the Commitment Parties, on the other.<br><br>For the avoidance of doubt, and notwithstanding anything to the contrary in this Term Sheet, any amendment, supplement modification or waiver of a provision of the Subscription Agreement or to the terms of the Equity Financing shall only require the consent of a party to the extent of such party's consent rights as set forth in this Term Sheet or the Plan. |
|---|---|
| **Specific Performance** | Each of the Debtors and the Commitment Parties agree that irreparable damage would occur if any provision of the Subscription Agreement were not performed in accordance with the terms thereof and that each of the parties thereto shall be entitled to an injunction or injunctions without the necessity of posting a bond to prevent breaches of the Subscription Agreement or to enforce specifically the performance of the terms and provisions thereof and hereof, in addition to any other remedy to which they are entitled at law or in equity. Unless otherwise expressly stated in the Subscription Agreement or herein, no right or remedy described or provided in the Subscription Agreement or herein is intended to be exclusive or to preclude a party thereto from pursuing other rights and remedies to the extent available under such agreement, herein, at law or in equity. |
| **Other Provisions** | The Subscription Agreement shall include such other provisions, covenants and agreements, mutually and reasonably agreed by the Company, Delta and the Required Commitment Parties, as are customary for equity exit financings, subscription agreements and plan support agreements. |
| **Mexican Law:** | |

31

US 170829640v3

| | |
|---|---|
| **Minimum Ownership Requirements and Subscription by Shareholders** | The Company shall pass a shareholders resolution to effectuate the obtained federal authorizations as necessary to provide for an amount of Mexican ownership sufficient to comply with the terms and conditions of this Term Sheet (the ***"Minimum Ownership Requirements"***).<br><br>The Debtors, the Commitment Parties, Delta, Apollo, and the Mexican Investors, shall work together to structure the Exit Financing and the other transactions contemplated by the Chapter 11 Plan in a manner that satisfies the Minimum Ownership Requirements prior to the Effective Date and otherwise complies with applicable Mexican law, the bylaws to be approved by the Shareholders Meeting to effectuate the last authorization obtained by the Company from the Mexican foreign investment agency and the authorizations in place from such foreign investment agency. Such structure shall be acceptable to the Debtors, the Required Commitment Parties, Delta, Apollo, and the Mexican Investors. |
| **Preemptive Rights** | Any existing shareholders party to the Shareholder Support Agreement shall be deemed to have waived and will waive at the Shareholders Meeting of Grupo held to effectuate the required capital increases and issuance of New Shares, all preemptive rights arising under applicable Mexican law and Grupo's bylaws (the "***Preemptive Rights***") in connection with confirmation of a Chapter 11 Plan and the transactions contemplated by this Term Sheet.<br><br>Upon exercise of any Preemptive Rights and subscription and purchase of any New Shares provided for under this Term Sheet, including the Chapter 11 Plan, Reorganized Grupo shall cause any remaining shares in "treasury" to be cancelled. |
| **Existing Shareholder Subscription Rights** | To the extent necessary, in satisfaction of all Preemptive Rights, any existing shareholders that (i) are not party to the Shareholder Support Agreement or (ii) have not otherwise waived their Preemptive Rights shall be offered the opportunity to subscribe for and purchase (the "***Statutory Equity Rights Offering***") New Shares at a price calculated in accordance with applicable law (the "***Subscription Shares***"), which, for the avoidance of doubt, shall be issued in addition to the New Shares issuable to the Commitment Parties, and shall dilute any other New Shares issued on the Effective Date, including the New Shares issued in respect of the Commitment Premium, except as otherwise set forth in this Term Sheet. |

32

US 170829640v3

| | |
|---|---|
| | Unless waived, the Subscription Shares shall be allocated to the shareholders in the Statutory Equity Rights Offering that duly and validly exercise their Preemptive Rights pursuant to terms and conditions to be approved by the Company's general shareholders meeting, and which Preemptive Rights shall be exercised pursuant to Grupo's corporate bylaws and applicable Mexican law.<br><br>The New Shares to be distributed on the Effective Date shall be reduced by the amount of cash that is received by the Company from the Statutory Equity Rights Offering (the "***Preemptive Rights True Up***") (which such reduction shall be calculated using Plan Equity Value), which shall be distributed pursuant to an election mechanic whereby each recipient of New Shares  may elect to receive more than its *pro rata* share of the Preemptive Rights True Up; *provided* that in no event shall less than the full amount of the Preemptive Rights True Up be distributed to the recipients of New Shares  (with the attendant reduction in New Shares to be distributed to such recipients). |
| **Tender Offer** | If agreed by the Debtors, Delta, Apollo and the Required Commitment Parties, a tender offer for all shares held by all existing Grupo shareholders will be launched before any equity conversion or capital increase prior to the Effective Date of the Chapter 11 Plan, to the extent not prohibited by the Bankruptcy Code, on terms agreed by the Debtors and the Required Commitment Parties, at a price of Mex\$0.01 (Mexican Pesos) per share (the "***Tender Offer***"). Existing equity interests in Grupo outstanding at the Effective Date will be diluted to a *de minimis* amount in Reorganized Grupo. |

33

| | |
|---|---|
| **Other Corporate and Regulatory Approvals** | The Debtors, the Commitment Parties, Delta, Apollo, and the Mexican Investors, shall use best efforts to obtain promptly all corporate (including Grupo's shareholder meeting approvals as described in more detail below) and any other regulatory approvals, as well as in connection with the Tender Offer (as applicable), from the CNBV, the General Direction of Foreign Investment of the Mexican Ministry of Economy and, if applicable, COFECE, and other foreign investment and sector-specific regulators charged with enforcing local laws, that are necessary in connection with consummation of the transactions contemplated under this Term Sheet.<br><br>The Debtors, Commitment Parties, Delta, Apollo and the Mexican Investors shall cooperate on a collective solution for all relevant regulatory and corporate issues involving foreign ownership and Preemptive Rights (which solution shall honor the allocation of rights and fees as set forth in this Term Sheet).<br><br>Grupo shall seek shareholder approvals to amend its bylaws consistent with regulatory authorizations already received by Grupo in April 2021 by the Mexican General Directorate of Foreign Investment, which would permit, among other things, Mexican trusts and special purpose vehicles to participate in the capital stock of Reorganized Grupo. Delta shall vote in favor of such bylaw amendments at the meeting of Grupo shareholders. |
| **New Board** | The Commitment Parties (including Delta and the Mexican Investors) and Apollo agree to use all commercially reasonable efforts to determine corporate governance mutually acceptable to the Required Commitment Parties, Delta, the Mexican Investors and Apollo, including the size and composition of the New Board and its committees, which New Board composition shall comply with applicable Mexican law. In addition, so long as Delta remains a strategic partner of the Company, Delta shall have the right to designate two directors to the New Board.<br><br>The bylaws of Reorganized Grupo or other relevant Definitive Documentation shall reflect the agreed corporate governance and New Board appointment and designation rights, each to the extent in compliance with applicable Mexican law. |

34

| | |
|---|---|
| **Additional Corporate Governance Matters** | Article Thirty-Fifth titled "Special Voting Provisions and Corporate Governance Matters" of the current bylaws of Grupo, which provides for a 2/3 shareholder supermajority vote, in addition to a majority of the Mexican shareholders, for the approval of major matters and extraordinary transactions, shall be retained in the bylaws and such provision shall be amended to add the requirement that any of such matters as set forth in Article Thirty-Fifth must be approved by a 2/3 supermajority vote of the New Board before being referred to the supermajority shareholder vote.<br><br>Such matters currently include:<br><br>(a) amendment of the bylaws;<br><br>(b) change of the business;<br><br>(c) sale of the Company;<br><br>(d) material acquisitions and divestitures;<br><br>(e) transactions exceeding 20% of consolidated assets; and<br><br>(f) acquisitions of equity by airline competitors in excess of 2.5% of the Company's outstanding shares. |
| **Miscellaneous:** | |

US 170829640v3

| | |
|---|---|
| **Certain Plan Treatment** | Holders of Tranche 2 Loans (other than Apollo, Delta and the Mexican Pension Fund) shall receive, on account of any such Allowed Claim, at their election, either (i) New Shares, pursuant to the terms set forth in the DIP Loan Documents, or (ii) payment in full in Cash on the Effective Date.[9]<br><br>Holders of "double dip" claims including Senior Notes Claims, shall receive, on account of any such Allowed Claim, on the Effective Date, payment in full in Cash and shall be unimpaired under the Chapter 11 Plan.<br><br>Holders of Aerovías de México, S.A. de C.V. General Unsecured Claims shall receive, on account of any such Allowed Claim, (i) their *pro rata* share of 12.21% of the New Shares and (ii) the opportunity to enter into Commitments to purchase their *pro rata* share of the New Shares and to receive their *pro rata* share of the Commitment Premium, as set forth herein. |
| **Outside Date** | No later than March 31, 2022, *provided* that the Outside Date shall be automatically extended for up to three (3) months solely to the extent necessary to obtain any regulatory approvals required to consummate the Chapter 11 Plan (the "***Outside Date***"). |
| **Governing Law** | Definitive documentation to be governed by New York law, with substantive Mexican securities, antitrust and foreign investment law to be respected as applicable. |
| **Fees & Expenses; Indemnification** | To the extent not otherwise payable pursuant to other orders of the Bankruptcy Court, including the *Final Order Granting Debtors'* |

---

[9]  Apollo and the Mexican Pension Fund's recovery percentage shall not be affected by any such election.

36

*Motion to (I) Authorize Certain Debtors in Possession to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 362, 363 and 364; (II) Grant Liens and Superpriority Administrative Expense Claims to DIP Lenders Pursuant to 11 U.S.C. §§ 364 and 507; (III) Modify Automatic Stay 19 Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507; and (IV) Grant Related Relief,* in In re Grupo Aeroméxico, S.A.B. de C.V., et al., Case No. 20-11563 (SCC) (the "**Final DIP Order**"), and without limitation of the Debtors' obligations thereunder, the Debtors shall be responsible for the payment in cash of all reasonable and documented fees, costs and expenses, whether incurred before or after the execution of the Equity Commitment Letter, of each of the Commitment Parties (other than the Mexican Investors, which provisions related to reimbursement are set forth below) or of the advisors, consultants and other professionals, including counsel (including, for the avoidance of doubt, Katten Muchin Rosenman LLP, Arnold & Porter Kaye Scholer LLP and any local counsel and conflicts counsel), financial advisors and investment banking professionals (including, for the avoidance of doubt, Guggenheim Securities LLC), engaged by the Commitment Parties in connection with the Chapter 11 Plan, the Chapter 11 Cases, the mediation conducted before the Honorable Judge Lane, the diligence, negotiation, formulation, preparation, execution, delivery, implementation, consummation and/or enforcement of the Commitments, this Term Sheet, the Equity Commitment Letter and the Definitive Documentation, any potential Alternative Exit Debt Financing and any amendments, waivers, consents, supplements or other modifications to any of the foregoing (the "**Reimbursed Fees and Expenses**"), which payments shall be made by the Debtors on a regular and continuing basis subject to procedures set forth in the Exit Financing Approval Order.

The Chapter 11 Plan shall provide that the Debtors shall reimburse and pay directly the Mexican Investors' reasonable costs and expenses, incurred in connection with the Debtors' Chapter 11 cases, this Term Sheet, the Chapter 11 Plan and the transactions contemplated hereunder or under the Chapter 11 Plan.

The Commitment Premium, the Reimbursed Fees and Expenses shall constitute allowed super-priority administrative expense claims of the Debtors' estate under sections 503(b) and 507 of the Bankruptcy Code, junior only to the DIP Loans.

