Richard J. Cooper
Luke A. Barefoot
Thomas S. Kessler
CLEARY GOTTLIEB STEEN &
HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

Lewis R. Clayton
Jeffrey D. Saferstein
William A. Clareman
Jacob A. Adlerstein
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990

*Counsel to Apollo Management Holdings, L.P.,*
*on behalf of one or more affiliates and/or funds*
*or separate accounts managed by it and its affiliates*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------- X

In re                                                                  :    Chapter 11

GRUPO AEROMÉXICO, S.A.B. de C.V., *et al.*,    :    Case No. 20-11563 (SCC)

Debtors.[1]                                           :    (Jointly Administered)

-------------------------------------------------------------------- X

### APOLLO'S JOINDER AND REPLY
### IN SUPPORT OF DEBTORS' JOINT CHAPTER 11 PLAN

Apollo Management Holdings, L.P., on behalf of one or more affiliates and/or funds or separate accounts managed by it and its affiliates (collectively, "Apollo"), submits this reply (the "Joinder and Reply") to the *Objection of the Ad Hoc Group of OpCo Creditors to Confirmation of the Debtors' Joint Chapter 11 Plan* (D.I. 2491, the "Objection of OpCo Creditors"), the *Objection of the Official Committee of Unsecured Creditors to Confirmation of the Debtors' Joint Chapter 11 Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* (D.I. 2493, the

---

[1]    The Debtors in these cases, along with each Debtor's registration number in the applicable jurisdiction, are as follows: Grupo Aeroméxico, S.A.B. de C.V. 286676; Aerovías de México, S.A. de C.V. 108984; Aerolitoral, S.A. de C.V. 217315; and Aerovías Empresa de Cargo, S.A. de C.V. 437094-1. The Debtors' corporate headquarters is located at Paseo de la Reforma No. 243, piso 25 Colonia Cuauhtémoc, Mexico City, C.P. 06500.

"UCC Objection"), and *Invictus Global Management, LLC's Objection to Confirmation of Debtors' Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* (D.I. 2490, the "Invictus Objection" and together with the Objection of OpCo Creditors and UCC Objection, the "Objections") and joinder to the *Debtors' (I) Memorandum of Law in Support of Confirmation of Debtors' Third Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code and (II) Omnibus Reply to Objections Thereto* (D.I. 2552, incorporated herein by reference, the "Confirmation Brief"), in further support of the Debtors' *Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* (D.I. 1806) (as amended, revised, or supplemented, the "Plan").[2]  To avoid burdening the Court, we limit this Joinder and Reply to matters uniquely concerning Apollo and state as follows:

1.      The Plan represents the culmination of months of negotiation between the Debtors and their stakeholders, and embodies precisely the kind of global compromise that the chapter 11 reorganization process demands:  A plan that balances the interests of a diverse set of separately situated parties while respecting their rights, honoring all applicable legal requirements and providing a means for the Debtors to emerge from these Chapter 11 Cases quickly and poised for continued success.  Apollo, which arranged $1 billion in debtor-in-possession financing at the outset of these cases more than eighteen months ago (in the early days of the Covid-19 pandemic and when such financing was far from readily available), has participated in good faith in the negotiations that led to the filing of the Plan, making significant compromises necessary to ensure the Plan's viability and success.  As such, Apollo is acutely aware of the tremendous value that approval and implementation of the Plan will provide to the Debtors and their stakeholders, and

---

[2]      The Debtors filed revised versions of the Plan at D.I. 1896, 2184, and 2293; they filed plan supplements at D.I. 2369 and 2483.  All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Plan.

uniquely exposed to the potential destruction of value that could result if the Plan is not approved.