The Subscription Agreement shall contain a customary indemnification provision in favor of the Commitment Parties and their affiliates, equity holders, members, partners, general partners,

37

| | |
|---|---|
| | managers and its and their respective representatives and controlling persons from and against any and all losses, claims, damages, liabilities and costs and expenses arising out of a claim asserted by a third party arising out of or in connection with the Equity Commitment Letter, this Term Sheet or the Subscription Agreement or the transactions contemplated hereby and thereby. |
| **Listing Matters** | The determination with respect to the continued public listing of the New Shares and timing considerations related thereto shall be mutually acceptable to Delta, Apollo and the Required Commitment Parties. |
| **Securities Law Matters** | The Debtors shall use commercially reasonable efforts to provide that the New Shares and the Commitment Premium are exempt from the registration requirements of the U.S. federal securities laws under Section 1145 of the Bankruptcy Code to the fullest extent permitted thereby or otherwise pursuant to Section 4(a)(2) of the Securities Act of 1933, as amended (the "***Securities Act***") and/or Regulation D promulgated thereunder, or another available exemption promulgated thereunder. Any of the New Shares and the Commitment Premium that are issued pursuant to certain exemptions under the Securities Act (and for the avoidance of doubt, not under Section 1145 of the Bankruptcy Code) may be "restricted securities" and/or otherwise subject to certain transfer restrictions under the U.S. federal securities laws unless sold pursuant to an exemption from the registration requirements of the U.S. federal securities laws or an effective registration statement. |

US 170829640v3

| | |
|---|---|
| | Reorganized Grupo will provide customary registration rights to the Commitment Parties and Apollo on terms mutually acceptable to Reorganized Grupo and the Required Commitment Parties. |
| **Additional Matters** | The terms of the MIP to be established and implemented with respect to Reorganized Grupo shall be on the terms set forth in the Chapter 11 Plan, which terms shall be consistent with market terms for a company of the size and complexity of Reorganized Grupo and the market in which it operates. The terms of the MIP set forth in the Chapter 11 Plan shall be acceptable to the Company, Delta, Apollo and the Required Commitment Parties. <br><br> Any true-up cash payments to members of Grupo's executive management team that may be contemplated shall be included in the Chapter 11 Plan and be mutually acceptable to the Company (including Grupo's current compensation committee and Grupo's executive management team), Delta, Apollo and the Required Commitment Parties. <br><br> The New Shares issued on the Effective Date will be diluted after the Effective Date by any issuances of New Shares under the MIP. |
| **Acquisition of Aircraft/ Lease Financing Claims** | Each Commitment Party covenants that if an aircraft lease and/or aircraft financing (including any JOLCOS) (an "***Aircraft Lease/Financing***") has not yet been rejected or restructured, but is the subject of an LOI or similar agreement between the applicable Debtor and the counterparty thereto, such Commitment Party will only purchase a claim, right or interest in respect of such Aircraft Lease/Financing if it agrees to the terms of such LOI or similar agreement, including, but not limited to any agreement to a rejection damages claim included therein. |
| **Releases** | The Chapter 11 Plan shall contain usual and customary releases in favor of the Commitment Parties and Apollo and otherwise mutually acceptable to the Debtors, Commitment Parties and Apollo. |
| **Tax Treatment** | The terms of the Equity Financing will be structured to maximize tax efficiencies for each of the Company and the Commitment Parties, and the Company shall use commercially reasonable efforts to coordinate efforts with the Commitment Parties in this regard. |

US 170829640v3

| **Confidentiality** | Except as may be required by law, the existence of this term sheet and the terms contained herein, as well as any discussions between the parties, will be kept confidential, except as otherwise may be expressly agreed to by the Required Commitment Parties, Apollo, Delta and the Debtors. |
|---|---|

40

## **Exhibit A**

Certain Definitions

"***Net Debt Amount***" means the Debt and Debt-like Items Amount, minus the Cash and Cash Equivalents Amount.

"***Debt and Debt-like Items***" means, in relation to the Company:

(a)     any financed fleet debt;

(b)     any capitalized fleet debt;

(c)     any commercial paper, securitized notes, receivables facilities, or other financed non-fleet debt;

(d)     any debts owed to PLM;

(e)     the BBVA revolving credit line; and

(f)     any indebtedness for borrowed money whether current or funded, fixed or contingent, or secured or unsecured (including any "take-back" debt related to the recoveries to holders of Notes claims), in each case, as reflected in the Business Plan; *provided*, that "Debt and Debt-like Items" shall include the pro forma impact of any liabilities for indebtedness for borrowed money contemplated by this transaction (as well as the pro forma impact of any repayments of existing indebtedness as contemplated by this transaction).

Debt and Debt-like Items shall not include:

(a)     any accrued and unfunded employee liabilities relating to any pension, retirement or deferred compensation benefits;

(b)     any on balance sheet provisions, whether related to the Company's fleet or otherwise; and

(c)     any unsecured debt expected to be extinguished upon the Effective Date.

"***Cash and Cash Equivalents***" means any cash and equivalents reflected in the Business Plan, including Restricted Cash.

"***Restricted Cash***" means (i) VMR accounts receivable facility; (ii) short term CEBURES; (iii) Sistemas (CIB/3482); (iv) any HSBC margin call restricted cash accounts.

<u>E̲QUITY E̲XIT F̲INANCING, DIP A̲MENDMENT AND S̲ETTLEMENT T̲ERM S̲HEET</u>

The following term sheet (this *"Term Sheet")* summarizes the principal terms and conditions of a proposed investment in Grupo Aeroméxico, S.A.B. de C.V. *("Grupo"* and, together with its direct and indirect subsidiaries, the *"Company")* and certain of its affiliates pursuant to a chapter 11 plan of reorganization. This Term Sheet is non-binding, and is not an express or implied offer with regard to the transactions described herein, and does not include all of the terms or conditions relating to such transactions. Any agreement with respect to the matters discussed herein shall be subject in all respect to negotiation and execution of definitive documentation.

THIS TERM SHEET IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF ANY CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE OR ANY OTHER PLAN OF REORGANIZATION OR SIMILAR PROCESS UNDER ANY OTHER APPLICABLE LAW. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS, PROVISIONS OF THE BANKRUPTCY CODE AND/OR OTHER APPLICABLE LAWS.

THIS TERM SHEET IS FOR SETTLEMENT DISCUSSION PURPOSES ONLY, SUBJECT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE. UNTIL PUBLICLY DISCLOSED WITH THE PRIOR CONSENT OF THE REQUIRED COMMITMENT PARTIES, APOLLO, DELTA, AND THE DEBTORS, THIS TERM SHEET AND THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL AND MAY NOT BE SHARED WITH ANY PERSON OTHER THAN THE COMMITMENT PARTIES, APOLLO, DELTA, THE MEXICAN INVESTORS AND THEIR RESPECTIVE PROFESSIONAL ADVISORS.

| <u>General Terms:</u> | |
|---|---|
| **Implementation** | The transactions contemplated by this Term Sheet shall be implemented through (i) the Exit Financing Approval Order (as defined below), (ii) the DIP Credit Agreement Amendment (as defined below) and (iii) the confirmation and effectiveness of a chapter 11 plan consistent in form and substance with this Term Sheet and otherwise subject to the consent rights set forth herein, and which shall provide for the settlement of all claims between the parties hereto and the Debtors in exchange for the consideration provided for in such plan (a **"Chapter 11 Plan",** and the date on which a Chapter 11 Plan becomes effective, the *"Effective Date"***).** |
| **Investors** | (i) Certain ~~entities for which any of The Baupost Group, L.L.C., Silver Point Capital, L.P. and Oaktree Capital Management, L.P. serve as investment manager, advisor, or subadvisor, of accounts or sub-accounts~~ |

| | |
|---|---|
| | ~~directly or indirectly under any of their management (the "*BSPO Investors*"); (ii) certain~~ of the members of the Ad Hoc Group of ~~Senior Noteholders~~OpCo Creditors represented by ~~Akin Gump Strauss Hauer & Feld LLP that, as applicable, serve as investment manager, subadvisor, or accounts or sub-accounts directly or indirectly under any of their management (the "*Noteholder Investors*"), each of which hold those 7.000% senior notes due 2025 (the "*Notes*", and such holders, the "*Noteholders*") issued pursuant to that certain Indenture, dated as of February 5, 2020, by and among Aerovías de México, S.A. de C.V. ("*Aerovías*"), as issuer, Grupo, as guarantor, and the Bank of New York Mellon, as trustee, transfer agent, registrar and paying agent; (iii) certain members of the Ad Hoc Group of Unsecured Claimholders represented by Gibson, Dunn & Crutcher~~Katten Muchin Rosenman LLP and Arnold & Porter Kaye Scholer LLP (~~together, ~~the "*Claimholder Investors*"), (~~iv~~ii) other entities that execute the Equity Commitment Letter (as defined below) (the "*Other Commitment Parties*"); (~~v~~iii) Delta Air Lines, Inc. ("*Delta*"), upon executing the Equity Commitment Letter, and (~~vi~~iv) a group of Mexican investors consisting of Eduardo Tricio Haro, Antonio Cosio Pando, Valentin Diez Morodo, and Jorge Esteve Recolons (clause (~~vi~~iv) collectively, the "*Mexican Investors*") ((i) through (~~vi~~iv), collectively, the "*Commitment Parties*" and each of (i) through (~~iv~~ii), an "*Investor Group*"). |
| **Exit Financing** | The Commitment Parties (other than Delta and the Mexican Investors) shall purchase or fund, as applicable, $~~600~~620 million of new equity (the "*Committed Equity Amount*"), which, including the Commitment Premium (defined below), shall represent ~~26.9~~27.2%[1] of all New Shares issued as of the Effective Date (before giving effect, solely to the extent applicable, to the exercise of any Preemptive Rights (as defined below) which any existing Grupo shareholder may be entitled to (other than any existing shareholders that (i) are party to that certain Support Agreement dated as of September 4, 2020 by and between Grupo, Alpage Debt Holdings S.à ¸r.l. and the shareholders party thereto from time to time (the "*Shareholder Support Agreement*") or (ii) have otherwise waived their Preemptive Rights) and concurrently with the issuance of the New Shares) and subject to *pro rata* dilution on account of the MIP (as defined below) (such aggregated dilution as described in this parenthetical, and in respect of any future equity issuances that may be consummated by Grupo after the Effective Date, collectively, the "*Specified Dilution*")), consisting of single |

---

[1]    Percentages assume all claims on account of Tranche 2 DIP Loans receive equity.

series shares (*Serie Unica*) (the "***Serie Unica Shares***") or, in the event that, with the prior approval of the Required Commitment Parties, Apollo (as defined below) and Delta, the existing foreign investment authorization (if required) and the bylaws of Grupo are amended, in compliance with applicable Mexican law, to contemplate different series of shares, "N" shares with limited voting rights ("***Series N Shares***") no worse in any respect than the corresponding rights currently set forth in the bylaws of Grupo for ordinary shares classified as "neutral," and "O" shares with full voting rights ("***Series O Shares***"), providing for the Minimum Ownership Requirements (as defined below) of Reorganized Grupo's (as defined below) common stock (each of the *Serie Unica* Shares, Series N Shares and the Series O Shares, as applicable, the "***New Shares***") (such financing (constituting a capital increase in Grupo), the "***Equity Financing***").

In addition, certain of the Commitment Parties (other than Delta and the Mexican Investors) shall commit to purchase or fund, as applicable, senior secured first lien notes in an aggregate principal amount of up to $762.5 million (the "***New Debt***"), the terms of which shall be set forth in a term sheet attached to a separate debt commitment letter (the "***Debt Financing Commitment Letter***") to be delivered to the Debtors (as defined below) on or around the date of the delivery of the Equity Commitment Letter (as defined below) (such financing, the "***Debt Financing***" and, together with the Equity Financing, the "***Financing***"). Certain Commitment Parties (other than Delta and the Mexican Investors) and/or other third party investors may provide exit debt financing in lieu of the Debt Financing contemplated by the Debt Financing Commitment Letter through a syndication expected to be arranged by JPMorgan on terms reasonably satisfactory to the Debtors, the Required Commitment Parties, Delta and Apollo (the "***Alternative Exit Debt Financing***").

Except as otherwise set forth herein, any Noteholder Investor that is a DIP Lender[1] under the DIP Credit Agreement (collectively, the "***AHG DIP Lenders***") that seeks treatment in respect of its Tranche 2 Loans other than

---

[1]   All terms used but not defined herein shall have the meaning ascribed to such terms in that certain $1 billion super priority debtor-in-possession term loan agreement (the "***DIP Credit Agreement***") entered into as of November 6, 2020 by and among Grupo, as Borrower, the Guarantors party thereto, the DIP Lenders party thereto and UMB Bank National Association, as Administrative Agent and Collateral Agent.