2.      As this Court is no doubt aware, the Plan could not have garnered the broad support that it enjoys from the Debtors' key stakeholders if it did not provide the Debtors with the critical tools they will need to emerge from chapter 11 on a strong footing, especially in light of the ongoing and evolving challenges to the airline industry posed by the Covid-19 pandemic (which has been particularly severe in Mexico).  In particular, the substantial inflow of cash from the exit financing transactions contemplated by the Plan, combined with the net reduction of debt on the Debtors' balance sheet, will bolster the Debtors' ability to respond to the disruptions caused by the Omicron variant in the first quarter of 2022,[3] to recover from the continuing turmoil in the industry (which may continue well into 2022 if not beyond), and to make the necessary adjustments and investments in the face of any future chapters of the Covid-19 pandemic.  Delaying confirmation of the Plan (or, worse yet, forcing the Debtors to start the plan negotiation process anew) would cause severe damage to the Debtors' ability to weather the ongoing effects of the Covid-19 pandemic and serve only to harm the Debtors' estates.

3.      As one of the Debtors' most senior creditors—holding in excess of $1 billion in superpriority administrative claims—Apollo has a paramount interest in the Debtors' success.  It is for that reason that, in addition to its provision of much-needed DIP financing at the outset of the case, Apollo has taken multiple steps throughout these Chapter 11 Cases to ensure the Debtors' ability to confirm the Plan and promptly reorganize.  This included recruiting local capital in the form of a DIP syndication to the Mexican pension fund AFORES as of May 2021 and agreeing

---

[3]      The critical need for the Debtors to exit the chapter 11 process expeditiously and with a well-capitalized balance sheet is particularly apparent in light of the disruptions caused by the Omicron variant beginning in the first week of January 2022, including the absence of more than 10% of their flight attendants, and cancellations representing 5% of the Company's operations.  *See* https://www.reuters.com/world/americas/aeromexico-halts-flights-covid-domino-effect-hits-crews-union-2022-01-07/.

with the Debtors and certain other parties to the exit financing transaction that is proposed as part of the Plan to convert a significant portion of its DIP loans into equity in the reorganized Company upon its emergence from chapter 11 (with the balance to be repaid in cash).  In order to foster a positive outcome and allow for negotiation of the exit financing transaction, Apollo, as the Debtors' majority DIP lender, also has extended deadlines and various milestones, waived events of default, and even extended the DIP maturity.  Apollo has not sought or received any fee or additional compensation in exchange for any of these waivers and extensions, and has cooperated with the Debtors and various stakeholders to address issues as they have been raised, including most recently agreeing to fund certain transactions on an interest-free basis in order to expedite the consummation of the Plan.  All of these actions underscore Apollo's good faith interest in the Debtors' ability to exit bankruptcy through consummation of the Plan and give credence to its grave concerns that further delays would be harmful and value-destructive to all of the Debtors' stakeholders.

4.       And Apollo is far from alone in its support of the Debtors' Plan.  Indeed, as set out more fully in the Confirmation Brief, the Plan was approved by *every* class of voting creditors, and enjoys the overwhelming support of the majority of the Debtors' other key constituents—including their secured and unsecured creditors and their existing shareholders—many of whom also have made significant concessions to ensure that the Plan is equitable and reasonable.  Further, many of these parties, including Apollo, have made every effort to consensually resolve the concerns raised in the Objections (which, in their present form, Apollo believes to be entirely unfounded).  Apollo believes that the Plan now before this Court represents a fair, equitable and readily implementable path for the Debtors to successfully reorganize and emerge from these Chapter 11 Cases, and to provide significant benefits to all of the Debtors' stakeholders.

5.      Despite Apollo's good faith engagement with the Debtors and other stakeholders throughout the restructuring process, the UCC argues that Apollo and other creditors engaged in so-called "impermissible cooperation" when they joined together, with the encouragement of the Debtors, to propose a Plan that all classes of creditors have now accepted.  (UCC Obj. ¶¶ 79–81.) This argument is baseless.

6.      A goal of chapter 11 proceedings is to promote negotiation among creditors with to produce a consensual plan.    "Congress intended that creditors have the opportunity to negotiate with debtors and amongst each other," and courts hesitate to interpret the Bankruptcy Code "in a way that chills or hamstrings the negotiation process that is at the heart of Chapter 11." *In re Indianapolis Downs, LLC*, 486 B.R. 286, 295, 297 (Bankr. D. Del. 2013); *see also In re L & V Realty Corp.*, 76 B.R. 35, 37 (Bankr. E.D.N.Y. 1987) ("At its simplest, a plan is an offer of promises made by a debtor and accepted by the creditors following serious and frequently protracted negotiations.").