| | |
|---|---|
| | ~~in cash (inclusive of the 5.0% exit fee) in accordance with the terms of the DIP Credit Agreement (a "*Non-Cash Conversion*") shall not be able to participate in the Equity Financing or the Debt Financing. For the avoidance of doubt, in no event shall the amount of New Shares (and the resulting percentage equity interest in Reorganized Grupo) issued to any of the Commitment Parties, Apollo, Delta, the Mexican Pension Fund (as defined below) or the Mexican Investors in accordance with this Term Sheet and the Definitive Documentation be reduced or diluted by the amount of any New Shares issued to any AHG DIP Lender seeking treatment in respect of its Tranche 2 Loans other than in cash (inclusive of the 5.0% exit fee).~~<br><br>"***Required Commitment Parties***" shall mean ~~(i) BSPO Investors then holding at least 60% of the Commitments held by all BSPO Investors (excluding Commitments held by any Defaulting~~<u>Claimholder Investors and/or Other</u> Commitment ~~Party (as defined below); (ii) Noteholder Investors~~<u>Parties</u> then holding at least ~~66-⅔~~<u>50</u>% of the Commitments held by ~~all Noteholder~~<u>(i) all Claimholder</u> Investors ~~(excluding Commitments held by any Defaulting Commitment Party); and (iii) at least two institutions from each of the BSPO Investors and Noteholder Investors~~<u>and (ii) all Other Commitment Parties</u>. |
| **Allocation of the Committed Equity Amount** | Commitments to purchase the New Shares (such equity purchase commitments, the "***Commitments***"), shall be memorialized in definitive documentation, including a commitment letter (the "***Equity Commitment Letter***") and a subscription agreement executed by the Commitment Parties and the Company for the New Shares (the "***Subscription Agreement***"~~).~~<u>).</u><br><br>The Commitments in respect of the New Shares shall be allocated among the Commitment Parties as ~~follows but subject to additional detail~~<u>set forth</u> on the schedules to the Equity Commitment Letter and the Subscription Agreement (the ~~"***Allocations***~~"<u>***Allocation***</u>")~~:~~<u>.</u><br><br>• ~~$305.0 million of the New Shares shall be subscribed and paid for by the BSPO Investors;~~<br><br>• ~~$175.0 million of the New Shares shall be subscribed and paid for by the Noteholder Investors;~~<br><br>• ~~$100.0 million of the New Shares shall be subscribed and paid for by the Claimholder Investors; and~~<br><br><u>The Commitments in respect of $310 million of new equity shall be</u> |

| | |
|---|---|
| | allocated *pro rata* among the Commitment Parties that execute the Equity Commitment Letter (or a joinder to the Equity Commitment Letter) through and including December [    ], 2021 (the "***Initial Commitment Parties***").  Any holder of Aerovías de México, S.A. de C.V. General Unsecured Claims may participate in the Initial Allocation.<br><br>Following the Initial Allocation, the Commitments in respect of an additional $310 million of new equity shall be allocated *pro rata* among the Initial Commitment Parties and any other holder of Aerovías de México, S.A. de C.V. General Unsecured Claims that executes the Equity Commitment Letter (or a joinder to the Equity Commitment Letter) (together with the Initial Commitment Parties, the "***Final Commitment Parties***").<br><br>• ~~$20.0 million of the New Shares~~The Commitment Premium shall be ~~subscribed and paid for by~~allocated among the ~~Other~~Final Commitment Parties *pro rata*. |
| **PLM Stock Participation Transaction** | In the event the Company determines to acquire the equity of PLM Premier, S.A.P.I de C.V. ("***PLM***") not directly or indirectly owned by Grupo or any of its direct or indirect subsidiaries as of the Closing Date (the "***PLM Stock Participation Transaction***") after payment in full of any Tranche 2 Obligations under the DIP Credit Agreement on account of which the right to convert such claims into equity of Reorganized Grupo has not been exercised, up to $375,000,000 shall be available to the Debtors (as defined below) through the Financing to be used in connection with the PLM Stock Participation Transaction as follows:<br><br>• up to $187.5 million of the Committed Equity Amount shall be used in connection with the PLM Stock Participation Transaction; and<br><br>• up to $187.5 million in principal amount of New Debt in respect of the Notes Purchase Amount B (as defined in the Debt Financing Commitment Letter) shall be purchased by certain of the Commitment Parties (other than Delta and the Mexican Investors), or shall be available from the Alternative Exit Debt Financing.<br><br>• Whether or not there is a PLM Stock Participation Transaction, $187.5 million from the Equity Financing shall at all times constitute part of the Committed Equity Amount, |

| | |
|---|---|
| | including related to the calculation of the Commitment Premium (as defined below), and none of the Committed Equity Amount, the Allocations or any Commitment of any Commitment Party shall be adjusted downward except upon the prior written consent (with email being sufficient) of each affected Commitment Party.  In the event that there is no PLM Stock Participation Transaction, $187.5 million from the Debt Financing shall be funded, but may be subject to repurchase pursuant to the terms of the Debt Financing Commitment Letter to the extent the PLM Stock Participation Transaction is not consummated. |
| **Delta Purchase Amount** | In addition to the Equity Financing by the Commitment Parties (other than Delta and the Mexican Investors), Delta shall subscribe and pay for $100 million of New Shares (the "***Delta Purchase Amount***") at the Price Per Share (as defined below).   The investment shall be made by Delta pursuant to the Subscription Agreement.  In connection with this investment, Delta shall receive the Commitment Premium in respect of the Delta Purchase Amount.

Delta shall additionally be required to convert all fully accrued amounts of its Tranche 2 Loans, including all PIK interest and its equity conversion fee[2] to New Shares at Plan Equity Value (as defined below) (the "***Delta Tranche 2 DIP Conversion***").

In exchange for (i) the assumption, amendment and extension of the joint cooperation agreement, dated May 27, 2015, by and among Aerovías de México, S.A. de C.V. and Delta, as of the Petition Date and any amendments, supplements or other modifications thereto through the Effective Date (the "***Delta JCA***"), and (ii) entry into a service agreement, as mutually agreed to by Delta and the Debtors, which shall document the continuation of the scope and level of support services Delta currently provides in support of the joint venture and strategic alliance between Delta and the Company (the "***Delta Service Agreement***"), Delta shall receive a contract fee (the "***Contract Fee***") at the Effective Date.  The Contract Fee shall equal 20.0% of the New Shares *less* the New Shares Delta receives on account of (i) the Delta Purchase Amount, (ii) the Delta Tranche 2 DIP Conversion and (iii) the Commitment Premium as of the Effective Date (the "***Delta New Share Formula***").  As a result, the |

---

[2]    For avoidance of doubt, this fully accrued amount, including PIK interest, and the equity conversion fee, is projected to be approximately $234 million, as of December 30, 2021.

| | |
|---|---|
| | Chapter 11 Plan shall reflect that Delta shall receive 20.0% of all New Shares issued under the Chapter 11 Plan (which shall represent 20.0% of the capital stock of Reorganized Grupo on the Effective Date (subject to the Specified Dilution) ("**Delta Ownership Interest**"). [3] In addition, any or all portions of Delta's claims asserted against the Debtors shall be allowed and satisfied in accordance with the Chapter 11 Plan and any distributions of New Shares on such claims shall be in addition to Delta's Ownership Interest.<br><br>It shall be a condition precedent to the Effective Date of the Chapter 11 Plan for the Contract Fee to have been approved by the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") as part of the Chapter 11 Plan (the "**Delta Condition Precedent**") and such Contract Fee shall be paid on the Effective Date to Delta.  The Chapter 11 Plan shall provide that any waiver of the Delta Condition Precedent shall be in Delta's sole discretion. |
| **Apollo Settlement Consideration** | In full and final satisfaction, settlement, release, and discharge of and in exchange for Apollo Management Holdings, L.P.'s (on behalf of one or more affiliates and/or funds or separate accounts managed by it and its affiliates, including Alpage Debt Holdings S.à r.l., "**Apollo**") Tranche 2 Loans, including all PIK interest and its equity conversion fee, and in consideration for Apollo's syndication of the DIP Loans and in full settlement of all claims Apollo may have, Apollo shall receive on the Effective Date (i) ~~$150 million in cash, (ii)~~ accrued interest at the applicable interest rate under the DIP Credit Agreement on the outstanding obligations under the Tranche 2 DIP Loans commencing on December 31, 2021 through the Effective Date in cash and (~~iii~~ii) ~~22.38~~28.28% of all New Shares issued as of the Effective Date (subject to the Specified Dilution).<br><br>The Apollo Obligations (as defined below) shall terminate (i) automatically if the Effective Date has not occurred by the Outside Date and (ii) at Apollo's option if there is a Termination of the |

---

[3]    Delta's receipt of 20.0% of all New Shares issued under the Chapter 11 Plan shall not be affected by any election hereunder.

| | |
|---|---|
| | Subscription Agreement as to all Commitment Parties. |
| **DIP Credit Agreement**<br><br>**Amendment** | Apollo reserves all rights and remedies under the DIP Credit Agreement[4] and other DIP Loan Documents, and nothing herein shall constitute a waiver thereof, nor shall it be a bar to the exercise of Apollo's rights or remedies at a later date; *provided* that the exercise of such rights or remedies shall not be inconsistent with the terms set forth herein or otherwise frustrate the consummation of the Restructuring.<br><br>Apollo, ~~the AHG DIP Lenders,~~ Delta and the Mexican Pension Fund, as applicable, shall enter into an amendment to the DIP Credit Agreement (the "***DIP Credit Agreement Amendment***") to:<br><br>• permit the proposed Restructuring on the terms set forth in this Term Sheet, *provided* that the DIP Credit Agreement Amendment shall provide that such amendments and each applicable Tranche 2 Lender that has elected to convert its Tranche 2 Loans into New Shares pursuant to the Restructuring shall be subject to (i) the satisfaction of the applicable conditions set forth under "Conditions Precedent" below, (ii) the accuracy in all material respect of all representations of the Debtors set forth under "Debtors' Representations and Warranties" below and (iii) compliance by the Debtors with the undertakings set forth under "Debtors' Covenants" and "Interim Operating Covenants" below and any other representations, warranties, covenants and termination events set forth in the Subscription Agreement;<br><br>• amend the Milestones (as defined in the DIP Credit Agreement) thereunder to the extent necessary to comply with the timeline as set forth in this Term Sheet, including to extend the Scheduled Maturity Date (as defined in the DIP Credit Agreement) to the Outside Date (as defined below), |

---

[4]   All terms used but not defined herein shall have the meaning ascribed to such terms in that certain $1 billion super-priority debtor-in-possession term loan agreement (the "***DIP Credit Agreement***") entered into as of November 6, 2020 by and among Grupo as Borrower, the Guarantors party thereto, the DIP Lenders party thereto and UMB Bank National Association, as Administrative Agent and Collateral Agent.

which shall be extended without any extension fee; and

- reimburse all reasonable and documented out-of-pocket fees, costs and expenses of Apollo, including, without limitation, in connection with the preservation or enforcement of its rights under the DIP Credit Agreement, the preparation, execution and delivery of the Definitive Documentation in connection with the proposal contained within this Term Sheet and any other exit financing proposal, including the reasonable and documented fees, costs and expenses of Cleary Gottlieb Steen & Hamilton LLP, Creel, García-Cuéllar, Aiza y Enríquez, S.C., Paul, Weiss, Rifkind, Wharton & Garrison LLP, Seabury Corporate Finance LLC, Barclays Industrial Coverage, Barclays Mexico Banking and ECM, and Evercore Group L.L.C. (with the terms of reimbursement of success fees to be set forth in the Chapter 11 Plan), as advisors to Apollo.

The DIP Credit Agreement Amendment shall be approved by the Bankruptcy Court on a date no later than the date on which the Equity Financing Approval Order is approved. The DIP Credit Agreement Amendment and the order approving the DIP Credit Agreement Amendment shall be consistent with the Equity Commitment Letter and this Term Sheet and otherwise in form and substance acceptable to Apollo and reasonably acceptable to the Required Commitment Parties and Delta.

9

| | |
|---|---|
| **Mexican Pension Fund DIP Conversion** | Banco Nacional de México, S.A., Integrante del Grupo Financiero Banamex, División Fiduciaria, solely in its capacity as trustee of the irrevocable trust (*fideicomiso irrevocable*) agreement number F/17937-8 (the "***Mexican Pension Fund***") shall convert all fully accrued amounts of its Tranche 2 Loans, including all PIK interest and its equity conversion fee, in full and final satisfaction, settlement, release, and discharge of and in exchange for the Mexican Pension Fund's Tranche 2 Loans, into approximately 3.54% of all New Shares issued as of the Chapter 11 Plan's Effective Date (subject to the Specified Dilution).[35] |
| <u>**New Shares:**</u> | |
| **Issuer** | Grupo (together with its debtor affiliates,  the "***Debtors" ),*** as reorganized pursuant to the Chapter 11 Plan *("**Reorganized Grupo"),*** effective immediately after the conversion of any claims against Grupo and its Debtor affiliates into equity of Reorganized Grupo, on the Effective Date. |
| **Purchase Price** | The subscription price for the New Shares (such amount, on a per New Share basis, the "***Price Per Share***") by the Commitment Parties shall be at a price per share calculated at Plan Equity Value (as defined below), and for the avoidance of doubt, not at a discount to Plan Equity Value. |
| **Plan Enterprise Value** | $~~5.4~~5.45 billion. |
| **Plan Equity Value** | "***Plan Equity Value***" means the Plan Enterprise Value less the Net Debt Amount (as defined in <u>Exhibit A</u>). ~~An illustrative Plan Equity Value calculation is included in~~ <u>~~Exhibit B.~~</u> For the avoidance of doubt, the Plan Equity Value calculation shall account for any decrease due to exit fees payable under the DIP Credit Agreement and exit debt commitment fees with respect to the Debt Financing and/or any Alternative Exit Debt Financing. |
| **Commitment Premium** | (a) For the Commitment Parties other than Delta and the Mexican Investors, ~~15.0~~12.0% of the Committed Equity Amount (which includes, for the avoidance of doubt, the $187.5 million committed |

---

[3][5] Transfer requirements to ensure continued Mexican holder ownership to satisfy Minimum Ownership Requirements and documentation and structures necessary to satisfy the Minimum Ownership Requirements and enforce necessary transfer requirements to be implemented.

by the Commitment Parties in connection with the PLM Stock Participation Transaction, such amount not to be reduced in connection with any downward adjustment to the Equity Financing or in Commitments by the Commitment Parties) in any case, payable in New Shares at the Effective Date; (b) for Delta, ~~15.0~~12.0% of the Delta Purchase Amount; and (c) for the Mexican Investors, ~~15.0~~12.0% of the Mexican Investors Purchase Amount, as applicable, the *"Commitment Premium"); provided* that the Commitment Premium for the Commitment Parties other than Delta and the Mexican Investors shall be paid in cash in certain alternative scenarios, including in the event of a sale or other disposition of (i) all or substantially all of the assets of the Company or (ii) all or substantially all of the equity of the Company (including, for the avoidance of doubt, equity of all or substantially all of Grupo's subsidiaries), where payment in New Shares is not feasible.