7.      The current Plan is the beneficial result of good faith consensus-building negotiations.  By early November 2021, the Debtors had received proposals from two groups: Apollo and the UCC, and the Joint Bidders (including the Ad Hoc Group of Senior Noteholders and the BSPO Investors).  (*See* AMX_Apollo_00014723.)  On November 1, 2021, the Debtors asked each side for a "best and final proposal" (DEBTORS2009366, at -367) and each group submitted revised proposals on November 3 and 4, 2021 (*see id.* at -368; *see also* AMX-0009283 (revised Apollo-UCC proposal); UCC Obj. Exs O, W (Apollo and Joint Bidder proposals)).

8.      The Debtors concluded that both proposals contained deficiencies.  The Debtors' lead financial advisor, Homer Parkhill, testified that the Apollo-UCC proposal "wouldn't have the support of creditors"—including the Joint Bidders, who "expressly" told the Debtors they would

not support it.  (Parkhill 11/30/21 Dep. at 101:23–101:7.)  The Joint Bidders' proposal also had

problems, including confirmation risk.  (*Id.* at 113:3–6.)  In light of these issues, Apollo and the

Joint Bidders worked together and succeeded in developing a proposal that, as described in the

Disclosure Statement, "is executable, provides robust creditor recoveries and ensures the highest

likelihood of a timely exit from bankruptcy," and which was reached "[a]fter many tireless months

of tireless negotiations."  (DS at 92–93.)

9.       The UCC's "coordination" argument is based entirely on two cases, neither of them

remotely applicable here.  *Trap Rock* concerned an alleged secret agreement between two bidders

in a § 363 sale (undisclosed to the debtor and the bankruptcy court) which the court found, if true,

would represent improper "collusion" for purposes of § 363(n).  *See* 42 F.3d 747, 750-53 (2d Cir.

1994).  In *American Capital*, the Third Circuit *rejected* a contention made by insurers of asbestos

liabilities that the plan was "collusive," because the "insurers have not pointed to any evidence of

an agreement to defraud" them.  *Id.*  Here, there was no secret agreement, no violation of § 363

bidding procedures, and no one was defrauded.  Apollo and the Joint Bidders' combined proposal

led to a plan that was confirmable and produced broad consensus.  Tellingly, the UCC engaged in

the very sort of "coordination" it now criticizes when it made a joint proposal with Apollo.  And,

contrary to the UCC's claim that it was excluded from negotiations, its financial advisor conceded

that in October and November, the UCC was having discussions with both the Joint Bidders and

Apollo.  (*See* Ex. 5, Star 1/23/22 Dep. at 174:15–22, 175:12–18.)

10.      The UCC's complaint that the current Plan treats general unsecured creditors worse

than the Apollo-UCC proposal or Joint Bidder proposal did is no more availing.  (*See* UCC Obj.

¶ 79.)  ***Everyone*** (including Apollo and the Joint Bidders) had to accept less value than they wanted

to arrive at a Plan that is confirmable, executable, and a supermajority of the Debtors' unsecured

creditors have voted to accept it. In short, the UCC's "coordination" argument is meritless.

11.    For these reasons, Apollo respectfully requests that this Court overrule the Objections and confirm the Plan in substantially the form proposed.


Dated: January 24, 2022

/s/ *Richard J. Cooper*
CLEARY GOTTLIEB STEEN &
HAMILTON LLP
Richard J. Cooper
Luke A. Barefoot
Thomas S. Kessler
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Counsel to Apollo Management Holdings, L.P., on behalf of one or more affiliates and/or funds or separate accounts managed by it and its affiliates*

/s/ *Lewis R. Clayton*
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
Lewis R. Clayton
Jeffrey D. Saferstein
William A. Clareman
Jacob A. Adlerstein
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990