The Commitment Premium shall be fully earned, nonrefundable and non- avoidable upon (1) entry by the Debtors and the Commitment Parties into the Subscription Agreement, (2) entry of an order of the Bankruptcy Court approving the Debtors' entry into the DIP Credit Agreement Amendment and (3) entry of an order of the Bankruptcy Court approving the Debtors' entry into the Subscription Agreement and the payment of all fees and expenses contemplated by this Term Sheet and the Subscription Agreement, including, for the avoidance of doubt, the Commitment Premium, the Reimbursed Fees and Expenses (as defined below), the Financing Fee (as defined below) and the indemnification provisions contemplated by this Term Sheet and the Subscription Agreement (the *"Exit Financing Approval Order")*. The Exit Financing Approval Order and the motion seeking approval of the Exit Financing Approval Order, as may be amended or revised, shall be consistent with the Equity Commitment Letter and this Term Sheet and otherwise in form and substance acceptable to the Required Commitment Parties and reasonably acceptable to Apollo and Delta.

The Commitment Premium shall be paid to the Commitment Parties that are not Defaulting Commitment Parties (as defined below) promptly on the Effective Date by Grupo or Reorganized Grupo to satisfy the Debtors' obligation, free and clear of any deduction for any applicable taxes, as set forth above.

~~In addition, Commitment Parties that are holders of (i) Notes claims against Grupo and Aerovías or (ii) other allowed claims against Aerovías with~~

| | |
|---|---|
| | ~~enforceable guarantees against Grupo, as consideration for their Commitments and other obligations hereunder and in the Subscription Agreement, shall have the option to receive their distribution on account of all such claims in all New Shares, all cash, or a combination of New Shares and cash.~~ |
| **Mexican Investors:** | |
| **Mexican Investors Incentive Shares and Mexican Investors Purchase Amount** | The Mexican Investors shall receive 3.2% of the New Shares, payable on the Effective Date (the ***"Incentive Shares"),*** in consideration of certain covenants to be made to the Company by the Mexican Investors as shall be set forth in the Chapter 11 Plan, and in connection with service as members of the New Board (as defined below).  The Incentive Shares shall be subject to the Specified Dilution. |
| | In addition, and incremental to the Equity Financing by the other Commitment Parties, the Mexican Investors shall subscribe and pay for $20 million of New Shares (the "**Mexican Investors Purchase Amount**") at the Price Per Share.  The investment shall be made by the Mexican Investors pursuant to the Subscription Agreement.  In connection with this investment, the Mexican Investors shall receive the Commitment Premium in respect of the Mexican Investors Purchase Amount.  The New Shares received by the Mexican Investors in respect of the Mexican Investors Purchase Amount, including in respect of the Commitment Premium, shall represent approximately 0.9% of all New Shares issued as of the Effective Date (subject to the Specified Dilution). |
| | The Chapter 11 Plan shall also set forth certain transfer requirements with respect to the Incentive Shares and/or the New Shares to be received by the Mexican Investors in respect of the Mexican Investors Purchase Amount and the Commitment Premium, as applicable, as determined to be necessary and desirable to satisfy the Minimum Ownership Requirements by the Debtors, Requisite Commitment Parties, Delta, Apollo and the Mexican Investors. |
| | If the Commitment Letter and/or the Subscription Agreement is terminated as to the Mexican Investors, the Mexican Investors shall not be Commitment Parties and the rights and obligations of the Mexican Investors as contemplated by this Term Sheet and incorporated into the Subscription Agreement or the Chapter 11 Plan, including consent rights, shall not apply or be honored. |

| | Additional documentation, which are considered Definitive Documentation under this Term Sheet, which may include a shareholders agreement, shall be necessary to implement and govern the terms described above. |

| **Documentation:** |

**Definitive Documentation** The Debtors and the Commitment Parties shall enter into the Subscription Agreement, in form and substance consistent with this Term Sheet, the Equity Commitment Letter and otherwise acceptable to the Debtors, Delta and the Required Commitment Parties. The Subscription Agreement and Equity Commitment Letter shall be consistent with this Term Sheet and otherwise in form and substance reasonably satisfactory to Apollo, solely to the extent impacting Apollo in its capacity as a holder of Tranche 2 DIP Loans and future shareholder of Reorganized Grupo, including with respect to Apollo's conversion of its Tranche 2 DIP Loans, receipt of New Shares, and treatment hereunder.[46]

The following definitive documentation (the "***Definitive Documentation***") shall be consistent with this Term Sheet, the Subscription Agreement and otherwise reasonably acceptable to (a) the Debtors, (b) the Required Commitment Parties, solely to the extent impacting the Commitment Parties in any respect, other than an immaterial respect, in their capacity as Commitment Parties (including, for the avoidance of doubt, related to their subscription, purchase and holding of New Shares), (c) ~~Noteholder Investors holding 50.01% in principal amount of the Notes then held by all Noteholder Investors (excluding Commitments held by any Defaulting Commitment Party)~~Delta, solely to the extent impacting ~~the Noteholder Investors~~Delta in any respect, other than an immaterial respect, in ~~their~~its capacity as ~~Noteholders and (d) BSPO Investors holding 50.01% in par amount of general unsecured claims against the Debtors then held by all BSPO Investors (excluding Commitments held by any Defaulting Commitment Party), to the extent impacting the BSPO Investors in any respect, other than an immaterial respect, in their capacity as holders of such claims against the Debtors, (e) Delta, solely to the extent impacting Delta in any respect, other than an immaterial respect, in its capacity as~~ a holder of Tranche 2 DIP Loans and future shareholder of Reorganized Grupo, including with respect to Delta's conversion of its Tranche 2 DIP Loans, receipt of New Shares, the Delta Contract Fee and treatment hereunder, (~~f~~d) Apollo, solely to the extent impacting Apollo in any respect, other than an immaterial respect, in its capacity as a holder of Tranche 2 DIP Loans and future shareholder of Reorganized Grupo, including with respect to Apollo's conversion of its Tranche 2 DIP Loans, receipt of New Shares, and treatment hereunder and (~~g~~e) the Mexican Investors, solely to the extent that any Definitive Documentation directly relates to the appointment and consent rights related to the members of the New Board (as defined below), the Incentive Shares, transfer requirements on any of the Incentive Shares or

---

[46] The Subscription Agreement and the Chapter 11 Plan shall include the relevant terms and provisions as set forth in this Term Sheet. This Term Sheet shall be attached and incorporated into the Subscription Agreement to account for any provisions that are not appropriately incorporated directly into the Subscription Agreement or the Chapter 11 Plan. To the extent of any conflicts between the Term Sheet and the Subscription Agreement or the Chapter 11 Plan, the Subscription Agreement shall designate which of the foregoing shall prevail.

New Shares to be issued to the Mexican Investors, the Mexican Investor covenants to be set forth in the Chapter 11 Plan, or to the extent such terms have a materially adverse and disproportionate impact on the Mexican Investors in their capacity as Commitment Parties as opposed to all other Commitment Parties: (i) the Chapter 11 Plan (and any and all exhibits, annexes, supplements and schedules thereto) and the order of the Bankruptcy Court confirming the Chapter 11 Plan (the "*Confirmation Order*"), (ii) the Disclosure Statement and all other solicitation materials and the order of the Bankruptcy Court approving the Disclosure Statement, (iii) all pleadings or motions (or related orders) filed by the Debtors or entered by the Bankruptcy Court in connection with the Debtors' chapter 11 cases being jointly administered under the caption In re Grupo Aeroméxico, S.A.B. de C.V., Case No. 20-11563 (SCC) (the "Chapter 11 Cases") and any and all deeds, instruments, filings, notifications, orders, certificates, letters, instruments, amendments, modifications, supplements or other documents and/or agreements, in each case that relate in any way to the Financing, any other transactions contemplated by this Term Sheet or the Chapter 11 Plan (including, for the avoidance of doubt, the Exit Financing Approval Order and the related order and related filings in respect of the DIP Credit Agreement Amendment), including the transactions contemplated by the Debt Financing Commitment Letter, the Alternative Exit Debt Financing, if applicable, and the DIP Credit Agreement Amendment, (iv) amended or new organizational documents or other governance agreements or documents of the Company or Reorganized Grupo, as applicable, (v) a management incentive plan of Reorganized Grupo (the "*MIP*"), subject, in addition, to the further consent rights set forth below under the caption "Additional Matters", (vi) documents and agreements pursuant to which the Incentive Shares shall be issued to the Mexican Investors (and other applicable documents and agreements related to the Mexican Investor covenants and transfer requirements) and the documents and agreements related to the proposed vehicle for the New Shares to be held by the Mexican Pension Funds and other investors[57] (the "*Mexican Pension Fund SPV*") and (vii) all other documents contemplated to be filed as a supplement to the Chapter 11 Plan, including the PLM Stock Participation Transaction documents; provided, that any Definitive Documentation related directly to the assumption, amendment, or extension of existing agreements with Delta, including the JCA and any effectuating, ancillary or other documents or agreements related thereto, and the Delta Services Agreement, shall be mutually acceptable solely to Delta and the Company and, to the extent such Definitive Documentation referred to in this proviso would materially and adversely impact the terms or transactions set forth in or contemplated by this Term Sheet, the Equity Commitment Letter, the Debt Commitment Letter, the Subscription Agreement or the Chapter 11 Plan, including in respect of the consummation of the transactions contemplated thereby, shall be reasonably acceptable to the Required Commitment Parties and Apollo.

---

[57] The organizational documents for the Mexican Pension Fund SPV shall be in form and substance consistent with the terms of this Term Sheet and reasonably acceptable to the Mexican Pension Fund, the Debtors, Apollo, Delta and the Required Commitment Parties, such applicable consent of the Debtors, Delta, Apollo, the Mexican Pension Fund and the Required Commitment Parties to be limited to ensuring the structure complies with relevant Mexican legal requirements and conforms to the terms hereunder and to be set forth in the Chapter 11 Plan.

14

The consent rights of the Noteholder Investors and the BSPO Investors as set forth under clauses (c) and (d) above include, in each case, (i) the allocation of value among individual Debtor entities, (ii) the form of consideration payable to, amount of distributions on account of, and classification and treatment of the Debtors' claims (to the extent not already set forth herein), including intercompany claims, (iii) other intercreditor matters and (iv) the allowance of any claim (other than a Notes claim) against a Debtor in excess, individually, of $5 million, it being understood that none of the Claimholder Investors, Other Commitment Parties, Apollo, Delta or the Mexican Investors shall have any consent rights with respect to those portions of the Definitive Documentation that address or relate to the matters described in clauses (i), (ii), (iii) and (iv) of this paragraph, *provided* that the Majority Claimholder Investors (as defined below) have reasonable consent rights with respect to allocation of value among individual Debtor entities to the extent such allocation has a materially adverse impact on the recoveries of holders of unsecured claims (other than holders of unsecured claims with recourse to both Grupo and Aerovías); *provided further, however*, that in no event shall the allocation of value to Grupo and Aerovías be insufficient to ensure the recoveries for the holders of claims with recourse to both Grupo and Aerovías as set forth in this Term Sheet.

Additional consent and consultation rights over the Definitive Documentation, which may include additional consent and consultation rights for the Mexican Investors, including, without limitation, with respect to governance, other Commitment Parties, if any, and other key stakeholders, are under continuing discussion and, if any, will be set forth in the Chapter 11 Plan.

| | |
|---|---|
| **Claimholder Investor Consent Rights** | The Claimholder Investors and the Other Commitment Parties, collectively, holding at least a majority in the aggregate of the Commitments held by all Claimholder Investors and the Other Commitment Parties (excluding Commitments held by any Defaulting Commitment Party) (the "***Majority Claimholders***"), have consent rights over the terms of the Definitive Documentation and the Subscription Agreement including any adjustments, amendments, modifications or waivers with respect thereto, solely to the extent such terms (i) have a materially adverse and disproportionate effect on the Claimholder Investors and Other Commitment Parties, collectively, in their capacity as Commitment Parties as opposed to all other Commitment Parties or (ii) deviate from this Term Sheet in a manner that adversely affects the economic recovery of general unsecured creditors (other than (x) Notes claims against Grupo and Aerovías and (y) other allowed claims against Aerovías with enforceable guarantees against Grupo, and for the avoidance of doubt, not with respect to any claims under the DIP Credit Agreement or the DIP Credit Agreement Amendment). |
| **Debtors' Representations and Warranties** | The Subscription Agreement shall contain customary representations and warranties on the part of the Debtors:<br><br>• corporate organization and good standing;<br><br>• requisite corporate power and authority with respect to |

15

|  | execution and delivery of transaction documents; |
|---|---|
|  | • due execution and delivery and enforceability of transaction documents; |
|  | • due issuance and authorization of New Shares; |
|  | • authorized and issued capital stock; |
|  | • no consents or approvals (other than Bankruptcy Court approval and, if applicable, antitrust or other regulatory approvals); |
|  | • no conflicts; |
|  | • no violation and compliance with laws; |
|  | • no MAE; |
|  | • no undisclosed material liabilities; |
|  | • financial statements prepared in accordance with IFRS; |
|  | • internal controls; |
|  | • litigation; |
|  | • intellectual property; |
|  | • contracts; |
|  | • privacy / data; |
|  | • taxes; |
|  | • labor matters; |
|  | • subsidiaries; |
|  | • environmental matters; |
|  | • real property; |
|  | • licenses and permits; |

|  |  |  |
|---|---|---|
|  |  | <ul><li>no brokers fee;</li><li>arms' length;</li><li>affiliate arrangements;</li><li>investment company act;</li><li>insurance;</li><li>immunity and other enforceability and jurisdictional matters;</li><li>no unlawful payments;</li><li>compliance in material respects with applicable money laundering laws; and</li><li>compliance in material respects with applicable sanctions laws.</li></ul> |
|  | **Commitment Parties' Representations and Warranties** | The Subscription Agreement shall contain customary representations and warranties on the part of the Commitment Parties, to be provided severally and not jointly, such representations and warranties to be provided by each of the Mexican Investors to the extent applicable given their status as individuals:<br><ul><li>corporate organization and good standing;</li><li>requisite corporate power and authority with respect to execution and delivery of transaction documents;</li><li>due execution and delivery and enforceability of transaction documents;</li><li>no consents or approvals required;</li><li>no conflicts, including without limitation, that the transactions contemplated hereby do not and will not conflict with, or constitute a default under any other arrangement or agreement to which any Commitment Party is a party;</li><li>sufficiency of funds;</li></ul> |

17

| | |
|---|---|
| | • no brokers fee; and<br><br>• accredited investor or qualified institutional buyer status and other customary private placement representations and warranties. |
| **Debtors' Covenants** | Customary covenants of the Debtors to:<br><br>• support the restructuring of the Debtors on terms consistent with the terms and consent rights set forth in this Term Sheet, the Subscription Agreement and the Chapter 11 Plan (the "***Restructuring***");<br><br>• use commercially reasonable efforts to obtain entry of the Exit Financing Approval Order (including the approval of the Debtors' entry into the Subscription Agreement), and the Confirmation Order by the Bankruptcy Court as a Final Order;<br><br>• customary access to information covenant;<br><br>• comply with antitrust laws, securities laws, and any blue sky law or similar compliance;<br><br>• cooperate with the Commitment Parties to provide all information necessary for and to make any filings in connection with the Subscription Agreement required by the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended from time to time ("***HSR***") and the *Comisión Federal de Competencia Económica* ("***COFECE***"), if required, and any other applicable antitrust laws or other applicable laws, including any filings with the *Comisión Nacional Bancaria y de Valores* (the "***CNBV***") and foreign investment and sector-specific regulators (and assist any Commitment Party in making any such filings); *provided*, that such filings shall be provided in advance to counsel to the Commitment Parties and the Debtors shall consider and include any reasonable comments thereto; and *provided further*, no Commitment Party (or its affiliates) shall be required to make any divestments in connection with obtaining antitrust approvals; and<br><br>• use the net proceeds from the Financing as provided in this |

| | |
|---|---|
| | Term Sheet and as to be set forth in the Chapter 11 Plan. |
| **Commitment Parties' Covenants** | Customary covenants of the Commitment Parties, to: <br><br> • use commercially reasonable efforts to support the Restructuring; <br><br> • vote to accept the Chapter 11 Plan and not object to the confirmation of the Chapter 11 Plan following their actual receipt of the solicitation materials and ballots that meet the requirements of sections 1125 and 1126 of the Bankruptcy Code; and <br><br> • make any filings in connection with the Subscription Agreement by HSR and COFECE and any other applicable antitrust laws. <br><br> The Subscription Agreement shall contain limitations and conditions on claims transfers, and other provisions related to supporting the Restructuring reasonably acceptable to the Debtors, the Required Commitment Parties and Delta. |
| **Apollo Covenants** | Customary covenants of Apollo, to: <br><br> • use commercially reasonable efforts to support the Restructuring; <br><br> • vote to accept the Chapter 11 Plan and not object to the confirmation of the Chapter 11 Plan following their actual receipt of the solicitation materials and ballots that meet the requirements of sections 1125 and 1126 of the Bankruptcy Code; and <br><br> • make any filings if required by HSR and COFECE and any other applicable antitrust laws. |
| **Interim Operating Covenants** | Before and through the Effective Date, except as set forth in the Subscription Agreement or with the written consent (which may be by email) of the Required Commitment Parties and Delta (not to be unreasonably withheld, conditioned or delayed), the Debtors shall, and shall cause the Company: <br><br> • to operate their business in the ordinary course; |

19

- to use commercially reasonable efforts to implement the Business Plan (as defined below) and, unless inconsistent with the Business Plan, preserve intact their current material business organizations; and

- to use commercially reasonable efforts to keep available the services of their current senior executive officers and key employees and preserve its material relationships with customers, suppliers, lessors, licensors, licensees, distributors and others having material business dealings with the Company or its subsidiaries.

Any of the following transactions shall require approval by the Required Commitment Parties and Delta (not to be unreasonably withheld), except for scheduled exceptions to be set forth in the Subscription Agreement:

- an acquisition from or merger with a third party, or other change of control of another business or any assets in excess of a threshold to be agreed;

- any internal reorganization of the subsidiaries of Grupo;

- a disposal of any assets in favor of third parties with a value in excess of a threshold to be agreed;

- agreement to new employee compensation (including any key employee incentive plan or key employee key employee retention plan, other than the MIP), new deferred compensation, severance arrangements or termination agreements unless required by contract or applicable law, in which case, the Debtors shall keep the Commitment Parties and Apollo informed, or for non-executives in the ordinary course of business;

- any material changes to the Business Plan (including with regard to the number and dollar amount of aircraft leases and financings the Debtors shall be party to on the Effective Date, any change to which shall be subject to the reasonable consent of the Required Commitment Parties, Delta and Apollo); and

- any significant capital expenditure (in excess of a threshold to

|  | be agreed) other than as described in the Business Plan. |
|---|---|
|  | "**Business Plan**" refers to the Company's business plan, as approved by the Company's applicable governing bodies and first made available to the Commitment Parties on July 9, 2021. |
| **Transferability of Commitments** | Each Commitment Party (other than Delta and the Mexican Investors, neither of which, for the avoidance of doubt, shall not have any rights to transfer Commitments) shall have the right to transfer all or any portion of its Commitments to (i) any investment fund the primary investment advisor to which (A) is such Commitment Party or (B) is the same investment advisor or manager to such Commitment Party, or (C) is an affiliate of such Commitment Party (other than any portfolio company) (an "**Affiliated Fund**") or (ii) (x) one or more special purpose vehicles that are wholly- owned by one or more of such Commitment Parties and its Affiliated Funds, created for the purpose of holding such Commitment or holding debt or equity of Grupo or any other Debtor, or (y) a bank or other financial institution that will hold equity of Grupo or any other Debtor for the ultimate benefit of the relevant Commitment Party, and with respect to which such Commitment Party either (A) has provided an adequate equity support letter or a guarantee of such special purpose vehicle's or bank's Commitment, in form and substance reasonably acceptable to the Debtors or (B) otherwise remains obligated to fund the Commitment to be transferred until the Effective Date; *provided*, *however*, that such special purpose vehicle shall not be related to or affiliated with any portfolio company of such Commitment Party or any of its affiliates or Affiliated Funds (other than solely by virtue of its affiliation with such Commitment Party) and the equity of such special purpose vehicle shall not be directly or indirectly transferable other than to such persons or entities described in clauses (i) or (ii) above, and in such manner as such Commitment Party's Commitment is transferable (each of the persons or entities referred to in clauses (i) and (ii), an "**Ultimate Purchaser**"), and that, in each case, (1) the Ultimate Purchaser provides a written agreement to the Debtors under which it (A) confirms the accuracy of the representations in the Subscription Agreement applicable to Commitment Parties as applied to such Ultimate Purchaser (B) agrees to purchase such portion of such Commitment Party's Commitment, and (C) agrees to be fully bound by, and subject to, the Subscription Agreement and become a Commitment Party pursuant to a joinder agreement, |

and (2) the transferring Commitment Party and Ultimate Purchaser shall have duly executed and delivered to Grupo written notice of such transfer.

Other than as set forth in the foregoing sentences, no Commitment Party shall be permitted to transfer all or any portion of its Commitment without the prior written consent of the Debtors, Apollo and Delta, which consent shall not be unreasonably withheld, conditioned or delayed (it being understood that (I)(A) Grupo is required, in all cases, to comply with the specific mechanisms, terms and conditions set out in Article Seventh of its corporate bylaws (which the Commitment Parties acknowledge must be complied with in connection with any transfer consent of Grupo hereunder) and (B) it would be unreasonable for the Debtors to withhold consent to any such transfer if (i) the transferee is another Commitment Party or an affiliate of another Commitment Party (other than any portfolio company), or (ii) the transferee has the financial wherewithal to fulfill its obligations with respect to the Commitment to be transferred, as determined in the Debtors' reasonable opinion after request (if any) by the Debtors to the transferee, and prompt delivery to the Debtors by the transferee, of proof of such financial wherewithal, and, in the case of clauses (i) and (ii), such transferee provides a written agreement to the Debtors under which it (x) confirms the accuracy of the representations in the Subscription Agreement applicable to Commitment Parties as applied to such transferee, (y) agrees to purchase such portion of such Commitment Party's Commitment, and (z) agrees to be fully bound by, and subject to, the Subscription Agreement and become a party thereunder pursuant to a joinder agreement in form and substance reasonably acceptable to the Debtors and (II) the consent of Delta and Apollo shall only apply if the transferee is not (A) an Affiliated Fund, Related Purchaser or Ultimate Purchaser of such Commitment Party or (B) any other Commitment Party or any of its Affiliated Funds, Related Purchasers or Ultimate Purchaser of such other Commitment Party.

Neither the Subscription Agreement nor any of the rights, interests or obligations under the Subscription Agreement shall be assigned by any party (whether by operation of law or otherwise) without the prior written consent (which may be by email) of the Debtors, the Required Commitment Parties and Delta (in each case, not to be unreasonably withheld, conditioned or delayed), other than an assignment by a Commitment Party expressly permitted by the Subscription Agreement on terms substantially similar to those set

22

| | |
|---|---|
| | forth in the immediately preceding paragraph, and any purported assignment in violation of the Subscription Agreement shall be void *ab initio*. The Subscription Agreement shall include reasonable provisions to address timing considerations in connection with applicable Mexican antitrust approvals (or amendments to any filings) required for the acquisition of New Shares resulting from any assignment of rights under the Subscription Agreement.<br><br>Notwithstanding the foregoing, and upon written notice to the Debtors and the non-transferring Commitment Parties, any Commitment Party (other than Delta and the Mexican Investors) may assign all or any portion of its rights (including, for the avoidance of doubt, all or any portion of the Commitment Premium) or obligations under the Subscription Agreement, without the consent of any party, (i) to a Related Purchaser (as defined below) or (ii) to any other Commitment Party; *provided, however*, that such Commitment Party shall comply with the requirements set forth in the Subscription Agreement; or (iii) with the prior written consent of the Debtors (not to be unreasonably withheld, conditioned or delayed), to any other person or entity that becomes party to the Subscription Agreement. |
| **Related Purchaser** | Each Commitment Party (other than Delta and the Mexican Investors) will have the right to assign or designate by written notice to the Debtors no later than two (2) business days prior to the Debtors' consummation of the Chapter 11 Plan (the "***Closing***") that some or all of the New Shares that it has subscribed to purchase under the Subscription Agreement and the Commitment Premium be issued in the name of, and delivered to, one or more of its affiliates or to any fund, account or sub-account that is managed, advised and/or sub-advised by such holder, an affiliate of such holder, or the same entity that manages or advises such holder (each, a "***Related Purchaser***") upon receipt by the Debtors of payment therefor, which notice of designation shall (i) be addressed to the Debtors and signed by such Commitment Party and each Related Purchaser, (ii) specify the number of New Shares to be delivered to or issued in the name of each such Related Purchaser, and (iii) contain a confirmation by each such Related Purchaser of the accuracy of the representations, warranties and covenants set forth in the Subscription Agreement, subject to applicable law and regulation. |
| **Commitment Party** | Any Commitment Party (including Delta and the Mexican |

23

| Default | Investors) that ~~(i)~~ fails to timely fund in full its Commitment by a funding deadline to be set forth in the Subscription Agreement, after written notice thereof and a three (3)-business day opportunity to cure ~~or (ii) that is an AHG DIP Lender that, to the extent applicable, seeks a Non-Cash Conversion in respect of its Tranche 2 Loans,~~ shall be deemed a "***Defaulting Commitment Party***." Each Commitment Party that is not a Defaulting Commitment Party (other than Delta and the Mexican Investors) (each, a "***Non-Defaulting Commitment Party***") shall have the right, but not the obligation, to purchase its Adjusted Commitment Percentage (as defined below) (or such other proportion as agreed by the Non-Defaulting Commitment Parties) of such Defaulting Commitment Party's Commitment. For this purpose, the "***Adjusted Commitment Percentage***" means, with respect to any Non-Defaulting Commitment Party, a fraction, expressed as a percentage, the numerator of which is the Commitment of such Non-Defaulting Commitment Party and the denominator of which is the Committed Equity Amount. If any Non-Defaulting Commitment Party does not elect to assume its full *pro rata* share of the Commitment of the Defaulting Commitment Party, then each Non-Defaulting Commitment Party that assumed its full *pro rata* share of the Defaulting Commitment Party's Commitment shall have customary oversubscription rights to assume the unsubscribed portion of the Defaulting Commitment Party's Commitment.<br><br>Any Defaulting Commitment Party shall not be entitled to its *pro rata* share of the Commitment Premium, and the portion of the Commitment Premium otherwise payable to any Defaulting Commitment Party shall be paid *pro rata* to any Commitment Parties that assume all or a portion of the Defaulting Commitment Party's Commitment. All distributions of New Shares distributable to a Defaulting Commitment Party, including on account of the Commitment Premium, shall be either (i) to the extent assumed by Non-Defaulting Commitment Parties, re-allocated contractually and turned over as liquidated damages (including any Commitment Premium) to those Non-Defaulting Commitment Parties that have elected to subscribe for their full Adjusted Commitment Percentage or (ii) if not assumed by the Non-Defaulting Commitment Parties, forfeited and retained by Reorganized Grupo, as applicable. |
|---|---|
| **Conditions Precedent** | The obligations of (i) Apollo to consummate the transactions pursuant to this Term Sheet and the Equity Commitment Letter (the "***Apollo Obligations***") and (ii) the Commitment Parties and the Debtors, as applicable, to consummate the transactions pursuant to |

the Subscription Agreement and, in the case of the Commitment Parties, to purchase the New Shares, are conditioned upon satisfaction of the following terms and conditions. All Commitment Party (other than Delta and the Mexican Investors) conditions shall be subject to waiver by the (w) Required Commitment Parties, (x) as to Delta, by Delta, (y) all Apollo conditions shall be subject to waiver by Apollo and (z) as to the Mexican Investors, by the Mexican Investors.

Conditions for Apollo (solely in respect of the Apollo Obligations), the Debtors, the Commitment Parties (other than Delta and the Mexican Investors), Delta as to Delta, and the Mexican Investors as to the Mexican Investors:

- the Confirmation Order having been entered, and such Confirmation Order shall be a Final Order;[68]

- all conditions to the Confirmation Order and the Effective Date having been satisfied or waived by the applicable parties;

- the members of the new board of directors of Reorganized Grupo (the "*New Board*") having been appointed pursuant to a resolution of a meeting of the shareholders of Grupo, and in any event in compliance with Mexican corporate law, Mexican securities law and Grupo's corporate bylaws;

- all required HSR, COFECE, antitrust, clearances under securities laws, other regulatory approvals (including any

---

[68] "*Final Order*" means an order of the Bankruptcy Court or a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court, which has not been reversed, vacated, or stayed and as to which (i) the time to appeal, petition for certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument, or rehearing shall then be pending, or (ii) if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari, or move for a new trial, reargument, or rehearing shall have expired; *provided* that no order shall fail to be a "Final Order" solely because of the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure (as promulgated by the United States Supreme Court under section 2072 of title 28 of the United States Code), under any analogous Federal Rules of Bankruptcy Procedure (as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code) (or any analogous rules applicable in another court of competent jurisdiction) or under sections 502(j) or 1144 of the Bankruptcy Code has been or may be filed with respect to such order.

required approvals from the *Secretaría de Economia* and the CNBV) having been obtained;

- all required consents of the board of directors of Grupo (the "**Board**") and/or the shareholders meeting of Grupo (including in order to amend the bylaws to implement the Financing on the terms set forth herein and to effectuate the approvals already obtained from the Mexican foreign investment agency), any other applicable governing body of any of the subsidiaries of Grupo, including any of the Debtors, and applicable equityholders to effectuate the terms of this Term Sheet, the Subscription Agreement and the Chapter 11 Plan having been obtained;

- no law or order having been enacted, adopted or issued by a governmental entity of competent authority that prohibits the implementation of the Chapter 11 Plan or the transactions contemplated by this Term Sheet, the Chapter 11 Plan or the Subscription Agreement;

- no voluntary or involuntary *concurso mercantil* proceeding shall be outstanding with respect to Grupo or any of its subsidiaries;

- the proceeds of the Statutory Equity Rights Offering (as defined below) shall not exceed $250 million;

- $100 million of excess cash available at the Effective Date to fund the Cash Pool; and

- the Effective Date having occurred or to be deemed to have occurred concurrently with the Closing.

Conditions for Apollo (solely in respect of the Apollo Obligations) and the Commitment Parties only:

- the Exit Financing Approval Order having been entered by the Bankruptcy Court consistent with the Equity Commitment Letter and this Term Sheet and otherwise in form and substance acceptable to the Debtors and the Required Commitment Parties and reasonably acceptable to Delta and Apollo, and such Exit Financing Approval Order shall be a Final Order;

- the order approving the DIP Credit Agreement Amendment having been entered by the Bankruptcy Court consistent with the Equity Commitment Letter and this Term Sheet and otherwise in form and substance acceptable to the Debtors and Apollo and reasonably acceptable to Delta and the Required Commitment Parties, and such order shall be a Final Order;

- the Subscription Agreement shall be in full force and effect in accordance with the terms of this Term Sheet;

- to the extent not addressed above, the Definitive Documentation is consistent in all material respects with the terms and consent rights set forth herein and in the Subscription Agreement, including, for the avoidance of doubt, the Confirmation Order and the governance documents for the Company;

- the Commitment Premium and Reimbursed Fees and Expenses and Financing Fee having been paid;

- the Company's representations and warranties having been brought down, subject to an all material respects standard;

- the Company having performed all covenants made by it, subject to an all material respects standard;

- the Financing shall be structured in a tax efficient manner acceptable to the Company and the Required Commitment Parties; and

- no MAE (as defined below) having occurred.

Condition for Delta only:

- Approval of the Equity Financing by Delta's Board of Directors, including authority to enter into the Subscription Agreement (the "***Delta Board Approval***").

Conditions for the Debtors only:

- the Commitment Parties' representations and warranties having been brought down, subject to an all material respects

27

| | |
|---|---|
| | standard; and |
| | • the Commitment Parties and Apollo (solely in respect of the Apollo Obligations) having performed all covenants made by them, subject to an all material respects standard. |
| **Material Adverse Effect** | A material adverse effect ("*MAE*") on, and/or material adverse developments that would reasonably be expected to result in an MAE with respect to, (a) the business, operations, properties, assets or financial condition of the Company taken as a whole; or (b) the ability of the Company to perform its material obligations under the Subscription Agreement and any other material agreement contemplated thereby, in the case of each of clauses (a) and (b), except to the extent arising from or attributable to the following (either alone or in combination): (i) the filing of the Chapter 11 cases; (ii) any change after the date hereof in global, national or regional political conditions (including hostilities, acts of war, sabotage, terrorism or military actions, or any escalation or material worsening of any such hostilities, acts of war, sabotage, terrorism, military actions existing or underway, acts of God or pandemics) or in the general business, market, financial or economic conditions affecting the industries, regions and markets in which the Company operates, including any change in the United States or applicable foreign economies or securities, commodities or financial markets, or force majeure events or "acts of God"; (iii) COVID-19 and any mutations and evolutions thereof, (iv) the filing of the Chapter 11 Plan and the other documents contemplated thereby, or any action required by the Chapter 11 Plan that is made in compliance with the Bankruptcy Code; (v) any changes in applicable law or generally accepted accounting principles in the United States or Mexico after the date hereof; (vi) declarations of national emergencies in the United States or Mexico or natural disasters in the United States or Mexico; *provided* that the exceptions set forth in clauses (ii), (iii), (iv), (v), and (vi) of this definition shall not apply to the extent that such described change has a disproportionately adverse impact on the Company as compared to other companies in the industries in which the Company operates. |
| **Termination of Commitment** | The Subscription Agreement shall terminate and be of no further force or effect: |
| | i.   by mutual written consent of the Debtors, the Required Commitment Parties and Delta; |
| | ii.  by either the Required Commitment Parties, as to all |

Commitment Parties, or Delta, as to Delta, upon written notice to the Debtors if:

1)   the Bankruptcy Court does not enter the Exit Financing Approval Order, on or prior to December 1[___], 2021 (subject to an automatic extension to the minimum extent required by Bankruptcy Court availability), or any order approving the Subscription Agreement or the Exit Financing Approval Order is reversed, stayed, dismissed or vacated;

2)   the Bankruptcy Court does not enter an order approving the Disclosure Statement in form and substance acceptable in all respects to the Debtors, Delta and the Required Commitment Parties, on or before December 17[___], 2021;

3)   the Bankruptcy Court does not enter a Confirmation Order in form and substance acceptable in all respects to the Debtors, Delta and the Required Commitment Parties, on or before February 1[___], 2022;

4)   the Debtors materially breach any representation, warranty, covenant or other agreement made by it in the Subscription Agreement, where any such breach is not curable by the Effective Date, or, if curable by the Effective Date, is not cured within ten (10) business days after written notice of such breach is provided to the Company by the Required Commitment Parties or Delta, as applicable;

5)   amendments or modifications are made to any of the Subscription Agreement, the Chapter 11 Plan or any other Definitive Documentation without the requisite consent of the Commitment Parties pursuant their consent rights under this Term Sheet or the Subscription Agreement;

6)   any law or final and non-appealable order shall have been enacted, adopted or issued by any governmental authority that prohibits or renders illegal the implementation of the Chapter 11 Plan

29

or the Financing;

7) the entry of an order by the Bankruptcy Court, or the filing of a motion or application by Grupo, any of its subsidiaries or any other Debtor seeking an order (without the prior written consent of the Required Commitment Parties and Delta), (i) converting one or more of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee under section 1104 of the Bankruptcy Code in one or more of the Chapter 11 cases, (iii) dismissing one or more of the Chapter 11 cases, (iv) terminating exclusivity under Bankruptcy Code section 1121, or (v) rejecting the Equity Commitment Letter or the Subscription Agreement;

8) an order is entered by the Bankruptcy Court granting relief from the automatic stay imposed by section 362 of the Bankruptcy Code authorizing any party to proceed against any material asset of the Company or any Debtor that would materially and adversely affect the Company's operational or financial performance;

9) the Debtors publicly announce their intention not to support the Financing or the Restructuring or withdraw the Chapter 11 Plan;

10) the Debtors fail to comply with the terms of this Term Sheet, the Subscription Agreement or the Exit Financing Approval Order, or file any motion or pleading with the Bankruptcy Court that is not consistent in all material respects with this Term Sheet or the Subscription Agreement, and such motion has not been withdrawn within two (2) business days of receipt by the Debtors of written notice from the Required Commitment Parties or Delta, as applicable, that such motion or pleading is inconsistent with this Term Sheet or the Subscription Agreement;

11) upon the occurrence of an Event of Default (as

defined in the DIP Credit Agreement Amendment) under the DIP Credit Agreement Amendment and the Majority DIP Lenders has taken an action or attempted to take any action to exercise rights or remedies thereunder or if Apollo shall have breached any of its obligations under the DIP Credit Agreement Amendment in any material respect;

12) three (3) Business Days after the Bankruptcy Court enters an order denying confirmation of the Plan; *provided*, the Commitment Parties and the Debtors shall use commercially reasonable efforts to agree to an approach to cure any infirmities causing the basis for the denial and, if the Debtors, Delta and the Required Commitment Parties have agreed to such approach (evidenced in writing, which may be by email) within three (3) Business Days, then no parties may terminate the Subscription Agreement; or

13) the Board and/or the shareholders meeting of Grupo approves a competing proposal to restructure or acquire all or any material portion of the equity or assets of the Company (whether by merger, consolidation, sale of assets, sale of equity or otherwise), including, without limitation, a Superior Transaction (as defined below) (an "***Alternative Transaction***") or the Company or any of its affiliates enters into an agreement to consummate an Alternative Transaction or files a motion to propose or approve any actual or proposed Alternative Transaction (or public announcement of any of the foregoing).

iii. By the Debtors upon written notice to the Commitment Parties (including Delta and the Mexican Investors) and Apollo if:

1) the Bankruptcy Court does not enter the Exit Financing Approval Order on or prior to December 17[__], 2021 (subject to an automatic extension to the minimum extent required by Bankruptcy Court availability), or

31

any order approving the Subscription Agreement or the Exit Financing Approval Order is reversed, stayed, dismissed or vacated;

2) the Commitment Parties materially breach any representation, warranty, covenant or other agreement made by them in the Subscription Agreement, where any such breach is not curable by the Effective Date, or, if curable by the Effective Date, is not cured within ten (10) business days after written notice of such breach is provided by the Debtors to the Commitment Parties;

3) the Board reasonably determines in good faith and on the advice of its outside financial and legal advisors that failing to enter into a Superior Transaction (as defined below) would be inconsistent with the exercise of its fiduciary duties under applicable law; or

4) any law or final and non-appealable order shall have been enacted, adopted or issued by any governmental authority that prohibits or renders illegal the implementation of the Chapter 11 Plan or the Financing.

iv. Automatically if the Effective Date has not occurred by the Outside Date, unless the Outside Date is amended pursuant to the terms of the Subscription Agreement.

v. Each Claimholder Investor or Other Commitment Party may terminate the Subscription Agreement, as to itself only and solely with respect to its Commitment (but not with respect to its support obligations), if the Financing is not structured in a tax efficient manner acceptable to such Claimholder Investor or Other Commitment Party.

Additionally, each Commitment Party may terminate the Subscription Agreement, as to itself only, upon the filing by any Debtor of a motion, application or adversary proceeding (or any of the Debtors supports any such motion, application, or adversary proceeding filed or commenced by any third party) challenging the validity or enforceability, or seeking avoidance,

| | subordination or disallowance, of ~~(i) the Notes claims, or (ii) any unsecured claim~~<u>any Claim and/or Interest</u> against any Debtor~~, in each case of (i) and (ii),~~ then held by such Commitment Party.<br><br>Delta may terminate the Subscription Agreement, as to itself only, if Delta has not obtained the Delta Board Approval.  To the extent Delta Board Approval is not received, or if for any reason Delta does not execute the Commitment Letter and/or the Subscription Agreement and Delta is not a Commitment Party, and Delta is not able to comply with its obligations under the Subscription Agreement, the rights and obligations of Delta as contemplated by this Term Sheet and incorporated into the Subscription Agreement or the Chapter 11 Plan, including consent rights, shall not apply or be honored. |
|---|---|
| **Fiduciary Out and Fiduciary Duties** | The Debtors will agree to a customary non-solicit prohibiting them and their representatives from soliciting alternative proposals. If the Board reasonably determines in good faith and on the advice of its outside financial and legal advisors that (i) an unsolicited *bona fide* proposal or proposals to restructure or acquire all or substantially all of the equity or assets of the Company is or would reasonably be expected to lead to a Superior Transaction (as defined below) and (ii) the failure of the Board to pursue such proposal would reasonably be expected to result in a breach of the Board's fiduciary duties under applicable law (a "***Superior Proposal***"), the Company may decide to negotiate with the party making the Superior Proposal and will (a) notify the Commitment Parties, Apollo and Delta of such determination promptly, provide the Commitment Parties, Apollo and Delta with the identity of the party making a Superior Proposal and provide the Commitment Parties, Apollo and Delta with a copy of such Superior Proposal, and (b) keep the Commitment Parties, Apollo and Delta apprised of negotiations and material terms thereof on a current basis.<br><br>A "***Superior Transaction***" is a transaction that the Board determines in good faith, based on the advice of its outside financial and legal advisors, would be in the best interests of the Company and its creditors and equity holders as a whole from a financial point of view, including, but not limited to the Commitment Parties; *provided* that any such Superior Transaction must provide higher recoveries to holders of ~~Notes claims and~~ general unsecured claims than the Restructuring. |
| **Amendment /** | The Subscription Agreement may only be amended, modified, |

| | |
|---|---|
| **Waiver** | supplemented or waived by an instrument in writing executed by the Debtors, Delta and the Required Commitment Parties (and, solely to the extent any such amendment affects the rights or interests of Apollo or any DIP Lender in any respect, other than an immaterial respect, solely in its capacity as a holder of Tranche 2 DIP Loans and future shareholder of Reorganized Grupo, including with respect to Apollo's conversion of its Tranche 2 DIP Loans, receipt of New Shares, and treatment hereunder, Apollo); *provided* that customary provisions shall be included in the Subscription Agreement to provide individual Commitment Parties or any of the individual Investor Groups consent rights to the extent there are changes (i) to the economics for any such Commitment Party or Investor Group, solely in their capacity as such and not related, for the avoidance of doubt, to their recoveries under the Chapter 11 Plan, (ii) that have a materially adverse and disproportionate effect on any such Commitment Party or Investor Group as opposed to all other Commitment Parties or Investor Groups or (iii) the definition of "Outside Date" or "Required Commitment Parties", and such other customary and related provisions to be agreed by the Required Commitment Parties and the Debtors in the Subscription Agreement. <br><br> In any case, and subject to all applicable consent rights, the terms of the Equity Financing may only be amended, modified or waived (i) in writing signed by each Debtor, Delta and the Required Commitment Parties (and, solely to the extent any such amendment, modification or waiver affects the rights or interests of Apollo or any DIP Lender in any respect, other than an immaterial respect, solely in its capacity as a holder of Tranche 2 DIP Loans and future shareholder of Reorganized Grupo, including with respect to Apollo's conversion of its Tranche 2 DIP Loans, receipt of New Shares, and treatment hereunder, Apollo) or (ii) by email by both counsel to the Company, on the one hand, and counsels to the Commitment Parties, on the other. <br><br> For the avoidance of doubt, and notwithstanding anything to the contrary in this Term Sheet, any amendment, supplement modification or waiver of a provision of the Subscription Agreement or to the terms of the Equity Financing shall only require the consent of a party to the extent of such party's consent |

| | |
|---|---|
| | rights as set forth in this Term Sheet or the Plan. |
| **Specific Performance** | Each of the Debtors and the Commitment Parties agree that irreparable damage would occur if any provision of the Subscription Agreement were not performed in accordance with the terms thereof and that each of the parties thereto shall be entitled to an injunction or injunctions without the necessity of posting a bond to prevent breaches of the Subscription Agreement or to enforce specifically the performance of the terms and provisions thereof and hereof, in addition to any other remedy to which they are entitled at law or in equity. Unless otherwise expressly stated in the Subscription Agreement or herein, no right or remedy described or provided in the Subscription Agreement or herein is intended to be exclusive or to preclude a party thereto from pursuing other rights and remedies to the extent available under such agreement, herein, at law or in equity. |
| **Other Provisions** | The Subscription Agreement shall include such other provisions, covenants and agreements, mutually and reasonably agreed by the Company, Delta and the Required Commitment Parties, as are customary for equity exit financings, subscription agreements and plan support agreements. |
| **Mexican Law:** | |

**Minimum Ownership Requirements and Subscription by Shareholders** The Company shall pass a shareholders resolution to effectuate the obtained federal authorizations as necessary to provide for an amount of Mexican ownership sufficient to comply with the terms and conditions of this Term Sheet (the ***"Minimum Ownership Requirements"*).**

The Debtors, the Commitment Parties, Delta, Apollo, and the Mexican Investors, shall work together to structure the Exit Financing and the other transactions contemplated by the Chapter 11 Plan in a manner that satisfies the Minimum Ownership Requirements prior to the Effective Date and otherwise complies with applicable Mexican law, the bylaws to be approved by the Shareholders Meeting to effectuate the last authorization obtained by the Company from the Mexican foreign investment agency and the authorizations in place from such foreign investment agency.  Such structure shall be acceptable to the Debtors, the Required Commitment Parties, Delta, Apollo, and the Mexican Investors.

| | |
|---|---|
| **Preemptive Rights** | Any existing shareholders party to the Shareholder Support Agreement shall be deemed to have waived and will waive at the Shareholders Meeting of Grupo held to effectuate the required capital increases and issuance of New Shares, all preemptive rights arising under applicable Mexican law and Grupo's bylaws (the "***Preemptive Rights***") in connection with confirmation of a Chapter 11 Plan and the transactions contemplated by this Term Sheet.<br><br>Upon exercise of any Preemptive Rights and subscription and purchase of any New Shares provided for under this Term Sheet, including the Chapter 11 Plan, Reorganized Grupo shall cause any remaining shares in "treasury" to be cancelled. |
| **Existing Shareholder Subscription Rights** | To the extent necessary, in satisfaction of all Preemptive Rights, any existing shareholders that (i) are not party to the Shareholder Support Agreement or (ii) have not otherwise waived their Preemptive Rights shall be offered the opportunity to subscribe for and purchase (the "***Statutory Equity Rights Offering***") New Shares at a price calculated in accordance with applicable law (the "***Subscription Shares***"), which, for the avoidance of doubt, shall be issued in addition to the New Shares issuable to the Commitment Parties, and shall dilute any other New Shares issued on the Effective Date, including the New Shares issued in respect of the |

36

Commitment Premium, except as otherwise set forth in this Term Sheet.

Unless waived, the Subscription Shares shall be allocated to the shareholders in the Statutory Equity Rights Offering that duly and validly exercise their Preemptive Rights pursuant to terms and conditions to be approved by the Company's general shareholders meeting, and which Preemptive Rights shall be exercised pursuant to Grupo's corporate bylaws and applicable Mexican law.

The New Shares to be distributed on the Effective Date ~~to holders of general unsecured claims (other than (i) Notes claims against Grupo and Aerovías and (ii) other allowed claims against Aerovías with enforceable guarantees against Grupo)~~ shall be reduced by the amount of cash that is received by the Company from the Statutory Equity Rights Offering (the "***Preemptive Rights True Up***") (which such reduction shall be calculated using Plan Equity Value), which shall be distributed pursuant to an election mechanic whereby each ~~holder~~<u>recipient</u> of ~~such general unsecured claims~~ <u>New Shares</u> may elect to receive more than its *pro rata* share of the Preemptive Rights True Up; *provided* that in no event shall less than the full amount of the Preemptive Rights True Up be distributed to the ~~holders~~<u>recipients</u> of ~~such general unsecured claims~~ <u>New Shares</u> (with the attendant reduction in New Shares to be distributed to such ~~holders~~<u>recipients</u>).

| | |
|---|---|
| **Tender Offer** | If agreed by the Debtors, Delta, Apollo and the Required Commitment Parties, a tender offer for all shares held by all existing Grupo shareholders will be launched before any equity conversion or capital increase prior to the Effective Date of the Chapter 11 Plan, to the extent not prohibited by the Bankruptcy Code, on terms agreed by the Debtors and the Required Commitment Parties, at a price of Mex$0.01 (Mexican Pesos) per share (the "***Tender Offer***"). Existing equity interests in Grupo outstanding at the Effective Date will be diluted to a *de minimis* amount in Reorganized Grupo. |
| **Other Corporate and Regulatory Approvals** | The Debtors, the Commitment Parties, Delta, Apollo, and the Mexican Investors, shall use best efforts to obtain promptly all corporate (including Grupo's shareholder meeting approvals as described in more detail below) and any other regulatory approvals, as well as in connection with the Tender Offer (as applicable), from the CNBV, the General Direction of Foreign Investment of the Mexican Ministry of Economy and, if applicable, COFECE, and other foreign investment and sector-specific regulators charged |

|  | with enforcing local laws, that are necessary in connection with consummation of the transactions contemplated under this Term Sheet.<br><br>The Debtors, Commitment Parties, Delta, Apollo and the Mexican Investors shall cooperate on a collective solution for all relevant regulatory and corporate issues involving foreign ownership and Preemptive Rights (which solution shall honor the allocation of rights and fees as set forth in this Term Sheet).<br><br>Grupo shall seek shareholder approvals to amend its bylaws consistent with regulatory authorizations already received by Grupo in April 2021 by the Mexican General Directorate of Foreign Investment, which would permit, among other things, Mexican trusts and special purpose vehicles to participate in the capital stock of Reorganized Grupo. Delta shall vote in favor of such bylaw amendments at the meeting of Grupo shareholders. |
|---|---|
| **New Board** | The Commitment Parties (including Delta and the Mexican Investors) and Apollo agree to use all commercially reasonable efforts to determine corporate governance mutually acceptable to the Required Commitment Parties, Delta, the Mexican Investors and Apollo, including the size and composition of the New Board and its committees, which New Board composition shall comply with applicable Mexican law.  In addition, so long as Delta remains a strategic partner of the Company, Delta shall have the right to designate two directors to the New Board.<br><br>The bylaws of Reorganized Grupo or other relevant Definitive Documentation shall reflect the agreed corporate governance and New Board appointment and designation rights, each to the extent in compliance with applicable Mexican law. |
| **Additional Corporate Governance Matters** | Article Thirty-Fifth titled "Special Voting Provisions and Corporate Governance Matters" of the current bylaws of Grupo, which provides for a 2/3 shareholder supermajority vote, in addition to a majority of the Mexican shareholders, for the approval of major matters and extraordinary transactions, shall be retained in the bylaws and such provision shall be amended to add the requirement that any of such matters as set forth in Article Thirty-Fifth must be approved by a 2/3 supermajority vote of the New Board before |

<table>
<tr><td></td><td>being referred to the supermajority shareholder vote.

Such matters currently include:

  (a) amendment of the bylaws;

  (b) change of the business;

  (c) sale of the Company;

  (d) material acquisitions and divestitures;

  (e) transactions exceeding 20% of consolidated assets; and

  (f) acquisitions of equity by airline competitors in excess of 2.5% of the Company's outstanding shares.</td></tr>
</table>

**Miscellaneous:**

| **Certain Plan Treatment** | ~~Certain Creditor Recoveries~~~~A cash pool of $450 million (consisting of $350 million from the Debtors' balance sheet and $100 million of excess cash) (the "*Cash Pool*") shall be distributed to unsecured creditors as follows:~~Holders of Tranche 2 Loans (other than Apollo, Delta and the Mexican Pension Fund) shall receive, on account of any such Allowed Claim, at their election, either (i) New Shares, pursuant to the terms set forth in the DIP Loan Documents, or (ii) payment in full in Cash on the Effective Date.[9] |
| --- | --- |
| | ~~(i)~~ |
| | Holders of ~~(x) Notes~~"double dip" claims ~~against Grupo and Aerovías and (y) other allowed claims against Aerovías with enforceable guarantees against Grupo~~including Senior Notes Claims, shall receive ~~an aggregate distribution~~, on account of ~~all~~any such ~~claims, in an amount equal to par~~ |

---

[9]    Apollo and the Mexican Pension Fund's recovery percentage shall not be affected by any such election.

| | plus accrued and unpaid interest due and owingAllowed Claim, on the Effective Date, payment in full in Cash and shall be unimpaired under such claims as of the Petition Date. Each holder of such allowed claimsChapter 11 Plan. |
| | |
| | Holders of Aerovías de México, S.A. de C.V. General Unsecured Claims shall receive, on account of any such distribution in the form of cash from the Cash Pool or, to the extent there is insufficient cash in the Cash Pool, through a combinationAllowed Claim, (i) their *pro rata* share of cash from12.21% of the Cash Pool and New Shares, subject to and except as otherwise set forth above in the last paragraph under the caption "Commitment Premium." |
| | |
| | (ii) Holders(ii) the opportunity to enter into Commitments to purchase their *pro rata* share of all other allowed general unsecured claims against the Debtors shallthe New Shares and to receive their *pro rata* share of the remainder of the Cash Pool and New SharesCommitment Premium, as set forth in the Chapter 11 Plan.[7] |
| | |
| | The Chapter 11 Plan will also include provisions for the payment of the reasonable and documented fees of the indenture trustee for the Notes.herein. |
| **Outside Date** | No later than March 31, 2022, *provided* that the Outside Date shall be automatically extended for up to three (3) months solely to the extent necessary to obtain any regulatory approvals required to consummate the Chapter 11 Plan (the "***Outside Date***"). |
| **Governing Law** | Definitive documentation to be governed by New York law, with substantive Mexican securities, antitrust and foreign investment law to be respected as applicable. |
| **Fees & Expenses; Indemnification** | To the extent not otherwise payable pursuant to other orders of the Bankruptcy Court, including the *Final Order Granting Debtors' Motion to (I) Authorize Certain Debtors in Possession to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 362, 363* |

---

[7] Allocation of remaining Cash Pool and New Shares among distinct Debtor entities to be agreed in accordance with the consent rights as provided under the caption "Definitive Documentation" above.

*and 364; (II) Grant Liens and Superpriority Administrative Expense Claims to DIP Lenders Pursuant to 11 U.S.C. §§ 364 and 507; (III) Modify Automatic Stay 19 Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507; and (IV) Grant Related Relief,* in In re Grupo Aeroméxico, S.A.B. de C.V., et al., Case No. 20-11563 (SCC) (the "**Final DIP Order**"), and without limitation of the Debtors' obligations thereunder, the Debtors shall be responsible for the payment in cash of all reasonable and documented fees, costs and expenses, whether incurred before or after the execution of the Equity Commitment Letter, of each of the Commitment Parties (other than the Mexican Investors, which provisions related to reimbursement are set forth below) or of the advisors, consultants and other professionals, including counsel (including, for the avoidance of doubt, <u>Katten Muchin Rosenman LLP, Arnold & Porter Kaye Scholer LLP and any</u> local counsel and conflicts counsel), financial advisors and investment banking professionals <u>(including, for the avoidance of doubt, Guggenheim Securities LLC)</u>, engaged by the Commitment Parties in connection with the Chapter 11 Plan, the Chapter 11 Cases, the mediation conducted before the Honorable Judge Lane, the diligence, negotiation, formulation, preparation, execution, delivery, implementation, consummation and/or enforcement of the Commitments, this Term Sheet, the Equity Commitment Letter and the Definitive Documentation, any potential Alternative Exit Debt Financing and any amendments, waivers, consents, supplements or other modifications to any of the foregoing (the "**Reimbursed Fees and Expenses**"), which payments shall be made by the Debtors on a regular and continuing basis subject to procedures set forth in the Exit Financing Approval Order~~; *provided however*, with respect to the Claimholder Investors, the Debtors shall only pay Reimbursed Fees and Expenses of Gibson, Dunn & Crutcher LLP, Rico, Robles Libenson S.C., Glenn Agre Bergman & Fuentes LLP (in an aggregate amount not to exceed $350,0000), KPMG Cardenas Dosal, S.C. (in an aggregate amount not to exceed $40,000) and, subject to the next sentence, Moelis & Company ("*Moelis*"). In addition, notwithstanding the foregoing or any other limitation or provision of the Final DIP Order, and without any reduction to any other fees due to them or that may have already been paid, the Debtors shall pay (i) an additional financing fee in the aggregate amount of $4,500,000 to Ducera Partners LLC and Banco BTG Pactual SA (the "*Ducera Financing Fee*") which, for the avoidance of doubt, shall not prejudice each advisor's entitlement to other fees and reimbursements provided for by their respective engagement letters, and (ii) an additional fee in the aggregate amount of $1,700,000 to Moelis (the "*Moelis Fee*"), in each case, subject to the procedures set forth in the Exit Financing Approval Order~~.

41

| | |
|---|---|
| | The Chapter 11 Plan shall provide that the Debtors shall reimburse and pay directly the Mexican Investors' reasonable costs and expenses, incurred in connection with the Debtors' Chapter 11 cases, this Term Sheet, the Chapter 11 Plan and the transactions contemplated hereunder or under the Chapter 11 Plan.

The Commitment Premium, the Reimbursed Fees and Expenses, the Ducera Financing Fee and the Moelis Fee shall constitute allowed super-priority administrative expense claims of the Debtors' estate under sections 503(b) and 507 of the Bankruptcy Code, junior only to the DIP Loans.

The Subscription Agreement shall contain a customary indemnification provision in favor of the Commitment Parties and their affiliates, equity holders, members, partners, general partners, managers and its and their respective representatives and controlling persons from and against any and all losses, claims, damages, liabilities and costs and expenses arising out of a claim asserted by a third party arising out of or in connection with the Equity Commitment Letter, this Term Sheet or the Subscription Agreement or the transactions contemplated hereby and thereby. |
| **Listing Matters** | The determination with respect to the continued public listing of the New Shares and timing considerations related thereto shall be mutually acceptable to Delta, Apollo and the Required Commitment Parties. |
| **Securities Law Matters** | The Debtors shall use commercially reasonable efforts to provide that the New Shares and the Commitment Premium are exempt from the registration requirements of the U.S. federal securities laws under Section 1145 of the Bankruptcy Code to the fullest extent permitted thereby or otherwise pursuant to Section 4(a)(2) of the Securities Act of 1933, as amended (the "*Securities Act*") and/or Regulation D promulgated thereunder, or another available exemption promulgated thereunder. Any of the New Shares and the Commitment Premium that are issued pursuant to certain exemptions under the Securities Act (and for the avoidance of doubt, not under Section 1145 of the Bankruptcy Code) may be "restricted securities" and/or otherwise subject to certain transfer restrictions under the U.S. federal securities laws unless sold pursuant to an exemption from the registration requirements of the U.S. federal securities laws or an effective registration statement.

Reorganized Grupo will provide customary registration rights to the |

| | Commitment Parties and Apollo on terms mutually acceptable to Reorganized Grupo and the Required Commitment Parties. |
|---|---|
| **Additional Matters** | The terms of the MIP to be established and implemented with respect to Reorganized Grupo shall be on the terms set forth in the Chapter 11 Plan, which terms shall be consistent with market terms for a company of the size and complexity of Reorganized Grupo and the market in which it operates.  The terms of the MIP set forth in the Chapter 11 Plan shall be acceptable to the Company, Delta, Apollo and the Required Commitment Parties.<br><br>Any true-up cash payments to members of Grupo's executive management team that may be contemplated shall be included in the Chapter 11 Plan and be mutually acceptable to the Company (including Grupo's current compensation committee and Grupo's executive management team), Delta, Apollo and the Required Commitment Parties.<br><br>The New Shares issued on the Effective Date will be diluted after the Effective Date by any issuances of New Shares under the MIP. |
| **Acquisition of Aircraft/ Lease Financing Claims** | Each Commitment Party covenants that if an aircraft lease and/or aircraft financing (including any JOLCOS) (an "***Aircraft Lease/Financing***") has not yet been rejected or restructured, but is the subject of an LOI or similar agreement between the applicable Debtor and the counterparty thereto, such Commitment Party will only purchase a claim, right or interest in respect of such Aircraft Lease/Financing if it agrees to the terms of such LOI or similar agreement, including, but not limited to any agreement to a rejection damages claim included therein. |
| **Releases** | The Chapter 11 Plan shall contain usual and customary releases in favor of the Commitment Parties and Apollo and otherwise mutually acceptable to the Debtors, Commitment Parties and Apollo. |
| **Tax Treatment** | The terms of the Equity Financing will be structured to maximize tax efficiencies for each of the Company and the Commitment Parties, and the Company shall use commercially reasonable efforts to coordinate efforts with the Commitment Parties in this regard. |

| **Confidentiality** | Except as may be required by law, the existence of this term sheet and the terms contained herein, as well as any discussions between the parties, will be kept confidential, except as otherwise may be expressly agreed to by the Required Commitment Parties, Apollo, Delta and the Debtors. |
|---|---|

## Exhibit A

Certain Definitions

"*Net Debt Amount*" means the Debt and Debt-like Items Amount, minus the Cash and Cash Equivalents Amount.

"*Debt and Debt-like Items*" means, in relation to the Company:

(a)    any financed fleet debt;

(b)    any capitalized fleet debt;

(c)    any commercial paper, securitized notes, receivables facilities, or other financed non-fleet debt;

(d)    any debts owed to PLM;

(e)    the BBVA revolving credit line; and

(f)    any indebtedness for borrowed money whether current or funded, fixed or contingent, or secured or unsecured (including any "take-back" debt related to the recoveries to holders of Notes claims), in each case, as reflected in the Business Plan; *provided*, that "Debt and Debt-like Items" shall include the pro forma impact of any liabilities for indebtedness for borrowed money contemplated by this transaction (as well as the pro forma impact of any repayments of existing indebtedness as contemplated by this transaction).

Debt and Debt-like Items shall not include:

(a)    any accrued and unfunded employee liabilities relating to any pension, retirement or deferred compensation benefits;

(b)    any on balance sheet provisions, whether related to the Company's fleet or otherwise; and

(c)    any unsecured debt expected to be extinguished upon the Effective Date.

"*Cash and Cash Equivalents*" means any cash and equivalents reflected in the Business Plan, including Restricted Cash.

"*Restricted Cash*" means (i) VMR accounts receivable facility; (ii) short term CEBURES; (iii) Sistemas (CIB/3482); (iv) any HSBC margin call restricted cash accounts.

**Exhibit B**

Illustrative Plan Equity Value Calculation (U.S.$ in millions)

| | |
|---|---|
| **TEV** | **$5,400** |
| (+) Secured Fleet | $236 |
| (+) Fleet Operating Leases | 2,323 |
| (+) Non-fleet debt | 686 |
| (+) Exit 1L Notes | 763 |
| **Debt and Debt-like Items** | **$4,008** |
| Cash on balance sheet[1] | $510 |
| (-) Exit 1L Notes commitment fee | (8) |
| (-) Tranche 2 DIP cash exit fee | (5) |
| (-) Tranche 2 DIP cash repayments | (108) |
| (+) Committed Equity Amount | 600 |
| (+) Delta Purchase Amount | 100 |
| (+) Mexican Shareholders Purchase Amount | 20 |
| (+) Exit 1L Notes cash proceeds | 763 |
| (-) Tranche 1 DIP cash repayment | (200) |
| (-) Cash distribution to GUCs | (350) |
| (-) Apollo Settlement Consideration | (150) |
| **Cash and Cash Equivalents** | **$1,171** |
| **Illustrative Plan Equity Value** | **$2,564** |

1.  Includes $486m of unrestricted cash and $24m of restricted cash and represents cash balance per the Business Plan.

Document comparison by Workshare 10.0 on Wednesday, November 24, 2021
1:46:31 PM

| Input: | |
|---|---|
| Document 1 ID | iManage://USDMS/US/170829640/1 |
| Description | #170829640v1<US> - Aermex - Equity Commitment Term Sheet-Draft |
| Document 2 ID | file://C:\Users\lb23600\Desktop\Aermex - Equity Commitment Term Sheet-Limited Objection.docx |
| Description | Aermex - Equity Commitment Term Sheet-Limited Objection |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 87 |
| Deletions | 115 |
| Moved from | 1 |
| Moved to | 1 |
| Style changes | 0 |
| Format changes | 0 |
| Total changes | 204 |